**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| Optim Energy, LLC, *et al.*, | Case No. 14-10262 (BLS) |
| Debtors.[1] | (Joint Administration Requested) |

**DECLARATION OF NICK RAHN,
CHIEF EXECUTIVE OFFICER OF OPTIM ENERGY, LLC,
IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

Pursuant to 28 U.S.C. § 1746, I, Nick Rahn, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1.      I am the Chief Executive Officer ("***CEO***") of Optim Energy, LLC ("***Optim Energy***"),[2] a Delaware limited liability company and one of the above-captioned debtors and debtors in possession (collectively, the "***Debtors***" or the "***Company***").  I serve as Optim Energy's CEO through my employment with Competitive Power Ventures, Inc. (the "***Asset Manager***" or "***CPV***"), and as the Authorized Representative who implements strategic and operational direction with respect to the other Debtors.[3]  I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

2.      On the date hereof (the "***Petition Date***"), Optim Energy and its direct and indirect subsidiaries filed voluntary petitions for relief under chapter 11 of title 11 of the United States

---

[1] The Debtors in these chapter 11 cases are: Optim Energy LLC; OEM 1, LLC; Optim Energy Cedar Bayou 4, LLC; Optim Energy Altura Cogen, LLC; Optim Energy Marketing, LLC; Optim Energy Generation, LLC; Optim Energy Twin Oaks GP, LLC; Optim Energy Twin Oaks, LP. The Debtors' main corporate and mailing address for purposes of these chapter 11 cases is: c/o Competitive Power Ventures, Inc., 8403 Colesville Road, Ste 915, Silver Spring, MD 20910.

[2] At the time of its formation, Optim Energy LLC was known as EnergyCo, LLC.

[3] CPV provides for executive management, contract administration, accounting, treasury, regulatory compliance and other services and specializes in the energy sector.  Further detail regarding CPV's relationship to the Debtors is described herein.

Bankruptcy Code (the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***").  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

3.      To minimize the chapter 11 cases' impact on business operations, the Debtors have filed motions and pleadings seeking various types of "first day" relief (collectively, the "***First Day Pleadings***").  The First Day Pleadings seek relief intended to allow the Debtors to perform and meet those obligations necessary to fulfill their duties as debtors in possession.  I am familiar with the contents of each First Day Pleading and believe that the relief sought in each First Day Pleading (a) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption, and loss of value to the Debtors' estates, (b) is critical to achieving a successful reorganization of the Debtors, and (c) best serves the Debtors' creditors' interests.  The description of the relief requested and the facts supporting each First Day Pleading are incorporated herein by reference and included in **Exhibit A** attached hereto.

4.      I submit this Declaration to provide an overview of the Debtors, their business, assets and liabilities, and the reasons for commencing these chapter 11 cases, as well as to support the Debtors' chapter 11 petitions and the First Day Pleadings.  Unless otherwise indicated herein, all facts set forth in this declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and the Debtors' advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' assets, liabilities, operations and financial condition.  I am authorized to

submit this declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## I.   INTRODUCTION

5.      The Debtors are power plant owners principally engaged in the production of energy in Texas's deregulated energy market.  As described in more detail below, the Debtors own and operate three power plants in eastern Texas.  Two of the plants are fueled by natural gas, and the third is coal-fired.  The current depressed economic environment of the electric power industry—particularly with respect to coal-fired plants—and the Debtors' liquidity constraints have resulted in continuing losses that, simply put, have left the Debtors without alternatives.  After struggling against the downturn in the Texas power markets in recent years, aggressively managing costs, and engaging in a comprehensive effort to explore strategic alternatives to mitigate systemic operating losses, the Debtors filed these chapter 11 cases with the goal of reorganizing, including the restructuring of the Debtors' obligations and pursuing strategic alternatives that will maximize the value of their power producing assets.

## II.   OVERVIEW OF THE DEBTORS

### A.   The Debtors' Formation and Current Business

6.      On January 8, 2007, PNM Resources, Inc. ("**PNMR**"), and Cascade Investment, L.L.C. ("**Cascade**") through its wholly-owned subsidiary, ECJV Holdings, LLC ("**ECJV**") formed Optim Energy as a limited liability company organized under the laws of Delaware.  The focus of PNMR, an energy holding company that provides electricity through its subsidiaries to areas in New Mexico and Texas, and Cascade was to enter the deregulated Texas electricity markets by acquiring or constructing merchant power plants to sell electricity to the public through the Electric Reliability Council of Texas ("**ERCOT**").  To form Optim Energy, PNMR

contributed the "Twin Oaks Plant" located in Robertson County, Texas, and Cascade contributed capital.

7.      Shortly after Optim Energy's formation, the company entered into a Credit Agreement ("***Credit Agreement***") with Wells Fargo Bank, National Association ("***Wells Fargo***") under which, and at which time, Optim Energy could borrow up to $1 billion (the "***Pre-Petition Facility***").  The Debtors' bank accounts are held with Wells Fargo in New Mexico and have been pledged to Cascade, in its capacity as collateral agent, for the benefit of Cascade and ECJV in connection with the Reimbursement Agreement (as defined below).  Borrowings under the Credit Agreement were used to, among other things, acquire the Debtors' "Altura Cogen Plant" in 2007 and fund the Debtors' investment in the construction of the "Cedar Bayou Plant" in 2008.

8.      The Debtors own and operate, in whole or in part, three power plants:  the Twin Oaks Plant, the Altura Cogen Plant and the Cedar Bayou Plant (collectively, the "***Power Plants***").  The Debtors sell the electricity generated by the Power Plants directly into the Texas energy market, on a wholesale basis.  Debtor Altura Cogen (defined below) also sells steam, and a portion of its electrical energy and capacity through an output contract.  The Debtors' sale of electrical energy and steam output, for the year 2013, generated approximately $236 million in revenues, in the aggregate.

9.      In 2008, the price of wholesale electricity plummeted.  As an unregulated power producer earning revenues from the energy market, the Debtors were exposed to significant risk when those prices declined substantially.  Sustained declining electricity prices (driven largely by a steady decrease in natural gas prices) carried the risk of rendering the Debtors unable to satisfy operating expenses and other obligations, including the ability to provide working capital in seasons such as winter when the Debtors generally experience lower revenues.

10.     As a result of these adverse market conditions, in September 2011, PNMR, ECJV and Cascade entered into agreements whereby Optim Energy was restructured such that PNMR's ownership in Optim Energy was reduced from 50% to 1% (with PNMR's remaining 1% ownership interest acquired by ECJV in January 2012).  In preparation for, and in conjunction with, this restructuring, the Debtors exhausted various cost reduction and stabilization strategies and ultimately laid off over 50 employees to enable the transition of the operations and management of the Debtors' plants to contractors NAES Corporation ("**NAES**") and CPV.

11.     This transition ultimately resulted in approximately $15 million in annual savings, in the aggregate, among the three power plants.  Unfortunately, the reduction in force and other cost-saving initiatives were insufficient to eliminate the recurring operating losses and required capital expenditures that strained liquidity and ultimately forced the Debtors to commence these chapter 11 cases.

12.     The Debtors' day-to-day management and operations are outsourced to third-party contractors and, therefore, the Debtors have no employees.  On September 22, 2011, the Debtors entered into the O&M Services Agreement with NAES for the Twin Oaks Plant and the O&M Services Agreement with NAES for the Altura Cogen Plant, respectively (each as amended and restated, and collectively, the "**NAES Agreements**").  Under the terms of the NAES Agreements, NAES, which is based out of Washington, employs plant personnel and is responsible for operating and maintaining the Twin Oaks Plant and the Altura Cogen Plant.[4]   The responsibilities of NAES include general operational and maintenance services such as permitting, providing and training personnel, procuring supplies and inventory, and coordinating operations and maintenance with CPV.

---

[4]   As discussed below, the Cedar Bayou Plant is operated by NRG Texas Power LLC.

13.     On October 31, 2011, Optim Energy entered into the Asset Management Agreement with CPV, pursuant to which CPV manages the Debtors' operations and finances. These responsibilities include executive management, contract administration, accounting, treasury, regulatory compliance and other services.  CPV is headquartered in Maryland, where the Debtors' financial records are located, and is supervised by Optim Energy's Board of Directors (the "*Optim Board*").

### B.     The Debtors' Power Plants

14.     <u>The Twin Oaks Plant:</u>  The Twin Oaks Plant is a coal-fired electric power generating facility capable of producing 305 megawatts.  The plant is owned by Debtor Optim Energy Twin Oaks, LP ("*Twin Oaks*") and is located in Robertson County, Texas, and sells energy into the ERCOT market.  Twin Oaks owns both the plant and underlying real property. Twin Oaks purchases the vast majority of its coal to operate the plant from Walnut Creek Mining Company ("*Walnut Creek*"), pursuant to a long term fuel supply agreement executed in 1987 (as amended, the "*FSA*").  Under the FSA, Twin Oaks must purchase in excess of approximately 90% of its coal from Walnut Creek and is required to purchase minimum coal quantities regardless of the Twin Oaks Plant's actual coal needs.  Pursuant to the terms of the FSA, Twin Oaks is obligated to purchase coal from Walnut Creek to operate the Twin Oaks Plant for at least another ten years.

15.     <u>The Altura Cogen Plant:</u>  The Altura Cogen Plant is a natural-gas powered plant capable of producing 600 megawatts located in Harris County, Texas and sells the majority of its energy in the ERCOT market.  The plant is owned by Debtor Optim Energy Altura Cogen, LLC ("*Altura Cogen*").  The Altura Cogen Plant has been commercially operating since 1985 and  is located within a complex of petrochemical facilities owned by Lyondell Chemical Company ("*Lyondell*").  Altura Cogen leases the property at which the power plant is situated from

Lyondell pursuant to the Lease and Easement Agreement dated September 6, 2005 (as amended, the "*Altura Lease*").  Altura Cogen purchases the natural gas to fuel the plant from EDF Trading North America, LLC ("*EDF*") pursuant to fuel purchase agreements, which typically expire every few years, at which time the Debtors must enter into a new agreements to supply the Altura Cogen Plant.  The current natural gas supply contract with EDF expires on March 31, 2014 and will need to be replaced.

16.     The energy generated by the Twin Oaks Plant and the Altura Cogen Plant is sold on a short-term basis into the ERCOT market pursuant to an energy management agreement between Optim Marketing (defined below) and EDF, dated as of November 1, 2011.  EDF provides power management services, including scheduling, bidding, and dispatching—in coordination with NAES—the power produced by the Twin Oaks Plant and Altura Cogen Plant. EDF also provides fuel management services, including procuring fuel for Altura Cogen, and EDF assists the Debtors with risk management, all of which is supervised by CPV.  Lyondell purchases a portion of the power generated at the Altura Cogen Plant, as well as the steam produced from power production operations.  The terms of the sale of steam and power to Lyondell are governed by a Steam and Electric Power Sales Agreement (as amended, the "*SEPSA*").  A letter of credit in the amount of $40 million has been issued under the Credit Agreement for the benefit of Lyondell in connection with the Debtors' obligations under the SEPSA, which expires on May 31, 2014.

17.     <u>The Cedar Bayou Plant:</u>  The Cedar Bayou Plant is a natural-gas powered plant capable of producing 550 megawatts located in Chambers County, Texas and operates in ERCOT's Houston Zone.  Debtor Optim Energy Cedar Bayou 4, LLC ("*Cedar Bayou*") owns a 50% undivided interest in the Cedar Bayou Plant and NRG Cedar Bayou Development

Company, LLC ("**NRG Cedar Bayou**") owns the remaining 50% undivided interest.  The Cedar Bayou Plant began operating in 2009.  The Cedar Bayou Plant is located within a complex of electric generation facilities owned by NRG Texas Power LLC ("**NRG Texas**"), which owns the real property upon which the Cedar Bayou Plant is situated.  The Cedar Bayou Plant is operated by NRG Cedar Bayou in accordance with a Joint Ownership Agreement (as amended and restated), dated August 1, 2007 between Cedar Bayou and NRG Cedar Bayou.  The energy generated by the Cedar Bayou Plant is sold on behalf of Cedar Bayou and NRG Texas as joint owners on a short-term basis into the Texas power market through a scheduling and dispatch agreement with NRG Texas.  Cedar Bayou purchases its share of the natural gas to fuel the plant pursuant to short term (typically periods of three months) fuel purchase agreements with NRG Power Marketing LLC ("**NRGPM**").  The current fuel purchase agreement expires on March 31, 2014, at which time the Debtors will need to enter into a new fuel purchase agreement to supply the Cedar Bayou Plant.    A letter of credit in the amount of $1 million has been issued under the Credit Agreement for the benefit of NRGPM in connection with the Debtors' obligations under the fuel purchase agreements for the Cedar Bayou Plant, which expires on May 31, 2014.

**C.    The Debtors' Organizational Structure**

18.    As indicated on the organizational chart below, the Debtors are wholly owned-subsidiaries of Cascade.  Cascade and ECJV are the ultimate parent companies of the Debtors.  Neither Cascade nor ECJV are debtors in these chapter 11 cases.



19.     Optim Energy is a holding company and Delaware limited liability company that directly or indirectly owns 100% of the outstanding equity interests of the other Debtors.

20.     Optim Energy Generation, LLC ("*Optim Generation*") is a holding company and Delaware limited liability company that indirectly owns the Twin Oaks Plant.    Specifically,

Optim Energy Twin Oaks GP, LLC ("**Optim Twin Oaks GP**"), owns the general partnership interest in Twin Oaks and Optim Generation wholly owns the limited partnership interest in Twin Oaks.  Twin Oaks, a limited partnership organized under the laws of Texas, owns the Twin Oaks Plant.

21.    Additionally, Optim Generation owns all of the equity interests in:

- Altura Cogen, a Delaware limited liability company, which owns the Altura Cogen Plant; and

- Cedar Bayou, a Delaware limited liability company, which owns an undivided 50% interest in the Cedar Bayou Plant.

22.    In sum, Twin Oaks, Altura Cogen and Cedar Bayou are the principal operating entities of the Debtor group as they are in direct ownership of the operating plants.

23.    Optim Energy initially created Debtor Optim Energy Marketing, LLC ("**Optim Marketing**") to sell the energy output of the Twin Oaks Plant and the Altura Cogen Plant to third parties.  Optim Marketing owns 100% of the outstanding equity interests of OEM 1, LLC ("**OEM**"), which previously performed operations incidental to scheduling and dispatching power produced by the Twin Oaks Plant and the Altura Cogen Plant.  While the services provided by Optim Marketing and OEM became obsolete when the Debtors engaged EDF to provide power management services, Optim Marketing continues to serve as the contractual counterparty for the energy management agreement with EDF.

**D.    Summary of Prepetition Indebtedness**

24.    Optim Energy, as borrower, and Wells Fargo, as lender, are parties to the Credit Agreement dated June 1, 2007, which provided for up to $1 billion of credit consisting of a revolving loan facility and a letter of credit facility.  The proceeds from borrowings under the revolving loan facility of the Credit Agreement were used, together with PNMR's contribution of the Twin Oaks Plant and Cascade's equity capital contribution, to fund the acquisitions of the

Altura Cogen Plant, the development and construction of the Cedar Bayou Plant and the general operations of the Debtors.

25.    As of the Petition Date, the aggregate principal amount of loans outstanding under the Credit Agreement was approximately $712 million and the face amount of issued and outstanding undrawn letters of credit is approximately $41 million, plus accrued, but unpaid, interest, fees and other amounts.  The Credit Agreement has a maturity date of June 1, 2015.

26.    Optim Energy's obligations under the Credit Agreement are guaranteed by each of Cascade and ECJV (together, the "***Guarantors***") under the Continuing Guaranty issued by Cascade and the Continuing Guaranty issued by ECJV, respectively, each dated as of June 1, 2007 (as amended, the "***Guarantees***"), for the benefit of Wells Fargo in respect of amounts owed by Optim Energy under the Credit Agreement.  The Debtors are obligated to reimburse the Guarantors for any payments made to Wells Fargo under the Guarantees pursuant to a Guaranty Reimbursement Agreement, dated June 1, 2007 (as amended, the "***Reimbursement Agreement***"). The Debtors' obligations under the Reimbursement Agreement are secured by (a) a senior lien on, and first priority interest in, substantially all of the Debtors' assets and (b) pledges of all of the shares of equity interests in all of Optim Energy's subsidiaries (the "***Prepetition Collateral***"). Additionally, Cascade, ECJV, Wells Fargo and all the Debtors entered into a Subordination Agreement, dated June 1, 2007, under which Cascade and ECJV, in their capacities as Guarantors under the Guarantees, agreed to subordinate all of the Guarantors' claims against the Debtors (including any amounts owed to any Guarantor under the Reimbursement Agreement) to all of the claims of Wells Fargo against the Debtors and the Guarantors (including any amounts owed to Wells Fargo under the Credit Agreement and the Guarantees) until such claims of Wells Fargo are paid in full.

27.     Pursuant to the Reimbursement Agreement, the Debtors were required to pay Cascade a guarantee fee of $1.934 million on December 31, 2013.  To preserve liquidity, the Debtors withheld this payment and on December 30, 2013, entered into a Forbearance Agreement by which Cascade and ECJV agreed, subject to certain conditions, to forbear from exercising any remedies as a result of such nonpayment until February 14, 2014.  As a result of Cascade's payment in full of the outstanding indebtedness under the Pre-Petition Facility (including delivery of cash collateral in respect of outstanding letters of credit) to Wells Fargo in accordance with the Guarantee on the Petition Date, the aggregate amount of the Debtors' outstanding obligations under the Reimbursement Agreement is approximately $713 million, which includes all accrued and unpaid interest and reasonable out-of-pocket charges and expenses incurred in connection with the Guarantees as of the Petition Date.

### III.     CIRCUMSTANCES LEADING TO COMMENCEMENT OF CHAPTER 11 CASES

28.     A changing marketplace and challenging circumstances have severely constrained the Debtors' liquidity and made it impossible for the Debtors to fund continuing business losses, refinance their debt, or access additional borrowed money, ultimately compelling the need to file these chapter 11 cases.  As discussed in more detail  above, the Debtors carried approximately $713 million of outstanding principal indebtedness related to the Credit Agreement and, due to the failure to meet certain financial covenants contained therein, the Debtors were unable to continue to borrow additional funds before the Petition Date without the consent of Cascade, who was unwilling to permit further borrowing under the Pre-Petition Facility under the circumstances.  However, as discussed more below, Cascade and ECJV have agreed, subject to certain terms and conditions, to provide debtor-in-possession financing and to permit the use of cash collateral to fund the Debtors' operations and restructuring in these chapter 11 cases.

**A.    Market Pressures and Declining Revenues Impaired the Debtors' Ability to Fund Business Operations.**

29.    Optim Energy's acquisition of the Twin Oaks Plant and Altura Cogen Plant and its investment to develop and construct the Cedar Bayou Plant occurred in 2007, one year before the 2008 economic downturn that plagued the energy industry, power markets and economy as a whole.   Over the ensuing years, sustained lower electricity prices, primarily driven by plummeting natural gas prices, have proved to be a substantial challenge to the Debtors' power generation assets.   The price of natural gas, which is closely tied to the price of electricity in much of the U.S. (including the ERCOT market where the Debtors' Power Plants are located), has fallen from about $8.50 per MMBtu in 2008 to under $3.90 per MMBtu as of December 2013 (a decline of approximately 54%).



30.    In large part, as a result of the drop in natural gas prices, ERCOT market power prices have fallen correspondingly from about $63.24 per MWh in 2008 to under $38.00 per MWh as of December 2013 (a decline of approximately 40%).   Consequently, the Debtors have

been left with a significant debt load that could not be serviced or repaid due to persistent recent operating losses, which are magnified by seasonal fluctuations in the Debtors' revenue with decreased revenues generally recorded in the winter months.

**B.    The Cost of Coal to Fuel the Twin Oaks Plant Has Exacerbated Operating Losses**

31.    The impact of depressed power prices is particularly acute with respect to the Twin Oaks Plant.  Twin Oaks is obligated under the FSA to purchase almost all of its coal requirements from Walnut Creek.  The terms of the FSA provide for escalating prices for coal purchased from Walnut Creek overtime without any adjustment for declining power prices. Over the last two years, this dynamic has generated average annual operating losses of approximately $11.5 million attributable to the Twin Oaks Plant.  The material cash flow drain required to sustain the Twin Oaks Plant, when combined with the systemic decrease in power prices, has materially impaired the Debtors' ability to service their debts and perform their obligations.  The Debtors intend to explore all strategic alternatives to address the Twin Oaks Plant operating losses during these chapter 11 cases, including a potential sale pursuant to section 363 of the Bankruptcy Code.

## IV.    PREPETITION RESTRUCTURING EFFORTS

**A.    The Debtors Initiated Discussions with Walnut Creek and Wells Fargo**

32.    Recognizing that recurring operating losses were likely to impair liquidity and the ability to refinance the Credit Agreement, in early 2013, the Debtors began to evaluate their strategic options, including the need for a potential restructuring.  To assist with the process, the Debtors initially retained Bracewell & Giuliani LLP to advise on restructuring negotiations and strategies. The Debtors later engaged Protiviti Inc. as their restructuring advisor and Barclays Capital, Inc. ("**Barclays**") as their financial adviser.

33.    Ultimately, the Debtors, in consultation with their advisors, concluded that an out-of-court solution was not attainable.  With respect to the Debtors' balance sheet, without available financing, the Debtors' operating losses impaired their liquidity to the point that the Debtors could not continue to satisfy their obligations in the ordinary course of business.  During the course of 2013 and 2014, the Debtors sought to address the operating losses at the Twin Oaks Plant through negotiations with Walnut Creek to amend the FSA.  In furtherance of those discussions, on January 30, 2014, the Debtors and Walnut Creek entered into a Forbearance Agreement whereby Walnut Creek agreed to forego exercising remedies until February 14, 2014 (subject to the Debtors' non-default and the applicable cure period related thereto).  But despite significant efforts, the parties were unable to agree upon an ultimate amendment to the Debtors' long term coal purchase obligations under the FSA.

34.    While attempting to agree on an amendment to the FSA with Walnut Creek, the Debtors' managers and their advisors worked closely with Barclays to analyze the Debtors' cash needs to determine how much additional liquidity was necessary to support a chapter 11 restructuring.  Barclays considered, among other things, costs that enable the continued maintenance and operation of the Debtors' Power Plants and demand for the Debtors' energy output.  In taking into account cash receipts and disbursements, the forecast considers the impact of the chapter 11 filing on operations, including fees and interest expense associated with debtor-in-possession financing, professional fees and required vendor payments.

35.    The Debtors' managers and Barclays contemplated the use of cash on hand without additional financing to fund operations during these chapter 11 cases.  Based on the Debtors' financial projections and liquidity constraints, the Debtors concluded that cash on hand alone would be insufficient to fund the Debtors' operations and business plan throughout the

pendency of these chapter 11 cases.  Thus, to provide the Debtors with adequate and necessary financing, obtaining debtor-in-possession financing ("***DIP Financing***") became critical.

36.    Because Cascade and ECJV had first priority liens on virtually all of the Debtors' assets, the Debtors, through their independent directors, requested Cascade to provide a DIP Financing Proposal in December 2013.  Cascade and ECJV objected to any third party DIP Financing that would prime their existing liens and submitted their own DIP Financing proposal.

37.    The Debtors and Cascade/ECJV, represented by separate advisors, engaged in significant good faith and arms-length negotiations that ultimately produced the DIP Financing that is proposed in the DIP Motion (as defined in **Exhibit A** attached hereto).  The Debtors' managers, Optim's independent directors and the Debtors' advisors concluded that debtor-in-possession financing provided by Cascade was the Debtors' best alternative.

38.    As further described in the DIP Motion, despite Barclays' efforts to obtain DIP Financing from alternative lending sources, no other party expressed an interest in providing DIP Financing to the Debtors.   I believe that Cascade's proposal is in the best interests of the Debtors' estates and creditors.  The DIP Financing ultimately secured by the Debtors on a fully-committed basis provides $115 million in additional liquidity, which includes letter of credit sub-facilities that enable the Debtors to replace existing letters of credit and continue hedging their safe-harbored energy contracts.   Additionally, the proposed DIP Financing provides adequate protection on account of Cascade and ECJV's security interests under the Guarantees and Reimbursement Agreement and allows for the continued use of cash collateral.  I believe that this financing provided by Cascade will preserve the Debtors' businesses and liquidity.   But, importantly, I believe it will enhance the value of the Debtors' businesses as it provides the Debtors with time to maximize the benefits of these chapter 11 cases.

39.    In sum, the Debtors commenced these chapter 11 cases to preserve value for the Debtors' estates and stakeholders and provide a platform to address the Debtors' financial obligations and operating challenges.

[*Remainder of Page Intentionally Left Blank*]

Wilmington, Delaware                        /s/ *Nick Rahn*
Dated:  February 12, 2014                   _____
                                            Nick Rahn
                                            Chief Executive Officer
                                            Optim Energy, LLC