## Exhibit A

**Facts In Support of "First Day" Pleadings**

## FACTUAL BACKGROUND IN SUPPORT
## OF THE DEBTORS' FIRST DAY MOTIONS

### Introduction

1.      As explained in my declaration, the Debtors have requested a variety of relief in various "first day" motions and applications (each, a "***First Day Motion***" and, collectively, the "***First Day Motions***")[1] to minimize the adverse effects of the commencement of these chapter 11 cases on their businesses and to ensure that their restructuring goals can be implemented with limited disruption to operations.  It is critically important for the Debtors to maintain the loyalty and goodwill of, among other constituencies, their vendors, employees and customers.

2.      I have reviewed each of the First Day Motions or had their contents explained to me.  The facts stated in each First Day Motion and described below are true and correct to the best of my information and belief, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully restructuring the Debtors' business.

3.      Several of the First Day Motions request authority to pay certain prepetition claims.  I understand that rule 6003 of the Federal Rules of Bankruptcy Procedures provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, and as set forth below, the Debtors have specified their requests for immediate authority to pay certain prepetition claims to

---

[1]  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the relevant First Day Motion.

those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.

**Administrative Motions**

**A.     Debtors' Motion for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases (the "*Joint Administration Motion*")**

4.     The Debtors request entry of an order directing joint administration of these chapter 11 cases for procedural purposes only.  Specifically, the Debtors request that the Court maintain one file and one docket for all of the chapter 11 cases under the case of Optim Energy, LLC.  Further, the Debtors request that entry be made on the docket of each of the Debtors' chapter 11 cases, other than Optim Energy, LLC, to reflect the joint administration of the chapter 11 cases.

5.     Given the integrated nature of the Debtors' operations, I believe that joint administration will provide significant administrative convenience without harming the substantive rights of any party in interest.  Optim Energy, LLC is the direct or indirect parent of each of the other seven Debtors.  As a result, each of the other seven Debtors is an "affiliate" of Optim Energy, LLC as such term is defined in the Bankruptcy Code.  Additionally, because of the Debtors' interrelated businesses, each of the motions filed in the chapter 11 cases will implicate many, if not all, of the Debtors.  Joint administration will also reduce fees and costs by avoiding duplicative filings and objections and will allow the U.S. Trustee and all parties in interest to easily monitor thee chapter 11 cases.

6.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption.  Accordingly, on

behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

**B.      Debtors' Application for Entry of an Order Pursuant to 28 U.S.C. § 156(c) Authorizing the Employment and Retention of Prime Clerk LLC as Claims and Noticing Agent, *Nunc Pro Tunc* to the Petition Date (the "*Prime Clerk Retention Application*")**

7.      The Debtors request entry of an order (a) authorizing the employment and retention of Prime Clerk LLC ("***Prime Clerk***") to perform certain claims and noticing functions in these chapter 11 cases pursuant to the terms and conditions set forth in the engagement agreement between the Debtors and Prime Clerk dated as of January 17, 2014 (the "***Engagement Agreement***") and (b) approving the terms of Prime Clerk's employment and the indemnification provisions set forth in the Engagement Agreement, *nunc pro tunc* to the Petition Date.

8.      The Debtors believe that they have at least a few hundred creditors and parties-in-interest that must be given notice of developments related to these chapter 11 cases.  With such a significant number of parties involved in these chapter 11 cases, it is likely that heavy administrative burdens will be imposed upon the Court and the Clerk of the United States Bankruptcy Court for the District of Delaware (the "***Clerk's Office***").

9.      Prime Clerk is a claims administration firm that specializes in chapter 11 administration, consulting and analysis, including noticing, claims processing, voting and other tasks in the effective administration of chapter 11 cases.  Prime Clerk has developed efficient and cost-effective methods to handle the voluminous mailings associated with chapter 11 noticing and claims processing that ensure the orderly and fair treatment of creditors, interest holders and all parties in interest.

10.      I believe that engaging Prime Clerk as an independent, third-party notice and claims agent to effectively and efficiently serve notice upon all creditors and other relevant

constituencies in these chapter 11 cases, as well as transmit, receive, docket and maintain all proofs of claim and proofs of interest filed in these chapter 11 cases will relieve the Clerk's Office of these burdens and comply with the Local Rules.  Further, I believe that such assistance will expedite service of notices, streamline the claims administration process and enable the Debtors to focus on their reorganization efforts.

11.    I believe that the relief requested in this application is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors and their professionals to focus on key aspects of the Debtors' reorganization efforts.  Accordingly, on behalf of the Debtors, I respectfully submit that the Prime Clerk Retention Application should be approved.

**C.     Debtors' Motion for Entry of an Order Authorizing the Debtors to (I) File (A) a Consolidated List of Creditors and (B) a Consolidated List of Debtors' Top Thirty General Unsecured Creditors and (II) Provide Notices of Commencement of Cases and Section 341 Meeting (the "*Creditor Matrix Motion*")**

12.    The Debtors request entry of an order authorizing the Debtors to (i) file (a) a consolidated list of creditors, and (b) a consolidated list of the Debtors' thirty (30) largest general unsecured creditors; and (ii) complete all mailings of notices, including notices of the commencement of these cases and of the meeting of creditors required by section 341 of the Bankruptcy Code; and granting them such other and further relief as the Court deems just and proper.

13.    The Debtors have identified at least a few hundred entities and individuals to which notice of certain events or requests for relief in these chapter 11 cases must be provided. The Debtors anticipate that such notice of events will include, without limitation, notice of: (a) the filing of the Debtors' voluntary petitions under chapter 11 of the Bankruptcy Code; (b) the initial meeting of the Debtors' creditors in accordance with section 341 of the Bankruptcy Code;

(c) applicable bar dates for the filing of claims; (d) the hearing on adequacy of a disclosure statement in respect of a plan of reorganization; and (e) the hearing to confirm a plan of reorganization (collectively, the "***Notices***").

14.     Local Rule 1007-2 provides that in a voluntary chapter 11 case, the debtor must file "a list containing the name and complete address of each creditor in such format as directed by the Clerk's Office Procedures."  The Debtors presently maintain various computerized lists of the names and addresses of their respective creditors that are entitled to receive the Notices and other documents in these chapter 11 cases.  The Debtors believe that the information, as maintained in computer files (or those of their agents), may be consolidated and utilized efficiently to provide interested parties with the Notices and other similar documents, as contemplated by Local Rule 1007-2.  Accordingly, by this Motion, the Debtors seek authority to file the lists on a consolidated basis, identifying their creditors and equity security holders in the format or formats currently maintained or developed in the ordinary course of the Debtors' businesses, which the debtors believe will be sufficient to permit the Agent to notice promptly all applicable parties as required by Local Rule 1007-2.

15.     Pursuant to Bankruptcy Rule 1007(d), a chapter 11 debtor must file with its voluntary petition a list setting forth the names, addresses and claim amounts of the creditors— excluding insiders—that hold the twenty (20) largest unsecured claims in the debtor's case, primarily used by the United States Trustee to evaluate the types and amounts of unsecured claims against the debtor and thus identify potential candidates to serve on an official committee of unsecured creditors appointed in the debtor's case pursuant to section 1102 of the Bankruptcy Code.

16.    The Debtors submit that a single consolidated list of their combined thirty (30) largest general unsecured creditors in these cases would be more reflective of the body of unsecured creditors that have the greatest stake in these cases than separate lists for each of the Debtors and that any marginal benefit to preparing individual creditor lists for each of the eight Debtors is far outweighed by its burden and expense.

17.    In lieu of effecting service through the Office of the Clerk of this Court, the Debtors also request that they (or the Agent) be approved and authorized to complete all mailings to creditors and equity holders in these cases, including notice of the commencement of these cases and notice of the meeting of creditors, pursuant to section 341 of the Bankruptcy Code.    Allowing the Debtors (or their Agent) to complete their own mailings will save significant time, cost and expense.

18.    I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption.    Accordingly, on behalf of the Debtors, I respectfully submit that the Creditor Matrix Motion should be approved

**Operational Motions**

**A.    Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Continue to Operate Their Cash Management System; (B) Authorizing the Debtors to Maintain Existing Business Forms; and (C) Granting Administrative Priority to Intercompany Claims and Authorizing the Debtors to Perform Under Certain Intercompany Arrangements and Historical Practices Among Debtors (the "*Cash Management Motion*")**

19.    The Debtors utilize a cash management system that provides well-established and efficient mechanisms for the collection, concentration, management and disbursement of funds used in their operations (the "***Cash Management System***").    The Debtors use the Cash Management System to (a) collect, transfer and disburse funds from operations and (b) facilitate

cash monitoring, forecasting and reporting.  The Cash Management System, among other things, enables the Debtors to maintain control over their bank accounts (collectively, the "***Bank Accounts***"), all of which are located at Wells Fargo.

20.     Pursuant to the Cash Management Motion, the Debtors request entry of Interim and Final orders (a) authorizing the Debtors to continue to utilize their prepetition Cash Management System, including by authorizing Wells Fargo to honor certain transfers and charge certain fees and other amounts, (b) authorizing the Debtors to maintain and continue using the Debtors' existing business forms, (c) waiving the requirements of section 345(b) of the Bankruptcy Code, (d) granting administrative priority to intercompany claims and authorizing the Debtors to continue to perform under certain intercompany arrangements consistent with historical practices among the Debtors, and (e) scheduling a Final Hearing to consider entry of the Final Order, to the extent necessary.  In connection with this relief, the Debtors respectfully request a waiver of certain of the operating guidelines established by the Office of the United States Trustee that require the Debtors to close all prepetition bank accounts, open new accounts designated as debtor in possession accounts and obtain new checks bearing a "debtor-in possession" legend.

21.     Pursuant to the Cash Management Motion, the Debtors further request that the Court authorize Wells Fargo to (a) continue to maintain, service and administer the Bank Accounts, as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business; (b) receive, process, honor and pay any and all checks, ACH and other instructions, and drafts payable through, drawn or directed on such Bank Accounts after the Petition Date by holders, makers or other parties entitled to issue instructions with respect thereto; provided, however, that any check, draft or other notification that the Debtors advised

-7-

Wells Fargo to have been drawn, issued or otherwise presented before the Petition Date may be honored by Wells Fargo only to the extent authorized by order of the Court; and (c) debit the Bank Accounts in the ordinary course of business on account of (i) checks or electronic funds transfers drawn on the Bank Accounts that are presented for payment at Wells Fargo or exchanged for cashier's checks before the Petition Date, (ii) checks or other items deposited in the Bank Accounts before the Petition Date that have been dishonored or returned unpaid for any reason (including any associated fees and costs) to the same extent the Debtors were responsible for such items before the Petition Date, and (iii) undisputed, outstanding service charges owed to Wells Fargo as of the Petition Date on account of the maintenance of the Debtors' Cash Management System, if any.

22.     The Cash Management System consists of six (6) Bank Accounts, all of which are held at Wells Fargo:

a.     *Optim Depository Account.*  Optim Energy maintains an interest-bearing Depository Account at Wells Fargo.  The Optim Depository Account is used to collect funds generated by customers—cash and check receipts, and wire transfers.  Miscellaneous cash receipts are also collected directly in the Optim Depository Account.  Subsequent to manual authorization by CPV personnel, funds in the Optim Depository Account are transferred bi-weekly via electronic transfer into the respective Debtors' Disbursement Accounts.  The Optim Depository Account generally maintains a balance below $50,000.  Any monies held in this account that are not used in the first instance to fund subsidiary expenses are invested in treasury notes, as described in subsection (d) below.

b.     *Optim Disbursement Account.*  Optim Energy maintains a Disbursement Account at Wells Fargo.  Funds from the Optim Disbursement Account are transferred manually by CPV on an as-needed basis to fund all of the Debtors' general and administrative expenses, including corporate and operational insurance policies as well the Debtors' expenses related to asset management services.  Wells Fargo interest and banking fees are automatically debited by Wells Fargo from the Optim Disbursement Account.

c.     *Operating Debtors' Disbursement Accounts.*  Optim Energy Altura Cogen, LLC; Optim Energy Twin Oaks, LP; and Optim Energy Cedar Bayou 4,

LLC each maintains a Disbursement Account at Wells Fargo.  Funds from the Optim Depository Account are manually transferred directly into the Operating Debtors' Disbursement Accounts on a bi-weekly basis, and on an as-needed basis to fund operating expenses, including vendor payments and taxes for the relevant Debtor.

d.    *Investment Account.*   Optim Energy maintains one interest-bearing Investment Account—the "T-Note Stage Coach Sweep" Account—to which the leftover balance of funds from the Optim Depository Account are held.  Funds in the Investment Account are intended to be invested in government-backed, safe and prudent investments.

23.    Optim Energy collects revenue on behalf of the Debtors, and CPV, in turn, authorizes distributions to the relevant Debtors on a bi-monthly basis.  The seamless account controls afforded by the Cash Management System are essential for the continuation of the Debtors' operations given the significant volume of cash transactions managed through the Cash Management System.  To streamline the process for revenue intake and to account properly for revenues in real time, Optim Energy collects revenue on behalf of the other Debtors and subsequently reimburses the other Debtors for their expenses.  As a result of these Intercompany Transactions, a receivable is recorded on the applicable Debtor's balance sheet, and a corresponding liability is posted on the balance sheet of the Debtor that received revenues from which reimbursements are still owed, all of which serves as the basis for the accrual of Intercompany Claims.

24.    In the ordinary course of business, Optim Energy, on average, collects approximately $12.6 million and makes aggregate monthly payments of approximately $9.4 million to the other Debtors to cover expenses as they come due.  To ensure that none of the Debtors will permanently fund the operations of any other Debtors, the Debtors respectfully request that, pursuant to sections 364(b), 503(b)(1) and 507(a)(2) of the Bankruptcy Code, all Intercompany Claims against a Debtor by another Debtor relating to the postpetition period be accorded administrative expense priority.   If such Postpetition Intercompany Claims are

accorded administrative expense priority, the appropriate Debtor will continue to bear the ultimate repayment responsibility for its respective ordinary course transaction.

25.     In the ordinary course of business, the Debtors conduct transactions by debit, wire or ACH and other similar methods.  In addition, a large percentage of the Debtors' customer payments are received through ACH or wire transfer.  Moreover, the Debtors are required by certain federal and state taxing authorities to submit tax payments electronically through wire or ACH, and failure to do so results in the imposition of penalties.

26.     Additionally, in the ordinary course, Wells Fargo (as well as certain credit card processors) charges, and the Debtors pay, honor or allow the deduction from the appropriate account, certain service charges and other fees, costs and expenses.

27.     Absent authority enabling the Debtors to continue to operate their Cash Management System, I believe the Debtors' financial managers would be severely distracted rebuilding a workable cash management system, and the Debtors would be unable to effectively maintain their financial operations, particularly at a time when their focus must be on the restructuring.  This would severely harm the Debtors' business and cause significant harm to the Debtors, their estates, creditors and all parties in interest.

28.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

**B.** **Debtors' Motion for Entry of an Order (A) Authorizing But Not Directing Payment of Prepetition Claims of Certain Critical Vendors and Lien Claimants and (B) Authorizing Procedures Related Thereto (the "*Critical Trade Vendors Motion*")**

29.     Debtors seek entry of Interim and Final orders (a) authorizing, but not directing, the Debtors to pay (a) the prepetition claims of Critical Vendors in an amount not to exceed $450,000 during the interim period, and an aggregate amount not to exceed  $750,000, on the terms described herein, and (b) possessory Lien Claimants in an amount not to exceed $150,000, all of which is expected to come due within the first 21 days of these chapter 11 cases.

30.     More specifically, the Debtors request the authority to pay up to $450,000 on account of outstanding prepetition amounts owed to Critical Vendors within 21 days of the commencement of these chapter 11 cases.  Pursuant to the Final Order, the Debtors seek the authority to pay an additional $300,000 for a total amount of $750,000.   Additionally, the Debtors seek permission to pay outstanding prepetition amounts owed to the Lien Claimants. Because the Debtors will face substantial harm if the Lien Claimants move to assert their lien rights or fail to release the goods in their possession, the Debtors seek authority to remit payment on account of the Lien Claimants in an amount up to $150,000 within 21 days from the Petition Date.

31.     Notably, many of the Critical Vendor Claims are for the value of goods received by the Debtors in the ordinary course of their business during the twenty-day period before the Petition Date, which may afford such claims administrative expense priority under section 503(b)(9) of the Bankruptcy Code.

32.     The Debtors have carefully examined all vendor claims as of the Petition Date, including the Critical Vendor Claims, and have determined that payment of the Critical Vendor Claims is necessary to maximizing enterprise value.  And the Debtors have been mindful of the need to seek relief only for truly critical vendors.  Indeed, the Critical Vendor Claims represent

-11-

less than 0.14% of the Debtors' and their Debtor affiliates' $720 million of total unsecured and project indebtedness.  Many of the Critical Vendors hold claims on account of goods received by the Debtors in the ordinary course of their business during the twenty-day period before the Petition Date, which claims may be entitled to administrative expense treatment.

33.     Specifically, the Debtors have determined that continued delivery of goods and services by the Critical Vendors is essential to the Debtors' continued operations because the Critical Vendors:

  a.     are sole- or limited-source providers;

  b.     are required for the Debtors to remain compliant with applicable laws and regulations;

  c.     provide customized products that alternative sources could not provide within a reasonable timeframe; and/or

  d.     possess unique knowledge of the Debtors' businesses, acquired through dealings with the Debtors over time.

34.     For any vendor meeting one or more of the above characteristics, the Debtors, together with their managers and advisors, then considered whether failure to pay the vendor's prepetition claims would result in a substantial risk that the vendor would refuse to provide goods or services to the Debtors post-petition, and whether such refusal would create a risk of significant disruption to the Debtors' businesses.  The Debtors' analysis considered, among other things: (a) whether the vendor was bound by contract to continue to provide goods and services to the Debtors; (b) the vendor's business, customer base, and financial position; (c) the business relationship and course of conduct between the Debtors and the vendor; and (d) prepetition discussions with the vendor and/or demands made by the vendor (and the credibility of such demands).  This analysis and screening process ultimately resulted in the exclusion of a

significant of the Debtors' vendors (and vendor claims) from consideration for Critical Vendor status.

35.     To ensure the continued and uninterrupted operation of the Debtors' businesses and, in particular, to ensure the continuous operation of their core energy production business, the Debtors are seeking relief intended to address potential refusals on the part of the Critical Vendors to provide goods or services after the Petition Date.

36.     According to the Debtors' books and records, the Debtors may owe prepetition amounts to over one hundred vendors.  The Debtors believe that approximately one-third of the total Critical Vendor Claims are entitled to administrative expense priority under section 503(b)(9) of the Bankruptcy Code.

37.     The Debtors' Critical Vendors include Compliance Vendors, Sole- or Limited-Source Vendors, and Specialized Maintenance Vendors (defined below).  The Debtors seek to pay all or part of the Critical Vendor Claims to ensure that the Critical Vendors provide necessary goods and services to the Debtors on a post-petition basis.

*(i)     Compliance Vendors.*

38.     The Debtors rely on a number of Critical Vendors to assist the Debtors in complying with applicable governmental laws and regulations (collectively, the "*Compliance Vendors*").  For example, the Debtors rely on certain companies that perform, among other services, (a) emissions testing, (b) services regarding the Debtors' continuous emissions monitoring systems, (c) regulatory compliance, and (d) installation and maintenance of environmental upgrades to the Debtors' facilities.  Because the Compliance Vendors are employed and/or licensed by the state or local governments in the jurisdictions in which the Debtors operate, the Debtors may not be able to obtain qualified service from any other source on a timely basis.

39.     Additionally, the Debtors must purchase certain specified chemicals to ensure that the Debtors are in compliance with environmental control requirements.  These chemicals take months to prepare and purify, and must be formulated according to the Debtors' specific standards.  An inability to obtain these chemicals from a Compliance Vendor would result in the Debtors being unable to meet certain regulatory requirements, which would force the Debtors to cease their production of energy.

40.     The Debtors believe that some of the Compliance Vendors will refuse to perform post-petition services if their prepetition claims are not paid, thereby exposing the Debtors to the risk of noncompliance with applicable governmental laws and regulations.  Any such potential violation could cause governmental entities to levy fines or penalties against the Debtors or potentially require the closure of facilities, which could result in a shutdown of the Debtors' energy production operations.  In addition, proper disposal of the regulated waste and chemicals on an uninterrupted basis will help to protect the environment and benefit the public health, including the health and safety of workers at the Debtors' power plants.

41.     Because the Debtors must comply with applicable governmental laws and regulations on a post-petition basis and cannot afford the potentially irreparable damage to their businesses that would be caused by adverse governmental action for regulatory noncompliance, the Debtors believe that their ability, in their sole discretion, to pay the Compliance Vendors is essential to their reorganization efforts.

*(ii)*     *Sole- or Limited-Source Vendors*

42.     The Debtors rely on a number of vendors (the "***Sole- or Limited-Source Vendors***") to supply essential raw materials, specialized replacement parts and supplies, operations consumables, and certain other goods and services required to operate the Debtors' plants and ensure continuous business operations (collectively, the "***Sole- or Limited-Source***

-14-

***Goods***").  The Sole- or Limited-Source Vendors typically are the only existing suppliers — or one of a limited number of suppliers — for a particular part, supply, or service.

43.    In some cases, other suppliers cannot supply the required Sole- or Limited-Source Goods in sufficient quantity, quality, or reliability, or they are unable to supply the required Sole- or Limited-Source Goods on a cost-efficient and timely basis in the appropriate geographic areas. In other cases, even if a replacement vendor exists, such vendors likely cannot supply the Debtors with sufficient quantity or quality or without significant delays.  The Debtors also believe that replacement limited-source vendors (with which the Debtors have no current relationship or course of dealing) may be unwilling to offer the Debtors payment terms as favorable as the vendors currently utilized by the Debtors.

44.    For example, each of the Debtors' power plants is designed to utilize bulk quantities of certain laboratory-grade chemicals, such as hydrogen, and specialized fuel, as part of its energy production and pollution control activities.  Due to the chemical specifications and quantities involved, the Debtors are dependent on a few Critical Vendors that can provide such chemicals to their plants to keep the plants running and compliant with environmental regulations, particularly in the remote areas in which the Debtors operate their plants.  These chemicals are required for the operation of the Debtors' natural-gas fired and coal powered power plants; without a steady supply of these chemicals, these plants could not produce energy.

45.    Other Sole- or Limited-Source Vendors supply the Debtors with specially fabricated repair and replacement parts for the Debtors' turbines, transformers, boilers, conveyor belts, elevators, HVAC systems, and other equipment used in the power generation process. Typically, this equipment is based upon patented designs available only from the manufacturer or is made or provided to the Debtors' exact specifications.

46.     Because the Debtors do not have viable alternatives to obtain substitute Sole- or Limited-Source Goods from other suppliers, they have determined that they must have authority to satisfy the prepetition claims of these Sole- or Limited-Source Vendors, in the Debtors' discretion, to ensure the continued delivery of the Sole- or Limited-Source Goods to their plants and operational locations without interruption.

### (iii)     *Specialized Maintenance Vendors.*

47.     The Debtors rely on specialized maintenance and repair services provided by certain Critical Vendors (collectively the "***Specialized Maintenance Vendors***") to ensure that specialized equipment required for energy production and pollution control (including boilers, turbines, pumps, and other ancillary equipment) operates in a safe, and efficient manner. Further, due to the specialized and often hazardous nature of some of the services involved, certain of the services can only be obtained from the Specialized Maintenance Vendors with permits or licenses as required by state or federal laws and regulations. For example, routine maintenance and repair services that can typically be performed by a wide range of vendors (*e.g.*, welding, electrical, and waste removal services) can only be performed by certain Specialized Maintenance Vendors possessing specialized skills and/or licenses when the services involve specialized or dangerous elements. Specialized or dangerous elements may include, among other things, high speed rotation motors, toxic substances, and high voltage electricity.

48.     The Debtors' plant staffing model places a great deal of importance on the services provided by the Specialized Maintenance Vendors. Unlike other energy producers, the Debtors' plants are operated with minimal in-house staffing capable of performing routine maintenance. These functions are supplemented by the specialized maintenance and repair services provided by the Specialized Maintenance Vendors on a regular or as-needed basis.

49.     Due to the limited availability of vendors able to provide the Debtors with these specialized maintenance and repair services, the Debtors believe that some of the Specialized Maintenance Vendors will refuse to provide post-petition services to the Debtors if all or a portion of their prepetition claims are not satisfied.  Although the Debtors will make every effort to obtain continued performance from the Specialized Maintenance Vendors, it is vital that the equipment required for energy production and pollution control be maintained in an appropriate manner to reduce the risk of disruption to the Debtors' operations.  It is, therefore, crucial that the Debtors have the authority to satisfy the prepetition claims of the Specialized Maintenance Vendors.

50.     The Debtors seek permission to pay outstanding prepetition amounts owed to carriers and warehousemen who are in possession of the Debtors' property as of the Petition Date.  Because the Debtors will face substantial harm if these Lien Claimants move to assert their lien rights or fail to release the goods in their possession, the Debtors.  Unless they are paid for outstanding prepetition amounts, the Debtors believe Third-Party Contractors may refuse to perform their ongoing obligations under their existing agreements with the Debtors, including installation, servicing, and warranty obligations, or may refuse to release finished goods in their possession.  Moreover, the value of the materials in the possession of the Third-Party Contractors generally exceeds the value of their respective prepetition claims.

51.     I believe that the relief requested in the Critical Trade Vendors Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Critical Trade Vendor Motion should be approved.

**C.    Debtors' Motion for Interim and Final Orders Authorizing Continued Performance Under Energy Trading Contracts ("*Energy Trading Contracts Motion*")**

52.    The Debtors request entry of Interim and Final Orders (a) authorizing the Debtors to honor and continue performing under the Energy Trading Contracts (as defined below) and to honor, pay, and/or otherwise satisfy any and all obligations under the Energy Trading Contracts in a manner consistent with prepetition practices, and to take any other actions to implement, consummate and execute transactions under the Energy Trading Contracts; (b) authorizing and directing financial institutions to receive, process, honor and pay all related checks and electronic payment requests for payment under the Energy Trading Contracts; (c) scheduling a Final Hearing to consider entry of the Final Order; and (d) granting such other and further relief as may be appropriate.

53.    The Debtors own and operate three power plants in eastern Texas: the Twin Oaks Plant, the Altura Cogen Plant and the Cedar Bayou Plant.  The Twin Oaks Plant—a coal-fired electric power generating facility capable of producing 305 megawatts—is owned by Debtor Twin Oaks and is located in Robertson County, Texas, and sells energy into the ERCOT market. Twin Oaks purchases all of the coal to operate the plant from Walnut Creek Mining Company pursuant to a long-term fuel supply agreement executed in 1987.

54.    The Altura Cogen Plant—a natural-gas powered plant capable of producing 600 megawatts—is located in Harris County, Texas and sells its energy into the ERCOT market.  The plant is owned by Debtor Altura Cogen.  The Altura Cogen Plant is located within a complex of petrochemical facilities owned by Lyondell.  Altura Cogen leases the property at which the power plant is situated from Lyondell pursuant to the Amended and Restated Lease and Easement Agreement, dated as of September 6, 2005 (as amended, the "*Altura Lease*").

55.    Pursuant to a Services Agreement for CLI Facility dated as of September 6, 2005 (as amended, the "***Altura Services Agreement***"), Altura Cogen and Lyondell provide to one another certain services relating to the operation of the Altura Cogen Plant.  As one example, the Altura Cogen Plant's water requirements are supplied under the terms of the Altura Services Agreement.  Pursuant to a Steam and Electric Power Sales Agreement dated as of September 6, 2005 (the "***SEPSA***" and, together with the Altura Lease and the Altura Services Agreement, collectively, the "***Lyondell Agreements***")  Altura Cogen provides to Lyondell, on a semi-exclusive basis, steam and electric power generated by Altura Cogen Plant.  The Lyondell Agreements include netting provisions.

56.    Altura Cogen purchases the natural gas to fuel the Altura Cogen Plant from EDF pursuant to fuel purchase agreements entered into under the EDF ISDA (as defined below).  In addition, EDF sells the capacity and energy generated by the Twin Oaks Plant and the Altura Cogen Plant on a short-term basis into the ERCOT market pursuant to an Energy Management Agreement dated as of November 1, 2011 (as amended, the "***EDF Energy Management Agreement***") with Debtor Optim Marketing.  As discussed below, the Debtors have historically netted obligations under the EDF ISDA and the EDF Energy Management Agreement, on a monthly basis, for billing convenience.

57.    The Cedar Bayou Plant—a natural-gas powered plant capable of producing 550 megawatts—is located in Chambers County, Texas and operates in ERCOT's Houston Zone. Debtor Cedar Bayou owns a 50% undivided interest in the Cedar Bayou Plant and NRG Cedar Bayou owns the remaining 50% undivided interest.  The Cedar Bayou Plant is located within a complex of electric generation facilities owned by NRG Texas.  The Cedar Bayou Plant is operated by NRG Texas in accordance with an Amended and Restated Joint Ownership

Agreement, dated August 1, 2007 between Cedar Bayou and NRG Cedar Bayou, as amended. Cedar Bayou purchases its share of the natural gas to fuel Cedar Bayou Plant pursuant to fuel purchase agreements with NRG Power Marketing entered into under the NRG ISDA (as defined below). In addition, the capacity and energy generated by the Cedar Bayou Plant is sold on behalf of Cedar Bayou and NRG Texas, as joint plant owners, on a short-term basis into the Texas power market through a Scheduling and Dispatch Agreement, dated as of June 1, 2009 (as amended, the "**NRG Scheduling and Dispatch Agreement**") between Cedar Bayou, NRG Cedar Bayou and Optim Marketing. The Debtors have historically netted obligations under the NRG ISDA and the NRG Scheduling and Dispatch Agreement, on a monthly basis, for billing convenience.

### (i)    The SEPSA

58.    The SEPSA became effective on January 1, 2007 for an initial term of 15 years, with an automatic two-year renewal option thereafter, until January 1, 2047. Lyondell purchases a portion of the power generated at the Altura Cogen Plant, and the steam produced from power production operations, pursuant to the SEPSA. The SEPSA requires Altura Cogen to deliver to Lyondell every 24-hour period up to (a) 80 megawatts of electric capacity and the associated energy and (b) 1.33 million pounds of steam per hour from the Altura Cogen Plant.

59.    A letter of credit in the amount of $40 million has been issued under the Credit Agreement for the benefit of Lyondell in connection with the Debtors' obligations under the SEPSA. The letter of credit expires on May 31, 2014.

60.    Altura Cogen bills Lyondell monthly in arrears for charges for the steam and electric power provided under the SEPSA. Altura Cogen sends separate steam and electric invoices to Lyondell by the 10th business day of the month, which detail the quantity of steam and electric power that Altura Cogen delivered to Lyondell for the prior month. The Debtors

believe there are no prepetition amounts due to Lyondell, on a net basis, as of the Petition Date. Under the steam invoice for January 2014, Lyondell owed Altura Cogen approximately $1.8 million for steam delivered under the SEPSA for January.  Under the electric invoice, Lyondell owed Altura Cogen approximately $1.8 million for electric power delivered under the SEPSA for January.  The Debtors expect to receive the invoiced amounts from Lyondell on or about February 25, 2014.

61.     In addition, on or before March 10, 2014 Altura Cogen will issue invoices to Lyondell for steam and electric power delivered under the SEPSA for February 2014.  Based on estimated market conditions that are subject to change, Altura Cogen estimates it will receive approximately $1.4 million from Lyondell (after netting) for steam and electric power delivered under the SEPSA on account of the first 12 days of February 2014 leading up to the Petition Date.  Altura Cogen should receive this amount from Lyondell on or about March 25, 2014.

62.     The SEPSA: (a) provides that the filing of a bankruptcy petition by Altura Cogen is an event of default permitting Lyondell to terminate the SEPSA; and (b) expressly states the intent of the parties that the SEPSA be deemed a "forward contract," and that Altura Cogen and Lyondell be deemed "forward contract merchants" as such terms are defined in any relevant law, rule or regulation, including, without limitation, the Bankruptcy Code.  If the SEPSA is a forward contract, Lyondell is protected by the safe harbor provisions of sections 362 (permitting certain actions without relief from the automatic stay) and 556 of the Bankruptcy Code (providing for the enforcement of certain ipso facto provisions).

63.     The Debtors desire to avoid termination of the SEPSA, which could materially impact the Altura Cogen Plant's operations.  Lyondell could attempt to draw on the letter of credit if Lyondell effectively terminated the SEPSA.  Out of an abundance of caution, the

Debtors therefore seek entry of Interim and Final Orders authorizing the Debtors to continue performing under the SEPSA and to satisfy any and all obligations under the SEPSA in a manner consistent with prepetition practices, including the netting arrangements.

### (ii)    The EDF ISDA

64.    On May 8, 2009, Optim Marketing entered into an ISDA 2002 Master Agreement (as amended, the "**EDF ISDA**") with EDF.  Under the EDF ISDA, Optim Marketing and EDF enter into transactions for the purchase, sale or exchange of natural gas products and derivatives. The current short-term contract to purchase natural gas from EDF under the EDF ISDA expires on March 31, 2014.  The Debtors will need to enter into a replacement three-year contract with EDF under the EDF ISDA to procure fuel for the Altura Cogen Plant after expiration of the current contract.[2]

65.    EDF nets amounts owed under the EDF ISDA against amounts owed under the EDF Energy Management Agreement on a monthly basis.  By the terms of the EDF Energy Management Agreement, prior to the 15th day of the month EDF is required to issue Optim Marketing monthly invoices setting forth for the prior month all related revenues earned and costs incurred for the sale of electricity under the EDF ISDA and the EDF Energy Management Agreement, net of fuel purchased under the EDF ISDA and other costs and fees.

66.    The Debtors believe there are no prepetition amounts due to EDF, on a net basis, as of the Petition Date.  The Debtors estimate for the month of January 2014 that Optim Marketing owes EDF approximately $10.0 million for gas purchases made under the EDF ISDA in January, while EDF owes Optim Marketing approximately $16.2 million for power sold under the EDF ISDA in January, resulting in a net payment obligation from EDF to Optim Marketing

---

[2]  Optim Energy issued a $3.5 million guarantee in favor of EDF by which Optim Energy has guaranteed the timely payment of Optim Marketing's obligations under the EDF ISDA.

of $6.2 million.  The Debtors expect to receive the net amount from EDF on or about February 25, 2014.  In addition, with respect to the first 12 days in February leading up to the Petition Date, based on estimated market conditions that are subject to change, the Debtors estimate that EDF will owe Optim Marketing between $5.5 million and $6 million, on a net basis, on or about March 25, 2014.

67.     The EDF ISDA provides that the filing of a bankruptcy petition by Optim Marketing is an event of default permitting EDF to terminate all of the transactions under the EDF ISDA.  Further, the transactions under the EDF ISDA may constitute "forward contracts" providing EDF the right to terminate the transactions under the NRG ISDA pursuant to sections 362 and 556 of the Bankruptcy Code.

68.     The Debtors desire to avoid termination of the transactions under the EDF ISDA, which could materially impact the Altura Cogen Plant's operations.  Without fuel, the Altura Cogen Plant would shut down and the Debtors might not be able to perform their obligations to Lyondell under the SEPSA.  Moreover, it could take as long as 60 days to transition to a new natural gas supplier to replace EDF if EDF were to terminate its contract or refuse to enter into a new contract.

### *(iii)     The NRG ISDA*

69.     On October 31, 2008, Cedar Bayou (as successor in interest to Optim Marketing) entered into an ISDA 2002 Master Agreement (as amended, the "***NRG ISDA***" and, together with the SEPSA and the EDF ISDA and the transactions under each of the foregoing, the "***Energy Trading Contracts***") with NRG Power Marketing.  Cedar Bayou enters into short term contracts (typically for three months) under the NRG ISDA to purchase all of the natural gas supply for Cedar Bayou's 50% share of the Cedar Bayou Plant's fuel requirements.  The current contract

under the NRG ISDA expires on March 31, 2014, at which time the Debtors will need to enter into a new agreement to supply the Cedar Bayou Plant.

70.     A letter of credit in the amount of $1 million has been issued under the Credit Agreement for the benefit of NRG Texas in connection with the Debtors' obligations in respect of the Cedar Bayou Plant.  The letter of credit expires on May 31, 2014.

71.     The Debtors have historically netted the obligations arising under the NRG ISDA and the NRG Scheduling and Dispatch Agreement on a monthly basis.  Specifically, the Debtors calculate the revenues earned and costs incurred for the sale of electricity under the NRG Scheduling and Dispatch Agreement, net of fuel purchased from NRG Power Marketing for the Debtors' portion of the Cedar Bayou Plant under the NRG ISDA.

72.     The Debtors believe there are no prepetition amounts due to NRG Power Marketing, on a net basis, as of the Petition Date.  In fact, the Debtors estimate for the month of January 2014 that Optim Energy Cedar Bayou 4 owes NRG Power Marketing approximately $1 million for gas purchases under the NRG ISDA made in January, while NRG Texas owes the Debtors approximately $1.5 million for power sold under the NRG Scheduling and Dispatch Agreement in January, resulting in a net payment due to the Debtors of $0.5 million for the month of January 2014.  The Debtors expect to receive the net amount on or about February 25, 2014.  In addition, with respect to the first 12 days in February leading up to the Petition Date, based on estimated market conditions that are subject to change, the Debtors expect to receive between $1.3 million and $1.5 million on or about March 25, 2014.

73.     Like the EDF ISDA, the NRG ISDA provides that the filing of a bankruptcy petition by Cedar Bayou is an event of default permitting NRG Power Marketing to terminate the transactions entered into under NRG ISDA.  Further, the transactions under the NRG ISDA may

constitute "forward contracts" affording NRG Power Marketing the right to terminate the transactions under the NRG ISDA pursuant to sections 362 and 556 of the Bankruptcy Code. The Debtors desire to avoid termination of the transactions under the NRG ISDA, which could materially impact the Cedar Bayou Plant's operations.  If the Debtors fail to procure their share of the fuel for the Cedar Bayou Plant, the Debtors would be in breach of their obligations under other agreements related to the Cedar Bayou Plant and the plant's operations could be disrupted.

74.     Businesses in the Debtors' industry routinely enter into trading contracts similar to the Debtors.  Moreover, as described more fully above, the Debtors routinely entered into such transactions in the past.  Accordingly, the Debtors believe that performing under and entering into Energy Trading Contracts is within the ordinary course of business and should be permitted.

75.     I believe that the relief requested in the Energy Trading Contracts Motion is necessary to preserve critical business and trading relationships and to maximize the value of their chapter 11 estates for the benefit of all parties in interest.  Without such relief, the Debtors are concerned that the commencement of these chapter 11 cases may allow the counterparties to the Energy Trading Contracts to attempt to terminate the contracts under the safe harbor protections of the Bankruptcy Code, causing severe disruptions to the Debtors' business operations.  Accordingly, on behalf of the Debtors, I respectfully submit that the Energy Trading Contracts Motion should be approved.

**D.     Debtors' Motion for Entry of Interim and Final Orders (I) Determining Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Service and (III) Establishing Adequate Assurance Procedures (the "*Utilities Motion*")**

76.     The Debtors request the entry of interim and final orders: (a) determining that the Debtors' Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the Debtors' proposed adequate

assurance; (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance pending entry of a Final Order; (d) determining that the Debtors are not required to provide any additional adequate assurance beyond what is proposed by this Motion and the Adequate Assurance Procedures described in the exhibits to the motion; and (e) scheduling a Final Hearing to consider entry of the Final Order to the extent a Final Hearing is necessary.

77.     In the ordinary course of business, the Debtors obtain natural gas, telephone, internet and other similar utility services from various Utility Providers.  As of the Petition Date, approximately 10 Utility Providers render these services to the Debtors.  On average, the Debtors spend approximately $116,610 per month for utility services.

78.     Uninterrupted utility services are essential to the Debtors' ongoing operations. Indeed, any interruption in utility services – even for a brief period of time – would negatively affect the Debtors' operations, customer relationships, revenues and profits, thereby impairing the Debtors' reorganization efforts and, ultimately, value and creditor recoveries.  Thus, it is critical that utility services continue uninterrupted during the chapter 11 cases.

79.     The Debtors intend to pay postpetition obligations owed to the Utility Providers in a timely manner.  The Debtors expect that their cash flows from operations, borrowing under the proposed DIP Facility and cash on hand will be sufficient to pay postpetition obligations related to their utility services.

80.     To provide additional assurance of payment for future services to the Utility Providers, the Debtors propose to deposit $58,305 – which represents an amount equal to the estimated aggregate cost for two weeks of utility service, calculated as a historical average over

the past twelve months – into a segregated, interest-bearing account for the benefit of Utility Providers on or before the date that is 20 days after the Petition Date.

81.    I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption.   Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

**E.    Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Certain Taxes and Fees (the "*Tax Motion*")**

82.    The Debtors request entry of interim and final orders: (a) authorizing, but not directing, the Debtors to remit and pay (i) certain property taxes, use taxes and franchise taxes (collectively, as discussed herein, the "*Taxes*"), including any Use Taxes that will become due and owing during the first 21 days of these chapter 11 cases, and (ii) certain regulatory fees (as discussed herein, the "*Regulatory Fees*") and, together with the Taxes, the "*Taxes and Fees*"), to the taxing and regulatory authorities in the jurisdictions in which the Debtors operate (the "*Taxing Authorities*"); (b) authorizing and directing financial institutions to receive, process, honor and pay all related checks and electronic payment requests for payment of the related Taxes and Fees, whether issued or presented prior to or after the Petition Date; (c) scheduling a Final Hearing to consider entry of the Final Order; and (d) granting such other and further relief as may be appropriate.

*(i)    Property Taxes*

83.    The Debtors own real property in the state of Texas upon which property tax obligations accrue (the "*Property Taxes*").   It is imperative that the Debtors be able to pay Property Taxes in the ordinary course as they come due, as the failure to pay gives rise to a

superpriority lien.  In addition, the Debtors' proposed DIP Financing requires that all undisputed taxes be paid if the tax obligation creates a lien on real property that is DIP Collateral.

84.     The Twin Oaks Plant operates in Robertson County, Texas.  Twin Oaks—which owns the Twin Oaks Plant and the real property on which it is situated—pays Property Taxes to Robertson County in January of each year on account of the prior year's tax assessment.  Optim Energy disputed the property appraisal issued by Robertson County for the 2013 tax year.  After discussions with Robertson County did not produce a settlement, in August 2013 Optim Energy Twin Oaks filed a complaint in the 82nd Judicial District Court, Robertson County, Texas against the Robertson County Appraisal District to dispute the appraised value of the plant.  On January 30, 2014, the Debtors paid approximately $1.1 million to Robertson County, representing an undisputed portion of the total 2013 tax liability, leaving approximately $1.6 million of the total 2013 tax liability outstanding and in dispute as of the Petition Date.  If a settlement is reached after the Petition Date regarding the disputed portion of the 2013 tax liability, the Debtors will seek appropriate relief from this Court regarding approval and payment of the same.  Additionally, as of the Petition Date for the 2014 prepetition period, the Debtors will have accrued Robertson County Property Taxes, which Taxes are not due and owing until January 2015.

85.     Altura Cogen owns the Altura Cogen Plant, and pays Property Taxes to Harris County in January of each year for the prior year's tax assessment.  As of the Petition Date, there are no Property Taxes for the 2013 calendar year that remain outstanding to Harris County.  The Debtors expect the next payment to come due in January 2015 in the amount of up to $2.8 million, approximately $230,000[3] of which relates to the 2014 prepetition period.

---

[3]  This estimate includes any accrued Property Taxes for the 2014 prepetition period that will be payable to the City of Houston on account of the Altura Cogen Plant, as discussed below.

86.     In addition, on June 1 of each year, Property Taxes become due and owing to the City of Houston with respect to the Altura Cogen Plant.  The Property Taxes due on account of 2013 calendar year amount to $386,805.88, all of which will be due and payable on June 1, 2014. As of the Petition Date, there are Property Taxes due to the City of Houston for the prepetition 2014 period that have accrued on account of the Altura Cogen Plant, which Taxes the Debtors expect will not be due and owing until June 2015.

87.     Optim Energy Cedar Bayou owns a 50% undivided interest in the Cedar Bayou Plant pursuant to a joint venture agreement with NRG Development.  Accordingly, the Debtors are responsible for payment to NRG of 50% of the Property Taxes due on account of the Cedar Bayou Plant, which the Debtors remit to NRG on or before January 31 of each year in respect of the prior year's tax liability.

88.     As of the Petition Date, approximately $175,000 has accrued for the prepetition 2014 period with respect to Property Taxes on account of the Cedar Bayou Plant, which Taxes are not due and owing until January 2015.

*(ii)*     ***Use Taxes***

89.     As they operate in the wholesale market, the Debtors do not collect sales taxes in connection with their sale of fuel and other consumables used in their energy generation business.  Use taxes typically arise if the Debtors purchase certain goods and services, including fuel, power generation-related equipment, and other spare equipment parts, from vendors who do not have business operations in the state in which it is supplying goods and do not charge state sales taxes.  In these cases, applicable law generally requires the Debtors to self-assess the amount of such taxes and, accordingly, subsequently pay use taxes to the applicable Taxing Authorities.

90.     The Debtors collect and remit their Use Taxes to the Taxing Authorities monthly for the respective Debtor's prior-month activity.  In 2013, the Debtors collected and remitted approximately $3,000 to $5,000 per month in Use Taxes to various Taxing Authorities.  As of the Petition Date, the Debtors estimate there are approximately $14,000 of unpaid Use Taxes— for one month of arrearage—which must be paid within 21 days of the Petition Date.

     *(iii)*     ***Texas Franchise or Margin Taxes***

91.     The Debtors are required to pay a Texas Franchise Tax (locally referred to as the "***Margin Tax***") to the Texas Comptroller of Public Accounts in order to conduct business in the state of Texas for the current calendar year.  The Debtors did not owe any Margin Tax for 2013, and the Debtors do not anticipate owing any Margin Tax for 2014.

     *(iv)*     ***Regulatory Fees***

92.     The Debtors are required to pay environmental and other regulatory fees (the "***Regulatory Fees***") to the Texas Commission on Environmental Quality in order to purchase air and water permits required to operate the Twin Oaks Plant.  The Debtors estimate the Regulatory Fees for 2013 will be approximately $360,000, which amount will come due in October 2014.  As of the Petition Date, approximately $30,000 of additional Regulatory Fees have accrued on account of the 2014 prepetition period, which amount will come due in October 2015.  Failure to pay Regulatory Fees would result in the risk of the Debtors having to immediately shut down—a disastrous result that would undermine the reorganization process.

93.     It is my understanding that the Debtors' failure to pay the Taxes and Fees could adversely affect the Debtors' business operations because the Taxing Authorities could suspend the Debtors' operations, file senior liens that are granted special priority under the Bankruptcy Code, or seek to lift the automatic stay.  In addition, certain Taxing Authorities may take precipitous action against the Debtors' directors and officers for unpaid Taxes, which

undoubtedly would distract those key personnel from their duties related to the Debtors' restructuring.

94.     I believe that the relief requested in the Tax Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption.  The Debtors believe that only the unpaid Use Taxes will become due within 21 days after the Petition Date.

**F.     Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Maintain Prepetition Insurance Policies and (II) Continue Financing Insurance Premiums (the "*Insurance Motion*")**

95.     The Debtors request entry of interim and final orders: (a) authorizing the Debtors to (i) maintain their prepetition insurance policies (collectively, and as discussed herein, the "***Insurance Policies***"), including the renewal and/or modification thereof in the ordinary course, and (ii) continue financing the premiums associated with certain of their Insurance Policies (collectively, the "***Financed Insurance Policies***"), including making a monthly installment payment in the amount of approximately $235,048.90 that will become due and owing during the first 21 days of these chapter 11 cases; (b) authorizing and directing financial institutions to receive, process, honor and pay all related checks and electronic payment requests for payment of the related Insurance Policies; (c) scheduling a Final Hearing to consider entry of the Final Order; and (d) granting such other and further relief as may be appropriate.

96.     The Debtors maintain nine Insurance Policies that are administered by various third-party Insurance Carriers.[4]   The Insurance Policies provide coverage for, among other things: (a) general commercial liability; (b) commercial excess liability (two layers); (c) director

---

[4]  Lockton Companies, LLC, a third-party Insurance Broker assists the Debtors in obtaining comprehensive insurance coverage in the most cost-effective manner.  The Debtors are liable for certain annual fees associated with obtaining such coverage.  Specifically, the Insurance Broker earns a flat annual fee in the amount of $115,000, covering calendar year 2014, which was paid on or about February 10, 2014

and officer liability; (d) director and officer excess liability; (e) property liability; (f) business auto liability; (g) commercial crime liability; and (h) commercial excess crime liability. Maintaining the Insurance Policies is essential to the preservation of the value of the Debtors' businesses, properties and assets.  In many cases, coverage provided by the Insurance Policies is required by the regulations, laws and contracts that govern the Debtors' commercial activities. Moreover, the Debtors are required to maintain insurance to protect the assets being pledged as DIP Collateral.

97.     To efficiently manage cash flow and avoid significant upfront cash outlays, effective on June 1, 2013, the Debtors financed the premiums associated with the Financed Insurance Policies under a financing agreement with AFCO Credit Corporation (the "***Financing Agreement***").  The Financing Agreement enabled the Debtors to spread out what would otherwise have been a lump-sum premium payment in the aggregate amount of $2,388,574.  The Financing Agreement enables the Debtors to make equal monthly installments for the Financed Insurance Policies over the applicable coverage period, which ends on June 1, 2014.  As of the Petition Date, the remaining balance of the obligation under the Financing Agreement was $705,146.70, of which $235,048.90 will come due within the first 21 days of these chapter 11 cases.

98.     I believe continuation of the Insurance Policies is essential to the preservation of the value of the Debtors' businesses, properties and assets.  I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption.  The Debtors believe that only a $235,048.90 monthly installment payment

under the Financing Agreement will come due within 21 days of the Petition Date.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

<u>Second Day Pleadings</u>

A.    **Debtors' Motion for Entry of Order Authorizing the Debtors to Continue Performance Under Prepetition Agreements with Competitive Power Ventures, Inc. and NAES Corporation Regarding the Outsourcing of Management and Operational Services, *Nunc Pro Tunc* to the Petition Date (the "*Management Agreements Motion*")**

99.    The Debtors, as soon as practicable, will request entry of an order authorizing the Debtors to continue performance under prepetition agreements with CPV and NAES regarding the outsourcing of management and operational services pursuant to the terms of the Management Agreements, *nunc pro tunc* to the Petition Date.

*(i)    The NAES Agreements*

100.    The Debtors' operations at the Twin Oaks Plant and the Altura Cogen Plant are outsourced to, and performed by, NAES pursuant to the NAES Agreements.[5]  NAES employs plant personnel and is responsible for the operational performance of the plants, including general operational and maintenance services such as obtaining or maintaining permits, providing and training personnel, procuring supplies, ensuring inventory, and coordinating operations with other energy suppliers.  As of the Petition Date, the Debtors estimate they do not owe any amounts under the NAES Agreements on account of the prepetition period.

*(ii)    The CPV Management Agreement*

101.    Pursuant to the CPV Management Agreement, CPV provides the Debtors' management and senior management, including their officers and certain directors, pursuant to the CPV Management Agreement, including myself as Optim Energy, LLC's Chief Executive Officer.

---

[5] The Debtors' third power plant, the Cedar Bayou Plant, is operated by NRG Texas.

102.     CPV currently provides Asset Management Services to Optim Energy pursuant to

the CPV Management Agreement, including the following:

(i)     performs all bookkeeping, record-keeping and accounting tasks on behalf of the Debtors, including, in conjunction with an independent public accounting firm, the preparation and filing of tax returns and other filings required to be made under applicable laws, regulations and ordinances;

(ii)    procures and maintains all governmental approvals required for the Debtors to carry out their business affairs;

(iii)   engages and supervises independent contractors that CPV deems necessary;

(iv)    purchases any materials, supplies and equipment necessary for the performance of the services set forth in the CPV Management Agreement;

(v)     supervises and monitors the Debtors' and the counterparties' compliance with the terms of all contracts under which the Debtors have any obligations or rights;

(vi)    prepares all documents required to be submitted pursuant to the Debtors loan facilities; and

(vii)   performs duties as directed in writing by the Debtors for the management of the Facility.

103.     CPV also currently provides Additional Services to Optim Energy pursuant to the

CPV Management Agreement, including:

(i)     services related to the occurrence of bankruptcy proceedings or similar proceeding with respect to the Debtors, or any incremental work associated with managing the Power Plants (as defined in the CPV Management Agreement);

(ii)    leadership of or material support for a process with respect to arranging for or negotiating the terms of any material financings, refinancings or restructurings related to Power Plants or the Debtors, other than in the ordinary course of business;

(iii)   the management of any litigation, arbitration or material dispute between the Debtors, the Power Plants and any third party; and

(iv)    additional management or administrative services on behalf of the Debtors or the Power Plants that goes beyond the scope of work reasonably contemplated by the CPV Management Agreement, including any services required or requested to be provided in connection with events occurring outside the ordinary course of business of the Debtors.

104.    As of the Petition Date, the Debtors estimate they do not owe any amounts under the CPV Management Agreement on account of the prepetition period.

105.    I believe that given CPV's and NAES's specialized knowledge of the Debtors' operations and plants, the Debtors would be unable to find suitable replacements for CPV and NAES in a timely fashion.  The Debtors would lose a wealth of institutional knowledge if they were to re-source their management and operations services, and any new manager would face hurdles in becoming familiar with the Debtors' businesses.  Even if suitable replacement management and/or employees were available to replace the teams of CPV and/or NAES, the disruption caused by an abrupt change in management and/or plant employees would be both an unnecessary and a wasteful disruption of the Debtors' operations.  The cost to the Debtors' estates of such disruption would be far greater than any better terms available for employment of such replacement management.  Meanwhile, the Debtors' urgent need to find replacement managers would grant replacement parties considerable negotiating leverage, and the Debtors could face substantial difficulty obtaining terms as favorable as those contained in the existing Management Agreements.  Accordingly, on behalf of the Debtors, I respectfully submit that the Management Agreements Motion should be approved.

**B.      Debtors' Motion for Entry of an Order Authorizing Debtors to File Under Seal Management Agreements with Competitive Power Ventures, Inc. and NAES Corporation ("*Motion to File Under Seal*")**

106.    Contemporaneously with the filing of  the Management Agreements Motion (as defined above), the Debtors will request entry of an order authorizing the Debtors to file: (i) un-redacted Management Agreements (as defined in the Management Agreements Motion) under seal; and (ii) a redacted Management Agreement Motion, and the redacted Management Agreements included therewith, in their current form on the docket, in order to redact

confidential economic terms, the disclosure of which is of concern to the Debtors, CPV and NAES.

107.    The Management Agreements contain sensitive commercial information regarding the Debtors' plants and business operations, including, but not limited to, the fee arrangement with CPV and NAES.    Publicizing the compensation arrangements and other proprietary information contained in the Management Agreements may aid CPV's and NAES' competitors by allowing them to exploit such information for their own competitive advantage. Additionally, providing other participants in the energy market space with this information could be used to compromise the Debtors' ability to negotiate future salaries, compensation packages and material terms of management agreements.

108.    Accordingly, on behalf of the Debtors, I respectfully submit that the Motion to File Under Seal should be approved.