## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Optim Energy, LLC, *et al.*, | Case No. 14-10262 (BLS) |
| Debtors.[1] | (Joint Administration Requested) |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) OBTAIN POST-PETITION SENIOR SECURED FINANCING AND (B) GRANT LIENS AND SUPERPRIORITY CLAIMS, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING ADEQUATE PROTECTION TO THE PRE-PETITION SECURED PARTIES, (IV) SCHEDULING A FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001(B) AND (C) AND (V) GRANTING RELATED RELIEF

Optim Energy, LLC ("***Optim Energy***") and its affiliated debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "***Debtors***"), respectfully represent:[2]

### Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested herein are sections 105, 361, 362, 363(c), 363(e), 364 and 507 of the Bankruptcy Code, Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rules 2002-1, 4001-2 and

---

[1] The Debtors in these chapter 11 cases are: Optim Energy LLC; OEM 1, LLC; Optim Energy Cedar Bayou 4, LLC; Optim Energy Altura Cogen, LLC; Optim Energy Marketing, LLC; Optim Energy Generation, LLC; Optim Energy Twin Oaks GP, LLC; Optim Energy Twin Oaks, LP. The Debtors' main corporate and mailing address for purposes of these chapter 11 cases is: c/o Competitive Power Ventures, Inc., 8403 Colesville Road, Suite 915, Silver Spring, MD 20910.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Orders (as defined herein) or the DIP Credit Documents (as defined herein), as applicable.

9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***").

**Introduction**

4.      The Debtors do not have sufficient cash to safely and effectively operate their businesses absent further financing.  Accordingly, Optim Energy and its advisors sought a commitment from various potential funding sources that could provide financing necessary for the Debtors' operations in connection with these chapter 11 cases.  Cascade Investment, L.L.C., Optim Energy's ultimate parent company ("***Cascade***"), has agreed to provide the Debtors with a $115 million new-money, revolving, priming senior-secured credit facility (the "***DIP Financing***" or the "***DIP Facility***").  In addition, subject to entry of the forms of the Interim Order and the Final Order (each as defined below) proposed hereunder, ECJV Holdings, LLC ("***ECJV***", and together with Cascade, the "***Pre-Petition Secured Parties***"), who, with Cascade, has a first priority secured interest in substantially all of the Debtors' assets (as described in further detail below) will consent to the Debtors' use of cash collateral to fund their operations during the pendency of these cases.[3]

5.      The  Debtors submit that the terms of the DIP Financing are reasonable and better than what can otherwise be obtained in the marketplace.  The Debtors sought DIP Financing from several alternative parties, however, no party other than Cascade expressed any interest in providing debtor-in-possession financing   The DIP Financing is the product of substantial arm's-length negotiations between the Debtor's management, independent directors and advisors, Cascade and Wells Fargo Bank, N.A. ("***Wells Fargo***"), in its capacity as Administrative Agent

---

[3] Cascade owns 100% of the equity of ECJV and ECJV in turn owns 100% of the equity of Optim Energy.  Optim Energy is the direct or indirect  parent company of all of the other Debtors.  A full description of the Debtors' business, corporate structure, prepetition indebtedness, and events leading to these chapter 11 cases is set forth in the Declaration of Nick Rahn, Chief Executive Officer of Optim Energy, LLC, in Support of Chapter 11 Petitions and First Day Pleadings (the "***First Day Declaration***"), filed concurrently herewith and incorporated by reference.

(as defined below) and L/C Issuer (as defined below) under the proposed DIP Credit Agreement. Those negotiations produced numerous concessions beneficial to the Debtors, including a DIP Financing with all interest and the vast majority of fees deferred until the maturity date and a cash flow based revolving credit structure that is not otherwise available in the market.  The Debtors believe the terms of the DIP Financing are competitive, fair and reasonable.

6.      The Debtors hereby respectfully request the Court to approve the DIP Financing to ensure the Debtors have access to liquidity.  This financing is needed by the Debtors not only to continue to run their businesses in the ordinary course, but also to demonstrate to their creditor constituencies, including vendors and customers, that the Debtors have the financial support necessary to reorganize and successfully  emerge from these chapter 11 cases.  In sum, approval of the DIP Facility is necessary to preserve the Debtors' businesses and liquidity and to accomplish a seamless transition into chapter 11.

### Relief Requested

7.      By this motion, the Debtors request entry of an interim order (the "***Interim Order***"), a copy of which is attached hereto as **Exhibit A**, and final order, a copy of which is attached hereto as **Exhibit B** (the "***Final Order***" and, together with the Interim Order, the "***DIP Orders***"), authorizing the Debtors to (a) enter into the $115 million Senior Secured Debtor in Possession Credit, Security and Guaranty Agreement (substantially in the form annexed as **Exhibit C** attached hereto and incorporated herein by reference, as may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and the DIP Orders, as applicable, the "***DIP Credit Agreement***"), (b) use cash collateral and (c) grant adequate protection to the Pre-Petition Secured Parties for the priming of their existing liens on the Pre-Petition Collateral and the Debtors' use of the cash collateral.  In support of this motion, the Debtors submit the Declaration of George Mack, a Managing  Director of Barclays Capital

Inc. ("**Barclays**") filed contemporaneously herewith (the "**George Mack Declaration**"), a copy of which is attached hereto as **Exhibit D** and the First Day Declaration.

8.      More specifically, the Debtors seek authority to:[4]

a.      permit the Debtors, pursuant to the Interim Order, to borrow up to $75 million under the DIP Facility and up to $115 million on a final basis;

b.      execute and deliver the DIP Credit Agreement and any related documents (including, without limitation, any letter of credit applications and related documents) required to be executed or delivered by or in connection with the DIP Credit Agreement (as may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the Interim Order and the Final Order, collectively, the "**DIP Credit Documents**");

c.      grant first-priority senior priming security interests in and liens upon (collectively, the "**DIP Liens**") all prepetition and post-petition assets of the Debtors (collectively, the "**DIP Collateral**") to the Administrative Agent, the L/C Issuer and each DIP Lender, as provided for by sections 364(c) and (d) of the Bankruptcy Code (subject to certain exceptions as specified in the DIP Orders and the DIP Credit Agreement);

d.      grant superpriority administrative claims (the "**Superpriority Claims**") against each of the Debtors pursuant to section 364(c) of the Bankruptcy Code, subject to the Carve-Out (as defined below), as provided in the DIP Orders and the DIP Credit Agreement;

e.      use cash collateral (as such term is defined in section 363 of the Bankruptcy Code) constituting Pre-Petition Collateral (including, without limitation, all cash and other amounts from time to time on deposit or maintained by the Debtors in any account or accounts held at Wells Fargo and controlled by Cascade and any cash proceeds of the disposition of any Pre-Petition Collateral (the "**Cash Collateral**")), subject to the grant of adequate protection to the Pre-Petition Secured Parties, and on the terms and conditions set forth in the DIP Orders and in the DIP Credit Agreement and in accordance with the Budget (as defined in the DIP Credit Agreement);

f.      grant adequate protection to the Pre-Petition Secured Parties as set forth in the DIP Orders to protect the Pre-Petition Secured Parties' interests in the Pre-Petition Collateral (including the Cash Collateral);

---

[4] This summary is qualified in its entirety by reference to the actual DIP Credit Documents and the DIP Orders. The DIP Credit Documents and the DIP Orders shall control if there is any conflict between them and this summary.

g.      lift the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Credit Documents, subject to the terms of the DIP Orders;

h.      waive any applicable stay, including under Bankruptcy Rule 6003 and 6004, to provide for immediate effectiveness of the DIP Orders; and

i.      pursuant to Bankruptcy Rule 4001, set a date for a hearing to consider entry of the Final Order, authorizing and approving the transactions described herein on a final basis.

**Concise Statement Pursuant
to Bankruptcy Rule 4001(c) Summarizing Terms of the Proposed DIP Financing**

9.      Pursuant to Bankruptcy Rule 4001(c), the Debtors submit this concise statement of the material terms of the DIP Financing, as specified in the DIP Credit Agreement and the Interim Order, substantially in the form attached hereto as **Exhibit A**.[5]

| Material Provision | Summary Description of Material Provision |
|---|---|
| **DIP Credit Agreement Parties**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement, §1.1. | Borrower: Optim Energy, LLC ("***Borrower***").<br><br>Guarantors: Each of the Borrower's affiliate Debtors in these chapter 11 cases (collectively, the "***Guarantors***").<br><br>Lenders: Cascade, as the initial lender, and other financial institutions, if any, to be determined by Cascade (collectively, the "***DIP Lenders***").<br><br>Administrative Agent: Wells Fargo (in its capacity as administrative agent, the "***Administrative Agent***").<br><br>L/C Issuer: Wells Fargo (in its capacity as the issuing bank for the letters of credit issued under the DIP Facility, the "***L/C Issuer***") |
| **Amount of Borrowing and Letters of Credit**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(ii)<br><br>DIP Credit Agreement, §§ 1.1, 2.1. | An amount not exceeding $115 million (including $75 million that may be borrowed on an interim basis), which shall include (a) a $56 million letter of credit sub-facility to replace existing letters of credit or to provide credit support for certain critical vendors ($41 million of which shall be used to replace pre-petition letters of credit only), and (b) a $25 million letter of credit sub-facility to support the hedging and trading of safe-harbored energy contracts. |
| **Purpose/Use of Funds**<br><br>Fed. R. Bankr. P. 4001(b)(1)(B)(ii) and (c)(1)(B); Local Rule 4001- | Proceeds of the DIP Facility will be used to fund (i) working capital, (ii) general corporate purposes, (iii) certain hedging obligations relating to energy trading contracts, (iv) replacement of existing letters of credit and new letters of credit to support certain critical vendors, and (v) restructuring expenses and professional fees, |

---

[5] This concise statement is qualified in its entirety by reference to the applicable provisions of the DIP Credit Documents or the DIP Orders, as applicable. To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Credit Documents or the DIP Orders, the provisions of the DIP Credit Documents or the DIP Orders, as applicable, shall control.

| Material Provision | Summary Description of Material Provision |
|---|---|
| 2(a)(ii)<br><br>Interim Order, ¶¶ 8, 15; DIP Credit Agreement, §§ 8.14 and 9.11. | in each case with respect to clauses (i) through (v), pursuant to the Budget; *provided, however,* that none of the proceeds of the DIP Facility and none of the DIP Obligations, the Cash Collateral, the DIP Collateral or the Carve-Out shall be used to, among other things, (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under or the liens, security interests or claims granted under the DIP Orders, the DIP Credit Documents or in connection with the pre-petition indebtedness or (b) investigate, initiate or prosecute any claims and defenses or causes of action against any of the Administrative Agent, the L/C Issuer, the DIP Lenders, the Pre-Petition Lender, or the Pre-Petition Secured Parties under or relating to the DIP Facility or the pre-petition indebtedness, (c) prevent, hinder or otherwise delay the Administrative Agent's or any DIP Lender's assertion, enforcement or realization on cash collateral or the DIP Collateral in accordance with the DIP Credit Documents and the DIP Orders, (d) seek to modify any of the rights granted to the Administrative Agent, the DIP Lenders, the L/C Issuer, the Pre-Petition Lender or the Pre-Petition Secured Parties under the DIP Credit Documents or the pre-petition indebtedness documents, in each of the foregoing cases without such parties' prior written consent, or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (A) approved by an order of the Court and (B) in accordance with the DIP Credit Documents and any relevant Budget; and *provided further,* that if an official creditors' committee of unsecured creditors (the "***Committee***") is appointed, then it or its counsel may use up to $125,000 to investigate, for a 60-day period from the date that notice of the Committee's formation is filed on the docket of these chapter 11 cases, the validity, perfection, priority, extent or enforceability of the pre-petition indebtedness and the liens on and security interests in the Pre-Petition Collateral (and in the case of other parties in interest with requisite standing, 75 days from the date of entry of the Interim Order). |
| **Interest Rate and Margins**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(ii)<br><br>DIP Credit Agreement, §§ 1.1, 2.3, and 2.4. | <u>Drawn Amounts</u>: LIBOR + 500 bps per annum (actual/360).<br><br><u>Letters of Credit</u>: LIBOR + 500 bps per annum (actual/360).<br>Interest shall accrue on a monthly basis only on drawn and unreimbursed Letters of Credit, but shall be paid when reimbursement obligations are paid in full.<br><br><u>Default Interest</u>:  The per annum interest rate at all times equal to (i) the sum of (A) the interest rate otherwise applicable to the loan as set forth in the DIP Credit Agreement plus (B) 2.0% *per annum* or (ii) the Maximum Rate (as defined in the DIP Credit Agreement) during the continuance of an Event of Default under the DIP Facility. |
| **Fees**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Interim Order, ¶ 2(c)(iii); DIP Credit Agreement, §§ 2.3(g), 2.5 and 16.6. | <u>Commitment Fee</u>:  Initial Availability: 2.0% of the lesser of (a) $75 million and (b) the Initial Availability under the DIP Facility due on the Closing Date, the payment of which shall not occur until the Maturity Date.<br>Full Availability:  Due upon the Full Availability under the DIP Facility, 2.0% of the lesser of (a) $115 million and (b) the Full Availability under the DIP Facility minus amount of Fees based upon Initial Availability, the payment of which shall not occur until the Maturity Date.<br><br><u>Undrawn Fee</u>:  After the Closing Date, a non-refundable fee will accrue at 0.75% *per annum* based on the aggregate average daily undrawn amount under the DIP Facility for the prior quarter, due quarterly in arrears, but payment deferred until the Maturity Date.<br><br><u>Extension Fee</u>: 1.0% of the aggregate principal amount of the loans and commitments outstanding under the DIP Facility (whether drawn or undrawn), calculated and due |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | as of the date of the extension, but payment deferred until the Maturity Date.<br><br>Letter of Credit Issuance Fees:  Borrower agrees to pay the L/C Issuer an amount equal to 0.90% of the stated amount of the issued Letters of Credit, and upon any extension of the term of any L/C (whether by renewal or otherwise), the Borrower shall pay the L/C Issuer for its own account an extension fee in an amount equal to 0.075% of the stated amount of such L/C for each month (rounded upwards for any partial month) such L/C is extended.<br><br>Agency Fee: Borrower shall pay the Administrative Agent an annual administrative fee of $40,000, which shall be earned by, and payable to, the Administrative Agent, monthly in advance, beginning on the Closing Date, so long as the DIP Credit Agreement is in effect.<br><br>Administrative Fees: Reimbursement of reasonable fees and expenses of the DIP Lenders, the Administrative Agent and the L/C Issuer, including, without limitation, of primary counsel, local counsel and financial advisors, as well as documentary and processing charges to be paid to the L/C Issuer for any issuance, amendment, transfer or payment of a Letter of Credit as are in accordance with the L/C Issuer's standard schedule for such charges as in effect at the time of such issuance, amendment, transfer or payment, as the case may be. |
| **Maturity Date**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(ii)<br><br>DIP Credit Agreement, §§ 1.1 and 2.2(h). | Earlier of (a) 12 months after the Petition Date or 15 months if the Extension Option is exercised, (b) the effective date of a chapter 11 plan of reorganization of any of the Debtors, and (c) the date that the DIP Facility is accelerated, whether at stated maturity, upon the occurrence of an Event of Default or otherwise.<br><br>Extension Option:  Borrower shall have a single three-month extension option, subject to no ongoing Event of Default, extension of the Debtors' exclusivity period, and the prior written consent of the Majority Lenders. |
| **Optional Prepayment**<br><br>Interim Order, ¶ 9; DIP Credit Agreement, § 3.2. | Borrower may voluntarily prepay the principal of the Loans, in whole or in part, without premium or penalty, at any time, subject to the payment of breakage costs and all accrued and unpaid interest on the principal amount being prepaid, with a minimum payment of $5 million. |
| **Mandatory Prepayment**<br><br>Interim Order, ¶ 9; DIP Credit Agreement, § 3.3. | Asset Sales: 100% of net cash proceeds of sales or disposition of any property or assets (net of reasonable costs, fees and expenses relating to the transaction, any applicable sales, transfer or other taxes and amounts required to obtain the release of related Permitted Liens (as defined in the DIP Credit Agreement) of the Debtor.<br><br>Insurance Proceeds: 100% of net cash proceeds of insurance paid on account of any loss of any property or assets or in respect of any business interruption of the Debtors other than up to $1 million of net cash proceeds that are applied to restoration of a property.<br><br>Excess Liquidity:  At the beginning of each month, if there is cash held in any Collateral Account (as defined in the DIP Credit Agreement) in an amount that exceeds the Liquidity Cushion  (as defined in the DIP Credit Agreement) by at least $1 million, all such excess cash shall be used to prepay outstanding loans, or if there are no such loans, to cash collateralize outstanding letters of credit, if any, on a pro rata basis. |
| **Events of Default** | Standard and customary events of default for financings of this type, including, |

| Material Provision | Summary Description of Material Provision |
|---|---|
| Fed. R. Bankr. P. 4001(b)(1)(B) and (c)(1)(B)(iii); Local Rule 4001-2(a)(ii)<br><br>DIP Credit Agreement, § 12.1. | without limitation:<br>• non-payment of principal, interest and fees;<br>• breaches of representations and warranties;<br>• defaults under affirmative and negative covenants;<br>• defaults with respect to post-petition debt or any take-or-pay contract entered into post-petition;<br>• termination, revocation or invalidity of any DIP Credit Documents or guaranty thereunder;<br>• unstayed judgments in excess of specified amounts;<br>• incurrence of certain ERISA liability;<br>• impairment of security interests in the DIP Collateral;<br>• a Debtor's application or the entry of an order, in either case without the prior written consent of the Majority Lenders, for the appointment of a trustee or examiner with enlarged powers under the Bankruptcy Code;<br>• entry of an order dismissing a Case or converting a Case to a case under Chapter 7 of the Bankruptcy Code;<br>• violation of any Debtor of any provisions of the DIP Orders if such violation is adverse to the Administrative Agent or the DIP Lenders;<br>• termination of the Debtors' exclusivity period for proposing a Plan of Reorganization;<br>• failure of Debtors to meet certain agreed upon Milestones relating to progress of these chapter 11 cases as to asset sales and/or a plan of reorganization;<br>• as of any date during the term of the DIP Credit Agreement, the absence of a Budget agreed between the Majority Lenders and the Borrower that covers at least four full weeks immediately following such dates;<br>• failure of the Debtors to file the Cases in the District of Delaware, or the transfer of any Case from the District of Delaware to another district;<br>• the Final Order shall not have been entered by the Court within 35 days from the entry of the Interim Order; and<br>• the addition of any member to the board of directors of the Borrower after the Closing Date, other than any addition of directors proposed by the Borrower and approved by the Majority Lenders (provided that there shall be no more than 3 directors at any one time). |
| **Priority of DIP Liens and Effect on Existing Liens**<br><br>Fed. R. Bankr. P. 4001(b)(1)(B)(i), (ii) and (c)(1)(B)(i); Local Rule 4001-2(a)(i)<br><br>Interim Order, ¶ 5; DIP Credit Agreement, § 8.2. | The Administrative Agent, the L/C Issuer and each of the DIP Lenders shall be granted security interests and liens (including liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code), payable from, and having recourse to, all pre-petition property, including, but not limited to, all Pre-Petition Collateral (except with respect to the NRG Lien and the Non-Primed Liens (each as defined in the DIP Orders)), and post-petition property of the Debtors' estates and all proceeds thereof (including, any Avoidance Actions and Avoidance Proceeds (each as defined in the DIP Orders)), subject only to the Carve-Out and the NRG Lien and any other Non-Primed Liens. |
| **Superpriority Claims**<br><br>Interim Order, ¶ 3; DIP Credit Agreement, § 8.2(b). | Pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Obligations shall at all times constitute allowed senior administrative expense claims against each of the Debtors with priority over any and all other administrative expenses, including, without limitation, the kinds specified in sections 105, 326, 328, 330, 331, 503(b), 506(c) (with any claims arising under section 506(c) only subject to the entry of the Final Order), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code or otherwise, which shall be payable from and have recourse to all pre- and post-petition property of the Debtors and their estates and all proceeds thereof, including, without |

| Material Provision | Summary Description of Material Provision |
|---|---|
|  | limitation, all Avoidance Actions and Avoidance Proceeds (each as defined in the DIP Orders), subject only to the Carve-Out. |
| **Adequate Protection Obligations** <br><br> Fed. R. Bankr. P. 4001(b)(1)(B)(iv) and (c)(1)(B)(ii) <br><br> Interim Order, ¶¶ 10, 17; DIP Credit Agreement §§ 1.1 and 3.3. | The Pre-Petition Secured Parties have agreed to adequate protection for the priming of their liens and the use of Cash Collateral, including through: (i) replacement security interests in and liens on all of the DIP Collateral (including, subject to and effective only upon entry of the Final Order, a replacement security interest and lien upon the Avoidance Actions and the Avoidance Proceeds (each as defined in the DIP Orders)), subject and subordinate only to the DIP Liens, the NRG Lien (as defined in the DIP Orders) and the Carve-Out, to the extent of any diminution in the value of their interests in the Pre-Petition Collateral, (ii) superpriority administrative claims, subject and subordinate only to the Superpriority Claims and the Carve-Out, for the extent of any diminution in value of their interests in the Prepetition Collateral, (iii) reimbursement of the Pre-Petition Secured Parties' fees and expenses, (iv) payment of certain asset sale proceeds to the extent that such proceeds repay the DIP Financing in full, (v) payment of real estate taxes to avoid encumbering the Debtors' real property, (vi) certain financial reporting and collateral monitoring rights and (vii) preservation of the right to credit bid up to the full amount of the Pre-Petition Indebtedness in connection with any sale of the DIP Collateral. |
| **Covenants** <br><br> Fed. R. Bankr. P. 4001(c)(1)(B) <br><br> DIP Credit Agreement, Articles 9 and 10. | Affirmative, negative and financial covenants that are customary and appropriate for financings of this kind, including, but not limited, to a commitment by the Borrower to establish a cash management system within a certain time (with monthly cash sweeps of any excess cash to the Cash Collateral Accounts, subject to an availability cushion), satisfactory to the DIP Lenders, and to satisfy certain liquidity, gross margin and budget compliance covenants. |
| **Budget** <br><br> Fed. R. Bankr. P. 4001(b)(1)(B) and (c)(1)(B); Local Rule 4001-2(a)(ii) <br><br> Interim Order, ¶ 16; DIP Credit Agreement, §§ 1.1, 7.2(f) | A 13-week cash flow budget of anticipated and forecasted revenues and expenses, to be updated every 4 weeks, which shall be acceptable to the Majority Lenders in accordance with Sections 7.2(f) of the DIP Credit Agreement. |
| **Milestones** <br><br> Fed. R. Bankr. P. 4001(b)(1)(B)(vi) and (c)(1)(B) <br><br> DIP Credit Agreement, § 12.1, Schedule 12.1. | Within the time periods set forth below, Borrower shall perform each action with respect to the Cases of each of the Debtors, including, without limitation, the Milestones set forth below, subject to waiver by consent of the Majority Lenders: <br>• As soon as practicable, but in any event within the 90 days immediately following the Petition Date, either (i) executing a sale agreement with a stalking horse bidder relating to the sale of, at a minimum, Twin Oaks or substantially all of Twin Oaks' assets, and filing a sale motion and bidding procedures motion relating to such sale with the Bankruptcy Court, or (ii) filing a bidding procedures motion and an auction sale motion with the Bankruptcy Court to implement bidding procedures for a sale of Twin Oaks or substantially all of Twin Oaks' assets without a stalking horse bidder; in each case acceptable to the Majority Lenders in their sole discretion; <br>• Within 120 days of the Petition Date, obtain entry of a bidding procedures order from the Bankruptcy Court approving bidding procedures for a sale of Twin Oaks or substantially all of Twin Oaks' assets; <br>• Within 150 days of the Petition Date, obtain Bankruptcy Court approval of a sale of Twin Oaks or substantially all of Twin Oaks' assets, to the extent a successful bidder has been selected; |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | • 6 months from the Petition Date, Borrower must deliver to the Lender either (a) a draft plan of reorganization (the "***Plan***") and disclosure statement (the "***Disclosure Statement***"), in each case acceptable to the Lender in its reasonable discretion or (b) a proposal for the sale of any or all of the equity in or assets of any or all of the Debtors (any such proposal, the "***Sale Proposal***") acceptable to the Lender in its reasonable discretion;<br>• 8 months from the Petition Date, Borrower must file the Plan and the Disclosure Statement or the Sale Proposal with the Bankruptcy Court; and<br>• 12 months from the Petition Date – Borrower must obtain confirmation by the Bankruptcy Court of the Plan and attain the effective date thereof or consummate the sale contemplated by the Sale Proposal; provided however, that if the Plan or the Sale Proposal has been filed, and the Extension Option has been elected, this Milestone deadline shall be 15 months |
| **Conditions of Lending**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(ii)<br><br>DIP Credit Agreement, §§ 11.1 and 11.2. | Conditions of Lending are standard and customary for financings of this kind. |
| **Carve-Out**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Interim Order, ¶ 4; DIP Credit Agreement, § 1.1. | The DIP Liens, the Superpriority Claims, the Adequate Protection Liens and the Adequate Protection Superpriority Claims shall be subject to the following: (i) any fees required to be paid to the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. §1930(a), (ii) any and all allowed and unpaid claims of professionals whose retention is approved by the Court during the Cases pursuant to Sections 327 and 1103 of the Bankruptcy Code for unpaid fees and expenses incurred (A) prior to the occurrence and continuation of an Event of Default, whether allowed before or after such Event of Default, and (B) after the occurrence and during the continuance of an Event of Default, in an aggregate amount not to exceed $350,000, which amount may be used subject to and effective only upon entry of the Final Order, to pay any fees or expenses incurred by the Debtors, in an amount not exceeding $250,000, and the Committee, in an amount not exceeding $100,000, in respect of (x) allowances of compensation for services rendered or reimbursement of expenses awarded by the Court to the Debtors' or the Committee's professionals and (y) the reimbursement of expenses allowed by the Court incurred by the Committee members in the performance of their duties (but excluding fees and expenses of third party professionals employed by such members).  The Carve-Out is subject to paragraph 15 of the DIP Orders regarding the limitation on use of financing proceeds and collateral. |
| **Stipulations**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(iii)<br><br>Interim Order, ¶¶ D, 14. | The Debtors make certain customary admissions and stipulations with respect to (i) the aggregate amount of prepetition indebtedness owing to the Pre-Petition Secured Parties, (ii) the binding nature of the obligations under the Pre-Petition Credit Agreement in respect of the Debtors, (iii) the validity, enforceability and priority of the liens and security interests granted to the Pre-Petition Secured Parties and (iv) the waiving of claims and defenses against the Pre-Petition Lender and the Pre-Petition Secured Parties regarding the obligations under the Pre-Petition Facility; *provided* that, such stipulations and admissions shall be binding upon the Debtors, the Debtors' estates and all parties in interest unless and solely to the extent that (i) a properly authorized adversary proceeding (subject to the limitations contained in paragraph 15 of the DIP Orders) has been commenced by the Committee or any other party in interest with requisite standing of the Debtors (x) challenging the validity, enforceability, priority or extent of the Outstanding Pre-Petition Facility Indebtedness, the Pre-Petition Indebtedness, the Pre-Petition Indebtedness Documents |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | or the Pre-Petition Secured Parties' liens on the Pre-Petition Collateral or (y) otherwise asserting claims or causes of action against the Pre-Petition Lender or the Pre-Petition Secured Parties in connection with matters related to the Outstanding Pre-Petition Facility Indebtedness, the Pre-Petition Facility, the Pre-Petition Indebtedness Documents or the Pre-Petition Collateral, by the earlier of (A) no later than the date that is 60 days after the date that notice of the formation of the Committee is appointed is filed on the docket of the Cases and (B) with respect to other parties in interest with requisite standing other than the Debtors or the Committee, by no later than the date that is 75 days after the date of the entry of the Interim Order, and (ii) there is a final order in favor of the plaintiff sustaining any such challenge in any properly authorized and timely filed adversary proceeding; *provided further* that, as to the Debtors, all such claims and defenses are irrevocably waived and relinquished as of the Petition Date upon entry of the Interim Order. |
| **Automatic Stay**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(iv)<br><br>Interim Order, ¶¶ 6(b), 12(b) | The automatic stay is modified to the extent necessary to permit the Debtors, the Administrative Agent, the L/C Issuer, the DIP Lenders and the Pre-Petition Secured Parties to implement and effectuate the terms and provisions of the DIP Credit Documents and the DIP Orders.<br><br>Any automatic stay otherwise applicable to the Administrative Agent, the L/C Issuer and the DIP Lenders is modified so that immediately upon occurrence and during the continuance of an Event of Default, and delivery of written notice to the Debtors and the Committee through their respective counsel, the Administrative Agent, the L/C Issuer and the DIP Lenders shall be entitled to exercise its rights and remedies in accordance with the DIP Credit Documents without further order of the Court beginning five (5) Business Days following delivery of the written notice to the extent set forth in the DIP Orders. |
| **Waivers and Consents**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(v), (vii – x)<br><br>Interim Order, ¶¶ 5, 6(b), 7, 10(a), 12(a); DIP Credit Agreement § 16.10 | <u>Non-Bankruptcy Law</u>.  The DIP Liens, the Adequate Protection Liens and other interests granted to the Administrative Agent, the L/C Issuer, the DIP Lenders and the Pre-Petition Secured Parties are deemed effective and perfected as of the Petition Date upon the entry of the Interim Order.<br><br><u>Indemnification</u>.  Indemnification provisions that are customary and appropriate for financings of this kind, including, but not limited to a commitment by the Borrower and Guarantors to indemnify the DIP Lenders, the L/C Issuer and the Administrative Agent, and each of their respective officers, directors, employees, counsel agents and attorneys-in-fact, from any and all losses arising from any investigation, litigation, or proceeding related to or arising out of the DIP Credit Documents, except for any such losses arising from the gross negligence or willful misconduct of any such party.<br><br><u>Sections 506(c) and 552(b)</u>.  Upon entry of the Final Order, to the extent granted therein, with the exception of the Carve-Out, no claim may be asserted against the Administrative Agent, the L/C Issuer, the DIP Lenders or the Pre-Petition Secured Parties, each in their capacity as such, to charge any expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, against the DIP Collateral or the Pre-Petition Collateral or recover such expenses from the DIP Collateral or the Pre-Petition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the Administrative Agent, the L/C Issuer, the DIP Lenders and the Pre-Petition Secured Parties, and no such consent shall be implied from any other action, inaction, or acquiescence by the Administrative Agent, the L/C Issuer, the DIP Lenders or the Pre-Petition Secured Parties.  Upon entry of the Final Order, in no event shall the |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | "equities of the case" exception of section 552(b) of the Bankruptcy Code apply to the secured claims of the Pre-Petition Secured Parties.  In no event shall the Administrative Agent, the L/C Issuer, the DIP Lenders, or the Pre-Petition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to their respective liens and security interests upon and in the DIP Collateral or the Pre-Petition Collateral, as applicable. |

## **Provisions to be Highlighted Pursuant to Local Rule 4001-2(a)(i)**

10.     The DIP Credit Agreement includes certain provisions the Debtors are required to highlight pursuant to Local Rule 4001-2(a)(i).  As discussed in detail herein, the Debtors believe these provisions are reasonable in light of the facts and circumstances of these chapter 11 cases and should be approved and are identified below:

a.     *Local Rule 4001-2(a)(i)(A)–Provisions that Grant Cross Collateralization.* Neither the DIP Orders nor the DIP Facility contemplate cross-collateralization other than replacement liens as adequate protection.

b.     *Local Rule 4001-2(a)(i)(B)–Validity, Perfection and Amount of Prepetition Obligations*.  As part of the Interim Order, the Debtors agree and stipulate that the liens, security interest and claims of the Pre-Petition Secured Parties are valid, perfected, enforceable and binding obligations of the Debtors not subject to challenge or defense.  Additionally, the Debtors have waived, discharged and released any right they may have to challenge any of the Pre-Petition Indebtedness or the security for those obligations.  Interim Order at ¶¶ D, 14.

c.     *Local Rule 4001-2(a)(i)(B)–Committee Challenge Period*.  All non-debtor parties in interest (other than the Committee) shall have until seventy-five (75) days from the date of entry of the Interim Order (and with respect to the Committee, up to sixty (60) days after its appointment) to investigate the validity, perfection, and enforceability of Pre-Petition Indebtedness and the Liens of the Pre-Petition Secured Parties.  Interim Order at ¶ 14.

d.     *Local Rule 4001-2(a)(i)(C) –Waiver of Section 506(c) Claims*. Subject to the entry of the Final Order, the DIP Facility will require the Debtors to waive certain rights to surcharge, pursuant to sections 105, 506(c) or 552 of the Bankruptcy Code or otherwise.  Interim Order at ¶¶ 6(b), 7.

e.     *Local Rule 4001-2(a)(i)(D)–Liens on Avoidance Actions*. The Debtors anticipate that the Interim Order will provide that the DIP Liens and the Superpriority Claims will include liens on, and superpriority administrative claims against, avoidance actions or the proceeds of

avoidance actions under Chapter 5 of the Bankruptcy Code. Subject to the entry of the Final Order, the Adequate Protection Liens will include a replacement security interest in and lien on avoidance actions or the proceeds of avoidance actions under Chapter 5 of the Bankruptcy Code. Interim Order at ¶¶ 3, 5(a), 10(a).

f.   *Local Rule 4001-2(a)(i)(E)–Deeming Prepetition Debt to be Postpetition Debt*.   The Debtors anticipate that the Final Order will not deem prepetition secured debt to be post-petition debt other than with respect to superpriority administrative claims that could arise as adequate protection granted to the Pre-Petition Secured Parties.

g.   *Local Rule 4001-2(a)(i)(F)–Treatment of Committee Professionals*. The treatment of the Committee's professional fees, among others, are included in the Carve-Out. As discussed above, each of the DIP Liens and Superpriority Claims are subject and subordinate to the Carve-Out. Interim Order at ¶ 4.

h.   Local Rule 4001-2(a)(i)(G)–*Non-Consensual Priming Liens*.   The DIP Financing does not seek to provide any non-consensual priming liens, consistent with the definition of "Non-Primed Liens" in the DIP Orders. The Pre-Petition Secured Parties have consented to priming liens in exchange for the adequate protection obligations provided for in the Interim Order and the Final Order. Interim Order at ¶ 5(b).

### The Debtors' Liquidity Needs

11.   As discussed in the First Day Declaration, as a result of rising costs for the Debtors' raw materials required to run their power plants and their debt load, the Debtors have experienced an unsustainable reduction in EBITDA.   Sustained decreased earnings (driven largely by a steady decrease in natural gas prices) have translated into a sharp decline in performance, placing stress on business operations and ultimately leading to the Debtors' inability to satisfy their payment obligations on an ongoing basis.

12.   Shortly after Optim Energy's formation, the company entered into a Credit Agreement, dated as of June 1, 2007, between Optim Energy and Wells Fargo (as amended, restated, supplemented or otherwise modified as of the date hereof, the "***Pre-Petition Credit Agreement***"), under which Wells Fargo agreed to extend a revolving credit facility to, and issue

letters of credit for, Optim Energy from time to time in an aggregate principal amount of up to $1 billion (the "**Pre-Petition Facility**").

13.     The Debtors' obligations under the Pre-Petition Credit Agreement are guaranteed by each of Cascade and ECJV under the Continuing Guaranty issued by Cascade and the Continuing Guaranty issued by ECJV, respectively, each dated as of June 1, 2007 (each as may be amended, restated, supplemented or otherwise modified from time to time, the "**Guarantees**"), for the benefit of Wells Fargo in respect of amounts owed by Optim Energy under the Pre-Petition Credit Agreement.  Pursuant to the Guaranty Reimbursement Agreement, dated June 1, 2007 (as amended, restated, supplemented or otherwise modified as of the date hereof, the "**Reimbursement Agreement**"), the Debtors agreed, jointly and severally, to reimburse Cascade and ECJV for any and all payments made on the Debtors' behalf to Wells Fargo or liabilities incurred under the Guarantees.  Pursuant to certain security documents, the Debtors granted Cascade, as collateral agent for the benefit of itself and ECJV, liens on and first priority security interests in substantially all of the Debtors assets.

14.     As a result of Cascade's payment in full of the outstanding $712 million principal amount of the Pre-Petition Facility, as well as approximately $975,000 in respect of accrued but unpaid interest, fees and expenses incurred or estimated to be incurred in connection with the Guarantees, and the delivery of $41 million of cash collateral relating to letters of credit issued and outstanding under the Pre-Petition Facility, the Pre-Petition Secured Parties have first priority secured claims against the Debtors in the approximate amount of $754 million.

15.     On December 31, 2013, the Debtors were required to pay Cascade a guarantee fee of $1.934 million, but instead, to preserve liquidity, did not make this payment and entered into a Forbearance Agreement, by which Cascade and ECJV agreed, subject to certain

conditions, to forbear from exercising any remedies as a result of such nonpayment until February 14, 2014. Due to the Debtors' failure to meet certain financial covenants contained in the Pre-Petition Facility, the Debtors could not continue to borrow additional funds needed for continued operations before the Petition Date without the consent of Cascade and ECJV. Cascade and ECJV would not permit the Debtors to borrow under the Pre-Petition Facility under the circumstances. Cascade and ECJV, however, agreed to provide the Debtors with the DIP Financing and the ability to use Cash Collateral pursuant to the terms of the DIP Orders and the DIP Credit Agreement and in accordance with the Budget.

16.     It is critical that there be no interruption in the supply of fuel to run the Debtors' power plants. The vendor and customer community in the Debtors' industry is highly competitive, specialized, and the Debtors' suppliers are extremely cautious to provide goods and services when receipt of payment is uncertain. With respect to the Debtor's suppliers, absent an ability to demonstrate that the Debtors have the means to operate in the ordinary course and procure goods and services that are vital to ongoing business operations, vendors and suppliers may seek alternative customers, resulting in disruption to the Debtors' supply chain. Any disruption in the Debtors' supply chain would cause a severe reduction in the Debtors' cash on hand. Furthermore, without fuel supplied in the ordinary course, the Debtors' plants would simply shut down.

17.     Immediate access to the DIP Facility and the use of Cash Collateral enables the Debtors to allay concerns of the Debtors' suppliers and customers and operate their power plants. Absent access to liquidity, the Debtors' ability to operate and ultimately restructure as a going concern will be jeopardized, all to the detriment of the Debtors' stakeholders. As a result, the

Debtors have an immediate need to secure the DIP Financing to ensure that working capital is available on an interim basis and throughout the pendency of these chapter 11 cases.

**The Debtors' Efforts to Obtain Post-Petition Financing**

18.     Beginning in December 2013, the Debtors—with the assistance of their advisors—initiated a process to identify potential sources of funding in case the Debtors ultimately needed to file for chapter 11 protection.  Because the Pre-Petition Secured Parties had senior-secured, security interests in virtually all of the Debtors' assets relating to the Guarantees and the Reimbursement Agreement, the Debtors initially approached the Pre-Petition Secured Parties regarding either their willingness to (a) provide DIP financing or (b) consent to DIP financing from a third-party that would prime the liens held by the Pre-Petition Secured Parties. (Mack Decl., ¶ 11).  The Pre-Petition Secured Parties expressly objected to a potential third-party priming transaction and provided the Debtors with a debtor-in-possession financing proposal. (*Id*.)

19.     After significant arms-length negotiations that improved the terms of the proposal for the benefit of the Debtors, the Pre-Petition Secured Parties proposed the DIP Financing and Cash Collateral usage that is the subject of this Motion.  There were multiple rounds of negotiations between Optim Energy (through its independent directors and advisors) and Cascade.  Optim Energy and Cascade were represented by separate advisors during the negotiations.  The negotiations were conducted in good faith and at arms length, and the terms of the DIP Financing approved by Optim Energy's independent directors.

20.     In addition, Barclays, on behalf of Optim, contacted five (5) parties, which included banks and funds that specialize in debtor-in-possession financing and have experience in the energy markets.  None of these parties was willing to provide unsecured debtor-in-possession financing or secured post-petition financing that would be junior to the liens granted

the Pre-Petition Secured Parties.  The Debtors (through their management, independent directors and advisors) ultimately concluded that a non-consensual priming debtor-in-possession financing was not worth pursuing due to the overleveraged nature of the Debtors' capital structure and time, risk and cost of a contested priming fight.  Indeed, the uncertainty regarding the Debtors' ability to finance their operations during a priming fight would likely materially impair the Debtors' relationships with vendors and customers at a crucial stage in the Debtors' efforts to restructure.

21.    Notably, the terms of the DIP Financing are better than what is available in the market.  The DIP Financing defers payment of all interest and the vast majority of fees until maturity of the DIP Financing.  Additionally, the DIP Financing is structured as a cash flow revolving credit facility that is not generally available in the market and permits the Debtors to mitigate the amount of interest that accrues.

22.    In sum, the Debtors believe DIP Financing represents the best and most favorable financing option available to the Debtors under the circumstances.  The proposed DIP Financing will provide the Debtors with the liquidity needed during these chapter 11 cases to continue running its businesses in the ordinary course with minimum disruption.

### Development of the Budget and the Debtors' Liquidity Needs

23.    To best assess the Debtors' funding needs during these chapter 11 cases, the Debtors, with the assistance of their advisors, analyzed their cash needs to determine what is necessary to maintain their operations in chapter 11 and work toward a successful reorganization. Based on the Debtors' financial projections, the Debtors concluded that cash on hand alone would be insufficient to fund the filing or the Debtors' business plan throughout the pendency of these chapter 11 cases.  Thus, to provide the Debtors with appropriate and necessary financing,

obtaining debtor-in-possession financing was critical to ensure that operations would continue uninterrupted during these chapter 11 cases.

24.     Utilizing this cash flow forecast to project their cash needs during these chapter 11 cases, the Debtors believe that access to approximately $75 million in liquidity is necessary for operations on an interim basis.  The Debtors believe vendors may tighten credit terms, which could result in a severe reduction to the Debtors' cash on hand.  Therefore, without approval of the relief requested herein, the Debtors believe they may face significant liquidity constraints in the coming weeks.

25.     In addition, the Debtors believe that they need to be able to issue letters of credit in the amount of up to $56 million ($41 million of which shall only be used to replace existing letters of credit) on an interim basis under the DIP Facility, which amount is included in the $75 million liquidity needs.  The Debtors have outstanding letters of credit of approximately $41 million, in the aggregate, to support certain of the Debtors' key business relationships (the "*Existing LCs*").  The Existing LCs expire on May 31, 2014 and will need to be replaced with new letters of credit.  The Debtors believe that the beneficiaries of these letters of credit will refrain from drawing on the Existing LCs if the Debtors promptly replace them with new letters of credit under the DIP Facility.  Avoiding draws on the Existing LCs would benefit the Debtors by preventing these contingent liabilities from becoming funded secured claims.

## Supporting Authority

**A.     The Proposed DIP Facility Reflects the Debtors' Sound Exercise of Business Judgment**

26.     A debtor's decision to enter into a post-petition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  *See In re YL W. 87th Holdings I, LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010)  ("Courts have generally deferred to

a debtor's business judgment in granting section 364 financing."); *Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving post-petition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment").  Thus, the "normal function in reviewing requests for post-petition financing is to defer to a debtor's own business judgment so long as a request for financing does not leverage the bankruptcy process and unfairly cede control of the reorganization to one party in interest." *In re Barbara K Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008).

27.    To determine whether this standard is met, the Court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); see also *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code") (citation omitted).

28.    The Debtors' determination to enter into the proposed DIP Facility is a sound exercise of the Debtors' business judgment and should be approved.  The Debtors and the Pre-Petition Secured Parties engaged separate advisors to negotiate the DIP Financing on an arms-length basis.  The DIP Financing is the only financing available to the Debtors under the circumstances and it provides crucial funding on reasonable and favorable terms in comparison to the existing market.  The DIP Financing carries an interest rate of LIBOR plus 500 bps per annum (actual/360) but defers payment of all such interest and the vast majority of fees for the DIP Financing until maturity of the DIP Financing (other than with respect to administrative fees

and letters of credit).  This deferment of fees and interest is a feature that is better than market for comparable financings.

29.     Moreover, it is critical that the Debtors assure their customers and vendors that they will operate in the ordinary course of business and have the resources in place to do so. Therefore, entry into the DIP Facility and securing the financing available thereunder is critical to the preservation of estate assets and is in the best interest of the Debtors' creditors and all parties in interest.  Thus, the Debtors respectfully submit that entry into the DIP Facility is an exercise of the Debtors' sound business judgment.

**B.      The Debtors Should Be Authorized to Obtain Financing Under Section 364 of the Bankruptcy Code on a Senior Secured and Superpriority Basis**

30.     Pursuant to section 364(c) of the Bankruptcy Code, a court may authorize a debtor to incur debt that is: (a) entitled to a superpriority administrative expense status; (b) secured by a lien on otherwise unencumbered property; or (c) secured by a junior lien on encumbered property if the debtor cannot obtain post-petition credit on an unsecured basis, as an ordinary administrative expense.  *See* 11 U.S.C. § 364(c)(1).  To incur credit on this basis, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis.  *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).  Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  *Id.* When few lenders are likely to be willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989).  *See also Pearl-Phil GMT (Far East) Ltd v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001)

(authorizing superpriority administrative expenses where debtor could not obtain credit as an administrative expense)

31.      The Debtors do not have material, unencumbered assets available to support a post-petition credit facility.  The Debtors do not believe financing would be available on commercially reasonable terms solely on an administrative priority or junior secured basis. Indeed, as described in the George Mack Declaration, no third parties expressed a willingness to finance the Debtors on an unsecured or junior secured basis.  Therefore, the Debtors believe their ability to secure the DIP Facility with superpriority administrative claims, and first priority liens on the Debtors' unencumbered property is appropriate under the circumstances of these chapter 11 cases.

**C.      The Debtors Should be Authorized to Obtain Post-Petition Financing Secured by First Priority Priming Liens**

32.      Section 364(d)(l) of the Bankruptcy Code provides that a court may authorize a debtor to incur post-petition debt on a senior or "priming" basis if (a) the debtor is unable to obtain credit otherwise and (b) there is "adequate protection" of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. *See* 11 U.S.C. § 364(d)(l).  Here, the DIP Facility primes the liens of the Pre-Petition Secured Parties, who have consented to such priming on the terms set forth herein.[6]

33.      Courts have identified a number of factors that support a debtor's determination to obtain credit secured by a "priming" lien, including:

      a.      whether the party subject to a priming lien has consented to such treatment;

---

[6]   For the avoidance of doubt, the Debtors' proposed DIP Facility will not prime the Carve-Out or valid perfected enforceable existing liens of any party, consistent with the definition of "Non-Primed Liens" in the DIP Orders, other than the Pre-Petition Secured Parties.  The Debtors believe the value of these liens is de minimis.

b. whether alternative financing is available on any other basis (i.e., whether any better offers, bids or timely proposals are before the court);

c. whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;

d. whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lender(s);

e. whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and

f. whether the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Barbara K. Enter.*, No. 08-11474, 2008 WL 2439649 at \*13 (Bankr. S.D.N.Y. Jun. 16, 2008); *see also 3 Collier on Bankruptcy* ¶ 364.05 (Alan N. Resnick & Henry J. Sommer eds. 16th ed.).

34. The Debtors respectfully submit that the DIP Facility is appropriate under this analysis and the facts of these chapter 11 cases.  The Pre-Petition Secured Parties have consented to the priming feature of the DIP Facility and to the adequate protection package described more fully below.  The Debtors require the DIP Facility to provide adequate liquidity for plant maintenance, operation, and repair of their assets.  Absent such relief, the Debtors cannot ensure they will have the financial wherewithal to operate with an adequate level of cash on hand, and value to the Debtors' estates may be lost if there are unexpected outages and/or the Debtors cannot operate or maintain their assets in the ordinary course.  Conversely, the Debtors' access to liquidity will benefit all stakeholders by facilitating the Debtors' efforts to preserve and enhance the plants' value and to facilitate the Debtors' ultimate emergence from chapter 11.  *See In re Trans World Airlines, Inc.*, 163 B.R. at 974.

35.     Additionally, the Debtors and their advisors have determined that the DIP Facility is the only readily available alternative for such liquidity.  The Debtors do not believe the financing necessary to fund these chapter 11 cases and the Debtors' operations is available from other parties on comparable terms.

**D.      The Scope of the Carve-Out is Appropriate**

36.     The proposed DIP Facility subjects the DIP Liens, the Superpriority Claims and the Adequate Protection Obligations to the Carve-Out.  Similar carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel.  *See Ames*, 115 B.R. at 40.  The DIP Facility does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases. *See Ames*, 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").   Additionally, the Carve-Out protects against administrative insolvency during the course of these chapter 11 cases by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees of the Debtors and a Committee, notwithstanding the grant of superpriority and administrative liens and claims under the DIP Facility.

**E.      The Payment of Fees to the Administrative Agent, L/C Issuer and DIP Lenders is Appropriate**

37.     The fees and charges to be paid to the Administrative Agent, the L/C Issuer and the DIP Lenders (described in the Bankruptcy Rule 4001(c) Concise Statement above) are reasonable and appropriate under the circumstances.  Courts routinely authorize similar lender incentives beyond the explicit liens and rights specified in section 364 of the Bankruptcy Code.

*See In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316 (9th Cir. BAP 1992) (approving financing facility pursuant to section 364 of the Bankruptcy Code that included a lender "enhancement fee"). Barclays has compared the fees and interest under the DIP Facility to the market and concluded that the DIP Facility is consistent with current market practice. In fact, the DIP Lenders, the Administrative Agent and the L/C Issuer have agreed to defer payment of all interest and the vast majority of fees until maturity of the DIP Facility, which is a beneficial feature that is likely not available in the market. Accordingly, the Debtors submit that the fee set forth in the DIP Credit Agreement payable to the Administrative Agent, the L/C Issuer and the DIP Lenders are in line with transactions of this type, and should be approved under the circumstances.

**F.    The DIP Facility was Negotiated in Good Faith and Should be Afforded the Protection of Section 364(e) of the Bankruptcy Code**

38.    Pursuant to section 364(e) of the Bankruptcy Code, any reversal or modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under section 364 of the Bankruptcy Code shall not affect the validity of that debt incurred or priority or lien granted as long as the entity that extended credit "extended such credit in good faith." *See* 11 U.S.C. § 364(e).

39.    As described above and in the First Day Declaration and the George Mack Declaration, the terms of the DIP Facility were negotiated in good faith and at arm's-length between the Debtors, Cascade (as the Initial Lender) and Wells Fargo (as the Administrative Agent and the L/C Issuer), and the DIP Financing will be extended by the DIP Lenders, the Administrative Agent and the L/C Issuer in good faith (as such term is used in section 364(e) of the Bankruptcy Code). The negotiations regarding the terms of the DIP Financing were hard-fought and conducted over the course of several weeks. The Debtors' independent directors and

advisors negotiated on behalf of the Debtors with the Initial Lender and Wells Fargo, obtaining several concessions from the Initial Lender and Wells Fargo that benefitted the Debtors. Moreover, some of the DIP Financing's terms are better than what is available from unaffiliated parties in the market.  The terms of the DIP Financing were ultimately approved by Debtors' independent directors with the advice and input of the Debtors' advisors.

40.    The DIP Facility has been extended in express reliance upon the protections afforded by section 364(e) of the Bankruptcy Code and the DIP Lenders, the Administrative Agent and the L/C Issuer should be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order or any provision thereof is vacated, reversed or modified on appeal or otherwise. *See* 11 U.S.C. § 364(e).

### G.    The Debtors' Proposed Grant of Adequate Protection is Appropriate

41.    As discussed above, the DIP Financing contemplates providing the Administrative Agent, the L/C Issuer and the DIP Lenders with priming liens on the liens granted to the Pre-Petition Secured Parties pursuant to section 364(d) of the Bankruptcy Code. Accordingly, the Debtors are required to show that the interests of the Pre-Petition Secured Parties are "adequately protected." 11 U.S.C. § 364(d).  Additionally, pursuant to section 363(c) of the Bankruptcy Code, the Debtors may only use cash collateral of the Pre-Petition Secured Parties subject to the consent of those parties or the grant of adequate protection. 11 U.S.C. § 363(c)(2).

42.    What constitutes adequate protection is decided on a case-by-case basis and it can come in various forms, including payment of adequate protection fees, payment of interest, granting of replacement liens and administrative claims.  *See In re Columbia Gas Sys., Inc*., 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Masello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry ... left to the

vagaries of each case"); *see also In re Realty Southwest Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted); *see also In re Continental Airlines Inc.*, 154 B.R. 176, 180-181 (Bankr. D. Del. 1993).

43.     Here, the Pre-Petition Secured Parties have agreed to the adequate protection (the "***Adequate Protection Obligations***") for the priming of their liens and the use of Cash Collateral, including: (i) replacement security interests in and liens on all of the DIP Collateral (which shall include, subject to and effective only upon entry of the Final Order, a replacement security interest in and lien upon the Avoidance Actions and the Avoidance Proceeds), subject and subordinate only to the DIP Liens, the NRG Lien (as defined in the DIP Orders) and the Carve-Out, to the extent of any diminution in the value of their interests in the Pre-Petition Collateral, (ii) superpriority administrative claims, subject and subordinate only to the Superpriority Claims and the Carve-Out, for the extent of any diminution in value of their interests in the Prepetition Collateral, (iii) reimbursement of the Pre-Petition Secured Parties' fees and expenses, (iv) payment of certain asset sale proceeds to the extent that such proceeds repay the DIP Financing in full, (v) payment of real estate taxes to avoid encumbering the Debtors' real property, (vi) certain financial reporting and collateral monitoring rights and (vii) preservation of the right to credit bid up to the full amount of the Pre-Petition Indebtedness in connection with any sale of the DIP Collateral. *Interim Order*, ¶ 10.

44.     The Debtors submit that the Adequate Protection Obligations proposed herein and in the DIP Orders are fair and reasonable and are sufficient to satisfy the requirements of sections 363(c) and 364(d) of the Bankruptcy Code. *See* 11 U.S.C. §§ 363(c), 364(d).

**H.     The Terms of the DIP Facility are Fair, Reasonable and Appropriate in Light of the Debtors' Needs and the Current Market Environment**

45.     It is well-recognized in this jurisdiction and others that the appropriateness of a proposed post-petition financing facility must be considered in light of current market conditions. *See, e.g., In re Snowshoe Co. Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (noting that a debtor is not required to seek credit from every possible lender before determining such credit is unavailable).  Indeed, courts often recognize that where there are few lenders likely, able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [a debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd, 99 B.R. 117 (N.D. Ga. 1989); *see also In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (authorizing secured credit under section 364(c)(2), after notice and a hearing, upon showing that unsecured credit was unobtainable); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (finding refusal of two national banks to grant unsecured loans was sufficient to support conclusion that requirements of section 364 requirement had been met); *Ames*, 115 B.R. at 37-39 (holding that debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

46.     Rather, a debtor must demonstrate that it made a reasonable effort to seek credit from other sources available under sections 364(a) and 364(b) of the Bankruptcy Code. *See Snowshoe*, 789 F.2d at 1088; *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 899-900 (Bankr. N.D. Ohio 1992).

47.    The Debtors' efforts to obtain alternative post-petition financing made clear that there is no ready market for the Debtors to obtain financing on any terms other than a senior secured, superpriority basis.  As discussed above and in the George Mack Declaration, the DIP Financing was the only available financing under the circumstances.

48.    Further, in considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland*, 294 B.R. at 886; *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (recognizing a debtor may have to enter into hard bargains to acquire funds for its reorganization).  Here, despite the unavailability of alternative post-petition financing, the Debtors, with the assistance of Barclays, conducted hard-fought negotiations to ensure that the terms of the DIP Financing were appropriate under the circumstances, with the end result being that the terms of the DIP Financing are comparable to financings approved over the past few months.  Additionally, as described above, certain terms of the DIP Financing are not generally available in the finance markets and, in these respects, the DIP Financing better than market for comparable financings.

49.    Accordingly, the Debtors submit that the terms of the DIP Credit Agreement are reasonable and represent the best source of financing available to the Debtors under the circumstances.

## I.    Approval of the DIP Facility on an Interim Basis is Necessary to Prevent Immediate and Irreparable Harm.

50.    Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain post-petition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion.

> If the motion so requests, the court may conduct a hearing before
> such 14 day period expires, but the court may authorize the
> obtaining of credit only to the extent necessary to avoid immediate
> and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. Proc. 4001(c)(2).

51.    In examining requests for interim relief under the immediate and irreparable harm standard, courts apply the same business judgment standard applicable to other business decisions. *See, e.g., Ames Dep't Stores*, 115 B.R. at 36; *Simasko*, 47 B.R. at 449. After the 14-day period, the request for financing is not limited to those amounts necessary to prevent the destruction of the debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its business. *Ames Dept. Stores* at 36.

52.    Immediate and irreparable harm would result if the relief requested herein is not granted on an interim basis.  As described in detail herein, the Debtors have an immediate need to obtain access to incremental liquidity to continue to operate in the ordinary course, satisfy any critical payment obligations and continually satisfy other general working capital and operational needs.  Accordingly, the Debtors believe that absent access to liquidity under the DIP Facility, some or all of the Debtors' operations may have to cease, which would cripple the Debtors' efforts to restructure.  Thus, availability of sufficient working capital and liquidity is imperative to preserve and maintain the value of the Debtors' estates.

**J.**    **Modification of the Automatic Stay Provided Under Section 362 of the Bankruptcy Code is Appropriate Under the Circumstances.**

53.    The Interim Order proposes that the automatic stay imposed under section 362(a) of the Bankruptcy Code be lifted to allow the DIP Lenders to file the Interim Order or such financing statements, mortgages, deeds of trust, notices of lien, or similar instruments or otherwise confirm perfection of such liens, security interests and mortgages.  Interim Order, ¶ 12. The Interim Order also proposes that, upon five (5) Business Days' written notice to the Debtors

and the Committee, each through their respective counsel, the automatic stay imposed under section 362(a) of the Bankruptcy Code be lifted to allow the DIP Lenders, the Administrative Agent and the L/C Issuer to exercise remedies following a default under the DIP Facility unless the Court determines, during such period, that there is no Event of Default under the DIP Facility.  Interim Order, ¶ 6(b).

54.     Stay modification provisions of this sort are customary features of debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated under the DIP Credit Agreement and the proposed DIP Orders.

55.     In sum, in evaluating a debtor's proposed post-petition financing, courts consider whether the post-petition financing (a) is necessary to preserve the assets of the estate and is necessary, essential and appropriate for continued operation of the Debtors' business, (b) is in the best interests of the Debtors' creditors and estates, (c) is an exercise of a debtor's sound and reasonable business judgment, (d) was negotiated in good faith and at arm's length between the debtor, on the one hand, and the agents and the lenders on the other and (e) contains terms that are fair, reasonable and adequate given the circumstances of the debtor and the proposed post-petition lender.  *In re Farmland Indus., Inc*., 294 B.R. 855, 862-79 (Bankr. W.D. Mo. 2003); *see also In re Ames Dep't Stores, Inc*., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); *In re Barbara K Enters., Inc*., No. 08-11474, 2008 WL 2439649, at *10 (Bankr. S.D.N.Y. June 16, 2008).

56.     The Debtors submit that entry into the DIP Facility and any entry of the DIP Orders meet these requirements, and are in the best interests of the Debtors' creditors, are necessary to preserve the value of estate assets and are an exercise of the Debtors' sound and reasonable business judgment.

**Request For Final Hearing**

57.     Pursuant to Bankruptcy Rules 400l(b)(2) and (c)(2) and Local Rule 4001-2(c), the Debtors requests that the Court set a date for the final hearing that is as soon as practicable, but in no event later than 35 days following the Petition Date, and fix the time and date prior to the final hearing for parties to file objections to this motion.

**Waiver of Bankruptcy Rules Regarding Notice and Stay of an Order**

58.     To implement the foregoing successfully, the debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h), 7062, 9014 or otherwise.

**Notice**

59.     The Debtors have provided notice of this Motion to:  (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to Wells Fargo Bank, N.A. as the Administrative Agent and the L/C Issuer; (d) counsel to Cascade Investment, L.L.C. and ECJV Holdings, LLC; (e) counsel to NAES Corporation; (f) counsel to Competitive Power Ventures, Inc.; (g) the Delaware Secretary of State; (h) the Delaware Secretary of Treasury; (i) the Delaware Attorney General; (j) the Office of the United States Attorney General for the State of Delaware; and (k) the Internal Revenue Service.  In light of the nature of the relief requested in this Motion, the Debtors respectfully submit that no further notice is necessary.

**No Prior Request**

60.     No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just and proper.

Dated: February 12, 2014
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNEL LLP**

/s/ *Robert J. Dehney*
Robert J. Dehney (No. 3578)
William M. Alleman, Jr. (No. 5449)
Christopher M. Hayes (No. 5902)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
rdehney@mnat.com
walleman@mnat.com
chayes@mnat.com

-and-

**BRACEWELL & GIULIANI LLP**

Kurt Mayr (*pro hac vice pending*)
Goodwin Square
225 Asylum Street, Suite 2600
Hartford, Connecticut 06103
Telephone: (860) 947-9000
Facsimile: (860) 246-3201
Kurt.Mayr@bgllp.com
-and-
Robert G. Burns (*pro hac vice pending*)
1251 Avenue of Americas, 49th Floor
New York, New York 10020-1104
Telephone: (212) 508-6100
Facsimile: (800) 404-3970
Robert.Burns@bgllp.com

*Proposed Counsel For The Debtors And Debtors In Possession*