IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------- x
                                   :
In re:                             :    Chapter 11
                                   :
OPTIM ENERGY, LLC, et al.,         :    Case No. 14-10262 (BLS)
                                   :
                    Debtors.[1]    :    Jointly Administered
                                   :
                                   :
---------------------------------- x

## MOTION OF WALNUT CREEK MINING COMPANY FOR ORDER GRANTING LEAVE, STANDING AND AUTHORITY TO COMMENCE AND PROSECUTE CERTAIN CLAIMS ON BEHALF OF THE DEBTORS' ESTATES AGAINST CASCADE INVESTMENT, L.L.C. AND ECJV HOLDINGS, LLC

Walnut Creek Mining Company ("Walnut Creek" or "Plaintiff"), by and through its undersigned counsel, hereby moves (the "Motion") for entry of an order authorizing Walnut Creek to commence and prosecute certain claims on behalf of the Debtors' estates against Cascade Investment, L.L.C. ("Cascade") and its wholly owned subsidiary, ECJV Holdings, LLC ("ECJV" and together with Cascade, the "Defendants").[2] In support of this Motion, Walnut Creek respectfully states as follows:

---

[1] The Debtors in these chapter 11 cases are: Optim Energy, LLC; OEM 1, LLC; Optim Energy Cedar Bayou 4, LLC; Optim Energy Altura Cogen, LLC; Optim Energy Marketing, LLC; Optim Energy Generation, LLC; Optim Energy Twin Oaks GP, LLC; Optim Energy Twin Oaks, LP. The Debtors' main corporate and mailing address for purposes of these chapter 11 cases is: c/o Competitive Power Ventures, Inc., 8403 Colesville Road, Suite 915, Silver Spring, MD 20910.

[2] If the Court grants Walnut Creek standing to pursue causes of action against the Defendants on behalf of the Debtors' estates, Walnut Creek intends to file an adversary complaint substantially similar to the draft attached hereto as Exhibit A (the "Complaint"). Portions of this Motion and the Complaint have been redacted and the exhibits annexed thereto have been filed under seal with the Court pursuant to that Order Approving and Entering Stipulation and Protective Order [Docket No. 182].

## PRELIMINARY STATEMENT

1. Walnut Creek requests entry of an order authorizing it to pursue certain claims against the Defendants, all as set forth more fully in the Complaint (the "Claims").

2. Walnut Creek requests such authority because, at the outset of these cases, by virtue of the stipulations contained in the interim and final orders approving debtor-in-possession financing – Defendant Cascade being the DIP lender – the Debtors fully compromised their ability to assert claims against the Defendants related to, among other things, the validity, priority and enforceability of the purported liens and claims of the Defendants in and against the Debtors' assets.

3. Walnut Creek, the largest non-insider creditor in these chapter 11 cases, has undertaken an investigation of the Defendants' liens and claims. As a result of this investigation, it is plainly apparent that the Debtors' estates have valid causes of action against the Defendants, and Walnut Creek is prepared to prosecute those claims on behalf of the Debtors' estates.

4. Walnut Creek seeks authority to bring the Complaint to preserve the rights and interests of the Debtors' unsecured creditors in the face of an inequitable scheme by the insider Defendants to transform themselves from mere equity holders to senior secured lenders. Walnut Creek has colorable claims against the Defendants in favor of the Debtors' estates for: (i) recharacterization of the Defendants' alleged debt as equity, (ii) equitable subordination of the Defendants' claims, and (iii) damages for Defendant ECJV's breach of its fiduciary duties and Defendant Cascade's aiding and abetting therein. If Walnut Creek is successful in prosecuting these Claims, recoveries for general unsecured creditors will be significantly increased. The Debtors cannot pursue these valuable causes of action pursuant to the terms of the DIP Financing

Orders (as defined below). Accordingly, it is crucial that Walnut Creek be granted standing to prosecute these Claims on behalf of the Debtors' estates.

5. As discussed below, all of the legal requirements for granting Walnut Creek derivative standing to pursue the Claims have been satisfied. Prosecution of the Claims is critical in these cases because the benefits will (i) result in the proper characterization of the Defendants as equityholders as opposed to secured lenders, (ii) in the alternative, equitably subordinate the claims of the insider Defendants, and (iii) produce a substantial recovery for the Debtors' unsecured creditors. Given the Debtors' inability to prosecute the Claims, and the fact that no committee of unsecured creditors has been appointed in these cases, Walnut Creek is the only qualified party in interest prepared to prosecute the Claims. Accordingly, Walnut Creek seeks authority to prosecute the Claims on behalf of the Debtors' estates and thereby preserve valuable estate assets for the benefit of the Debtors' unsecured creditors.

## JURISDICTION AND VENUE

6. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are §§ 105 and 1109(b) of title 11 of the United States Code (the "Bankruptcy Code").

## PROCEDURAL BACKGROUND

7. On February 12, 2014 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court.

8. The Debtors continue to operate their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been

appointed in these cases. The Debtors' chapter 11 cases are jointly administered and have been consolidated for procedural purposes only.

9.  A committee of unsecured creditors has not been appointed in these chapter 11 cases.

10. On February 12, 2014, the Court entered an Interim Order (I) Authorizing Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) Utilize Cash Collateral of Pre-Petition Secured Parties Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364; and (III) Granting Related Relief [Docket No. 36] (the "Interim DIP Financing Order"). On March 6, 2014, the Court entered a Final Order (I) Authorizing Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) Utilize Cash Collateral of Pre-Petition Secured Parties Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364; and (III) Granting Related Relief [Docket No. 144] (the "Final DIP Financing Order" and together with the Interim DIP Financing Order, the "DIP Financing Orders"). Pursuant to the terms of the Final DIP Financing Order, any adversary proceeding (i) challenging the validity, enforceability, priority or extent of the Debtors' prepetition indebtedness and/or the Defendants' liens on the Debtors' prepetition collateral, or (ii) otherwise asserting any action for preferences, fraudulent conveyances, other avoidance power claims, subordination, recharacterization or any other claims or defenses against the Defendants or any of their affiliates, must be brought by no later than May 13, 2014 (the "Challenge Deadline"), in the case of a party in interest with

4

requisite standing other than the Debtors or an appointed committee. See Final DIP Financing Order at ¶ 14.

11.  The DIP Financing Orders provide that, as to the Debtors, all such claims and defenses against the Defendants are irrevocably waived and relinquished as of the Petition Date. See Interim DIP Financing Order at ¶ 14; Final DIP Financing Order at ¶ 14.

12.  By letter dated April 9, 2014 (the "Demand Letter"), Walnut Creek asked the Debtors to consent to Walnut Creek's standing to commence and prosecute the Claims. The Debtors declined to respond to Walnut Creek's demand within the requested time period – which was short in light of the need to file and obtain a hearing on the Motion prior to the Challenge Deadline so that the Complaint can be timely filed. Walnut Creek files this Motion out of an abundance of caution, and reserves its right to withdraw and/or modify the Motion, as applicable, upon receipt of the Debtors' response to the Demand Letter.

## FACTUAL BACKGROUND

13.  Cascade through its wholly-owned subsidiary, ECJV, indirectly holds 100% of the equity interests of each of the Debtors in these chapter 11 cases. Cascade, as the ultimate controlling shareholder of the Debtors, and ECJV, as its affiliate, are "insiders" of the Debtors pursuant to sections 101(31)(B)(iii) and (E) of the Bankruptcy Code.

14.  Prior to the filing of these chapter 11 cases, the Debtors were obligors under an unsecured credit facility with Wells Fargo Bank, National Association ("WFB") in the initial amount of $1 billion (the "WFB Unsecured Credit Facility") of which, on the Petition Date, in excess of $700 million was outstanding. The WFB Unsecured Credit Facility was guaranteed jointly and severally by the Defendants under a Continuing Guaranty issued by each of Cascade

and ECJV, dated as of June 1, 2007, for the benefit of WFB (collectively, the "Cascade Guarantees").

15. Simultaneously with the Defendants' issuance of the Cascade Guarantees, the Debtors entered into a Guaranty Reimbursement Agreement (the "Reimbursement Agreement") pursuant to which the Debtors agreed to reimburse the Defendants for any payments made pursuant to the Cascade Guarantees. The Defendants took security interests in substantially all of the Debtors' assets, including their respective equity interests and real property, to secure the Debtors' reimbursement obligations.

16. Upon the commencement of the Debtors' chapter 11 cases, Cascade paid the outstanding balance of the WFB Unsecured Credit Facility, putatively triggering the Reimbursement Agreement with the Debtors, and thereby allegedly transforming themselves from mere equity holders to senior secured lenders with a claimed lien on substantially all of the Debtors' assets.

## BASIS FOR RELIEF

### A. Standard For Derivative Standing.

17. In light of the importance of protecting creditors' rights under the Bankruptcy Code, creditors have a limited right to initiate adversary proceedings to pursue causes of action typically brought by a trustee or the debtor in possession. To that end, Bankruptcy Code section 1109(b) provides, in pertinent part, that:

> A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.

11 U.S.C. § 1109(b). This general right to be heard would be rendered meaningless with respect to creditors unless they are also given the right to act, on behalf of the estate, if a debtor in

possession or trustee, who is explicitly granted the right to act, unjustifiably fails to do so. See In re iPCS, Inc., 297 B.R. 283, 290 (Bankr. N.D. Ga. 2003) ("[I]f a debtor has a cognizable claim, but refuses to pursue that claim, an important objective of the Code [the recovery and collection of estate property] would be impeded if the bankruptcy court has no power to authorize another party to proceed on behalf of the estate in the debtor's stead."); Official Comm. of Unsecured Creditors of Joyanna Holitogs, Inc. v. I. Hyman Corp. (In re Joyanna Holitogs, Inc.), 21 B.R. 323, 326 (Bankr. S.D.N.Y. 1982) (holding that general right to be heard would be empty grant unless those with such a right also have right to act when debtors refuse to do so).

18.  The Third Circuit has recognized that a "straightforward application" of a bankruptcy court's equitable powers allows for a grant of derivative standing upon creditors' committees to assert causes of action on behalf of, and for the benefit of, the debtor's estate. See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 568 (3d Cir. 2003). While derivative standing is most often requested by creditors' committees, courts have applied the same reasoning to individual creditor's requests for derivative standing. See Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.), 316 B.R. 141, 145 (D. Del. 2004) ("Although the Third Circuit discussed creditors' committees specifically, the Court is persuaded that its decision is applicable" to grant standing to individual creditor); Glinka v. Murad (In re Housecraft Indus. USA, Inc.), 310 F.3d 64, 71 n.7 (2d Cir. 2002) ("Although STN and Commodore both involved creditors' committees, the holdings of those cases also apply to individual creditors"); Nebraska State Bank v. Jones, 846 F.2d 477, 478 (8th Cir. 1988) (noting that where "the debtor in possession has not exercised its avoidance powers, a dissatisfied creditor has several options [including] . . . petition[ing] the court . . .. to gain court permission to institute the action itself").

19.  A creditor seeking derivative standing in the Third Circuit must establish the following three elements: (i) that the trustee unjustifiably refused to pursue the claim; (ii) a colorable claim; and (iii) the permission of the bankruptcy court to initiate the action. In re Centaur, LLC, No. 10-10799, 2010 Bankr. LEXIS 3918 at *13 (Bankr. D. Del. Nov. 5, 2010) (citing In re Yes! Entm't Corp., 316 B.R. at 145).

**B.  Walnut Creek Clearly Satisfies The Test For Derivative Standing.**

    **i.  Unjustified Refusal To Assert The Claims.**

20.  The first element of the derivative standing test requires that Walnut Creek make a demand on the Debtors to assert the Claims, and the Debtors unjustifiably refuse the demand.

21.  Pursuant to the Demand Letter, Walnut Creek made a formal demand that the Debtors consent to Walnut Creek's prosecution of the Claims and confirm that the Debtors do not intend to bring the Claims. As of the date hereof, the Debtors have not responded to the Demand Letter, provided their consent for Walnut Creek's standing, and/or confirmed that the Debtors do not intend to bring the Claims.

22.  Walnut Creek has not formally demanded that the Debtors themselves prosecute the Claims because Walnut Creek believes that such a demand would be futile given the Debtors' releases, waivers, and stipulations with respect to such actions in the DIP Financing Orders. Case law makes clear that a creditor is not required to demand formally that a debtor take action where it is "plain from the record that no action on the part of the debtor would have been forthcoming." See Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.), 326 B.R. 532, 544 (W.D. Pa. 2005) (affirming bankruptcy court decision that formal demand by committee would have been futile because debtor waived all rights to contest bank's claims by express language in interim and final DIP financing orders); In re First Capital Holdings Corp., 146 B.R. 7, 13 (Bankr. C.D. Cal. 1992) (creditors' committee would be excused

8

from making demand on debtor to pursue actions against its officers, directors and controlling shareholders where such demand would be futile).

23.     Policy considerations also support excusing Walnut Creek from making a formal demand with respect to the Claims. As stated by the Nat'l Forge Court, "[t]he policy concerns underlying the general requirement of a formal demand are to ensure that the debtor is: (i) informed of the committee's intent to assert the subject claims and (ii) afforded an opportunity to explain its reasons, if any, for declining to pursue the claims itself." 326 B.R. at 544.

24.     Both of the foregoing concerns are clearly satisfied here. Express language in the DIP Financing Orders put all parties on notice that: (i) the Debtors waived their rights to contest the Defendants' liens and claims, and (ii) to the extent any party in interest with requisite standing identified any challenges to the Defendants' liens or claims, the terms of the DIP Financing Orders expressly contemplate that such challenges could be commenced and prosecuted by such party in interest. See Interim DIP Financing Order at ¶ 14; Final DIP Financing Order at ¶ 14. Because of the releases, waivers, and stipulations contained in the DIP Financing Orders, policy considerations support Walnut Creek's prosecution of the Claims.

25.     Thus, Walnut Creek respectfully submits that a formal request upon the Debtors to prosecute the Claims would have been futile based upon the record in these cases. In any event, pursuant to the Demand Letter, Walnut Creek has sought confirmation from the Debtors that they will not bring the Claims against the Defendants.

ii.     **Walnut Creek Has Asserted Colorable Claims.**

26.     The second element of the derivative standing test outlined above requires Walnut Creek to demonstrate that colorable claims exist against the Defendants. The case law construing the requirement for "colorable" claims clearly provides that the requisite showing is a

relatively low threshold to satisfy. See e.g., Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.), 330 B.R. 364, 376 (Bankr. S.D.N.Y. 2005) (holding that requisite standard for presenting "colorable" claim is relatively easy to meet); In re Colfor, Inc., No. 96-60306, 1998 Bankr. LEXIS 158 at *7 (Bankr. N.D. Ohio Jan. 5, 1998) ("colorable" claim is one which is "plausible" or "not without some merit"). Courts have held that, in determining whether a colorable claim exists, "the same analysis [applies] as when a defendant moves to dismiss a complaint for failure to state a claim." In re Centaur, LLC, 2010 Bankr. LEXIS 3918 at *13; In re iPCS, Inc., 297 B.R. at 291 (quoting In re America's Hobby Ctr., Inc., 223 B.R. 275, 282 (Bankr. S.D.N.Y. 1998)); see also In re Valley Park, Inc., 217 B.R. 864, 869 n.4 (Bankr. D. Mont. 1998) (proposed plaintiff "does not have to satisfy the quantum of proof necessary for a judgment in order to show a colorable claim").

27. In determining whether a claim is colorable, this Court is not required to conduct a mini-trial. Instead, "the Court may weigh the 'probability of success and financial recovery,' as well as the anticipated costs of litigation, as part of a cost/benefit analysis conducted to determine whether pursuit of the colorable claims are likely to benefit the estate." In re iPCS, Inc., 297 B.R. at 291 (citations omitted). Thus, Walnut Creek is only required to establish the existence of a plausible claim and that the claims have some value to the Debtors' estates and their creditors.

28. A review of the Complaint illustrates that Walnut Creek has stated colorable claims which, at a minimum, overcome the plausibility requirement. As set forth more fully in the Complaint, Walnut Creek asserts colorable claims that the Defendants' agreements to guarantee the Debtors' obligations under the WFB Unsecured Credit Facility represent equity investments on the part of the Debtors' controlling shareholder, rather than secured debt

obligations, and thus should be recharacterized accordingly. Alternatively, the Complaint asserts colorable equitable claims that the Defendants' claims should be subordinated to non-insider unsecured creditor claims.

29. Shortly after Optim Energy, LLC's (then known as EnergyCo, LLC) formation, the company entered into the WFB Unsecured Credit Facility. WFB's agreement to enter into the WFB Unsecured Credit Facility was contingent upon delivery by the Defendants of the Cascade Guarantees. See WFB Unsecured Credit Facility at § 7.1(a)(3), (4). The Cascade Guarantees provided WFB with adequate assurance of repayment in the event the newly-formed and severely undercapitalized Debtors were to default under the Facility. Simultaneously with the issuance of the Cascade Guarantees, the Debtors and the Defendants entered into the Reimbursement Agreement, whereby the Debtors agreed to reimburse the Defendants for any payments made to WFB pursuant to such Guarantees. The Debtors' alleged indebtedness to the Defendants pursuant to the Reimbursement Agreement was subordinated to the Debtors' indebtedness to WFB under the WFB Unsecured Credit Facility. Upon the commencement of these chapter 11 cases, the insider Defendants paid the outstanding balance under the WFB Unsecured Credit Facility, thereby implicating the Debtors' reimbursement obligations, and allegedly converting over $700 million of unsecured bank debt into secured insider debt.

30. Notwithstanding the title of the Reimbursement Agreement and the related pledge and security agreements (collectively, the "Cascade Agreements"), the economic reality of the circumstances surrounding the transaction demonstrate that the intent of the Defendants and the Debtors, *ab initio*, was to enter into an equity investment relationship, not a lending relationship. The recharacterization of the Defendants' claims arising out of the Cascade Agreements to equity is supported by, among other indicia: (i) the Debtors were inadequately capitalized at the time of

11

execution of the Cascade Agreements; (ii) the Defendants guaranteed the Debtors' obligations under the WFB Unsecured Credit Facility when no prudent, *bona fide* lender would have done so; (iii) the Debtors granted the Defendants security interests on substantially all of their assets at a time when the Debtors did not owe the Defendants any debt; (iv) on at least one occasion, the Defendants waived payment of their fees under the Reimbursement Agreement; (v) the Debtors' obligations under the Cascade Agreements were subordinated to the Debtors' obligations under the WFB Unsecured Credit Facility; and ███████████████████████████████████████ ███████████████████████████████████████ ███████████████ Accordingly, the Complaint alleges colorable claims that the Defendants' purported claims arising under the Cascade Agreements should be recharacterized as equity.

31.    Even if this Court were to determine that the Defendants' purported reimbursement claims represent claims for the repayment of debt, principles of equity nonetheless compel subordination of the Defendants' claims. The Defendants knew that by paying off the WFB Unsecured Credit Facility, they preferred themselves over the interests of the Debtors and their non-insider unsecured creditors. Insiders should not be able to transform themselves from equity holders to senior secured lenders and thereby reduce or eliminate recoveries available for the Debtors' non-insider creditors. The facts and circumstances giving rise to the Defendants' claims mandate equitable subordination in this case. Accordingly, the Complaint alleges colorable claims that the Defendants' claims should be equitably subordinated to the claims of all non-insider unsecured creditors.

32.    Lastly, the Complaint asserts colorable claims that Defendant ECJV, as the controlling shareholder of Optim Energy since September 23, 2011, breached its fiduciary duties

of good faith, loyalty and care to Optim Energy, and, ███████████████████ ███, to Optim Energy's creditors. Defendant ECJV breached its fiduciary duties by taking actions and making decisions in the best interest of the Defendants, rather than in the best interests of Optim Energy and its creditors. Defendant Cascade knowingly participated in the furtherance of Defendant ECJV's breach of its fiduciary duties, and is thus liable as an aider and abettor.

33.     The benefit to the Debtors' estates of asserting these Claims is clear. Successful prosecution of the Claims would result in the recharacterization and/or subordination of over $700 million in allegedly secured claims owed to the Defendants, as well as affirmative recovery on the tort claims. Such proceeds would inure to the benefit of the Debtors' unsecured creditors. Each of the Claims set forth in the Complaint would also impact the Defendants' ability to credit bid their claims at a sale of the Debtors' assets. Under the terms of the Final DIP Financing Order, the Defendants have the right to "credit bid the full amount of the Pre-Petition Indebtedness with respect to any sale of the Pre-Petition Collateral not in the ordinary course of business pursuant to a plan of reorganization or section 363 of the Bankruptcy Code regardless of any other bidding procedures or deadlines that may apply to other potential bidders or buyers." See Final DIP Financing Order at ¶ 17. Moreover, failure of the Debtors' to meet certain sale milestones constitutes an event of default under the DIP Credit Agreement (as defined in the Final DIP Financing Order). See DIP Credit Agreement at § 12.1(r); Schedule 12.1. Accordingly, the Debtors are aggressively pursuing a potential sale. The recharacterization and/or equitable subordination of the Defendants' claims would eliminate the Defendants' ability to credit bid those claims in any sale, and thereby maximize cash proceeds for the Debtors, their estates and their creditors. Similarly, the breach of fiduciary duty and

aiding and abetting claims would provide a setoff to the Defendants' claims, thus limiting their use for credit bid purposes. Absent prosecution of the Claims as proposed in this Motion, the insider Defendants will seize all of the value of the Debtors' estates, leaving unsecured creditors with little or nothing in the way of recoveries. Moreover, the costs incurred in pursuing such Claims pale in comparison to recognizable value, even when discounting for the inherent uncertainty of litigation.

### iii. Walnut Creek Is Seeking Prior Court Approval.

34. Finally, Walnut Creek is seeking permission from this Court to pursue the Claims against the Defendants. Since these Claims are colorable and the Debtors have unjustifiably refused to pursue these Claims and/or demand upon the Debtors is futile, the Court should grant derivative standing to Walnut Creek to commence and prosecute the Claims.

## RESERVATION OF RIGHTS

35. Walnut Creek reserves its right to seek authority to commence and prosecute other claims and/or causes of action against the Defendants and other parties on behalf of the Debtors' estates.

## NOTICE

36. This Motion has been served on: (i) the Office of the United States Trustee for the District of Delaware; (ii) the Debtors and their counsel; (iii) counsel to the Defendants; and (iv) all entities that have filed a request for service of filings pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.

## NO PRIOR REQUEST

37. No prior request for the relief sought in this Motion has been made to this or any other court in connection with these chapter 11 cases.

## CONCLUSION

WHEREFORE, Walnut Creek respectfully requests the entry of an order, substantially in the form attached hereto as <u>Exhibit B</u>, pursuant to sections 105(a) and 1109(b) of the Bankruptcy Code, granting Walnut Creek standing to commence and prosecute the Claims against the Defendants on behalf of the Debtors' estates.

Dated: Wilmington, Delaware
April 14, 2014

/s/ *Anthony W. Clark*
Anthony W. Clark (I.D. No. 2051)
Sarah E. Pierce (I.D. No. 4648)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and -

Kenneth S. Ziman
Christine A. Okike
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

- and -

Robert J. Bothe
McGrath North Mullin & Kratz, PC LLO
Suite 3700, First National Tower
1601 Dodge Street
Omaha, Nebraska 68102-1627
Telephone: 402-341-3070
Facsimile: (402) 341-0216
rbothe@mcgrathnorth.com

*Counsel for Walnut Creek Mining Company*