IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>Optim Energy, LLC, *et al.*,<br><br>      Debtors.[1] | Chapter 11<br><br>Case No. 14-10262 (BLS)<br><br>(Jointly Administered)<br><br>**Hearing Date: May 13, 2014, at 10:00 a.m. (ET)**<br>**Objection Deadline: May 6, 2014, at 4:00 p.m. (ET)** |

**DEBTORS' MOTION FOR ENTRY OF
AN ORDER AUTHORIZING THE DEBTORS TO (A) HONOR
ORDINARY COURSE BONUS OBLIGATIONS UNDER THEIR
MANAGEMENT AGREEMENTS FOR THE DEBTORS' PLANT WORKERS
AND (B) IMPLEMENT AN INCENTIVE BONUS PLAN FOR KEY EMPLOYEES
PURSUANT TO SECTIONS 105, 363 AND 503 OF THE BANKRUPTCY CODE**

Optim Energy, LLC ("***Optim Energy***") and its affiliated debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "***Debtors***") hereby move (the "***Motion***") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "***Order***"), approving and authorizing (a) the Debtors' ordinary course bonus plan (the "***Bonus Plan***") implemented pursuant to management agreements between certain of the Debtors and NAES Corporation ("***NAES***") for part-time and full-time workers and plant managers employed at the Debtors' power plants, (b) the implementation of an incentive bonus plan for the Debtors' key operational and management personnel (the "***KEIP***"); and (c) the implementation of a Manager Incentive Program (the "***MIP***") for Debtor Optim Energy's chief

---

[1] The Debtors in these chapter 11 cases are: Optim Energy, LLC; OEM 1, LLC; Optim Energy Cedar Bayou 4, LLC; Optim Energy Altura Cogen, LLC; Optim Energy Marketing, LLC; Optim Energy Generation, LLC; Optim Energy Twin Oaks GP, LLC; Optim Energy Twin Oaks, LP. The Debtors' main corporate and mailing address for purposes of these chapter 11 cases is: c/o Competitive Power Ventures, Inc., 8403 Colesville Road, Suite 915, Silver Spring, MD 20910.

executive officer. In further support of the Motion, the Debtors have filed (a) the *Declaration of Nick Rahn in Support of the Bonus Plan and KEIP* (the "**Rahn Declaration**"), which is attached hereto as **Exhibit B** and incorporated herein by reference, (b) the *Declaration of Richard Fleming in Support of the Manager Incentive Plan* (the "**Fleming Declaration**"), which is attached hereto as **Exhibit C** and incorporated herein by reference, and respectfully represent as follows:

## Jurisdiction

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The bases for the relief requested herein are sections 105(a), 363 and 503 of title 11 of the United States Code (the "**Bankruptcy Code**").

## Background

4. On February 12, 2014 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are power plant owners principally engaged in the production of energy in Texas' deregulated energy market through three power plants with an aggregate output of more than 1200 megawatts. The depressed and changing economic environment of the electric power industry—particularly with respect to coal-fired plants—and the Debtors' continuous liquidity constraints culminated in aggregated and continuing losses that required the Debtors to file these chapter 11 cases.[2]

---

[2] A description of the circumstances surrounding the filing of these chapter 11 cases and a broad overview of the management contracts that are the subject of this Motion are described in further detail below, and in the Declaration of Nick Rahn, Chief Executive Officer of Optim Energy, LLC, In Support of Chapter 11 Petitions and First Day Pleadings (the "**First Day Declaration**") that was filed on the Petition Date [D.I. 4], which is incorporated herein by reference.

5. The Debtors continue to operate their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or official committee of unsecured creditors has been appointed in the Debtors' cases.

6. Pursuant to the Debtors' post-petition, debtor-in-possession financing approved by this Court on March 6, 2014 [D.I. 144] (the "**DIP Financing**"), the Debtors must, among other things, seek authorization to sell all or substantially of the Twin Oaks' assets on a compressed timeline. To effectuate a successful sale of the Debtors' assets and continue to maximize the value of these chapter 11 estates, it is critical that plant personnel continue to perform their daily job functions in the ordinary course without interruption, which, in turn, requires that the Debtors continue their past compensation practices, including providing plant personnel with annual performance bonuses that have been historically paid as part of the terms of the Debtors' management agreements.

7. Additionally, since the commencement of these chapter 11 cases, some senior managers have been required to perform services above and beyond their typical job requirements. These managers are aware that, despite their efforts, their job roles may be in question upon consummation of the sale of Twin Oaks' assets or the confirmation of the Debtors' plan of reorganization. In light of this uncertainty, the demands and pressures that have been and will be placed on these employee incentive participants have been greatly increased to ensure that the Debtors will complete the sale process successfully and on a compressed timeline.

8. Indeed, the plant management and senior operations managers (including Mr. Rahn) will continue to be vital in preserving the value of the Debtors' estates, maintaining partner and vendor relationships, as well as the plant personnel's focus in the chapter 11 environment in which the Debtors currently operate. Additionally, these key individuals are and

will continue to be, actively engaged in providing information to, and interfacing and negotiating with, potential buyers of the Debtors' businesses and assets, and assisting in the due diligence process associated with such sales. The Debtors believe it is critical that these individuals not only be compensated for their extraordinary efforts, but that they be appropriately incentivized to ensure that the value of the chapter 11 estate and consideration of the Twin Oaks plant sale proceeds are maximized, irrespective of their future employment prospects.

9. With the assistance of the Debtors' advisors, and the input of their Board of Directors (the "*Board*") the Debtors have painstakingly calculated and developed narrowly-tailored and reasonable employee and management incentive programs that directly align incentive bonuses for participants with the operational performance of the Debtors' businesses and the consideration to be received from the sale of the Twin Oaks plant. In the aggregate, assuming all milestones are achieved, the maximum amount the Debtors could be obligated to pay under the various incentive programs is approximately $2.55 million.

**Relief Requested**

10. By this Motion, the Debtors respectfully request entry of an order, substantially in the form attached hereto as **Exhibit A**, authorizing the Debtors to implement the Bonus Plan, the KEIP and the MIP and make any payments required thereunder. The Debtors respectfully request to continue in the ordinary course of business the same or substantially similar incentive compensation programs that have been in place since these functions were outsourced to NAES and Competitive Power Ventures, Inc. ("*CPV*") approximately three years ago. It is important to the stability of the Debtors' operations and their value as a going concern during this critical time during the Debtors' reorganization proceeding that existing relationships among NAES, CPV, the Debtors and the plant workers, respectively, remain in place.

**The Debtors' Operations and Agreements with CPV and NAES**

**A.     The NAES Management Agreements**

11.     The Debtors own and operate three power plants in Texas, two of which—the Twin Oaks Plant and the Altura Cogen Plant—are managed by NAES.[3] The Twin Oaks Plant is a coal-fired electric power generating facility capable of producing 305 megawatts. The Twin Oaks Plant is owned by Debtor Optim Energy Twin Oaks LP ("*Twin Oaks*") and is located in Robertson County, Texas, and sells energy into the Electric Reliability Council of Texas ("*ERCOT*") market. Approximately sixty-two (62) workers work at the Twin Oaks Plant. The Altura Cogen Plant is a natural-gas powered plant capable of producing 600 megawatts located in Harris County, Texas and sells its energy into the ERCOT market. The plant is owned by Debtor Optim Energy Altura Cogen, LLC ("*Altura Cogen*"). The Altura Cogen Plant has been commercially operating since 1985 and is located within a complex of petrochemical facilities owned by Lyondell Chemical Company ("*Lyondell*"). Approximately thirty-six (36) workers work at the Altura Cogen Plant.

12.     The Debtors' operational management at the Twin Oaks Plant and the Altura Cogen Plant is outsourced to NAES pursuant to O&M Agreements (as defined below). Specifically, the Twin Oaks Plant is operated under an Operations and Maintenance Services Agreement, dated as of October 19, 2012, between NAES and Twin Oaks (the "*Twin Oaks Agreement*"), and the Altura Cogen Plant is operated under a substantially similar agreement, dated as of October 19, 2012, between NAES and Altura Cogen (the "*Altura Cogen Agreement*," and together with the Twin Oaks Agreement, the "*O&M Agreements*"). Each O&M Agreement expires on December 31, 2016, and may be extended by the Debtors for up to

---

[3]  The Debtors' third power plant, the Cedar Bayou Plant, is operated by NRG Texas (as defined in the First Day Declaration).

one year. The Debtors and NAES have been performing their respective obligations under the O&M Agreements since the commencement of these chapter 11 cases.

13. Among other services NAES provides pursuant to the O&M Agreements, NAES employs the plant personnel—most of which are prior employees of Twin Oaks and Altura Cogen. NAES is also responsible for the operational performance of the plants, providing and training plant workers and other plant personnel, procuring supplies, ensuring inventory, and coordinating operations with other energy suppliers.

14. For services provided at the Twin Oaks Plant, NAES is paid a flat fee of $350,000 per year, payable in equal monthly installments. For services provided at the Altura Cogen Plant, NAES is paid a flat Fee of $250,000 per year, payable in equal monthly installments.

**B.    The Bonus and Incentive Programs**

15. Pursuant to the O&M Agreements and consistent with past practice, the Debtors and NAES have agreed upon the specific terms of the Bonus Plan for 2014 that is the subject of this Motion, which sets forth the parameters under which a plant worker or plant manager may earn his or her bonus. Generally speaking, the incentive program is based on the weighted average performance with respect to, among other things: (a) unit availability, (b) EBITDA, (c) cost efficiency, (d) safety performance, (e) environmental compliance, and (f) other factors deemed relevant by management in their reasonable discretion and judgment. In total, there are approximately 100 NAES plant workers eligible to receive a bonus under the Bonus Plan.  The maximum amount that would be payable under this bonus pool is approximately $1.9 million in the aggregate.

16. The Bonus Plan was established to accomplish several important objectives including, among other things, to (i) maximize company profitability and contribute to its growth

targets; (ii) provide incentive compensation correlated to the achievement of desired financial performance levels; (iii) focus attention and effort on achieving overall financial objectives; and (iv) enable the company to attract and motivate key personnel. The Bonus Plan and KEIP described below are critical and important pieces of the compensation packages paid to the employees and managers charged with the day-to-day operation of the Debtors' power plants.

**C.      The CPV Management Agreement**

17.     The Debtors' executive management responsibilities are outsourced to, and performed by, CPV pursuant to an asset management agreement dated October 31, 2011 (the "***CPV Management Agreement***").  The CPV Management Agreement expires on December 31, 2015, subject to a one-year extension option.

18.     CPV provides the Debtors with specific management and senior management personnel.  The primary officer and director provided by CPV is Nick Rahn, who currently serves as Optim Energy's Chief Executive Officer and managing agent for Optim's affiliated Debtors. CPV also provides contract administration, accounting, treasury, regulatory compliance and other services.

19.     CPV is paid a flat Monthly Fee for providing Asset Management Services to Optim Energy.  The Monthly Fee consists of: (a) (x) $250,000 for any month in which CPV has provided services to the Debtors' three Power Plants; or (y) a reduced amount, to be agreed upon by the parties, for any month in which CPV is providing Asset Management Services for fewer than all of the Debtors' power plants; <u>plus</u> (b) an additional $20,000 per month to the extent that a "Non-Recourse Financing" has been consummated and initial funding thereunder has occurred.

**D.     The Key Employee Incentive Program**

20.     In addition to the ordinary course incentive bonuses the Debtors are seeking to implement pursuant to this Motion, the Debtors seek to implement a KEIP that has been carefully calculated to ensure that crucial senior-level managers are properly incentivized to maximize profits and sale proceeds of the Debtors' businesses.  Specifically, four members of plant management personnel employed by NAES, two members of plant management personnel employed by CPV, and Mr. Rahn are eligible to participate in the KEIP.[4] To be eligible to receive a bonus, plan participants must achieve objective milestones that maximize gross margin and minimize gross margin opportunity cost at the Twin Oaks and Altura Cogen plants as well as certain subjective factors deemed relevant by management in their reasonable discretion and business judgment. The maximum aggregate payment that could be earned under the KEIP is $400,000.

21.     The KEIP was specifically designed to include targets that are not guaranteed without the significant effort of each participant. Simply put, the Debtors believe the KEIP incentivizes performance that will maximize operational profit and sale proceeds.

---

[4] After performance targets for KEIP participants were established, the Board determined it was appropriate to include Mr. Rahn in the KEIP, and established a target bonus based on prior performance-based compensation historically paid to Mr. Rahn.  *See* Fleming Decl., at ¶ 5.

E.  **The Manager Incentive Plan**

22. As has been demonstrated to this Court, the Debtors' key manager is Mr. Rahn, who is the Chief Executive Officer of Optim Energy and the Authorized Representative for Optim Energy's affiliated Debtors. The MIP for Mr. Rahn is designed to provide ordinary course incentives for the management of the Debtors' business, and also the successful sale of the Twin Oaks plant, which the Debtors have determined will be closely correlated with Mr. Rahn's efforts in assisting with negotiations and meetings of prospective purchasers of the Twin Oaks Plant.

23. In addition to participating in the KEIP, the Debtors are also proposing the MIP, which would make Mr. Rahn eligible to receive a performance bonus for managing the successful sale of the Twin Oaks facility. The maximum sale bonus Mr. Rahn could earn under the MIP would be $250,000, which is comprised of two components. The first is a $150,000 bonus payable upon the Bankruptcy Court's approval of a motion to establish bidding procedures relating to the sale of the Twin Oaks facility. The second element is based on a percentage of sale proceeds above a threshold determined by the Board. The sale bonus is capped at $100,000.

F.  **Incentive Compensation Plan Design and Approval**

24. As discussed herein, and in the Rahn and Fleming Declarations, CPV, which functions as the Debtors' executive management team, consistently monitors Optim's compensation programs as compared to those adopted by other power companies in comparable positions on relevant local, state, regional or national levels. The Bonus Plan and KEIP are designed to ensure overall compensation levels for the Debtors' plant workers and managers are commensurate with market levels and reflective of the Debtors' operational performance.

25. After CPV prepared the proposed Bonus Plan and KEIP, Mr. Rahn presented the programs to the Optim Board of Directors in a series of meetings. During this process, the

components of these two incentive plans were subject to Board scrutiny and comments to ensure bonuses were truly incentivizing, and would not be granted as a matter of course. CPV—led by Mr. Rahn—made numerous adjustments to the programs to resolve questions raised by the Board and incorporated comments made by the Board. Subsequent to careful consideration and a thorough financial analysis, the Board approved the adoption of the Bonus Plan and KEIP.

26.     In designing the MIP, the Board coordinated with Mr. Magill of CPV to analyze the historical compensation paid to Mr. Rahn, from which to develop a detailed understanding of Mr. Rahn's influence on the day-to-day management of the power plants, and the scope of his contemplated involvement in the Twin Oaks sale process. After several meetings and calls involving the Board and Optim Energy's advisors, the Board determined a MIP was appropriate and should be adopted in addition to adding Mr. Rahn to the KEIP.[5]

## Basis for Relief

**A.     Payments Under the Bonus Plan and the KEIP Constitute an Ordinary Course Transaction.**

27.     The Debtors believe that the proposed payments described herein under the Bonus Plan and the KEIP fall within the section 363(c)(1) "ordinary course of business" standard. This Circuit has applied the two-part test adopted in *In re Roth American, Inc.*, 975 F.2d 949, 952 (3d Cir. 1992) for purposes of determining whether a plan falls within the ordinary course of a debtor's business. *See, e.g.*, *Nellson Nutraceutical*, 369 B.R. 787, 788 (Bankr. D. Del. 2007). In *Roth*, the Court applied a horizontal and vertical dimensions test for purposes of determining whether a transaction was considered "ordinary course." *See Roth*, 975 F.2d at 952. The relevant inquiry under the "horizontal" test is whether the proposed transaction "is of the sort commonly

---

[5] To be clear and for the avoidance of doubt, Mr. Rahn had no influence in the determination of his compensation under the KEIP or MIP. The original KEIP prepared by CPV initially approved by the Board that was presented by Mr. Rahn did not include him as a participant.

undertaken by companies in that industry." *Id.* at 953. Under the "vertical" test, on the other hand, the Court looks to the reasonable expectations of interested parties as to the types of transactions a debtor is likely to enter into the ordinary course of business. *Id.* The relevant inquiry under the "vertical" test is whether the proposed plan is consistent with the Debtors' prepetition business practices and conduct. *Id.*

28. Bonuses such as those under the Bonus Plan and the KEIP are commonplace in the Debtors' industry. Since the inception of the Bonus Plan over three years ago, CPV has consistently monitored whether the compensation levels of the plant workers are commensurate with competitive employers. CPV and NAES have the ability to compare wage and salary levels on a local, state, regional or national level, as deemed appropriate by the specific employee role. For example, if the Debtors are seeking to establish an appropriate compensation level for a plant worker, the company can focus on comparable compensation paid to other plant workers in the region (for example, Texas) or nationally. If, however, the Debtors want to determine the appropriate compensation level for their plant managers, they may look at salary surveys to determine the amounts paid to other plant managers on a regional or national basis. The Debtors' survey instruments allow them to continually monitor compensation levels to track industry and geographic trends over time.

29. Additionally, as discussed above, a form of the Bonus Plan has been in place for over three years, with the targets under the Bonus Plan being reset on an annual basis (to the extent necessary) to reflect the Debtors' financial projections and operational goals. These incentive payments have become an integral part of the Debtors' compensation programs for plant workers, who have been performing in response to an expectation of a receipt of these bonus payments since the Bonus Plan's inception.

30.  Finally, numerous courts have concluded that payments such as these may be made in the ordinary course. *See, e.g.*, *In re Nellson Nutraceutical*, 369 B.R. at 797 (holding that a postpetition modification of a debtor's prepetition bonus plan that paid out bonuses despite missing some target goals was in the ordinary course of business); *In re Global Home Prods., LLC*, 369 B.R. 778 (Bankr. D. Del. 2007) (holding that an incentive plan established postpetition by a debtor for the benefit of senior management was in the ordinary course of the debtor's business); *In re Dana Corp.*, 358 B.R. 567 (Bankr. S.D.N.Y. 2006) (same).

**B.  Payment Under the Bonus Plan, the KEIP and the MIP Reflect Sound Business Judgment.**

31.  Were this Court to find that payments on account of the Bonus Plan, the KEIP and/or the MIP are not ordinary course, section 363(b) of the Bankruptcy Code authorizes the Debtors to "use . . . other than in the ordinary course of business, property of the estate" after notice and a hearing. 11 U.S.C. § 363(b)(l). Courts routinely hold that transactions should be approved under section 363(b) when they are supported by the reasonable business judgment of the debtor's management. *See, e.g.*, *In re Martin,* 91 F.3d 389, 395 (3d Cir. 1996) (stating that the court generally defers to the trustee's judgment so long as there is a legitimate business justification); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (noting that courts have applied the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)); *In re Del. & Hudson R.R. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (same).

32.  Once the debtor articulates a valid business justification, "the business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). The business judgment rule has ongoing vitality

in chapter 11 cases. *Id.*; *see also In re Johns-Manville Corp.*, 60 B.R. 612, 615 (Bankr. S.D.N.Y. 1986) ("The Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

33.     The Debtors submit that their decision to implement the KEIP and MIP and continue the Bonus Plan is supported by sound business reasons and was made in good faith. The Bonus Plan, the KEIP and the MIP will continue to motivate plant workers and management to assist the Debtors achieve financial targets and the overall profitability of the company. Irrespective of the direction these chapter 11 cases ultimately take, there is no question that an increase in the Debtors' profitability inures to the benefit of all parties in interest. Indeed, increased profitability will enable the Debtors to more quickly pay amounts owed to their post-petition, secured lender, and higher EBITDA levels will make the Debtors' businesses more attractive to potential investors through either a plan or sale process.

34.     Historically, courts have approved employee compensation programs that are outside the ordinary course of business pursuant to section 363(b)(1) of the Bankruptcy Code when (a) a debtor has used proper business judgment in formulating such a program, and (b) the court finds that the program was fair and reasonable. *See, e.g.*, *In re Montgomery Ward Holding Corp.*, 242 B.R. at 154 (affirming bankruptcy court approval of the key employee retention program on the basis that debtors showed a "sound business purpose" justifying such approval); *In re Global Home Prods., LLC*, 369 B.R. at 783-84 ("Compensation issues are normally governed by the business judgment standards, i.e., proof that there is a broad business purpose for an action…The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment.") (citations omitted); *In re Dana Corp.*, 358 B.R. at 584 (applying business judgment rule to find that debtor's long term incentive plan was

within the fair and reasonable business judgment of the debtor).  Thus, to the extent the proposed incentive payments would be made outside the ordinary course of business, they should be evaluated under standards applicable to section 363(b)(1) of the Bankruptcy Code, which provides, in pertinent part that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate…." 11 U.S.C. § 363(b)(1).

35. Ultimately, payment of the bonuses in accordance with the Bonus Plan and pursuant to the Debtors' business practices, and implementation of the KEIP and MIP are in the best interests of the Debtors' estates, creditors and all parties in interest and will enable the Debtors to continue to operate their businesses in an economic and efficient manner without disruption. Moreover, the relief sought herein—payment of up to $2.55 million, in the aggregate in incentive bonuses—will not harm the Debtors' estates or creditors.

C. **Proposed Payments Under the Bonus Plan, the KEIP and the MIP, Comply with Section 503(c) of the Bankruptcy Code.**

36. In the context of employee compensation, consideration must be given to section 503(c) of the Bankruptcy Code.  Section 503(c) of the Bankruptcy Code has three key provisions. Sections 503(c)(1) and (c)(2) of the Bankruptcy Code prohibit retention and severance payments, respectively, to "insiders" as administrative claims during chapter 11 cases absent specific findings. *See* 11 U.S.C. §§ 503(c)(1) & (c)(2). Section 503(c)(3) of the Bankruptcy Code applies both to insider and non-insider employees and prohibits transfers "outside the ordinary course" that are not justified by the "facts and circumstance" of the case. 11 U.S.C. § 503(C)(3); *see also In re Dana Corp.*, 351 B.R. 96, 100 (Bankr. S.D.N.Y. 2006). Section 503(c) of the Bankruptcy Code, however, was not "intended to foreclose a chapter 11 debtor from reasonably compensating employees including 'insiders,' for their contribution to the

debtors' reorganization." *See Dana*, 358 B.R. at 575 (citing *In re Nobex Corp.*, No 05-20050 (MFW), 2006 WL 4063024, at *3-4 (Bankr. D. Del. Jan. 19, 2006).

37. Pursuant to the statute's plain language, section 503(c)(1) concerns retention plans, while section 503(c)(2) applies to severance plans. Because the primary purpose of the proposed bonus payments are to implement the Debtors' historic compensation commitments for successful performance under the O&M Agreements, or otherwise motivate and incentivize management, and not to retain or offer severance-type compensation to terminated employees, such payments cannot be considered part of a severance or retention plan. *See, e.g.*, *In re Global Home Prods.*, 369 B.R. at 778 (holding that inasmuch as proposed compensation plans were "plans intended to incentivize management, the analysis utilizes the more liberal business judgment review under § 363."). Moreover, even if such bonus payments have some retentive effect, they still would not be subject to the strictures of sections 503(c)(1) and (c)(2) because it is the primary purpose of a plan that is determinative. *In re Nellson Nutraceutical*, 369 B.R. at 802 ("[A]lthough the…bonus program has some retentive effect, it is for the primary purpose of motivating employees and, thus, the limitations of section 503(c)(1) are not applicable.").

38. Because the chief purpose of the proposed bonus payments is to incentivize workers to reach, and reward workers for, achieving operational and performance milestones, sections 503(c)(1) and (c)(2) of the Bankruptcy Code are inapplicable. Finally, section 503(c)(3) of the Bankruptcy Code only limits payments that are "outside the ordinary course of business." *Id.* The Debtors would respectfully submit that the application of the section 503(c)(3) standard, if applicable, would be met in these circumstances. The Bonus Plan, the KEIP and the MIP are not in the nature of a severance and are not primarily motivated to retain personnel, but rather,

they are based entirely on operational performance and the success of the Debtors' upcoming sale process.

39.   The relevant inquiry under section 503(c)(3) of the Bankruptcy Code is whether the proposed plan is "justified by the facts and circumstances" of the case. 11 U.S.C. § 503(c)(3). Courts have generally used a form of "business judgment" standard to determine whether the section 503(c)(3) "facts and circumstances" standard has been satisfied. *See, e.g.*, *In re Dura Automotive Sys., Inc.*, Case No. 06-11202, Hr'g Tr. 40:17-41:2 (Bankr. D. Del. Apr. 25, 2007); (section 503(c)(3) "mean[s] something above the business judgment standard but maybe not much farther above it"); *In re Werner Holding Co. (DE), Inc.,* Case No. 06-10578 (KJC) (Bankr. D. Del. July 20, 2006, Aug. 22, 2006, and Dec. 20, 2006 (ordering various relief requested in connection with debtors' incentive bonus plans pursuant to sections 363(b) and 503(c) of the Bankruptcy Code); *In re Nobex Corp.*, Case No. 05-20050 (CSS) (Bankr. D. Del. Jan. 20, 2006) (ruling that "[section 363(b)] is the catch-all and the standard . . . for any transfers or obligations made outside the ordinary course of business . . . that are justified by the facts and circumstances of the case . . . I find it quite frankly nothing more than a reiteration of the standard under 363 . . . . the business judgment of the debtor . . .").

40.   In applying section 503(c)(3) of the Bankruptcy Code, the court in *Dana*, 358 B.R. 567 (Bankr. S.D.N.Y. 2006), noted that the "test in section 503(c)(3) appears to be no more stringent a test than the one courts must apply in approving an administrative expense under section 503(b)(1)(A)." *Dana*, 358 B.R. at 576. The court considered the following factors in determining whether the debtor had satisfied the "sound business judgment" test: (a) whether a reasonable relationship existed between the proposed plan and desired results; (b) whether the cost of the plan was reasonable in light of the overall facts of the case; (c) whether the scope of

the plan was fair and reasonable; (d) whether the plan was consistent with industry standards; (e) whether the debtor put forth sufficient due diligence efforts in formulating the plan; and (f) whether the debtor received sufficient independent counsel in performing any due diligence and formulating the plan. *See id.* at 576-77.

41. Many of these factors were described and discussed above to demonstrate that the Debtors believe payment under the Bonus Plan is an ordinary course transaction that is within the sound purview of the Debtors' Board of Directors. As discussed above, the Bonus Plan, the KEIP and the MIP are designed to promote efficiency, and thus, profitability. The Debtors submit that there is a direct relationship between the various incentive programs, and financial results of the Debtors. Moreover, the scope of the plans are reasonable and fair, particularly in light of the fact that the aggregate potential bonus payments that are the subject of this Motion equate to $2.55 million upon the achievement of the Debtors' gross margin in excess of $78 million. Each worker's bonus was determined based upon, among other things, that individual's performance, decision-making authority and accountability.

42. The Debtors further submit that the remaining *Dana* factors support approval of the Bonus Plan, the KEIP and the MIP. All are the result of extensive due diligence and deliberation by the Debtors' management and Board. The Debtors continually monitor their competitors to identify target compensation levels. Finally, the Debtors performed their due diligence with the assistance of an independent board in determining how to best motivate their workers and senior management, and extensively considered and calculated the metrics that determine the bonus amounts. Accordingly, the Debtors submit that the Bonus Plan, the KEIP and the MIP are consistent with industry standards, are appropriate in respect of the facts and

circumstances in these chapter 11 cases and/or otherwise satisfy the standards set forth under section 503(c)(3) of the Bankruptcy Code.

43.     Accordingly, the Debtors submit that payments under the Bonus Plan, the KEIP and the MIP are in the best interests of the Debtors, and all stakeholders in these chapter 11 cases.

### Notice

44.     The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to Cascade Investment, L.L.C. and ECJV Holdings, LLC; (d) counsel to NAES; and (e) any party who has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested in this motion, the Debtors respectfully submit that no further notice is necessary.

### No Prior Request

45.     No prior motion for the relief requested herein has been made to this or any other court.

[*Remainder of Page Intentionally Left Blank*]

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just and proper.

Dated: April 22, 2014
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ William M. Alleman, Jr.*
Robert J. Dehney (No. 3578)
William M. Alleman, Jr. (No. 5449)
Christopher M. Hayes (No. 5902)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
rdehney@mnat.com
walleman@mnat.com
chayes@mnat.com

-and-

**BRACEWELL & GIULIANI LLP**

Kurt Mayr (*admitted pro hac vice*)
Goodwin Square
225 Asylum Street, Suite 2600
Hartford, Connecticut 06103
Telephone: (860) 947-9000
Facsimile: (860) 246-3201
Kurt.Mayr@bgllp.com
-and-
Robert G. Burns (*admitted pro hac vice*)
1251 Avenue of Americas, 49th Floor
New York, New York 10020-1104
Telephone: (212) 508-6100
Facsimile: (800) 404-3970
Robert.Burns@bgllp.com

*Counsel For The Debtors And Debtors In Possession*