# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| **Optim Energy, LLC,** *et al.,* | Case No. 14-10262 (BLS) |
| | (Jointly Administered) |
| Debtors. | Related to Docket Nos. 194, 223, 251, 254, & 257 |

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
Anthony W. Clark, Esq.
Sarah E. Pierce, Esq.
One Rodney Square
P.O. Box 636
Wilmington, DE 19899-0636

-and-

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
Kenneth S. Ziman, Esq.
Christine A. Okike, Esq.
Four Times Square
New York, NY 10036-6522

*Counsel for Walnut Creek*
*Mining Company*

MORRIS, NICHOLS,
ARSHT & TUNNELL LLP
Robert J. Dehney, Esq.
William M. Alleman, Jr., Esq.
Christopher M. Hayes, Esq.
1201 N. Market Street
16th Floor
Wilmington, DE 19801

-and-

BRACEWELL & GIULIANI
LLP
Kurt Mayr, Esq.
Goodwin Square
225 Asylum Street
Suite 2600
Hartford, CT 06103

-and-

YOUNG CONAWAY
STARGATT & TAYLOR LLP
Pauline K. Morgan, Esq.
Margaret Whiteman Greecher
Rodney Square
1000 North King Street
Wilmington, DE 19801

-and-

CLEARY GOTTLIEB STEEN
& HAMILTON LLP
Lindsee P. Granfield, Esq.
Boaz S. Morag, Esq.
One Liberty Plaza
New York, NY 10006

*Counsel for Cascade Investment,
L.L.C. and ECJV Holdings, LLC*

Rachel B. Goldman, Esq.
Robert G. Burns, Esq.
1251 Avenue of the Americas
49th Floor
New York, NY 10020-1104

*Counsel for the Debtors and
Debtors in Possession*

# OPINION[1]

Walnut Creek Mining Company ("Walnut Creek"), an unsecured creditor, seeks derivative standing to pursue claims for recharacterization, equitable subordination, and breach of fiduciary duties against Cascade Investments, L.L.C. ("Cascade") and ECJV Holdings, LLC ("ECJV") on behalf of the Debtors,[2] alleging that the secured debt should be recharacterized as equity, equitably subordinated, or otherwise set aside. For the reasons set forth below, the Court will deny Walnut Creek's request for derivative standing on the ground that Walnut Creek has failed to allege colorable claims.

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law, as required by the Federal Rules of Bankruptcy Procedure. *See* Fed. R. Bankr. P. 7052, 9014(c).

[2] The Debtors in these chapter 11 cases are: Optim Energy, LLC; OEM 1, LLC; Optim Energy Cedar Bayou 4, LLC; Optim Energy Altura Cogen, LLC; Optim Energy Marketing, LLC; Optim Energy Generation, LLC; Optim Energy Twin Oaks GP, LLC; and Optim Energy Twin Oaks, LP.

# I. JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a), (b)(1), and 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Consideration of this matter constitutes a "core proceeding" under 28 U.S.C. § 157(b)(2)(A), (B), and (O).

# II. BACKGROUND

## A. Procedural Background

On February 12, 2014 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court. The Debtors continue to operate their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. A committee of unsecured creditors has not been appointed in these chapter 11 cases.

On February 12 and March 6, 2014, respectively, the Court entered Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and (B) Utilize Cash Collateral of Pre-Petition Secured Parties Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364; and (III) Granting Related Relief [Docket Nos. 36 & 144] (the "DIP Financing Orders"). The DIP Financing Orders provide that, as to the Debtors, all claims and defenses against Cascade and ECJV are irrevocably waived and relinquished as of the Petition Date. *See* Interim DIP Financing Order at ¶ 14; Final DIP Financing Order at ¶ 14. In addition, any adversary proceeding (i) challenging the validity, enforceability, priority, or extent of the Debtors' prepetition indebtedness and/or Cascade and ECJV's liens on the Debtors' prepetition collateral, or (ii) otherwise asserting any action for preferences, fraudulent conveyances, other avoidance power claims, subordination, recharacterization or any other claims or defenses against Cascade and ECJV or any of their affiliates, must be brought by no later than May 13, 2014 (the "Challenge Deadline"), in the case of a party in interest with requisite standing other than the Debtors or an appointed committee. *See* Final DIP Financing Order at ¶ 14.

By letter dated April 9, 2014, Walnut Creek asked the Debtors to consent to Walnut Creek's standing to commence and prosecute the Claims. The Debtors declined to respond to Walnut Creek's demand within the requested time period - which was short in light of the need

to file a motion and obtain a hearing on derivative standing prior to the Challenge Deadline so that the Complaint could be timely filed.

On April 14, 2014, Walnut Creek filed the Motion for Order Granting Leave, Standing and Authority to Commence and Prosecute Certain Claims on Behalf of the Debtors' Estate Against Cascade Investment, L.L.C. and ECJV Holdings, LLC (the "Standing Motion"). Briefing is complete and the Court heard argument on May 5, 2014. This matter is ripe for decision.

## B. The Parties

Debtors own and operate three power plants in Texas: Twin Oaks, Altura Cogen, and Cedar Bayou. Cascade, through its wholly-owned subsidiary, ECJV, indirectly holds 100% of the equity interests of each of the Debtors in these chapter 11 cases. ECJV directly owns Debtor Optim Energy, LLC ("Optim Energy") and indirectly owns all of the other Debtors. Cascade, as the ultimate controlling shareholder of the Debtors, and ECJV, as its affiliate, are "insiders" of the Debtors pursuant to section 101(31)(B)(iii) and (E) of the Bankruptcy Code. Cascade and ECJV have first priority liens on substantially all of the Debtors' assets and provide DIP Financing for these chapter 11 cases.

PNM Resources, Inc. ("PNMR") is an energy holding company. PNMR and Cascade (through ECJV) formed Optim Energy[3] in 2007: PNMR contributed the Twin Oaks plant, and Cascade contributed capital.

Walnut Creek is the largest non-insider general unsecured creditor in the Debtors' chapter 11 cases. Walnut Creek is party to a Fuel Supply Agreement dated November 18, 1987 (as amended, the "FSA") with Debtor Optim Energy Twin Oaks L.P. ("Twin Oaks"). Pursuant to the FSA, Walnut Creek supplies Twin Oaks with substantially all of the lignite coal used to operate its coal-fired plant. The FSA obligations are guaranteed by Twin Oaks.

## C. Factual Background

On January 8, 2007, PNMR and Cascade, through its wholly-owned subsidiary, ECJV, formed Optim Energy as a limited liability company organized under the laws of Delaware. Optim Energy's purpose was to enter the deregulated Texas electricity markets by acquiring or constructing merchant power plants to sell electricity to the public through the Electric Reliability Council of Texas ("ERCOT").

---

[3] At the time of its formation Optim Energy, LLC was creatively known as EnergyCo, LLC; the name was changed on February 2, 2009.

PNMR and ECJV each made a $10.00 capital contribution to Optim Energy at formation, and each contributed an additional $2.5 million to Optim Energy to fund start-up expenses.[4]

On May 25, 2007, Optim Energy's Board of Directors held a special meeting to discuss the purchase and financing of the Altura Cogen Plant, which Optim Energy was attempting to acquire from Dynegy Inc. ("Dynegy"). The accompanying Board presentation notes that with respect to Optim Energy's revised second-round bid, the "[k]ey issue remaining is financial support for the bid given [Optim Energy's] current lack of capitalization." Compl. Ex. E at p. 2. According to the minutes of the special meeting, Mr. Kubow, Optim Energy's President, briefed the Board on the status of the bid:

> [Mr. Kubow] added that because [Optim Energy] will not be capitalized and will not have access to the Wells Fargo revolving credit facility until after June 1 and the Altura closing, Dynegy is also requiring a ten (10) percent parental guaranty to provide assurance that [Optim Energy] will be able to finance and close on the transaction in the meantime. Mr. Kubow stated that the parental guaranty will cease as soon as [Optim Energy] can post the five (5) percent letter of credit from the Wells Fargo facility. He further reported PNMR has agreed to provide such a guaranty contingent upon Cascade Investment, LLC providing a back-up guaranty for half of the obligation amount. He stated that PNMR and Cascade are completing negotiation of the details related to these guarantees and that there is agreement that any payments under the guarantees would be treated as capital contributions.

Compl. Ex. F at p. 2. The Board presentation also provides that the parent guarantees were intended only as temporary support, and that permanent support for the transaction would come from the Wells Fargo Credit Facility. Compl. Ex. E at p. 6.

---

[4] Because the Standing Motion seeks to challenge the rights of the Debtors' senior secured creditors, a detailed summary of the Debtors' complex financial transactions over the past seven years is required.

~ 5 ~

On June 1, 2007, PNMR contributed its ownership of wholly-owned subsidiary Altura Power, L.P. (now known as Twin Oaks), including its 305 MW coal-fired power plant located 150 miles south of Dallas, Texas (the "Twin Oaks Plant"), to Optim Energy for an agreed fair market value of $553.8 million. ECJV then made a cash contribution to Optim Energy of $276.9 million, and Optim Energy distributed that cash to PNMR. After this transaction, PNMR and ECJV each held a 50% ownership interest in Optim Energy.

Also on June 1, 2007, Optim Energy entered into a five-year unsecured credit facility with Wells Fargo Bank, National Association ("Wells Fargo") in the initial amount of $1 billion (the "Wells Fargo Credit Facility") of which, on the Petition Date, in excess of $700 million was outstanding. The Wells Fargo Credit Facility provided Optim Energy with a revolving line of credit and bank letters of credit. Optim Energy used the revolving loan facility to fund the acquisition of the Altura Cogen Plant, to build the Cedar Bayou Plant, and to support the general operations of the Debtors.

The Wells Fargo Credit Facility was guaranteed jointly and severally by Cascade and ECJV under a Continuing Guaranty issued by Cascade and a Continuing Guaranty issued by ECJV, each dated as of June 1, 2007, for the benefit of Wells Fargo (collectively, the "Cascade Guarantees"). The Cascade Guarantees provided Wells Fargo with adequate assurance of repayment, and Wells Fargo's agreement to enter into the Wells Fargo Credit Facility was contingent upon Optim Energy obtaining the Cascade Guarantees and the Subordination Agreement (defined below).[5]

On the same day, the Debtors, Cascade, and ECJV entered into a Guaranty Reimbursement Agreement (the "Guaranty Reimbursement

---

[5] *See* Wells Fargo Credit Facility at § 7.1(a)(3)-(5):

> The obligation of the Lender to make the initial Loan and the obligation of the Issuing Lender to issue the initial Letter of Credit (as applicable), is subject to the following conditions precedent, each of which shall be satisfied prior to the making of the initial Loan or the issuance of the initial Letter of Credit…: (a) The Lender shall have received all of the following…each dated as of the Closing Date…: (3) the [Cascade Guaranty]; (4) the [ECJV Guaranty]; (5) the Subordination Agreement [defined therein as 'the Subordination Agreement of even date herewith among the Lender, as "Senior Creditor," Holdings [ECJV] and CILLC [Cascade], as "Subordinated Creditors," and Borrower']…."

Compl. Ex. M.

Agreement") pursuant to which the Debtors are obligated to reimburse Cascade and ECJV for any payments made to Wells Fargo pursuant to the Cascade Guarantees (the "Reimbursement Obligations").

The Guaranty Reimbursement Agreement states that the Debtors' Reimbursement Obligations "constitute indebtedness of the Debtors and shall not, in any event, constitute or be treated as an equity or capital contribution by the Guarantors." Compl. Ex. C at § 5.7. The Guaranty Reimbursement Agreement further provides that Debtors shall pay quarterly fees to Cascade, as Collateral Agent, for the Guarantors having entered into the Guaranty. Compl. Ex. C at § 2.2 (as amended May 8, 2012). The Debtors are required to reimburse Cascade and ECJV within thirty days after receiving notice that a payment had been made pursuant to the Cascade Guarantees. Compl. Ex. C at § 2.1(a).

Pursuant to the Pledge and Security Agreement dated June 1, 2007, Cascade and ECJV took security interests in substantially all of the Debtors' assets, including their equity interests and real property, to secure the Debtors' obligations under the Guaranty Reimbursement Agreement. *See* Cascade & ECJV's Obj. Ex. 6 (UCC records). The Subordination Agreement, also dated June 1, 2007, provides that Cascade and ECJV agree to subordinate all of their claims as Guarantors to all of Wells Fargo's claims against the Debtors and Guarantors.

In June 2007, Optim Energy distributed $87.5 million to each ECJV and PNMR from a long-term borrowing under the Wells Fargo Credit Facility. Compl. Ex. D. On August 1, 2007, Optim Energy acquired the Altura Cogen Plant for $477.9 million, funded through cash contributions of $42.5 million from each of PNMR and ECJV, with the remainder financed through borrowings under the Wells Fargo Credit Facility. Altura Cogen, LLC pledged its real property, including the Altura Cogen Plant, to Cascade and ECJV pursuant to the Altura Cogen Deed of Trust dated August 1, 2007.

Also in August 2007, Optim Energy began a project with NRG Energy, Inc. to jointly develop the Cedar Bayou Plant. Under the Cedar Bayou Deed of Trust dated August 1, 2007 (together with the Altura Cogen Deed of Trust, the "Deeds of Trust"), EnergyCo Cedar Bayou 4, LLC[6] pledged all of its real property, including the Cedar Bayou Plant, to Cascade and ECJV. Optim Energy financed its share of the

---

[6] EnergyCo Cedar Bayou 4, LLC is now known as Debtor Optim Energy Cedar Bayou 4, LLC.

construction costs with borrowings under the Credit Agreement and cash flows from the Twin Oaks Plant and Altura Cogen Plant.

On October 17, 2008, Optim Energy and Wells Fargo amended the Wells Fargo Credit Facility to increase the revolving credit facility from $1 billion to $1.25 billion. Compl. Ex. M. ECJV, PNMR, and Optim Energy entered into a Contribution Agreement on April 7, 2010, pursuant to which ECJV and PNMR each made $15 million capital contributions to Optim Energy (the "2010 Capital Contribution"). The Contribution Agreement states that the capital contributions were to be made "as a result of [Optim Energy's] recent completion of its Cedar Bayou IV project" and provides that "the proceeds [of the 2010 Capital Contribution] shall be used by [Optim Energy] to repay a portion of the outstanding principal amount of the [Wells Fargo Credit Facility]...." Compl. Ex. K at p. 2. The Contribution Agreement further provides that ECJV and PNMR each would make four additional quarterly capital contributions to Optim Energy, with each quarterly capital contribution to "equal the amount of the aggregate monthly invoices submitted by PNMR Services...for the relevant quarter[.]"[7] Compl. Ex. K at § 2.4. The proceeds of these quarterly capital contributions were also to be used to repay a portion of the loans outstanding under the Wells Fargo Credit Facility. The capital accounts of ECJV and PNMR were each adjusted to reflect the 2010 Capital Contribution. Compl. Ex. K at §§ 2.2, 2.3.

On February 14, 2011, Optim Energy and Wells Fargo amended the Wells Fargo Credit Facility. Among other changes, the parties removed Optim Energy's representation that "[a]fter giving effect to this Agreement and the other Loan Documents ... Borrower and its Subsidiaries, taken as a whole, are and shall continue to be solvent." Compl. Ex. M.

On September 23, 2011, PNMR, ECJV, and Cascade restructured Optim Energy to reduce PNMR's ownership to 1% and increase ECJV's ownership to 99% (the "2011 Restructuring"). *See* Register of Membership Interests, Ex. 4.1 to Amended and Restated Operating Agreement, Compl. Ex. O; *see also* Contribution and Restructuring Agreement, Compl. Ex. N (the Contribution and Restructuring Agreement together with the Amended and Restated Operating Agreement are referred to as the "Restructuring Agreements").

Pursuant to the Restructuring Agreements, ECJV made a $5 million payment (the "2011 Capital Contribution") directly to Wells

---

[7] PNMR Services was the management and operations services provider to the Debtors at that time.

Fargo to pay down loans outstanding under the Wells Fargo Credit Facility. The Restructuring Agreements provide that the 2011 Capital Contribution "shall be deemed to be a capital contribution to [Optim Energy] made by ECJV" and that Optim Energy "shall adjust ECJV's capital account to reflect the [2011 Capital Contribution] and shall issue 24,500,980 Class C Units in [Optim Energy] to ECJV" in exchange for the 2011 Capital Contribution. Compl. Ex. N at § 2.1; Compl. Ex. O at § 4.3.

The Amended and Restated Operating Agreement also provided that ECJV had the option to purchase PNMR's remaining 1% interest in Optim Energy at fair market value from January 1, 2012 to December 31, 2015. Compl. Ex. O at § 9.4; Compl. Ex. P. The fair value of PNMR's 1% interest in Optim Energy was *de minimis* as of September 30, 2011. Compl. Ex. Q. ECJV exercised its option on January 3, 2012, and the transfer was finalized on January 4, 2012 for a purchase price of $0, as the fair market value of PNMR's 1% interest was less than zero. Compl. Ex. R.

Pursuant to the Guaranty Reimbursement Agreement, the Debtors owed Cascade a guaranty fee of $1.934 million due December 31, 2013. The Debtors did not pay the fee, but instead entered into a Forbearance Agreement with Cascade and ECJV on December 30, 2014. The Forbearance Agreement provides that, subject to certain conditions, Cascade and ECJV would forbear from exercising any remedies resulting from the nonpayment of the guaranty fee until February 14, 2014.

On February 11, 2014, as the Debtors were preparing to file bankruptcy, Cascade wired funds equal to the amount outstanding under the Wells Fargo Credit Facility to a newly-opened account with Wells Fargo (the "Cascade Account"). *See* Compl. Ex. S. On the morning of the Petition Date, Wells Fargo set-off the funds in the Cascade Account against the outstanding balance of the Wells Fargo Credit Facility, in accordance with the terms of the Cascade Guarantees. *See* Compl. Ex. S. This payment to Wells Fargo triggered the Debtors' obligations under the Guaranty Reimbursement Agreement and the Pledge and Security Agreement, and Cascade and ECJV are now senior secured lenders with a claimed lien on substantially all of the Debtors' assets.

## III. LEGAL ANALYSIS

Walnut Creek believes that the Debtors have colorable claims against Cascade and ECJV arising out of an allegedly inequitable

scheme by Cascade and ECJV to transform themselves from equity holders to senior secured lenders. These claims are for (i) recharacterization of Cascade and ECJV's alleged debt as equity; (ii) equitable subordination of Cascade and ECJV's claims; and (iii) damages for ECJV's breach of fiduciary duties and Cascade's aiding and abetting therein (the "Claims").[8] Because the DIP Financing Orders prevent the Debtors from pursuing these claims, and because no committee of unsecured creditors has been appointed in these chapter 11 cases, Walnut Creek seeks leave of the Court, authority, and derivative standing to commence and prosecute the Claims.

The Third Circuit has held that to be granted derivative standing, the moving party must demonstrate that (i) the debtor-in-possession has unjustifiably refused to pursue the claim or refused to consent to the moving party's pursuit of the claim on behalf of the debtor-in-possession; (ii) the moving party has alleged colorable claims; and (iii) the moving party has received leave to sue from the bankruptcy court. *Official Committee of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003).

## A. Colorable Claims

The Court first considers whether the Claims are colorable. "In deciding whether there is a colorable claim, the court should undertake the same analysis as when a defendant moves to dismiss a complaint for failure to state a claim." *In re Centaur, LLC,* 2010 WL 4624910, at *4 (Bankr. D. Del. Nov. 5, 2010). The motion to dismiss standard is well known: "[to] survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009), (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678, 129 S. Ct. 1937.

---

[8] Walnut Creek also asserted a claim for "lien avoidance." However, lien avoidance appears to be the remedy that Walnut Creek seeks, and no basis for avoiding the liens has been stated beyond that the liens were "improperly granted," which has not been established. Thus, the lien avoidance claim must fail.

### 1. Breach of Fiduciary Duties and Aiding and Abetting Breach of Fiduciary Duties

The claims for breach of fiduciary duties and aiding and abetting breach of fiduciary duties are futile. Walnut Creek seeks derivative standing to bring a claim against ECJV for breach of fiduciary duties to the Debtor and its creditors, as well as a claim against Cascade for aiding and abetting ECJV's alleged breach of fiduciary duties. Walnut Creek alleges that "ECJV, as the controlling shareholder of Optim Energy at least since September 23, 2011, owed fiduciary duties" to the Debtor and its creditors. However, under the Debtor's amended operating agreement, dated September 23, 2011, no fiduciary duties were owed. "The Members agree that, to the fullest extent permitted by the [Delaware Limited Liability Company] Act and other applicable laws, neither the Directors nor any Member shall have any duties or obligations to the Company [Debtor], any Member or any other party except as expressly set forth in this Agreement." Compl. Ex. O at § 11.16. "In connection with the foregoing, the Members specifically intend that no Director or Member shall have any fiduciary duties to the Company, any Member or any other party." *Id.* Such elimination of fiduciary duties is permitted under the Delaware Limited Liability Company Act. "To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or to another person that is a party or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement; provided, that the limited liability company agreement may not eliminate the implied contractual covenant of good faith and fair dealing." 6 Del. Code § 18-1002(c). Therefore, due to the specific statement in the Debtor's operating agreement that no fiduciary duties were owed, the Court determines that the breach of fiduciary duties claim against ECJV and the aiding and abetting breach of fiduciary duties claim against Cascade must fail.

### 2. Recharacterization

Recharacterization of debt as equity is a recognized but challenging cause of action.[9] "The Third Circuit has held that the

---

[9] The Third Circuit has instructed that, with respect to the "facial plausibility" pleading requirement, "[s]ome claims will demand relatively more factual

overarching inquiry with respect to recharacterizing debt as equity is whether the parties to the transaction in question intended the loan to be a disguised equity contribution." *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders North Am., Inc.)*, 405 B.R. 527, 554 (Bankr. D. Del. 2009) (citing *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron)*, 432 F.3d 448, 455-56 (3d. Cir. 2006)). While "[n]o mechanistic scorecard suffices," the parties' intent "may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstance." *SubMicron*, 432 F.3d at 456.

In support of its claim for recharacterization of Cascade and ECJV's secured claims as equity, Walnut Creek relies upon the following contentions: (i) the Debtors were inadequately capitalized at the time of execution of the Cascade Agreements; (ii) Cascade and ECJV guaranteed the Debtors' obligations under the Wells Fargo Credit Facility when no prudent, *bona fide* lender would have done so; (iii) the Debtors granted Cascade and ECJV security interests on substantially all of their assets at a time when the Debtors did not owe Cascade and ECJV any debt; (iv) on at least one occasion, Cascade and ECJV waived payment of their fees under the Guaranty Reimbursement Agreement; (v) the Debtors' obligations under the Cascade Agreements were subordinated to the Debtors' obligations under the Wells Fargo Credit Facility; and (vi) Cascade and ECJV made various capital contributions in the form of equity investments to the Debtors for the purpose of paying down the Wells Fargo Credit Facility.

After careful consideration of the indicia cited by Walnut Creek, the Court finds that Walnut Creek has not alleged a colorable claim that the "Cascade Investments" (*i.e.*, Cascade and ECJV's secured claims) should be recharacterized as equity contributions. As discussed more fully below, the Court concludes that the many transactions and financial arrangements that give rise to Cascade and ECJV's secured claims were structured and intended as debt obligations and are not susceptible to being recharacterized as equity contributions.

### i.  Inadequate Capitalization

The issue of undercapitalization is first discussed in the seminal decision in *Pepper v. Litton*, 308 U.S. 295, 60 S. Ct. 238 (1939): "where the paid-in capital is purely nominal, the capital necessary for the scope

---

detail to satisfy this standard, while others require less." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 361 n.18 (3d Cir. 2010).

and magnitude of the operations of the company being furnished by the stockholder [will be treated] as a loan." *Pepper v. Litton*, 308 U.S. at 310, 60 S. Ct. at 246-47. Capitalization may be assessed both at the time of initial capitalization and at the time of subsequent transactions or transfers. *Autobacs Strauss, Inc. v Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525, 576 (Bankr. D. Del. 2012) (internal quotations omitted). However, "Courts should not put too much emphasis on this factor, in any event, because all companies in bankruptcy are in some sense undercapitalized." *In re BH S & B Holdings LLC*, 420 B.R. 112, 159 (Bankr. S.D.N.Y. 2009) *aff'd as modified*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011) (citing *In re Lifschultz Fast Freight*, 132 F.3d 339, 345 (7th Cir. 1997)); *see also In re Phase I Molecular Toxicology, Inc.*, 287 B.R. 571, 578 (Bankr. D.N.M. 2002) (finding that "[w]hether the Debtor was undercapitalized at the time of the transaction, though relevant, is not determinative.").

Walnut Creek alleges in the Complaint that the Debtors were inadequately capitalized at the time they entered into the Cascade Guarantees, Guaranty Reimbursement Agreement, the Pledge and Security Agreement, the Deeds of Trust and related Uniform Commercial Code financing statements (the "Cascade Investments"). Walnut Creek's allegations focus on the Board of Directors' concerns over Optim Energy's initial lack of capitalization in late May 2007 when negotiating the purchase of the Altura Cogen Plant and the treatment as capital contributions of parent guarantees required by Dynegy to close the Altura Cogen transaction. *See* Compl. ¶¶ 32-33. The Court finds that these allegations are unsupported by the record, which clearly indicates that the Wells Fargo Credit Facility would be in place by June 1, 2007. Moreover, the parent guarantees were only a bridging measure until the Wells Fargo Credit Facility, which would provide permanent support for the transaction, went into effect.

The Complaint also alleges that the Debtors began to experience liquidity problems shortly after entering into the Wells Fargo Credit Facility, and cites an analysis dated June 29, 2007, predicting that "as an alternative to contributing equity to support the investment, $982 million of the $1 billion facility would be utilized by November 2007." Compl. ¶ 34. The Court finds that the June 29 projection does not reflect definite financial difficulties that the Debtors faced at that time; rather, it is a prediction of the consequences that could result from potential trading actions. Furthermore, the Complaint does not state any facts to support the allegation that Debtors actually experienced liquidity problems at the time they entered into the Agreement, nor are there

allegations that the Debtors were unable to pay operating costs and obligations during the seven years they were in operation prior to commencing these bankruptcy proceedings.

The final point in Walnut Creek's initial undercapitalization argument is that "Optim Energy's total capitalization as of October 31, 2007 was only $1,165,322" which shows that Optim Energy was in "dire need of additional financing." Compl. ¶ 35; Compl. Ex. I (October 2007 Performance Report) (the "Report"). However, the cited Report indicates that the total capitalization was $1.165 billion, not $1.165 million, as the figures are listed "in thousands." Compl. Ex. I at p. 8.

In sum, the Court finds the age of the transaction significant: the Cascade Guarantees and the Guaranty Reimbursement Agreement were part of the Debtors' financial structure from the outset and were in existence for seven years before the Debtors filed for bankruptcy. The Court also notes that neither new equity nor expanded ownership rights were provided with the Cascade Guarantees and Guaranty Reimbursement Agreement: if these obligations had been intended as equity, then ECJV's contribution would have been $1 billion more than PNMR's contribution, yet ECJV and PNMR had equal shares in Optim Energy. This strongly supports the proposition that the Cascade Guarantees were not intended as equity, for if they were, they would surely have been reflected in a much different ownership structure.

Walnut Creek also argues that the 2008 increase in the Wells Fargo Credit Facility from $1 billion to $1.25 billion was insufficient to adequately address the liquidity needs of the company, and that Optim Energy was undercapitalized at the time the Wells Fargo Credit Facility was amended in October 2008. As with Walnut Creek's allegations of initial undercapitalization, the Court finds no support in the record for a claim of undercapitalization in 2008, as there is no allegation of default until February 2014.

### ii. No Prudent, *Bona Fide* Lender Would Have Guaranteed the Debtors' Obligations

The Complaint alleges that Cascade and ECJV guaranteed the Debtors' obligations under the Wells Fargo Credit Facility when no prudent, *bona fide* lender would have done so, because the Debtors were a newly-formed company with insufficient capital. Walnut Creek also alleges that when the Debtors were faced with a deficit under the Wells Fargo Credit Facility by December 2008, no third-party lender would extend additional financing to the Debtors.

The Court finds that Walnut Creek has failed to plead any facts tending to support an inference that no third-party lender would have guaranteed the Debtors' obligations or would have extended additional financing to the Debtors. As a threshold matter, the Court has already found *supra* that these Debtors were not inadequately capitalized in 2007. The Court notes that the requirement that a loan be guaranteed by insiders of a debtor is not *per se* evidence of the Debtors' undercapitalization. *Lifschultz Fast Freight*, 132 F.3d at 353. In addition, this factor is unpersuasive when it is the pre-existing lender that is extending additional financing. *SubMicron*, 432 F.3d at 457.

### iii. The Debtors Granted Security Interests to Cascade and ECJV When the Debtors Did Not Owe Any Debt

Walnut Creek alleges that the Debtors' grant of security interests to Cascade and ECJV pursuant to the Pledge and Security Agreement supports its claim for recharacterization. The Court finds this allegation both conclusory and contradicted by the record. The security interests were granted in connection with the Guaranty Reimbursement Agreement, Wells Fargo Credit Facility, and all of the other transactions which occurred on June 1, 2007. These transactions were all required by Wells Fargo, they are not unusual in the context of these Debtors' business and financing requirements, and Debtors' receipt of the Wells Fargo Credit Facility was contingent upon Debtors' grant of security interests. Thus, this factor does not support Walnut Creek's claim.

### iv. Cascade and ECJV Waived Payment of Fees

Walnut Creek alleges that by waiving payment of their fees under the Guaranty Reimbursement Agreement, Cascade and ECJV demonstrate that the Cascade Investments represent equity investments. The Court disagrees, finding this allegation contradicted by the record. Not only does the payment remain part of Cascade's secured claim, *see* SOFA, Docket No. 214; Schedule D, Docket No. 206 at p. 18, but the fact that the parties entered into the Forbearance Agreement lends support to the existence of a true creditor relationship. The Court further notes that "[i]n the case of a pre-existing lender, it is legitimate for the lender to take actions to protect its existing loans, including extending additional credit or granting forbearance." *In re Moll Indus., Inc.*, 454 B.R. 574, 591 (Bankr. D. Del. 2011) (citing *In re Radnor Holdings Corp.*, 353 B.R. 820, 839 (Bankr. D. Del. 2006)). Therefore, this factor does not support Walnut Creek's claim for recharacterization.

### v. Subordination to Wells Fargo

Walnut Creek argues that the fact that the Debtors' obligations under the Cascade Agreements were subordinated to the Debtors' obligations under the Wells Fargo Credit Facility supports its claim for recharacterization. Walnut Creek cites no support for this contention. The Court recognizes that subordination to all other claims may be an indication that the claims are capital contributions, not loans. *In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 752 (6th Cir. 2001). However, the Subordination Agreement provides for the subordination of Cascade and ECJV's reimbursement guaranty claims against the Debtors to Wells Fargo's claims only until Wells Fargo's claims are paid in full. Moreover, it is typical in the Court's experience for the credit facility obligations to have priority over the claims of the guarantors. Accordingly, this factor does not support recharacterization.

### vi. Capital Contributions

Walnut Creek alleges that the parties treated the 2010 and 2011 Capital Contributions as equity because Cascade and ECJV never required the Debtors to repay the amount under the Guaranty Reimbursement Agreement. Treatment of the pre-petition capital contributions as equity, contrary to the express provisions of the Guaranty Reimbursement Agreement, is effectively a waiver of the Guaranty Reimbursement Agreement.

The Court disagrees. First, the equity contributions were unrelated to the Guaranty Reimbursement Agreement and Cascade Guarantees, and there was no default under the Wells Fargo Credit Facility to trigger those Agreements. Second, the 2010 Contribution Agreement and 2011 Contribution Agreement clearly state that the parties intended the payments as equity. *See* Compl. Ex. K § 2.2 "ECJV shall make a capital contribution to the Company in the amount of $15,000,000…."; Compl. Ex. N, § 2.1 "ECJV (or Cascade or any Affiliate of ECJV) shall make a payment in the amount of $5,000,000 directly to the Bank…and such payment shall be deemed to be a capital contribution to the Company made by ECJV…." The Court finds that the capital contributions are separate and distinct from Cascade and ECJV's obligations under the Cascade Guarantees and Guaranty Reimbursement Agreement. Thus, this factor does not support recharacterization.

After considering the overall factual allegations in Walnut Creek's Complaint, as well as the indicia cited in support, the Court finds that Walnut Creek has not alleged sufficient facts to support a

colorable claim for recharacterization. Moreover, while the Court acknowledges that Cascade and ECJV's dual roles as equity holder and lender certainly complicate the analysis here, the transactions described above clearly demonstrate that the parties were able to clearly identify and document debt versus equity arrangements.

### 3. Equitable Subordination

The equitable subordination claim that Walnut Creek seeks standing to bring fails the test of colorability. Section 510(c)(1) provides that a court may "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest." 11 U.S.C. 510(c)(1). However, equitable subordination remains a "'drastic' and 'unusual' remedy." *Radnor*, 353 B.R. at 840 (quoting *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron)*, 291 B.R. 314, 327-29 (D. Del. 2003)). The Third Circuit Court of Appeals has stated:

> Before ordering equitable subordination, most courts
> have required a showing involving three elements: (1) the
> claimant must have engaged in some type of inequitable
> conduct, (2) the misconduct must have resulted in injury
> to the creditors or conferred an unfair advantage on the
> claimant, and (3) equitable subordination of the claim
> must not be inconsistent with the provisions of the
> bankruptcy code.

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 986-87 (3d Cir. 1998) (footnote omitted) (citing *U.S. v. Noland*, 517 U.S. 535, 116 S. Ct. 1524, 134 L. Ed. 2d 748 (1996) (describing existing case law as consistent with the three part test identified in *In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977)); *see also, SubMicron*, 432 F.3d at 461-62. "[C]ourts recognize three general categories of behavior that may constitute inequitable conduct: 1) fraud, illegality, or breach of fiduciary duties; 2) undercapitalization; and 3) claimant's use of the debtors as a mere instrumentality or alter ego." *Bank of N.Y. v. Epic Resorts-Palm Spring Marquis Villas, LLC (In re Epic Capital Corp.)*, 290 B.R. 514, 524 (Bankr. D. Del 2003); *see also, Burtch v. Owlstone, Inc. (In re Advance Nanotech, Inc.)*, 2014 WL 1320145 at *8 (Bankr. D. Del. 2014).

For purposes of evaluating inequitable conduct, insiders are held to a higher standard. "Courts differentiate between insiders and

outsiders when analyzing whether a claimant's conduct was inequitable. An insider's conduct is rigorously scrutinized, and the plaintiff bears the burden of presenting material evidence of unfair conduct that the insider claimant then must rebut by proving the fairness of his transactions with the debtor." *Official Unsecured Creditors' Committee of Broadstripe, LLC v. Highland Capital Management, L.P. (In re Broadstripe, LLC)*, 444 B.R. 51, 79 (Bankr. D. Del. 2010) (internal quotations omitted); *see also Autobacs Strauss*, 473 B.R. at 582. "A party may be found to constitute an 'insider' for purposes of equitable subordination if the party either (1) meets the statutory definition of insider, or (2) are in a close relationship with the debtor to such an extent as to suggest transactions were not conducted at arm's length." *Broadstripe*, 444 B.R. at 79; *see also Autobacs Strauss*, 473 B.R. at 582. Cascade and ECJV do not dispute that they are insiders of Optim Energy. ECJV owns 100% of the outstanding equity securities of Optim Energy, and ECJV is a wholly-owned subsidiary of Cascade. As the direct and indirect owners of the outstanding equity securities, Cascade and ECJV meet the definition in the Bankruptcy Code of insiders. *See* 11 U.S.C. § 101(31)(B), (E). They were also insiders at the time the Cascade Guarantees were signed, although ECJV only owned 50% of the outstanding equity securities at that time.

The equitable subordination claim is not colorable because, taking all of Walnut Creek's well-pled allegations as true, there was no allegation of inequitable conduct. *See In re Midway Games Inc.*, 428 B.R. 303, 322 (Bankr. D. Del. 2010) (dismissing claim for equitable subordination where plaintiff failed to state facts that would justify a finding of inequitable conduct). It is merely alleged that Cascade and ECJV performed under their guarantees on the Wells Fargo Credit Facility, guarantees that had been in existence for almost seven years. When Optim Energy filed its bankruptcy petition on February 12, 2014, the filing constituted an event of default under the Wells Fargo Credit Facility.[10] There is no dispute that Cascade and ECJV as guarantors were obligated upon such an event of default to pay the outstanding

---

[10] "The existence or occurrence of any one or more of the following events, whatever the reason therefor and under any circumstances whatsoever, shall constitute an Event of Default . . . (j) Holdings [ECJV], CILLC [Cascade], Borrower [Debtor] or any Subsidiary institutes or consents to the institution of any proceeding under a Debt Relief Law [the Bankruptcy Code] relating to it or to all or any material part of its property . . ." Wells Fargo Credit Facility, Compl. Ex. M at § 8.1.

balance under the Wells Fargo Credit Facility.[11] There is also no dispute that at such time the outstanding aggregate principal amount of debt was approximately $712 million, which amount Cascade paid to Wells Fargo on the Petition Date. The Court has already determined *supra* that there is no viable claim for breach of fiduciary duties and that Optim Energy was not undercapitalized in 2007 at the time the Cascade Guarantees and Guaranty Reimbursement Agreement were signed, and there were no alter ego allegations. Therefore, even under the more stringent standards applied to insiders, the facts alleged do not rise to the level of wrongful conduct.

### B. Unjustified Refusal

Because Walnut Creek has failed to articulate colorable claims, the Court need not consider whether the Debtor's refusal to prosecute these claims was unjustified.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that Walnut Creek has failed to allege colorable claims against Cascade and ECJV. Therefore, Walnut Creek's Standing Motion is **DENIED**.  An appropriate Order follows.

BY THE COURT:

Dated: May 13, 2014
Wilmington, Delaware

Brendan Linehan Shannon
United States Bankruptcy Judge

---

[11] "Guarantor hereby irrevocably and unconditionally guaranties and promises to pay and perform on demand upon and during the continuance of an Event of Default the Guarantied Obligations and each and every one of them, including all amendments, modifications, supplements, renewals or extensions of any of them . . ." Cascade Guarantees, Debtor's Obj. Ex. 2 at § 2.

~ 19 ~