## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Optim Energy, LLC, *et al.*, | Case No. 14-10262 (BLS) |
| Debtors.[1] | (Jointly Administered) |
| | **Proposed Hearing Date:  June 25, 2014 at 1:00 p.m. (prevailing Eastern Time)** |
| | **Proposed Objection Deadline: June 23, 2014 at 12:00 p.m. (prevailing Eastern Time)** |

## DEBTORS' MOTION FOR ORDERS: (A)(I) APPROVING SALE PROCEDURES AND PROPOSED PURCHASER PAYMENTS IN CONNECTION WITH THE SALE OF CERTAIN ASSETS OF OPTIM ENERGY TWIN OAKS, LP, (II) SCHEDULING AN AUCTION AND HEARING TO CONSIDER APPROVAL OF THE SALE, (III) APPROVING NOTICE RELATING TO THE SALE, AND (IV) GRANTING RELATED RELIEF; AND (B)(I) AUTHORIZING AND APPROVING OPTIM ENERGY TWIN OAKS, LP TO SELL SUBSTANTIALLY ALL OF ITS PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES, (II) AUTHORIZING OPTIM ENERGY TWIN OAKS, LP TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF

Optim Energy, LLC ("**Optim Energy**")[2] and certain of its affiliates, as debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**")

hereby move (the "**Motion**") for entry of two orders:

---

[1]  The Debtors in these chapter 11 cases are: Optim Energy, LLC; OEM 1, LLC; Optim Energy Cedar Bayou 4, LLC; Optim Energy Altura Cogen, LLC; Optim Energy Marketing, LLC; Optim Energy Generation, LLC; Optim Energy Twin Oaks GP, LLC; Optim Energy Twin Oaks, LP. The Debtors' main corporate and mailing address for purposes of these chapter 11 cases is: c/o Competitive Power Ventures, Inc., 8403 Colesville Road, Suite 915, Silver Spring, MD 20910.

[2]  Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the PSA or the Sale Procedures, as applicable.  All summaries of the key documents related to the Sale (as defined herein) provided in this Motion are provided for informational purposes only; in the event of any conflict between this Motion and those documents, the terms of the documents, and not this Motion, shall control.

- first, an order, in the form attached hereto as **Exhibit A** (the "*Sale Procedures Order*"), providing for, among other things:

  - approval of the sale procedures in the form attached hereto as **Exhibit 1** to **Exhibit A** and incorporated herein by reference (the "*Sale Procedures*") with respect to the sale of the Twin Oaks facility (as described herein, the "*Facility*") owned by the Debtor entity Optim Energy Twin Oaks, LP ("*Twin Oaks*" or the "*Seller*") (such transaction, the "*Sale*");

  - approval of the Break-Up Fee and Expense Reimbursement (each as defined herein), payable to Major Oak Power, LLC (the "*Proposed Purchaser*") on the terms described in the Sale Procedures Order and in accordance with the purchase and sale agreement by and among Twin Oaks, certain other Debtors, and the Proposed Purchaser, in the form attached hereto as **Exhibit 1** to **Exhibit B** (the "*PSA*");

  - approval of the form and manner of notice of an auction with respect to the Sale, as contemplated in the Sale Procedures (the "*Auction*") and substantially in the form attached hereto as **Exhibit 2** to **Exhibit A** (the "*Sale Notice*");

  - the date of the hearing at which the Court will consider approval of the Sale in accordance with the Sale Procedures (the "*Sale Hearing*") for August 5, 2014, at 10:00 a.m. (prevailing Eastern Time) and related deadlines contemplated by the Sale Procedures; and

  - approval of notice for the assumption and assignment of contracts and leases, substantially in the form attached hereto as **Exhibit 3** to **Exhibit A;**

- second, an order, in the form attached hereto as **Exhibit B** (the "*Sale Order*"):

  - authorizing and approving the Sale free and clear of all liens, claims, and encumbrances, pursuant to the PSA or a Modified Purchase Agreement (as defined in the Sale Procedures) on terms consistent with the Sale Procedures; and

  - authorizing and approving the Debtors' entry into the PSA or a Modified Purchase Agreement on terms consistent with the Sale Procedures; and

  - authorizing the assumption and assignment of certain executory contracts and unexpired leases in accordance with the PSA or a Modified Purchase Agreement.

In support of the Motion, the Debtors submit the (a) the *Declaration of Nick Rahn, Chief Executive Officer of Optim Energy, LLC, in Support of Chapter 11 Petitions and First Day*

*Pleadings* [D.I. 4] (the "***First Day Declaration***") and (b) *Declaration of George Mack in Support of Debtors' Motion for Orders: (A)(I) Approving Sale Procedures and Proposed Purchaser Payments in Connection with the Sale of Certain Assets of Optim Energy Twin Oaks, LP, (II) Scheduling an Auction and Hearing to Consider Approval of the Sale, (III) Approving Notice Related to the Sale, and (IV) Granting Related Relief; and (B)(I) Authorizing and Approving Optim Energy Twin Oaks, LP to Sell Substantially All of its Property Free and Clear of All Liens, Claims, and Encumbrances, (II) Authorizing the Assumption and Assignment of Certain Contracts, and (III) Granting Related Relief* incorporated herein by reference and attached hereto as __Exhibit C__ (the "***Mack Declaration***").   In further support of the Motion, the Debtors respectfully state as follows:

<u>**Jurisdiction**</u>

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a), 363, 364, 365, 503 and 507 of title 11 of the United States Code (the "***Bankruptcy Code***"), Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***").

<u>**Background**</u>

4.      On February 12, 2014 (the "***Petition Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5.      The Debtors continue to operate their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors' chapter 11 cases are being

jointly administered for procedural purposes only under Case No. 14-10262 (BLS).  No trustee, examiner, or official committee of unsecured creditors has been appointed in the Debtors' cases.

## The Twin Oaks Plant and the Marketing Process

6.     Twin Oaks is the owner of a two-unit lignite-fired electric generating plant known as Twin Oaks Power Station, located in Robertson County, Texas (the "*Facility*").  Twin Oaks sells its generated power into the market regulated by the Electric Reliability Council of Texas ("*ERCOT*").  Twin Oaks owns both the plant and the underlying real property.

7.     As described in the First Day Declaration, Twin Oaks purchases the vast majority of the coal necessary to operate the Facility from Walnut Creek Mining Company ("*Walnut Creek*"), pursuant to an executory long-term fuel supply agreement executed in 1987 (the "*FSA*").  Under the FSA, Twin Oaks must purchase in excess of approximately 90% of its coal from Walnut Creek and is required to purchase minimum coal quantities regardless of its actual needs. (*See* First Day Decl., ¶ 14.) Under the FSA, Twin Oaks is obligated to purchase coal from Walnut Creek for at least another 10 years. (*Id.*) The terms of the FSA provide for escalating prices for coal purchased from Walnut Creek over time without any adjustment for declining power prices. (*Id.* at ¶ 31.)

8.     As described in detail in the Mack Declaration, in February 2014, the Debtors initiated a broad-based marketing process led by Barclays Capital, Inc. ("*Barclays*"), the Debtors' investment banker retained in these chapter 11 cases.

9.     In February, Barclays prepared a high level "teaser" that set forth a basic description of the Facility and general information relating to its operations.  The teaser was sent to more than sixty parties that Barclays believed, based on its experience in conducting sales of distressed assets and sales of power plant facilities, might have an interest in acquiring the

Facility. The recipients of the teaser included private equity investors and strategic industry participants. (Mack Decl., ¶ 7.)

10.     Barclays received a high level of interest in the Facility. Twenty-eight parties, including Walnut Creek, executed confidentiality agreements (collectively, the "***Potential Purchasers***").  (*Id.*, ¶ 8.) Consistent with customary practice, the confidentiality agreements precluded the Potential Purchasers from disclosing confidential information regarding the potential transaction and prohibited engaging in any discussions with any vendor of the Twin Oaks Facility, including Walnut Creek. (*Id.*)

11.     Potential Purchasers received a Confidential Information Memorandum ("***CIM***") setting forth detailed information about the Facility, including a technical Facility description, a summary of existing commercial arrangements and key contracts, historical operating data, and market and environmental overviews. (*Id.*, ¶ 9.) The Debtors also provided Potential Purchasers with access to Barclays and the Facility's management to assist with their due diligence. (*Id.*) The Debtors requested that Potential Purchasers submit non-binding preliminary proposals by March 21, 2014. (*Id.*) Fourteen Potential Purchasers submitted non-binding preliminary proposals. (*Id.*) Walnut Creek did not submit an asset purchase proposal. (*Id.*)

12.     The Debtors, in consultation with their advisors, reviewed the proposals with the Debtors' independent directors (the "***Independent Directors***"), the DIP Lender (as defined in the DIP Orders) and the Pre-Petition Secured Parties. After a thorough review process, the Debtors determined that eight Potential Purchasers would be invited to participate in a second round of the marketing process (the "***Round Two Participants***"). (*Id.*, ¶ 10.)  The Debtors and their advisors provided the Round Two Participants with access to an electronic data-room that contained extensive information about the Facility. (*Id.*) The data-room included copies of the

Seller's significant contracts, detailed financial reports, and comprehensive operational data.  The Debtors and their advisors designed the second round of the marketing process to elicit detailed binding proposals from the Round Two Participants. (*Id.*)

13.     The Debtors invited each of the Round Two Participants to meet with the Twin Oaks management team and tour the Facility. (*Id.*, ¶ 11.)  All of the Round Two Participants scheduled individual trips to College Station, Texas to attend a management presentation and Q&A session and a tour of the Facility. (*Id.*)  The site visits took place in April.  Several of the Round Two Participants retained independent consultants and advisors to assist with their due diligence and bid preparation. (*Id.*)  The Debtors also granted to the Round Two Participants the opportunity to participate in a detailed question and answer process, which included calls with experts in particular subject areas.  (*Id.*)

14.     On April 22, 2014, Barclays distributed bid instructions to each Round Two Participant. (*Id.*, ¶ 12.)  The instructions described the requirements for the next round of bidding, including a deadline of May 12, 2014, which the Debtors subsequently extended to May 16, 2014, for definitive purchase proposals. (*Id.*)  The Debtors also provided the Round Two Participants with a form asset purchase agreement and proposed section 363 sale procedures, which they were asked to mark-up and submit with their bids.  (*Id.*)  Of the eight Round Two Participants, four submitted binding offers to serve as proposed purchasers (the "***Second Round Bids***") by the May 16 bid deadline.[3] (*Id.*)

15.     Following receipt of the Second Round Bids, the Debtors and their advisors, in consultation with the Independent Directors, the DIP Lender, and the Pre-Petition Secured Parties, continued to negotiate the terms of the Second Round Bids, as well as the terms of the

---

[3] The Debtors extended the May 16 bid deadline to Monday, May 19 for one of the Round Two Participants.

sale procedures and other related documents. (*Id.*, ¶ 13.)  At least one of the Second Round Bidders conducted additional due diligence, including a second site visit. (*Id.*)  After four weeks of negotiations that resulted in beneficial improvements to the Second Round Bids and applicable asset purchase agreements, including price adjustments and diminished execution risk, the Debtors determined that the Second Round Bid of the Proposed Purchaser provided the highest and best offer for the Facility.   (*Id.*) The Debtors and the Proposed Purchaser subsequently engaged in additional negotiations to finalize the definitive documentation relating to the Proposed Purchaser's bid. (*Id.*)

16.    On June 13, 2014, after extensive arm's-length and good faith negotiations, Twin Oaks and the Proposed Purchaser executed the PSA.  (*Id.*)

17.    As described herein, the PSA proposes that the Proposed Purchaser will purchase the Facility for a cash purchase price of $60 million, subject to certain additional adjustments, plus the assumption and assignment of certain executory contracts.   The PSA does not contemplate assumption of the FSA with Walnut Creek.

## Relief Requested

18.    By this Motion, the Debtors request entry the Sale Procedures Order which will, among other things, establish the following dates and deadlines:

- <u>Bid Deadline</u>: July 23, 2014 at 3:00 p.m. (prevailing Eastern Time), as the last date by which Potential Bidders may deliver bid documents required to participate in the Auction pursuant to the Sale Procedures (the "***Bid Deadline***");

- <u>Sale Objection Deadline</u>: July 29, 2014 at 5:00 p.m. (prevailing Eastern Time), as the deadline to object to the Sale and/or the assumption and assignment of Designated Contracts or Cure Costs related thereto (the "***Sale Objection Deadline***");

- <u>Auction</u>: August 4, 2014 at 10:00 a.m. (prevailing Eastern Time), as the date and time the Auction, if one is needed, will be held at the offices of

7

Bracewell & Giuliani, LLP, 1251 Avenue of Americas, New York, New York 10020-1104; and

- <u>Sale Hearing</u>: August 5, 2014 at 10:00 a.m. (prevailing Eastern Time), as the date and time the Sale Hearing will be held before the Honorable Brendan Shannon, United States Bankruptcy Judge for District of Delaware.

19.     The Sale Procedures Order will also: (a) approve the Sale Notice; and (b) authorize and approve procedures for the assumption and assignment of contracts and leases, including notice in the form attached hereto as **Exhibit 3** to **Exhibit A**.  The Debtors submit that the Sale Procedures will permit interested parties reasonable opportunities to evaluate whether to propose a bid for Twin Oaks' property that is higher and better in value to the Seller than the terms of the PSA.  Key terms of the Sale Procedures are highlighted in paragraph 21 below.

20.     In addition, the Debtors seek, at the Sale Hearing, entry of the Sale Order.  The Sale Order will, among other things: (a) authorize the sale of the Purchased Assets to the Proposed Purchaser, or such other person or entity who is the Prevailing Bidder in accordance with the Sale Procedures, with such sales being free and clear of all liens, claims, encumbrances, and other interests; and (b) authorize the assumption and assignment of certain executory contracts and unexpired leases to the Proposed Purchaser or the Prevailing Bidder.  Key terms of the PSA and Sale Order are highlighted below.

**Basis for Relief Requested**

**A.    Approval of Sale Procedures**

21.    The Sale Procedures are designed to maximize value for the Debtors' estates and ensure that a marketing and sales process is undertaken by the Debtors in accordance with the timeline required under the DIP Credit Agreement and by the Proposed Purchaser.  The Sale Procedures are the result of arm's-length negotiations between the Debtors and the Proposed Purchaser and are summarized[4] as follows:

   *(i)*    <u>Assets for Sale</u>.  All of Seller's right, title and interest in the two-unit lignite-fired electric generating plant known as Twin Oaks Power Station, located in Robertson County, Texas.  (*See* "Purchased Assets," PSA §2.1(b).)

   *(ii)*    <u>Consultation Parties</u>.  The Seller will reasonably consult with the DIP Lenders and the Pre-Petition Secured Parties, and their respective advisors, throughout the bidding process. (*See* Sale Procedures, ¶ 1.)

   *(iii)*    <u>Participation Requirements</u>: Potential Bidders must provide, so as to be received no later than Monday, July 14, 2014 at 3:00 p.m. (prevailing Eastern Time): (a) an executed confidentiality agreement (to the extent that a Potential Bidder has not already entered into a confidentiality agreement with Optim Energy concerning the Seller); (b) financial disclosure acceptable to the Seller to determine that the Potential Bidder has the financial wherewithal to consummate the Transactions; and (c)evidence that the Potential Bidder has the internal corporate, legal or other authorizations or approval to engage in and close the Transactions. Satisfaction of (a), (b), and (c) herein, subject to the Seller's rights, and consultation with the Consultation Parties, under the Sale Procedures will deem a Potential Bidder a "Qualifying Bidder."  (*See* Sale Procedures, ¶ 4.)

   *(iv)*    <u>Due Diligence</u>. The Seller will provide any Qualifying Bidder with reasonably requested diligence access, provided such diligence materials were provided to the Proposed Purchaser. (*See* Sale Procedures, ¶ 5.)

   *(v)*    <u>Bid Requirements</u>.  Subject to and qualified by paragraph 7 of the Sale Procedures, to be deemed a "Qualifying Bid," a bid must be received no later than the Bid Deadline and must, among other things, satisfy each of

---

[4] The description of the Sale Procedures provided herein is not restated, but rather a summary and is qualified in its entirety by reference to the Sale Procedures attached as **Exhibit 1** to **Exhibit A** hereto.

the following requirements: (a) the binding purchase offer must be made on terms and through a purchase and sale agreement no less favorable to the Seller's estate than that of the PSA to which such Qualifying Bidder is prepared to legally enter into; (b) identify the aggregate "Purchase Price" and the form and source of consideration thereof; (c) include a "Modified Purchase Agreement" pursuant to which the Qualifying Bidder proposes to effectuate an Alternative Transaction, as well as a marked Modified Purchase Agreement and form of Sale Order reflecting any variations from the PSA and the Sale Order agreed to by the Proposed Purchaser; (d) identify each contract and/or unexpired lease to be assumed through a purchase and sale agreement and contain full details of the Qualifying Bidder's proposal for the treatment of related cure costs; (e) propose a purchase price of $5 million greater than that provided in the PSA, plus the Expense Reimbursement and Break-Up Fee (as described herein and in the Sale Procedures), which does not include any financial contingencies; (f) state that since February 12, 2014, the Qualifying Bidder has not had any discussions with Walnut Creek related to the Walnut Creek Mine, the Seller, the Purchased Assets, any proposed transaction regarding the such entities or assets, any contractual arrangement between such entities, or any confidential information regarding the foregoing; (g) state that the bid is irrevocable until the selection of the Prevailing Bidder and the Back-up Bidder (if applicable), and to the extent the bidder is selected as the Prevailing Bidder or the Back-up Bidder, shall remain irrevocable until the earlier of (1) the "Closing Date" (with respect to the Prevailing Bidder) and (2) the "Outside Back-up Date" (with respect to the Back-up Bidder); and (h) be accompanied by a cash deposit equal to 15% of the aggregate Purchase Price (the "***Good Faith Deposit***") (Sale Procedures, ¶ 7.).

*(vi)* <u>DIP Lenders and Pre-Petition Secured Parties' Right to Credit Bid</u>.  The DIP Lenders and the Pre-Petition Secured Parties have agreed that, to the extent that the PSA and the Sale Procedures are not amended or modified in a manner that is adverse to the DIP Lenders and the Pre-Petition Secured Parties in any material respect prior to the Closing Date without written consent of the DIP Lenders and the Pre-Petition Secured Parties, they will not submit a credit bid for the Purchased Assets under the Sale Procedures, except as a back-up credit bid as provided in paragraph 16 of the Sale Procedures (Failure to Consummate Purchase). (Sale Procedures, ¶¶ 7, 16.)

*(vii)* <u>Evaluation of Qualifying Bids</u>.  The Seller will identify the Baseline Bid and provide a copy of the Baseline Bid and all associated documentation to all Qualifying Bidders within two (2) Business Days after the Bid Deadline.  (*See* Sale Procedures, ¶ 8.)

*(viii)* <u>Proposed Purchaser</u>.  The Proposed Purchaser is deemed a Qualifying Bidder and the PSA is a deemed a Qualifying Bid.  (*See* Sale Procedures, ¶ 7.)

*(ix)*    Auction.

i.    <u>No Qualifying Bids</u>. Seller shall not hold an Auction and instead shall promptly declare the Proposed Purchaser and the PSA to be the Prevailing Bid and request at the Sale Hearing that the Bankruptcy Court approve the PSA with the Proposed Purchaser.  (*See* Sale Procedures, ¶ 9.)

ii.    <u>Participation at the Auction</u>.  Only the Debtors, the Proposed Purchaser, the DIP Lenders, the Pre-Petition Secured Parties and the other Qualifying Bidders who have made a Qualifying Bid, in each case, along with their advisors, shall be entitled to attend the Auction, and only the Proposed Purchaser and such other Qualifying Bidders may make any subsequent bids at the Auction. (*See* Sale Procedures, ¶ 11(a).)

iii.    <u>No Discussions with Vendors</u>.  Consistent with the bidders' obligations under their confidentiality agreements and the marketing process for the Facility, the Sale Procedures require bidders to certify that, since the Petition Date, they have not engaged in discussions with vendors, including Walnut Creek and its affiliates.  (*See* Sale Procedures, ¶ 11(d).)

iv.    <u>Overbids</u>.  The Proposed Purchaser and each Qualifying Bidder may submit successive bids in increments of at least $2,000,000 higher than the Baseline Bid at which the Auction commenced (after taking into account the Proposed Purchaser Payments if the Proposed Purchaser submitted the Baseline Bid) and then continue in minimum increments of at least $2,000,000 higher in value to the Debtors than the previous bid (after taking into account the Proposed Purchaser Payments if the Proposed Purchaser submitted the previous bid).  (*See* Sale Procedures, ¶ 11(g).)

v.    <u>Conclusion of the Auction</u>: The Seller shall announce the party who is the Prevailing Bidder and the party who is the Back-Up Bidder.  The Debtors shall formally announce the close of the Auction after choosing the Prevailing Bidder and the Back-Up Bidder.  No later than 12:00 p.m. (prevailing Eastern Time) the day after the close of the Auction, the Debtors shall file a notice announcing the identity of the Prevailing Bidder and the Back-Up Bidder with the Bankruptcy Court. (See Sale Procedures, ¶ 12.)

    *(x)*    <u>Failure to Consummate Purchase</u>.  If the Prevailing Bidder fails to consummate an approved Sale by the Closing Date as provided in the Bidding Procedures, the Back-up Bidder will be deemed to be the new Prevailing Bidder, and the Seller will be authorized to consummate the Sale with the Back-up Bidder without further order of the Bankruptcy Court.  To the extent that the Prevailing Bidder and the Back-up Bidder, if any, fail to consummate the Sale by any outside closing date provided in the definitive sale agreement with such Prevailing Bidder or Back-up Bidder, the DIP Lenders and/or the Pre-Petition Secured Parties may credit bid at the amount of the Prevailing Bid and will be authorized to consummate the Sale without further Bankruptcy Court approval. (*See* Sale Procedures, ¶ 16.)

    22.    Importantly, the Sale Procedures recognize the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all bid proposals, and preserve the Seller's right, after consultation with the Consultation Parties, to modify the Sale Procedures as necessary or appropriate to maximize value for their estates as set forth in the Sale Procedures. (*See* Sale Procedures, ¶ 11(m), 18.)  The Sale Procedures provide that the Seller may not impair or modify the Proposed Purchaser's rights and obligations under the PSA, and the PSA provides the Proposed Purchaser with a termination right if the Sale Procedures Order or Sale Order are modified in any manner that is adverse to the Proposed Purchaser in any material respect.  (*See* Sale Procedures, ¶ 18.)

**B.**    **Confidentiality**

    23.    A notable and important feature of the Sale Procedures is the requirement that no party seeking to become a Qualifying Bidder shall have had any communication with Walnut Creek or its affiliates relating to, among other things, the FSA, the Facility or the transactions that are the subject of this Motion (*See* Sale Procedures, ¶¶ 7(h), 11(d)). While it is not unusual in sale processes to preclude or limit contact between a potential buyer and key vendors or potential competing bidders, the prohibition in this transaction is specifically intended to reflect the well-reasoned business judgment of the Independent Directors. Put simply, based on the

long-standing history of failed negotiations with Walnut Creek and the contentious posture Walnut Creek has taken in these chapter 11 cases, the Independent Directors determined that contact between Potential Bidders and Walnut Creek would be counterproductive, distracting, not in the best interest of the estate, and potentially detrimental to the overall sale process.

24.     The Independent Directors revisited the determination to preclude discussions with Walnut Creek several times during the course of the sale process based on, among other things, contemporaneous conversations between representatives of the Debtors and Walnut Creek, as well as negotiations with Potential Purchasers. At no point did Walnut Creek put forth any commercial proposal or structure for a dialogue with Potential Purchasers that the Independent Directors reasonably believed would be constructive or value maximizing for the Debtors. In fact, certain proposals made by Walnut Creek would, in the opinion of the Independent Directors, have been highly beneficial to Walnut Creek while at the same time risking the destruction or diversion of economic value away from the Debtors. In sum, the Independent Directors consistently opined that Walnut Creek was seeking to use the Debtors' sale process to divert value to it, while disrupting the sale process for the Facility.

25.     While Walnut Creek has been and will be precluded from any communication or collaboration with any Potential Purchaser, it is not excluded from the sale process. Walnut Creek executed a confidentiality agreement and received sale materials (through Barclays, not its litigation process). Additionally, Walnut Creek is clearly entitled to submit a Qualifying Bid pursuant to the terms of the Sale Procedures, which would allow it to participate in the Auction. Walnut Creek's status as a Potential Bidder is another reason why the Independent Directors, in its business judgment, determined not to permit bidders to engage in discussions with Walnut

Creek.  The risk of bid collusion, given the relationship between the Facility and Walnut Creek's mine, was a significant consideration for the Independent Directors.

## C.    Good Faith Deposits

26.    A Good Faith Deposit must accompany each Qualifying Bid.  Each bidder shall, by wire transfer of immediately available funds, deposit cash equal to 15% of the aggregate Purchase Price, which will be held in a segregated, interest-bearing account selected by the Seller and disbursed pursuant to an escrow agreement agreed upon between the Seller and the Qualifying Bidder in accordance with the Sale Procedures.  In accordance with the Sale Procedures and notwithstanding anything in the DIP Orders [D.I. 36, 144], the Good Faith Deposits shall be returned to each bidder not selected as the Prevailing Bidder or the Back-up Bidder no later than five (5) Business Days following the conclusion of the Auction (Sale Procedures, ¶ 15.).  The Good Faith Deposits of the Prevailing Bidder and Back-up Bidder will be treated as described in the Sale Procedures.

## D.    Approval of Buyer Protections

27.    In consideration of the Proposed Purchaser's due diligence, good faith negotiations of, and entering into, the PSA, and in recognition of the Proposed Purchaser's work in establishing a bid minimum for other bidders and serving, by its expressed interest, as a catalyst for other bidders, the Debtors have agreed to pay the Proposed Purchaser, subject to and in accordance with, Section 4.6 of the PSA, (a) a break-up fee in the amount of $1.8 million, or three percent (3%) of the $60 million Base Price (as defined in the PSA) (the "***Break-Up Fee***"); and (b) an amount equal to Buyer's reasonable and documented costs and expenses incurred in connection with the due diligence, preparation, execution and performance of the PSA, and ancillary documents, and the consummation of the transactions contemplated thereby (such expenses, in any case, not to exceed the lesser of such actual costs and expenses and

14

$1,000,000.00, subject to the Debtors' receipt of supporting documentation in reasonable detail (the "*Expense Reimbursement*" and, together with the Break-Up Fee, the "*Proposed Purchaser Payments*").

28.    The Proposed Purchaser Payments are payable upon the occurrence of the consummation of a transaction with a Person other than the Proposed Purchaser pursuant to a Qualifying Bid or any sale or other disposition of any material portion of the Seller's assets and properties relating to the Business to a Person other than the Proposed Purchaser (an "*Alternative Transaction*").  If the Proposed Purchaser becomes entitled to receive the Proposed Purchaser Payments due to the consummation of an Alternative Transaction, in accordance with the terms of the PSA, which right survives the termination of the PSA, then the Proposed Purchaser Payments shall each constitute an administrative expense (which shall, subject only to the first proviso of Section 4.6(d) of the PSA, be a super-priority administrative expense claim senior to all other administrative expense claims and payable out of the Debtors' cash or other collateral securing the Debtors' obligations to the DIP Lenders and the Pre-Petition Secured Parties, prior to any recovery by such parties) of the Debtors under Section 364(c)(1) of the Bankruptcy Code; provided, however, that notwithstanding the foregoing, the Break-Up Fee and the Expense Reimbursement shall be junior to the claims of Wells Fargo Bank, National Association in its capacity as L/C Issuer and Agent (each as defined in the DIP Credit Agreement) arising under the DIP Credit Agreement; provided, further, that, for the avoidance of doubt, any increase in the amount of the Loan (as defined in the DIP Credit Agreement) on account of an L/C Disbursement (as defined in the DIP Credit Agreement) that gives rise to Unpaid Reimbursement Obligations (as defined in the DIP Credit Agreement) shall be junior to the Break-Up Fee and Expense Reimbursement. The Debtors agree that until the earlier to occur of (i) the Closing Date

or (ii) payment of the Break-Up Fee and Expense Reimbursement in full, the Debtors shall not

incur or otherwise agree to any other administrative claim that is senior to, or *pari passu* with,

the priorities of the Break-Up Fee and Expense Reimbursement set forth in section 4.6(d) of the

PSA.

**E.     Additional Key Terms of the PSA and Sale Order**

29.     In addition to the key terms of the PSA and the Sale Order highlighted above, the

Debtors disclose, in accordance with Local Rule 6004-1, the following:

a.     Releases. Upon the occurrence of the Closing Date, except for the
enumerated rights and obligations of the Debtors and the Prevailing
Bidder under the PSA and under the Equity Commitment Letter, the
Prevailing Bidder, to the extent permitted by law, will be deemed to have
irrevocably and unconditionally released, remised, and forever discharged
the Debtors and their affiliates, and all their past, present and future
shareholders, partners, members, board of directors and/or supervisors,
managers, officers, employees, agents, representatives and advisors from
any and all suits, legal or administrative proceedings, claims, demands,
damages, losses, costs, liabilities, interest or causes of action whatsoever
at law or in equity, known or unknown, which the Prevailing Bidder or its
affiliates might now or subsequently may have, based on, relating to or
arising out of the PSA, the transactions contemplated thereby, the
ownership, use or operation of the Purchased Assets or the condition,
quality, status or nature of the Purchased Assets, including rights to
contribution under the Comprehensive Environmental Response,
Compensation, and Liability Act of 1980, as amended, breaches of
statutory or implied warranties, nuisance or other tort actions, rights to
punitive damages, common law rights of contribution and rights under
insurance maintained by the Debtors or any of their affiliates. (Sale Order
¶ 22.)

Upon the occurrence of the Closing Date, except for the enumerated rights
and obligations of the Debtors and the Prevailing Bidder under the PSA,
the Debtors, to the extent permitted by law, will be deemed to have
irrevocably and unconditionally released, remised, and forever discharged
the Prevailing Bidder and its affiliates, and all their past, present and
future shareholders, partners, members, board of directors and/or
supervisors, managers, officers, employees, agents, representatives and
advisors from any and all suits, legal or administrative proceedings,
claims, demands, damages, losses, costs, liabilities, interest or causes of
action whatsoever at law or in equity, known or unknown, which the
Debtors or its affiliates might now or subsequently may have, based on,

16

relating to or arising out of the negotiation and sale of the Purchased Assets, the transactions contemplated thereby, and the agreements (including, without limitation, the PSA) and ancillary documents memorializing and effectuating the sale. (Sale Order ¶ 23.)

b.  <u>Closing and Other Deadlines</u>.  Seller is to obtain entry by the Bankruptcy Court of the Sales Procedure Order no later than June 27, 2014 and the Sale Order no later than August 12, 2014. (PSA §§ 4.4(h), 7.2(b).) Subject to the terms of section 4.4(a) of the PSA, the PSA may be terminated by the Proposed Purchaser or the Seller if the Closing has not occurred by the close of business on November 30, 2014. (PSA § 4.4(a).)

c.  <u>Good Faith Deposit</u>.  Within two Business Days of the execution of the PSA, the Proposed Purchaser will, by wire transfer of immediately available funds, deposit 15% of the Base Price with the Deposit Escrow Agent, to be held in a segregated, interest-bearing account and disbursed pursuant to the Escrow Agreement.  (PSA, § 3.2(a).)

d.  <u>Proceeds</u>.  The proceeds of the Sale shall be applied in accordance with paragraph 9 of the DIP Order [D.I. 144] and section 3.3(a) of the DIP Credit Agreement.

e.  <u>Tax Exemptions</u>.  In accordance with section 1146(a) of the Bankruptcy Code, the making or delivery of any instrument or transfer, including the filing of any deed or other document of transfer to evidence, effectuate or perfect the right, title and interest contemplated by the PSA, shall be in contemplation of a plan of reorganization to be confirmed in the Twin Oaks bankruptcy case, and such shall be free and clear of any and all sales, use, stamp, documentary stamp, filing, recording, transfer (including real property transfer taxes), goods and services, value added or similar taxes. (PSA § 9.3(f); Sale Order ¶ 19.)

f.  <u>Record Retention</u>.  Under the PSA, the Proposed Purchaser shall provide Twin Oaks with unfettered access to all books and records being transferred in order to fulfill Twin Oaks' obligations under the Bankruptcy Code.  (PSA, § 8.6.)

g.  <u>Successor Liability</u>.  The Proposed Purchaser is not assuming any liabilities arising from the operation of any successor or transferee liability laws.  (PSA § 2.4(m).)  The Proposed Purchaser shall not be deemed to be a successor to the Debtors under the doctrines of successor liability.  (Sale Order ¶ 21.)

**F.      Approval of Notice Procedures; Form and Manner of Sale Notice**

30.      To preserve the Debtors' going-concern value, the Debtors wish to proceed to the Auction and Sale Hearing as expeditiously as the Court's calendar will allow, while providing the requisite notice of the proposed Sale as required under Bankruptcy Rule 2002.

31.      Not later than five (5) Business Days after entry of the Sale Procedures Order, the Debtors will serve a copy of the Sale Notice as well as a copy of this Motion and the Sale Procedures Order, by first-class mail postage prepaid upon: (a) the Office of the United States Trustee for the District of Delaware; (b) all known creditors of Twin Oaks; (c) counsel to Cascade Investment, L.L.C. and ECJV Holdings, LLC; (d) any party who has requested notice pursuant to Bankruptcy Rule 2002 (e) the Internal Revenue Service; (f) all other applicable state and federal taxing authorities having jurisdiction over the Purchased Assets; (g) the United States Environmental Protection Agency and any applicable state environmental agency; (h) the counterparties to each of the Designated Contracts; (i) all other parties known to the Debtors who have or may have asserted liens against any of the Purchased Assets; and (j) all other entities known to have expressed an interest in a transaction with respect to all or part of the Purchased Assets.

32.      In addition, on or before ten (10) Business Days after the entry of the Sale Procedures Order, the Debtors shall publish the Sale Notice in *The Robertson County News*, the *Platts Gas Daily*, the *Houston Chronicle*, and the *Oil & Gas Journal* (the "***Publication Notice***").

**G.      Approval of Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases**

33.      To facilitate and effect the Sale, pursuant to the PSA, the Proposed Purchaser requests that the Debtors assume and assign certain executory contracts and unexpired leases related to the Purchased Assets identified on **Schedule 7.3(c)** to **Exhibit 1** to **Exhibit B** hereto

(collectively, the "***Designated Contracts***").[5]    The Debtors shall serve a copy of the Notice to Counterparties to Potentially Assumed Executory Contracts and Unexpired Leases (substantially in form attached as **Exhibit 3** to **Exhibit A** hereto) (the "***Assumption Notice***") to be provided to any counterparty to a Designated Contract on or before two (2) Business Days after the entry of the Sale Procedures Order. The Assumption Notice shall identify all Contracts and Permits of Seller related to the Purchased Assets that Seller believes may be assumed and assigned in connection with the sale of the Purchased Assets and set forth a good faith estimate of the amount of cure costs applicable to each such Contract pursuant to section 365 of the Bankruptcy Code (the "***Cure Cost***").   The Seller reserves the right to supplement such list of Contracts and Permits and to provide additional notice of assumption up to three (3) Business Days prior to the Closing Date and to remove a Contract or Permit from the list of Contracts and Permits at any time prior to the Closing Date.

34.    Any objections to the assumption and assignment of any executory contract or unexpired lease identified in the Assumption Notice, including, but not limited to, objections relating to adequate assurance of future performance or to the Cure Costs set forth in the Assumption Notice, must be in writing and filed with the Court and served upon counsel to the Debtors no later than 4:00 p.m. (prevailing Eastern Time) on July 22, 2014 (the "***Cure Objection Deadline***").

35.    If no timely objection to the assumption and assignment of a particular executory contract or unexpired lease is received, then the Cure Costs set forth in the Assumption Notice

---

[5] The inclusion of any document on **Schedule 7.3(c) to the PSA (attached hereto as Exhibit 1 to Exhibit B)** for assumption and/or assignment shall not constitute or be deemed to be a determination or admission by the Debtors that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, and all rights to dispute such designation are expressly reserved by the Debtors. Also, the Proposed Purchaser reserves its right to remove a contract from the schedule of Designated Contracts prior to the Closing Date, as provided per the PSA.

will be binding upon the non-debtor party or parties to the Designated Contract for all purposes in these chapter 11 cases and otherwise.  All such counterparties to the Designated Contracts will (a) be forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts with respect to the Designated Contracts, (b) be deemed to have consented to the assumption and assignment, and (c) be forever barred and estopped from asserting or claiming against the Debtors or the Prevailing Bidder that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Designated Contracts or that there is any objection or defense to the assumption and assignment of such Designated Contracts, including that the Prevailing Bidder has not provided adequate assurance of future performance.

36.    If a non-debtor counterparty to a Designated Contract files an objection to assumption or assignment, whether based on Cure Cost, adequate assurance of future performance, or any other alleged cause or claim, then, to the extent the relevant parties are not able to consensually resolve the dispute prior to the Sale Hearing, such dispute shall be heard and resolved at the Sale Hearing.

## **Arguments and Authorities**

**A.    The Sale Procedures are Fair and are Designed to Maximize the Value Received for the Purchased Assets Given the Financial Exigencies Facing the Debtors**

37.    The Sale Procedures proposed herein are designed to maximize the value received for the Purchased Assets by facilitating a competitive bidding process in which all Potential Bidders are encouraged to participate and submit competing bids, taking into account the financial exigencies facing the Debtors.

38.    At the same time, the Sale Procedures provide the Debtors with the opportunity to consider all competing offers and to select the highest or best offer for the completion of the Sale.  Entering into the PSA with the Proposed Purchaser ensures fair value by setting a

minimum purchase price and testing the price in the marketplace.  Accordingly, the Debtors and all parties in interest can be assured that, taking into account the financial condition of the Debtors, the consideration paid for the Purchased Assets will be fair, reasonable, and in the best interest of the Debtors' estates and creditors, and there are sound business reasons to approve the Sale Procedures.

**B.    Approval of the Proposed Purchaser Payments Is Warranted and Appropriate**

39.    Courts have acknowledged that the approval of break-up fees and expenses in connection with substantial sales in bankruptcy is warranted to compensate an unsuccessful, potential acquirer whose initial offer served as the basis and catalyst for higher or better offers, which can only inure to the benefit of the debtor's estates.  *See Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 533 (3d Cir. 1999) (holding that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of 503(b) of the Bankruptcy Code govern in the bankruptcy context); *see also In re Hupp Indus., Inc.*, 140 B.R. 191, 195 (Bankr. N.D. Ohio 1992).  As listed in *Hupp Industries*, courts consider various factors in determining whether to authorize break-up fees, such as:

a.    whether the fee requested correlates with a maximization of value to the debtor's estate;

b.    whether the transaction in the negotiated agreement is an arms-length transaction between the debtor's estate and the negotiating acquirer;

c.    whether the principal secured creditors and the official creditors committee are supportive of the concession;

d.    whether the subject break-up fee constitutes a fair and reasonable percentage of the proposed purchase price;

e.    whether the dollar amount of the break-up fee is so substantial that it provided a "chilling effect" on other Potential Bidders;

f.   the existence of available safeguards beneficial to the debtor's estate; and

g.   whether there exists a substantial adverse impact upon unsecured creditors, where such creditors are in opposition to the break-up fee.

40.   The Break-Up Fee and the Expense Reimbursement induced the Proposed Purchaser to submit a bid that will serve as a minimum floor bid on which the Debtors, their creditors and other bidders may rely.  The Proposed Purchaser has provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible price for the Purchased Assets will be received.

41.   Courts have provided protections similar to the Proposed Purchaser Payments as reasonable and consistent with the type and range of bidding protection typically approved.  *See, e.g.*, *In re Constar International Holdings LLC*, Case No. 13-13281 (CSS) (Bankr. D. Del. Jan. 10, 2014) (approving break-up fee of 3% plus reimbursement of expenses); *In re Furniture Brands International, Inc.*, Case No. 13-12329 (CSS) (Bankr. D. Del. Oct. 3, 2013) (court approved break-up fee of $4 million plus reimbursement of expenses); *Northstar Aerospace (USA) Inc.*, Case No. 12-11817 (MFW) (Bankr. D. Del. June 27, 2012) (approving break-up fee of 3.5%); *In re Global Motorsports Group, Inc.*, Case No. 08-10192 (KJC) (Bankr. D. Del. Feb. 28, 2008) (approving break-up fee of 3% plus reimbursement of expenses).

42.   Here, the Break-Up Fee and Expense Reimbursement were agreed upon—and will only be paid to the Proposed Purchaser upon the closing of an Alternative Transaction—in light of the considerable time spent and expense incurred by the Proposed Purchaser in connection with the negotiation of the PSA and the purchase of the Facility.  If the Facility is sold to a purchaser other than the Proposed Purchaser, such competing bidder's bid will include compensation for the Proposed Purchaser for the Break-Up Fee and Expense Reimbursement. As is customary, the Break-Up Fee and Expense Reimbursement were required by the Proposed

Purchaser as a condition to it spending the significant time and expense necessary to negotiate and ultimately agree upon the terms of the PSA.

43.    The Debtors do not believe that these protections will stifle bidding.  On the contrary, the Debtors believe the Break-Up Fee and Expense Reimbursement will serve to: (a) retain a potentially successful bid; (b) establish the floor for other bidders to follow; and (c) attract additional bidders.  If the assets are sold to a party other than the Proposed Purchaser, it will be because of the Proposed Purchaser's crucial role as an initial bidder generating interest in the assets.  Indeed, the DIP Lender's consent to allowing payment of the Break-Up Fee and Expense Reimbursement to be senior to the DIP Lender's and Pre-Petition Secured Parties' super-priority claims under the DIP Credit Agreement, pursuant to the terms and conditions of the PSA, is an attestation to these facts.

44.    Accordingly, the Debtors respectfully submit that the Sale Procedures, the Break-Up Fee and Expense Reimbursement are reasonable and appropriate, and represent the best method to maximize value for the Debtors' estates.

**C.    The Debtors Have Exercised Sound Business Judgment and Provided Adequate Notice and Opportunity to Object With Respect to the Designated Contracts**

45.    Bankruptcy Code section 365(a) provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985); *In re Gucci*, 193 B.R. 411 (S.D.N.Y. 1996).  Under the business judgment test, a court should approve a debtor's proposed assumption if such assumption will benefit the estate.  *In re Pinnacle Brands, Inc.*, 259

B.R. 46, 53-54 (Bankr. Del. 2001); *see also In re Chi-Feng, Huang*, 23 B.R. 798, 801 (B.A.P. 9th Cir. 1982); *In re Gunter Hotel Assocs.*, 96 B.R. 696, 698 (Bankr. W.D. Tex. 1988); *In re Food City, Inc.* 94 B.R. 91, 93-94 (Bankr. W.D. Tex. 1988). Moreover, a debtor's decision to assume an executory contract or unexpired lease should be accepted "except upon a finding of bad faith or gross abuse of [the debtor's] business discretion." *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc., (In re Richmond Metal Finishers, Inc.)*, 756 F.2d 1043, 1047 (4th Cir. 1985). "More exacting scrutiny would slow the administration of the debtors' estates and increase its cost, interfere with the Bankruptcy Court's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing*, 762 F.2d at 1311.

46.    To assume an agreement, pursuant to Bankruptcy Code section 365(b)(1), a debtor must "cure, or provide adequate assurance that the debtor will promptly cure" any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1). Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract. Bankruptcy Code section 365(f) specifically provides that contract provisions seeking to prohibit or limit assignment are unenforceable. *See* 11 U.S.C. § 365(f)(1); *see also, e.g.*, *In re Office Prods. of Am., Inc.*, 140 B.R. 407 (Bankr. W.D. Tex. 1992) (provisions that work as a restriction on assignment of leases should be struck down); *In re Rickel Home Ctrs., Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("[T]he code generally favors free assignability as a means to maximize the value of the debtor's estate.").

47.    Pursuant to Bankruptcy Code section 365(a), assignment is conditioned on "adequate assurance of future performance [being] provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances

of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc.*
*v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re*
*Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future
performance does not mean absolute assurance that the debtor will thrive).  Among other things,
adequate assurance may be given by demonstrating the assignee's financial health and experience
in managing the type of enterprise or property assigned.  *Accord In re Bygaph, Inc.,* 56 B.R. 596,
605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when
prospective assignee of lease from the debtor has financial resources and has expressed
willingness to devote sufficient funding to business in order to give it strong likelihood of
succeeding).

48.     Here, any Qualifying Bidder must be an entity with financial resources adequate
to perform under the respective executory contracts and unexpired leases.  Additionally, the
Debtors respectfully submit that the proposed cure procedures for the identification and payment
of Cure Costs (the "*Cure Procedures*") are appropriate and reasonably tailored to provide non-
Debtor counterparties to potential assumed and assigned contracts with adequate notice of the
proposed assumption and assignment of their applicable contract, as well as the proposed Cure
Costs related thereto, if any.  Such non-Debtor parties to the potential assumed and assigned
contracts are given an opportunity to object to the proposed assumption and assignment and, in
the event an objection is not resolved, this Court will adjudicate the dispute, including issues
pertaining to adequate assurance of future performance.  Accordingly, the Debtors submit that
implementation of the proposed Cure Procedures is appropriate in these cases.

**D.      The Sale of the Purchased Assets Is Authorized Under Bankruptcy Code Section 363(b)**

49.      At the conclusion of the Sale Hearing, the Debtors request that the Court approve the sale of the Purchased Assets to the Proposed Purchaser or such other Qualifying Bidder who submits the Prevailing Bid.[6] The Debtors submit that the sale of the Purchased Assets to the Proposed Purchaser pursuant to the PSA, or such other agreement as the Debtors may reach with the party submitting the Prevailing Bid, is in the best interest of the Debtors' estates and their creditors.

50.      Bankruptcy Code section 363(b)(1) provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  To approve the use, sale or lease of property outside the ordinary course of business, this Court need only determine that the Debtors' decision is supported by "some articulated business justification," as established by the Second Circuit in *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1070 (2nd Cir. 1983). *See also Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.),* 242 B.R. 147, 153 (D. Del. 1999)*; Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc., et al. (In re Cont'l Air Lines, Inc.),* 780 F.2d 1223, 1226 (5th Cir. 1986); *Fulton State Bank* v. *Schipper,* 933 F.2d 513, 515 (7th Cir. 1991).

51.      The discretion and decisions of a debtor's board of directors and management are presumed to be reasonable under the business judgment rule.  *See In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[A] presumption of reasonableness attaches to a debtor's management decisions.").  Once a debtor articulates a valid business justification, "[t]he

---

[6] To be clear, this portion of the relief is requested to be entered after the Sale Hearing in the form of the Sale Order. The Debtors hereby reserve the right to file supplemental pleadings in support of its request for entry of the Sale Order.

business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

52.     Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1).  When applying the business judgment standard, courts show great deference to a debtor's business decisions.  *See In re Trans World Airlines*, 2001 Bankr. LEXIS 267, at *45-50 (Bankr. D. Del. March 12, 2001) (describing business judgment rule as "very deferential standard"); *In re First Wellington Canyon Assocs.*, 1989 U.S. Dist. LEXIS 10687, at *8-9 (N.D. Ill. Sept. 8, 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

53.     The fairness and reasonableness of the consideration to be paid for the Purchased Assets by the Proposed Purchaser or the Prevailing Bidder, as may be declared at the Sale Hearing, will be conclusively demonstrated by the exposure of the opportunity to the marketplace.  The Debtors have proposed a fair and open process for achieving the objective of obtaining the highest or best offer and sale of the Purchased Assets for the benefit of the Debtors' estates and their creditors.  The Debtors' decision to proceed with the sale process is consistent with sound business judgment.  Under the circumstances, the Sale Procedures and Auction process represent the best way to achieve substantial consideration for the Seller's businesses, and offer the best resolution to the Seller's current financial situation in the manner that will maximize the value available to the Debtors' estates and their creditors.

E.     **The Sale of The Purchased Assets Free and Clear of Liens, Claims, and Interests Is Authorized Under Bankruptcy Code Section 363(f)**

54.     The Debtors respectfully submit that it is appropriate to sell the Purchased Assets free and clear of all Interests, Liens, and/or Claims (other than the Assumed Liabilities and the Permitted Exceptions (as defined in the PSA)), pursuant to Bankruptcy Code section 363(f), with all such Interests, Liens, and/or Claims attaching to the net cash sale proceeds of the Purchased Assets (the "*Cash Proceeds*"), with the same validity, extent and priority as immediately prior to the transaction, subject to any rights, claims and defenses that the Debtors and other parties in interest may possess with respect thereto.  Bankruptcy Code section 363(f) authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

a.     applicable non-bankruptcy law permits sale of such property free and clear of such interests;

b.     such entity consents;

c.     such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

d.     such interest is in bona fide dispute; or

e.     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  This provision is supplemented by Bankruptcy Code section 105(a), which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

55.     Because Bankruptcy Code section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Purchased Assets free and clear of the interests.  *In re Dundee Equity Corp.*, 1992 Bankr. LEXIS 436, *12 (Bankr. S.D.N.Y. March 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of interest concerned may occur if any one of the conditions of § 363(f) have been met."); *In re Wolverine Radio Co.*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section

363(f) is written in the disjunctive; holding that the court may approve the sale 'free and clear' provided at least one of the subsections of section 363(f) is met).

56.    The Debtors believe that one or more of the tests under section 363(f) will be satisfied with respect to the transfer of the Purchased Assets pursuant to a Sale Order.   In particular, the Debtors believe that sections 363(f)(2) and (5) will be satisfied.

57.    A sale free and clear of Interests, Liens, and/or Claims is necessary to maximize the value of the Purchased Assets.  The Proposed Purchaser would not have entered into the PSA and would not consummate the Transaction if the sale of the Purchased Assets to the Proposed Purchaser was not free and clear of all Interests, Liens, and/or Claims (other than the Assumed Liabilities and the Permitted Exceptions), or if the Proposed Purchaser would, or in the future could, be liable for any such Interests, Liens, and/or Claims.  A sale of the Purchased Assets other than one free and clear of all Interests, Liens, and/or Claims would yield substantially less value for the Debtors' estates, with less certainty than the Transaction.   Therefore, the Transaction contemplated by the PSA is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

**F.    Relief from the Fourteen-Day Waiting Periods Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

58.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen (14) days after the entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtors request that the Sale Procedures Order and the Sale Order be effective immediately

by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

59.     Here, a waiver of the stay is necessary in order to meet the timelines imposed by the Debtors' post-petition financing and because of the current operating performance of the Facility. Moreover, as described in the Mack Declaration, the Sale was extensively marketed and notice of the Sale was and will be adequately provided to all parties in interest.

60.     Accordingly, the Debtors hereby request that the Court waive the fourteen (14) day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## Notice

61.     The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) all known creditors of Twin Oaks; (c) counsel to Cascade Investment, L.L.C. and ECJV Holdings, LLC; (d) any party who has requested notice pursuant to Bankruptcy Rule 2002 (e) the Internal Revenue Service; (f) all other applicable state and federal taxing authorities having jurisdiction over the Purchased Assets; (g) the United States Environmental Protection Agency and any applicable state environmental agency; (h) the counterparties to each of the Designated Contracts; (i) all other parties known to Debtors who have or may have asserted liens against any of the Purchased Assets; (j) Counsel to the Proposed Purchaser; and (k) all other entities known to have expressed an interest in a transaction with respect to all or part of the Purchased Assets.  In light of the nature of the relief requested in this Motion, the Debtors respectfully submit that no further notice is necessary.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just and proper.

Dated: June 17, 2014
Wilmington, Delaware

**MORRIS, NICHOLS,
ARSHT & TUNNELL LLP**

/s/ *William M. Alleman, Jr.*

Robert J. Dehney (No. 3578)
William M. Alleman, Jr. (No. 5449)
Christopher M. Hayes (No. 5902)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
rdehney@mnat.com
walleman@mnat.com
chayes@mnat.com

**BRACEWELL & GIULIANI LLP**

Kurt Mayr (*admitted pro hac vice*)
Goodwin Square
225 Asylum Street, Suite 2600
Hartford, Connecticut 06103
Telephone: (860) 947-9000
Facsimile: (860) 246-3201
Kurt.Mayr@bgllp.com
          -and-
Robert G. Burns (*admitted pro hac vice*)
Joseph A. Pack (*admitted pro hac vice*)
1251 Avenue of Americas, 49th Floor
New York, New York 10020-1104
Telephone: (212) 508-6100
Facsimile: (800) 404-3970
Robert.Burns@bgllp.com
Joseph.Pack@bgllp.com
          -and-
Jason G. Cohen (*admitted pro hac vice*)
711 Louisiana, Suite 2300
Houston, Texas 77002
Telephone: (713) 223-2300
Facsimile: (713) 221-1212
Jason.Cohen@bgllp.com

*Counsel for the Debtors and Debtors In Possession*