## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re

Optim Energy, LLC, *et al.*,

Debtors.[1]

Chapter 11

Case No. 14-10262 (BLS)

(Jointly Administered)

## DISCLOSURE STATEMENT FOR THE DEBTORS' JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**BRACEWELL & GIULIANI LLP**

Kurt Mayr (admitted *pro hac vice*)
Mark E. Dendinger (admitted *pro hac vice*)
CityPlace I, 34th Floor
185 Asylum Street
Hartford, Connecticut 06103
Telephone: (860) 947-9000
Facsimile: (800) 404-3970

-and-

Robert G. Burns (admitted *pro hac vice*)
1251 Avenue of Americas, 49th Floor
New York, New York 10020-1104
Telephone: (212) 508-6100
Facsimile: (800) 404-3970

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

Robert J. Dehney (No. 3578)
Eric D. Schwartz (No. 3134)
William M. Alleman, Jr. (No. 5449)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Counsel to the Debtors and Debtors in Possession*

Dated: March 18, 2015

**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. ACCORDINGLY, THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

---

[1] The Debtors in these chapter 11 cases are: Optim Energy, LLC; OEM 1, LLC; Optim Energy Cedar Bayou 4, LLC; Optim Energy Altura Cogen, LLC; Optim Energy Marketing, LLC; Optim Energy Generation, LLC; Optim Energy Twin Oaks GP, LLC; and Optim Energy Twin Oaks, LP. The Debtors' main corporate and mailing address for purposes of these chapter 11 cases is: c/o Competitive Power Ventures, Inc., 8403 Colesville Road, Suite 915, Silver Spring, MD 20910.

## DISCLAIMER

THIS DISCLOSURE STATEMENT[2] IS BEING DISTRIBUTED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN FROM THE PARTIES ENTITLED TO VOTE ON THE PLAN.  A COPY OF THE PLAN IS ATTACHED HERETO AS **EXHIBIT A**. ALTHOUGH STYLED AS A "JOINT" PLAN, THE PLAN CONSISTS OF EIGHT (8) SEPARATE SUBPLANS (ONE FOR EACH OF THE DEBTORS), AND EACH DEBTOR IS A DEBTOR OF THE PLAN WITHIN THE MEANING OF SECTION 1129 OF THE BANKRUPTCY CODE IN ITS RESPECTIVE CHAPTER 11 CASE.

PURSUANT TO SECTION 1128 OF THE BANKRUPTCY CODE, A CONFIRMATION HEARING WILL BE HELD WITH RESPECT TO THE PLAN (INCLUDING THE SUBPLANS CONTAINED THEREIN) ON **JUNE 4, 2015 AT 10:00 A.M. PREVAILING EASTERN TIME** BEFORE THE HONORABLE BRENDAN L. SHANNON, CHIEF UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 NORTH MARKET STREET, 3RD FLOOR, WILMINGTON, DELAWARE 19801.   OBJECTIONS TO CONFIRMATION OF THE PLAN (INCLUDING THE SUBPLANS CONTAINED THEREIN) MUST BE FILED AND SERVED NO LATER THAN [**MAY 26], 2015 AT 4:00 P.M. PREVAILING EASTERN TIME** IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER, OR ELSE THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.   THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME WITHOUT FURTHER NOTICE.

ALL HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS THAT ARE ENTITLED TO VOTE ON A SUBPLAN(S) ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE SUBPLAN(S).   TO BE COUNTED, THE BALLOT INDICATING ACCEPTANCE OR REJECTION OF A SUBPLAN(S) MUST BE RECEIVED BY PRIME CLERK, LLC, THE CLAIMS AND SOLICITATION AGENT FOR THE DEBTORS IN THESE CHAPTER 11 CASES, NO LATER THAN [**MAY 26], 2015 AT 4:00 P.M. PREVAILING EASTERN TIME**.

THERE CAN BE NO ASSURANCE AS TO WHETHER OR WHEN CONFIRMATION OF THE SUBPLAN(S) ACTUALLY WILL OCCUR.   IF ANY SUBPLAN(S) IS NOT CONFIRMED, THEN THE DEBTORS RESERVE THE RIGHT TO EITHER (A) REQUEST THAT OTHER SUBPLAN(S) BE CONFIRMED OR (B) WITHDRAW SOME OR ALL OF THE SUBPLAN(S).   THE DEBTORS' INABILITY TO CONFIRM OR ELECTION TO WITHDRAW ANY SUBPLAN(S) SHALL NOT IMPAIR THE CONFIRMATION OF ANY OTHER SUBPLAN(S).

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code*, attached hereto as **Exhibit A**.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NONBANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT HAS BEEN NEITHER REVIEWED NOR APPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "*SEC*"), OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY OTHER SUCH STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE SUBPLAN(S).  NO SOLICITATION OF VOTES TO ACCEPT THE SUBPLAN(S) MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO OR HAVE BEEN, OR WILL BE, SEPARATELY FILED WITH THE BANKRUPTCY COURT.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  IN THE EVENT OF ANY CONFLICT, INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER SUCH DOCUMENTS, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN AND CONTROL FOR ALL PURPOSES.  EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BASED UPON INFORMATION THAT IS PUBLICLY AVAILABLE OR PROVIDED BY THE DEBTORS' MANAGEMENT.  THE DEBTORS MAY HAVE NOT INDEPENDENTLY VERIFIED ALL OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, AND, AS SUCH, MAKE NO REPRESENTATION OR WARRANTY THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE FINANCIAL INFORMATION CONTAINED IN OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED, EXCEPT AS SPECIFICALLY INDICATED OTHERWISE.  THE FINANCIAL PROJECTIONS ATTACHED HERETO AS **EXHIBIT B** (THE "*FINANCIAL PROJECTIONS*"), ESTIMATED PROJECTED RECOVERIES DISCUSSED ELSEWHERE IN THIS DISCLOSURE STATEMENT, AND LIQUIDATION ANALYSIS ATTACHED HERETO AS **EXHIBIT C** (THE "*LIQUIDATION ANALYSIS*") HAVE BEEN PREPARED BY THE DEBTORS' MANAGEMENT IN CONSULTATION WITH THEIR ADVISORS. THE FINANCIAL PROJECTIONS, ESTIMATES, AND ANALYSES, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, NECESSARILY WERE BASED ON A VARIETY OF

ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY UNCERTAIN AND MAY BE BEYOND THE CONTROL OF THE DEBTORS' MANAGEMENT. IMPORTANT FACTORS THAT MAY AFFECT ACTUAL RESULTS AND CAUSE FORECASTS TO NOT BE ACHIEVED INCLUDE, BUT ARE NOT LIMITED TO, RISKS AND UNCERTAINTIES RELATING TO THE DEBTORS' ABILITY TO ACHIEVE STRATEGIC GOALS, OBJECTIVES AND TARGETS OVER APPLICABLE PERIODS, INDUSTRY PERFORMANCE, THE REGULATORY ENVIRONMENT, GENERAL BUSINESS AND ECONOMIC CONDITIONS AND OTHER FACTORS. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE PROJECTIONS, ESTIMATES, OR ANALYSES OR TO THE ULTIMATE PERFORMANCE OF THE REORGANIZED DEBTORS COMPARED TO THE INFORMATION CONTAINED IN THE FORECASTS OR THAT THE FORECASTED RESULTS WILL BE ACHIEVED. THEREFORE, THE FINANCIAL PROJECTIONS, ESTIMATES, AND LIQUIDATION ANALYSIS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE THAT THE ACTUAL RESULTS WILL OCCUR.

HOLDERS OF CLAIMS AND EQUITY INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE SUBPLAN(S) MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE SUBPLAN(S). IMPORTANTLY, PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE SUBPLAN(S), EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST IN A VOTING CLASS SHOULD REVIEW THE PLAN IN ITS ENTIRETY AND CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN HEREIN, AND THE PLAN SUPPLEMENT.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER CAUSES OF ACTION, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, OR AS A STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY BANKRUPTCY OR NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY (OTHER THAN IN CONNECTION WITH APPROVAL OF THIS DISCLOSURE STATEMENT OR CONFIRMATION OF ANY SUBPLAN(S)), NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS. YOU ARE ADVISED TO OBTAIN INDEPENDENT EXPERT ADVICE ON SUCH SUBJECTS.

NONE OF THE REORGANIZED OEG EQUITY INTERESTS HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (AS AMENDED, THE "***SECURITIES ACT***") OR SIMILAR STATE SECURITIES OR "BLUE SKY" LAWS. THE OFFER AND ISSUANCE IS BEING MADE IN RELIANCE ON THE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING SECTION 4(a)(2) THEREOF, OR AS SPECIFIED IN SECTION 1145 OF THE BANKRUPTCY CODE, AS APPLICABLE. THE ISSUANCE OF EQUITY INTERESTS UNDER OR IN CONNECTION

WITH THE SUBPLAN FOR OPTIM GENERATION HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SEC OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

**SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995**: ALL FORWARD-LOOKING STATEMENTS CONTAINED HEREIN OR OTHERWISE MADE BY THE DEBTORS INVOLVE MATERIAL RISKS AND UNCERTAINTIES AND ARE SUBJECT TO CHANGE BASED ON NUMEROUS FACTORS, INCLUDING FACTORS THAT ARE BEYOND THE DEBTORS' CONTROL.  ACCORDINGLY, THE DEBTORS' FUTURE PERFORMANCE AND FINANCIAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED IN ANY SUCH FORWARD-LOOKING STATEMENTS.  SUCH FACTORS INCLUDE, BUT ARE NOT LIMITED TO, THOSE DESCRIBED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS DO NOT UNDERTAKE TO PUBLICLY UPDATE OR REVISE FORWARD-LOOKING STATEMENTS EVEN IF EXPERIENCE OR FUTURE CHANGES MAKE IT CLEAR THAT ANY PROJECTED RESULTS EXPRESSED OR IMPLIED THEREIN WILL NOT BE REALIZED.

## TABLE OF CONTENTS

**Page**

**ARTICLE I INTRODUCTION**................................................................................1
    Section 1.01. Summary of the Plan................................................................3
    Section 1.02. Bidding Procedures.................................................................7
    Section 1.03. Purpose of this Disclosure Statement ......................................9

**ARTICLE II SOLICITATION AND VOTING PROCEDURES** ...........................9
    Section 2.01. Parties Entitled to Vote ...........................................................9
    Section 2.02. Votes Required for Acceptance by Class...............................10
    Section 2.03. Certain Factors to be Considered Prior to Voting...................10
    Section 2.04. Solicitation Procedures .........................................................11

**ARTICLE III GENERAL INFORMATION ABOUT THE DEBTORS** ...............14
    Section 3.01. Debtors' Business and Industry.............................................14
    Section 3.02. Debtors' Formation ...............................................................14
    Section 3.03. Debtors' Corporate Structure ................................................14
    Section 3.04. Debtors' Prepetition Indebtedness.........................................15
    Section 3.05. Events Leading to the Chapter 11 Cases................................17
    Section 3.06. Attempts to Reorganize Outside Bankruptcy .........................18
    Section 3.07. Commencement of the Chapter 11 Cases ..............................18
    Section 3.08. Debtors' Current Assets ........................................................18
    Section 3.09. Debtors' Management ...........................................................19
    Section 3.10. Federal and State Regulatory Matters....................................20
    Section 3.11. Environmental Laws and Regulations ....................................21

**ARTICLE IV THE CHAPTER 11 CASES** ......................................................22
    Section 4.01. Overview of Chapter 11.........................................................22
    Section 4.02. First Day Motions .................................................................23
    Section 4.03. Employee Incentive Plans......................................................25

**ARTICLE V OTHER SIGNIFICANT EVENTS OF THE CHAPTER 11 CASES**..............27
    Section 5.01. DIP Facility Milestones and Amendments ..............................27
    Section 5.02. Retention and Employment of Professionals...........................32
    Section 5.03. Schedules and Statements of Financial Affairs ........................32
    Section 5.04. Bar Dates...............................................................................32
    Section 5.05. Walnut Creek Motion ............................................................33
    Section 5.06. Twin Oaks Plant Sale.............................................................33
    Section 5.07. Walnut Creek Rejection Damages Claims................................34
    Section 5.08. Exclusivity ............................................................................34
    Section 5.09. Nonresidential Leases ...........................................................35
    Section 5.10. Cedar Bayou IDA ..................................................................35
    Section 5.11. Status of Litigation Pending on the Petition Date.....................35
    Section 5.12. Sales and Use Tax Claims......................................................37

**ARTICLE VI TREATMENT OF UNCLASSIFIED CLAIMS**............................38
    Section 6.01. DIP Facility Claims................................................................38
    Section 6.02. Administrative Claims ...........................................................39

## TABLE OF CONTENTS (CONT'D)

Section 6.03. Priority Tax Claims..................................................................40

ARTICLE VII CLASSIFICATION AND TREATMENT OF CLAIMS AGAINST
AND EQUITY INTERESTS IN REORGANIZING DEBTORS................................40
Section 7.01. Classification............................................................................40
Section 7.02. Subplan OG: Treatment of Claims Against and Equity Interests in
Optim Generation..................................................................42
Section 7.03. Subplan CB: Treatment of Claims Against and Equity Interests in
Cedar Bayou..........................................................................44
Section 7.04. Subplan AC: Treatment of Claims Against and Equity Interests in
Altura Cogen.........................................................................47

ARTICLE VIII CLASSIFICATION AND TREATMENT OF CLAIMS AGAINST
AND EQUITY INTERESTS IN LIQUIDATING DEBTORS ............................49
Section 8.01. Classification............................................................................49
Section 8.02. Subplan OE: Treatment of Claims Against and Equity Interests in
Optim Energy.........................................................................51
Section 8.03. Subplan OM: Treatment of Claims Against and Equity Interests in
Optim Marketing....................................................................55
Section 8.04. Subplan OEM: Treatment of Claims Against and Equity Interests in
OEM......................................................................................58
Section 8.05. Subplan TOGP: Treatment of Claims Against and Equity Interests
in Twin Oaks GP....................................................................60
Section 8.06. Subplan TOLP: Treatment of Claims Against and Equity Interests in
Twin Oaks LP .......................................................................63

ARTICLE IX ACCEPTANCE OR REJECTION OF THE SUBPLANS............................67
Section 9.01. Acceptance by an Impaired Class ...........................................67
Section 9.02. Nonconsensual Confirmation...................................................67
Section 9.03. Limited Deficiency Waiver......................................................68

ARTICLE X IMPLEMENTATION OF THE SUBPLANS FOR THE
REORGANIZING DEBTORS ...................................................................68
Section 10.01. Restructuring Transactions ....................................................68
Section 10.02. Sale Transaction.....................................................................69
Section 10.03. Exit Financing ........................................................................69
Section 10.04. Organization of the Reorganized Debtors..............................69
Section 10.05. Assets and Liabilities of the Reorganized Debtors .................70
Section 10.06. Governance of the Reorganized Debtors ................................70
Section 10.07. Funding of Reserves ..............................................................70
Section 10.08. Distribution Trust...................................................................71
Section 10.09. Post-Confirmation Property Sales..........................................74
Section 10.10. Causes of Action of the Reorganizing Debtors.......................74

ARTICLE XI IMPLEMENTATION OF THE SUBPLANS FOR THE
LIQUIDATING DEBTORS.........................................................................75

# TABLE OF CONTENTS (CONT'D)

**Page**

Section 11.01. Organization of the Liquidating Debtors ....................................................75
Section 11.02. Assets and Liabilities of the Liquidating Debtors .....................................75
Section 11.03. Governance of the Liquidating Debtors.....................................................76
Section 11.04. Funding of Reserves ..................................................................................76
Section 11.05. Liquidation Trust ......................................................................................76
Section 11.06. Causes of Action of the Liquidating Debtors ...........................................80

**ARTICLE XII TREATMENT OF EXECUTORY CONTRACTS AND LEASES ............81**
Section 12.01. Executory Contracts and Unexpired Leases of the Reorganizing
Debtors.......................................................................................................81
Section 12.02. Executory Contracts and Unexpired Leases of the Liquidating
Debtors.......................................................................................................81
Section 12.03. Effect of Confirmation Order on Assumption/Rejection...........................82
Section 12.04. Cure of Defaults and Objections to Assumption ......................................82
Section 12.05. Rejection Damages Claims and Objections to Rejection ..........................83
Section 12.06. Preexisting Obligations to the Debtors Under Executory Contracts
and Unexpired Leases .................................................................................83
Section 12.07. Modifications, Amendments, Supplements, Restatements or Other
Agreements .................................................................................................83
Section 12.08. Reservation of Rights.................................................................................83
Section 12.09. Non-Occurrence of the Effective Date .....................................................84

**ARTICLE XIII PROVISIONS GOVERNING DISTRIBUTIONS ...........................................84**
Section 13.01. Amount of Distributions ...........................................................................84
Section 13.02. Method of Distributions............................................................................84
Section 13.03. Delivery of Distributions ..........................................................................85
Section 13.04. No Fractional or De Minimis Distributions ..............................................85
Section 13.05. Undeliverable Distributions ......................................................................85
Section 13.06. Tax Withholding From Distributions.........................................................86
Section 13.07. Allocations ................................................................................................86
Section 13.08. Time Bar to Cash Payments ......................................................................86
Section 13.09. Means of Cash Payments ..........................................................................87
Section 13.10. Foreign Currency Exchange Rates.............................................................87
Section 13.11. Setoffs .......................................................................................................87
Section 13.12. Cancellation of Instruments Evidencing Claims or Equity Interests .........87
Section 13.13. Claims Paid or Payable by Third Parties ...................................................87

**ARTICLE XIV PROCEDURES FOR RESOLVING DISPUTED CLAIMS........................88**
Section 14.01. Prosecution of Objections to Claims.........................................................88
Section 14.02. Estimation of Claims.................................................................................88
Section 14.03. No Distributions on Disputed Claims .......................................................89
Section 14.04. Reserve of Cash for Disputed Claims .......................................................89

**ARTICLE XV CONDITIONS PRECEDENT TO CONFIRMATION AND
CONSUMMATION OF THE PLAN ...................................................................89**
Section 15.01. Conditions Precedent to Confirmation......................................................89

**TABLE OF CONTENTS (CONT'D)**

Section 15.02. Effect of Non-Occurrence of Conditions to Confirmation or Conditions Precedent to the Effective Date ...............................................90

Section 15.03. Conditions Precedent to the Effective Date ...............................................90

Section 15.04. Waiver of Conditions Precedent ...............................................91

**ARTICLE XVI EFFECT OF CONFIRMATION OF THE PLAN .......................................92**

Section 16.01. Discharge of Claims.................................................................92

Section 16.02. Releases.................................................................92

Section 16.03. Exculpation .................................................................95

Section 16.04. Injunction .................................................................95

Section 16.05. Protection Against Discriminatory Treatment ...........................................96

Section 16.06. Release of Liens .................................................................96

Section 16.07. Cancellation of Securities .................................................................96

**ARTICLE XVII MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN.................................................................97**

Section 17.01. Modification of a Subplan .................................................................97

Section 17.02. Revocation or Withdrawal of a Subplan .................................................................97

**ARTICLE XVIII RETENTION OF JURISDICTION .................................................................97**

**ARTICLE XIX MISCELLANEOUS PROVISIONS .................................................................99**

Section 19.01. Corporate Action.................................................................99

Section 19.02. Securities Issued Under the Plan.................................................................100

Section 19.03. General Settlement of Claims .................................................................100

Section 19.04. Preservation of Causes of Action Not Expressly Released ...................100

Section 19.05. Section 1146(a) Exemption.................................................................102

Section 19.06. Elimination of Vacant Classes .................................................................102

Section 19.07. Intercompany Claims .................................................................102

Section 19.08. Additional Documents .................................................................102

Section 19.09. Successors and Assigns.................................................................102

Section 19.10. Reservation of Rights.................................................................103

Section 19.11. Notices .................................................................103

Section 19.12. Term of Injunctions or Stay .................................................................103

Section 19.13. Entire Agreement .................................................................104

Section 19.14. Plan Supplement Exhibits .................................................................104

Section 19.15. Severability .................................................................104

Section 19.16. Substantial Consummation .................................................................104

**ARTICLE XX RISK FACTORS.................................................................104**

Section 20.01. Risks Related to the Plan and Other Bankruptcy Law Considerations.................................................................105

Section 20.02. Certain Business Specific Risk Factors .................................................112

Section 20.03. Avoidance Actions.................................................................116

Section 20.04. Intercompany Claims .................................................................117

Section 20.05. Disclosure Statement Disclaimer .................................................................117

## TABLE OF CONTENTS (CONT'D)

**Page**

**ARTICLE XXI CONFIRMATION AND CONSUMMATION PROCEDURE**..................**119**
    Section 21.01. Plan Objection Deadline .......................................................119
    Section 21.02. Confirmation Hearing .........................................................120
    Section 21.03. Plan Confirmation Requirements Under the Bankruptcy Code..............120
    Section 21.04. "Cramdown" Under Section 1129(b) of the Bankruptcy Code...............122
    Section 21.05. Liquidation Analysis; Financial Projections; Valuation.........................123
    Section 21.06. Notice to Holders of Claims and Equity Interests ...................125

**ARTICLE XXII ALTERNATIVES TO CONFIRMATION AND
CONSUMMATION OF THE PLAN** ..........................................................**126**

**ARTICLE XXIII CERTAIN SECURITIES LAWS MATTERS**..........................................**126**

**ARTICLE XXIV CERTAIN MATERIAL U.S. FEDERAL INCOME TAX
CONSEQUENCES** ......................................................................**128**
    Section 24.01. Certain U.S. Federal Income Tax Consequences of the Debtors.............129
    Section 24.02. Certain Material U.S. Federal Income Tax Consequences to U.S.
        Holders of Certain Allowed Claims and Disputed Claims ...................129
    Section 24.03. Market Discount.........................................................132
    Section 24.04. Withholding ...........................................................132

**ARTICLE XXV CONCLUSION AND RECOMMENDATION** ..........................................**133**

## EXHIBITS

**Exhibit**

Plan ...........................................................................................................................A

Financial Projections.....................................................................................................B

Liquidation Analysis........................................................................................................C

Membership Interest Purchase and Sale Agreement ....................................................D

Bidding Procedures......................................................................................................E

# ARTICLE I

# INTRODUCTION

The Debtors hereby submit this Disclosure Statement pursuant to section 1125(b) of the Bankruptcy Code to holders of Claims against and Equity Interests in the Debtors for use in the solicitation of acceptances of the Plan (including the Subplans contained therein).

As described in more detail below, on the Petition Date the Debtors owned interests in and operated, in whole or in part, three power plants in eastern Texas—one coal-fired power plant (the Twin Oaks Plant) and two gas-fired power plants (the Altura Cogen Plant and the Cedar Bayou Plant and, together, the "***Gas Plant Portfolio***"). Shortly after the Petition Date, the Debtors initiated a broad-based marketing process for the Twin Oaks Plant led by Barclays Capital, Inc. ("***Barclays***"), the Debtors' investment banker retained in these Chapter 11 Cases. After a successful marketing and auction process, the Debtors sold the Twin Oaks Plant pursuant to section 363 of the Bankruptcy Code.

In light of the successful Twin Oaks Plant sale, the Debtors carefully considered whether a similar process should be explored with respect to the Gas Plant Portfolio. In consultation with the Debtors' advisors, their independent directors and the Consultation Parties, the Debtors ultimately determined that, in light of existing market conditions and the nature of the Debtors' operations and assets after the Twin Oaks Plant sale, marketing the Gas Plant Portfolio may be the best alternative to maximize value for the Debtors' Estates and to reorganize their affairs. As was done with the Twin Oaks Plant, in November 2014 the Debtors initiated a broad-based marketing process led by Barclays. Barclays prepared a high level "teaser" that provided basic information regarding the opportunity to purchase the Gas Plant Portfolio. The teaser was sent to more than seventy (70) parties that Barclays believed, based on its experience with the Twin Oaks Plant and in conducting sales of assets in distressed situations and sales of power plant facilities, might have an interest in acquiring the Gas Plant Portfolio. Barclays received a high level of initial interest in the Gas Plant Portfolio. Nearly thirty (30) parties executed confidentiality agreements (collectively, the "***Potential Purchasers***"). The Debtors requested that Potential Purchasers submit non-binding preliminary proposals to purchase the Gas Plant Portfolio (the "***Preliminary Proposals***") by November 21, 2014. Several Potential Purchasers submitted Preliminary Proposals. The Debtors, in consultation with their advisors and independent directors, reviewed the Preliminary Proposals with the Consultation Parties. After a thorough review process, the Debtors invited several Potential Purchasers to participate in a second round of the marketing process (the "***Round Two Participants***"). The Debtors distributed a proposed form of purchase agreement to Round Two Participants and established a deadline for Round Two Participants to submit definitive documented bids.

The Debtors, in consultation with their advisors, independent directors and the Consultation Parties, reviewed the bids received from Round Two Participants. The Debtors have determined that the best path forward for a potential Sale of the Gas Plant Portfolio is through the Plan and pursuant to the proposed Bidding Procedures in the form substantially attached hereto as **<u>Exhibit E</u>**. The Plan, filed contemporaneously herewith, contemplates a potential Sale of the Gas Plant Portfolio at a value to the Debtors in Cash of at least $355 million

(net of all deductions and/or adjustments and with no right of set off) (the "**Reserve Price**"), on terms satisfactory to the Debtors and the Consultation Parties, to serve as a floor for further bidding.  If the Debtors receive only one Qualifying Bid that meets or exceeds the Reserve Price on terms satisfactory to the Debtors and the Consultation Parties, the Debtors intend to execute a Membership Interest Purchase and Sale Agreement with such Qualifying Bidder in the form substantially attached hereto as **Exhibit D** and seek Confirmation of the Plan to effectuate the Sale to the Qualifying Bidder pursuant to the Bidding Procedures.  Alternatively, if the Debtors receive more than one Qualifying Bid that meets or exceeds the Reserve Price on terms satisfactory to the Debtors and the Consultation Parties, the Debtors intend to conduct an auction for the Sale of the Reorganized OEG Equity Interests pursuant to the Bidding Procedures, after which the Debtors intend to execute a Membership Interest Purchase and Sale Agreement and seek Confirmation of the Plan to effectuate the Sale to the Prevailing Bidder.  Finally, if the Debtors do not receive a Qualifying Bid that meets or exceeds the Reserve Price on terms satisfactory to the Debtors and the Consultation Parties by the Bid Deadline (as defined in the Bidding Procedures), the Debtors will suspend the Sale process and seek Confirmation of the Plan, which in such circumstance, would in part, provide for the delivery of the Reorganized OEG Equity Interests to the Pre-Petition Secured Parties in full satisfaction of the Allowed Pre-Petition Secured Parties Secured Claims.  Whether a Sale is ultimately pursued or not will very likely not affect Plan recoveries on General Unsecured Claims.[3]

Based on what can reasonably be anticipated as Sale proceeds, the Pre-Petition Secured Parties are expected to receive substantially less than a full recovery on account of their Pre-Petition Secured Parties Secured Claims.  Nonetheless, the Pre-Petition Secured Parties are consenting to the Debtors' Estates funding the distributions to holders of Allowed Claims under each Subplan so long as holders of such Allowed Claims do not submit a Ballot rejecting the Plan and opting out of the releases contained in Section 12.03 of the Plan, and, for holders of General Unsecured Claims against the Liquidating Debtors, Convenience Class Claims and Walnut Creek Claims, so long as the Class of such Claims also votes in favor of the applicable Subplan(s).  It is therefore very important that you read this Disclosure Statement, the attached Plan and all of the referenced supporting documentation in their entirety and, if you support the Plan, that you submit a Ballot voting in favor of the Subplan and the recoveries it will provide, and consent to the release provisions contained therein.

**THE DEBTORS BELIEVE THAT THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES AND PROVIDES THE BEST RECOVERY AND CERTAINTY OF OUTCOME TO CLAIM HOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THESE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

---

[3] If the Debtors receive a Qualifying Bid for the Gas Plant Portfolio which, net of adjustments, would satisfy the outstanding Allowed Pre-Petition Secured Parties Secured Claims in full, recoveries for holders of Allowed Claims in junior Classes would increase.

**Section 1.01.    Summary of the Plan**

The Plan distinguishes between two categories of Debtors: the Reorganizing Debtors (Optim Generation, Cedar Bayou and Altura Cogen) on the one hand, and the Liquidating Debtors (Optim Energy, Optim Marketing, OEM, Twin Oaks GP and Twin Oaks LP) on the other hand.  A Distribution Trust shall be established on the Effective Date of the Subplans for the Reorganizing Debtors.  The Distribution Trust shall be funded with, among other things, either (a) Cash from the Sale proceeds or, (b) in the event the Sale does not close by September 30, 2015, and with the consent of the Pre-Petition Secured Parties, Cash on hand (which is Cash Collateral) and/or Cash from the Exit Financing, if any.  A Liquidation Trust shall be established on the Effective Date of the Subplans for the Liquidating Debtors.  The Liquidation Trust shall be funded with, among other things, with the consent of the Pre-Petition Secured Parties, Cash on hand (which is Cash Collateral).

As described more fully in this Disclosure Statement, the Subplans provide for distributions on account of certain Allowed Claims in the form of Cash payments, assumption of specified liabilities, and new equity instruments.  The Plan distributions will be in various amounts and will take various forms, depending on the classification and treatment of any particular Claim against or Equity Interest in the Debtors.  The following table summarizes the classification and treatment of Allowed Claims and Allowed Equity Interests under the various Subplans, if confirmed, compared to what such holders could receive in a hypothetical chapter 7 liquidation.  To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.  *For a more detailed description of the classification and treatment of Claims and Equity Interests under the various Subplans, please see ARTICLE III and ARTICLE IV of the Plan.*

(a)    Reorganizing Debtors

(i)    Subplan OG: Claims Against and Equity Interests in Optim Generation

| Class | Claim or Equity Interest | Estimated Amount of Claims[4] | Estimated % Recovery Under the Plan | Estimated % Recovery Under Chapter 7 |
|-------|--------------------------|-----------------------------|-------------------------------------|--------------------------------------|
| OG 1 | Allowed Pre-Petition Secured Parties Secured Claims | $713 million | Less than 100% | Less than 100% |
| OG 2 | Other Secured Claims | $0 | 100% | 0% |
| OG 3 | Other Priority Claims | $0 | 100% | 0% |
| OG 4 | General Unsecured Claims | $0 | 100% | 0% |

---

[4] The Estimated Amount of Claims and Estimated % Recovery Under the Plan amounts, when used in any of the tables in this Section 1.01, reflect the total anticipated Allowed Claims against a particular Debtor, including estimated Cure Costs but excluding (a) any Claims for which the bar date has not passed, (b) any Post-Petition Interest, as applicable, and (c) in the case of Convenience Class Claims, any additional Claims that may result from the election by a holder(s) of General Unsecured Claims in excess of $10,000.00 to reduce the amount of its General Unsecured Claim(s) to $10,000.00 in order meet Convenience Class Claims threshold.

| Class | Claim or Equity Interest | Estimated Amount of Claims[4] | Estimated % Recovery Under the Plan | Estimated % Recovery Under Chapter 7 |
|---|---|---|---|---|
| OG 5 | Equity Interests | N/A | 0% | 0% |

      (ii)      Subplan CB: Claims Against and Equity Interests in Cedar Bayou

| Class | Claim or Equity Interest | Estimated Amount of Claims | Estimated % Recovery Under the Plan | Estimated % Recovery Under Chapter 7 |
|---|---|---|---|---|
| CB 1 | Allowed Pre-Petition Secured Parties Secured Claims | $713 million | Less than 100% | Less than 100% |
| CB 2 | Other Secured Claims | $0 | 100% | 0% |
| CB 3 | Other Priority Claims | $0 | 100% | 0% |
| CB 4 | General Unsecured Claims | $400,000 to $500,000 | 100% | 0% |
| CB 5 | Equity Interests | N/A | N/A | N/A |

      (iii)      Subplan AC: Claims Against and Equity Interests in Altura Cogen

| Class | Claim or Equity Interest | Estimated Amount of Claims | Estimated % Recovery Under the Plan | Estimated % Recovery Under Chapter 7 |
|---|---|---|---|---|
| AC 1 | Allowed Pre-Petition Secured Parties Secured Claims | $713 million | Less than 100% | Less than 100% |
| AC 2 | Other Secured Claims | Less than $1,000 | 100% | 0% |
| AC 3 | Other Priority Claims | $0 | 100% | 0% |
| AC 4 | General Unsecured Claims | $800,000 to $900,000 | 100% | 0% |
| AC 5 | Equity Interests | N/A | N/A | N/A |

(b)    Liquidating Debtors

(i)    Subplan OE: Claims Against and Equity Interests in Optim Energy

| Class | Claim or Equity Interest | Estimated Amount of Claims | Estimated % Recovery Under the Plan[5] | Estimated % Recovery Under Chapter 7 |
|---|---|---|---|---|
| OE 1 | Allowed Pre-Petition Secured Parties Secured Claims | $713 million | Less than 100% | Less than 100% |
| OE 2 | Other Secured Claims | Less than $10,000 | 100% | 0% |
| OE 3 | Other Priority Claims | $0 | 100% | 0% |
| OE 4 | General Unsecured Claims | $0 | [____]% | 0% |
| OE 5 | Convenience Class Claims | Less than $20,000 | 75%-90% | 0% |
| OE 6 | Walnut Creek Claims | $3.9 million[6] | 0% | 0% |
| OE 7 | Subordinated Claims | $0 | 0% | 0% |
| OE 8 | Equity Interests | N/A | 0% | 0% |

(ii)    Subplan OM: Claims Against and Equity Interests in Optim Marketing

| Class | Claim or Equity Interest | Estimated Amount of Claims | Estimated % Recovery Under the Plan | Estimated % Recovery Under Chapter 7 |
|---|---|---|---|---|
| OM 1 | Allowed Pre-Petition Secured Parties Secured Claims | $713 million | Less than 100% | Less than 100% |
| OM 2 | Other Secured Claims | $0 | 100% | 0% |
| OM 3 | Other Priority Claims | $0 | 100% | 0% |
| OM 4 | General Unsecured Claims | $0 | [____]%[7] | 0% |
| OM 5 | Subordinated Claims | $0 | 0% | 0% |
| OM 6 | Equity Interests | N/A | 0% | 0% |

---

[5] Class OE 4, OE 5 and OE 6 Claim recoveries are contingent on each Class voting to accept the Plan. If each such Class does not vote to accept the Plan, holders of a Claim or Claims in each Class will not receive a distribution.
[6] Walnut Creek has filed Proofs of Claim asserting Rejection Damages of approximately $190 million under the Fuel Supply Agreement. The Debtors have filed an objection to these Claims and have sought their disallowance. For more information, please see Section 5.07 of this Disclosure Statement.
[7] Class OM 4 Claim recoveries are contingent on the Class voting to accept the Plan. If the Class does not vote to accept the Plan, holders of a Claim or Claims in the Class will not receive a distribution.

(iii)    Subplan OEM: Claims Against and Equity Interests in OEM

| Class | Claim or Equity Interest | Estimated Amount of Claims | Estimated % Recovery Under the Plan | Estimated % Recovery Under Chapter 7 |
|---|---|---|---|---|
| OEM 1 | Allowed Pre-Petition Secured Parties Secured Claims | $713 million | Less than 100% | Less than 100% |
| OEM 2 | Other Secured Claims | $0 | 100% | 0% |
| OEM 3 | Other Priority Claims | $0 | 100% | 0% |
| OEM 4 | General Unsecured Claims | $0 | [____]%[8] | 0% |
| OEM 5 | Subordinated Claims | $0 | 0% | 0% |
| OEM 6 | Equity Interests | N/A | 0% | 0% |

(iv)    Subplan TOGP: Claims Against and Equity Interests in Twin Oaks GP

| Class | Claim or Equity Interest | Estimated Amount of Claims | Estimated % Recovery Under the Plan | Estimated % Recovery Under Chapter 7 |
|---|---|---|---|---|
| TOGP 1 | Allowed Pre-Petition Secured Parties Secured Claims | $713 million | Less than 100% | Less than 100% |
| TOGP 2 | Other Secured Claims | $0 | 100% | 0% |
| TOGP 3 | Other Priority Claims | $0 | 100% | 0% |
| TOGP 4 | General Unsecured Claims | $0 | [____]%[9] | 0% |
| TOGP 5 | Subordinated Claims | $0 | 0% | 0% |
| TOGP 6 | Equity Interests | N/A | 0% | 0% |

(v)    Subplan TOLP: Claims Against and Equity Interests in Twin Oaks LP

| Class | Claim or Equity Interest | Estimated Amount of Claims | Estimated Recovery (as % of Claim Amount)[10] | Estimated % Recovery Under Chapter 7 |
|---|---|---|---|---|
| TOLP 1 | Allowed Pre-Petition Secured Parties Secured Claims | $713 million | Less than 100% | Less than 100% |

---

[8] Class OEM 4 Claim recoveries are contingent on the Class voting to accept the Plan.  If the Class does not vote to accept the Plan, holders of a Claim or Claims in the Class will not receive a distribution.

[9] Class TOGP 4 Claim recoveries are contingent on the Class voting to accept the Plan.  If the Class does not vote to accept the Plan, holders of a Claim or Claims in the Class will not receive a distribution.

[10] Class TOLP 4, TOLP 5 and TOLP 6 Claim recoveries are contingent on each Class voting to accept the Plan.  If each such Class does not vote to accept the Plan, holders of a Claim or Claims in each Class will not receive a distribution.

| Class | Claim or Equity Interest | Estimated Amount of Claims | Estimated Recovery (as % of Claim Amount)[10] | Estimated % Recovery Under Chapter 7 |
|---|---|---|---|---|
| TOLP 2 | Other Secured Claims | $0 | 100% | 0% |
| TOLP 3 | Other Priority Claims | $0 | 100% | 0% |
| TOLP 4 | General Unsecured Claims | $120,000 to $150,000 | 65%-70% | 0% |
| TOLP 5 | Convenience Class Claims | $90,000 to $120,000 | 85%-90% | 0% |
| TOLP 6 | Walnut Creek Claims | $3.9 million[11] | 2% | 0% |
| TOLP 7 | Subordinated Claims | $0 | 0% | 0% |
| TOLP 8 | Equity Interests | N/A | 0% | 0% |

**Section 1.02.  Bidding Procedures[12]**

The Debtors have filed the Bidding Procedures Motion [D.I. [____]] contemporaneously herewith in an effort to maximize the value of the Gas Plant Portfolio through a potential Sale. Pursuant to the proposed Bidding Procedures, which are attached hereto as **Exhibit E**, the Debtors would propose to sell the Gas Plant Portfolio at a Reserve Price of at least $355 million in Cash, on terms satisfactory to the Debtors and the Consultation Parties, to serve as a floor for further bidding.  If the Debtors receive only one Qualifying Bid that meets or exceeds the Reserve Price on terms satisfactory to the Debtors and the Consultation Parties, the Debtors intend to execute a Membership Interest Purchase and Sale Agreement with such Qualifying Bidder in the form substantially attached hereto as **Exhibit D**, seek Confirmation of the Plan to effectuate the Sale to the Qualifying Bidder pursuant to the Bidding Procedures, and the Debtors will not pursue the delivery of the Reorganized OEG Equity Interests to the Pre-Petition Secured Parties in satisfaction of the Allowed Pre-Petition Secured Parties Secured Claims through the Plan unless, at any time before closing, the Membership Interest Purchase and Sale Agreement is terminated under its terms.  Alternatively, if the Debtors receive more than one Qualifying Bid that meets or exceeds the Reserve Price on terms satisfactory to the Debtors and the Consultation Parties, the Debtors intend to conduct an auction for the Sale of the Reorganized OEG Equity Interests pursuant to the Bidding Procedures, after which the Debtors intend to execute a Membership Interest Purchase and Sale Agreement and seek Confirmation of the Plan to effectuate the Sale to the Prevailing Bidder, and the Debtors will not pursue the delivery of the

---

[11] Walnut Creek has filed Proofs of Claim asserting Rejection Damages of approximately $190 million under the Fuel Supply Agreement.  The Debtors have filed an objection to these Claims and have sought their disallowance. For more information, please see Section 5.07 of this Disclosure Statement.

[12] This Section 1.02 is a general description of the proposed Bidding Procedures and its provisions.  To the extent this Section 1.02 is inconsistent with the Bidding Procedures that may be approved by the Bankruptcy Court, the court-approved Bidding Procedures shall control for all purposes.  Capitalized terms used but not otherwise defined in this Section 1.02 shall have the meanings ascribed to them in the proposed Bidding Procedures, which are attached hereto as **Exhibit E**.

Reorganized OEG Equity Interests to the Pre-Petition Secured Parties in satisfaction of the Allowed Pre-Petition Secured Parties Secured Claims through the Plan unless, at any time before closing, the Membership Interest Purchase and Sale Agreement is terminated under its terms. Finally, if the Debtors do not receive a Qualifying Bid that meets or exceeds the Reserve Price on terms satisfactory to the Debtors and the Consultation Parties, the Debtors will suspend the Sale process and seek Confirmation of the Plan, which, in such circumstance, would, in part, provide for the delivery of the Reorganized OEG Equity Interests to the Pre-Petition Secured Parties in satisfaction of the Allowed Pre-Petition Secured Parties Secured Claims.

Below is summary of some of the key provisions of the proposed Bidding Procedures:

| Provision | Summary |
|---|---|
| **Participation Requirements** | Each Potential Bidder: (a) shall execute a confidentiality agreement with the Debtors (to the extent it has not already done so); and (b) produce evidence of the bidder's (i) financial wherewithal to consummate the Sale, and (ii) internal corporate, legal or other authorizations and approvals necessary to engage in and close the Sale. |
| **Bid Deadline** | 3:00 p.m. (ET) on May 1, 2015. |
| **Auction** | If the Debtors receive more than one Qualifying Bid that meets or exceeds the Reserve Price on terms satisfactory to the Debtors and the Consultation Parties, the Debtors will identify the Baseline Bid and conduct the Auction at the New York office of Bracewell & Giuliani LLP, 1251 Avenue of the Americas, 49th Floor, New York, New York 10020-1100, starting at 10:00 a.m. (prevailing Eastern Time) or such other time as announced by the Debtors no later than two (2) business days prior to the Auction, on a date to be determined but in any event at least seven (7) days after the Bid Deadline. |
| **Conclusion of the Auction** | Prior to the conclusion of the Auction, to the extent it occurs, the Debtors shall announce the party who is the Prevailing Bidder and the party who is the Back-up Bidder. |
| **One Qualifying Bid** | If the Debtors receive only one Qualifying Bid that meets or exceeds the Reserve Price on terms satisfactory to the Debtors and the Consultation Parties, such Qualifying Bid shall become the Prevailing Bid and such bidder shall become the Prevailing Bidder, and the Debtors will negotiate in good faith with such Prevailing Bidder regarding execution of the Purchase Agreement on terms satisfactory to the Debtors and the Consultation Parties. |
| **No Qualifying Bids** | If the Debtors do not receive a Qualifying Bid prior to the Bid Deadline that meets or exceeds the Reserve Price on terms satisfactory to the Debtors and the Consultation Parties, the Debtors will not hold an |

| Provision | Summary |
|-----------|---------|
|           | Auction and instead shall promptly proceed to seek confirmation and consummation of the Plan. |

**Section 1.03.   Purpose of this Disclosure Statement**

After a chapter 11 plan has been filed, holders of certain claims against and equity interests in a debtor are permitted to vote to accept or reject such plan.   Before soliciting acceptances of the proposed plan, however, a debtor is required under section 1125 of the Bankruptcy Code to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.

The Debtors are submitting this Disclosure Statement to holders of Claims against and Equity Interests in the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code.   This Disclosure Statement sets forth specific information regarding the pre-bankruptcy history of the Debtors, the nature and progress of the Chapter 11 Cases and the anticipated organizational and capital structure as well as the operations of the Debtors after confirmation of the Plan and emergence from chapter 11.   This Disclosure Statement also describes the Plan, alternatives to the Plan, effects of confirmation of the Plan, certain risk factors associated with the equity securities that will be issued to the Purchaser and/or the Pre-Petition Secured Parties and the manner in which distributions will be made under the Plan.   In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims and Equity Interests entitled to vote must follow in order for their votes to be counted.

The purpose of this Disclosure Statement is to provide those holders of Claims against and Equity Interests in the Debtors that are entitled to vote on the Subplans with adequate information to make an informed decision as to whether to accept or reject the Subplans.   On [_____], 2015, after notice and a hearing, the Bankruptcy Court approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical, reasonable investor being solicited to make an informed judgment whether to accept or reject the Subplans.   **APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT CONSTITUTES A DETERMINATION THAT THIS DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION REGARDING THE PLAN, BUT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

## ARTICLE II

## SOLICITATION AND VOTING PROCEDURES

**Section 2.01.   Parties Entitled to Vote**

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable, and contractual

rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest, and the claim or interest is impaired by the plan. If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the plan.

Additional detail regarding impairment (and the entitlement of holders of Claims against or Equity Interests in the Debtors to vote on the Subplans) is included below and in ARTICLE III and ARTICLE IV of the Plan.

## Section 2.02.  Votes Required for Acceptance by Class

Under the Bankruptcy Code, acceptance of a plan of reorganization (whether for a reorganizing debtor or a liquidating debtor) by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number of claims voting to accept, as a percentage of the allowed claims or interests, as applicable, that has voted. Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted. Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

## Section 2.03.  Certain Factors to be Considered Prior to Voting

There are a variety of factors that all holders of Claims and Equity Interests entitled to vote on the Subplans should consider prior to voting to accept or reject the applicable Subplan(s). These factors may impact recoveries under the Plan and include:

(i)     unless otherwise specifically indicated, the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

(ii)    although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

(iii)   the Debtors may request Confirmation without the acceptance of all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

(iv)    any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Claims.

While these factors could affect distributions available to holders of Allowed Claims and Equity Interests under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Impaired Classes entitled to vote to accept or reject the Plan (the "***Voting Classes***") or necessarily require a re-solicitation of the votes of holders of Claims and Equity Interests in such Voting Classes.

For a further discussion of risk factors, please refer to the Risk Factors included in ARTICLE XX herein.

**Section 2.04.  Solicitation Procedures**

(a)    <u>Claims and Solicitation Agent</u>

The Debtors retained the Claims and Solicitation Agent, Prime Clerk LLC ("***Prime Clerk***") to act, among other things, as the Claims and Solicitation Agent in connection with the solicitation of votes to accept or reject the Subplans.

(b)    <u>Solicitation Package</u>

The following materials will constitute the solicitation package (the "***Solicitation Package***") distributed to holders of Claims entitled to vote to accept or reject the Subplans:

(i)    this Disclosure Statement, as approved by the Court (with the Plan as an exhibit thereto);

(ii)    the *Order (A) Approving the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballots and Notices in Connection Therewith, (D) Establishing the Plan Confirmation Schedule and (E) Granting Related Relief* [D.I. [_____]] (including exhibits thereto) (the "***Disclosure Statement Order***");

(iii)    the Solicitation Procedures, substantially in the form attached to the Disclosure Statement Order;

(iv)    the *Notice of Order (A) Approving the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballots and Notices in Connection Therewith, (D) Establishing the Plan Confirmation Schedule and (E) Granting Related Relief*, substantially in the form attached to the Disclosure Statement Order (the "***Confirmation Hearing Notice***");

(v)    a cover letter from the Debtors, substantially in the form attached to the Disclosure Statement Order, describing the contents of the Solicitation

Package and urging the holders of Claims in each of the Voting Classes to vote to accept the Subplans;

(vi)    appropriate forms of Ballots for holders of Claims in the Voting Classes, substantially in the forms of the Ballots attached to the Disclosure Statement Order;

(vii)    any supplemental documents the Debtors file with the Court and any documents that the Court orders to be included in the Solicitation Package; and

(viii)    a pre-addressed, postage paid return envelope.

(c)    <u>Distribution of the Solicitation Package and Plan Supplement</u>

The Debtors shall cause the Solicitation Package (other than the Ballots) to be provided in paper or CD-ROM format and the Ballots shall be provided in paper format. The Solicitation Package (except the Ballots) may be obtained from Prime Clerk, by: (i) accessing the Debtors' restructuring website at https://cases.primeclerk.com/optim/Home-DocketInfo; (ii) writing to Prime Clerk at Optim Energy, LLC Ballot Processing Center, c/o Prime Clerk LLC, 830 Third Avenue, Ninth Floor, New York, NY 10022; or (iii) contacting Prime Clerk via telephone at (855) 410-7360 or via email at solicitation@primeclerk.com.

The Debtors shall serve, or cause to be served, all of the materials in the Solicitation Package (including the Ballots) on holders of Claims entitled to vote on the Subplans. In addition, the Debtors shall serve, or cause to be served, all of the materials in the Solicitation Package (other than the Ballots) on: (i) the Office of the United States Trustee for the District of Delaware; (ii) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (iii) counsel to Cascade Investment, L.L.C. and ECJV Holdings, LLC; and (iv) any party who has requested notice pursuant to Bankruptcy Rule 2002.

No later than ten (10) days prior to the date first scheduled for the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, the Debtors intend to file the Plan Supplement, which will include, among other things, documents and forms of documents, agreements, schedules, and exhibits to the Plan (all of which shall be in form and substance satisfactory to the Debtors and the Consultation Parties). As the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website. The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement, by: (i) accessing the Debtors' restructuring website at https://cases.primeclerk.com/optim/Home-DocketInfo; (ii) writing to Prime Clerk at Optim Energy, LLC Ballot Processing Center, c/o Prime Clerk LLC, 830 Third Avenue, Ninth Floor, New York, NY 10022; or (iii) contacting Prime Clerk via telephone at (855) 410-7360 or via email at solicitation@primeclerk.com.

(d)    Voting Record Date

The Court has approved [April 22], 2015 as the record date for purposes of determining which holders of Claims are entitled to vote on the Subplans (the "***Voting Record Date***").

(e)    Voting Deadline

The Court has approved [May 26], 2015 at 4:00 p.m. ET as the voting deadline (the "***Voting Deadline***") for the Plan.  The Debtors may extend the Voting Deadline, in their discretion, without further order of the Court.  To be counted as votes to accept or reject the Subplans, all ballots sent to holders of Claims ("***Ballots***") must be properly executed, completed and delivered in accordance with the instructions set forth in the Ballots, by (i) first class mail, (ii) overnight courier or (iii) personal delivery so that they are **actually received**, in any case, no later than the Voting Deadline by Prime Clerk.  Delivery of a Ballot to Prime Clerk by facsimile, email or any other electronic means will not be valid.

**IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS  THE DEBTORS DETERMINE OTHERWISE IN THEIR SOLE DISCRETION.**

**ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM OR EQUITY INTEREST ENTITLED TO VOTE ON THE SUBPLAN(S), BUT THAT (I) DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE APPLICABLE SUBPLAN(S) OR (II) INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE SUBPLAN(S) WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE SUBPLAN(S).**

**EACH HOLDER OF A CLAIM OR EQUITY INTEREST MUST VOTE ALL OF ITS CLAIMS OR EQUITY INTERESTS EITHER TO ACCEPT OR REJECT THE SUBPLAN(S) AND MAY NOT SPLIT SUCH VOTES.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM OR EQUITY INTEREST WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM OR EQUITY INTEREST HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS OR EQUITY INTEREST, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.  IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLASS OF CLAIMS OR EQUITY INTERESTS AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.**

**IT IS IMPORTANT THAT THE HOLDER OF A CLAIM OR EQUITY INTEREST ENTITLED TO VOTE FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON OR ACCOMPANYING SUCH HOLDER'S BALLOT.  HOLDERS OF CLAIMS AGAINST THE DEBTORS THAT DO NOT VOTE TO REJECT THE PLAN AND OPT OUT OF GRANTING THE RELEASES DESCRIBED IN SECTION 12.03 OF THE PLAN BY CHECKING THE APPROPRIATE BOX ON THEIR RESPECTIVE**

**BALLOT(S) WILL BE DEEMED TO CONSENT TO SUCH RELEASES.  <u>ANY HOLDER OF A CLAIM OR CLAIMS AGAINST ANY OF THE DEBTORS WHO REJECTS THE PLAN AND OPTS OUT OF THE RELEASES DESCRIBED IN SECTION 12.03 OF THE PLAN WILL NOT RECEIVE ANY DISTRIBUTIONS.</u>**

RECOVERIES ON GENERAL UNSECURED CLAIMS AGAINST THE LIQUIDATING DEBTORS, CONVENIENCE CLASS CLAIMS AND WALNUT CREEK CLAIMS ARE CONTINGENT ON EACH CLASS VOTING TO ACCEPT THE SUBPLAN(S).  IF EACH SUCH CLASS DOES NOT VOTE TO ACCEPT THE APPLICABLE SUBPLAN(S), HOLDERS OF A CLAIM OR CLAIMS IN EACH SUCH CLASS WILL NOT RECEIVE A DISTRIBUTION.

## ARTICLE III

## GENERAL INFORMATION ABOUT THE DEBTORS[13]

### Section 3.01.  Debtors' Business and Industry

The Debtors are power plant owners principally engaged in the production of energy in Texas's deregulated energy market.  The Debtors owned and operated, in whole or in part, three power plants on the Petition Date: the Twin Oaks Plant, the Altura Cogen Plant and the Cedar Bayou Plant.  The Debtors sold the Twin Oaks Plant in 2014 and continue to own the other two plants in the Gas Plant Portfolio as of the date of this Disclosure Statement.

### Section 3.02.  Debtors' Formation

On January 8, 2007, PNM Resources, Inc. ("***PNMR***"), and Cascade Investment, L.L.C. ("***Cascade***") through its wholly-owned subsidiary, ECJV Holdings, LLC ("***ECJV***") formed Optim Energy as a limited liability company organized under the laws of Delaware.  The focus of ECJV and PNMR (an energy holding company that provides electricity through its subsidiaries to areas in New Mexico and Texas) was to enter the deregulated Texas electricity markets by acquiring or constructing merchant power plants to sell electricity to the public through the Electric Reliability Council of Texas, Inc. ("***ERCOT***").  To form Optim Energy, PNMR originally contributed the "Twin Oaks Plant" located in Robertson County, Texas, and ECJV contributed Cash.

### Section 3.03.  Debtors' Corporate Structure

Debtor Optim Energy is the wholly-owned direct subsidiary of non-Debtor ECJV (which is a wholly-owned subsidiary of Cascade) and is a holding company and Delaware limited liability company that directly or indirectly owns 100% of the outstanding equity interests of the other Debtors.  Debtors Optim Marketing and Optim Generation are both wholly-owned direct subsidiaries of Optim Energy.  Debtor OEM is the wholly-owned direct subsidiary of Optim

---

[13] The following is a summary of the Debtors' businesses and operations.  For additional details concerning the Debtors and the background to these Chapter 11 Cases, readers are referred to the *Declaration of Nick Rahn, Chief Executive Officer of Optim Energy, LLC, In Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 4] (the "***First Day Declaration***").

Marketing.  All the remaining Debtors are subsidiaries of Optim Generation.  Twin Oaks GP owns the general partnership interest in Twin Oaks LP, and Optim Generation wholly owns the limited partnership interest in Twin Oaks LP.  Twin Oaks LP, a limited partnership organized under the laws of Texas, owned the Twin Oaks Plant before its sale as described herein.  Additionally, Optim Generation owns all of the Equity Interests in: (a) Altura Cogen, a Delaware limited liability company, which owns the Altura Cogen Plant; and (b) Cedar Bayou, a Delaware limited liability company, which owns an undivided 50% interest in the Cedar Bayou Plant.

An organizational chart showing the Debtors' legal structure as of the Petition Date is below:



## Section 3.04.  Debtors' Prepetition Indebtedness

Optim Energy, as borrower, and Wells Fargo, as lender, entered into a credit agreement dated June 1, 2007 (the "***Wells Fargo Credit Agreement***"), which provided for up to $1 billion of credit consisting of a revolving loan facility and a letter of credit facility.  The proceeds from borrowings under the revolving loan facility of the Wells Fargo Credit Agreement were used, together with PNMR's contribution of the Twin Oaks Plant and certain equity Cash contributions and ECJV's equity Cash contributions, to fund the acquisitions of the Altura Cogen Plant, the

development and construction of the Cedar Bayou Plant and the general operations of the Debtors. Optim Energy's obligations under the Wells Fargo Credit Agreement were guaranteed by each of Cascade and ECJV (together, the "**Guarantors**") under the Continuing Guaranty issued by Cascade and the Continuing Guaranty issued by ECJV, respectively, each dated as of June 1, 2007 (as amended, the "**Guarantees**"), for the benefit of Wells Fargo in respect of amounts owed by Optim Energy under the Wells Fargo Credit Agreement. The Debtors were also obligated to reimburse the Guarantors for any payments made to Wells Fargo under the Guarantees pursuant to the Pre-Petition Reimbursement Agreement. The Debtors' obligations under the Pre-Petition Reimbursement Agreement are secured by (a) a senior lien on, and first priority interest in, substantially all of the Debtors' assets and (b) pledges of all of the shares of equity interests in all of Optim Energy's subsidiaries pursuant to the Pre-Petition Reimbursement Agreement Security Documents. Additionally, Cascade, ECJV, Wells Fargo and all the Debtors entered into a Subordination Agreement, dated June 1, 2007, under which Cascade and ECJV, in their capacities as Guarantors under the Guarantees, agreed to subordinate all of the Guarantors' claims against the Debtors (including any amounts owed to any Guarantor under the Reimbursement Agreement) to all of the claims of Wells Fargo against the Debtors and the Guarantors (including any amounts owed to Wells Fargo under the Wells Fargo Credit Agreement and the Guarantees) until such claims of Wells Fargo are paid in full.

Pursuant to the Reimbursement Agreement, the Debtors were required to pay Cascade a guarantee fee of $1.934 million on December 31, 2013. To preserve liquidity, the Debtors withheld this payment and, on December 30, 2013, entered into a Forbearance Agreement in which Cascade and ECJV agreed, subject to certain conditions, to forbear from exercising any remedies as a result of such nonpayment until February 14, 2014. As a result of Cascade's payment in full of the outstanding indebtedness under the revolving loan facility (including delivery of Cash Collateral in respect of outstanding letters of credit) to Wells Fargo in accordance with the Guarantee on the Petition Date, the aggregate amount of the Debtors' outstanding obligations under the Reimbursement Agreement was approximately $715 million, which included all accrued and unpaid interest, the missed guarantee fee of $1.934 million, and reasonable out-of-pocket charges and other fees and expenses incurred in connection with the Guarantees as of the Petition Date, plus the face amount of issued and outstanding undrawn letters of credit[14] of approximately $41 million, plus accrued, but unpaid, interest, fees and other amounts.

Since the Petition Date, the Twin Oaks Plant has been sold. Proceeds from the sale of the Twin Oaks Plant were used to pay the administrative costs associated with that sale, and to pay down the Debtors' obligations under the Reimbursement Agreement. As of January 31, 2015, the aggregate principal amount of the secured amount outstanding under the Reimbursement Agreement was approximately $596.5 million [D.I. 773]. This amount does not include the missed guarantee fee of $1.934 million and certain other fees paid to Wells Fargo.

---

[14] The pre-petition letter of credit obligations were replaced by new letters of credit issued by Wells Fargo as issuing bank under the DIP Credit Agreement.

**Section 3.05.  Events Leading to the Chapter 11 Cases**

Optim Energy's acquisition of the Twin Oaks Plant and Altura Cogen Plant and its investment to develop and construct the Cedar Bayou Plant occurred in 2007, one year before the 2008 economic downturn that plagued the energy industry, power markets and economy as a whole.  Over the ensuing years, sustained lower electricity prices, primarily driven by plummeting natural gas prices, proved to be a substantial challenge to the Debtors' power generation assets.  The price of natural gas, which is closely tied to the price of electricity in much of the U.S. (including the ERCOT market where the Debtors' Power Plants are located), fell from about $8.50 per MMBtu in 2008 to under $3.90 per MMBtu as of December 2013 (a decline of approximately 54%).

In large part as a result of the drop in natural gas prices, ERCOT market power prices fell correspondingly from about $63.24 per MWh in 2008 to under $38.00 per MWh as of December 2013 (a decline of approximately 40%).  Consequently, the Debtors were left with a significant debt load that could not be serviced or repaid due to persistent operating losses, which were magnified by seasonal fluctuations in the Debtors' revenue with decreased revenues generally recorded in the winter months.

The impact of depressed power prices was particularly acute with respect to the Twin Oaks Plant.  Prior to the sale of the Twin Oaks Plant, Twin Oaks was obligated under the long term fuel supply agreement between Walnut Creek and Optim Energy Twin Oaks, LP, executed in 1987 (as amended, the "***Fuel Supply Agreement***") to purchase almost all of its coal requirements from Walnut Creek.  The terms of the Fuel Supply Agreement provided for escalating prices for coal purchased from Walnut Creek over time without any adjustment for declining power prices.  In the two (2) years prior to the Petition Date, this dynamic generated average annual operating losses of approximately $11.5 million attributable to the Twin Oaks Plant.  The material cash flow drain required to sustain the Twin Oaks Plant, when combined with the systemic decrease in power prices, materially impaired the Debtors' ability to service their debts and perform their obligations.

As a result of these adverse market conditions, in September 2011, PNMR, ECJV and Cascade entered into agreements whereby Optim Energy was restructured such that PNMR's ownership in Optim Energy was reduced from 50% to 1% (with PNMR's remaining 1% ownership interest acquired by ECJV in January 2012).  In preparation for, and in conjunction with, this restructuring, the Debtors implemented various cost reduction and stabilization strategies and ultimately laid off over 50 employees to enable the transition of the operations and management of the Debtors' plants to contractors NAES Corporation ("***NAES***") and Competitive Power Ventures, Inc. ("***CPV***").  This transition ultimately resulted in approximately $15 million in annual savings, in the aggregate, among the three original power plants.  Unfortunately, the reduction in force and other cost-saving initiatives were insufficient to eliminate the recurring operating losses and required capital expenditures that strained liquidity.  The depressed economic environment of the electric power industry—particularly with respect to coal-fired plants—and the Debtors' liquidity constraints resulted in continuing losses that left the Debtors without alternatives to a chapter 11 filing.

**Section 3.06.   Attempts to Reorganize Outside Bankruptcy**

Recognizing that recurring operating losses were likely to impair liquidity and the ability to refinance the Wells Fargo Credit Agreement, in early 2013 the Debtors began to evaluate their strategic options, including the need for a potential restructuring.  To assist with the process, the Debtors initially retained Bracewell & Giuliani LLP ("**Bracewell**") to advise on restructuring negotiations and strategies.  The Debtors later engaged Protiviti Inc. ("**Protiviti**") as their restructuring advisor and Barclays as their financial advisor.  Ultimately, the Debtors, in consultation with their advisors, concluded that an out-of-court solution was not attainable.  With respect to the Debtors' balance sheet, without available financing, the Debtors' operating losses impaired their liquidity to the point that the Debtors could not continue to satisfy their obligations in the ordinary course of business.  During the course of 2013 and 2014, the Debtors sought to address the operating losses at the Twin Oaks Plant through negotiations with Walnut Creek to amend the Fuel Supply Agreement.  In furtherance of those discussions, on January 30, 2014, the Debtors and Walnut Creek entered into a Forbearance Agreement whereby Walnut Creek agreed to forego exercising remedies until February 14, 2014 (subject to the Debtors' non-default and the applicable cure period related thereto).  But despite significant efforts, the parties were unable to agree upon an ultimate amendment to the Debtors' long term coal purchase obligations under the Fuel Supply Agreement.

On February 11, 2014, Alan Heuberger, John Erickson, Quinn Cornelius and Randy Jack resigned their positions as directors of Optim Energy.  The remaining two board positions were held by independent directors Richard Fleming and David Gibson.  On April 7, 2014, Joseph Bondi was appointed as an additional independent director of Optim Energy.

**Section 3.07.   Commencement of the Chapter 11 Cases**

After struggling against the downturn in the Texas power markets in recent years, aggressively managing costs, and engaging in a comprehensive effort to explore strategic alternatives to mitigate systemic operating losses, the Debtors filed these Chapter 11 Cases on February 12, 2014 with the goal of reorganizing, including the restructuring of the Debtors' obligations and pursuing strategic alternatives to maximize the value of their power producing assets.

**Section 3.08.   Debtors' Current Assets**

The Debtors currently own and operate, in whole or in part, two power plants: the Altura Cogen Plant and the Cedar Bayou Plant.  The Debtors sell the electricity generated by these two plants directly into ERCOT, on a wholesale basis.  Debtor Altura Cogen also sells steam, and a portion of its electrical energy and capacity through an output contract.   Additional detail regarding the two remaining power plants follows:

(a)      The Altura Cogen Plant

The Altura Cogen Plant is a natural-gas powered plant capable of producing 600 megawatts located in Harris County, Texas and sells the majority of its energy in the ERCOT market.  The plant is owned by Debtor Altura Cogen, LLC.  The Altura Cogen Plant has been commercially operating since 1985 and is located within a complex of petrochemical facilities

owned by Lyondell Chemical Company ("**Lyondell**"). Altura Cogen leases the land under which the power plant is situated from Lyondell pursuant to a ground lease entitled the "Lease and Easement Agreement" dated September 6, 2005 (as amended and restated, the "**Altura Lease**"). Altura Cogen purchases the natural gas to fuel the plant from EDF Trading North America, LLC ("**EDF**") pursuant to fuel purchase agreements, which typically expire every few years, at which time the Debtors must enter into new agreements to supply the Altura Cogen Plant. The energy generated by the Altura Cogen Plant is sold on a short-term basis into the ERCOT market pursuant to an energy management agreement between Debtor Optim Marketing and EDF, dated as of November 1, 2011. EDF provides power management services, including scheduling, bidding, and dispatching—in coordination with NAES—the power produced by the Altura Cogen Plant. EDF also provides fuel management services, including procuring fuel for Altura Cogen, and EDF assists the Debtors with risk management, all of which is supervised by CPV. Lyondell purchases a portion of the power generated at the Altura Cogen Plant, as well as the steam produced from power production operations. The terms of the sale of steam and power to Lyondell are governed by a Steam and Electric Power Sales Agreement (as amended, the "**SEPSA**"). A letter of credit in the amount of $40 million has been issued under the DIP Credit Agreement for the benefit of Lyondell in connection with the Debtors' obligations under the SEPSA.

(b)　　The Cedar Bayou Plant

The Cedar Bayou Plant is a natural-gas powered plant capable of producing 550 megawatts located in Chambers County, Texas and operates in ERCOT's Houston Zone. Debtor Cedar Bayou owns a 50% undivided interest in the Cedar Bayou Plant and NRG Cedar Bayou Development Company, LLC ("**NRG Cedar Bayou**") owns the remaining 50% undivided interest. The Cedar Bayou Plant began operating in 2009. The Cedar Bayou Plant is located within a complex of electric generation facilities owned by NRG Texas Power LLC ("**NRG Texas**"), which owns the real property upon which the Cedar Bayou Plant is situated. Cedar Bayou and NRG Cedar Bayou are co-lessees from NRG Texas of the real property upon which the Cedar Bayou Plant is located pursuant to that certain Premises Lease dated August 1, 2007 (as amended, the "**CB4 Lease**"). The Cedar Bayou Plant is operated by NRG Cedar Bayou in accordance with a Joint Ownership Agreement (as amended and restated), dated August 1, 2007 between Cedar Bayou and NRG Cedar Bayou. The energy generated by the Cedar Bayou Plant is sold on behalf of Cedar Bayou and NRG Texas as joint owners on a short-term basis into ERCOT through a scheduling and dispatch agreement with NRG Texas. Cedar Bayou purchases its share of the natural gas to fuel the plant pursuant to short term (typically periods of three (3) months) fuel purchase agreements with NRG Power Marketing LLC ("**NRGPM**"). Prior to the Petition Date, a letter of credit in the amount of $1 million was issued under the Wells Fargo Credit Agreement for the benefit of NRGPM in connection with the Debtors' obligations under the fuel purchase agreements for the Cedar Bayou Plant. This letter of credit has been replaced by one issued under the DIP Credit Agreement.

**Section 3.09. Debtors' Management**

The Debtors' day-to-day management and operations are outsourced to third-party contractors and, therefore, the Debtors have no employees. On September 22, 2011, the Debtors entered into the O&M Services Agreement with NAES for the Altura Cogen Plant (as amended

and restated, "***Altura Cogen NAES Agreement***").  Under the terms of the Altura Cogen NAES Agreement, NAES employs plant personnel and is responsible for operating and maintaining the Altura Cogen Plant.  The responsibilities of NAES include general operational and maintenance services such as permitting, providing and training personnel, procuring supplies and inventory, and coordinating operations and maintenance with CPV.  On October 31, 2011, Optim Energy entered into the Asset Management Agreement with CPV (as amended, the "***CPV Management Agreement***"), pursuant to which CPV manages the Debtors' operations and finances.  These responsibilities include executive management, contract administration, accounting, treasury, regulatory compliance and other services.  CPV is headquartered in Maryland, where the Debtors' financial records are located, and is supervised by Optim Energy's independent board of directors.

## Section 3.10.   Federal and State Regulatory Matters

The Public Utility Commission of Texas ("***PUCT***") has oversight over the competitive wholesale electricity market administered by ERCOT and regulates certain aspects regarding entities owning electric generating facilities in Texas and transactions involving the transfer of ownership of such facilities.  Each of the Debtors is registered as a power generation company under the Texas Public Utility Regulatory Act and, by virtue of such registration, qualifies to generate electric energy and power in Texas.  The Debtors are also subject to standards and rules adopted by the PUCT relating to the operation of the competitive wholesale electric market administered by ERCOT.  The PUCT requires market participants to observe all ERCOT scheduling, operating, reliability, and settlement policies, rules, guidelines, and procedures and prohibits activities by wholesale market participants which are unfair, misleading, or deceptive or constitute an abuse of market power.  The PUCT monitors the activities of market participants in the wholesale ERCOT market, and to the extent the PUCT determines that any activity constitutes an abuse of market power or is otherwise unfair, misleading, or deceptive or violates a governing ERCOT practice or procedure, the PUCT may assess administrative penalties of up to $25,000 per violation per day and may also order the disgorgement of all excess revenue resulting from the violation.

The Debtors are also subject to oversight by the Federal Energy Regulatory Energy Commission ("***FERC***"), North American Electric Reliability Corporation ("***NERC***"), and Texas Reliability Entity, Inc. ("***TRE***") in connection with national electric reliability standards for the bulk power system promulgated by NERC and adopted by FERC.  In ERCOT, TRE has been delegated the authority to administer, monitor and enforce compliance with the NERC electric reliability standards and conducts compliance and enforcement activities in accordance with the NERC rules of procedure.  FERC has authority to assess penalties of up to $1,000,000 per day of violation for violations of the NERC electric reliability standards.  In addition to FERC-assessed monetary penalties for violation of the NERC electric reliability standards, NERC or TRE may issue a remedial action directive, such as: (a) specifying operating or planning criteria or limits; (b) requiring specific system studies; (c) defining operating practices or guidelines; (d) requiring confirmation of data, practices, or procedures through inspection, testing, or other methods; (e) requiring specific training for personnel; (f) requiring development of specific operating plans; and/or (g) requiring an independent contractor for internal audit.  TRE also has authority to apply a sanction, which is not limited to a monetary penalty, with the objective of promoting reliability

and compliance with the reliability standards, such as limiting the entity's activities, functions, or operations, or placing the entity on a reliability watch list.

## Section 3.11.   Environmental Laws and Regulations

The Debtors are subject to numerous federal, state and local laws and regulations with regard to air and water quality, hazardous and solid waste management, environmental remediation and other environmental matters.  Environmental laws and regulations affecting the Debtors include, but are not limited to:

- the Clean Air Act, as well as state laws and regulations impacting air emissions, including State Implementation Plans relating to existing and new National Ambient Air Quality Standards for ozone and particulate matter. Owners and/or operators of air emission sources are responsible for obtaining permits and for annual compliance and reporting;

- the Clean Water Act, as well as state laws and regulations regarding water quality, which require permits for facilities that discharge wastewater and storm water into the environment;

- the Comprehensive Environmental Response, Compensation and Liability Act, which can require any individual or entity that currently owns or in the past may have owned or operated a disposal site, as well as transporters or generators of hazardous substances sent to a disposal site, to share in remediation costs; and

- the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, as well as state laws and regulations regarding solid and hazardous waste, which require certain solid wastes, including hazardous wastes, to be managed pursuant to a comprehensive regulatory regime.

These laws and regulations can result in increased capital, operating and other costs. These laws and regulations generally require the Debtors to obtain and comply with a wide variety of environmental licenses, permits, inspections and other approvals.  Compliance with these laws and regulations can require significant expenditures, including expenditures for the installation of pollution control equipment, environmental monitoring, emissions fees, permits and cleanup costs and damages arising from contaminated properties.  Failure to comply with environmental regulations may result in the assessment of administrative, civil and criminal penalties, including the assessment of monetary penalties, the imposition of investigatory and remedial obligations, the suspension or revocation of necessary permits, licenses and authorizations, the requirement that additional pollution controls be installed and the issuance of orders enjoining future operations or imposing additional compliance requirements.

Additionally, other recently passed and potential future environmental laws and regulations could have a significant impact on the Debtors' results of operations, cash flows or financial position.  The U.S. Environmental Protection Agency (EPA) has adopted and is in the process of implementing regulations governing the emission of nitrogen oxide (NOx), sulfur

dioxide (SO2), particulate matter, mercury and other air pollutants under the Clean Air Act through the National Ambient Air Quality Standards, the Mercury and Air Toxics Standards rule and other air quality regulations. The EPA also adopted the Cross-State Air Pollution Rule, which provides for limits on the interstate transport of NOx and SO2 emissions, and recently finalized regulations governing the management of cooling water intake structures. In addition, the EPA has proposed revisions to the effluent guidelines for steam electric generating plants under the Clean Water Act and proposed new carbon dioxide (CO2) emissions requirements for existing fossil fuel electric generating units, called the Clean Power Plan. There have also been a number of other federal and state legislative and regulatory initiatives to reduce greenhouse gas (GHG) emissions. These recent and potential future environmental laws and regulations may require the Debtors to make additional capital expenditures and increase operating and maintenance costs.

## ARTICLE IV

## THE CHAPTER 11 CASES

### Section 4.01.  Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Chapter 11 authorizes a debtor to reorganize its business for the benefit of its creditors, interest holders, and other parties in interest. Commencing a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The principal objective of a chapter 11 case is to consummate a plan of reorganization or liquidation. A plan of reorganization or liquidation sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by a bankruptcy court binds a debtor, any issuer of securities thereunder, any person acquiring property under the plan, any creditor or interest holder of a debtor, and any other person or entity the bankruptcy court may find to be bound by such plan. Chapter 11 contains certain requirements related to obtaining the approval of a plan of reorganization by the bankruptcy court.

Subject to certain limited exceptions, the bankruptcy court order confirming a plan of reorganization or liquidation discharges a debtor from any debt that arose prior to the effective date of a plan of reorganization or liquidation, and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization or liquidation.

Prior to soliciting acceptances of a proposed plan of reorganization or liquidation, Bankruptcy Code section 1125 requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor typical of the types of claims and interests in the case to make an informed judgment regarding acceptance of the plan of reorganization or liquidation. This Disclosure Statement is submitted in accordance with Bankruptcy Code section 1125.

**Section 4.02.   First Day Motions**

The Debtors devoted substantial efforts to stabilizing their operations and preserving and restoring their relationships with vendors, customers, landlords and utility providers that had been impacted by the commencement of these Chapter 11 Cases.  As a result of these initial efforts, the Debtors minimized the negative impact resulting from the commencement of these Chapter 11 Cases.

On the Petition Date, in addition to the voluntary petitions for relief filed by the Debtors under chapter 11 of the Bankruptcy Code, the Debtors also filed a number of "first day" motions and applications (collectively, the "***First Day Motions***") with the Bankruptcy Court.   The Bankruptcy Court entered several orders to, among other things: (i) prevent interruptions to the Debtors' businesses; (ii) ease the strain on the Debtors' relationships with certain essential constituents; (iii) allow the Debtors to retain certain advisors necessary to assist the Debtors with the administration of the Chapter 11 Cases; and (iv) obtain debtor in possession financing (each, a "***First Day Order***").   The First Day Motions and First Day Orders are described in more detail below:

(a)      Administrative Motions

To facilitate a smooth and efficient administration of these Chapter 11 Cases, the Bankruptcy Court entered a procedural order authorizing the joint administration of the Debtors' Chapter 11 Cases [D.I. 27].

(b)      Cash Management Systems

As part of a smooth transition into these Chapter 11 Cases, the Debtors sought and the Bankruptcy Court entered certain orders authorizing the Debtors to (i) continue using the Debtors' existing cash management system, (ii) maintain existing bank accounts and business forms, (iii) continue intercompany transactions, and (iv) grant superpriority administrative expense status to postpetition intercompany payments [D.I. 30, 140].   Further, the Bankruptcy Court deemed the Debtors' bank accounts to be debtor in possession accounts and authorized the Debtors to maintain and continue using these accounts in the same manner as those employed before the Petition Date without reference to their status as debtors in possession.

(c)      Critical Vendors

The Debtors rely on their vendors to, among other things, (i) assist the Debtors in complying with applicable governmental laws and regulations, (ii) supply essential raw materials, specialized replacement parts and supplies, operations consumables, and certain other goods required to operate the Debtors' generating facilities and ensure continuous business operations, and (iii) ensure the wide range of specialized equipment the Debtors utilize for energy production and pollution control operate in an effective, safe, and efficient manner. While the Debtors rely on hundreds of vendors, payments for truly critical vendors represented less than 0.14 percent of the Debtors' approximately $720 million of total unsecured and project debt.   The disruption of their work would impede the Debtors' ability to continue operation. Therefore, the Bankruptcy Court entered a First Day Order authorizing the Debtors to pay prepetition claims of certain critical vendors in the interim amount of $450,000 [D.I. 34].   The

Debtors obtained a Final Order authorizing them to pay their critical vendors in the aggregate amount of $750,000 on March 4, 2014 [D.I. 126]. The Debtors have paid their critical vendors $541,691.75, pursuant to the Final Order, as of the date of this Disclosure Statement.

(d)     Lien Claimants

Before the Petition Date, and in the ordinary course of business, the Debtors contracted with certain domestic third-party carriers and warehousemen (the "***Lien Claimants***") to ship, transport, and deliver raw materials, parts, and components to the Debtors. The Debtors use certain raw materials without which the Debtors cannot generate electricity or maintain compliance with environmental regulations. Additionally, the Debtors' generating facilities employ sophisticated generating equipment to monitor the facilities, move supplies within the facilities, and produce energy, which all require replacement parts, supplies, and other critical goods to continue operating. An inability to acquire raw materials and parts from the Lien Claimants could have resulted in a slow-down or shut-down of the Debtors' operations at various facilities. The Debtors were concerned that unless these Lien Claimants were paid outstanding prepetition amounts, many of these Lien Claimants would refuse to perform their ongoing obligations under their existing agreements with the Debtors or may refuse to release goods in their possession, which would have had a material adverse effect on the Debtors' businesses. The Bankruptcy Court entered a First Day Order [D.I. 34] and then, on March 4, 2014, a Final Order [D.I. 126] authorizing, among other things, the Debtors to pay certain prepetition claims of the Lien Claimants.

(e)     Energy Trading

The Debtors were parties to prepetition contracts with respect to energy trading. First, the SEPSA became effective on January 1, 2007, for an initial term of fifteen (15) years, with an automatic two-year renewal option thereafter, until January 1, 2047. Under the SEPSA, Lyondell purchases a portion of the power generated at the Altura Cogen Plant, and the steam produced from the power production operations. The SEPSA requires Altura Cogen to deliver to Lyondell every 24-hour period up to (i) 80 megawatts of electric capacity and the associated energy and (ii) 1.33 million pounds of steam per hour from the Altura Cogen Plant. Second, on May 18, 2009 Optim Marketing entered into an ISDA 2002 Master Agreement (the "***EDF ISDA***") with EDF. Under the EDF ISDA, Optim Marketing and EDF enter into transactions for the purchase, sale or exchange of natural gas products and derivatives. Third, on October 31, 2008 Cedar Bayou (as successor in interest to Optim Marketing) entered into an ISDA 2002 Master Agreement (as amended, the "***NRG ISDA***" and, together with the SEPSA and the EDF ISDA and the transactions under each of the foregoing, the "***Energy Trading Contracts***") with NRG Power Marketing for the purchase of natural gas supply for Cedar Bayou's 50% share of the Cedar Bayou Plant's fuel requirements. Concerned that certain counterparties could take actions adverse to the Debtors as a result of the bankruptcy filings, out of an abundance of caution, the Debtors sought and the Bankruptcy Court entered a First Day Order [D.I. 35] and then, on March 6, 2014, a Final Order [D.I. 139] authorizing, among other things, the Debtors to continue performance under their Energy Trading Contracts, enter into new trading contracts, and pledge Collateral as necessary and appropriate under their trading contracts, provided that notice was provided to certain parties.

(f)    Taxes and Fees

The Debtors believed that, in some cases, certain taxing, regulatory, and governmental authorities had the ability to exercise rights and remedies if the Debtors failed to remit certain taxes and fees. Accordingly, the Debtors sought entry of an order authorizing the Debtors to pay certain fees and taxes to avoid harm to the Debtors' business operations. On February 12, 2014, the Bankruptcy Court entered a First Day Order authorizing the Debtors to pay certain taxes and fees [D.I. 33], and on March 6, 2014, the Bankruptcy Court entered a Final Order authorizing the Debtors to pay such taxes and fees [D.I. 138].

(g)    Utilities

Section 366 of the Bankruptcy Code protects debtors from utility service cutoffs upon a bankruptcy filing while providing utility companies with adequate assurance that the debtors will pay for postpetition services. To ensure uninterrupted utility service, the Debtors filed a First Day Motion seeking entry of an order approving procedures for, among other things, determining adequate assurance for utility providers and prohibiting utility providers from altering, refusing or discontinuing services without further order by the Bankruptcy Court [D.I. 9]. On February 12, 2014, the Bankruptcy Court entered a First Day Order approving the relief requested in this motion [D.I. 31] and, on March 4, 2014, the Bankruptcy Court entered a Final Order approving the relief requested in this motion [D.I. 127].

(h)    DIP Facility and Cash Collateral

On the Petition Date, the Debtors filed a motion [D.I. 16] to obtain approval of the DIP Facility and use of the Pre-Petition Secured Parties' Cash Collateral to fund operational and other expenses during the Chapter 11 Cases. Following the First Day Hearing, on the Petition Date the Bankruptcy Court entered an interim order authorizing the Debtors' use of Cash Collateral and to borrow up to $75 million under the DIP Facility [D.I. 36]. On March 6, 2014, the Bankruptcy Court entered a Final Order authorizing the Debtors' use of Cash Collateral and granting approval to borrow up to $115 million under the DIP Facility [D.I. 144].

**Section 4.03.  Employee Incentive Plans**

During the course of the Chapter 11 Cases, the Debtors implemented certain employee incentive plans. The terms of these narrowly-tailored plans were calculated and developed by Optim Energy's independent board of directors with the assistance of Debtors' advisors. A summary of these incentive plans is provided below:

(a)    2014 Bonus Plan

The Debtors outsourced operational management of the Twin Oaks Plant and the Altura Cogen Plant pursuant to the Operations and Maintenance Services Agreement between NAES and Twin Oaks LP (the "***Twin Oaks NAES Agreement***") and the Altura Cogen NAES Agreement (together with the Twin Oaks NAES Agreement, the "***O&M Agreements***"). Pursuant to the O&M Agreements, in connection with the sale of the Twin Oaks Plant and consistent with past practice, the Debtors and NAES agreed on terms for a Bonus Plan for 2014 that set parameters under which a plant worker or plant manager could earn his or her bonus. The

-25-

incentive program was based on the weighted average performance with respect to, among other things: (i) unit availability; (ii) EBITDA; (iii) cost efficiency; (iv) safety performance; (v) environmental compliance; and (vi) other factors deemed relevant by management in their reasonable discretion and judgment.  In total, there were approximately 100 NAES plant workers eligible to receive a bonus under the Bonus Plan.  The maximum amount payable under the Bonus Plan was approximately $1.9 million in the aggregate.  To date, $1,585,000 has been paid under the Bonus Plan in the aggregate.

       (b)     <u>The KEIP</u>

As described above, the Debtors outsourced executive management responsibilities, which were performed by CPV pursuant to the CPV Management Agreement.  The primary officer and director provided by CPV is Nick Rahn, who serves as Optim Energy's Chief Executive Officer and managing agent for Optim Energy's affiliated Debtors.  In addition to the ordinary course incentive bonuses described above, on May 14, 2014 the Debtors implemented a Key Employee Incentive Plan (the "**KEIP**") approved by the Bankruptcy Court [D.I. 293].  In addition to Mr. Rahn, four members of the plant management personnel employed by NAES and two members of the plant management personnel employed by CPV were eligible to participate in the KEIP.  The maximum amount that could be earned under the KEIP was $400,000, which has been paid.

       (c)     <u>The Original MIP</u>

The Debtors implemented a Management Incentive Plan (the "**Original MIP**") for Mr. Rahn, the Chief Executive Officer of Optim Energy and the Debtors' key manager, in connection with the sale of the Twin Oaks Plant.  On May 14, 2014, the Bankruptcy Court entered an order approving the Original MIP [D.I. 293].  The maximum sale bonus that Mr. Rahn could earn under the Original MIP was $250,000, which was comprised of two components.  First, a $150,000 bonus was earned upon the approval of the Twin Oaks bidding procedures.  Second, a sale bonus component capped at $100,000, which was based on a percentage of sale proceeds above a threshold was earned upon the Bankruptcy Court's entry of the Order approving the sale of the Twin Oaks Plant.  Under the Original MIP, $250,000 has been paid to Mr. Rahn.

       (d)     <u>The Gas Plant Portfolio MIP</u>

The Debtors implemented a second Management Incentive Plan (the "**Gas Plant Portfolio MIP**") for Mr. Rahn, the Chief Executive Officer of Optim Energy and the Debtors' key manager, in connection with the Sale of the Gas Plant Portfolio.  On October 27, 2014, the Bankruptcy Court entered an order approving the Gas Plant Portfolio MIP [D.I. 612].  The incentive award payable to Mr. Rahn under the Gas Plant Portfolio MIP is comprised of two components.  There is a $200,000 bonus payable upon the entry of: (x) a final order approving a sale of the Gas Plant Portfolio; (y) a confirmation order approving the transactions set forth in a plan sponsor agreement that results in a disposition of the Gas Plant Portfolio; or (z) an order approving any other binding sale agreement or plan sponsor agreement relating to the disposition of the Gas Plant Portfolio to a buyer unaffiliated with the DIP Lenders or the Pre-Petition Secured Parties.  There is also a sale bonus component, which is based on a percentage of sale proceeds above a threshold.  Nothing has been paid to Mr. Rahn to date under the terms of the

Gas Plant Portfolio MIP.  However, amounts will be payable to Mr. Rahn under the Gas Plant Portfolio MIP if a sale of the Gas Plant Portfolio under a Membership Interest Purchase and Sale Agreement is completed.

## ARTICLE V

## OTHER SIGNIFICANT EVENTS OF THE CHAPTER 11 CASES

### Section 5.01.  DIP Facility Milestones and Amendments

Pursuant to section 12.1 of the DIP Credit Agreement, it shall constitute an event of default under the DIP Credit Agreement if, among other things, the Debtors fail to meet any of the milestones set forth on Schedule 12.1 of the DIP Credit Agreement, which are set forth below:

(i)     As soon as practicable, but in any event within the ninety (90) days immediately following the Petition Date, either (a) executing a sale agreement with a stalking horse bidder relating to the sale of, at a minimum, Twin Oaks or substantially all of Twin Oaks' assets, and filing a sale motion and bidding procedures motion relating to such sale with the Bankruptcy Court, or (b) filing a bidding procedures motion and an auction sale motion with the Bankruptcy Court to implement bidding procedures for a sale of Twin Oaks or substantially all of Twin Oaks' assets without a stalking horse bidder; in each case acceptable to the Majority Lenders in their sole discretion;

(ii)    Within one hundred twenty (120) days of the Petition Date, obtain entry of a bidding procedures order from the Bankruptcy Court approving bidding procedures for a sale of Twin Oaks or substantially all of Twin Oaks' assets;

(iii)   Within one hundred fifty (150) days of the Petition Date, obtain Bankruptcy Court approval of a sale of Twin Oaks or substantially all of Twin Oaks' assets, to the extent a successful bidder has been selected;

(iv)    By six (6) months from the Petition Date, deliver to the Lenders either (a) a draft Plan of Reorganization and Disclosure Statement, in each case acceptable to the Majority Lenders in their reasonable discretion or (b) a Sale Proposal acceptable to the Majority Lenders in their reasonable discretion;

(v)     By eight (8) months from the Petition Date, file the Plan of Reorganization and the Disclosure Statement or file a sale and bidding procedures motion relating to the Sale Proposal with the Bankruptcy Court; and

(vi)    By twelve (12) months from the Petition Date, obtain confirmation by the Bankruptcy Court of the Plan of Reorganization and attain the effective

date thereof or consummate the sale contemplated by the Sale Proposal; provided, however, that if the Plan of Reorganization or the Sale Proposal has been filed, and the Extension has been elected by the Borrower and consented by the Majority Lenders in writing, this Milestone deadline shall be fifteen (15) months.

The DIP Facility has been amended several times since entry of the Final Order approving it.  A summary of the amendments is set for the below:

(i)     On April 15, 2014, the Debtors filed a notice of Consent dated April 7, 2014 pursuant to which the DIP Lenders agreed: (a) to amend Schedule 12.1 to the DIP Credit Agreement to extend the milestones regarding the sale of the Twin Oaks Plant by thirty (30) days, including the milestones for (x) execution of a sale agreement or filing of a bidding procedures motion, (y) obtaining entry of a bidding procedures order from the Bankruptcy Court, and (z) obtaining Bankruptcy Court approval of a sale; and (b) to appoint Joseph Bondi as an additional Independent Director of Optim Energy [D.I. 222].

(ii)    On June 17, 2014, the Debtors filed notices of Consent and Amendment dated June 12, 2014, and Consent and Amendment dated June 13, 2014, pursuant to which the DIP Lenders agreed to amend Schedule 12.1 to the DIP Credit Agreement to extend first to June 13, 2014, and subsequently to June 17, 2014, the milestone regarding (a) the execution of a sale agreement with a stalking horse bidder relating to the sale of, at a minimum, Twin Oaks LP or substantially all of Twin Oaks LP's assets, and the filing of a sale motion and bidding procedures motion relating to such sale with the Bankruptcy Court, or, in the alternative (b) the filing of a bidding procedures motion and an auction sale motion with the Bankruptcy Court to implement bidding procedures for a sale of Twin Oaks LP or substantially all of Twin Oaks LP's assets without a stalking horse bidder [D.I. 363].

(iii)   On August 12, 2014, the Debtors filed a notice of Consent and Amendment dated August 11, 2014 pursuant to which the DIP Lenders agreed to amend Schedule 12.1 to the DIP Credit Agreement to extend to September 26, 2014 the milestone regarding the Debtors' delivery to the DIP Lenders (a) a draft Plan of Reorganization and Disclosure Statement (each as defined in the DIP Credit Agreement), in each case acceptable to the Majority Lenders (as defined in the DIP Credit Agreement) in their reasonable discretion, or (b) a Sale Proposal (as defined in the DIP Credit Agreement) acceptable to the Majority Lenders in their reasonable discretion [D.I. 484].

(iv)    On October 2, 2014, the Debtors filed a notice of Consent, Amendment and Waiver dated September 25, 2014 and an Amendment dated October 8, 2014 pursuant to which the DIP Lenders agreed: (a) to amend Schedule 12.1 to the DIP Credit Agreement to extend to October 10, 2014 the

milestone regarding the Debtors' delivery to the Lenders of either (x) a draft Plan of Reorganization and Disclosure Statement, in each case acceptable to the Majority Lenders in their reasonable discretion, or (y) a Sale Proposal acceptable to the Majority Lenders in their reasonable discretion [D.I. 559]; and (b) to waive any default of the Gross Margin Covenant under Sections 10.1 and 12.1(c) of the DIP Credit Agreement that has arisen or may arise for August 2014 until the earlier of (x) October 31, 2014 and (y) the date of entry of a Bankruptcy Court order approving an amendment to the Gross Margin Covenant.

(v)     On October 8, 2014, the Debtors filed a notice of Consent and Amendment dated October 8, 2014 pursuant to which the DIP Lenders agreed to amend Schedule 12.1 to the DIP Credit Agreement to extend to October 31, 2014 the milestones regarding: (a) the Debtors' delivery to the Lenders of either (x) a draft Plan of Reorganization and Disclosure Statement, in each case acceptable to the Majority Lenders in their reasonable discretion, or (y) a Sale Proposal acceptable to the Majority Lenders in their reasonable discretion; and (b) the Debtors' filing of a Plan of Reorganization and the Disclosure Statement or the filing of a sale and bidding procedures motion relating to the Sale Proposal with the Bankruptcy Court [D.I. 571].

(vi)    On October 8, 2014 the Debtors entered into Amendment No. 6 to the DIP Credit Agreement pursuant to which the Debtors and the DIP Lenders agreed to amend the DIP Credit Agreement to provide $15 million of continuing DIP Financing commitments upon the closing of the Twin Oaks Plant sale, to be increased to $85 million upon the Bankruptcy Court's approval of Amendment No. 7 to the DIP Credit Agreement, which the Debtors also entered into on October 8, 2014.  On October 8, 2014, the Debtors filed a motion for an order approving Amendment No. 7 to the DIP Credit Agreement [D.I. 568].  On October 27, 2014, the Bankruptcy Court entered an order approving Amendment No. 7 as of October 8, 2014, and pursuant to which (x) Section 10.1 of the DIP Credit Agreement was amended to implement a revised Gross Margin Covenant following the sale of the Twin Oaks Plant (and to reflect operating revenues generated from only the remaining Gas Plant Portfolio), and (y) the requirement that $44 million in letters of credit be cash collateralized from the proceeds of the sale of the Twin Oaks Plant was removed [D.I. 614].

(vii)   On November 3, 2014, the Debtors filed a notice of Consent and Amendment dated October 30, 2014 pursuant to which the DIP Lenders agreed to amend Schedule 12.1 to the DIP Credit Agreement to extend to November 14, 2014 the milestones regarding (a) the Debtors' delivery to the Lenders of either (x) a draft Plan of Reorganization and Disclosure Statement, in each case acceptable to the Majority Lenders in their reasonable discretion, or (y) a Sale Proposal acceptable to the Majority Lenders in their reasonable discretion; and (b) the Debtors' filing of either such Plan of Reorganization and Disclosure Statement or a sale and bidding

procedures motion relating to such Sale Proposal with the Bankruptcy Court [D.I. 623].

(viii)  On November 17, 2014, the Debtors filed a notice of Consent and Amendment dated November 13, 2014 pursuant to which the DIP Lenders agreed to amend Schedule 12.1 to the DIP Credit Agreement: (a) to extend to December 15, 2014 the milestone regarding the Debtors' delivery to the Lenders of either (x) a draft Plan of Reorganization and Disclosure Statement, in each case acceptable to the Majority Lenders in their reasonable discretion, or (y) a Sale Proposal acceptable to the Majority Lenders in their reasonable discretion; and (b) to extend to February 9, 2015 the milestone regarding the Debtors' filing of either (x) such Plan of Reorganization and Disclosure Statement or (y) a sale and bidding procedures motion relating to such Sale Proposal with the Bankruptcy Court [D.I. 637].

(ix)  On December 16, 2014, Debtors filed a notice of Consent and Amendment dated December 12, 2014 pursuant to which the DIP Lenders agreed to amend Schedule 12.1 to the DIP Credit Agreement to extend to January 30, 2015 the milestone regarding the Debtors' delivery to the Lenders of either (a) a draft Plan of Reorganization and Disclosure Statement, in each case acceptable to the Majority Lenders in their reasonable discretion, or (b) a Sale Proposal acceptable to the Majority Lenders in their reasonable discretion [D.I. 662].

(x)  On January 14, 2015, the Debtors filed a notice of the *Request of Extended Outside Date* dated January 13, 2015 pursuant to which the DIP Lenders agreed to extend the Outside Date by a single three-month period to the Extended Outside Date, which is May 12, 2015, pursuant to Section 2.2(h) of the DIP Credit Agreement, to become effective on the date of and upon the Bankruptcy Court entering an order that extends the Debtors' Exclusive Filing Period (as defined below) for proposing a plan of reorganization to at least the Extended Outside Date, provided that on such date no Event of Default has occurred and is continuing [D.I. 691] (the "***Extension***").  On February 3, 2015, the Bankruptcy Court entered an order extending the Debtors' Exclusive Filing Period through and including June 9, 2015 [D.I. 722], and the Extension became effective.

(xi)  On January 28, 2015, the Debtors filed a notice of Consent and Amendment dated January 27, 2015 pursuant to which the DIP Lenders agreed to amend Schedule 12.1 to the DIP Credit Agreement:

a.  to extend to February 9, 2015 the milestone regarding the Debtors' delivery to the Lenders (as defined in the DIP Credit Agreement) of either (a) a draft Plan of Reorganization and Disclosure Statement, in each case acceptable to the Majority Lenders in their reasonable discretion, or (b) a Sale Proposal acceptable to the Majority Lenders in

their reasonable discretion; provided, however, that if, on or before February 9, 2015, the Extension becomes effective (which it has), then this milestone deadline shall be February 27, 2015;

    b.  to extend to February 9, 2015 the milestone regarding either (a) the Debtors' filing of the Plan of Reorganization and Disclosure Statement or (b) the Debtors' filing of a sale and bidding procedures motion relating to the Sale Proposal with the Bankruptcy Court; provided, however, that if, on or before February 9, 2015, the Extension becomes effective (which it did), then this Milestone deadline shall be March 6, 2015; and

    c.  to extend to February 12, 2015 the milestone regarding either (a) the confirmation by the Bankruptcy Court of the Plan of Reorganization and attainment of the effective date thereof or (b) the consummation of the sale contemplated by the Sale Proposal; provided, however, that if the Plan of Reorganization or the Sale Proposal has been filed and the Extension becomes effective (which it did), this milestone deadline shall be May 12, 2015 [D.I. 712].

    (xii)  On March 2, 2015, the Debtors filed a notice of Consent and Amendment dated February 25, 2015 pursuant to which the DIP Lenders agreed to amend Schedule 12.1 to the DIP Credit Agreement to: (a) extend to March 13, 2015 the milestone regarding the Debtors' delivery to the Lenders of either (x) a draft Plan of Reorganization and Disclosure Statement, in each case acceptable to the Majority Lenders in their reasonable discretion, or (y) a Sale Proposal acceptable to the Majority Lenders in their reasonable discretion; (b) extend to March 20, 2015 the milestone regarding the Debtors' filing of either (x) such Plan of Reorganization and Disclosure Statement or (y) a sale and bidding procedures motion relating to such Sale Proposal with the Bankruptcy Court; and (c), pursuant to their satisfaction of the aforementioned milestones, the Debtors shall, no later than May 12, 2015, obtain confirmation by the Bankruptcy Court of the Plan of Reorganization and attain the effective date thereof or consummate the sale contemplated by the Sale Proposal [D.I. 749].

    (xiii)  On March 13, 2015, the Debtors filed a notice of Consent and Amendment dated March 10, 2015 pursuant to which the DIP Lenders agreed to amend Schedule 12.1 to the DIP Credit Agreement to extend to April 24, 2015 the milestone regarding the Debtors' delivery to the Lenders of either (i) a draft Plan of Reorganization and Disclosure Statement, in each case acceptable to the Majority Lenders in their reasonable discretion, or (ii) a Sale Proposal acceptable to the Majority Lenders in their reasonable discretion [D.I. 767].

On May 29, 2014, the DIP Lenders and the L/C Issuer agreed to waive the requirements of the Debtors to (i) apply excess cash to cash collateralize the letters of credit and (ii) deposit

excess cash in a segregated account so that the Debtors could use the excess cash as working capital. The DIP Lenders and/or the L/C Issuer may rescind the waiver upon written notice at any time.

The DIP Facility will mature on May 12, 2015. The Debtors have been in discussions with the DIP Lenders regarding the terms of an extension of the DIP Facility. The Debtors plan to file a motion seeking Bankruptcy Court approval to extend the DIP Facility maturity date beyond May 12, 2015 on terms satisfactory to the Debtors and the Consultation Parties. As of the date of this Disclosure Statement, letters of credit of approximately $41 million are outstanding under the DIP Facility; otherwise, there are no outstanding borrowings under the facility. For more information about the specific terms of the DIP Facility, including the Debtors' stipulations and protective provisions regarding the DIP Lenders and Pre-Petition Secured Parties, refer to the Final DIP Order [D.I. 144], the DIP Motion [D.I. 16] and the exhibits thereto.

## Section 5.02.   Retention and Employment of Professionals

The Debtors filed various applications, which were subsequently approved, for employment of Professionals in connection with the Chapter 11 Cases. Such applications include: (a) Bracewell, as general bankruptcy and restructuring counsel [D.I. 172]; (b) Morris, Nichols, Arsht & Tunnell LLP, as Delaware bankruptcy co-counsel [D.I. 173]; (c) Barclays, as investment banker [D.I. 166]; (d) Protiviti, as restructuring advisor [D.I. 171]; (e) Prime Clerk as Claims and Solicitation Agent [D.I. 29, 164]; (e) KPMG LLP, as independent auditors [D.I. 279]; (f) Deloitte Tax LLP, as tax advisor [D.I. 271 and 738]; and (g) certain Professionals in the ordinary course of business [D.I. 165] (Professionals covered by this application consist of various outside Professionals whom the Debtors employed prior to filing the Chapter 11 Cases). These Professionals (and the services provided) are: (i) Nora Del Bosque (lobbying/consulting); (ii) David Carlile (coal market consultant); (iii) Element Markets (management and marketing of emissions credits); (iv) Jackson Walker LLP (legal representation in the Varner Litigation); (v) Bob Warburton (consultant/operational advice); (vi) WCM (environmental consulting, air permit for Twin Oaks repowering); (vii) Thorndike Landing (dispatch forecast for 2015 budget projections; (viii) Norton Rose Fulbright (tax advice – legal); (ix) Myers-Hill, Attorneys at Law (tax advice (compliance) – legal); and (x) Black & Veatch Corporation (consultant/operational advice). Finally, the Debtors utilized Wise & Susong, LLC to obtain a mineral abstract for 2,769.762 acres in Robertson County, TX, in connection with the sale of the Twin Oaks Plant.

## Section 5.03.   Schedules and Statements of Financial Affairs

On April 14, 2014, the Debtors filed their Schedules [D.I. 206-21].

## Section 5.04.   Bar Dates

On May 9, 2014, the Bankruptcy Court entered the bar date order and established the following deadlines for filing Proofs of Claim in these Chapter 11 Cases: (a) August 11, 2014 at 4:00 p.m. (ET) as the governmental bar date by which Proofs of Claim against the Debtors by a Governmental Unit must be filed; and (b) June 18, 2014 at 4:00 p.m. (ET) as the general bar date

by which Proofs of Claim against the Debtors must be filed for all other Claims (other than Administrative Claims and Rejection Damages Claims, if any) [D.I. 275].

## Section 5.05.  Walnut Creek Motion

On April 14, 2014, Walnut Creek filed a motion seeking the derivative standing of the Debtors to pursue purported claims on behalf of the Debtors against Cascade and ECJV as Pre-Petition Secured Parties.

In connection with its motion for standing, Walnut Creek submitted a proposed complaint asserting five claims against Cascade and ECJV: (a) recharacterization of prepetition debt owed to Cascade and ECJV as equity; (b) equitable subordination of the secured claims to the claims of unsecured creditors; (c) breach of fiduciary duty; (d) aiding and abetting breach of fiduciary duty; and (e) avoidance of Cascade and ECJV's liens.  Both the Debtors and Cascade/ECJV opposed Walnut Creek's motion, arguing that Walnut Creek failed to satisfy the standard for derivative standing as it had not demonstrated that the Debtors' refusal to pursue the claims at issue was unjustified or that the claims were colorable.

The Bankruptcy Court held a hearing on Walnut Creek's motion on May 5, 2014, where all interested parties were provided an opportunity to be heard.  By opinion [D.I. 288] and accompanying Order [D.I. 289], issued May 13, 2014, the Bankruptcy Court denied Walnut Creek's request for derivative standing and found that none of Walnut Creek's claims were colorable.  More specifically, the Bankruptcy Court held that Walnut Creek's breach of fiduciary duty claims could not lie because the Debtors' operating agreement provided that no fiduciary duties were owed, which provision was supported by Delaware law.  Second, the Bankruptcy Court found that Walnut Creek's recharacterization claim was not colorable because Walnut Creek had failed to allege sufficient facts to support a claim that the prepetition transactions and financial arrangements were structured and intended as equity rather than debt, and thus were not susceptible to recharacterization.  Third, the Bankruptcy Court held that Walnut Creek had not alleged any inequitable conduct to sustain a claim of equitable subordination.  Finally, the Bankruptcy Court held that the lien avoidance claim failed because it was more in the nature of a proposed remedy than a separate claim, and Walnut Creek failed to state any basis for avoiding the liens.

On May 14, 2014, Walnut Creek filed a notice of appeal from the Bankruptcy Court's order [D.I. 296] to the United States District Court for the District of Delaware (the "***Delaware District Court***").  Oral argument took place on February 10, 2015.  On March 13, 2015, the Delaware District Court entered an order affirming the Bankruptcy Court's decision denying Walnut Creek derivative standing to pursue purported claims on behalf of the Debtors against Cascade and ECJV as Pre-Petition Secured Parties.

## Section 5.06.  Twin Oaks Plant Sale

On June 17, 2014, the Debtors filed a motion [D.I. 359] to sell the Twin Oaks Plant free and clear of liens pursuant to section 363(f) of the Bankruptcy Code.  On July 3, 2014, the Bankruptcy Court entered an order [D.I. 423] approving the Debtors' selection of Twin Oaks Power, LLC, an affiliate of ArcLight Capital Partners, LLC, as the proposed purchaser of the

Twin Oaks Plant.  The Debtors conducted an auction on August 4, 2014.  At the conclusion of the auction, the Debtors determined that: (a) Major Oak Power, LLC, an affiliate of Blackstone Capital Partners VI L.P. and Blackstone Energy Partners L.P. (together with their respective affiliates, "**Blackstone**") was the highest and best bidder for the Twin Oaks Plant with a bid of $126 million; and (b) Twin Oaks Power, LLC was the second highest and best qualifying back-up bidder for the Twin Oaks Plant with a bid of $121.5 million.  On August 5, 2014, the Debtors filed a notice [D.I. 467] with the Bankruptcy Court in this regard.  On October 14, 2014, the Debtors closed on the sale of the Twin Oaks Plant to Major Oak Power, LLC.  Proceeds from the sale of the Twin Oaks Plant were used first to pay the administrative costs associated with the sale and then to pay down the Pre-Petition Secured Parties under the Pre-Petition Reimbursement Agreement.

**Section 5.07.   Walnut Creek Rejection Damages Claims**

On September 12, 2014, the Bankruptcy Court entered an order approving Twin Oaks LP's rejection of the Fuel Supply Agreement effective as of the closing of the sale of the Twin Oaks Plant [D.I. 537].  On November 14, 2014, Walnut Creek filed Proofs of Claim (Nos. 113-15) against Optim Energy and Twin Oaks LP asserting Rejection Damages Claims of approximately $190 million under the Fuel Supply Agreement.  The Debtors object to the Walnut Creek Claims, and have sought their disallowance.  On January 22, 2015, the Debtors filed an objection to the Walnut Creek Claims [D.I. 707], wherein the Debtors argue that the Walnut Creek Claims should be disallowed because, *inter alia*, (a) as the Twin Oaks Plant and the Walnut Creek mine are under the common control of Blackstone, all of the economic benefit available is being captured by Blackstone, and Blackstone cannot demonstrate, as required under Texas law, that it actually suffered damages, or establish with reasonable certainty any alleged lost profits; (b) as Blackstone required the rejection of the Fuel Supply Agreement as a condition of purchasing the Twin Oaks Plant, Blackstone should not now be allowed to claim damages from that rejection; and (c) the Proofs of Claim do not provide support for the purported damages of over $190 million.  A hearing on the Walnut Creek Claims objection is scheduled to occur in the Bankruptcy Court on May 27, 2015 at 10:00 a.m. ET.

**Section 5.08.   Exclusivity**

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of one hundred twenty (120) days from the petition date (which may be extended by a bankruptcy court for a period of up to eighteen (18) months from the petition date) (the "***Exclusive Filing Period***").  If a debtor files a plan within this initial exclusive period, then the debtor has the exclusive right for one hundred eighty (180) days from the petition date to solicit acceptances to the plan (which may be extended by a bankruptcy court for a period of up to twenty (20) months from the petition date) (the "***Exclusive Solicitation Period***").  During these exclusive periods, no other party in interest may file a competing plan of reorganization.  However, a court may extend these periods upon request of a party in interest and "for cause."

The Debtors' initial 120-day Exclusive Filing Period was scheduled to expire on June 12, 2014 with the initial 180-day Exclusive Solicitation Period set to expire on August 11, 2014.  On June 10, 2014, the Bankruptcy Court extended the Exclusive Filing Period through and including

October 10, 2014 and the Exclusive Solicitation Period through and including December 9, 2014 [D.I. 343].  On November 10, 2014, the Bankruptcy Court further extended the Exclusive Filing Period through and including February 9, 2015 and the Exclusive Solicitation Period through and including April 10, 2015 [D.I. 632].   On February 3, 2015, the Bankruptcy Court further extended the Exclusive Filing Period through and including June 9, 2015 and the Exclusive Solicitation Period through and including August 10, 2015 [D.I. 722].  The Debtors filed the Plan and Disclosure Statement within the Exclusive Filing Period.

## Section 5.09.   Nonresidential Leases

Under the Bankruptcy Code, for unexpired leases of nonresidential real property with respect to which a debtor is the lessee, a debtor must make a decision to assume or reject the lease within an initial period of one-hundred twenty (120) days from the petition date (the "***Nonresidential Lease Deadline***").   A bankruptcy court may extend the 120-day period (prior to its expiration) for ninety (90) days on the motion of the debtor or lessor "for cause."   Any subsequent extensions of time require the written consent of the lessor in each instance.

The Debtors' initial 120-day Nonresidential Lease Deadline was June 12, 2014.   On June 10, 2014, the Bankruptcy Court extended the Nonresidential Lease Deadline through and including September 10, 2014 [D.I. 342].  On August 19, 2014, the Bankruptcy Court entered an order [D.I. 495] approving a stipulation and further extension of the Nonresidential Lease Deadline, through and including November 12, 2014, with respect to the CB4 Lease.  On August 22, 2014, the Bankruptcy Court entered an order [D.I. 506] approving a stipulation and further extension of the Nonresidential Lease Deadline, through and including November 12, 2014 at 4:00 p.m. (ET), with respect to the Altura Lease.  On November 7, 2014, the Bankruptcy Court entered orders [D.I. 628-29] approving stipulations and further extension of the Nonresidential Lease Deadline, through and including February 9, 2015, with respect to the foregoing two leases.   On January 14-15, 2015, the Bankruptcy Court entered orders [D.I. 688 and 697] approving stipulations and further extension of the Nonresidential Lease Deadline, through and including June 9, 2015, with respect to the foregoing two leases.

## Section 5.10.   Cedar Bayou IDA

On October 22, 2014, Cedar Bayou filed a motion authorizing it to enter into an Industrial District Agreement (the "***IDA***") with the NRG Cedar Bayou and the City of Baytown, Texas, a municipal corporation in Harris and Chambers County, Texas.  On November 10, 2014, the Bankruptcy Court entered an order approving the IDA [D.I. 633] establishing the parties' payment in lieu of tax obligations for calendar years 2014-2020.

## Section 5.11.   Status of Litigation Pending on the Petition Date

(a)     Robertson County Dispute/Tax Settlement

Prior to the Petition Date, Twin Oaks LP disputed the appraised value of the Twin Oaks Plant assigned by the Robertson County Appraisal District.  Twin Oaks met and conferred with representatives of the Appraisal District on several occasions in an attempt to resolve the dispute regarding the appraised value.  After discussions with the Appraisal District did not produce a settlement, on August 6, 2013 Twin Oaks filed a petition for review against the Appraisal

District in the 82nd Judicial District Court, Robertson County, Texas, *Optim Energy Twin Oaks, LP vs. Robertson County Appraisal District*, Case No. 13-08- 19389-CV.  The litigation was pending on the Petition Date.

On April 18, 2014, the Debtors filed *Debtors' Motion for Determination of Tax Liability Under 11 U.S.C. §§ 105 and 505* [D.I. 233] (the "***505 Motion***") in an effort to bring this matter before the Bankruptcy Court.  Following settlement discussions, Twin Oaks LP reached a settlement with Robertson County regarding the appraised value of the Twin Oaks Plant for purposes of assessing taxes for the 2013 and 2014 tax years.  Pursuant to Bankruptcy Rule 9019, a debtor has the ability to seek court approval of a settlement or compromise if the compromise is fair, reasonable, and in the best interest of the estate.  On May 22, 2014 the Debtors filed *Debtors' Motion for Entry of an Order Pursuant To Sections 105(a) And 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019 Approving Settlement Agreement with Robertson County Appraisal District and Robertson County* [D.I. 320] (the "***9019 Motion***").

On June 12, 2014, the Bankruptcy Court entered an order approving the 9019 Motion [D.I. 341].  Pursuant to the terms of the settlement agreement: (a) the appraised value of the Twin Oaks Plant for the 2013 and 2014 tax years was established as $70,000,000; (b) the appraised value for certain tax exempt accounts related to pollution control equipment was established as $1,566,400; (c) the total property tax liability for the Twin Oaks Plant for the 2013 tax year was established as $1,403,994.40, of which $961,640.00 was paid by Twin Oaks prior to the Petition Date, and the balance was paid before June 30, 2014; (d) the total property tax liability for the Twin Oaks Plant for the 2014 tax year would be calculated and paid in the ordinary course; (e) Robertson County would withdraw its proof of claim with respect to the 2013 tax year, with prejudice, and amend its proof of claim with respect to the 2014 tax year on account of the new appraised values of the Twin Oaks Plant; and (f) Twin Oaks LP would withdraw the 505 Motion with prejudice.  In mid-August 2014, all of the foregoing conditions were satisfied, and the Debtors withdrew the 505 Motion with prejudice [D.I. 487].  On July 28, 2014, the Robertson County Appraisal District filed an amended Proof of Claim asserting zero property tax liability for the Twin Oaks Plant for the 2013 tax year, and asserting $1,446,808.86 in total property tax liability for the Twin Oaks Plant for the 2014 tax year (Proof of Claim No. 92).  The Debtors' property tax liability for the 2014 tax year was apportioned pursuant to the Twin Oaks asset purchase agreement.  As of the date of this Disclosure Statement, the Debtors believe they have fully funded their portion of the tax liability for the 2014 tax year, and therefore the Debtors should have no further tax liability to the Appraisal District.

    (b)    <u>Varner Dispute/Asserted Proofs of Claim</u>

Prior to the Petition Date, on January 21, 2010 Charlton Varner was allegedly employed as a courier for Pronto Courier and had arrived at the Twin Oaks Plant to deliver a package.  Ms. Varner was allegedly walking through the warehouse at the Twin Oaks Plant when she allegedly slipped and fell and allegedly suffered bodily injury.  On January 27, 2012, Ms. Varner and her husband, Bruce Varner (together, the "***Varners***"), filed a complaint against Optim Energy, Twin Oaks LP and Twin Oaks GP in the 82nd Judicial District Court, Robertson County, Texas, *Charlton Varner & Bruce Varner v.  GE Capital Commercial, Optim Energy Twin Oaks, LP, Optim Energy Twin Oaks GP, LLC, and Optim Energy, LLC*, Case No. 12-01-18996-CV.  The Varners' litigation was pending on the Petition Date, and it has been stayed on account of the

Chapter 11 Cases.  On November 12, 2014, plaintiffs filed Proofs of Claim in the Chapter 11 Cases (Nos. 110-12, 116-17) of approximately $900,000 against the Twin Oaks LP, Twin Oaks GP and Optim Energy Estates on account of the prepetition litigation.  The Debtors oppose the Claims asserted by the Varners in their entirety.

**Section 5.12.   Sales and Use Tax Claims**

As described in the First Day Declaration and in the Debtors' First Day Motion regarding taxes and fees, use taxes arise in the ordinary course of the Debtors' business when the Debtors purchase certain goods and services, including fuel, power generation-related equipment, and other spare equipment parts, from vendors who do not have business operations in the State of Texas.  Applicable law and regulations require the Debtors to self-assess the amount of such taxes, and subsequently pay use taxes to the Tax Authority monthly.  On July 30 and August 11, 2014, the Texas Comptroller of Public Accounts on behalf of the State of Texas, Texas Municipalities, Texas Counties, Special Purpose Districts and/or Texas Metropolitan or Regional Transportation Authorities (the "*Tax Authority*") filed Proofs of Claim in the Chapter 11 Cases, which are described below:

    (a)    <u>Tax Claims Asserted Against Cedar Bayou</u>

        (i)    Priority Tax Claim

In Proof of Claim number 100, the Tax Authority asserts that it has a Priority Tax Claim against Cedar Bayou in the amount of $12,636,452.18, which represents purported unpaid sales and use taxes in the aggregate amount of $12,306,354.69 allegedly owed by Cedar Bayou for the period from July 2010 through the Petition Date, $183,657.78 in penalties and $146,439.71 in interest as a result of nonpayment, all of which the Tax Authority asserts is entitled to priority treatment under section 507(a)(8) of the Bankruptcy Code.  The Debtors have reviewed their books and records and believe that Cedar Bayou had funded all of its sales and use tax payment obligations to the Tax Authority as of the Petition Date.  The Debtors are currently in discussions with the Tax Authority to resolve its Priority Tax Claim against Cedar Bayou; however, the Debtors reserve the right to object to such Claim if necessary.

        (ii)    Administrative Claim

In Proof of Claim number 101, the Tax Authority asserts that it has an Administrative Claim against Cedar Bayou in the amount of $4,646,085.03, which represents purported unpaid sale and use taxes in the aggregate amount of $4,207,007.73 allegedly owed by Cedar Bayou for the period from the Petition Date through June 2014, $420,775.12 in penalties and $28,302.18 in interest as a result of nonpayment, all of which the Tax Authority asserts is entitled as an administrative expense under section 503(b) of the Bankruptcy Code.  The Debtors have reviewed their books and records and believe that Cedar Bayou has funded all of its sales and use tax payment obligations to the Tax Authority during these Chapter 11 Cases.  The Debtors are currently in discussions with the Tax Authority to resolve its Administrative Claim against Cedar Bayou; however, the Debtors reserve the right to object to such Claim if necessary.

(b)    Tax Claims Asserted Against Twin Oaks GP

(i)    Priority Tax Claim

In Proof of Claim number 107, the Tax Authority asserts that it has a Priority Tax Claim against Twin Oaks GP in the amount of $1,192,048.01, which represents purported unpaid sales and use taxes in the aggregate amount of $1,037,905.00 allegedly owed by Twin Oaks GP for the period from February 2011 through the Petition Date, $98,295.71 in penalties and $55,847.30 in interest as a result of nonpayment, all of which the Tax Authority claims is entitled to priority treatment under section 507(a)(8) of the Bankruptcy Code.  The Debtors have reviewed their books and records and believe that Twin Oaks GP had funded all of its sales and use tax payment obligations to the Tax Authority as of the Petition Date.  The Debtors are currently in discussions with the Tax Authority to resolve its Priority Tax Claim against Twin Oaks GP; however, the Debtors reserve the right to object to such Claim if necessary.

(ii)    Administrative Claim

In Proof of Claim number 106, the Tax Authority asserts that it has an Administrative Claim against Twin Oaks GP in the amount of $142,197.44, which represents purported unpaid sales and use taxes in the aggregate amount of $130,247.08 allegedly owed by Twin Oaks GP for the period from the Petition Date through June 2014, $11,600.12 in penalties and $350.24 in interest as a result of nonpayment, all of which the Tax Authority asserts is entitled as an administrative expense under section 503(b) of the Bankruptcy Code  The Debtors have reviewed their books and records and believe that Twin Oaks GP has funded all of its sales and use tax payment obligations to the Tax Authority during these Chapter 11 Cases.  The Debtors are currently in discussions with the Tax Authority to resolve its Administrative Claim against Twin Oaks GP; however, the Debtors reserve the right to object to such Claim if necessary.

# ARTICLE VI

# TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(l) of the Bankruptcy Code, DIP Facility Claims, Administrative Claims (including Professional Claims) and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in ARTICLE III and ARTICLE IV of the Plan.  For any Subplan, the following designation and treatment of unclassified Claims applies:

## Section 6.01.  DIP Facility Claims

Consistent with the Final DIP Order, all DIP Facility Claims are and shall be deemed Allowed Claims against each of the Debtors.  On the Effective Date of each of the Subplans for the Debtors, the holders of the Allowed DIP Facility Claims shall receive, in full and final satisfaction of such Claims, an amount of Cash equal to the amount of such Claims (including, without limitation, all outstanding principal and accrued but unpaid interest, costs, fees and expenses owing as of the Effective Date, or any other amounts due and owing under the DIP Facility) to the extent not previously paid during the Chapter 11 Cases.

-38-

**Section 6.02.   Administrative Claims**

To the extent not previously paid during the Chapter 11 Cases, except as otherwise provided herein or unless the holder agrees to a different treatment, each holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release and discharge of such Claim, an amount of Cash equal to the amount of such Allowed Administrative Claim on the later of: (a) the Effective Date; or (b) the date such Administrative Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto (x) on or prior to the Effective Date, by the Debtors from their operating accounts, and (y) after the Effective Date, by the Plan Administrator, in the ordinary course of business solely from the Reorganizing Debtors Claims Reserve or the Liquidating Debtors Claims Reserve, as the case may be, subject to the provisions of the Plan, the Distribution Trust Agreement and/or the Liquidation Trust Agreement.

(a)      Administrative Claims Bar Date

Holders of Administrative Claims (other than Professional Claims) shall file any request for allowance and payment of Administrative Claims by the Administrative Claims Bar Date or otherwise be forever barred, estopped, and enjoined from asserting such Claims against the Debtors, the Liquidating Debtors, the Reorganizing Debtors, the Reorganized Debtors and their respective Estates and property, the Plan Administrator, the Distribution Trust, the Liquidation Trust or otherwise, and such Administrative Claim shall be deemed discharged and released as of the Effective Date.

(b)      Professional Claims Bar Date

Holders of Professional Claims shall file any request for allowance and payment of Professional Claims by the Professional Claims Bar Date or otherwise be forever barred, estopped, and enjoined from asserting such Claims against the Debtors, the Liquidating Debtors, the Reorganizing Debtors, the Reorganized Debtors and their respective Estates and property, the Plan Administrator, the Distribution Trust, the Liquidation Trust or otherwise, and such Professional Claim shall be deemed discharged as of the Effective Date.  For the avoidance of doubt, Allowed Professional Claims against the Debtors shall be paid from the Professional Claims Reserve after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and prior Bankruptcy Court orders.

(c)      U.S. Trustee Fees

All fees payable pursuant to 28 U.S.C. § 1930(a) shall be paid by the applicable Debtor, or the Plan Administrator (for and on behalf of the Distribution Trust and/or Liquidation Trust, as applicable), as the case may be, for each quarter (including any fraction therein) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first. For the avoidance of doubt, all fees payable pursuant to 28 U.S.C. § 1930(a) incurred on or before the Effective Date shall be paid from Cash being held by the Debtors on the Effective

Date.  All fees payable pursuant to 28 U.S.C. § 1930(a) incurred after the Effective Date shall be paid in Cash from the Reorganizing Debtors Wind-Down Costs Reserve or the Liquidating Debtors Wind-Down Costs Reserve, as the case may be.

**Section 6.03.  Priority Tax Claims**

To the extent not previously paid during the Chapter 11 Cases, unless the holder agrees to a different treatment each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release and discharge of such Claim, an amount of Cash equal to the amount of such Allowed Priority Tax Claim on the later of: (a) the Effective Date; or (b) the date such Priority Tax Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.  For the avoidance of doubt, Allowed Priority Tax Claims against the Debtors shall be paid in Cash solely from the Reorganizing Debtors Claims Reserve or the Liquidating Debtors Claims Reserve, as the case may be, subject to the provisions of the Plan, the Distribution Trust Agreement and/or the Liquidation Trust Agreement.

## ARTICLE VII

## CLASSIFICATION AND TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN REORGANIZING DEBTORS

The Plan distinguishes between two categories of Debtors: the Reorganizing Debtors on the one hand, and the Liquidating Debtors on the other.  The classification and treatment of Claims against and Equity Interests in the Reorganizing Debtors is contained in ARTICLE III of the Plan.  For the avoidance of doubt, unless otherwise specified in ARTICLE III of the Plan, any holder of a Claim or Claims against or Equity Interests in any of the Reorganizing Debtors that is entitled to receive Cash on account of such Allowed Claim or Equity Interest under the Subplan for the applicable Reorganizing Debtor(s) shall be paid in Cash solely from the Reorganizing Debtors Claims Reserve, subject to the provisions of the Plan and the Distribution Trust Agreement, without recourse to (i) any other Asset of the Distribution Trust or (ii) the Reorganizing Debtors, the Reorganized Debtors, the Liquidating Debtors, the Liquidation Trust, the Plan Administrator, or any of their property or Assets.  In the event no holder of a Claim with respect to a specific Class for a particular Debtor timely submits a Ballot that complies with the Disclosure Statement Order indicating acceptance or rejection of the Plan, such Class will be deemed to have accepted the Plan (including for purposes of satisfying section 1129(a)(10) of the Bankruptcy Code).  FURTHER, ANY HOLDER OF A CLAIM OR CLAIMS AGAINST ANY OF THE REORGANIZING DEBTORS WHO REJECTS THE PLAN AND OPTS OUT OF THE RELEASES DESCRIBED IN SECTION 12.03 OF THE PLAN WILL NOT RECEIVE ANY DISTRIBUTIONS UNDER THE SUBPLAN(S) FOR THE APPLICABLE REORGANIZING DEBTOR(S).

**Section 7.01.  Classification**

The Plan constitutes a separate Subplan with respect to each Reorganizing Debtor.  The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, confirmation and distribution pursuant to any Subplan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Equity Interest shall be

deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

Holders of Allowed Other Secured Claims against the Reorganizing Debtors shall receive Post-Petition Interest required to be paid under section 506(b) of the Bankruptcy Code (if any) on account of such Allowed Claims. Holders of Allowed Other Priority Claims against the Reorganizing Debtors shall receive Post-Petition Interest on account of such Allowed Claims.

Claims against (other than those listed in ARTICLE II of the Plan, which are not required to be classified pursuant to section 1123(a)(1) of the Bankruptcy Code) and Equity Interests in the Reorganizing Debtors are classified as follows:

(a)    Subplan OG: Claims Against and Equity Interests in Optim Generation

| Class | Claim or Equity Interest | Status | Voting Rights |
|-------|--------------------------|--------|---------------|
| OG 1 | Allowed Pre-Petition Secured Parties Secured Claims | Impaired | Entitled to Vote |
| OG 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| OG 3 | Other Priority Claims | Unimpaired | Deemed to Accept |
| OG 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| OG 5 | Equity Interests | Impaired | Deemed to Reject |

(b)    Subplan CB: Claims Against and Equity Interests in Cedar Bayou

| Class | Claim or Equity Interest | Status | Voting Rights |
|-------|--------------------------|--------|---------------|
| CB 1 | Allowed Pre-Petition Secured Parties Secured Claims | Impaired | Entitled to Vote |
| CB 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| CB 3 | Other Priority Claims | Unimpaired | Deemed to Accept |
| CB 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| CB 5 | Equity Interests | Unimpaired | Deemed to Accept |

(c)    Subplan AC: Claims Against and Equity Interests in Altura Cogen

| Class | Claim or Equity Interest | Status | Voting Rights |
|-------|--------------------------|--------|---------------|
| AC 1 | Allowed Pre-Petition Secured Parties Secured Claims | Impaired | Entitled to Vote |
| AC 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| AC 3 | Other Priority Claims | Unimpaired | Deemed to Accept |
| AC 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| AC 5 | Equity Interests | Unimpaired | Deemed to Accept |

**Section 7.02.   Subplan OG: Treatment of Claims Against and Equity Interests in Optim Generation**

(a)      Class OG 1—Allowed Pre-Petition Secured Parties Secured Claims

(i)      *Allowance*: The Class OG 1 Allowed Pre-Petition Secured Parties Secured Claims against Optim Generation have been deemed Allowed against Optim Generation pursuant to the terms of the Final DIP Order.

(ii)     *Treatment*: The holders of Class OG 1 Allowed Pre-Petition Secured Parties Secured Claims against Optim Generation shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, their Allowed Claims, either:

a.   In the event the Sale closes by September 30, 2015 at or above the Reserve Price on terms satisfactory to the Debtors and the Consultation Parties, (x) the Effective Date Class OG 1 Distributable Cash, on the Effective Date; (y) the residual Cash in the Reorganizing Debtors Wind-Down Costs Reserve, if any, following payment of all amounts budgeted for thereunder; and (z) the residual Distribution Trust Assets, if any, following dissolution of the Distribution Trust in accordance with Section 6.08(j) of the Plan; or

b.   In the event the Debtors do not receive a Qualifying Bid by the Bid Deadline (both as defined in the Bidding Procedures) or the Sale does not close as prescribed in Section 3.02(a)(ii)a of the Plan, (x) the Reorganized OEG Equity Interests, on the Effective Date; (y) the residual Cash in the Reorganizing Debtors Wind-Down Costs Reserve, if any, following payment of all amounts budgeted for thereunder; and (z) the residual Distribution Trust Assets, if any, following dissolution of the Distribution Trust in accordance with Section 6.08(j) of the Plan.

(iii)    *Voting*: Class OG 1 is Impaired.  The holders of the Class OG 1 Allowed Pre-Petition Secured Parties Secured Claims against Optim Generation are entitled to vote to accept or reject the Subplan for Optim Generation.

(b)      Class OG 2—Other Secured Claims

(i)      *Treatment*: Unless the holder agrees to a different treatment, each holder of a Class OG 2 Allowed Other Secured Claim against Optim Generation shall receive, in Optim Generation's sole discretion and in full and final satisfaction, release, settlement and discharge of, and in exchange for, such holder's Allowed Other Secured Claim, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court:

a. Cash equal to the amount of such Allowed Other Secured Claim plus Post-Petition Interest required to be paid under section 506(b) of the Bankruptcy Code (if any), payable solely from the Reorganized Debtors Claims Reserve subject to the provisions of the Plan and the Distribution Trust Agreement;

b. Reinstatement of the legal, equitable and contractual rights of the holder of such Allowed Other Secured Claim, subject to the provisions of the Subplan for Optim Generation;

c. the Collateral securing such Allowed Other Secured Claim plus Post-Petition Interest required to be paid under section 506(b) of the Bankruptcy Code (if any); or

d. such other treatment as necessary to satisfy the requirements of section 1124(2) of the Bankruptcy Code for such Allowed Other Secured Claim to be rendered Unimpaired.

(ii)  *Voting*: Class OG 2 is Unimpaired.  The holders of Class OG 2 Allowed Other Secured Claims against Optim Generation are conclusively deemed to accept the Subplan for Optim Generation pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(c)  Class OG 3—Other Priority Claims

(i)  *Treatment*: Unless the holder agrees to a different treatment, each holder of a Class OG 3 Allowed Other Priority Claim against Optim Generation shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, Cash equal to the amount of such Allowed Claim plus Post-Petition Interest, payable solely from the Reorganized Debtors Claims Reserve subject to the provisions of the Plan and the Distribution Trust Agreement, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.

(ii)  *Voting*: Class OG 3 is Unimpaired.  The holders of Class OG 3 Allowed Other Priority Claims against Optim Generation are conclusively deemed to accept the Subplan for Optim Generation pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(d)  Class OG 4—General Unsecured Claims

(i)  *Treatment*: Unless the holder agrees to a different treatment, each holder of a Class OG 4 Allowed General Unsecured Claim against Optim Generation (other than a holder of a Class OG 4 Allowed Pre-Petition Secured Parties Deficiency Claim against Optim Generation) shall receive, in full and final

satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, Cash equal to the amount of such Allowed Claim, payable solely from the Reorganized Debtors Claims Reserve subject to the provisions of the Plan and the Distribution Trust Agreement, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court. For the avoidance of doubt, in consideration for the Class OG 1—Allowed Pre-Petition Secured Parties Secured Claims treatment in Section 3.02(a)(ii) of the Plan, the holders of Class OG 4 Allowed Pre-Petition Secured Parties Deficiency Claims against Optim Generation have agreed to waive and withdraw such Claims on the Effective Date.

(ii)  *Voting*: Class OG 4 is Impaired. The holders of Class OG 4 Allowed General Unsecured Claims against Optim Generation are entitled to vote to accept or reject the Subplan for Optim Generation.

(e)  <u>Class OG 5—Equity Interests</u>

(i)  *Treatment*: On the Effective Date, the Class OG 5 Equity Interests in Optim Generation shall be cancelled, extinguished and discharged; and either (x) the Purchaser shall receive 100% of the Reorganized OEG Equity Interests if the Sale closes as prescribed in Section 3.02(a)(ii)a of the Plan; or (y) the Pre-Petition Secured Parties (or their nominee) shall receive 100% of the Reorganized OEG Equity Interests if the Sale does not close as prescribed in Section 3.02(a)(ii)a of the Plan.

(ii)  *Voting*: Class OG 5 is Impaired. The holders of the Equity Interests in Optim Generation are conclusively deemed to reject the Subplan for Optim Generation pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

**Section 7.03. Subplan CB: Treatment of Claims Against and Equity Interests in Cedar Bayou**

(a)  <u>Class CB 1—Allowed Pre-Petition Secured Parties Secured Claims</u>

(i)  *Allowance*: The Class CB 1 Allowed Pre-Petition Secured Parties Secured Claims against Cedar Bayou have been deemed Allowed against Cedar Bayou pursuant to the terms of the Final DIP Order.

(ii)  *Treatment*: On the Effective Date, the holders of Class CB 1 Allowed Pre-Petition Secured Parties Secured Claims against Cedar Bayou shall release, settle and discharge their Class CB 1 Allowed Pre-Petition Secured Parties Secured Claims against Cedar Bayou in consideration for the Class OG 1—Allowed Pre-Petition Secured Parties Secured Claims treatment in Section 3.02(a)(ii) of the Plan.

-44-

(iii)  *Voting*: Class CB 1 is Impaired.  The holders of the Class CB 1 Allowed Pre-Petition Secured Parties Secured Claims against Cedar Bayou are entitled to vote to accept or reject the Subplan for Cedar Bayou.

(b)  Class CB 2—Other Secured Claims

(i)  *Treatment*: Unless the holder agrees to a different treatment, each holder of a Class CB 2 Allowed Other Secured Claim against Cedar Bayou shall receive, in Cedar Bayou's sole discretion and in full and final satisfaction, release, settlement and discharge of, and in exchange for, such holder's Allowed Other Secured Claim, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court:

a.  Cash equal to the amount of such Allowed Other Secured Claim plus Post-Petition Interest required to be paid under section 506(b) of the Bankruptcy Code (if any), payable solely from the Reorganized Debtors Claims Reserve subject to the provisions of the Plan and the Distribution Trust Agreement;

b.  Reinstatement of the legal, equitable and contractual rights of the holder of such Allowed Other Secured Claim, subject to the provisions of the Subplan for Cedar Bayou;

c.  the Collateral securing such Allowed Other Secured Claim plus Post-Petition Interest required to be paid under section 506(b) of the Bankruptcy Code (if any); or

d.  such other treatment as necessary to satisfy the requirements of section 1124(2) of the Bankruptcy Code for such Allowed Other Secured Claim to be rendered Unimpaired.

(ii)  *Voting*: Class CB 2 is Unimpaired.  The holders of Class CB 2 Allowed Other Secured Claims against Cedar Bayou are conclusively deemed to accept the Subplan for Cedar Bayou pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(c)  Class CB 3—Other Priority Claims

(i)  *Treatment*: Unless the holder agrees to a different treatment, each holder of a Class CB 3 Allowed Other Priority Claim against Cedar Bayou shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, Cash equal to the amount of such Allowed Claim plus Post-Petition Interest, payable solely from the Reorganized Debtors Claims Reserve subject to the provisions of the Plan and the Distribution Trust Agreement, on the later of: (x) the Effective

-45-

Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.

    (ii)   *Voting*: Class CB 3 is Unimpaired.  The holders of Class CB 3 Allowed Other Priority Claims against Cedar Bayou are conclusively deemed to accept the Subplan for Cedar Bayou pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(d)    <u>Class CB 4—General Unsecured Claims</u>

    (i)   *Treatment*: Unless the holder agrees to a different treatment each holder of a Class CB 4 Allowed General Unsecured Claim against Cedar Bayou (other than a holder of a Class CB 4 Allowed Pre-Petition Secured Parties Deficiency Claim against Cedar Bayou) shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, Cash equal to the amount of such Allowed Claim, payable solely from the Reorganized Debtors Claims Reserve subject to the provisions of the Plan and the Distribution Trust Agreement, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court. For the avoidance of doubt, in consideration for the Class OG 1—Allowed Pre-Petition Secured Parties Secured Claims treatment in Section 3.02(a)(ii) of the Plan, the holders of Class CB 4 Allowed Pre-Petition Secured Parties Deficiency Claims against Cedar Bayou have agreed to waive and withdraw such Claims on the Effective Date.

    (ii)   *Voting*: Class CB 4 is Impaired.  The holders of Class CB 4 Allowed General Unsecured Claims against Cedar Bayou are entitled to vote to accept or reject the Subplan for Cedar Bayou.

(e)    <u>Class CB 5—Equity Interests</u>

    (i)   *Treatment*: On the Effective Date, the legal, equitable and contractual rights of the holders of the Class CB 5 Equity Interests shall be reinstated and otherwise unaltered by the Subplan for Cedar Bayou.  Class CB 5 Equity Interests are Unimpaired solely to preserve the Reorganized Debtors' corporate structure, and holders of those Equity Interests shall not otherwise receive or retain any property on account of such Equity Interests.

    (ii)   *Voting*: Class CB 5 is Unimpaired.  The holders of the Equity Interests in Cedar Bayou are conclusively deemed to accept the Subplan for Cedar Bayou pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

**Section 7.04.  Subplan AC: Treatment of Claims Against and Equity Interests in Altura Cogen**

(a)    <u>Class AC 1—Allowed Pre-Petition Secured Parties Secured Claims</u>

   (i)    *Allowance*: The Class AC 1 Allowed Pre-Petition Secured Parties Secured Claims against Altura Cogen have been deemed Allowed against Altura Cogen pursuant to the terms of the Final DIP Order.

   (ii)    *Treatment*: On the Effective Date, the holders of Class AC 1 Allowed Pre-Petition Secured Parties Secured Claims against Altura Cogen shall release, settle and discharge their Class AC 1 Allowed Pre-Petition Secured Parties Secured Claims against Altura Cogen in consideration for the Class OG 1—Allowed Pre-Petition Secured Parties Secured Claims treatment in Section 3.02(a)(ii) of the Plan.

   (iii)    *Voting*: Class AC 1 is Impaired.  The holders of the Class AC 1 Allowed Pre-Petition Secured Parties Secured Claims against Altura Cogen are entitled to vote to accept or reject the Subplan for Altura Cogen.

(b)    <u>Class AC 2—Other Secured Claims</u>

   (i)    *Treatment*: Unless the holder agrees to a different treatment, each holder of a Class AC 2 Allowed Other Secured Claim against Altura Cogen shall receive, in Altura Cogen's sole discretion and in full and final satisfaction, release, settlement and discharge of, and in exchange for, such holder's Allowed Other Secured Claim, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court:

      a.    Cash equal to the amount of such Allowed Other Secured Claim <u>plus</u> Post-Petition Interest required to be paid under section 506(b) of the Bankruptcy Code (if any), payable solely from the Reorganized Debtors Claims Reserve subject to the provisions of the Plan and the Distribution Trust Agreement;

      b.    Reinstatement of the legal, equitable and contractual rights of the holder of such Allowed Other Secured Claim, subject to the provisions of the Subplan for Altura Cogen;

      c.    the Collateral securing such Allowed Other Secured Claim <u>plus</u> Post-Petition Interest required to be paid under section 506(b) of the Bankruptcy Code (if any); or

      d.    such other treatment as necessary to satisfy the requirements of section 1124(2) of the Bankruptcy Code for such Allowed Other Secured Claim to be rendered Unimpaired.

(ii)  *Voting*: Class AC 2 is Unimpaired.  The holders of Class AC 2 Allowed Other Secured Claims against Altura Cogen are conclusively deemed to accept the Subplan for Altura Cogen pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(c)  Class AC 3—Other Priority Claims

(i)  *Treatment*: Unless the holder agrees to a different treatment, each holder of a Class AC 3 Allowed Other Priority Claim against Altura Cogen shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, Cash equal to the amount of such Allowed Claim <u>plus</u> Post-Petition Interest, payable solely from the Reorganized Debtors Claims Reserve subject to the provisions of the Plan and the Distribution Trust Agreement, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.

(ii)  *Voting*: Class AC 3 is Unimpaired.  The holders of Class AC 3 Allowed Other Priority Claims against Altura Cogen are conclusively deemed to accept the Subplan for Altura Cogen pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(d)  Class AC 4—General Unsecured Claims

(i)  *Treatment*: Unless the holder agrees to a different treatment each holder of a Class AC 4 Allowed General Unsecured Claim against Altura Cogen (other than a holder of a Class AC 4 Allowed Pre-Petition Secured Parties Deficiency Claim against Altura Cogen) shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, Cash equal to the amount of such Allowed Claim, payable solely from the Reorganized Debtors Claims Reserve subject to the provisions of the Plan and the Distribution Trust Agreement, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court. For the avoidance of doubt, in consideration for the Class OG 1—Allowed Pre-Petition Secured Parties Secured Claims treatment in Section 3.02(a)(ii) of the Plan, the holders of Class AC 4 Allowed Pre-Petition Secured Parties Deficiency Claims against Altura Cogen have agreed to waive and withdraw such Claims on the Effective Date.

(ii)  *Voting*: Class AC 4 is Impaired.  The holders of Class AC 4 Allowed General Unsecured Claims against Altura Cogen are entitled to vote to accept or reject the Subplan for Altura Cogen.

(e)    Class AC 5—Equity Interests

(i)    *Treatment*: On the Effective Date, the legal, equitable and contractual rights of the holders of the Class AC 5 Equity Interests shall be reinstated and are unaltered by the Subplan for Altura Cogen.  Class AC 5 Equity Interests are Unimpaired solely to preserve the Reorganized Debtors' corporate structure, and holders of those Equity Interests shall not otherwise receive or retain any property on account of such Equity Interests.

(ii)    *Voting*: Class AC 5 is Unimpaired.  The holders of the Equity Interests in Altura Cogen are conclusively deemed to accept the Subplan for Altura Cogen pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

# ARTICLE VIII

## CLASSIFICATION AND TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN LIQUIDATING DEBTORS

The classification and treatment of Claims against and Equity Interests in the Liquidating Debtors is contained in ARTICLE IV of the Plan.  For the avoidance of doubt, unless otherwise specified in ARTICLE IV of the Plan, any holder of a Claim or Claims against or Equity Interests in any of the Liquidating Debtors that is entitled to receive Cash on account of such Allowed Claim or Equity Interest under the Subplan for the applicable Liquidating Debtor(s) shall be paid in Cash solely from the Liquidating Debtors Claims Reserve, subject to the provisions of the Plan and the Liquidation Trust Agreement, without recourse to (i) any other Asset of the Liquidation Trust or (ii) the Reorganizing Debtors, the Reorganized Debtors, the Liquidating Debtors, the Distribution Trust, the Plan Administrator, or any of their property or Assets.  In the event no holder of a Claim with respect to a specific Class for a particular Debtor timely submits a Ballot that complies with the Disclosure Statement Order indicating acceptance or rejection of the Plan, such Class will be deemed to have accepted the Plan (including for purposes of satisfying section 1129(a)(10) of the Bankruptcy Code).  ANY HOLDER OF A CLAIM OR CLAIMS AGAINST ANY OF THE LIQUIDATING DEBTORS WHO REJECTS THE PLAN AND OPTS OUT OF THE RELEASES DESCRIBED IN SECTION 12.03 OF THE PLAN WILL NOT RECEIVE ANY DISTRIBUTIONS UNDER THE SUBPLAN(S) FOR THE APPLICABLE LIQUIDATING DEBTOR(S).

## Section 8.01.  Classification

The Plan constitutes a separate Subplan with respect to each Liquidating Debtor.  The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, confirmation and distribution pursuant to any Subplan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of

such different Class.  A Claim or Equity Interest is in a particular Class only to extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

Holders of Allowed Other Secured Claims against the Liquidating Debtors shall receive Post-Petition Interest required to be paid under section 506(b) of the Bankruptcy Code (if any) on account of such Allowed Claims.

Claims against (other than those listed in ARTICLE II of the Plan, which are not required to be classified pursuant to section 1123(a)(1) of the Bankruptcy Code) and Equity Interests in the Liquidating Debtors are classified as follows:

(a)      Subplan OE: Claims Against and Equity Interests in Optim Energy

| Class | Claim or Equity Interest | Status | Voting Rights |
|---|---|---|---|
| OE 1 | Allowed Pre-Petition Secured Parties Secured Claims | Impaired | Entitled to Vote |
| OE 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| OE 3 | Other Priority Claims | Unimpaired | Deemed to Accept |
| OE 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| OE 5 | Convenience Class Claims | Impaired | Entitled to Vote |
| OE 6 | Walnut Creek Claims | Impaired | Entitled to Vote |
| OE 7 | Subordinated Claims | Impaired | Deemed to Reject |
| OE 8 | Equity Interests | Impaired | Deemed to Reject |

(b)      Subplan OM: Claims Against and Equity Interests in Optim Marketing

| Class | Claim or Equity Interest | Status | Voting Rights |
|---|---|---|---|
| OM 1 | Allowed Pre-Petition Secured Parties Secured Claims | Impaired | Entitled to Vote |
| OM 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| OM 3 | Other Priority Claims | Unimpaired | Deemed to Accept |
| OM 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| OM 5 | Subordinated Claims | Impaired | Deemed to Reject |
| OM 6 | Equity Interests | Impaired | Deemed to Reject |

(c)      Subplan OEM: Claims Against and Equity Interests in OEM

| Class | Claim or Equity Interest | Status | Voting Rights |
|---|---|---|---|
| OEM 1 | Allowed Pre-Petition Secured Parties Secured Claims | Impaired | Entitled to Vote |
| OEM 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| OEM 3 | Other Priority Claims | Unimpaired | Deemed to Accept |
| OEM 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| OEM 5 | Subordinated Claims | Impaired | Deemed to Reject |
| OEM 6 | Equity Interests | Impaired | Deemed to Reject |

(d)    Subplan TOGP: Claims Against and Equity Interests in Twin Oaks GP

| Class | Claim or Equity Interest | Status | Voting Rights |
|-------|--------------------------|--------|---------------|
| TOGP 1 | Allowed Pre-Petition Secured Parties Secured Claims | Impaired | Entitled to Vote |
| TOGP 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| TOGP 3 | Other Priority Claims | Unimpaired | Deemed to Accept |
| TOGP 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| TOGP 5 | Subordinated Claims | Impaired | Deemed to Reject |
| TOGP 6 | Equity Interests | Impaired | Deemed to Reject |

(e)    Subplan TOLP: Claims Against and Equity Interests in Twin Oaks LP

| Class | Claim or Equity Interest | Status | Voting Rights |
|-------|--------------------------|--------|---------------|
| TOLP 1 | Allowed Pre-Petition Secured Parties Secured Claims | Impaired | Entitled to Vote |
| TOLP 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| TOLP 3 | Other Priority Claims | Unimpaired | Deemed to Accept |
| TOLP 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| TOLP 5 | Convenience Class Claims | Impaired | Entitled to Vote |
| TOLP 6 | Walnut Creek Claims | Impaired | Entitled to Vote |
| TOLP 7 | Subordinated Claims | Impaired | Deemed to Reject |
| TOLP 8 | Equity Interests | Impaired | Deemed to Reject |

## Section 8.02.  Subplan OE: Treatment of Claims Against and Equity Interests in Optim Energy

(a)    Class OE 1—Allowed Pre-Petition Secured Parties Secured Claims

(i)    *Allowance*: The Class OE 1 Allowed Pre-Petition Secured Parties Secured Claims against Optim Energy have been deemed Allowed against Optim Energy pursuant to the terms of the Final DIP Order.

(ii)    *Treatment*: The holders of Class OE 1 Allowed Pre-Petition Secured Parties Secured Claims against Optim Energy shall receive the following, in full and final satisfaction, release, settlement and discharge of, and in exchange for, their Allowed Claims: (x) the Effective Date Class OE 1 Distributable Cash, on the Effective Date; (y) the residual Cash in the Liquidating Debtors Wind-Down Costs Reserve, if any, following payment of all amounts budgeted for thereunder; and (z) the residual Liquidation Trust Assets, if any, following dissolution of the Liquidation Trust in accordance with Section 7.05(j) of the Plan.

(iii)    *Voting*: Class OE 1 is Impaired.  The holders of the Class OE 1 Allowed Pre-Petition Secured Parties Secured Claims against Optim Energy are entitled to vote to accept or reject the Subplan for Optim Energy.

(b)      Class OE 2—Other Secured Claims

    (i)    *Treatment*: Unless the holder agrees to a different treatment, each holder of a Class OE 2 Allowed Other Secured Claim against Optim Energy shall receive, in Optim Energy's sole discretion and in full and final satisfaction, release, settlement and discharge of, and in exchange for, such holder's Allowed Other Secured Claim, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court:

        a.    Cash equal to the amount of such Allowed Other Secured Claim <u>plus</u> Post-Petition Interest required to be paid under section 506(b) of the Bankruptcy Code (if any), payable solely from the Liquidating Debtors Claims Reserve subject to the provisions of the Plan and the Liquidation Trust Agreement;

        b.    Reinstatement of the legal, equitable and contractual rights of the holder of such Allowed Other Secured Claim, subject to the provisions of the Subplan for Optim Energy;

        c.    the Collateral securing such Allowed Other Secured Claim <u>plus</u> Post-Petition Interest required to be paid under section 506(b) of the Bankruptcy Code (if any); or

        d.    such other treatment as necessary to satisfy the requirements of section 1124(2) of the Bankruptcy Code for such Allowed Other Secured Claim to be rendered Unimpaired.

    (ii)    *Voting*: Class OE 2 is Unimpaired.  The holders of Class OE 2 Allowed Other Secured Claims against Optim Energy are conclusively deemed to accept the Subplan for Optim Energy pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(c)      Class OE 3—Other Priority Claims

    (i)    *Treatment*: Unless the holder agrees to a different treatment, each holder of a Class OE 3 Allowed Other Priority Claim against Optim Energy shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, Cash equal to the amount of such Allowed Claim, payable solely from the Liquidating Debtors Claims Reserve subject to the provisions of the Plan and the Liquidation Trust Agreement, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.

    (ii)    *Voting*: Class OE 3 is Unimpaired.  The holders of Class OE 3 Allowed Other Priority Claims against Optim Energy are conclusively deemed to

accept the Subplan for Optim Energy pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(d)    Class OE 4—General Unsecured Claims

(i)    *Treatment*: In the event that Class OE 4 votes to accept the Subplan for Optim Energy, unless the holder agrees to a different treatment each holder of a Class OE 4 Allowed General Unsecured Claim against Optim Energy (other than a holder of a Class OE 4 Allowed Pre-Petition Secured Parties Deficiency Claim against Optim Energy) shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, Cash equal to its Pro Rata share of $10,000.00 (not to exceed such holder's possible percentage recovery under Class OE 5), payable solely from the Liquidating Debtors Claims Reserve subject to the provisions of the Plan and the Liquidation Trust Agreement, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.  For the avoidance of doubt, in consideration for the Class OE 1—Allowed Pre-Petition Secured Parties Secured Claims treatment in Section 4.02(a)(ii) of the Plan, and in the event that Class OE 4 votes to accept the Subplan for Optim Energy, the holders of Class OE 4 Allowed Pre-Petition Secured Parties Deficiency Claims against Optim Energy have agreed to waive and withdraw such Claims on the Effective Date.

In the event that Class OE 4 does not vote to accept the Subplan for Optim Energy, on the Effective Date each holder of a Class OE 4 Allowed General Unsecured Claim against Optim Energy: (x) shall be enjoined from pursuing any Class OE 4 Allowed General Unsecured Claim against Optim Energy; and (y) shall not receive or retain any distribution on account of its Class OE 4 Allowed General Unsecured Claim under the Subplan for Optim Energy.

(ii)    *Voting*: Class OE 4 is Impaired.  The holders of Class OE 4 Allowed General Unsecured Claims against Optim Energy are entitled to vote to accept or reject the Subplan for Optim Energy.

(e)    Class OE 5—Convenience Class Claims

(i)    *Treatment*: In the event that Class OE 5 votes to accept the Subplan for Optim Energy, unless the holder agrees to a different treatment each holder of a Class OE 5 Allowed Convenience Class Claim against Optim Energy shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, Cash equal to its Pro Rata share of $1,393.00, payable solely from the Liquidating Debtors Claims Reserve subject to the provisions of the Plan and the Liquidation Trust Agreement,

on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.

In the event that Class OE 5 does not vote to accept the Subplan for Optim Energy, on the Effective Date each holder of a Class OE 5 Allowed Convenience Class Claim against Optim Energy: (x) shall be enjoined from pursuing any Class OE 5 Allowed Convenience Class Claim against Optim Energy; and (y) shall not receive or retain any distribution on account of its Class OE 5 Allowed Convenience Class Claim under the Subplan for Optim Energy.

(ii)     *Voting*: Class OE 5 is Impaired.  The holders of Class OE 5 Allowed Convenience Class Claims against Optim Energy are entitled to vote to accept or reject the Subplan for Optim Energy.

(f)     Class OE 6—Walnut Creek Claims

(i)     *Treatment*: In the event that Class OE 6 votes to accept the Subplan for Optim Energy, unless the holder agrees to a different treatment each holder of a Class OE 6 Allowed Walnut Creek Claim against Optim Energy shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, the Class TOLP 6— Allowed Walnut Creek Claims treatment in Section 4.06(f)(i) of the Plan.

In the event that Class OE 6 does not vote to accept the Subplan for Optim Energy, on the Effective Date each holder of a Class OE 6 Allowed Walnut Creek Claim against Optim Energy: (x) shall be enjoined from pursuing any Class OE 6 Allowed Walnut Creek Claim against Optim Energy; and (y) shall not receive or retain any distribution on account of its Class OE 6 Allowed Walnut Creek Claim under the Subplan for Optim Energy.

(ii)     *Voting*: Class OE 6 is Impaired.  The holders of Class OE 6 Allowed Walnut Creek Claims against Optim Energy are entitled to vote to accept or reject the Subplan for Optim Energy.

(g)     Class OE 7—Subordinated Claims

(i)     *Allowance*: A Subordinated Claim (if any) against Optim Energy may only become Allowed by Final Order of the Bankruptcy Court.

(ii)     *Treatment*: On the Effective Date, each holder of a Class OE 7 Allowed Subordinated Claim against Optim Energy: (x) shall be enjoined from pursuing any Class OE 7 Subordinated Claim against Optim Energy; and (y) shall not receive or retain any distribution on account of its Class OE 7 Subordinated Claim under the Subplan for Optim Energy.

(iii)     *Voting*: Class OE 7 is Impaired.  The holders of Class OE 7 Allowed Subordinated Claims against Optim Energy are conclusively deemed to

reject the Subplan for Optim Energy pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(h)    Class OE 8—Equity Interests

(i)    *Treatment*: On the Effective Date, the Class OE 8 Equity Interests in Optim Energy shall be cancelled, extinguished and discharged and each holder thereof shall not receive or retain any distribution on account of its Class OE 8 Equity Interests under the Subplan for Optim Energy.

(ii)    *Voting*: Class OE 8 is Impaired.  The holders of the Equity Interests in Optim Energy are conclusively deemed to reject the Subplan for Optim Energy pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

**Section 8.03.  Subplan OM: Treatment of Claims Against and Equity Interests in Optim Marketing**

(a)    Class OM 1—Allowed Pre-Petition Secured Parties Secured Claims

(i)    *Allowance*: The Class OM 1 Allowed Pre-Petition Secured Parties Secured Claims against Optim Marketing have been deemed Allowed against Optim Marketing pursuant to the terms of the Final DIP Order.

(ii)    *Treatment*: On the Effective Date, the holders of Class OM 1 Allowed Pre-Petition Secured Parties Secured Claims against Optim Marketing shall release, settle and discharge their Class OM 1—Allowed Pre-Petition Secured Parties Secured Claims against Optim Marketing in consideration for the Class OE 1—Allowed Pre-Petition Secured Parties Secured Claims treatment in Section 4.02(a)(ii) of the Plan.

(iii)    *Voting*: Class OM 1 is Impaired.  The holders of the Class OM 1 Allowed Pre-Petition Secured Parties Secured Claims against Optim Marketing are entitled to vote to accept or reject the Subplan for Optim Marketing.

(b)    Class OM 2—Other Secured Claims

(i)    *Treatment*: Unless the holder agrees to a different treatment, each holder of a Class OM 2 Allowed Other Secured Claim against Optim Marketing shall receive, in Optim Marketing's sole discretion and in full and final satisfaction, release, settlement and discharge of, and in exchange for, such holder's Allowed Other Secured Claim, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court:

a.    Cash equal to the amount of such Allowed Other Secured Claim plus Post-Petition Interest required to be paid under section 506(b) of the

Bankruptcy Code (if any), payable solely from the Liquidating Debtors Claims Reserve subject to the provisions of the Plan and the Liquidation Trust Agreement;

b.  Reinstatement of the legal, equitable and contractual rights of the holder of such Allowed Other Secured Claim, subject to the provisions of the Subplan for Optim Marketing;

c.  the Collateral securing such Allowed Other Secured Claim plus Post-Petition Interest required to be paid under section 506(b) of the Bankruptcy Code (if any); or

d.  such other treatment as necessary to satisfy the requirements of section 1124(2) of the Bankruptcy Code for such Allowed Other Secured Claim to be rendered Unimpaired.

(ii)  *Voting*: Class OM 2 is Unimpaired.  The holders of Class OM 2 Allowed Other Secured Claims against Optim Marketing are conclusively deemed to accept the Subplan for Optim Marketing pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(c)  Class OM 3—Other Priority Claims

(i)  *Treatment*: Unless the holder agrees to a different treatment, each holder of a Class OM 3 Allowed Other Priority Claim against Optim Marketing shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, Cash equal to the amount of such Allowed Claim, payable solely from the Liquidating Debtors Claims Reserve subject to the provisions of the Plan and the Liquidation Trust Agreement, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.

(ii)  *Voting*: Class OM 3 is Unimpaired.  The holders of Class OM 3 Allowed Other Priority Claims against Optim Marketing are conclusively deemed to accept the Subplan for Optim Marketing pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(d)  Class OM 4—General Unsecured Claims

(i)  *Treatment*: In the event that Class OM 4 votes to accept the Subplan for Optim Marketing, unless the holder agrees to a different treatment each holder of a Class OM 4 Allowed General Unsecured Claim against Optim Marketing (other than a holder of a Class OM 4 Allowed Pre-Petition Secured Parties Deficiency Claim against Optim Marketing) shall receive, in full and final satisfaction, release, settlement and discharge of, and in

exchange for, its Allowed Claim, Cash equal to its Pro Rata share of $10,000.00, payable solely from the Liquidating Debtors Claims Reserve subject to the provisions of the Plan and the Liquidation Trust Agreement, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court. For the avoidance of doubt, in consideration for the Class OE 1—Allowed Pre-Petition Secured Parties Secured Claims treatment in Section 4.02(a)(ii) of the Plan, and in the event that Class OM 4 votes to accept the Subplan for Optim Marketing, the holders of Class OM 4 Allowed Pre-Petition Secured Parties Deficiency Claims against Optim Marketing have agreed to waive and withdraw such Claims on the Effective Date.

In the event that Class OM 4 does not vote to accept the Subplan for Optim Marketing, on the Effective Date each holder of a Class OM 4 Allowed General Unsecured Claim against Optim Marketing: (x) shall be enjoined from pursuing any Class OM 4 Allowed General Unsecured Claim against Optim Marketing; and (y) shall not receive or retain any distribution on account of its Class OM 4 Allowed General Unsecured Claim under the Subplan for Optim Marketing.

(ii)  *Voting*: Class OM 4 is Impaired.  The holders of Class OM 4 Allowed General Unsecured Claims against Optim Marketing are entitled to vote to accept or reject the Subplan for Optim Marketing.

(e)  Class OM 5—Subordinated Claims

(i)  *Allowance*: A Subordinated Claim (if any) against Optim Marketing may only become Allowed by Final Order of the Bankruptcy Court.

(ii)  *Treatment*: On the Effective Date, each holder of a Class OM 5 Allowed Subordinated Claim against Optim Marketing: (x) shall be enjoined from pursuing any Class OM 5 Subordinated Claim against Optim Marketing; and (y) shall not receive or retain any distribution on account of its Class OM 5 Subordinated Claim under the Subplan for Optim Marketing.

(iii)  *Voting*: Class OM 5 is Impaired.  The holders of Class OM 5 Allowed Subordinated Claims against Optim Marketing are conclusively deemed to reject the Subplan for Optim Marketing pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(f)  Class OM 6—Equity Interests

(i)  *Treatment*: On the Effective Date, the Class OM 6 Equity Interests in Optim Marketing shall be cancelled, extinguished and discharged and each holder thereof shall not receive or retain any distribution on account of its Class OM 6 Equity Interests under the Subplan for Optim Marketing.

(ii) *Voting*: Class OM 6 is Impaired. The holders of the Equity Interests in Optim Marketing are conclusively deemed to reject the Subplan for Optim Marketing pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

**Section 8.04.   Subplan OEM: Treatment of Claims Against and Equity Interests in OEM**

(a)   Class OEM 1—Allowed Pre-Petition Secured Parties Secured Claims

   (i) *Allowance*: The Class OEM 1 Allowed Pre-Petition Secured Parties Secured Claims against OEM have been deemed Allowed against OEM pursuant to the terms of the Final DIP Order.

   (ii) *Treatment*: On the Effective Date, the holders of Class OEM 1 Allowed Pre-Petition Secured Parties Secured Claims against OEM shall release, settle and discharge their Class OEM 1—Allowed Pre-Petition Secured Parties Secured Claims against OEM in consideration for the Class OE 1—Allowed Pre-Petition Secured Parties Secured Claims treatment in Section 4.02(a)(ii) of the Plan.

   (iii) *Voting*: Class OEM 1 is Impaired. The holders of the Class OEM 1 Allowed Pre-Petition Secured Parties Secured Claims against OEM are entitled to vote to accept or reject the Subplan for OEM.

(b)   Class OEM 2—Other Secured Claims

   (i) *Treatment*: Unless the holder agrees to a different treatment, each holder of a Class OEM 2 Allowed Other Secured Claim against OEM shall receive, in OEM's sole discretion and in full and final satisfaction, release, settlement and discharge of, and in exchange for, such holder's Allowed Other Secured Claim, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court:

      a. Cash equal to the amount of such Allowed Other Secured Claim plus Post-Petition Interest required to be paid under section 506(b) of the Bankruptcy Code (if any), payable solely from the Liquidating Debtors Claims Reserve subject to the provisions of the Plan and the Liquidation Trust Agreement;

      b. Reinstatement of the legal, equitable and contractual rights of the holder of such Allowed Other Secured Claim, subject to the provisions of the Subplan for OEM;

      c. the Collateral securing such Allowed Other Secured Claim plus Post-Petition Interest required to be paid under section 506(b) of the Bankruptcy Code (if any); or

-58-

> d. such other treatment as necessary to satisfy the requirements of section 1124(2) of the Bankruptcy Code for such Allowed Other Secured Claim to be rendered Unimpaired.

> (ii) *Voting*: Class OEM 2 is Unimpaired. The holders of Class OEM 2 Allowed Other Secured Claims against OEM are conclusively deemed to accept the Subplan for OEM pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(c)   Class OEM 3—Other Priority Claims

> (i) *Treatment*: Unless the holder agrees to a different treatment, each holder of a Class OEM 3 Allowed Other Priority Claim against OEM shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, Cash equal to the amount of such Allowed Claim payable solely from the Liquidating Debtors Claims Reserve subject to the provisions of the Plan and the Liquidation Trust Agreement, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.

> (ii) *Voting*: Class OEM 3 is Unimpaired. The holders of Class OEM 3 Allowed Other Priority Claims against OEM are conclusively deemed to accept the Subplan for OEM pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(d)   Class OEM 4—General Unsecured Claims

> (i) *Treatment*: In the event that Class OEM 4 votes to accept the Subplan for OEM, unless the holder agrees to a different treatment each holder of a Class OEM 4 Allowed General Unsecured Claim against OEM (other than a holder of a Class OEM 4 Allowed Pre-Petition Secured Parties Deficiency Claim against OEM) shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, Cash equal to its Pro Rata share of $10,000.00, payable solely from the Liquidating Debtors Claims Reserve subject to the provisions of the Plan and the Liquidation Trust Agreement, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court. For the avoidance of doubt, in consideration for the Class OE 1—Allowed Pre-Petition Secured Parties Secured Claims treatment in Section 4.02(a)(ii) of the Plan, and in the event that Class OEM 4 votes to accept the Subplan for OEM, the holders of Class OEM 4 Allowed Pre-Petition Secured Parties Deficiency Claims against OEM have agreed to waive and withdraw such Claims on the Effective Date.

In the event that Class OEM 4 does not vote to accept the Subplan for OEM, on the Effective Date each holder of a Class OEM 4 Allowed General Unsecured Claim against OEM: (x) shall be enjoined from pursuing any Class OEM 4 Allowed General Unsecured Claim against OEM; and (y) shall not receive or retain any distribution on account of its Class OEM 4 Allowed General Unsecured Claim under the Subplan for OEM.

(ii)    *Voting*: Class OEM 4 is Impaired.  The holders of Class OEM 4 Allowed General Unsecured Claims against OEM are entitled to vote to accept or reject the Subplan for OEM.

(e)    Class OEM 5—Subordinated Claims

(i)    *Allowance*: A Subordinated Claim (if any) against OEM may only become Allowed by Final Order of the Bankruptcy Court.

(ii)    *Treatment*: On the Effective Date, each holder of a Class OEM 5 Allowed Subordinated Claim against OEM: (x) shall be enjoined from pursuing any Class OEM 5 Subordinated Claim against OEM; and (y) shall not receive or retain any distribution on account of its Class OEM 5 Subordinated Claim under the Subplan for OEM.

(iii)    *Voting*: Class OEM 5 is Impaired.  The holders of Class OEM 5 Allowed Subordinated Claims against OEM are conclusively deemed to reject the Subplan for OEM pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(f)    Class OEM 6—Equity Interests

(i)    *Treatment*: On the Effective Date, the Class OEM 6 Equity Interests in OEM shall be cancelled, extinguished and discharged and each holder thereof shall not receive or retain any distribution on account of its Class OEM 6 Equity Interests under the Subplan for OEM.

(ii)    *Voting*: Class OEM 6 is Impaired.  The holders of the Equity Interests in OEM are conclusively deemed to reject the Subplan for OEM pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

**Section 8.05.  Subplan TOGP: Treatment of Claims Against and Equity Interests in Twin Oaks GP**

(a)    Class TOGP 1—Allowed Pre-Petition Secured Parties Secured Claims

(i)    *Allowance*: The Class TOGP 1 Allowed Pre-Petition Secured Parties Secured Claims against Twin Oaks GP have been deemed Allowed against Twin Oaks GP pursuant to the terms of the Final DIP Order.

(ii)     *Treatment*: On the Effective Date, the holders of Class TOGP 1 Allowed Pre-Petition Secured Parties Secured Claims against Twin Oaks GP shall release, settle and discharge their Class TOGP 1—Allowed Pre-Petition Secured Parties Secured Claims against Twin Oaks GP in consideration for the Class OE 1—Allowed Pre-Petition Secured Parties Secured Claims treatment in Section 4.02(a)(ii) of the Plan.

(iii)    *Voting*: Class TOGP 1 is Impaired.  The holders of the Class TOGP 1 Allowed Pre-Petition Secured Parties Secured Claims against Twin Oaks GP are entitled to vote to accept or reject the Subplan for Twin Oaks GP.

(b)     <u>Class TOGP 2—Other Secured Claims</u>

(i)     *Treatment*: Unless the holder agrees to a different treatment, each holder of a Class TOGP 2 Allowed Other Secured Claim against Twin Oaks GP shall receive, in Twin Oaks GP's sole discretion and in full and final satisfaction, release, settlement and discharge of, and in exchange for, such holder's Allowed Other Secured Claim, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court:

a.   Cash equal to the amount of such Allowed Other Secured Claim <u>plus</u> Post-Petition Interest required to be paid under section 506(b) of the Bankruptcy Code (if any), payable solely from the Liquidating Debtors Claims Reserve subject to the provisions of the Plan and the Liquidation Trust Agreement;

b.   Reinstatement of the legal, equitable and contractual rights of the holder of such Allowed Other Secured Claim, subject to the provisions of the Subplan for Twin Oaks GP;

c.   the Collateral securing such Allowed Other Secured Claim <u>plus</u> Post-Petition Interest required to be paid under section 506(b) of the Bankruptcy Code (if any); or

d.   such other treatment as necessary to satisfy the requirements of section 1124(2) of the Bankruptcy Code for such Allowed Other Secured Claim to be rendered Unimpaired.

(ii)    *Voting*: Class TOGP 2 is Unimpaired.  The holders of Class TOGP 2 Allowed Other Secured Claims against Twin Oaks GP are conclusively deemed to accept the Subplan for Twin Oaks GP pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(c)  Class TOGP 3—Other Priority Claims

  (i)  *Treatment*: Unless the holder agrees to a different treatment, each holder of a Class TOGP 3 Allowed Other Priority Claim against Twin Oaks GP shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, Cash equal to the amount of such Allowed Claim, payable solely from the Liquidating Debtors Claims Reserve subject to the provisions of the Plan and the Liquidation Trust Agreement, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.

  (ii)  *Voting*: Class TOGP 3 is Unimpaired.  The holders of Class TOGP 3 Allowed Other Priority Claims against Twin Oaks GP are conclusively deemed to accept the Subplan for Twin Oaks GP pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(d)  Class TOGP 4—General Unsecured Claims

  (i)  *Treatment*: In the event that Class TOGP 4 votes to accept the Subplan for Twin Oaks GP, unless the holder agrees to a different treatment each holder of a Class TOGP 4 Allowed General Unsecured Claim against Twin Oaks GP (other than a holder of a Class TOGP 4 Allowed Pre-Petition Secured Parties Deficiency Claim against Twin Oaks GP) shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, Cash equal to its Pro Rata share of $10,000.00, payable solely from the Liquidating Debtors Claims Reserve subject to the provisions of the Plan and the Liquidation Trust Agreement, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.  For the avoidance of doubt, in consideration for the Class OE 1—Allowed Pre-Petition Secured Parties Secured Claims treatment in Section 4.02(a)(ii) of the Plan, and in the event that Class TOGP 4 votes to accept the Subplan for Twin Oaks GP, the holders of Class TOGP 4 Allowed Pre-Petition Secured Parties Deficiency Claims against Twin Oaks GP have agreed to waive and withdraw such Claims on the Effective Date.

  In the event that Class TOGP 4 does not vote to accept the Subplan for Twin Oaks GP, on the Effective Date each holder of a Class TOGP 4 Allowed General Unsecured Claim against Twin Oaks GP: (x) shall be enjoined from pursuing any Class TOGP 4 Allowed General Unsecured Claim against Twin Oaks GP; and (y) shall not receive or retain any distribution on account of its Class TOGP 4 Allowed General Unsecured Claim under the Subplan for Twin Oaks GP.

(ii)    *Voting*: Class TOGP 4 is Impaired.  The holders of Class TOGP 4 Allowed General Unsecured Claims against Twin Oaks GP are entitled to vote to accept or reject the Subplan for Twin Oaks GP.

(e)    <u>Class TOGP 5—Subordinated Claims</u>

(i)    *Allowance*: A Subordinated Claim (if any) against Twin Oaks GP may only become Allowed by Final Order of the Bankruptcy Court.

(ii)    *Treatment*: On the Effective Date, each holder of a Class TOGP 5 Allowed Subordinated Claim against Twin Oaks GP: (x) shall be enjoined from pursuing any Class TOGP 5 Subordinated Claim against Twin Oaks GP; and (y) shall not receive or retain any distribution on account of its Class TOGP 5 Subordinated Claim under the Subplan for Twin Oaks GP.

(iii)    *Voting*: Class TOGP 5 is Impaired.  The holders of Class TOGP 5 Allowed Subordinated Claims against Twin Oaks GP are conclusively deemed to reject the Subplan for Twin Oaks GP pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(f)    <u>Class TOGP 6—Equity Interests</u>

(i)    *Treatment*: On the Effective Date, the Class TOGP 6 Equity Interests in Twin Oaks GP shall be cancelled, extinguished and discharged and each holder thereof shall not receive or retain any distribution on account of its Class TOGP 6 Equity Interests under the Subplan for Twin Oaks GP.

(ii)    *Voting*: Class TOGP 6 is Impaired.  The holders of the Equity Interests in Twin Oaks GP are conclusively deemed to reject the Subplan for Twin Oaks GP pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

**Section 8.06.  Subplan TOLP: Treatment of Claims Against and Equity Interests in Twin Oaks LP**

(a)    <u>Class TOLP 1—Allowed Pre-Petition Secured Parties Secured Claims</u>

(i)    *Allowance*: The Class TOLP 1 Allowed Pre-Petition Secured Parties Secured Claims against Twin Oaks LP have been deemed Allowed against Twin Oaks LP pursuant to the terms of the Final DIP Order.

(ii)    *Treatment*: On the Effective Date, the holders of Class TOLP 1 Allowed Pre-Petition Secured Parties Secured Claims against Twin Oaks LP shall release, settle and discharge their Class TOLP 1—Allowed Pre-Petition Secured Parties Secured Claims against Twin Oaks LP in consideration for the Class OE 1—Allowed Pre-Petition Secured Parties Secured Claims treatment in Section 4.02(a)(ii) of the Plan.

(iii)    *Voting*: Class TOLP 1 is Impaired.  The holders of the Class TOLP 1 Allowed Pre-Petition Secured Parties Secured Claims against Twin Oaks LP are entitled to vote to accept or reject the Subplan for Twin Oaks LP.

(b)    Class TOLP 2—Other Secured Claims

(i)    *Treatment*: Unless the holder agrees to a different treatment, each holder of a Class TOLP 2 Allowed Other Secured Claim against Twin Oaks LP shall receive, in Twin Oaks LP's sole discretion and in full and final satisfaction, release, settlement and discharge of, and in exchange for, such holder's Allowed Other Secured Claim, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court:

   a.    Cash equal to the amount of such Allowed Other Secured Claim plus Post-Petition Interest required to be paid under section 506(b) of the Bankruptcy Code (if any), payable solely from the Liquidating Debtors Claims Reserve subject to the provisions of the Plan and the Liquidation Trust Agreement;

   b.    Reinstatement of the legal, equitable and contractual rights of the holder of such Allowed Other Secured Claim, subject to the provisions of the Subplan for Twin Oaks LP;

   c.    the Collateral securing such Allowed Other Secured Claim plus Post-Petition Interest required to be paid under section 506(b) of the Bankruptcy Code (if any); or

   d.    such other treatment as necessary to satisfy the requirements of section 1124(2) of the Bankruptcy Code for such Allowed Other Secured Claim to be rendered Unimpaired.

(ii)    *Voting*: Class TOLP 2 is Unimpaired.  The holders of Class TOLP 2 Allowed Other Secured Claims against Twin Oaks LP are conclusively deemed to accept the Subplan for Twin Oaks LP pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(c)    Class TOLP 3—Other Priority Claims

(i)    *Treatment*: Unless the holder agrees to a different treatment, each holder of a Class TOLP 3 Allowed Other Priority Claim against Twin Oaks LP shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, Cash equal to the amount of such Allowed Claim, payable solely from the Liquidating Debtors Claims Reserve subject to the provisions of the Plan and the Liquidation Trust Agreement, on the later of: (x) the Effective Date; or (y) the date such

Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.

(ii)     *Voting*: Class TOLP 3 is Unimpaired.  The holders of Class TOLP 3 Allowed Other Priority Claims against Twin Oaks LP are conclusively deemed to accept the Subplan for Twin Oaks LP pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(d)     Class TOLP 4—General Unsecured Claims

(i)     *Treatment*: In the event that Class TOLP 4 votes to accept the Subplan for Twin Oaks LP, unless the holder agrees to a different treatment each holder of a Class TOLP 4 Allowed General Unsecured Claim against Twin Oaks LP (other than a holder of a Class TOLP 4 Allowed Pre-Petition Secured Parties Deficiency Claim against Twin Oaks LP) shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, Cash equal to its Pro Rata share of $80,000.00, payable solely from the Liquidating Debtors Claims Reserve subject to the provisions of the Plan and the Liquidation Trust Agreement, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.  For the avoidance of doubt, in consideration for the Class OE 1—Allowed Pre-Petition Secured Parties Secured Claims treatment in Section 4.02(a)(ii) of the Plan, and in the event that Class TOLP 4 votes to accept the Subplan for Twin Oaks LP, the holders of Class TOLP 4 Allowed Pre-Petition Secured Parties Deficiency Claims against Twin Oaks LP have agreed to waive and withdraw such Claims on the Effective Date.

In the event that Class TOLP 4 does not vote to accept the Subplan for Twin Oaks LP, on the Effective Date each holder of a Class TOLP 4 Allowed General Unsecured Claim against Twin Oaks LP: (x) shall be enjoined from pursuing any Class TOLP 4 Allowed General Unsecured Claim against Twin Oaks LP; and (y) shall not receive or retain any distribution on account of its Class TOLP 4 Allowed General Unsecured Claim under the Subplan for Twin Oaks LP.

(ii)     *Voting*: Class TOLP 4 is Impaired.  The holders of Class TOLP 4 Allowed General Unsecured Claims against Twin Oaks LP are entitled to vote to accept or reject the Subplan for Twin Oaks LP.

(e)     Class TOLP 5—Convenience Class Claims

(i)     *Treatment*: In the event that Class TOLP 5 votes to accept the Subplan for Twin Oaks LP, unless the holder agrees to a different treatment each holder of a Class TOLP 5 Allowed Convenience Class Claim against Twin Oaks LP shall receive, in full and final satisfaction, release, settlement and

discharge of, and in exchange for, its Allowed Claim, Cash equal to its Pro Rata share of $80,000.00, payable solely from the Liquidating Debtors Claims Reserve subject to the provisions of the Plan and the Liquidation Trust Agreement, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.

In the event that Class TOLP 5 does not vote to accept the Subplan for Twin Oaks LP, on the Effective Date each holder of a Class TOLP 5 Allowed Convenience Class Claim against Twin Oaks LP: (x) shall be enjoined from pursuing any Class TOLP 5 Allowed Convenience Class Claim against Twin Oaks LP; and (y) shall not receive or retain any distribution on account of its Class TOLP 5 Allowed Convenience Class Claim under the Subplan for Twin Oaks LP.

(ii)   *Voting*: Class TOLP 5 is Impaired.  The holders of Class TOLP 5 Allowed Convenience Class Claims against Twin Oaks LP are entitled to vote to accept or reject the Subplan for Twin Oaks LP.

(f)   Class TOLP 6—Walnut Creek Claims

(i)   *Treatment*: In the event that Class TOLP 6 votes to accept the Subplan for Twin Oaks LP, unless the holder agrees to a different treatment each holder of a Class TOLP 6 Allowed Walnut Creek Claim against Twin Oaks LP shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, $80,000.00, payable solely from the Liquidating Debtors Claims Reserve subject to the provisions of the Plan and the Liquidation Trust Agreement, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.

In the event that Class TOLP 6 does not vote to accept the Subplan for Twin Oaks LP, on the Effective Date each holder of a Class TOLP 6 Allowed Walnut Creek Claim against Twin Oaks LP: (x) shall be enjoined from pursuing any Class TOLP 6 Allowed Walnut Creek Claim against Twin Oaks LP; and (y) shall not receive or retain any distribution on account of its Class TOLP 6 Allowed Walnut Creek Claim under the Subplan for Twin Oaks LP.

(ii)   *Voting*: Class TOLP 6 is Impaired.  The holders of Class TOLP 6 Allowed Walnut Creek Claims against Twin Oaks LP are entitled to vote to accept or reject the Subplan for Twin Oaks LP.

(g)   Class TOLP 7—Subordinated Claims

(i)   *Allowance*: A Subordinated Claim (if any) against Twin Oaks LP may only become Allowed by Final Order of the Bankruptcy Court.

(ii)     *Treatment*: On the Effective Date, each holder of a Class TOLP 7 Allowed Subordinated Claim against Twin Oaks LP: (x) shall be enjoined from pursuing any Class TOLP 7 Subordinated Claim against Twin Oaks LP; and (y) shall not receive or retain any distribution on account of its Class TOLP 7 Subordinated Claim under the Subplan for Twin Oaks LP.

(iii)    *Voting*: Class TOLP 7 is Impaired.  The holders of Class TOLP 7 Allowed Subordinated Claims against Twin Oaks LP are conclusively deemed to reject the Subplan for Twin Oaks LP pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(h)      Class TOLP 8—Equity Interests

(i)      *Treatment*: On the Effective Date, the Class TOLP 8 Equity Interests in Twin Oaks LP shall be cancelled, extinguished and discharged and each holder thereof shall not receive or retain any distribution on account of its Class TOLP 8 Equity Interests under the Subplan for Twin Oaks LP.

(ii)     *Voting*: Class TOLP 8 is Impaired.  The holders of the Equity Interests in Twin Oaks LP are conclusively deemed to reject the Subplan for Twin Oaks LP pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

## ARTICLE IX

## ACCEPTANCE OR REJECTION OF THE SUBPLANS

**Section 9.01.  Acceptance by an Impaired Class**

In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, Impaired Classes entitled to vote under a Subplan shall have accepted the applicable Subplan if it is accepted by the holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims that have timely and properly voted to accept or reject the Subplan.

**Section 9.02.  Nonconsensual Confirmation**

The Debtors may request confirmation under section 1129(b) of the Bankruptcy Code with respect to (a) any Impaired Class of Claims and Equity Interests that have not accepted a Subplan in accordance with sections 1126 and 1129(a)(8) of the Bankruptcy Code and (b) any Class that is deemed to reject the applicable Subplan pursuant to section 1126(g) of the Bankruptcy Code or the terms of the Subplan or otherwise.  The Debtors reserve the right, subject to the written approval of the Consultation Parties to amend or modify any Subplan in accordance with Section 13.01 of the Plan to the extent, if any, that Confirmation of the Subplan pursuant to section 1129(b) of the Bankruptcy Code requires such amendment or modification. If any Subplan(s) is not confirmed, then the Debtors reserve the right, subject to the written

approval of the Consultation Parties, to either (a) request that other Subplans be confirmed or (b) withdraw some or all Subplans.  The Debtors' inability to confirm or election to withdraw any Subplan(s) shall not impair the confirmation of any other Subplan(s).

**Section 9.03.  Limited Deficiency Waiver**

For the avoidance of doubt, the holders of the Allowed Pre-Petition Secured Parties Deficiency Claims against a Liquidating Debtor agree to waive and withdraw such Claims on the Effective Date only if the respective Class of General Unsecured Claims against that particular Liquidating Debtor (i.e., Class OE 4, Class OM 4, Class OEM 4, Class TOGP 4 and/or Class TOLP 4) votes, as a Class, to accept the Subplan for the Liquidating Debtor.

## ARTICLE X

## IMPLEMENTATION OF THE SUBPLANS FOR THE REORGANIZING DEBTORS

The transactions required to implement the Subplans for the Reorganizing Debtors shall be implemented in accordance with ARTICLE VI of the Plan.

**Section 10.01. Restructuring Transactions**

On or before the Effective Date or as soon as reasonably practicable thereafter, the Plan Administrator, the Reorganizing Debtors or the Reorganized Debtors (as applicable), the Liquidating Debtors, the Purchaser (if any) and the Exit Lenders are authorized, without further order of the Bankruptcy Court, to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Restructuring Transactions under and in connection with the Plan, the Membership Interest Purchase and Sale Agreement and/or the Exit Financing, including, without limitation: (a) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) rejection or assumption, as applicable, of Executory Contracts and Unexpired Leases; (d) selection of the board of directors of Reorganized Generation or any employees or trustee of the Distribution Trust or Liquidation Trust; (e) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; (f) the consummation of the transactions contemplated by the Membership Interest Purchase and Sale Agreement, if any; (g) the consummation of the transactions contemplated by the Exit Financing and the execution of all documents related thereto; (h) the issuance of the Reorganized OEG Equity Interests and the execution of all documents related thereto; and (i) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

**Section 10.02. Sale Transaction**

Optim Generation and the Purchaser shall be authorized to consummate the Sale pursuant to the terms of the Membership Interest Purchase and Sale Agreement, if any, and the Confirmation Order.

**Section 10.03. Exit Financing**

In the event the Sale does not close as prescribed in Section 3.02(a)(ii)a of the Plan, the Exit Financing shall become effective on the Effective Date.  From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date financing, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of directors of the applicable Reorganized Debtors deem appropriate.

**Section 10.04. Organization of the Reorganized Debtors**

      (a)      <u>Reorganized Generation</u>

            (i)      Formation

On or before the Effective Date of the Subplan for Optim Generation, Reorganized Generation will be formed pursuant to the New Governance Documents.  Except as otherwise provided in the New Governance Documents, including as they may be amended or modified from time to time in accordance with applicable law, Reorganized Generation will be a "private" company that is not required to register any Securities pursuant to the Securities Exchange Act of 1934.

            (ii)      Issuance of New Equity Interests

On the Effective Date of the Subplan for Optim Generation: (x) the existing Equity Interests in Optim Generation will be cancelled, extinguished and discharged; and (y) 100% of the Reorganized OEG Equity Interests will be issued (A) in the event the Sale closes as prescribed in Section 3.02(a)(ii)a of the Plan, to the Purchaser, or (B) in the event the Sale does not close as prescribed in Section 3.02(a)(ii)a of the Plan, to the Pre-Petition Secured Parties (or their nominee).  The Reorganized OEG Equity Interests shall have the rights, privileges, limitations and restrictions set forth in the New Governance Documents.

      (b)      <u>Reorganized Cedar Bayou and Reorganized Altura Cogen</u>

On the Effective Date of any Subplan for Cedar Bayou and Altura Cogen, Reorganized Generation will continue to own 100% of the Equity Interests in each of Reorganized Cedar Bayou and Reorganized Altura Cogen, which shall be in such amount and have the rights, privileges, limitations and restrictions set forth in their existing certificates of formation (or other constitutive documents, as applicable), except as such terms may be amended pursuant to the terms of the Subplans for each of Cedar Bayou and Altura Cogen, and as may be permitted under their respective constitutive documents and applicable non-bankruptcy law.

**Section 10.05. Assets and Liabilities of the Reorganized Debtors**

(a)    Reorganized Generation

On the Effective Date of the Subplan for Optim Generation, all of the Assets of Optim Generation and its Estate except for the Distribution Trust Assets, including but not limited to 100% of the outstanding membership interests in Reorganized Cedar Bayou and Reorganized Altura Cogen, shall vest in Reorganized Generation free and clear of all Liens, Claims and encumbrances (except for Liens, if any, granted to secure the repayment of the Exit Financing, and Claims and obligations provided for in the Subplan for Optim Generation).

(b)    Reorganized Cedar Bayou and Reorganized Altura Cogen

On the Effective Date of the Subplans for Cedar Bayou and Altura Cogen, all of the Assets of Cedar Bayou, Altura Cogen, and their Estates except for the Distribution Trust Assets, including but not limited to their respective operating assets and 100% of the ownership interests of the entities they each owned before the Effective Date, shall vest in Reorganized Cedar Bayou and Reorganized Altura Cogen, respectively, free and clear of all Liens, Claims and encumbrances (except for Liens, if any, granted to secure the repayment of the Exit Financing, and Claims or obligations provided for in the Subplans for Cedar Bayou and Altura Cogen, respectively).

**Section 10.06. Governance of the Reorganized Debtors**

On and after the Effective Date of the Subplans for the Reorganizing Debtors, the Reorganized Debtors' businesses will be managed by and under the direction of their respective boards of directors or other governing body, as they may be constituted from time to time pursuant to their certificates of formation (or other constituent documents, including the New Governance Documents, as applicable) and applicable non-bankruptcy law.  The officers and directors of the Reorganized Debtors will be those individuals listed in the Plan Supplement.

**Section 10.07. Funding of Reserves**

On the Effective Date of the Subplans for the Reorganizing Debtors, the Reorganizing Debtors Claims Reserve, the Reorganizing Debtors Wind-Down Costs Reserve and the Professional Claims Reserve shall be funded with either (a) Cash from the Sale proceeds, or (b) in the event the Sale does not close by September 30, 2015 pursuant to Section 3.02(a)(ii)a of the Plan, and with the consent of the Pre-Petition Secured Parties, Cash on hand (which is Cash Collateral) and/or Cash from the Exit Financing.  The reserves funded pursuant to Section 6.07 of the Plan shall be deemed authorized and approved by the Bankruptcy Court pursuant to the Confirmation Order.

**Section 10.08. Distribution Trust[15]**

    (a)    <u>Creation of the Distribution Trust</u>

On the Effective Date of the Subplans for the Reorganizing Debtors, the Distribution Trust shall be created and established by the execution and delivery of the Distribution Trust Agreement.

    (b)    <u>Transfer of the Distribution Trust Assets</u>

On the Effective Date of the Subplans for the Reorganizing Debtors, the Pre-Petition Secured Parties and the Debtors, as applicable, shall transfer the Distribution Trust Assets to the Distribution Trust, for and on behalf of the holders of Allowed Claims against the Reorganizing Debtors, with no reversionary interest in the Debtors.

    (c)    <u>Purpose of the Distribution Trust</u>

The Distribution Trust shall be established for the sole purpose of making distributions to holders of Allowed Claims under the Subplans for the Reorganizing Debtors (to the extent such Allowed Claims were not previously paid under the Subplans), and winding up the remaining affairs of the Estates of Optim Generation, Altura Cogen, and Cedar Bayou in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Distribution Trust.

    (d)    <u>Administration of the Distribution Trust</u>

The Distribution Trust shall be administered by the Plan Administrator pursuant to the Distribution Trust Agreement and the Subplans for the Reorganizing Debtors.

    (e)    <u>Powers and Duties of the Plan Administrator</u>

The Plan Administrator shall have the rights and powers set forth in the Distribution Trust Agreement, and shall be governed in all respects by the terms of the Distribution Trust Agreement and the Subplans for the Reorganizing Debtors.  The Plan Administrator shall have reasonable access to the Reorganizing Debtors' and Reorganized Debtors' books and records to the extent necessary to carry out its duties under the Distribution Trust Agreement.  Subject to the terms of the Distribution Trust Agreement, the Plan Administrator shall be authorized, empowered, and directed to take all actions necessary to comply with the Subplans for the Reorganizing Debtors and exercise and fulfill the duties and obligations arising thereunder, including, without limitation, to: (i) act as the trustee for the Distribution Trust and administer the Distribution Trust; (ii) take any action necessary to transfer the Distribution Trust Assets to the Distribution Trust and establish the Distribution Trust in accordance with the Subplans for

---

[15] Section 6.05 of the Plan and Section 10.08 of this Disclosure Statement are general descriptions of the Distribution Trust and its provisions. The Distribution Trust Agreement shall be included in the Plan Supplement. To the extent Section 6.05 of the Plan or Section 10.08 of this Disclosure Statement are inconsistent with the Distribution Trust Agreement, the Distribution Trust Agreement shall control for all purposes.

the Reorganizing Debtors and applicable law, including, without limitation, in respect of the establishment of the Distribution Trusts for the allocation of assets, the making of related reserves and the attribution of rights of holders of beneficial interests based on the classification schemes of the applicable Subplans for the Reorganizing Debtors; (iii) retain attorneys, advisors, and other professionals as may be necessary and appropriate to perform the duties required of, and the obligations assumed by, the Plan Administrator under the applicable Subplans for the Reorganizing Debtors and the Distribution Trust Agreement, and pursuant to Section 6.08(g) of the Plan; (iv) execute any documents, instruments, contracts, and agreements necessary and appropriate to carry out the powers and duties of the Distribution Trust; (v) open, maintain, and administer bank accounts as necessary to discharge the duties of the Plan Administrator under the applicable Subplans for the Reorganizing Debtors and the Distribution Trust Agreement; (vi) administer, sell, liquidate, or otherwise dispose of the Distribution Trust Assets in accordance with the applicable Subplans for the Reorganizing Debtors; (vii) make, on behalf of the Reorganizing Debtors and their Estates, all transfers and distributions required to be made pursuant to the Subplans for the Reorganizing Debtors on and after the Effective Date, including, without limitation, distributions from the proceeds of the Distribution Trust Assets; (viii) file and prosecute objections to, and negotiate, settle, or otherwise resolve without Bankruptcy Court approval, any and all Disputed Claims against the Reorganizing Debtors and their Estates; (ix) review all Proofs of Claim filed against the Reorganizing Debtors for Administrative Claims, requests for payment therein and, if warranted, object thereto; (x) represent the Distribution Trust before the Bankruptcy Court and other courts of competent jurisdiction with respect to matters concerning the Distribution Trust; (xi) investigate, commence, and prosecute all Causes of Action transferred to the Distribution Trust under the Subplans for the Reorganizing Debtors to judgment or settlement, and take all other necessary and appropriate steps to collect, recover, liquidate, or otherwise reduce such Causes of Action and accounts receivable to Cash; (xii) prepare and file quarterly financial reports with the Bankruptcy Court; and (xiii) comply with applicable orders of the Bankruptcy Court and any other court of competent jurisdiction over the matters set forth herein, and all applicable laws and regulations concerning the matters set forth herein.  The Plan Administrator may purchase any insurance the Plan Administrator reasonably deems necessary or appropriate for the benefit of the Reorganized Debtors pursuant to the Distribution Trust Agreement.

     (f)    <u>Cash Investments</u>

All Cash held by the Distribution Trust shall be held in a non-interest-bearing account at domestic bank selected by the Plan Administrator and shall not be invested or reinvested.

     (g)    <u>Retention of Professionals</u>

The Plan Administrator is authorized to retain, employ, and compensate any attorneys, advisors, or other professionals necessary to assist the Plan Administrator in carrying out its duties under the Plan and the Distribution Trust Agreement, without further order of the Bankruptcy Court.  The past or current retention of any Professional in the Chapter 11 Cases shall not be asserted by any party in interest as a basis to disqualify such Professional from being retained by the Distribution Trust.  From and after the Effective Date, the Plan Administrator, for and on behalf of the Distribution Trust, shall pay in Cash the reasonable legal fees and expenses incurred by the professionals retained by the Plan Administrator pursuant to the Wind-Down

Budget, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court. For the avoidance of doubt, any requirement that a professional retained by the Plan Administrator comply with sections 327 through 331 and/or 1103 of the Bankruptcy Code in seeking compensation for services rendered, for and on behalf of the Distribution Trust, shall terminate.

In no event shall the Plan Administrator or any agent, employee, attorney, advisor or other professional retained by the Plan Administrator have any recourse against the Debtors, the Reorganizing Debtors, the Reorganized Debtors, the Consultation Parties, or any of their respective Related Persons, with respect to compensation for services rendered, and reimbursement for expenses incurred by, the Plan Administrator or any agent, employee, attorney, advisor or other professional retained by the Plan Administrator, with respect to the administration of the Subplans for the Reorganizing Debtors, regardless of whether sufficient Cash or other property remains for payment of such compensation or reimbursement in the Wind-Down Budget at the time such request for compensation or reimbursement is made.

(h)      Accounting and Reporting

The Plan Administrator shall maintain an accounting of receipts and disbursements with respect to the Distribution Trust, which shall be open to inspection and review by the Bankruptcy Court and any holder of an Allowed Claim against the Reorganizing Debtors, upon reasonable notice to the Plan Administrator. After the Effective Date, the Plan Administrator shall continue the reporting obligations for the Estate of each Reorganized Debtor pursuant to U.S. Trustee guidelines until the Bankruptcy Court enters a Final Decree closing each of the Chapter 11 Cases of the Reorganizing Debtors.

(i)      Resignation/Removal of Plan Administrator

The Plan Administrator for the Distribution Trust may resign or be removed in accordance with the Distribution Trust Agreement. Any successor Plan Administrator for the Distribution Trust shall be appointed in accordance with the Distribution Trust Agreement and subject to the written approval of the Consultation Parties.

(j)      Termination of the Distribution Trust; Final Distribution

The Distribution Trust shall terminate upon the earlier of: (i) satisfaction of all Allowed Claims against the Reorganizing Debtors; (ii) the one (1) year anniversary of the Effective Date; or (iii) the entry by the Bankruptcy Court of a Final Decree(s) closing each of the Chapter 11 Cases of the Reorganizing Debtors, and submission by the Plan Administrator of the final financial report to the Bankruptcy Court pursuant to the applicable Subplan for each Reorganized Debtor. On or prior to the date of termination of the Distribution Trust, the Bankruptcy Court, upon motion by the Plan Administrator, may extend the term of the Distribution Trust for cause shown. Upon termination of the Distribution Trust and as soon as practicable thereafter, the balance of any Cash and other assets of the Distribution Trust shall be transferred to the Pre-Petition Secured Parties pursuant to Section 3.02(a)(ii) of the Plan.

(k)     Governing Law

The establishment of the Distribution Trust and all transfers to the Distribution Trust shall be governed by the laws of the State of Delaware.

(l)     Limitation on Liability

No recourse shall ever be had, directly or indirectly, against the Plan Administrator or its officers, directors, agents, employees, attorneys, advisors or other professionals by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge, or note, or upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Plan Administrator under the Subplans for the Reorganizing Debtors or the Distribution Trust Agreement, or by reason of the creation of any indebtedness by the Plan Administrator under the Subplans for the Reorganizing Debtors for any purpose authorized by such Subplans.  Every undertaking, contract, covenant or agreement entered into in writing by the Plan Administrator shall provide expressly against the personal liability of the Plan Administrator under the Distribution Trust Agreement.  The Plan Administrator and its officers, directors, agents, employees, attorneys, advisors and other professionals shall not be liable for any act they may do, or omit to do under the Distribution Trust Agreement in good faith and in the exercise of their respective best judgment, and the fact that such act or omission was advised, directed or approved by an attorney acting as counsel for the Plan Administrator shall be conclusive evidence of such good faith and best judgment; provided, however, that Section 6.08(l) of the Plan shall not apply to any bad faith, fraud, gross negligence or willful misconduct by the Plan Administrator under the Distribution Trust Agreement or its officers, directors, agents, employees, attorneys, advisors or other professionals.

(m)     Reliance on Documents

The Plan Administrator may rely, and shall be protected in acting or refraining from acting, upon any certificates, opinions, statements, instruments or reports believed by it to be genuine and to have been signed or presented by the proper Entity.

**Section 10.09. Post-Confirmation Property Sales**

To the extent the Reorganizing Debtors, the Reorganized Debtors or the Distribution Trust, as applicable, purchase or sell any property prior to or including the date that is one (1) year after the Confirmation Date, the Debtors or the Reorganized Debtors, as applicable, may elect to purchase or sell such property pursuant to sections 363, 1123(a)(5)(D), 1141(c), and 1146(a) of the Bankruptcy Code.

**Section 10.10. Causes of Action of the Reorganizing Debtors**

(a)     Preservation of Causes of Action Other Than Avoidance Actions

In accordance with section 1123(b) of the Bankruptcy Code or any corresponding provision of federal or state laws, and except as expressly released by the Plan, Final DIP Order, Confirmation Order or other Final Order: (i) on the Effective Date of the Subplans for the

Reorganizing Debtors, all Causes of Action of the Reorganizing Debtors shall be transferred to and vest in the Distribution Trust as part of the Distribution Trust Assets; and (ii) on and after the Effective Date of the Subplans for the Reorganizing Debtors, all such Causes of Action for the Reorganizing Debtors shall be retained by the Distribution Trust, and the Distribution Trust and/or the Plan Administrator may, in accordance with the Distribution Trust Agreement, enforce, sue on, settle, or compromise (or decline to do any of the foregoing) any or all of such Causes of Action on behalf of the Reorganizing Debtors; provided, however, that as of the Effective Date, all Avoidance Actions of the Reorganizing Debtors shall be waived and released.

(b)    No Waiver

Except as otherwise provided in Section 12.02 of the Plan, or as released by the Final DIP Order, the Confirmation Order or other Final Order, nothing in the Plan shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, account receivable, right of setoff, or other legal or equitable right or defense that the Plan Administrator may have or choose to assert on behalf of the Reorganizing Debtors or their respective Estates under any provision of the Bankruptcy Code or any applicable non-bankruptcy law. No Entity may rely on the absence of a specific reference in the Plan to any Cause of Action or account receivable against it as an indication that the Plan Administrator will not pursue any and all available Causes of Action or accounts receivable against it, and all such rights to prosecute or pursue any and all Causes of Action or accounts receivable against any Entity are expressly reserved for later adjudication and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action or accounts receivable upon or after the Confirmation or Consummation of the Subplans for the Reorganizing Debtors.

## ARTICLE XI

## IMPLEMENTATION OF THE SUBPLANS FOR THE LIQUIDATING DEBTORS

The transactions required to implement the Subplans for the Liquidating Debtors shall be implemented in accordance with ARTICLE VII of the Plan.

### Section 11.01. Organization of the Liquidating Debtors

On the Effective Date of the Subplans for the Liquidating Debtors: (a) the Equity Interests of the respective Liquidating Debtor will be deemed cancelled and of no further force and effect, and deemed extinguished without any further corporate action; and (b) the existing members of the Liquidating Debtors' board(s) of directors will resign or be deemed to have been terminated.

### Section 11.02. Assets and Liabilities of the Liquidating Debtors

On the Effective Date of the Subplans for the Liquidating Debtors, the Liquidation Trust Assets shall be transferred to, and vest in, the Liquidation Trust free and clear of Liens, Claims and encumbrances (except for Claims and obligations provided for in the Subplans for the Liquidating Debtors).

**Section 11.03. Governance of the Liquidating Debtors**

On and after the Effective Date of the Subplans for the Liquidating Debtors, the Liquidating Debtors' affairs will be managed by and under the direction of the Plan Administrator pursuant to the Liquidation Trust Agreement. Within the time determined by the Plan Administrator as necessary or appropriate under the circumstances, each Liquidating Debtor shall be dissolved without any further action by its former stockholders, officers, members, or directors. The Plan Administrator may, in his or her discretion, file all necessary certificates of dissolution and take any other actions necessary or appropriate to effect such dissolution under applicable non-bankruptcy law. All applicable regulatory or governmental agencies shall accept any certificates of dissolution or other papers filed by the Plan Administrator on behalf of each Liquidating Debtor and shall take all steps necessary to allow and effect the prompt dissolution as provided herein, without the payment of any fee, tax, or charge and without need for the filing of reports or certificates, except as the Plan Administrator may determine in its sole discretion. Upon entry of a Final Decree in each Chapter 11 Case of each Liquidating Debtor, if not previously dissolved, the applicable Liquidating Debtor shall be deemed automatically dissolved and wound up without any further action or formality which might otherwise be required under applicable non-bankruptcy laws.

**Section 11.04. Funding of Reserves**

On the Effective Date of the Subplans for the Liquidating Debtors, the Liquidating Debtors Claims Reserve, the Liquidating Debtors Wind-Down Costs Reserve and the Professional Claims Reserve shall be funded, with the consent of the Pre-Petition Secured Parties, with Cash on hand (which is Cash Collateral) and/or Cash from the Exit Financing. The reserves funded pursuant to Section 7.04 of the Plan shall be deemed authorized and approved by the Bankruptcy Court pursuant to the Confirmation Order.

**Section 11.05. Liquidation Trust[16]**

(a)    Creation of the Liquidation Trust

On the Effective Date of the Subplans for the Liquidating Debtors, the Liquidation Trust shall be created and established by the execution and delivery of the Liquidation Trust Agreement.

(b)    Transfer of the Liquidation Trust Assets

On the Effective Date of the Subplans for the Liquidating Debtors, the Liquidation Trust Assets shall be deemed irrevocably transferred to the Liquidation Trust free and clear of all Liens, Claims, and encumbrances, for and on behalf of the holders of Allowed Claims against the Liquidating Debtors, with no reversionary interest in the Debtors.

---

[16] Section 7.05 of the Plan and Section 11.05 of this Disclosure Statement are general descriptions of the Liquidation Trust and its provisions. The Liquidation Trust Agreement shall be included in the Plan Supplement. To the extent that Section 7.05 of the Plan or Section 11.05 of this Disclosure Statement are inconsistent with the Liquidation Trust Agreement, the Liquidation Trust Agreement shall control for all purposes.

(c)    Purpose of the Liquidation Trust

The Liquidation Trust shall be established for the sole purpose of making distributions to holders of Allowed Claims under the Subplans for the Liquidating Debtors (to the extent such Allowed Claims were not previously paid under the Subplans), and winding up the remaining affairs of the Liquidating Debtors' Estates in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Liquidation Trust.

(d)    Administration of the Liquidation Trust

The Liquidation Trust shall be administered by the Plan Administrator pursuant to the Liquidation Trust Agreement and the Subplans for the Liquidating Debtors.

(e)    Powers and Duties of the Plan Administrator

The Plan Administrator shall be a representative of the Estates of the Liquidating Debtors pursuant to section 1123 of the Bankruptcy Code, and shall have the rights and powers set forth in the Liquidation Trust Agreement, and shall be governed in all respects by the terms of the Liquidation Trust Agreement and the Subplans for the Liquidating Debtors.    The Plan Administrator shall have reasonable access to the Liquidating Debtors' books and records to the extent necessary to carry out its duties under the Liquidation Trust Agreement.    Subject to the terms of the Liquidation Trust Agreement, the Plan Administrator shall be authorized, empowered, and directed to take all actions necessary to comply with the Subplans for the Liquidating Debtors and exercise and fulfill the duties and obligations arising thereunder, including, without limitation, to: (i) act as the trustee for the Liquidation Trust and administer the Liquidation Trust; (ii) take any action necessary to transfer the Liquidation Trust Assets to the Liquidation Trust, establish the Liquidation Trust, and dissolve the Liquidating Debtors in accordance with the Subplans for the Liquidating Debtors and applicable law, including, without limitation, in respect of the establishment of the Liquidation Trust for the allocation of assets, the making of related reserves and the attribution of rights of holders of beneficial interests based on the classification schemes of the applicable Subplans for the Liquidating Debtors; (iii) retain attorneys, advisors, and other professionals as may be necessary and appropriate to perform the duties required of, and the obligations assumed by, the Plan Administrator under the applicable Subplans for the Liquidating Debtors and the Liquidation Trust Agreement, and pursuant to Section 7.05(g) of the Plan; (iv) execute any documents, instruments, contracts, and agreements necessary and appropriate to carry out the powers and duties of the Liquidation Trust; (v) open, maintain, and administer bank accounts as necessary to discharge the duties of the Plan Administrator under the applicable Subplans for the Liquidating Debtors and the Liquidation Trust Agreement; (vi) administer, sell, liquidate, or otherwise dispose of the Liquidation Trust Assets in accordance with the applicable Subplans for the Liquidating Debtors; (vii) make, on behalf of the Liquidating Debtors and their Estates, all transfers and distributions required to be made pursuant to the Subplans for the Liquidating Debtors on and after the Effective Date, including, without limitation, distributions from the proceeds of the Liquidation Trust Assets; (viii) file and prosecute objections to, and negotiate, settle, or otherwise resolve without Bankruptcy Court approval, any and all Disputed Claims against the Liquidating Debtors and their Estates; (ix) review all Proofs of Claim filed against the Liquidating Debtors for

Administrative Claims, requests for payment therein and, if warranted, object thereto; (x) represent the Liquidation Trust before the Bankruptcy Court and other courts of competent jurisdiction with respect to matters concerning the Liquidation Trust; (xi) investigate, commence, and prosecute all Causes of Action transferred to the Liquidation Trust under the Subplans for the Liquidating Debtors to judgment or settlement, and take all other necessary and appropriate steps to collect, recover, liquidate, or otherwise reduce such Causes of Action and accounts receivable to Cash; (xii) prepare and file quarterly financial reports with the Bankruptcy Court; and (xiii) comply with applicable orders of the Bankruptcy Court and any other court of competent jurisdiction over the matters set forth herein, and all applicable laws and regulations concerning the matters set forth herein. The Plan Administrator may purchase any insurance the Plan Administrator reasonably deems necessary or appropriate for the benefit of the Liquidating Debtors pursuant to the Liquidation Trust Agreement. The Plan Administrator shall have the authority, but not the obligation, to destroy the Liquidating Debtors' books and records following termination of the Liquidation Trust pursuant to Section 7.05(j) of the Plan.

In no event shall the Plan Administrator or any agent, employee, attorney, advisor or other professional retained by the Plan Administrator have any recourse against the Debtors, the Liquidating Debtors, the Consultation Parties, or any of their respective Related Persons, with respect to compensation for services rendered, and reimbursement for expenses incurred by, the Plan Administrator or any agent, employee, attorney, advisor or other professional retained by the Plan Administrator, with respect to the administration of the Subplans for the Liquidating Debtors, regardless of whether sufficient Cash or other property remains for payment of such compensation or reimbursement in the Wind-Down Budget at the time such request for compensation or reimbursement is made.

(f)      Cash Investments

All Cash held by the Liquidation Trust shall be held in a non-interest-bearing account at domestic bank selected by the Plan Administrator and shall not be invested or reinvested.

(g)      Retention of Professionals

The Plan Administrator is authorized to retain, employ, and compensate any attorneys, advisors, or other professionals necessary to assist the Plan Administrator in carrying out its duties under the Plan and the Liquidation Trust Agreement, without further order of the Bankruptcy Court. The past or current retention of any Professional in the Chapter 11 Cases shall not be asserted by any party in interest as a basis to disqualify such Professional from being retained by the Liquidation Trust. From and after the Effective Date, the Plan Administrator, for and on behalf of the Liquidation Trust, shall pay in Cash the reasonable legal fees and expenses incurred by the professionals retained by the Plan Administrator pursuant to the Wind-Down Budget, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court. For the avoidance of doubt, any requirement that a professional retained by the Plan Administrator comply with sections 327 through 331 and/or 1103 of the Bankruptcy Code in seeking compensation for services rendered, for and on behalf of the Liquidation Trust, shall terminate.

In no event shall the Plan Administrator or any agent, employee, attorney, advisor or other professional retained by the Plan Administrator have any recourse against the Debtors, the Liquidating Debtors, the Consultation Parties, or any of their respective Related Persons, with respect to compensation for services rendered, and reimbursement for expenses incurred by, the Plan Administrator or any agent, employee, attorney, advisor or other professional retained by the Plan Administrator, with respect to the administration of the Subplans for the Liquidating Debtors, regardless of whether sufficient Cash or other property remains for payment of such compensation or reimbursement in the Wind-Down Budget at the time such request for compensation or reimbursement is made.

(h)    Accounting and Reporting

The Plan Administrator shall maintain an accounting of receipts and disbursements with respect to the Liquidation Trust, which shall be open to inspection and review by the Bankruptcy Court and any holder of an Allowed Claim against the Liquidating Debtors, upon reasonable notice to the Plan Administrator.  After the Effective Date, the Plan Administrator shall continue the reporting obligations for the Estate of each Liquidating Debtor pursuant to U.S. Trustee guidelines until the Bankruptcy Court enters a Final Decree closing each of the Chapter 11 Cases of the Liquidating Debtors.

(i)    Resignation/Removal of Plan Administrator

The Plan Administrator for the Liquidation Trust may resign or be removed in accordance with the Liquidation Trust Agreement.  Any successor Plan Administrator for the Liquidation Trust shall be appointed in accordance with the Liquidation Trust Agreement and subject to the written approval of the Consultation Parties.

(j)    Termination of the Liquidation Trust; Final Distribution

The Liquidation Trust shall terminate upon the earlier of: (x) satisfaction of all Allowed Claims against the Liquidating Debtors; (y) the three (3) year anniversary of the Effective Date; or (z) the entry by the Bankruptcy Court of a Final Decree(s) closing each of the Chapter 11 Cases of the Liquidating Debtors, and submission by the Plan Administrator of the final financial report to the Bankruptcy Court pursuant to the applicable Subplan for each Liquidating Debtor. On or prior to the date of termination of the Liquidation Trust, the Bankruptcy Court, upon motion by the Plan Administrator, may extend the term of the Liquidation Trust for cause shown. Upon termination of the Liquidation Trust and as soon as practicable thereafter, the balance of any Cash and other assets of the Liquidation Trust shall be transferred to the Pre-Petition Secured Parties pursuant to Section 4.02(a)(ii) of the Plan.

(k)    Governing Law

The establishment of the Liquidation Trust and all transfers to the Liquidation Trust shall be governed by the laws of the State of Delaware.

(l)    Limitation on Liability

No recourse shall ever be had, directly or indirectly, against the Plan Administrator or its officers, directors, agents, employees, attorneys, advisors or other professionals by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge, or note, or upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Plan Administrator under the Subplans for the Liquidating Debtors or the Liquidation Trust Agreement, or by reason of the creation of any indebtedness by the Plan Administrator under the Subplans for the Liquidating Debtors for any purpose authorized by such Subplans. Every undertaking, contract, covenant or agreement entered into in writing by the Plan Administrator shall provide expressly against the personal liability of the Plan Administrator under the Liquidation Trust Agreement.   The Plan Administrator and its officers, directors, agents, employees, attorneys, advisors and other professionals shall not be liable for any act they may do, or omit to do under the Liquidation Trust Agreement in good faith and in the exercise of their respective best judgment, and the fact that such act or omission was advised, directed or approved by an attorney acting as counsel for the Plan Administrator shall be conclusive evidence of such good faith and best judgment; provided, however, that Section 7.05(l) shall not apply to any bad faith, fraud, gross negligence or willful misconduct by the Plan Administrator under the Liquidation Trust Agreement or its officers, directors, agents, employees, attorneys, advisors or other professionals.

(m)    Reliance on Documents

The Plan Administrator may rely, and shall be protected in acting or refraining from acting, upon any certificates, opinions, statements, instruments or reports believed by it to be genuine and to have been signed or presented by the proper Entity.

## Section 11.06. Causes of Action of the Liquidating Debtors

(a)    Preservation of Causes of Action Other Than Avoidance Actions

In accordance with section 1123(b) of the Bankruptcy Code or any corresponding provision of federal or state laws, and except as expressly released by the Plan, the Final DIP Order, the Confirmation Order or other Final Order: (i) on the Effective Date of the Subplans for the Liquidating Debtors, all Causes of Action for the Liquidating Debtors shall be transferred to and vest in the Liquidation Trust as part of the Liquidation Trust Assets; and (ii) on and after the Effective Date of the Subplans for the Liquidating Debtors, all such Causes of Action for the Liquidating Debtors shall be retained by the Liquidation Trust, and the Liquidation Trust and/or the Plan Administrator may, in accordance with the Liquidation Trust Agreement, enforce, sue on, settle, or compromise (or decline to do any of the foregoing) any or all of such Causes of Action on behalf of the Liquidating Debtors, including, without limitation, Causes of Action the Plan Administrator may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) against Walnut Creek on account of the Walnut Creek Motion, the Walnut Creek Claims or any other Claims asserted by Walnut Creek against the Debtors, the Liquidating Debtors, or the Liquidation Trust, and any defenses or counterclaims the Plan Administrator may assert with respect to any such Claims; provided, however, that as of the Effective Date, all Avoidance Actions of the Liquidating Debtors shall be waived and released.

(b)     No Waiver

Except as otherwise provided in Section 12.02 of the Plan, or as released by the Final DIP Order, the Confirmation Order or other Final Order, nothing in the Plan shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, account receivable, right of setoff, or other legal or equitable right or defense that the Plan Administrator may have or choose to assert on behalf of the Liquidating Debtors or their respective Estates under any provision of the Bankruptcy Code or any applicable non-bankruptcy law.  No Entity, including but not limited to Walnut Creek on account of the Walnut Creek Motion, the Walnut Creek Claim or otherwise, may rely on the absence of a specific reference in the Plan to any Cause of Action or account receivable against it as an indication that the Plan Administrator will not pursue any and all available Causes of Action or accounts receivable against it, and all such rights to prosecute or pursue any and all Causes of Action or accounts receivable against any Entity are expressly reserved for later adjudication and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action or accounts receivable upon or after the Confirmation or Consummation of the Subplans for the Liquidating Debtors.

## ARTICLE XII

## TREATMENT OF EXECUTORY CONTRACTS AND LEASES

### Section 12.01. Executory Contracts and Unexpired Leases of the Reorganizing Debtors

Except as otherwise expressly provided in (a) the Subplans for the Reorganizing Debtors, (b) the Plan Supplement, or (c) any other filing made before the Confirmation Hearing, all Executory Contracts and Unexpired Leases of the Reorganizing Debtors shall be cured and assumed by the applicable Reorganized Debtor(s) as of the Effective Date in accordance with, and subject to the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code; provided, however, that Section 8.01 of the Plan shall not apply to any Executory Contract and Unexpired Lease of a Reorganizing Debtor that expired or terminated pursuant to its own terms prior to the Petition Date.

### Section 12.02. Executory Contracts and Unexpired Leases of the Liquidating Debtors

Except as otherwise expressly provided in (a) the Subplans for the Liquidating Debtors, (b) the Plan Supplement, or (c) any other filing made before the Confirmation Hearing, all Executory Contracts and Unexpired Leases of the Liquidating Debtors shall be deemed rejected by the applicable Liquidating Debtor(s) as of the Effective Date in accordance with, and subject to the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code; provided, however, that Section 8.02 of the Plan shall not apply to any Executory Contract and Unexpired Lease of a Liquidating Debtor that expired or terminated pursuant to its own terms prior to the Petition Date.

## Section 12.03. Effect of Confirmation Order on Assumption/Rejection

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order of the Bankruptcy Court pursuant to sections 365 and 1123(b) of the Bankruptcy Code approving the assumption, assumption and assignment, or rejection, as applicable, of the Executory Contracts and Unexpired Leases as of the Effective Date and determining that: (a) with respect to such rejections, such rejected Executory Contracts and Unexpired Leases are burdensome and that the rejection therein is in the best interests of the Estates; (b) with respect to such assumptions, to the extent necessary, that the applicable Debtor has (i) cured any default, (ii) compensated the counterparty for any actual pecuniary loss resulting from any default, and (iii) provided adequate assurance of future performance under such Executory Contract or Unexpired Lease, and (c) with respect to any assignment, to the extent necessary, that the applicable Debtor has (i) cured any default, (ii) compensated the counterparty for any actual pecuniary loss resulting from any default, and (iii) that "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) by the assignee has been demonstrated and no further adequate assurance is required. Assumption of any Executory Contract or Unexpired Lease and satisfaction of the Cure Costs shall result in the full discharge, release and satisfaction of any claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date such Executory Contract or Unexpired Lease is assumed. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or Bankruptcy Court order shall vest in and be fully enforceable by the applicable Debtor. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

## Section 12.04. Cure of Defaults and Objections to Assumption

Except as may be otherwise agreed to by the parties, the Purchaser, if any, shall pay any undisputed Cure Costs to the Debtors on the Effective Date. Within five (5) Business Days after the Effective Date, the Plan Administrator shall pay any undisputed Cure Costs to the counterparties to any assumed Executory Contracts and Unexpired Leases from the Distribution Trust or the Liquidation Trust, as applicable. The Cure Costs for the contracts to be assumed by the Debtors will be included in the Schedule of Assumed Executory Contracts and Unexpired Leases. If there are no Cure Costs listed for an Executory Contract or Unexpired Lease, then the proposed Cure Costs shall be $0.00. Such amount shall be deemed full payment of such Debtor's obligations under section 365(b) of the Bankruptcy Code, unless, on or before the Voting Deadline, the contract counter-party files an objection disputing: (a) the amount of any Cure Costs, (b) the ability of the Debtors or any assignee to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (c) any other matter pertaining to assumption. The disputed Cure Costs required by section 365(b)(1) of the Bankruptcy Code shall be made only after entry of a Final Order resolving the dispute and approving the assumption.

**Section 12.05. Rejection Damages Claims and Objections to Rejection**

Claims arising out of the rejection of Executory Contract or Unexpired Leases pursuant to the Plan must be filed and served on the Debtors pursuant to the procedures specified in the Bar Date Order, or another order of the Bankruptcy Court, no later than thirty (30) days after the Effective Date. Holders of any Claim not filed within such time will be forever barred from asserting such Claim against the Debtors, their Estates, the Reorganizing Debtors, the Reorganized Debtors, the Liquidating Debtors, their respective successors or their respective properties, or against the Distribution Trust or the Liquidation Trust. Unless otherwise ordered by the Bankruptcy Court or specified in the Plan, all Claims arising from the rejection of Executory Contracts and Unexpired Leases shall be treated as General Unsecured Claims under the Plan.

**Section 12.06. Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

The Debtors, the Reorganizing Debtors, the Reorganized Debtors and the Liquidating Debtors, as applicable, reserve the right to assert that rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of obligations owed to the Debtors under such contracts or leases prior to the rejection of such contracts or leases. Notwithstanding any nonbankruptcy law to the contrary, the Reorganizing Debtors, the Reorganized Debtors or the Liquidating Debtors, as applicable, expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on good previously purchased, or services previously received, by the contracting Debtors from counterparties to rejected Executory Contracts and Unexpired Leases.

**Section 12.07. Modifications, Amendments, Supplements, Restatements or Other Agreements**

Unless otherwise provided in the Plan, each assumed or assumed and assigned Executory Contract and Unexpired Lease shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or is rejected under the Plan or otherwise.

Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

**Section 12.08. Reservation of Rights**

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganizing

Debtors, the Reorganized Debtors or the Liquidating Debtors, as applicable, have any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Reorganizing Debtors, the Reorganized Debtors or the Liquidating Debtors, as applicable, shall have ninety (90) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided herein.

### Section 12.09. Non-Occurrence of the Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, notwithstanding anything to the contrary in the Plan or otherwise.

## ARTICLE XIII

## PROVISIONS GOVERNING DISTRIBUTIONS

### Section 13.01. Amount of Distributions

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim to the extent payable in accordance with the Plan.

### Section 13.02. Method of Distributions

(a)  Reorganizing Debtors

Except as otherwise provided in the Plan, the Plan Administrator or such third-party disbursing agent as the Plan Administrator may employ, will make all distributions required under the Subplans for the Reorganizing Debtors pursuant to such Subplans and the Distribution Trust Agreement. Each third-party disbursing agent will receive from the Distribution Trust, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services. These payments will be made on terms agreed to with the Plan Administrator, and will not be deducted from distributions to be made pursuant to the Subplans for the Reorganizing Debtors to holders of Allowed Claims or Allowed Equity Interests against the Reorganizing Debtors receiving distributions from a third-party disbursing agent.

(b)  Liquidating Debtors

Except as otherwise provided in the Plan, the Plan Administrator or such third-party disbursing agent as the Plan Administrator may employ, will make all distributions required under the Subplans for the Liquidating Debtors pursuant to such Subplans and the Liquidation Trust Agreement. Each third-party disbursing agent will receive from the Liquidation Trust, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services.

These payments will be made on terms agreed to with the Plan Administrator, and will not be deducted from distributions to be made pursuant to the Subplans for the Liquidating Debtors to holders of Allowed Claims against the Liquidating Debtors receiving distributions from a third-party disbursing agent.

## Section 13.03. Delivery of Distributions

Distributions to holders of Allowed Claims shall be made at the address of the holder of such Claim as indicated in the Claims Register as of the Distribution Record Date.  The Plan Administrator shall have no obligation to recognize the transfer of or sale of any Claim or Equity Interest that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those holders of Allowed Claims and Equity Interests who are holders as of the close of business on the Distribution Record Date.

## Section 13.04. No Fractional or De Minimis Distributions

Notwithstanding anything contained herein to the contrary, payments of fractional dollars will not be made.  Whenever any payment of a fraction of a dollar under the applicable Subplan would otherwise be called for, the actual payment made will reflect a rounding down of such fractions.  The Plan Administrator or any third-party disbursing agent shall not be required to make any payment of less than $20.00 on any distribution.

## Section 13.05. Undeliverable Distributions

(a)    Holding of Undeliverable Distributions

If any distribution to a holder of an Allowed Claim is returned to the Plan Administrator or any third-party disbursing agent as undeliverable, no further distributions shall be made to such holder unless and until such Plan Administrator is notified in writing of such holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such holder as soon as practicable.  Undeliverable Distributions shall remain in the possession of the Plan Administrator or the third-party disbursing agent until such time as a distribution becomes deliverable, and shall not be supplemented with any interest, dividends or other accruals of any kind.

(b)    Failure to Claim Undeliverable Distributions

Any holder of an Allowed Claim that does not assert a Claim pursuant to the Plan for an Undeliverable Distribution within one hundred eighty (180) days after the distribution is distributed shall be deemed to have waived its Claim for such Undeliverable Distribution and shall be forever barred from asserting any such Claim against the Reorganizing Debtors, the Reorganized Debtors, the Liquidating Debtors or their property.  In such cases, notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary, any Cash held for distribution on account of such Undeliverable Distribution shall be property of the Distribution Trust or the Liquidation Trust, free of any restrictions thereon.  Nothing contained in the Plan shall require the Reorganizing Debtors, the Reorganized Debtors, the Liquidating Debtors or the Plan Administrator to attempt to locate any holder of an Allowed

Claim.  Notwithstanding any provision herein to the contrary, Undeliverable Distributions that become property of the Distribution Trust or the Liquidation Trust shall be distributed Pro Rata to the remaining holders of Allowed Claims, which distribution shall be effectuated through the subsequent distributions provided for under the applicable Subplan, it being understood that for purposes of this sentence, "Pro Rata" shall be determined as if the Claims underlying such Undeliverable Distributions had been disallowed.

## Section 13.06. Tax Withholding From Distributions

The Plan Administrator shall withhold all amounts required by law to be withheld from payments made under the Plan.  Any amounts so withheld from any payment made under the Plan shall be deemed paid to the holder of the Allowed Claim subject to withholding. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any Governmental Unit, on account of such distribution, except for taxes withheld from payments made under the Plan.  The Plan Administrator has the right, but not the obligation, not to make a distribution until such holder has made arrangements satisfactory to the Plan Administrator for payment of any withholding tax obligations.  If the Plan Administrator fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse the Plan Administrator.  Notwithstanding any provision in the Plan to the contrary, the Plan Administrator shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms it believes are reasonable and appropriate.  The Plan Administrator may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder.  If the holder fails to comply with such a request within six (6) months, such distribution shall be deemed an Undeliverable Distribution.  Finally, the Plan Administrator reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

## Section 13.07. Allocations

Unless otherwise provided in the Plan, distributions in respect of Allowed Claims shall be allocated first to the principal amount (as determined for U.S. federal income tax purposes) of such Allowed Claims, and then, to the extent the consideration exceeds the principal amount of such Allowed Claims, to any portion of such Allowed Claims for accrued but unpaid interest.

## Section 13.08. Time Bar to Cash Payments

Checks issued on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance therein.  Requests for reissuance of any check shall be made in writing directly to the Plan Administrator by the holder of the Allowed Claim with respect to which such check originally was issued.  Any Claim in respect of such a voided check shall be made in writing on or before the later of one hundred eighty (180) days after the

Effective Date or ninety (90) days after the date of issuance of such check.  After such date, all Claims in respect of void checks shall be discharged and forever barred and the distribution on account of such Claims shall be treated in accordance with Section 9.05 of the Plan.

## Section 13.09. Means of Cash Payments

Any Cash payment to be made pursuant to the Plan will be made in U.S. dollars by checks drawn on or by wire transfer from a domestic bank selected by the Plan Administrator. No post-Effective Date interest shall be paid on Cash distributions hereunder.

## Section 13.10. Foreign Currency Exchange Rates

As of the Effective Date, any Claim asserted in currency(ies) other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the mid-range spot rate of exchange for the applicable currency as published in *The Wall Street Journal*, National Edition, the day after the Petition Date.

## Section 13.11. Setoffs

The Plan Administrator may, pursuant to section 553 of the Bankruptcy Code and applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Claim (before any distribution is made on account of such Claim), the claims, rights and Causes of Action of any nature that Debtors, the Reorganizing Debtors, the Reorganized Debtors, the Distribution Trust, the Liquidating Debtors or the Liquidation Trust, as the case may be, may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release of any such claims, rights and Causes of Action that the Debtors, the Reorganizing Debtors, the Reorganized Debtors, the Distribution Trust, the Liquidating Debtors or the Liquidation Trust may possess against such holder.

## Section 13.12. Cancellation of Instruments Evidencing Claims or Equity Interests

On the Effective Date, any Certificate evidencing a Claim against or Equity Interest in the Debtors shall be deemed cancelled solely with respect to the Reorganizing Debtors or the Liquidating Debtors, as the case may be, and such cancellation shall not alter the obligations or rights of any third parties vis-à-vis one another with respect to such Certificate.

## Section 13.13. Claims Paid or Payable by Third Parties

A Claim shall be reduced in full and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to, or action, order or approval of, the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, Reorganizing Debtor, Reorganized Debtor, or Liquidating Debtor, or from the Plan Administrator or third-party disbursing agent. To the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, Reorganizing Debtor, Reorganized Debtor, or Liquidating Debtor, or from the Plan Administrator or third-party disbursing agent, on account of such Claim, such holder shall repay, return or deliver any distribution held by or transferred to

the holder to the applicable Debtor, Reorganizing Debtor, Reorganized Debtor, Liquidating Debtor, Distribution Trust or Liquidation Trust, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE XIV

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

### Section 14.01. Prosecution of Objections to Claims

After the Effective Date, subject to the terms of the Distribution Trust Agreement and the Liquidation Trust Agreement, as applicable, the Plan Administrator shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim and shall have the exclusive authority to file objections and to settle, compromise, withdraw or litigate to judgment objections to Claims against the Debtors (except those Allowed by, or released by, the Plan, or by the Final DIP Order, the Confirmation Order or other Final Order). From and after the Effective Date, the Plan Administrator may settle or compromise any Disputed Claim against the Debtors without approval of the Bankruptcy Court or notice to any other party. The Plan Administrator shall file objections to any Disputed Claims in accordance with the Bankruptcy Rules on or before the Claims Objection Deadline, as the same may be extended pursuant to the terms of the Plan or order of the Bankruptcy Court.

### Section 14.02. Estimation of Claims

The Plan Administrator may at any time request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors, the Reorganizing Debtors, the Reorganized Debtors or the Liquidating Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time, including during litigation concerning any objection to any Claim, and during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Plan Administrator, on behalf of any Reorganizing Debtor, Reorganized Debtor or Liquidating Debtor, as applicable, may elect to pursue any supplemental proceedings to object to the allowance and any ultimate payment on such Claim. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

**Section 14.03. No Distributions on Disputed Claims**

Notwithstanding any provision in the Plan to the contrary, except as otherwise agreed by the Plan Administrator in its sole and absolute discretion, no distributions, partial or otherwise, shall be made with respect to a Disputed Claim until all disputes with respect to such Claim are resolved by Final Order.  Subject to the provisions of the Plan, after a Disputed Claim becomes an Allowed Claim, the holder of such Allowed Claim will receive all distributions to which such holder is then entitled under the Plan.  No post-Effective Date interest shall be paid on distributions hereunder.  If a Creditor incorporates more than one Claim in a Proof of Claim, then: (a) the Claims will be considered one Claim for purposes of the Plan, and (b) unless the Plan Administrator otherwise agrees in its sole and absolute discretion, no Claim will be bifurcated into an Allowed portion and a Disputed portion.

**Section 14.04. Reserve of Cash for Disputed Claims**

(a)  Reorganizing Debtors

On the Effective Date, the Reorganizing Debtors Claims Reserve shall be held, in part, for the benefit of holders of Disputed Claims, if any, against the Reorganizing Debtors.  As Disputed Claims against the Reorganizing Debtors are resolved, the Plan Administrator shall make distributions under the Subplans to holders of Allowed Claims against the Reorganizing Debtors and the Reorganizing Debtors Claims Reserve shall be adjusted accordingly; provided, however, that the Reorganizing Debtors Claim Reserve shall be approved by the Bankruptcy Court in the Confirmation Order, and that such amount shall be binding on all Holders of Disputed Claims against the Reorganizing Debtors.

(b)  Liquidating Debtors

On the Effective Date, the Liquidating Debtors Claims Reserve shall be held, in part, for the benefit of holders of Disputed Claims, if any, against the Liquidating Debtors.  As Disputed Claims against the Liquidating Debtors are resolved, the Plan Administrator shall make distributions under the Subplans to holders of Allowed Claims against the Liquidating Debtors and the Liquidating Debtors Claims Reserve shall be adjusted accordingly; provided, however, that the Liquidating Debtors Claim Reserve shall be approved by the Bankruptcy Court in the Confirmation Order, and that such amount shall be binding on all Holders of Disputed Claims against the Liquidating Debtors.

## ARTICLE XV

## CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

**Section 15.01. Conditions Precedent to Confirmation**

It shall be a condition to Confirmation of any Subplan that the following conditions shall have been satisfied or waived pursuant to the provisions of Section 11.04 of the Plan:

(i)    the Disclosure Statement Order shall have been entered by the Bankruptcy Court on the docket of the Chapter 11 Cases in form and substance acceptable to the Debtors and the Consultation Parties, and such order shall not be subject to a stay; and

(ii)    an order shall have been entered by the Bankruptcy Court on the docket of the Chapter 11 Cases in form and substance acceptable to the Debtors and the Consultation Parties, which may be the Confirmation Order (in which case Section 11.01(ii) of the Plan shall become a condition precedent to the Effective Date pursuant to Section 11.03 of the Plan), approving the Membership Interest Purchase and Sale Agreement, if any, and authorizing the Debtors to enter into and perform under it pursuant to its terms.

## Section 15.02. Effect of Non-Occurrence of Conditions to Confirmation or Conditions Precedent to the Effective Date

If the conditions in Section 11.01 and Section 11.03 of the Plan are not satisfied for any Subplan, or if the Confirmation Order is vacated regarding any Subplan, the affected Subplan shall be null and void in all respects and nothing contained in the affected Subplan or this Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors; (b) prejudice in any manner the rights of the Debtors, or any other Person or Entity; or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtors or any other Person or Entity in any respects.

## Section 15.03. Conditions Precedent to the Effective Date

It shall be a condition to occurrence of the Effective Date of any Subplan that the following conditions shall have been satisfied or waived pursuant to Section 11.04 of the Plan:

(i)    all conditions precedent to Confirmation have been satisfied;

(ii)    the Confirmation Order shall have been entered by the Bankruptcy Court on the docket of the Chapter 11 Cases in form and substance acceptable to the Debtors and the Consultation Parties, and such order shall not be subject to a stay;

(iii)    all closing conditions in the Membership Interest Purchase and Sale Agreement, if any, shall have been satisfied or waived in accordance with the terms thereof;

(iv)    all of the conditions precedent for effectiveness of the Exit Financing, if any, shall have been satisfied or waived in accordance with the terms thereof;

(v)    all financing provided to the Debtors pursuant to section 364 of the Bankruptcy Code, including the DIP Facility, shall have been paid or replaced, or other arrangements to the lenders providing such financing in

their discretion regarding the repayment and termination of such financing shall have been made;

(vi)     the Distribution Trust shall have been formed and the Distribution Trust Agreement, in form and substance acceptable to the Debtors and the Consultation Parties, shall have been executed and become enforceable;

(vii)    the Liquidation Trust shall have been formed and the Liquidation Trust Agreement, in form and substance acceptable to the Debtors and the Consultation Parties, shall have been executed and become enforceable;

(viii)   the appointment of the Plan Administrator shall have been confirmed pursuant to an order of the Bankruptcy Court, which may be the Confirmation Order and which shall not be subject to a stay;

(ix)     all reserves shall have been funded for the Reorganizing Debtors and Reorganized Debtors, as applicable, including the Reorganizing Debtors Claims Reserve and the Reorganizing Debtors Wind-Down Costs Reserve;

(x)      all reserves shall have been funded for the Liquidating Debtors, including the Liquidating Debtors Claims Reserve and the Liquidating Debtors Wind-Down Costs Reserve;

(xi)     the Professional Claims Reserve shall have been funded;

(xii)    all other actions and documents necessary to implement the provisions of the Plan to be effectuated on or before the Effective Date (including but not limited to the Plan Supplement and the Exit Financing Facility Documents) shall be reasonably satisfactory to the Debtors and the Consultation Parties; and

(xiii)   the Debtors shall have received all authorizations, consents, approvals, regulatory approvals, rulings, letters, opinions or documents, if any, necessary to implement the Plan.

**Section 15.04. Waiver of Conditions Precedent**

The Debtors, with the written approval of the Consultation Parties, may waive any of the conditions precedent set forth in Section 11.01 and Section 11.03 of the Plan in whole or in part at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to confirm and/or consummate the Plan.

## ARTICLE XVI

## EFFECT OF CONFIRMATION OF THE PLAN

**Section 16.01. Discharge of Claims**

**Except as otherwise provided for herein and effective as of the Effective Date: (a) the rights afforded in the Plan and the treatment of all Claims and Equity Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims against and Equity Interests in the Debtors, their property and Estates of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date; (b) the Plan shall bind all holders of Claims and Equity Interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) the Debtors shall be deemed discharged and released under and to the fullest extent provided under the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever and all Claims against and Equity Interests in the Debtors, their property and Estates shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Reorganizing Debtors, the Reorganized Debtors, the Distribution Trust, the Liquidating Debtors, the Liquidation Trust, their Estates, their successors and assigns and their assets and properties any and all Claims, Equity Interests, damages, debts, and other liabilities based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.**

**Section 16.02. Releases**

Under Section 12.02 of the Plan, the Debtors, the Reorganizing Debtors, the Reorganized Debtors, the Liquidating Debtors, the Estates and any Person or Entity seeking to exercise the rights of each of the foregoing (including the Plan Administrator or any third-party disbursing agent) have agreed to release the Released Parties (i.e., the Debtors and their Estates, each of the Debtors' current and former officers and directors, the Pre-Petition Secured Parties, the DIP Agent, the DIP Lenders, the L/C Issuer, the Distribution Trust, the Liquidation Trust, the Exit Lenders, and the respective Related Persons of each of the foregoing) from any and all claims and Causes of Action taking place before the Effective Date; provided, however, that the foregoing releases shall not apply to claims or Causes of Action resulting from fraud, gross negligence or willful misconduct of a Released Party. In addition, under Section 12.03 of the Plan, the Releasing Parties (i.e., the Debtors and each holder of a Claim against or Equity Interest in the Debtors that (a) affirmatively votes to accept or reject the applicable Subplan, (b) is Unimpaired pursuant to the applicable Subplan, or (c) rejects the Plan or abstains from voting on the applicable Subplan and who does not mark its Ballot indicating its desire to opt out of the releases provided in Section 12.03 of the Plan) have also agreed to release the Released Parties from any and all claims and Causes of Action taking place before the Effective Date; provided, however, that the foregoing releases shall not apply to claims or Causes of Action resulting from fraud, gross negligence or willful misconduct of a Released Party. **It is important to note that a holder of a Claim or Claims against any of the Debtors who opts out of the releases**

**described in Section 12.03 of the Plan will not receive any distributions under the Subplan for the applicable Debtor.** In addition, the Debtors believe the Pre-Petition Secured Parties are entitled to these releases in consideration for, among other reasons, their agreement to (i) waive their Allowed Pre-Petition Secured Parties Deficiency Claims, if any, and (ii) consent to the Debtors' Estates funding the distributions to holders of Allowed Claims under each Subplan so long as holders of such Allowed Claims do not submit a Ballot rejecting the Plan and opting out of the releases contained in Section 12.03 of the Plan.

The specific release provisions in the Plan are set forth below:

(a)    Certain Releases by the Debtors

**Notwithstanding anything contained herein to the contrary, as of the Effective Date, and to the fullest extent authorized by applicable law, for good and valuable consideration, the adequacy of which is hereby confirmed, the Released Parties are deemed released and discharged by the Debtors, the Reorganizing Debtors, the Reorganized Debtors, the Liquidating Debtors, the Estates and any Person or Entity seeking to exercise the rights of the Debtors, the Reorganizing Debtors, the Reorganized Debtors, the Liquidating Debtors or the Estates (including the Plan Administrator or any third-party disbursing agent) from any and all claims, obligations, suits, judgments, damages, demands, debts, remedies, Causes of Action, rights of setoff, other rights, and liabilities whatsoever, whether for tort, contract, violations of federal or state securities laws, Avoidance Actions, including any derivative claims, asserted or that could possibly have been asserted directly or indirectly on behalf of the Debtors, the Reorganizing Debtors, the Reorganized Debtors, the Liquidating Debtors, the Estates or their Affiliates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, and any and all Causes of Action asserted or that could possibly have been asserted on behalf of the Debtors, the Reorganizing Debtors, the Reorganized Debtors, the Liquidating Debtors, the Estates or their Affiliates (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Entity, based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganizing Debtors, the Reorganized Debtors, the Liquidating Debtors, the Estates or their Affiliates, the conduct of the Debtors' businesses, the in-court or out-of-court efforts to implement the Sale, the Membership Interest Purchase and Sale Agreement and/or the Exit Financing, the formulation, preparation, solicitation, dissemination, negotiation, or filing of the Disclosure Statement or Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with or pursuant to the Disclosure Statement, or the Plan, the filing and prosecution of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganizing Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors, the Reorganizing Debtors, the Liquidating Debtors, the Estates or their Affiliates, on the one hand, and any Released Party, on the other hand, prepetition contracts and agreements with one or more Debtors, or any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date; provided that to the extent that a claim or Cause of Action**

-93-

is determined by a Final Order to have resulted from fraud, gross negligence or willful misconduct of a Released Party, such claim or Cause of Action shall not be so released against such Released Party; <u>provided</u>, <u>however</u>, and for the avoidance of doubt, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in Section 12.02 of the Plan, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by Section 12.02 of the Plan; (c) in the best interests of the Debtors, their Estates and all holders of Claims and Equity Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity asserting any claim or Cause of Action released by Section 12.02 of the Plan.

(b)     <u>Certain Releases by Holders of Claims and Equity Interests</u>

Notwithstanding anything contained herein to the contrary, as of the Effective Date, and to the fullest extent authorized by applicable law, the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, remedies, Causes of Action, rights of setoff, other rights, and liabilities whatsoever, whether for tort, contract, violations of federal or state securities laws, Avoidance Actions, including any derivative claims, asserted or that could possibly have been asserted directly or indirectly on behalf of the Releasing Parties or their Affiliates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, and any and all Causes of Action asserted or that could possibly have been asserted on behalf of the Releasing Parties or their Affiliates (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Entity, based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganizing Debtors, the Liquidating Debtors, the Estates or their Affiliates, the conduct of the Debtors' businesses, the in-court or out-of-court efforts to implement the Sale, the Membership Interest Purchase and Sale Agreement and/or the Exit Financing, the formulation, preparation, solicitation, dissemination, negotiation, or filing of the Disclosure Statement or Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with or pursuant to the Disclosure Statement, or the Plan; the filing and prosecution of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganizing Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any of the Debtors, the Reorganizing Debtors, the Liquidating Debtors, the Estates or their Affiliates, on the one hand, and any Released Party, on the other hand, prepetition contracts and agreements

with one or more Debtors, or any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date; provided that to the extent that a claim or Cause of Action is determined by a Final Order to have resulted from fraud, gross negligence or willful misconduct of a Released Party, such claim or Cause of Action shall not be so released against such Released Party.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any obligations arising on or after the Effective Date of any party under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in Section 12.03 of the Plan, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by Section 12.03 of the Plan; (c) in the best interests of the Debtors and all holders of Claims and Equity Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity granting a release under Section 12.03 of the Plan from asserting any claim or Cause of Action released by Section 12.03 of the Plan.

Section 16.03. Exculpation

Effective as of the Effective Date and to the fullest extent authorized by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim or any obligation, Cause of Action, or liability for any Exculpated Claim except to the extent determined in a Final Order to have resulted from actual fraud, gross negligence or willful misconduct of such Exculpated Party.  The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of acceptances and rejections of the Plan and the making of distributions pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable, law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

Section 16.04. Injunction

Except as otherwise provided herein or in the Confirmation Order, from and after the Effective Date and to the fullest extent authorized by applicable law, all Entities are, to the fullest extent provided under section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined and forever barred from taking any of the following actions against, as applicable, the Released Parties, the Reorganizing Debtors, the Reorganized Debtors, the Liquidating Debtors, the Distribution Trust, the Liquidation Trust and/or the Exculpated Parties and their respective properties and Assets: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Claims against or Equity Interests in the Debtors; (b) enforcing, attaching, collecting, or recovering by any manner or means

any judgment, award, decree, or order on account of or in connection with or with respect to any such Claims or Equity Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind on account of or in connection with or with respect to any such Claims or Equity Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind on account of or in connection with or with respect to any such Claims or Equity Interests unless such holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Equity Interests released, exculpated or settled pursuant to the Plan.

### Section 16.05. Protection Against Discriminatory Treatment

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganizing Debtor, Reorganized Debtor or Liquidating Debtor, as applicable, or any Entity with which a Reorganizing Debtor, Reorganized Debtor or Liquidating Debtor has been or is associated, solely because such Reorganizing Debtor, Reorganized Debtor or Liquidating Debtor was a debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Reorganizing Debtor, Reorganized Debtor or Liquidating Debtor was granted a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

### Section 16.06. Release of Liens

Except as otherwise provided herein, in the Confirmation Order, or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released, settled and discharged, and all of the rights, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Distribution Trust, the Liquidation Trust, the Plan Administrator or third-party disbursing agent, as applicable.

### Section 16.07. Cancellation of Securities

So long as the treatments provided for in, and the distributions contemplated by, ARTICLE II, ARTICLE III and ARTICLE IV of the Plan are effectuated or made, on the Effective Date, but subject to Section 12.08 of the Plan, each of (a) the Pre-Petition Reimbursement Agreement; (b) the DIP Credit Agreement; (c) the Equity Interests in Optim Generation; (d) the Equity Interests in Optim Energy; (e) the Equity Interests in Optim Marketing; (f) the Equity Interests in OEM; (g) the Equity Interests in Twin Oaks GP; (h) the Equity Interests in Twin Oaks LP; and (i) any other notes, bonds, indentures, certificates or other instruments or documents evidencing or creating any Claims or Equity Interests that are Impaired by the Plan, shall be cancelled and deemed terminated and satisfied and discharged with respect to the Debtors, and the holders thereof shall have no further rights or entitlements in respect thereof against the Debtors, except the rights to receive the distributions, if any, to which the holders thereof are entitled under the Plan.

# ARTICLE XVII

# MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

## Section 17.01. Modification of a Subplan

The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, and subject to the written approval of the Consultation Parties, to amend or modify the Plan or any Subplan before the entry of the Confirmation Order, subject to the limitations set forth herein and the Membership Interest Purchase and Sale Agreement, if any. After entry of the Confirmation Order for any Subplan, the Debtors may amend or modify such Subplan, subject to the written approval of the Consultation Parties and in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission or reconcile any inconsistency in such Subplan in such manner as may be necessary to carry out the purpose and intent of the Subplan, provided that such post-Confirmation amendment or modification shall be subject in all cases to the limitations set forth in the Membership Interest Purchase and Sale Agreement, if any.

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan or any Subplan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

## Section 17.02. Revocation or Withdrawal of a Subplan

The Debtors reserve the right, subject to the written approval of the Consultation Parties to revoke or withdraw the Plan or any Subplan before the Confirmation Date and to file subsequent chapter 11 Subplans.  If the Debtors revoke or withdraw a Subplan, or if Confirmation or the Effective Date does not occur with respect to any Subplan, then: (a) the affected Subplan will be null and void in all respects; (b) any settlement or compromise embodied in the Subplan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Subplan, and any document or agreement executed pursuant hereto shall be null and void in all respects; and (c) and nothing contained in the affected Subplan or this Disclosure Statement shall: (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors; (ii) prejudice in any manner the rights of the Debtors or any other Entity, or (iii) constitute an admission, acknowledgment, offer or undertaking by the Debtors or any other Entity in any respects; provided that Section 13.02 of the Plan subject in all cases to the limitations set forth in the Membership Interest Purchase and Sale Agreement, if any.

# ARTICLE XVIII

# RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date for any Subplan, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases after the Effective Date as legally permissible, including jurisdiction to:

(i)     allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims;

(ii)    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(iii)   resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease (including Cure Costs) to which the Debtors are parties or with respect to which the Debtors may be liable, including but not limited to matters related to the Walnut Creek Claims;

(iv)    ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(v)     decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

(vi)    enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, the Disclosure Statement, the Membership Interest Purchase and Sale Agreement and/or the Exit Financing;

(vii)   enter and enforce any order related to the Sale or otherwise in connection with any sale of property pursuant to sections 363 or 1123 of the Bankruptcy Code;

(viii)  decide or resolve any Causes of Action arising under the Bankruptcy Code, including, without limitation, Avoidance Actions and Claims under sections 362, 510, 542 and 543 of the Bankruptcy Code;

(ix)    resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Plan or any Subplan, or any Person's or Entity's obligations incurred in connection with the Plan or any Subplan;

(x)     issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with Consummation or enforcement of the Plan or any Subplan, except as otherwise provided herein;

(xi)    resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in ARTICLE XII of the

Plan and enter such orders as may be necessary or appropriate to implement such releases, injunction and other provisions;

(xii)   enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(xiii)  determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, the Membership Interest Purchase and Sale Agreement and/or the Exit Financing, or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or the Disclosure Statement;

(xiv)  enter order(s) and/or Final Decree(s) concluding the Chapter 11 Cases;

(xv)   consider any post-Confirmation property sale(s) of the type specified in Section 6.09 of the Plan, and enter an order(s) with respect thereto;

(xvi)  hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(xvii) consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Court, including the Confirmation Order; and

(xviii) hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XIX

## MISCELLANEOUS PROVISIONS

### Section 19.01. Corporate Action

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Equity Interests, directors, managers or officers of the Plan Administrator, the Plan Administrator, the Reorganizing Debtors, the Reorganized Debtors, the Liquidating Debtors or any other Entity or Person, as applicable, including: (a) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) rejection or assumption, as applicable, of  Executory Contracts and Unexpired Leases; (d) selection of the

board of directors of Reorganized Generation or any employees or trustee of the Distribution Trust or the Liquidation Trust; (e) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; (f) the consummation of the transactions contemplated by the Membership Interest Purchase and Sale Agreement, if any; (g) the consummation of the transactions contemplated by the Exit Financing and the execution of all documents related thereto; (h) the issuance of the Reorganized OEG Equity Interests and the execution of all documents related thereto; and (i) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law. All matters provided for in the Plan involving the company structure of the Debtors, and any company action required by the Debtors in connection therewith, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, authorized persons or officers of the Debtors. The authorizations and approvals contemplated by Section 15.01 of the Plan shall be effective notwithstanding any requirements under nonbankruptcy law.

### Section 19.02. Securities Issued Under the Plan

The new Reorganized OEG Equity Interests will be issued under the Plan. The Reorganized OEG Equity Interests will be exempt from registration under Section 4(a)(2) of the Securities Act of 1933 or, if issued to the Pre-Petition Secured Parties, then under section 1145(a) of the Bankruptcy Code.

### Section 19.03. General Settlement of Claims

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan constitute a good-faith compromise and settlement of all Claims and Equity Interests.

### Section 19.04. Preservation of Causes of Action Not Expressly Released

The Plan Administrator, on behalf of the Distribution Trust and the Liquidation Trust, as applicable, retains all rights on behalf of the Reorganizing Debtors, the Reorganized Debtors and the Liquidating Debtors, respectively, to commence and pursue, as appropriate, any and all claims or Causes of Action, whether arising before or after the Petition Date, in any court or other tribunal including, without limitation, in an adversary proceeding filed in one or more of the Debtors' Chapter 11 Cases other than Avoidance Actions or any Causes of Action released under the Plan. The failure to list any potential or existing claims or Causes of Action is not intended to limit the rights of the Plan Administrator to pursue any claims or Causes of Action not listed or identified.

Unless a claim or Cause of Action against a Creditor or other Person or Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, the Debtors expressly reserve such claim or Cause of Action for later adjudication by the Plan Administrator for and on behalf of the Debtors, the Reorganizing Debtors, the Reorganized Debtors and the Liquidating Debtors (including, without limitation, claims and Causes of Action

not specifically identified or which Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to Debtors at this time or facts or circumstances which may change or be different from those which the Debtors now believe to exist).   No preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such claims or Causes of Action upon or after the Confirmation or Consummation of the Plan based on this Disclosure Statement, the Plan or the Confirmation Order, except where such claims or Causes of Action have been released in the Plan or other Final Order.   In addition, the Debtors and their successor entities under the Plan expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Person or Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Except as otherwise provided in the Plan or in any contract, instrument, release, indenture or other agreement entered into in connection with the Plan, in accordance with section 1123(b)(3) of the Bankruptcy Code, any claims, rights, and Causes of Action that the respective Debtors, Reorganizing Debtors, Reorganized Debtors, or Liquidating Debtors may hold against any Person, shall vest in the Distribution Trust and the Liquidation Trust, and the Distribution Trust and the Liquidation Trust, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such claims, rights or Causes of Action.   The Plan Administrator, for and on behalf of the Distribution Trust and Liquidation Trust, shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such claims, rights, and Causes of Action without the consent or approval of any third party and without any further order of court.

Delivery (by any means) of the Plan or Disclosure Statement to any Person to whom the Debtors, the Reorganizing Debtors, the Reorganized Debtors or the Liquidating Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors, the Reorganizing Debtors, the Reorganized Debtors or the Liquidating Debtors, or a transfer of money or property of the Debtors, the Reorganizing Debtors, the Reorganized Debtors or the Liquidating Debtors, or who has transacted business with the Debtors, the Reorganizing Debtors, the Reorganized Debtors or the Liquidating Debtors, or leased equipment or property from the Debtors, the Reorganizing Debtors, the Reorganized Debtors or the Liquidating Debtors, shall constitute actual notice that such obligation, transfer, or transaction may be reviewed by the Debtors, the Reorganizing Debtors, the Reorganized Debtors, the Liquidating Debtors or the Plan Administrator subsequent to the Effective Date and may, if appropriate, be the subject of an action after the Effective Date, whether or not: (a) such Person has filed a Proof of Claim against Debtors, the Reorganizing Debtors, the Reorganized Debtors or the Liquidating Debtors in these Chapter 11 Cases; (b) such Person's Proof of Claim has been objected to by the Debtors, the Reorganizing Debtors, the Reorganized Debtors, the Liquidating Debtors or the Plan Administrator; (c) such Person's Claim was included in Debtors' Schedules; (d) such Person's scheduled Claim has been objected to by the Debtors, the Reorganizing Debtors, Reorganized Debtors, the Liquidating Debtors or the Plan Administrator or has been identified by the Debtors, the Reorganizing Debtors, Reorganized Debtors, the Liquidating Debtors or the Plan Administrator as a Disputed Claim; or (e) such action falls within the list of affirmative Causes of Action in the Plan Supplement.

**Section 19.05. Section 1146(a) Exemption**

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property under the Plan (including the Sale, if any) shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording tax, or other similar tax or governmental assessment.  Upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax, fee, or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

**Section 19.06. Elimination of Vacant Classes**

Any Class of Claims against, or Equity Interests in, the Debtors that is not populated as of the commencement of the Confirmation Hearing by an Allowed Claim or Equity Interest or a Claim or Equity Interest temporarily allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the applicable Subplan for purposes of: (a) voting to accept or reject the Subplan; and (b) determining the acceptance or rejection of the Subplan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**Section 19.07. Intercompany Claims**

On the Effective Date, all Intercompany Claims shall be cancelled, extinguished and discharged and the holders of Intercompany Claims shall not receive or retain any property under the Plan on account of such Intercompany Claims.  This determination was made by the Debtors in consultation with the Consultation Parties.

**Section 19.08. Additional Documents**

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Subplans for the Reorganizing Debtors or the Liquidating Debtors.  The Debtors, the Reorganizing Debtors, the Reorganized Debtors or the Liquidating Debtors, as applicable, and all holders of Claims and Equity Interests receiving distributions pursuant to any Subplan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**Section 19.09. Successors and Assigns**

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

**Section 19.10. Reservation of Rights**

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, this Disclosure Statement, the Confirmation Order or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the holders of Claims or Equity Interests prior to the Effective Date.

**Section 19.11. Notices**

Except as otherwise set forth in the Plan, all notices or requests in connection with the Plan shall be in writing and will be deemed to have been given when received by personal delivery, facsimile, e-mail, overnight courier or first class mail and addressed to:

| **If to the Debtors:** | Bracewell & Giuliani LLP<br>CityPlace I, 34th Floor<br>185 Asylum Street<br>Hartford, Connecticut 06103<br>Attn: Kurt Mayr<br><br>with a copy to:<br><br>Bracewell & Giuliani LLP<br>1251 Avenue of Americas, 49th Floor<br>New York, New York 10020<br>Attn: Robert G. Burns |
|---|---|
| **If to the Consultation Parties:** | Cleary Gottlieb Steen & Hamilton LLP<br>One Liberty Plaza<br>New York, New York 10006<br>Attn: Lindsee P. Granfield<br>     Luke A. Barefoot |

**Section 19.12. Term of Injunctions or Stay**

**Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

## Section 19.13. Entire Agreement

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.  To the extent the Confirmation Order is inconsistent with the Plan, the Confirmation Order shall control for all purposes.

## Section 19.14. Plan Supplement Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Claims and Solicitation Agent's website at https://cases.primeclerk.com/optim/Home-DocketInfo or the Bankruptcy Court's website at www.deb.uscourts.gov.

## Section 19.15. Severability

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, and subject to the written approval of the Consultation Parties, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms; (b) integral to the Plan; and (c) non-severable and mutually dependent.

## Section 19.16. Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

## ARTICLE XX

## RISK FACTORS

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

**THESE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE PLAN AND ITS IMPLEMENTATION.**

**Section 20.01. Risks Related to the Plan and Other Bankruptcy Law Considerations**

(a)    A Claim or Equity Interest Holder May Object to, and the Bankruptcy Court May Disagree with, the Debtors' Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, which are substantially similar to the other Claims and Equity Interests in each such class.  However, a Claim or Equity Interest holder could challenge the Debtors' classification.  In such an event, the cost of the Chapter 11 Cases and the time needed to confirm the Plan (including the Subplans therein) may increase, and there can be no assurance that the Bankruptcy Court will agree with the Debtors' classification.  If the Bankruptcy Court concludes that either or both of the classifications of Claims and Equity Interests under any of the Subplan(s) does not comply with the requirements of the Bankruptcy Code, the Debtors may need to modify the Subplan(s).  Such modification could require re-solicitation of votes on the applicable Subplan(s).  The Subplan(s) may not be confirmed  if the Bankruptcy Court determines that the Debtors' classification of Claims and Equity Interests is not appropriate.

(b)    The Debtors May Not Be Able to Satisfy the Voting Requirements for Confirmation of the Subplan(s)

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Subplan(s), the Debtors may seek, as promptly as practicable thereafter, Confirmation.  If the Subplan(s) is not accepted by at least one Class of Claims that is impaired under the applicable Subplan(s), the Debtors may elect to amend the Subplan(s), seek to sell their assets pursuant to section 363 of the Bankruptcy Code, or proceed with liquidation.

Although styled as a "joint" plan, the Plan consists of eight (8) separate Subplans (one for each of the Debtors), and each Debtor is a proponent herein within the meaning of section 1129 of the Bankruptcy Code in its respective Chapter 11 Case.  If any Subplan(s) is not confirmed, then the Debtors reserve the right to either (a) request that other Subplans be confirmed or (b) withdraw some or all Subplans.  The Debtors' inability to confirm or election to withdraw any Subplan(s) shall not impair the confirmation of any other Subplan(s).

(c)    The Bankruptcy Court May Not Confirm the Subplan(s)

The Debtors cannot assure you that any or all the Subplan(s) will be confirmed by the Bankruptcy Court.  Section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a plan of reorganization, requires, among other things, a finding by a bankruptcy court that the plan of reorganization is "feasible," that all claims and interests have been

classified in compliance with the provisions of section 1122 of the Bankruptcy Code, and that, under the plan of reorganization, each holder of a claim or interest within each impaired class either accepts the plan of reorganization or receives or retains cash or property of a value, as of the date the plan of reorganization becomes effective, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. There can be no assurance that the Bankruptcy Court will conclude that the feasibility test and other requirements of section 1129 of the Bankruptcy Code have been met with respect to the Subplan(s).

If the Subplan(s) are not confirmed, the Chapter 11 Cases may be converted into cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  An analysis of the effects that a chapter 7 liquidation would have on the recoveries of holders of claims and interests is provided in the Liquidation Analysis, which is attached hereto as **Exhibit C**.  As set forth in the Liquidation Analysis, in the case of a chapter 7 liquidation, any Sale proceeds are expected to be insufficient to pay Allowed Pre-Petition Secured Parties Secured Claims in full and, as a result, holders of Claims against the Debtors, including holders of Claims pursuant to Section 503(b)(9) of the Bankruptcy Code, are unlikely to receive any recovery.  The Debtors believe that the Plan provides a greater recovery for holders of Allowed Claims and Equity Interests than would be achieved in a liquidation under chapter 7 of the Bankruptcy Code.  This belief is based on a number of considerations, including: (a) the Debtors' assets would have a substantially reduced value in a chapter 7 liquidation; (b) the Administrative Claims would significantly increase as a result of conversion to a chapter 7 case; (c) the delays caused by a chapter 7 liquidation; and, perhaps most importantly, (d) the Consultation Parties' consent to fund Cash distributions to junior Classes of Claims and Equity Interests despite not being paid in full under the Plan on account of their Pre-Petition Secured Parties Secured Claims.  The Debtors believe there is insufficient value to fund these Cash distributions to creditors in a chapter 7 liquidation.

(d)    Nonconsensual Confirmation

In the event that any impaired class of claims against or interests in a debtor does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any insider in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased Administrative Claims.

(e)     The Debtors May Object to the Amount or Classification of a Claim or Equity Interest

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Equity Interest under the Subplans.  The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim or Equity Interest where such Claim or Equity Interest is subject to an objection.  Any holder of a Claim or Equity Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

(f)     Even if the Debtors Receive All Necessary Acceptances for the Subplans to Become Effective, the Debtors May Fail to Meet All Conditions Precedent to Effectiveness of the Subplans

The Confirmation and effectiveness of the Subplans are subject to certain conditions that may or may not be satisfied.  The Debtors cannot assure you that all requirements for Confirmation and effectiveness required under the Subplans will be satisfied.

(g)     Contingencies May Affect Distributions to Holders of Allowed Claims and Equity Interests

The distributions available to holders of Allowed Claims and Equity Interests under the Subplans can be affected by a variety of contingencies, including, whether the Bankruptcy Court orders certain Allowed Claims to be disallowed or subordinated to other Allowed Claims.  For example, the Debtors cannot determine whether certain Classes of Claims against the Liquidating Debtors will vote to accept the applicable Subplan(s).  Without such Class acceptance, holders of Claims in these Classes will not receive a distribution on account of their Allowed Claims under the Subplan(s).  The occurrence of such contingencies could affect distributions under the Subplans.

(h)     Allowed Claims May Exceed Amount in the Claims Reserves

Unless explicitly provided otherwise in the Plan with respect to a particular Claim, the Reorganizing Debtors Claims Reserve and the Liquidating Debtors Claims Reserve, as applicable with respect to each Claim, shall be the only source of recovery for Claims not Allowed as of the Effective Date (including Disputed and contingent Claims).  There is a risk that if such Claims are allowed in higher amounts than the aggregate available in the Reorganizing Debtors Claims Reserve and the Liquidating Debtors Claims Reserve, as applicable, and accounting for other Claims that were Allowed in higher or lower amounts, certain Claims not Allowed as of the Effective Date may receive lower recoveries.

(i)     The Debtors May Seek to Amend, Waive, Modify or Withdraw a Subplan(s) at Any Time Prior to Confirmation

The Debtors reserve the right, subject to the written approval of the Consultation Parties, to revoke or withdraw the Plan or any Subplan before the Confirmation Date and to file subsequent chapter 11 Subplans prior to the Confirmation of the Subplan(s) or substantial Consummation thereof, subject to the provisions of section 1127 of the Bankruptcy Code and

applicable law, to amend the terms of the Subplan(s) or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to Consummate the Subplan(s). The potential impact of any such amendment or waiver on the holders of Claims and Equity Interests cannot presently be foreseen but may include a change in the economic impact of the applicable Subplan(s) on some or all of the proposed classes or a change in the relative rights of such classes. All holders of Claims and Equity Interests will receive notice of such amendments or waivers to the extent required by applicable law or the Bankruptcy Court. If, after receiving sufficient acceptances, but prior to Confirmation of the Subplan(s), the Debtors seek to modify the Subplan(s), the previously solicited acceptances will be valid only if (i) all Classes of adversely affected creditors and interest holders accept the modification in writing, or (ii) the Bankruptcy Court determines, after notice to designated parties, that such modification did not adversely change the treatment of holders of accepting Claims and Equity Interests or is otherwise permitted by the Bankruptcy Code.

(j)     Releases, Injunctions, and Exculpations Provisions May Not Be Approved

ARTICLE XII of the Plan provides for certain releases, injunctions, and exculpations. However, all of the releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.

(k)     No Substantive Consolidation

The Debtors are not seeking substantive consolidation. The Claims held against any one of the Debtors will be satisfied solely from the assets of such Debtor. Nothing in the Plan shall constitute or be deemed to constitute an admission that one of the Debtors is subject to or liable for any Claim against any other Debtor. The Claims of Creditors that hold Claims against all Debtors will be treated as separate Claims with respect to each Debtor's Estate for all purposes (including, but not limited to, distributions and voting), and such Claims will be administered as provided in the Plan and each Subplan.

(l)     The Debtors Cannot Predict the Amount of Time Spent in Bankruptcy for the Purpose of Implementing the Plan (Including the Subplans Therein).

The Debtors estimate that the process of obtaining Confirmation of the Plan by the Bankruptcy Court will last approximately sixty (60) to ninety (90) days from filing the Plan, but it could last considerably longer if, for example, Confirmation is contested or the conditions to Confirmation or Consummation are not satisfied or waived. If the Debtors are unable to obtain Confirmation of the Subplans on a timely basis, because of a challenge to the Plan or otherwise, the Debtors may be forced to operate in bankruptcy for a longer period of time while they try to develop a different reorganization plan that can be confirmed. A protracted bankruptcy case could increase both the probability and the magnitude of the adverse effects described above.

(m)     Other Parties in Interest Might Be Permitted to Propose Alternative Plans of Reorganization that May Be Less Favorable to Certain of the Debtors' Constituencies than the Plan

Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization to the Plan. Under the Bankruptcy Code, a debtor in

possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization for a period of one hundred twenty (120) days from filing. However, such exclusivity period can be reduced or terminated upon order of a bankruptcy court. The Debtors' exclusive period to file a plan of reorganization currently extends through June 9, 2015. If the Bankruptcy Court does not enter an order further extending this period, other parties in interest may then have the opportunity to propose alternative plans of reorganization.

If other parties in interest were to propose an alternative plan of reorganization following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to existing holders of Claims and Equity Interests and may seek to exclude these holders from receiving the distributions completed by the Plan. Alternative plans of reorganization also may treat less favorably the Claims of a number of other constituencies, including the Debtors' trading partners and customers. The Debtors consider maintaining relationships with their Creditors, trading partners, and customers as critical to maintaining the value of the Reorganized Debtors following the Effective Date, and have sought to treat those constituencies accordingly. However, proponents of alternative plans of reorganization may not share the Debtors' assessments and may seek to impair the Claims of such constituencies to a greater degree. If there were competing plans of reorganization, the Chapter 11 Cases likely would become longer, more complicated, and much more expensive. If this were to occur, or if the Debtors' other constituencies important to the Debtors' business reacted adversely to an alternative plan of reorganization, there could be adverse consequences to holders of Claim against and Equity Interests in the Debtors.

       (n)       <u>The Debtors May Be Unable to Assume Executory Contracts and Unexpired Leases</u>

The Debtors may need to obtain the consent of the counterparty to maintain the benefit of the contract or lease. There is no guarantee that such consent either would be forthcoming or that conditions would not be attached to any such consent that makes assuming the contracts unattractive. The Debtors then would be required to either forego the benefits offered by such contracts or to find alternative arrangements to replace them. There can be no assurance that alternative arrangements can be found.

       (o)       <u>The Membership Interest Purchase and Sale Agreement, if Any, Could Terminate Prior to the Effective Date</u>

The Membership Interest Purchase and Sale Agreement, if any, could terminate prior to the Effective Date. If so, Confirmation may be delayed.

       (p)       <u>There Can be No Assurance that a Sale, if Any, Will Be Successfully Completed on the Timetable Currently Proposed or at All.</u>

The Sale, if any, may be subject to customary closing conditions, including the absence of legal prohibitions on the consummation of the Sale, the accuracy of the representations and warranties of the parties to the Membership Interest Purchase and Sale Agreement, the performance by such parties of their respective obligations under the Membership Interest Purchase and Sale Agreement and the absence of a material adverse effect on the Reorganizing

Debtors.  There can be no assurance that the conditions to closing of the Sale will be satisfied or waived or that other events will not intervene to delay or prevent the closing of the Sale, causing the Confirmation of certain Subplans to be delayed.

(q)    Necessary Governmental Approvals for the Sale, if Any, May Not Be Granted

Consummation of the Sale depends upon various approvals required by governmental authorities.  Failure by any governmental authority to grant a necessary approval could prevent consummation of the Sale, and delay Confirmation of certain Subplans.

(r)    The Debtors May Not Be Able to Secure Plan Confirmation Within the Milestones Currently Required by the DIP Facility

The Debtors may not be able to secure Confirmation of the Plan within the milestones currently contemplated by the DIP Credit Agreement.  Currently, the Debtors must obtain Confirmation of the Plan and Consummation thereof or consummate the Sale contemplated by the Sale Proposal by May 12, 2015, unless further extended by the DIP Lenders.  In addition, due to the scheduled DIP maturity on May 12, 2015, the Debtors have been in discussions with the DIP Lenders regarding the terms of an extension of the DIP Facility.  The Debtors may not be able to obtain Confirmation and Consummation of the Plan within the current deadlines, and the Debtors cannot guarantee that the DIP Lenders will agree to amend the DIP Credit Agreement to extend these milestones any further, or grant an extension of the DIP Facility.  To the extent that the terms or conditions of the DIP Credit Agreement are not satisfied, or to the extent events giving rise to termination of the DIP Facility under the DIP Credit Agreement occur, the DIP Facility may terminate prior to the Confirmation of the Plan, which could result in the loss of financing and/or support for the Plan by important creditor constituents.  Any such loss of financing and/or support could adversely affect the Debtors' ability to reorganize and confirm and Consummate the Plan.

(s)    Non-Occurrence of the Effective Date

Operating in bankruptcy imposes significant risks on the Debtors' operations.  If the Sale does not occur, the Debtors believe that the Effective Date will occur very shortly after the Confirmation Date, however there can be no assurance as to such timing.  If the Sale does occur, the Effective Date may not occur until sixty (60) to ninety (90) days or longer after the Confirmation Date, due in large part to the environmental and regulatory approvals that will be required to close the Sale, however there can be no assurance as to such timing.  In fact, there can be no assurance as that the conditions to the Effective Date will ever be satisfied, including without limitation: (i) entry of the Confirmation Order by the Bankruptcy Court in form and substance reasonably acceptable to the Debtors and the Consultation Parties; (ii) the satisfaction (or waiver in accordance with the terms therein) of the conditions precedent for the closing of the Exit Financing; and (iii) the Debtors' receipt of all authorizations, consents, approvals, regulatory approvals, rulings, letters, opinions or documents, if any, necessary to implement the Plan.

(t)    The Debtors' Ability to Consummate the Plan May Be Jeopardized Due to a Potential Liquidity Shortfall

If the Sale contemplated by the Plan does not close by September 30, 2015, the Debtors' ability to reorganize may be jeopardized in light of a potential lack of liquidity. The Debtors have agreed with the DIP Lenders regarding the initial three-month extension (to May 12, 2015) contemplated by the DIP Facility. In addition, due to the scheduled DIP maturity on May 12, 2015, the Debtors have been in discussions with the DIP Lenders regarding the terms of an extension of the DIP Facility. There can be no guarantee of any further extension of the DIP Facility, nor can there be any assurance that a replacement facility can be found. The Debtors may not have sufficient Cash to safely and effectively operate their businesses during the pendency of these Chapter 11 Cases, absent further financing, which may in turn impact the Debtors' ability to Consummate the Plan.

(u)    Walnut Creek Motion

On March 13, 2015, the Delaware District Court entered an order affirming the Bankruptcy Court's decision denying Walnut Creek derivative standing to pursue purported claims on behalf of the Debtors against Cascade and ECJV as Pre-Petition Secured Parties, as described in Section 5.05 of this Disclosure Statement. It is unclear whether Walnut Creek will further appeal the Delaware District Court's decision. If a further appeal is pursued, and if Walnut Creek ultimately were to succeed in such appeal and obtain derivative standing to bring these claims against the Pre-Petition Secured Parties, the Pre-Petition Secured Parties may withdraw their support for the Plan, including their consent to the Debtors' Estates funding the distributions to holders of Allowed Claims under each Subplan, which distributions are currently given so long as holders of such Allowed Claims do not submit a Ballot rejecting the Plan and opting out of the releases contained in Section 12.03 of the Plan and for holders of General Unsecured Claims, Convenience Class Claims and Walnut Creek Claims, so long as each respective Class also votes to accept the applicable Subplan. In this circumstance, the Debtors: (i) may withdraw the Plan in its entirety resulting in delay both in Confirmation and the Debtors' emergence from chapter 11; or (ii) reserve the right, in the event the Pre-Petition Secured Parties do not withdraw support for the Plan, to continue seeking Confirmation and Consummation of one or more of the Subplans.

(v)    Certain Claims May Not Be Discharged

The Debtors are subject to complex and stringent energy, environmental, and other governmental laws and regulations at the federal, state, and local levels in connection with the development, ownership, and operation of the power plants, and in connection with the purchase and sale of electricity. There may be future claims not discharged in the Chapter 11 Cases related to the Debtors' business operations and this regulatory environment.

In particular, Debtors' activities in the ERCOT wholesale market are subject to electric reliability standards, market governance rules, and prohibitions on certain activities promulgated under federal and state law. An occurrence of a violation of such standards, rules, and prohibitions could result in substantial penalties and disgorgement of excess revenues resulting

from the violation.  If any such violation were to be found to have occurred, such matter might not be discharged in the Chapter 11 Cases related to the Debtors' business operations.

(w)     Certain Material U.S. Federal Income Tax Consequences

Certain material U.S. federal income tax consequences of the Plan are summarized in ARTICLE XXIV of this Disclosure Statement.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described therein.  No ruling from the U.S. Internal Revenue Service ("*IRS*") has been sought by the Debtors regarding the tax consequences described in this Disclosure Statement.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position disclosed in this Disclosure Statement. For a more detailed discussion please review ARTICLE XXIV of this Disclosure Statement.

**Section 20.02. Certain Business Specific Risk Factors**

If the Debtors do not receive a Qualifying Bid that meets or exceeds the Reserve Price on terms satisfactory to the Debtors and the Consultation Parties by the Bid Deadline (as defined in the Bidding Procedures), the Debtors will terminate the Sale process and seek Confirmation of the Plan, which in such circumstance, would convert a portion of the Allowed Pre-Petition Secured Parties Secured Claims into Reorganized OEG Equity Interests.  In this circumstance, the Reorganizing Debtors would (subject to Confirmation and Consummation) emerge as Reorganized Debtors subject to ongoing business and financial risks after bankruptcy, which could affect the Pre-Petition Secured Parties (or their assignee) on account of their ownership of the Reorganized OEG Equity Interests, as well as counterparties to any assumed Executory Contracts and Unexpired Leases.  Such business risk factors include:

(a)     General Economic Conditions

In its financial projections, the Debtors have assumed that the general economic conditions of the U.S. economy will improve over the next several years.  The stability of economic conditions is subject to many factors outside the Debtors' control, including interest rates, inflation, unemployment rates, the housing market, consumer spending, war, terrorism, natural disasters, and other such factors.  Any one of these or other economic factors could have a significant effect on the operating performance of the Debtors.

(b)     Implementation of Business Plan

The Debtors believe that the Reorganized Debtors will succeed in implementing and executing its business plan and financial restructuring.  There are risks, however, that the goals of the Reorganized Debtors' going-forward business plan and financial restructuring strategy will not be achieved.  In such event, the Reorganized Debtors may be unable to restructure their funded debt or be forced to sell all or parts of their business, develop and implement further restructuring plans not contemplated in this Disclosure Statement, or become subject to further insolvency proceedings.

(c)     Repairs to Gas Plant Portfolio

There may be repairs necessary in the future to allow the Gas Plant Portfolio to operate at or near full capacity.  There are risks, however, that such repairs may be unsuccessful and that the Reorganized Debtors may suffer loss of cash flow due to operational issues at the Gas Plant Portfolio.  In such event, the Reorganized Debtors may be unable to restructure their funded debt or be forced to sell all or parts of their business, develop and implement further restructuring plans not contemplated in this Disclosure Statement, or become subject to further insolvency proceedings.

(d)     Contracts

As described in the First Day Declaration, the Reorganizing Debtors' contracts are instrumental to their ongoing business operations.  Some of these contracts are summarized in Section 3.08, Section 3.09, Section 4.02(e) and Section 5.10 of this Disclosure Statement.  If the Reorganized Debtors are unable to maintain these contracts, the Reorganized Debtors may be unable to find alternative contract counterparties at economically feasible prices, which could increase operational costs and cause a material adverse effect on the Reorganized Debtors' business, financial condition, and results of operations.

(e)     Seasonality

The Debtors' principal sources of revenue are revenues generated by power generation. The Debtors experience seasonal revenue patterns similar to those of the merchant power generation industry in general.  This seasonality can be expected to also cause fluctuations in the Reorganized Debtors' revenues, cash flows, profit margins, and net income.

(f)     Competition

The power generation industry is highly competitive, which may affect the Reorganized Debtors' ability to compete successfully for customers with their industry competitors.  The Debtors generally operate in markets that contain numerous competitors.  The Reorganized Debtors' ability to remain competitive requires the Reorganized Debtors to offer their electricity at competitive prices vis-à-vis the national and regional markets.  If the Reorganized Debtors are unable to compete successfully in these areas, this may limit their respective operating margins, diminish their market share, and reduce their earnings.

(g)     Operational Costs

Many of the expenses associated with owning and operating the Gas Plant Portfolio, such as debt-service payments, property taxes, insurance, and utilities, are relatively inflexible and do not necessarily decrease in tandem with a reduction in the Reorganized Debtors' revenue.  The Reorganized Debtors' expenses also will be affected by inflationary increases and certain costs may exceed the rate of inflation in any given period.  In the event of a significant decrease in demand for electricity, the Reorganized Debtors may be unable to reduce the size of their operating expenses or to offset any such increased expenses with higher electricity or coal prices. As a result, any of the Reorganized Debtors' efforts to reduce operating costs or failure to make scheduled capital expenditures also could adversely affect the future growth of their business and

the value of the Reorganized Debtors' assets and it is possible that increased operational costs may decrease the Reorganized Debtors' net revenues.

(h)    Terrorist Attacks, Future War, or Risk of War may Adversely Impact the Debtors' Results of Operations, their Ability to Raise Capital, or their Future Growth

As power generators, the Debtors may face an above-average risk of an act of terrorism, which could include either a direct act against the Gas Plant Portfolio or an inability to operate as a result of systemic damage resulting from an act against the transmission and distribution infrastructure that they use to transport their power.   If such an attack were to occur, the Reorganized Debtors' business, financial condition, and results of operations could be materially adversely impacted.   In addition, such an attack could impact their ability to service their indebtedness, their ability to raise capital, and their future growth opportunities.

(i)    Potential Costs to Comply with Environmental Laws

The Reorganizing Debtors' activities are subject to complex and stringent energy, environmental, and other governmental laws and regulations as described in Section 3.10 and Section 3.11 of this Disclosure Statement, which could adversely affect their operations. Although the Reorganizing Debtors believe that they have obtained the requisite approvals and permits for their existing operations and that their business is operated in accordance with applicable laws, the Reorganized Debtors remain subject to a varied and complex body of laws and regulations that both public officials and private individuals may seek to enforce.   Existing laws and regulations may be revised or reinterpreted, or new laws and regulations may become applicable to the Reorganized Debtors that may have a negative effect on their business and results of operations.

(j)    Key Personnel

The success of the business of the Reorganized Debtors will be materially dependent upon the skills, experience, and efforts of its executive officers and senior management.  The loss of one or more of these people could have a material adverse effect on its business, operating results, or financial condition.

(k)    Employee and Labor Relations Issues

The Reorganized Debtors may be subject to many of the costs and risks generally associated with the power plant labor forces.   Although currently the Debtors have no direct employees (plant personnel are employed by third parties and dispatched to the plants), there can be no guarantee this will continue.   If the Reorganized Debtors employ plant personnel, the Debtors' operations may be disrupted as a result of strikes, lockouts, public demonstrations, or other negative actions.   The Reorganized Debtors may also incur increased legal costs and indirect labor costs as a result of contract disputes or other events.   The resolution of labor disputes could lead to increased labor costs, either by increases in wages or benefits or by changes in work rules that raise operating costs.   The Reorganized Debtors may not have the ability to affect the outcome of these negotiations.

(l)    Capital Expenditures

The Debtors will have an ongoing need to make potentially significant capital expenditures to remain competitive in the power generation marketplace or to comply with applicable laws or regulations.  The timing and costs of such capital expenditures may result in reduced operating performance during construction and may not improve the return on these investments.  These capital expenditures may also reduce the availability of cash for other purposes and are subject to cost overruns and delays.

(m)    Liquidity Risk Factors

(i)    Exit Financing

Disruptions in the capital and credit markets could adversely affect the ability of the Reorganized Debtors to close on the Exit Financing.  Even if the Reorganized Debtors close, these factors may continue to impact their ability to draw on the Exit Financing.  The Reorganized Debtors' access to funds under their Exit Financing Facility Documents will be dependent on the ability of the lender(s) that will be parties to the facility to meet their funding commitments.  Those lender(s) may not be able to meet their funding commitments to the Reorganized Debtors if they experience shortages of capital and liquidity or if they experience excessive volumes of borrowing requests from the Reorganized Debtors and other borrowers within a short period of time.  Longer-term disruptions in the capital and credit markets as a result of uncertainty, changing or increased regulation, reduced alternatives or failures of significant financial institutions could adversely affect the Reorganized Debtors' access to liquidity needed for its business.  Any disruption could require the Reorganized Debtors to take measures to conserve cash until the markets stabilize or until alternative credit arrangements or other funding for its business needs can be arranged.  Such disruptions may also impact the capital needs of the Reorganized Debtors' vendors and third party manufacturers, which, in turn, could adversely affect the Reorganized Debtors' results of operations, cash flows and financial condition.

(ii)    Adverse Effect of Indebtedness on Financial Health and Operating Flexibility

The Reorganized Debtors' Exit Financing may affect their value, by, among other things: (w) limiting their ability to borrow additional amounts for working capital, capital expenditures, debt service requirements, execution of business strategy, to support surety bonds required for constructions, and development or other purposes; (x) limiting the Reorganized Debtors' ability to use operating cash flows in other areas of the business or to pay dividends; (y) increasing the vulnerability of the Reorganized Debtors to general adverse economic and industry conditions, including increases in interest rates; (z) limiting the Reorganized Debtors' ability to capitalize on business opportunities, reinvest in and develop the Reorganized Debtors' assets, and to react to competitive pressures and adverse changes in government regulation; (ww) limiting the Reorganized Debtors' ability, or increasing the costs, to restructure funded indebtedness; (xx) limiting the Reorganized Debtors' ability to enter into marketing and hedging transactions by reducing the number of potential counterparties to such transactions as well as the volume of those transactions; and (yy) giving secured lenders the ability to foreclose on assets.

      (iii)    Debt Restrictions and Covenants

The terms of the Reorganized Debtors' Exit Financing may require the Reorganized Debtors to satisfy certain customary affirmative and negative covenants and to meet financial ratios and tests including ratios and tests based on leverage, interest coverage, and net worth. In addition, the covenants and other restrictions under the Exit Financing Facility Documents may limit the ability of the Reorganized Debtors to, among other things, incur indebtedness, create liens on assets, sell assets, manage cash flows, transfer assets to other subsidiaries, make capital expenditures, engage in mergers and acquisitions, and make distributions to equity holders.

Due to the current lending environment, the Chapter 11 Cases, the Debtors' financial condition, and general economic factors, the Reorganized Debtors' Exit Financing Facility Documents may contain restrictive operational and financial covenants, restrictions on the distribution of cash flows from properties serving as Collateral for the debt, and, in certain limited instances, higher interest rates. These fees and cash flow restrictions may affect the ability of the Reorganized Debtors to fund their respective ongoing operations from operating cash flows and may significantly limit the operating and financial flexibility of the Reorganized Debtors as well as their ability to respond to business changes or competitive activities.

      (iv)    Despite current anticipated indebtedness levels and restrictive covenants, the Reorganized Debtors may incur additional indebtedness in the future

Despite their current anticipated level of indebtedness, the Reorganized Debtors may be able to incur substantial additional indebtedness in the future, including additional secured indebtedness. Although the terms of the Exit Financing may restrict the Reorganized Debtors from incurring additional indebtedness, these restrictions are subject to important exceptions and qualifications. If the Reorganized Debtors incur additional indebtedness, the risks that it will face as a result of its leverage could intensify.

## Section 20.03. Avoidance Actions

A bankruptcy trustee (or a debtor as a debtor in possession) may avoid as a preference a transfer of property made by a debtor to a creditor on account of an antecedent debt while a debtor was insolvent, where that creditor receives more than it would have received in a liquidation of the entity under chapter 7 had the payment not been made, if (i) the payment was made within ninety (90) days before the date the bankruptcy case was commenced or (ii) the creditor is found to have been an "insider," as defined in the Bankruptcy Code, within one year before the commencement of the bankruptcy case. A debtor is presumed to have been insolvent during the ninety (90) days preceding the commencement of the case.

A bankruptcy trustee (or a debtor as a debtor in possession) may avoid as a fraudulent transfer a transfer of property made by a debtor within two (2) years (and under applicable state laws, longer) before the date the bankruptcy case was commenced if a debtor (a) received less than reasonably equivalent value in exchange for such transfer and (b) was insolvent on the date of such transfer or became insolvent as a result of such transfer, such transfer left a debtor with an unreasonably small capital, or a debtor intended to incur debts that would be beyond a Debtors' ability to pay as such debts matured.

-116-

Except as expressly released by the Plan, Final DIP Order, Confirmation Order or other Final Order, all Causes of Action (other than Avoidance Actions, which are being released) for the Reorganized Debtors and the Liquidating Debtors are being retained by the Distribution Trust and the Liquidation Trust, as the case may be, and the Plan Administrator may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) any or all of such Causes of Action.  To date, the Debtors may not have conclusively identified all potential Avoidance Actions prior to their decision to release such Avoidance Actions under the Plan.

**Section 20.04. Intercompany Claims**

On the Effective Date, all Intercompany Claims shall be cancelled and the holders of Intercompany Claims shall not receive or retain any property under the Plan on account of such Intercompany Claims.  This determination was made by the Debtors in consultation with the Consultation Parties.  Based on anticipated Sale proceeds, if any, the Pre-Petition Secured Parties will receive substantially less than a full recovery on of their Pre-Petition Secured Parties Secured Claims.  While the Debtors have provided disclosure on Intercompany Claims in their Schedules, the Debtors may not have conclusively categorized all potential Intercompany Claims prior to their decision to release such Intercompany Claims under the Plan.  However, any additional recovery on account of Intercompany Claims would likely only benefit the Pre-Petition Secured Parties on account of their Allowed Pre-Petition Secured Parties Secured Claims, which are secured by the Intercompany Claims.

**Section 20.05. Disclosure Statement Disclaimer**

(a)      <u>Information Contained Herein is for Soliciting Votes</u>

The information contained in this Disclosure Statement is for the purpose of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

(b)      <u>Disclosure Statement Was Not Approved by the SEC</u>

This Disclosure Statement was not filed with the SEC nor is it required to be.  Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the Exhibits or the statements contained herein, and any representation to the contrary is unlawful.

(c)      <u>Disclosure Statement May Contain Forward Looking Statements</u>

This Disclosure Statement may contain "forward looking statements."  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," the negative thereof, or other variations thereon or comparable terminology.

The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the pendency of the Chapter 11 Cases;

-117-

- results of litigation;

- business strategy;

- contractual obligations; and

- projected and estimated liability costs, including tort, and environmental costs and costs of environmental remediation.

Statements concerning these and other matters are not guarantees of the Debtors' future performance.    The reader is cautioned that all forward-looking statements are necessarily speculative.    The Liquidation Analysis and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to holders of Allowed Claims and Equity Interests may be affected by many factors that cannot be predicted. Forward-looking statements represent the Debtors' estimates and assumptions only as of the date such statements were made.    There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement.

(d)    No Legal or Tax Advice Is Provided to You by This Disclosure Statement

**THIS DISCLOSURE STATEMENT IS NOT LEGAL ADVICE TO YOU**.    The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Equity Interest.    This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan (including the Subplans therein) or object to Confirmation.

(e)    No Admissions Made

The information and statements contained in this Disclosure Statement shall neither (1) constitute an admission of any fact or liability by any entity (including the Debtors) nor (2) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, holders of Allowed Claims or Equity Interests, or any other parties-in-interest.

(f)    Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement.    The Debtors reserve the right to continue to investigate Claims and Equity Interests and file and prosecute objections to Claims and Equity Interests.

(g)    No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a holder of an Allowed Claim or Equity Interest for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors to object to that holder's Allowed Claim or Equity Interest, or to bring Causes of Action or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of

Action of the Debtors or their respective Estates are specifically or generally identified herein, except as expressly released by the Plan, Final DIP Order, Confirmation Order or other Final Order.

(h)    <u>Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors</u>

Counsel to, and other advisors retained by, the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to, and other advisors retained by the Debtors, have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

(i)    <u>Potential Exists for Inaccuracies and the Debtors Have No Duty to Update</u>

The Debtors make the statements contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since such date.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered by the Bankruptcy Court.

(j)    <u>No Representations Outside of this Disclosure Statement Are Authorized</u>

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement (which, for the avoidance of doubt, does not include the representations and warranties contained in the Membership Interest Purchase and Sale Agreement).  In deciding whether to vote to accept or reject the Plan, you should not rely upon any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, unless otherwise indicated herein.

## ARTICLE XXI

## CONFIRMATION AND CONSUMMATION PROCEDURE

### Section 21.01. Plan Objection Deadline

The Bankruptcy Court has established 4:00 p.m. prevailing Eastern Time on [May 26] 2015, as the deadline to object to confirmation of the Plan (the "***Plan Objection Deadline***").  All such objections must be filed with the Bankruptcy Court and served on the Debtors, counsel to the DIP Lenders and the Pre-Petition Secured Parties, and certain other parties in interest in accordance with the Disclosure Statement Order and Solicitation Procedures so that they are

actually received on or before the Plan Objection Deadline. The Debtors believe the Plan Objection Deadline, as established by the Bankruptcy Court, affords the Bankruptcy Court, the Debtors, and other parties in interest reasonable time to consider the objections to the Plan before a Confirmation Hearing.

## Section 21.02. Confirmation Hearing

Assuming the requisite acceptances are obtained for the Plan (including the Subplans contained therein), the Debtors intend to seek Confirmation of the Plan at the Confirmation Hearing to be held on June 4, 2015, 10:00 a.m. prevailing Eastern Time, before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, in Courtroom No. 1 of the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Wilmington, Delaware 19801. The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the entities who have filed objections to the Plan, without further notice to other parties in interest. The Bankruptcy Court, in its discretion and before a Confirmation Hearing, may put in place additional procedures governing such hearing. The Plan may be modified, if necessary, before, during, or as a result of the hearing to confirm the Plan without further notice to parties in interest.

## Section 21.03. Plan Confirmation Requirements Under the Bankruptcy Code

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of chapter 11 of the Bankruptcy Code that must be satisfied in order for a plan to be confirmed. Specifically, in addition to other applicable requirements, the Debtors believe that the Plan complies with the applicable provisions of the Bankruptcy Code and satisfies or will satisfy the following requirements of section 1129 of the Bankruptcy Code:

(i)     the Debtors, as the proponents of the Plan, have complied with the applicable provisions of the Bankruptcy Code;

(ii)     the Plan has been proposed in good faith and not by any means forbidden by law;

(iii)     any payment made or promised by the Debtors or by a person acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment: (a) made before the Confirmation of the Plan is reasonable; or (b) is subject to the approval of the Bankruptcy Court as reasonable, if such payment is to be fixed after Confirmation of the Plan.

(iv)     the Debtors, as proponents of the Plan, will disclose the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as the Plan Administrator, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and with public policy;

-120-

(v)     the Debtors will disclose the identity of any insider that will be employed or retained as or by the Plan Administrator and the nature of any compensation for such insider;

(vi)    each holder of an Impaired Claim or Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Equity Interest, property of a value as of the Effective Date that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code (the "best interests" test);

        a.  the starting point in determining whether the Plan meets the "best interests" test is a determination of the amount of proceeds that would be generated from the hypothetical liquidation of the Debtors' assets in the context of a chapter 7 liquidation (such amount, the "***Liquidation Proceeds***").  The Liquidation Proceeds must then be reduced by the costs of such liquidation, including costs incurred during the Chapter 11 Cases and allowed under chapter 7 of the Bankruptcy Code (such as Professionals' fees and expenses, a chapter 7 trustee's fees and the fees and expenses of professionals retained by the chapter 7 trustee).  The potential chapter 7 liquidation distribution in respect of each class must be reduced further by costs imposed by the delay caused by conversion to chapter 7.  In addition, inefficiencies in the claims resolution process in a chapter 7 liquidation would negatively impact the recoveries of creditors.  The net present value of a hypothetical chapter 7 liquidation distribution in respect of an Impaired Claim or Equity Interest is then compared to the recovery provided by the Plan for such Impaired Claim or Equity Interest;

        b.  to support their opinion that the Plan meets the best interests test, the Debtors have prepared the Liquidation Analysis attached as **Exhibit C** hereto.  Based on this, the Debtors are of the opinion that the Plan meets the best interests test;

(vii)   except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code, each Class of Claims or Equity Interests either has accepted the Plan or is not an Impaired Class under the Plan;

(viii)  except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims, Priority Tax Claims and Other Priority Claims will be paid in full or otherwise treated in accordance with section 1129(a)(9) of the Bankruptcy Code;

(ix)    at least one Impaired Class of Claims has accepted the Plan or there is no Impaired non-consenting Class of Claims in accordance with section 1129(a)(10) of the Bankruptcy Code;

(x)     Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.  To support their opinion that the Plan is not likely to be followed by liquidation or the need for further financial reorganization, except as contemplated by the Plan, the Debtors have prepared the Financial Projections attached as **Exhibit B**.  Based on such projections, the Debtors believe that they will be able to make all payments required under the Plan.  Therefore, Confirmation is not likely to be followed by liquidation or the need for further reorganization; and

(xi)    All fees payable under 28 U.S.C. § 1930, including the fees of the U.S. Trustee, have been paid or will be paid as of the Effective Date.

## Section 21.04. "Cramdown" Under Section 1129(b) of the Bankruptcy Code

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a chapter 11 plan of reorganization even if not all impaired classes have accepted the plan, provided that such plan has been accepted by at least one impaired class.  The Debtors will seek to confirm the Subplan(s) notwithstanding their rejection by any of the Impaired Classes.

In order to obtain such nonconsensual confirmation (or "cramdown") of the Subplan(s), the Debtors must demonstrate to the Bankruptcy Court that the applicable Subplan(s) "does not discriminate unfairly" and is "fair and equitable" with respect to each Impaired Class that voted to reject the Subplan(s) (each such Impaired Class, a "***Non-Accepting Class***").

(a)     <u>Fair and Equitable Test</u>

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable" and sets different standards for secured creditors, unsecured creditors, and equity holders, as follows:

(i)     Secured Creditors

With respect to Non-Accepting Classes of secured claims, the "fair and equitable" test requires that either: (x) each impaired secured creditor retains the liens securing its allowed secured claim and receives on account of that claim deferred cash payments having a present value equal to the amount of its allowed secured claim; (y) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (x) or (y) of this paragraph; or (z) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim.

(ii)    Unsecured Creditors

With respect to Non-Accepting Classes of unsecured claims, the "fair and equitable" test requires that: (x) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim; or (y) the holders of any claims (or equity

interests) that are junior to the Non-Accepting Class will not receive any property under the Plan. (This provision is often referred to as the "absolute priority" rule.)

> (iii)    Equity Interests

With respect to the classes of equity interests, the "fair and equitable" test requires that: (x) the Plan provides that each holders of an allowed equity interest receives or retains on account of such allowed equity interest property of a value, as of the Effective Date of the Plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such allowed equity interest; or (y) the holder of any allowed equity interest that is junior to the allowed equity interest of such class will not receive or retain any property under the Plan on account of such junior interest.

> (b)    No Unfair Discrimination

A plan does not "discriminate unfairly" with respect to a Non-Accepting Class if the value of the cash and/or securities to be distributed to the class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the Non-Accepting Class.  Exact parity is not required.  The Debtors believe that any discrepancy in treatment or potential distributions to holders of Claims is justified based on certain inherent differences in the nature of their Claims, the time that will be required to liquidate their Claims, and the relative levels of risk that are being taken by different creditors simply based upon the time it will take to liquidate their Claims.

To the extent necessary, the Debtors will establish at the Confirmation Hearing that each of these requirements has been satisfied under the Plan.

**Section 21.05. Liquidation Analysis; Financial Projections; Valuation**

> (a)    Liquidation Analysis

The Debtors, in consultation with their financial advisors, have prepared an unaudited Liquidation Analysis, which is attached hereto as **Exhibit C**, to assist holders of Claims in evaluating the Plan.  The Liquidation Analysis compares the projected creditor recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to holders of Allowed Claims and Equity Interests under the Plan.  The Liquidation Analysis is based on the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date.  Further, the analysis is subject to potentially material changes, including with respect to economic and business conditions and legal rulings.  Therefore, the actual liquidation value of the Debtors could vary materially from the estimate provided in the Liquidation Analysis.

Underlying the Liquidation Analysis is a number of estimates and assumptions that, although developed and considered reasonable by the Debtors, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management.  The Liquidation Analysis also is based on assumptions with

regard to liquidation decisions that are subject to change and significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management.  Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the results of a liquidation of the Debtors.  Accordingly, the values reflected might not be realized if the Debtors were, in fact, to be liquidated.  The chapter 7 liquidation period is assumed to average [____] to [____] months following the appointment of a chapter 7 trustee, allowing for, among other things, the discontinuation and wind-down of operations, the sale of the operations, the sale of assets and the collection of receivables.  All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Liquidation Analysis is based in connection with their evaluation of the Plan.

The Debtors believe that the Plan provides a greater recovery for holders of Allowed Claims and Equity Interests than would be achieved in liquidation under chapter 7 of the Bankruptcy Code.  This belief is based on a number of considerations, including: (a) the Debtors' assets would have a substantially reduced value in a chapter 7 liquidation; (b) the Administrative Claims would significantly increase as a result of conversion to a chapter 7 case; (c) the delays caused by a chapter 7 liquidation; and, perhaps most importantly, (d) the Consultation Parties' consent to fund Cash distributions to junior Classes of Claims and Equity Interests despite not being paid in full under the Plan on account of their Pre-Petition Secured Parties Secured Claims.  The Debtors believe there is insufficient value to fund these Cash distributions to creditors in a chapter 7 liquidation.

(b)     Financial Projections

The Bankruptcy Code permits a plan to be confirmed only if confirmation is not likely to be followed by liquidation or the need for further financial reorganization except to the extent provided for in a plan.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared the Financial Projections of the Reorganized Debtors for each of the five (5) fiscal years from 2015 through [2019], which are attached hereto as **Exhibit B**.  If the Reorganized OEG Equity Interests are sold to a Purchaser, the holders of Claims against the Reorganized Debtors will no longer have an interest in the ongoing financial performance of the Reorganizing Debtors' business.  Accordingly, the Financial Projections only relate to the ongoing business operations of the Debtors if the Reorganized OEG Equity Interests are issued to the Pre-Petition Secured Parties under the Plan.  Based upon the Financial Projections, the Debtors believe that they will be able to make all payments required pursuant to the Plan while conducting ongoing business operations and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.  The Financial Projections are based on the assumption that the Plan will be confirmed by the Bankruptcy Court and, for projection purposes, the Effective Date will be [____].

THE PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN.  WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT

THE PROJECTIONS WILL BE REALIZED. THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE PROJECTIONS.

The Debtors have prepared the Financial Projections based upon certain assumptions that they believe to be reasonable under the circumstances.  Those assumptions considered to be significant are described in **Exhibit B**.  The Financial Projections have not been examined or compiled by independent accountants.  The Debtors make no representation as to the accuracy of the projections or their ability to achieve the projected results.  Many of the assumptions on which the projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management.  Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results.  Therefore, the actual results achieved throughout the five-year period of the Financial Projections may vary from the projected results and the variations may be material.  All holders of Claims that are entitled to vote to accept or reject the Subplans are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of the Plan.

(c)     Valuation of the Reorganizing Debtors

[RESERVED]

**Section 21.06. Notice to Holders of Claims and Equity Interests**

Approval by the Bankruptcy Court of this Disclosure Statement means that the Bankruptcy Court has found that this Disclosure Statement contains information of a kind and in sufficient and adequate detail to enable holders of Claims and Equity Interests entitled to vote on the Subplan(s) to make an informed judgment about whether to accept or reject the applicable Subplan(s).  **THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR THEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.**

**IF THE PLAN IS APPROVED BY THE REQUISITE VOTE OF HOLDERS OF CLAIMS OR EQUITY INTERESTS ENTITLED TO VOTE AND IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS, WHETHER OR NOT THEY WERE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN.  THUS ALL HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES, SUPPLEMENTS AND/OR EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.**

**THIS DISCLOSURE STATEMENT AND THE PLAN ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN.**  No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtors other than the information contained herein or therein.  No such information should be relied upon in making a determination to vote to accept or reject the Plan.

## ARTICLE XXII

### ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If any Subplan(s) cannot be confirmed, the Debtors may seek to: (1) prepare and present to the Bankruptcy Court an alternative chapter 11 plan for confirmation; (2) effect a merger or sale transaction, including, potentially, a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code; or (3) liquidate the Debtors under chapter 7 of the Bankruptcy Code.  If the Debtors were to pursue liquidation, the Chapter 11 Cases would be converted to cases under chapter 7 of the Bankruptcy Code and a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that liquidation under chapter 7 of the Bankruptcy Code would have on Creditors' recoveries and the Debtors is described in the unaudited Liquidation Analysis attached hereto as **Exhibit C**.  Any attempt to formulate an alternative chapter 11 plan would necessarily delay creditors' receipt of distributions and, due to the incurrence of additional administrative expenses during such period of delay, may provide for smaller distributions to holders of Allowed Claims than are currently provided for under the Plan.  Accordingly, the Debtors believe that the Plan will enable all creditors to realize the greatest possible recovery on their respective Claims or Equity Interests with the least delay.

## ARTICLE XXIII

### CERTAIN SECURITIES LAWS MATTERS

Under the Subplan for Optim Generation, Reorganized Generation will issue Equity Interests upon the Effective Date either (a) to the Purchaser if the Sale closes by September 30, 2015, or (b) the Pre-Petition Secured Parties (or their nominee) if the Debtors do not receive a Qualifying Bid (as defined in the Bidding Procedures) or the Sale does not close by September 30, 2015.  The Equity Interests shall be considered duly authorized, validly issued, fully paid, and non-assessable when issued pursuant to the Subplan for Optim Generation.

If the Equity Interests are issued to the Purchaser, the offering, sale and issuance of the Equity Interests shall be exempt from any securities laws registration requirements pursuant to Section 4(2) of the Securities Act and, to the extent applicable, Regulation D promulgated thereunder, and Section 18 of the Securities Act with respect to similar state securities or "blue sky" laws.  Section 4(2) of the Securities Act exempts from registration transactions by an issuer not involving a public offering.  Regulation D similarly exempts from the registration requirements of the Securities Act private offerings by an issuer of securities to "accredited

-126-

investors," as such term is defined under Regulation D, and to certain other qualified investors. Equity Interests issued pursuant to an exemption from registration pursuant to section 4(2) or Regulation D will be deemed "restricted securities" and may not be resold without registration under the Securities Act or pursuant to an exemption therefrom.

If the Equity Interests are issued to the Pre-Petition Secured Parties (or their nominee), the offering, issuance, and distribution of the Equity Interests of Reorganized Generation shall be exempt from the registration requirements of section 5 of the Securities Act pursuant to section 1145 of the Bankruptcy Code.  In general, offers and issuances of securities made in reliance on the exemption afforded under section 1145(a) of the Bankruptcy Code are deemed to be made in a public offering.  Accordingly, the Pre-Petition Secured Parties (or their nominee) shall be able to resell the Equity Interests of Reorganized Generation without registration under the Securities Act or other federal securities laws, unless such Pre-Petition Secured Party or nominee is an "underwriter" with respect to the Equity Interests, within the meaning of section 1145(b)(1) of the Bankruptcy Code or similar federal, state, local, or foreign laws.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who: (a) purchases a claim against, an interest in, or a claim for an administrative expense in the case concerning, the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest; (b) offers to sell securities offered under a plan of reorganization for the holders of those securities; (c) offers to buy those securities from the holders of the securities, if the offer to buy is (i) with a view to distributing those securities and (ii) under an agreement made in connection with the plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or (d) is an "issuer" with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

To the extent that the Pre-Petition Secured Parties (or their nominee) who receive the Equity Interests of Reorganized Generation under the Subplan are deemed to be "underwriters," resales by such Entities may not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code.  Those Entities may, however, be permitted to sell such Equity Interests without registration, subject to the provisions of Rule 144 under the Securities Act, which permit the public sale of securities received pursuant to a plan of reorganization by "underwriters," subject to the availability to the public of current information regarding the issuer, volume limitations and certain other conditions.  Whether or not any Entity would be deemed to be an "underwriter" with respect to the Equity Interests of Reorganized Generation would depend upon various facts and circumstances applicable to that Entity. Accordingly, the Debtors express no view as to whether any Entity would be an "underwriter" with respect to the Equity Interests of Reorganized Generation and Debtors make no representation concerning the ability of any particular person to resell the securities to be distributed under the Subplan.  **YOU SHOULD CONFER WITH YOUR OWN LEGAL ADVISORS TO HELP DETERMINE WHETHER OR NOT YOU ARE AN "UNDERWRITER" OR MAY FREELY TRADE SUCH SECURITIES.**

# ARTICLE XXIV

## CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion is a summary of certain material U.S. federal income tax consequences of the Consummation of the Plan to the Debtors and to certain holders of Allowed Claims.  This summary is based on the Internal Revenue Code of 1986, as amended (the "*IRC*"), the Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the IRS and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed in this Disclosure Statement.

This discussion does not address the U.S. federal income tax consequences to holders of Allowed Claims that are (a) Unimpaired or otherwise entitled to payment in full in Cash on the Effective Date under the Plan, or (b) deemed to reject the Plan.

The following discussion does not address the U.S. federal income tax consequences to holders of Allowed Claims that are not U.S. Holders.  For purposes of this discussion, a "*U.S. Holder*" is a holder that is: (a) an individual citizen or resident of the United States for U.S. federal income tax purposes; (b) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof, or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (i) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more U.S. persons have authority to control all substantial decisions of the trust or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person. This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain holders of Allowed Claims in light of their individual circumstances, nor does it address tax issues with respect to such holders that are subject to special treatment under the U.S. federal income tax laws (including, without limitation, banks, governmental authorities or agencies, pass-through entities (such as partnerships or disregarded entities), brokers, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, mutual funds, small business investment companies, and regulated investment companies and those holding, or who will hold, Allowed Claims as part of a hedge, straddle, conversion, or constructive sale transaction).  Furthermore, the following discussion does not purport to address any aspect of state, local, estate, gift, foreign, or other tax law.  Lastly, the following discussion assumes (a) each holder of an Allowed Claim holds its Claim as a "capital asset" (generally, property held for investment) within the meaning of Section 1221 of the IRC, and (b) the debt obligations(s) underlying each Allowed Claim is properly treated as debt (rather than equity) of the related Debtor(s) for U.S. federal income tax purposes.

If a holder is a partnership or a disregarded entity for U.S. federal income tax purposes, the tax treatment of a partner in or owner of such entity generally will depend upon the status of the partner or owner, and the activities of the entity. Partners or owners of other pass-through entities that are holders of Allowed Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF A HOLDER OF AN ALLOWED CLAIM. ALL HOLDERS OF ALLOWED CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, NON-U.S., AND OTHER TAX CONSEQUENCES OF THE PLAN.**

## Section 24.01. Certain U.S. Federal Income Tax Consequences of the Debtors

Each Debtor is an entity disregarded as separate from its beneficial owner as determined for U.S. federal income tax purposes. Accordingly, all assets and liabilities of each Debtor are treated as assets and liabilities of its beneficial owner as determined for U.S. federal income tax purposes. As such, the Debtors themselves are not subject to U.S. federal income tax, but rather operate as unincorporated divisions of their beneficial owners as determined for U.S. federal income tax purposes. Each Debtor's taxable income (or loss) is included in the U.S. federal income tax return filed by its beneficial owner as determined for U.S. federal income tax purposes. Consequently, the transactions contemplated by the Plan should be treated for U.S. federal income tax purposes as though they were effected directly by the beneficial owners of the Debtors and should not have any U.S. federal income tax consequences to the Debtors.

## Section 24.02. Certain Material U.S. Federal Income Tax Consequences to U.S. Holders of Certain Allowed Claims and Disputed Claims

(a)     Consequences to the U.S. Holders of Allowed Claims

The discussion of the certain material U.S. federal income tax consequences to the U.S. Holders of Allowed Claims in this Section 24.02(a) of this Disclosure Statement does not address the tax consequences of the Plan to holders of Allowed Claims who also own Equity Interests in the Debtors, including holders of Allowed Claims in Class OG 1 and Class OE 1.

With respect to each U.S. Holder of an Allowed Claim against the Debtors (other than the U.S. Holders of Class OG 1 Claims or Class OE 1 Claims), each such U.S. Holder should be treated for U.S. federal income tax purposes as a direct owner of its allocable percentage of the Distribution Trust Assets or Liquidation Trust Assets, as applicable. Each such U.S. Holder should recognize gain or loss equal to the difference between (i) the fair market value of its respective share of the Trust's assets it is deemed to have received in exchange for its Allowed Claims (other than any claim for accrued but unpaid interest and imputed interest) and (ii) such U.S. Holder's adjusted tax basis in the Allowed Claims surrendered by such U.S. Holder (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income).

The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Allowed Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to its Allowed Claim.  See the discussions of "accrued interest" and "market discount" below.  Such gain may be long-term capital gain or loss if the Claim has been held for more than one year.  Each U.S. Holder of the Claim should consult its own tax advisor to determine the character of the gain or loss recognized.  A U.S. Holder's tax basis in its respective interest in the Distribution Trust or Liquidation Trust, as applicable, should equal its respective fair market value as of the Effective Date.  A U.S. Holder's holding period for its respective interest in the Distribution Trust or Liquidation Trust, as applicable, should begin on the day following the Effective Date.

To the extent that a U.S. Holder of an Allowed Claim, including Disputed Claims that ultimately become Allowed Claims, receive additional distributions subsequent to the Effective Date, a portion of the subsequent distributions may be treated as interest.  In addition, to the extent a U.S. Holder of an Allowed Claim receives distributions in a taxable year or years following the year of the initial distribution, the recognition of gain or loss realized by a U.S. Holder in satisfaction of an Allowed Claim may be deferred until all subsequent distributions relating to Disputed Claims are determinable.  In addition, a portion of any gain realized may be deferred under the "installment method" of reporting.  All U.S. Holders of Allowed Claims are urged to consult their tax advisors regarding the timing of the recognition of the realized gain or loss and the possible application of (or ability to elect out of) the "installment method" of reporting in respect of their Claims.

Pursuant to Treasury Regulation Section 301.770l-4(d) and related regulations, the Debtors believe that each of the Distribution Trust and Liquidation Trust (each, a "***Trust***" and together, the "***Trusts***") should be treated as a grantor trust established for the benefit of the U.S. Holders of such Allowed Claims and the following discussion assumes that the Trusts will be so treated for U.S. federal income tax purposes.  However, no ruling has been requested from the IRS and no opinion of counsel has been requested concerning the tax status of the Trusts as grantor trusts.  Accordingly, there can be no assurance that the IRS would not take a contrary position.  If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Trusts, the U.S. Holders of Allowed Claims, and the Debtors could vary from those discussed herein (including the potential for an entity level tax on any income of each Trust).

Consistent therewith, all parties must treat each Trust as a grantor trust of which such U.S. Holders of Allowed Claims are the owners and grantors.  U.S. Holders that receive Trust interests should be treated for U.S. federal income tax purposes as receiving their respective share of the Trust's assets from the applicable Debtor in a taxable exchange and then depositing them into the Trust in exchange for Trust interests.  Such U.S. Holders of Allowed Claims against the Debtors should be treated as the direct owners of an undivided interest in the assets of the Trust for all U.S. federal income tax purposes (which assets will have an initial tax basis equal to their fair market value on the Effective Date).  Accordingly, each U.S. Holder of an Allowed Claim will be required to report on its U.S. federal income tax return its allocable share of any income, gain, loss, deduction or credit recognized or incurred by the Trust in accordance

with its relative beneficial interest.  The character of items of income, deduction and credit to any U.S. Holder and the ability of such U.S. Holder to benefit from any deduction or losses may depend on the particular situation of such U.S. Holder.  The U.S. federal income tax reporting obligations of a U.S. Holder is not dependent upon the Trusts' distribution of cash or other proceeds.  Therefore, a U.S. Holder may incur a U.S. federal income tax liability with respect to its allocable share of the income of a Trust regardless of the fact that the Trust has not made any concurrent distribution to the U.S. Holder.  In general, a distribution of cash by the Trust to a U.S. Holder of Allowed Claims should not be taxable to the U.S. Holder since such U.S. Holder is already regarded for U.S. federal income tax purposes as owning the underlying assets.

(b)     Tax Reporting for Liquidation Trust Assets and/or Distribution Trust Assets Allocable to Disputed Claims.

The Reorganizing Debtors Claims Reserve will hold Cash sufficient to fund, among other things, the anticipated Allowed amount of Disputed Claims against the Reorganizing Debtors (the "***Reorganizing Debtors Disputed Claims Reserve***").  The Liquidating Debtors Claims Reserve will hold Cash sufficient to fund, among other things, the anticipated Allowed amount of Disputed Claims against the Liquidating Debtors (the "***Liquidating Debtors Disputed Claims Reserve***" and, together with the Reorganizing Debtors Disputed Claims Reserve, the "***Disputed Claims Reserves***") Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, each of the Disputed Claims Reserves is intended to be treated, for U.S. federal income tax purposes, as a disputed ownership fund within the meaning of Treasury Regulations Section 1.468B-9(b)(1).  If so treated, any income of each Disputed Claims Reserve will be subject to tax as provided by the regulations governing disputed ownership funds.  Any payment of Cash or distribution from the applicable Trust made out of the applicable Disputed Claims Reserve should not be deemed to have been made to any U.S. Holder of a Disputed Claim until, and only to the extent that, the amount (if any) to which such U.S. Holder is entitled has been determined and distributed.  At such time, such U.S. Holder will take such amount into account for U.S. federal income tax purposes as an amount received in respect of its Claim.  Upon the disallowance of a Disputed Claim, the applicable Disputed Claims Reserve will be treated as distributing to the U.S. Holder of the applicable Trust, the portion of the assets of such applicable Trust allocable to such Disputed Claim.  Recipients of amounts from the Disputed Claims Reserve should report these amounts consistently with the foregoing and should consult their tax advisors concerning the federal, state, local, and other tax consequences of the receipt of amounts from the Disputed Claims Reserve.  A U.S. Holder must differentiate between the tax treatment of any distributions from the Disputed Claims Reserves and the tax treatment of the distribution out of assets of the applicable Trust to which the U.S. Holder is already considered the owner for U.S. federal income tax purposes (as discussed in Section 24.02(a) of this Disclosure Statement).

Upon the allowance or disallowance of a Disputed Claim, the Disputed Claims Reserve generally will be treated as having sold or exchanged the portion of the assets of the applicable Trust allocable to such Claim for purposes of IRC Section 1001(a).  Any income realized by the Disputed Claims Reserve will be reported as income of and taxable to the Disputed Claims Reserve.

(c)     Accrued Interest

A portion of the consideration received by the U.S. Holders of Allowed Claims may be attributable to accrued interest on such Allowed Claims.  Such amount may be taxable to that holder as interest income if such accrued interest has not been previously included in the holder's gross income for U.S. federal income tax purposes.  Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent any accrued interest on the Allowed Claims was previously included in the holder's gross income but was not paid in full by the Debtors.

If the fair market value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued interest is unclear.  Under Section 9.07 of the Plan, the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for U.S. federal income tax purposes, while certain Treasury Regulations generally treat payments as allocated first to any accrued but unpaid interest and then as a payment of principal.  The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.  U.S. Holders of Allowed Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

## Section 24.03. Market Discount

Under the "market discount" provisions of the IRC, some or all of any gain realized by a U.S. Holder of an Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the Allowed Claim.  In general, a debt instrument is considered to have been acquired by a U.S. Holder with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

## Section 24.04. Withholding

All distributions to U.S. Holders of Claims under the Plan (whether by the Debtors, the Distribution Trust, the Liquidation Trust, or the Disputed Claims Reserves) are subject to any applicable tax withholding, including employment tax withholding.  Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable backup withholding rate (currently 28%).  Backup withholding generally applies if the U.S. Holder (a) fails to furnish its social security number or other taxpayer identification number ("***TIN***"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number

and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF AN ALLOWED CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES. ALL HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-US, OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## ARTICLE XXV

## CONCLUSION AND RECOMMENDATION

The Debtors believe that Confirmation and implementation of the Plan is preferable to any of the alternatives described herein because it will provide the greatest recovery to holders of Claims and Equity Interests. Other alternatives would involve significant delay, erosion of value, uncertainty and substantial administrative costs and are likely to reduce any return to holders of Impaired Claims and Equity Interests. The Debtors urge the holders of Claims entitled to vote on the Subplans to vote to accept the Subplans and to evidence such acceptance by casting their Ballots as set forth in the instructions enclosed with the Ballots so that they will be received by the Voting Deadline.

Dated: March 18,2015
Wilmington, Delaware

Respectfully submitted,

Optim Energy, LLC

By: _____

Name:  Nicholas R. Rahn
Title:   Chief Executive Officer


Optim Energy Marketing, LLC

By: _____

Name:  Nicholas R. Rahn
Title:   Manager


OEM 1, LLC

By: _____

Name:  Nicholas R. Rahn
Title:   Manager


Optim Energy Generation, LLC

By: _____

Name:  Nicholas R. Rahn
Title:   Manager


Optim Energy Cedar Bayou 4, LLC

By: _____

Name:  Nicholas R. Rahn
Title:   Manager


-134-

Optim Energy Altura Cogen, LLC

By: _____

Name: Nicholas R. Rahn
Title:  Manager


Optim Energy Twin Oaks GP, LLC

By: _____

Name: Nicholas R. Rahn
Title:  Manager


Optim Energy Twin Oaks, LP

By Optim Energy Twin Oaks GP, LLC its General
Partner

By: _____

Name: Nicholas R. Rahn
Title:  Manager