## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Optim Energy, LLC, *et al.*, | Case No. 14-10262 (BLS) |
| Debtors.[1] | (Jointly Administered) |

**THIRD AMENDED DISCLOSURE STATEMENT FOR THE THIRD AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**BRACEWELL & GIULIANI LLP**

Kurt Mayr (admitted *pro hac vice*)
Mark E. Dendinger (admitted *pro hac vice*)
CityPlace I, 34th Floor
185 Asylum Street
Hartford, Connecticut 06103
Telephone: (860) 947-9000
Facsimile: (800) 404-3970

-and-

Robert G. Burns (admitted *pro hac vice*)
1251 Avenue of Americas, 49th Floor
New York, New York 10020-1104
Telephone: (212) 508-6100
Facsimile: (800) 404-3970

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

Robert J. Dehney (No. 3578)
Eric D. Schwartz (No. 3134)
Erin R. Fay (No. 5268)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Counsel to Optim Energy Altura Cogen, LLC and Optim Energy Cedar Bayou 4, LLC*

Dated: May 6, 2015

> **THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. ACCORDINGLY, THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

---

[1] The Debtors in these chapter 11 cases are: Optim Energy, LLC; OEM 1, LLC; Optim Energy Cedar Bayou 4, LLC; Optim Energy Altura Cogen, LLC; Optim Energy Marketing, LLC; Optim Energy Generation, LLC; Optim Energy Twin Oaks GP, LLC; and Optim Energy Twin Oaks, LP. The Debtors' main corporate and mailing address for purposes of these chapter 11 cases is: c/o Competitive Power Ventures, Inc., 8403 Colesville Road, Suite 915, Silver Spring, MD 20910.

## DISCLAIMER

THIS DISCLOSURE STATEMENT[2] IS BEING DISTRIBUTED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN FROM THE PARTIES ENTITLED TO VOTE ON THE PLAN.  A COPY OF THE PLAN IS ATTACHED HERETO AS **EXHIBIT A**.  ALTHOUGH STYLED AS A "JOINT" PLAN, THE PLAN CONSISTS OF TWO (2) SEPARATE SUBPLANS (ONE FOR EACH REORGANIZING DEBTOR), AND EACH REORGANIZING DEBTOR IS A PROPONENT OF THE PLAN WITHIN THE MEANING OF SECTION 1129 OF THE BANKRUPTCY CODE IN ITS RESPECTIVE CHAPTER 11 CASE.  EACH SUBPLAN IS INDEPENDENTLY SUBJECT TO THE REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE.

PURSUANT TO SECTION 1128 OF THE BANKRUPTCY CODE, A CONFIRMATION HEARING WILL BE HELD WITH RESPECT TO THE PLAN (INCLUDING THE SUBPLANS CONTAINED THEREIN) ON **JUNE [24], 2015 AT 10:00 A.M. PREVAILING EASTERN TIME** BEFORE THE HONORABLE BRENDAN L. SHANNON, CHIEF UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 NORTH MARKET STREET, 3RD FLOOR, WILMINGTON, DELAWARE 19801.  OBJECTIONS TO CONFIRMATION OF THE PLAN (INCLUDING THE SUBPLANS CONTAINED THEREIN) MUST BE FILED AND SERVED NO LATER THAN **JUNE [15], 2015 AT 4:00 P.M. PREVAILING EASTERN TIME** IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER, OR ELSE THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.  THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME WITHOUT FURTHER NOTICE.

ALL HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE ON A SUBPLAN(S) ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE SUBPLAN(S).  TO BE COUNTED, THE BALLOT INDICATING ACCEPTANCE OR REJECTION OF A SUBPLAN(S) MUST BE RECEIVED BY PRIME CLERK, LLC, THE CLAIMS AND SOLICITATION AGENT FOR THE REORGANIZING DEBTORS IN THEIR CHAPTER 11 CASES, NO LATER THAN **JUNE [15], 2015 AT 4:00 P.M. PREVAILING EASTERN TIME**.

THERE CAN BE NO ASSURANCE AS TO WHETHER OR WHEN CONFIRMATION OF THE SUBPLAN(S) ACTUALLY WILL OCCUR.  IF EITHER SUBPLAN IS NOT CONFIRMED, THEN THE REORGANIZING DEBTORS RESERVE THE RIGHT TO EITHER (A) REQUEST THAT THE OTHER SUBPLAN BE CONFIRMED OR (B) WITHDRAW ONE OR BOTH OF THE SUBPLAN(S).  THE REORGANIZING DEBTORS' INABILITY TO CONFIRM OR ELECTION TO WITHDRAW ANY SUBPLAN(S) SHALL NOT IMPAIR THE CONFIRMATION OF ANY OTHER SUBPLAN(S).

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code*, attached hereto as **Exhibit A**.

i

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NONBANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER REVIEWED NOR APPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "*SEC*"), OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY OTHER SUCH STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE SUBPLAN(S). NO SOLICITATION OF VOTES TO ACCEPT THE SUBPLAN(S) MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO OR HAVE BEEN, OR WILL BE, SEPARATELY FILED WITH THE BANKRUPTCY COURT. ALTHOUGH THE REORGANIZING DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER SUCH DOCUMENTS, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN AND CONTROL FOR ALL PURPOSES. EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BASED UPON INFORMATION THAT IS PUBLICLY AVAILABLE OR PROVIDED BY THE REORGANIZING DEBTORS' MANAGEMENT. THE REORGANIZING DEBTORS MAY HAVE NOT INDEPENDENTLY VERIFIED ALL OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, AND, AS SUCH, MAKE NO REPRESENTATION OR WARRANTY THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE FINANCIAL INFORMATION CONTAINED IN OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED, EXCEPT AS SPECIFICALLY INDICATED OTHERWISE. THE FINANCIAL PROJECTIONS (THE "***FINANCIAL PROJECTIONS***") ATTACHED HERETO AS **EXHIBIT C**, THE ESTIMATED PROJECTED RECOVERIES DISCUSSED ELSEWHERE IN THIS DISCLOSURE STATEMENT, AND THE LIQUIDATION ANALYSIS ATTACHED HERETO AS **EXHIBIT D** (THE "***LIQUIDATION ANALYSIS***") HAVE BEEN OR WILL BE PREPARED BY THE REORGANIZING DEBTORS' MANAGEMENT IN CONSULTATION WITH THEIR ADVISORS. THE FINANCIAL PROJECTIONS, ESTIMATES, AND ANALYSES, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, NECESSARILY

ARE BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY UNCERTAIN AND MAY BE BEYOND THE CONTROL OF THE REORGANIZING DEBTORS' MANAGEMENT.  IMPORTANT FACTORS THAT MAY AFFECT ACTUAL RESULTS AND CAUSE FORECASTS TO NOT BE ACHIEVED INCLUDE, BUT ARE NOT LIMITED TO, RISKS AND UNCERTAINTIES RELATING TO THE REORGANIZING DEBTORS' ABILITY TO ACHIEVE STRATEGIC GOALS, OBJECTIVES AND TARGETS OVER APPLICABLE PERIODS, INDUSTRY PERFORMANCE, THE REGULATORY ENVIRONMENT, GENERAL BUSINESS AND ECONOMIC CONDITIONS AND OTHER FACTORS.  THE REORGANIZING DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE PROJECTIONS, ESTIMATES, OR ANALYSES OR TO THE ULTIMATE PERFORMANCE OF THE REORGANIZED DEBTORS COMPARED TO THE INFORMATION CONTAINED IN THE FORECASTS OR THAT THE FORECASTED RESULTS WILL BE ACHIEVED.  THEREFORE, THE FINANCIAL PROJECTIONS, ESTIMATES, AND THE LIQUIDATION ANALYSIS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE THAT THE ACTUAL RESULTS WILL OCCUR.

HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE SUBPLAN(S) MUST RELY ON THEIR OWN EVALUATION OF THE REORGANIZING DEBTORS AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE SUBPLAN(S).  IMPORTANTLY, PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE SUBPLAN(S), EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST IN A VOTING CLASS SHOULD REVIEW THE PLAN IN ITS ENTIRETY AND CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN HEREIN, AND THE PLAN SUPPLEMENT.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER CAUSES OF ACTION, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, OR AS A STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY BANKRUPTCY OR NONBANKRUPTCY PROCEEDING INVOLVING THE REORGANIZING DEBTORS OR ANY OTHER PARTY (OTHER THAN IN CONNECTION WITH APPROVAL OF THIS DISCLOSURE STATEMENT OR CONFIRMATION OF ANY SUBPLAN(S)), NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE REORGANIZING DEBTORS.  YOU ARE ADVISED TO OBTAIN INDEPENDENT EXPERT ADVICE ON SUCH SUBJECTS.

THE NEWCO EQUITY INTERESTS, THE REORGANIZED AC EQUITY INTERESTS AND THE REORGANIZED CB 4 EQUITY INTERESTS WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933 (AS AMENDED, THE "*SECURITIES ACT*") OR SIMILAR STATE SECURITIES OR "BLUE SKY" LAWS.  THE OFFER AND ISSUANCE IS BEING MADE IN RELIANCE ON THE EXEMPTION FROM

REGISTRATION UNDER THE SECURITIES ACT, INCLUDING SECTION 4(a)(2) THEREOF, OR AS SPECIFIED IN SECTION 1145 OF THE BANKRUPTCY CODE, AS APPLICABLE. THE ISSUANCE OF THE NEWCO EQUITY INTERESTS, THE REORGANIZED AC EQUITY INTERESTS AND THE REORGANIZED CB 4 EQUITY INTERESTS HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SEC OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

**SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995**: ALL FORWARD-LOOKING STATEMENTS CONTAINED HEREIN OR OTHERWISE MADE BY THE REORGANIZING DEBTORS INVOLVE MATERIAL RISKS AND UNCERTAINTIES AND ARE SUBJECT TO CHANGE BASED ON NUMEROUS FACTORS, INCLUDING FACTORS THAT ARE BEYOND THE REORGANIZING DEBTORS' CONTROL. ACCORDINGLY, THE REORGANIZING DEBTORS' FUTURE PERFORMANCE AND FINANCIAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED IN ANY SUCH FORWARD-LOOKING STATEMENTS. SUCH FACTORS INCLUDE, BUT ARE NOT LIMITED TO, THOSE DESCRIBED IN THIS DISCLOSURE STATEMENT. THE REORGANIZING DEBTORS DO NOT UNDERTAKE TO PUBLICLY UPDATE OR REVISE FORWARD-LOOKING STATEMENTS EVEN IF EXPERIENCE OR FUTURE CHANGES MAKE IT CLEAR THAT ANY PROJECTED RESULTS EXPRESSED OR IMPLIED THEREIN WILL NOT BE REALIZED.

# TABLE OF CONTENTS

**Page**

**ARTICLE I INTRODUCTION**..................................................................................................1
    Section 1.01. Summary of the Plan ........................................................................2
    Section 1.02. Purpose of this Disclosure Statement ..............................................4

**ARTICLE II SOLICITATION AND VOTING PROCEDURES** ........................................4
    Section 2.01. Classification Under the Plan ..........................................................4
    Section 2.02. Parties Entitled to Vote....................................................................5
    Section 2.03. Votes Required for Acceptance by Class .........................................5
    Section 2.04. Certain Factors to be Considered Prior to Voting............................6
    Section 2.05. Solicitation Procedures....................................................................6

**ARTICLE III GENERAL INFORMATION ABOUT THE DEBTORS**...............................9
    Section 3.01. Debtors' Business and Industry........................................................9
    Section 3.02. Debtors' Formation.........................................................................10
    Section 3.03. Debtors' Corporate Structure .........................................................10
    Section 3.04. Debtors' Prepetition Indebtedness..................................................11
    Section 3.05. Events Leading to the Chapter 11 Cases ........................................12
    Section 3.06. Attempts to Reorganize Outside Bankruptcy .................................13
    Section 3.07. Commencement of the Chapter 11 Cases.......................................14
    Section 3.08. Debtors' Current Assets..................................................................14
    Section 3.09. Debtors' Management.....................................................................15
    Section 3.10. Federal and State Regulatory Matters ...........................................15
    Section 3.11. Environmental Laws and Regulations............................................16

**ARTICLE IV THE CHAPTER 11 CASES**..........................................................................18
    Section 4.01. Overview of Chapter 11 .................................................................18
    Section 4.02. First Day Motions ..........................................................................18
    Section 4.03. Employee Incentive Plans ..............................................................21

**ARTICLE V OTHER SIGNIFICANT EVENTS OF THE CHAPTER 11 CASES** .............23
    Section 5.01. DIP Facility Milestones and Amendments.....................................23
    Section 5.02. Retention and Employment of Professionals..................................30
    Section 5.03. Schedules and Statements of Financial Affairs ..............................31
    Section 5.04. Bar Dates .......................................................................................31
    Section 5.05. Walnut Creek Motion.....................................................................31
    Section 5.06. Exclusivity ......................................................................................32
    Section 5.07. Twin Oaks Plant Sale .....................................................................32
    Section 5.08. Nonresidential Leases .....................................................................33
    Section 5.09. Cedar Bayou IDA............................................................................34
    Section 5.10. Sales and Use Tax Claims Against Cedar Bayou ...........................34
    Section 5.11. Lyondell Claims and Objections.....................................................35

**ARTICLE VI TREATMENT OF UNCLASSIFIED CLAIMS**............................................35
    Section 6.01. DIP Facility Claims ........................................................................36
    Section 6.02. Administrative Claims.....................................................................36
    Section 6.03. Priority Tax Claims .........................................................................37

**ARTICLE VII CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS** ........................................................**37**
  Section 7.01. Classification ...........................................................................38
  Section 7.02. Subplan CB: Treatment of Claims Against and Equity Interests in Cedar Bayou.........................................................................39
  Section 7.03. Subplan AC: Treatment of Claims Against and Equity Interests in Altura Cogen ...................................................................42

**ARTICLE VIII ACCEPTANCE OR REJECTION OF THE SUBPLANS** ..........................**44**
  Section 8.01. Acceptance by an Impaired Class ..............................................44
  Section 8.02. Nonconsensual Confirmation ....................................................45
  Section 8.03. Limited Deficiency Waiver ........................................................45

**ARTICLE IX IMPLEMENTATION OF THE PLAN** ...........................................................**45**
  Section 9.01. Organization of Newco ..............................................................45
  Section 9.02. Issuance of Equity Interests.......................................................46
  Section 9.03. Restructuring Transactions ........................................................46
  Section 9.04. Incurrence of Indebtedness........................................................47
  Section 9.05. Assets and Liabilities ................................................................49
  Section 9.06. Funding of Reserves...................................................................49
  Section 9.07. Causes of Action .......................................................................49

**ARTICLE X TREATMENT OF EXECUTORY CONTRACTS AND LEASES** ................**50**
  Section 10.01. Treatment of Executory Contracts and Unexpired Leases .............50
  Section 10.02. Effect of Confirmation Order on Assumption/Rejection ...............50
  Section 10.03. Cure of Defaults and Objections to Assumption ...........................51
  Section 10.04. Rejection Damages Claims and Objections to Rejection ...............51
  Section 10.05. Preexisting Obligations Under Executory Contracts and Unexpired Leases .............................................................................52
  Section 10.06. Modifications, Amendments, Supplements, Restatements or Other Agreements ........................................................................52
  Section 10.07. Reservation of Rights ...............................................................52
  Section 10.08. Non-Occurrence of the Effective Date.......................................52

**ARTICLE XI PROVISIONS GOVERNING DISTRIBUTIONS** .........................................**53**
  Section 11.01. Amount of Distributions...........................................................53
  Section 11.02. Method of Distributions ...........................................................53
  Section 11.03. Delivery of Distributions ..........................................................53
  Section 11.04. No Fractional or De Minimis Distributions.................................54
  Section 11.05. Undeliverable Distributions......................................................54
  Section 11.06. Tax Withholding From Distributions .........................................54
  Section 11.07. Allocations...............................................................................55
  Section 11.08. Time Bar to Cash Payments .....................................................55
  Section 11.09. Means of Cash Payments..........................................................56
  Section 11.10. Foreign Currency Exchange Rates.............................................56
  Section 11.11. Setoffs.....................................................................................56

## TABLE OF CONTENTS (CONT'D)

**Page**

Section 11.12. Claims Paid or Payable by Third Parties ....................................................56

**ARTICLE XII PROCEDURES FOR RESOLVING DISPUTED CLAIMS** ........................**57**
Section 12.01. Prosecution of Objections to Claims ....................................................57
Section 12.02. Estimation of Claims ....................................................57
Section 12.03. No Distributions on Disputed Claims ....................................................57
Section 12.04. Reserve of Cash for Disputed Claims ....................................................57

**ARTICLE XIII CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ....................................................**58**
Section 13.01. Conditions Precedent to Confirmation ....................................................58
Section 13.02. Effect of Non-Occurrence of Conditions to Confirmation or Conditions Precedent to the Effective Date ....................................................58
Section 13.03. Conditions Precedent to the Effective Date ....................................................58
Section 13.04. Waiver of Conditions Precedent ....................................................59

**ARTICLE XIV EFFECT OF CONFIRMATION OF THE PLAN** ....................................................**59**
Section 14.01. Discharge of Claims Against and Equity Interests in the Reorganizing Debtors ....................................................59
Section 14.02. Releases ....................................................60
Section 14.03. Exculpation ....................................................63
Section 14.04. Injunction ....................................................63
Section 14.05. Protection Against Discriminatory Treatment ....................................................64
Section 14.06. Release of Liens ....................................................64
Section 14.07. Cancellation of Securities and Notes Against the Reorganizing Debtors ....................................................64

**ARTICLE XV MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN** ....................................................**64**
Section 15.01. Modification of a Subplan ....................................................64
Section 15.02. Revocation or Withdrawal of a Subplan ....................................................65

**ARTICLE XVI RETENTION OF JURISDICTION** ....................................................**65**

**ARTICLE XVII MISCELLANEOUS PROVISIONS** ....................................................**67**
Section 17.01. Corporate Action ....................................................67
Section 17.02. Securities Issued Under the Plan ....................................................68
Section 17.03. General Settlement of Claims ....................................................68
Section 17.04. Preservation of Causes of Action Not Expressly Released ....................................................68
Section 17.05. Section 1146(a) Exemption ....................................................69
Section 17.06. Elimination of Vacant Classes ....................................................69
Section 17.07. Intercompany Claims ....................................................70
Section 17.08. Additional Documents ....................................................70
Section 17.09. Successors and Assigns ....................................................70
Section 17.10. Reservation of Rights ....................................................70
Section 17.11. Notices ....................................................71
Section 17.12. Term of Injunctions or Stay ....................................................71

## TABLE OF CONTENTS (CONT'D)

Section 17.13. Entire Agreement ...................................................................71
Section 17.14. Plan Supplement Exhibits .......................................................72
Section 17.15. Severability ............................................................................72
Section 17.16. Substantial Consummation .....................................................72

**ARTICLE XVIII RISK FACTORS ........................................................72**
Section 18.01. Risks Related to the Plan and Other Bankruptcy Law Considerations ...........73
Section 18.02. Certain Business Specific Risk Factors......................................79
Section 18.03. Avoidance Actions .................................................................83
Section 18.04. Intercompany Claims ..............................................................84
Section 18.05. Disclosure Statement Disclaimer ............................................84

**ARTICLE XIX CONFIRMATION AND CONSUMMATION PROCEDURE...................87**
Section 19.01. Plan Objection Deadline ..........................................................87
Section 19.02. Confirmation Hearing..............................................................87
Section 19.03. Plan Confirmation Requirements Under the Bankruptcy Code....................87
Section 19.04. "Cramdown" Under Section 1129(b) of the Bankruptcy Code .....................89
Section 19.05. Liquidation Analysis; Financial Projections; Valuation ...............91
Section 19.06. Notice to Holders of Claims and Equity Interests.........................93

**ARTICLE XX ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ...................................................................93**

**ARTICLE XXI CERTAIN SECURITIES LAWS MATTERS............................................94**

**ARTICLE XXII CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES ........................................................95**
Section 22.01. Certain Material U.S. Federal Income Tax Consequences to the Reorganizing Debtors.......................................................96
Section 22.02. Certain Material U.S. Federal Income Tax Consequences to U.S. Holders of Certain Allowed Claims and Disputed Claims .......................97
Section 22.03. Market Discount.....................................................................98
Section 22.04. Withholding ...........................................................................99

**ARTICLE XXIII CONCLUSION AND RECOMMENDATION........................................99**

**EXHIBITS**

**Exhibit**

Plan ............................................................................................................................... A

Post-Effective Date Organizational Chart ............................................................. B

Financial Projections ............................................................................................ C

Liquidation Analysis ............................................................................................ D

# ARTICLE I

## INTRODUCTION

The Reorganizing Debtors hereby submit this Disclosure Statement pursuant to section 1125(b) of the Bankruptcy Code to holders of Claims against and Equity Interests in the Reorganizing Debtors for use in the solicitation of acceptances of the Plan (including the Subplans contained therein).

As described in more detail below, on the Petition Date the Debtors owned interests in and operated, in whole or in part, three power plants in eastern Texas—one coal-fired power plant (the Twin Oaks Plant) and two gas-fired power plants (the Altura Cogen Plant and the Cedar Bayou Plant and, together, the "***Gas Plant Portfolio***"). Shortly after the Petition Date, the Debtors initiated a broad-based marketing process for the Twin Oaks Plant led by Barclays Capital, Inc. ("***Barclays***"), the Debtors' investment banker retained in these Chapter 11 Cases. After a successful marketing and auction process, the Debtors sold the Twin Oaks Plant pursuant to section 363 of the Bankruptcy Code.

In light of the successful Twin Oaks Plant sale, the Reorganizing Debtors carefully considered whether a similar process should be explored with respect to the Gas Plant Portfolio. In consultation with the Reorganizing Debtors' advisors, their independent directors and the Consultation Parties, the Reorganizing Debtors ultimately determined that, in light of existing market conditions and the nature of the Reorganizing Debtors' operations and assets after the Twin Oaks Plant sale, marketing the Gas Plant Portfolio may be the best alternative to maximize value for the Reorganizing Debtors' Estates and to reorganize their affairs. As was done with the Twin Oaks Plant, in November 2014 the Reorganizing Debtors initiated a broad-based marketing process led by Barclays. Barclays prepared a high level "teaser" that provided basic information regarding the opportunity to purchase the Gas Plant Portfolio. The teaser was sent to more than seventy (70) parties that Barclays believed, based on its experience with the Twin Oaks Plant and in conducting sales of assets in distressed situations and sales of power plant facilities, might have an interest in acquiring the Gas Plant Portfolio. Barclays received a high level of initial interest in the Gas Plant Portfolio. Nearly thirty (30) parties executed confidentiality agreements (collectively, the "***Potential Purchasers***"). The Debtors requested that Potential Purchasers submit non-binding preliminary proposals to purchase the Gas Plant Portfolio (the "***Preliminary Proposals***") by November 21, 2014. Several Potential Purchasers submitted Preliminary Proposals. The Reorganizing Debtors, in consultation with their advisors and independent directors, reviewed the Preliminary Proposals with the Consultation Parties. After a thorough review process, the Reorganizing Debtors invited several Potential Purchasers to participate in a second round of the marketing process (the "***Round Two Participants***"). The Reorganizing Debtors distributed a proposed form of purchase agreement to Round Two Participants and established a deadline for Round Two Participants to submit definitive documented bids.

The Reorganizing Debtors, in consultation with their advisors, independent directors and the Consultation Parties, reviewed the bids received from Round Two Participants. The Reorganizing Debtors initially determined that the best path forward for a potential sale of the Gas Plant Portfolio would be through a plan of reorganization and proposed bidding procedures at a value to the Reorganizing Debtors in Cash of at least $355 million (net of all deductions

and/or adjustments and with no right of set off). However, after running an extensive marketing campaign the Reorganizing Debtors did not receive any bids for the Gas Plant Portfolio on terms satisfactory to the Reorganizing Debtors and the Consultation Parties.

The Reorganizing Debtors have now determined, in consultation with their advisors, independent directors and the Consultation Parties, that the best path forward is to terminate the sale process and instead seek Confirmation of the Plan.  The Plan, if confirmed, will provide the Pre-Petition Secured Parties with a Second Lien Note, ownership of the Gas Plant Portfolio (via the Newco Equity Interests), certain residual Cash and certain unclaimed Undeliverable Distributions in exchange for the Allowed Pre-Petition Secured Parties Secured Claims against the Reorganizing Debtors.  The Pre-Petition Secured Parties will receive substantially less than a full recovery on account of their Claims under the Plan.  Nonetheless, the Pre-Petition Secured Parties are consenting to the Reorganizing Debtors' Estates funding the distributions to holders of Allowed Claims under each Subplan.  Holders of Allowed General Unsecured Claims will receive distributions so long as the Class of such Claims at each Reorganizing Debtor also votes in favor of the applicable Subplan(s).  If the Class of General Unsecured Claims in each of the Reorganizing Debtors votes to accept the applicable Subplan, a holder of Allowed General Unsecured Claims in such Subplan will receive additional consideration if such holder does not opt out of the releases contained in Section 10.03 of the Plan.It is therefore very important that you read this Disclosure Statement, the attached Plan and all of the referenced supporting documentation in their entirety and, if you support the Plan, that you submit a Ballot voting in favor of the Subplan and the recoveries it will provide, and consent to the release provisions contained therein.

**THE REORGANIZING DEBTORS BELIEVE THAT THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF THE REORGANIZING DEBTORS' ESTATES AND PROVIDES THE BEST RECOVERY AND CERTAINTY OF OUTCOME TO CLAIM HOLDERS.  AT THIS TIME, THE REORGANIZING DEBTORS BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE REORGANIZING DEBTORS' CHAPTER 11 CASES.  THE REORGANIZING DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## Section 1.01.  Summary of the Plan

As described more fully in this Disclosure Statement, the Subplans provide for distributions on account of certain Allowed Claims in the form of Cash payments, assumption of specified liabilities, and new debt and equity instruments.  The Plan distributions will be in various amounts and will take various forms, depending on the classification and treatment of any particular Claim against or Equity Interest in the Reorganizing Debtors.  The following table summarizes the classification and treatment of Allowed Claims and Allowed Equity Interests under the various Subplans, if confirmed, compared to what such holders could receive in a hypothetical chapter 7 liquidation.  To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern. *For a more detailed description of the classification and treatment of Claims and Equity Interests under the various Subplans, please see ARTICLE III of the Plan.*

    (a)    <u>Subplan CB: Claims Against and Equity Interests in Cedar Bayou</u>

| Class | Claim or Equity Interest | Estimated Amount of Claims[3] | Estimated % Recovery Under the Plan | Estimated % Recovery Under Chapter 7 |
|---|---|---|---|---|
| CB 1 | Allowed Pre-Petition Secured Parties Secured Claims | $713 million | Less than 100% | Less than 100% |
| CB 2 | Other Secured Claims | $0 | 100% | 0% |
| CB 3 | Other Priority Claims | $0 | 100% | 0% |
| CB 4 | General Unsecured Claims | $400,000 to $500,000 | 75%-95%[4] | 0% |
| CB 5 | Equity Interests | N/A | N/A | N/A |

    (b)    <u>Subplan AC: Claims Against and Equity Interests in Altura Cogen</u>

| Class | Claim or Equity Interest | Estimated Amount of Claims | Estimated % Recovery Under the Plan | Estimated % Recovery Under Chapter 7 |
|---|---|---|---|---|
| AC 1 | Allowed Pre-Petition Secured Parties Secured Claims | $713 million | Less than 100% | Less than 100% |
| AC 2 | Other Secured Claims | Less than $1,000 | 100% | 0% |
| AC 3 | Other Priority Claims | $0 | 100% | 0% |
| AC 4 | General Unsecured Claims | $800,000 to $900,000 | 75%-95%[5] | 0% |
| AC 5 | Equity Interests | N/A | N/A | N/A |

---

[3] The Estimated Amount of Claims and Estimated % Recovery Under the Plan amounts, when used in either of the tables in this Section 1.01, reflect the total anticipated Allowed Claims against a particular Reorganizing Debtor, including estimated Cure Costs and anticipated Claims objections as of the filing of this Disclosure Statement, but excluding (a) any Claims for which the bar date has not passed, (b) any Post-Petition Interest, as applicable, and (c) Rejection Damages Claims that may be asserted, if any.

[4] Class CB 4 Claim recoveries are dependent on Class voting and not opting out of the releases provided in Section 10.03 of the Plan. If the Class votes to accept the Plan, holders of Allowed Class CB 4 Claim(s) will receive Cash equal to 75% of the Allowed Claim(s). If the Class votes to accept the Plan, a holder of an Allowed Class CB 4 Claim will receive additional consideration if such holder does not opt out of the releases contained in Section 10.03 of the Plan.

[5] Class AC 4 Claim recoveries are dependent on Class voting and not opting out of the releases provided in Section 10.03 of the Plan. If the Class votes to accept the Plan, holders of Allowed Class AC 4 Claim(s) will receive Cash equal to 75% of the Allowed Claim(s). If the Class votes to accept the Plan, a holder of an Allowed Class AC 4 Claim will receive additional consideration if such holder does not opt out of the releases contained in Section 10.03 of the Plan.

**Section 1.02.  Purpose of this Disclosure Statement**

After a chapter 11 plan has been filed, holders of certain claims against and equity interests in a debtor are permitted to vote to accept or reject such plan.  Before soliciting acceptances of the proposed plan, however, a debtor is required under section 1125 of the Bankruptcy Code to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.

The Reorganizing Debtors are submitting this Disclosure Statement to holders of Claims against and Equity Interests in the Reorganizing Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code.  This Disclosure Statement sets forth specific information regarding the pre-bankruptcy history of the Debtors, the nature and progress of the Chapter 11 Cases and the anticipated organizational and capital structure as well as the operations of the Reorganizing Debtors after confirmation of the Plan and emergence from chapter 11.  This Disclosure Statement also describes the Plan, alternatives to the Plan, effects of confirmation of the Plan, certain risk factors associated with the equity securities and indebtedness that will be issued to the Pre-Petition Secured Parties and the manner in which distributions will be made under the Plan.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims entitled to vote must follow in order for their votes to be counted.

The purpose of this Disclosure Statement is to provide those holders of Claims entitled to vote on the Subplans with adequate information to make an informed decision as to whether to accept or reject the Subplans.  On [____], 2015, after notice and a hearing, the Bankruptcy Court approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical, reasonable investor being solicited to make an informed judgment whether to accept or reject the Subplans.  **APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT CONSTITUTES A DETERMINATION THAT THIS DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION REGARDING THE PLAN, BUT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

## ARTICLE II

## SOLICITATION AND VOTING PROCEDURES

**Section 2.01.  Classification Under the Plan**

Under section 1122(a) of the Bankruptcy Code, a chapter 11 plan may place a claim or equity interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  To determine whether claims are substantially similar, the proper focus is on the legal character of the claim as it relates to the assets of the debtor.  Thus, the question is whether the claims in a class have the same or similar legal status in relation to the assets of the debtor.

Under section 1122(b) of the Bankruptcy Code, a chapter 11 plan may designate a separate class of claims for all unsecured claims that are less than or reduced to an amount approved by the Bankruptcy Court. This class of claims is often referred to as a "convenience class" and is utilized by debtors when a separate class of unsecured claims is reasonable and necessary for administrative convenience.

## Section 2.02.  Parties Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest, and the claim or interest is impaired by the plan. If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the plan.

The Reorganizing Debtors' proposed voting procedures would allow holders of Claims who, on or before the Voting Record Date, have timely filed a Proof of Claim (or an untimely Proof of Claim which has been Allowed as timely by the Court under applicable law on or before the Voting Record Date) that (i) (a) has not been expunged, disallowed, disqualified, withdrawn or superseded prior to the Voting Record Date; and (b) is not the subject of a pending objection, other than a "reduce and allow" objection, filed with the Court at least seven days prior to the Voting Deadline; provided, however, that the holder of a Claim that is the subject of a pending objection on a "reduce and allow" basis shall be entitled to vote such Claim in the reduced amount contained in the objection; or (ii) is the subject of a pending objection but has been provisionally allowed for voting purposes only by order of the Court pursuant to Bankruptcy Rule 3018 before the Voting Deadline.

Additional detail regarding impairment (and the entitlement of holders of Claims to vote on the Subplans) is included below and in ARTICLE III of the Plan.

## Section 2.03.  Votes Required for Acceptance by Class

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number of claims voting to accept, as a percentage of the allowed claims or interests, as applicable, that has voted. Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in

dollar amount of the total allowed claims that have voted. Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

## Section 2.04. Certain Factors to be Considered Prior to Voting

There are a variety of factors that all holders of Claims entitled to vote on the Subplans should consider prior to voting to accept or reject the applicable Subplan(s). These factors may impact recoveries under the Plan and include:

    (i)    unless otherwise specifically indicated, the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

    (ii)    although the Reorganizing Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Reorganizing Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

    (iii)    the Reorganizing Debtors may request Confirmation without the acceptance of all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

    (iv)    any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Claims.

While these factors could affect distributions available to holders of Allowed Claims and Equity Interests under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Impaired Classes entitled to vote to accept or reject the Plan (the "***Voting Classes***") or necessarily require a re-solicitation of the votes of holders of Claims and Equity Interests in such Voting Classes.

For a further discussion of risk factors, please refer to the Risk Factors included in ARTICLE XVIII herein.

## Section 2.05. Solicitation Procedures

(a)    <u>Claims and Solicitation Agent</u>

The Debtors retained the Prime Clerk LLC ("***Prime Clerk***") to act, among other things, as the Claims and Solicitation Agent in connection with the solicitation of votes to accept or reject the Subplans.

(b)     Solicitation Package

The following materials will constitute the solicitation package (the "**Solicitation Package**") distributed to holders of Claims entitled to vote to accept or reject the Subplans:

(v)     this Disclosure Statement, as approved by the Court (with the Plan as an exhibit thereto);

(vi)    the Disclosure Statement Order;

(vii)   the Solicitation Procedures, substantially in the form attached to the Disclosure Statement Order;

(viii)  the *Notice of Order (A) Approving the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballots and Notices in Connection Therewith, (D) Establishing the Plan Confirmation Schedule and (E) Granting Related Relief*, substantially in the form attached to the Disclosure Statement Order (the "**Confirmation Hearing Notice**");

(ix)    a cover letter from the Reorganizing Debtors, substantially in the form attached to the Disclosure Statement Order, describing the contents of the Solicitation Package and urging the holders of Claims in each of the Voting Classes to vote to accept the Subplans;

(x)     appropriate forms of Ballots for holders of Claims in the Voting Classes, substantially in the forms of the Ballots attached to the Disclosure Statement Order;

(xi)    any supplemental documents the Reorganizing Debtors file with the Court and any documents that the Court orders to be included in the Solicitation Package; and

(xii)   a pre-addressed, postage paid return envelope.

(c)     Distribution of the Solicitation Package and Plan Supplement

The Reorganizing Debtors shall cause the Solicitation Package (other than the Ballots) to be provided in paper or CD-ROM format and the Ballots shall be provided in paper format.  The Solicitation Package (except the Ballots) may be obtained from Prime Clerk, by: (i) accessing the Reorganizing Debtors' restructuring website at https://cases.primeclerk.com/optim/Home-DocketInfo; (ii) writing to Prime Clerk at Optim Energy, LLC Ballot Processing Center, c/o Prime Clerk LLC, 830 Third Avenue, Ninth Floor, New York, NY 10022; or (iii) contacting Prime Clerk via telephone at (855) 410-7360 or via email at solicitation@primeclerk.com.

The Reorganizing Debtors shall serve, or cause to be served, all of the materials in the Solicitation Package (including the Ballots) on holders of Claims entitled to vote on the Subplans.  In addition, the Reorganizing Debtors shall serve, or cause to be served, all of the

materials in the Solicitation Package (other than the Ballots) on: (i) the Office of the United States Trustee for the District of Delaware; (ii) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (iii) counsel to Cascade Investment, L.L.C. and ECJV Holdings, LLC; and (iv) any party who has requested notice pursuant to Bankruptcy Rule 2002.

The Court has approved June [15], 2015 as the deadline by which the Reorganizing Debtors shall file the Plan Supplement, which will include, among other things, documents and forms of documents, agreements, schedules, and exhibits to the Plan (all of which shall be in form and substance satisfactory to the Reorganizing Debtors and the Consultation Parties). The Reorganizing Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement, by: (i) accessing the Reorganizing Debtors' restructuring website at https://cases.primeclerk.com/optim/Home-DocketInfo; (ii) writing to Prime Clerk at Optim Energy, LLC Ballot Processing Center, c/o Prime Clerk LLC, 830 Third Avenue, Ninth Floor, New York, NY 10022; or (iii) contacting Prime Clerk via telephone at (855) 410-7360 or via email at solicitation@primeclerk.com.

(d)     Voting Record Date

The Court has approved May [13], 2015 as the record date for purposes of determining which holders of Claims are entitled to vote on the Subplans (the "***Voting Record Date***").

(e)     Voting Deadline

The Court has approved June [15], 2015 at 4:00 p.m. ET as the voting deadline (the "***Voting Deadline***") for the Plan. The Reorganizing Debtors may extend the Voting Deadline, in their discretion, without further order of the Court. To be counted as votes to accept or reject the Subplans, all Ballots sent to holders of Claims must be properly executed, completed and delivered in accordance with the instructions set forth in the Ballots, by (i) first class mail, (ii) overnight courier or (iii) personal delivery so that they are **actually received**, in any case, no later than the Voting Deadline by Prime Clerk. Delivery of a Ballot to Prime Clerk by facsimile, email or any other electronic means will not be valid.

**IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE REORGANIZING DEBTORS DETERMINE OTHERWISE IN THEIR SOLE DISCRETION.**

**ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM ENTITLED TO VOTE ON THE SUBPLAN(S), BUT THAT (I) DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE APPLICABLE SUBPLAN(S) OR (II) INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE SUBPLAN(S) WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE SUBPLAN(S).**

**EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS EITHER TO ACCEPT OR REJECT THE SUBPLAN(S) AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM OR EQUITY INTEREST WILL CERTIFY TO THE BANKRUPTCY COURT AND THE**

REORGANIZING DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.  IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLASS OF CLAIMS AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.  A HOLDER OF CLAIMS UNDER BOTH SUBPLANS IS NOT REQUIRED TO VOTE ALL OF ITS CLAIMS UNDER THE SUBPLANS IN THE SAME MANNER AND, INSTEAD, IS PERMITTED TO VOTE TO ACCEPT ONE SUBPLAN AND REJECT THE OTHER.

IT IS IMPORTANT THAT HOLDERS OF CLAIMS ENTITLED TO VOTE FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON OR ACCOMPANYING SUCH HOLDER'S BALLOT.  HOLDERS OF CLAIMS THAT DO NOT VOTE TO REJECT THE PLAN AND OPT OUT OF GRANTING THE RELEASES DESCRIBED IN SECTION 10.03 OF THE PLAN BY CHECKING THE APPROPRIATE BOX ON THEIR RESPECTIVE BALLOT(S) WILL BE DEEMED TO CONSENT TO SUCH RELEASES.  IF THE CLASS OF GENERAL UNSECURED CLAIMS AT EACH REORGANIZING DEBTOR VOTES TO REJECT THE APPLICABLE SUBPLAN, <u>HOLDERS OF CLAIMS IN THAT CLASS WILL NOT RECEIVE ANY DISTRIBUTIONS.</u>

<u>FURTHERMORE, RECOVERIES ON GENERAL UNSECURED CLAIMS ARE HIGHER IF THE CLASS VOTES TO ACCEPT THE SUBPLAN(S) AND A HOLDER DOES NOT OPT OUT OF THE RELEASES DESCRIBED IN SECTION 10.03 OF THE PLAN.</u>

## ARTICLE III

## GENERAL INFORMATION ABOUT THE DEBTORS[6]

### Section 3.01.  Debtors' Business and Industry

The Debtors are power plant owners principally engaged in the production of energy in Texas's deregulated energy market.  The Debtors owned and operated, in whole or in part, three power plants on the Petition Date: the Twin Oaks Plant, the Altura Cogen Plant and the Cedar Bayou Plant.  The Debtors sold the Twin Oaks Plant in 2014 and continue to own the other two plants in the Gas Plant Portfolio as of the date of this Disclosure Statement.

---

[6] The following is a summary of the Debtors' businesses and operations.  For additional details concerning the Debtors and the background to these Chapter 11 Cases, readers are referred to the *Declaration of Nick Rahn, Chief Executive Officer of Optim Energy, LLC, In Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 4] (the "***First Day Declaration***").

## Section 3.02.  Debtors' Formation

On January 8, 2007, PNM Resources, Inc. ("**PNMR**"), and Cascade Investment, L.L.C. ("**Cascade**") through its wholly-owned subsidiary, ECJV Holdings, LLC ("**ECJV**") formed Optim Energy as a limited liability company organized under the laws of Delaware.  The focus of ECJV and PNMR (an energy holding company that provides electricity through its subsidiaries to areas in New Mexico and Texas) was to enter the deregulated Texas electricity markets by acquiring or constructing merchant power plants to sell electricity to the public through the Electric Reliability Council of Texas, Inc. ("**ERCOT**").  To form Optim Energy, PNMR originally contributed the "Twin Oaks Plant" located in Robertson County, Texas, and ECJV contributed Cash.

## Section 3.03.  Debtors' Corporate Structure

Debtor Optim Energy is the wholly-owned direct subsidiary of non-Debtor ECJV (which is a wholly-owned subsidiary of Cascade) and is a holding company and Delaware limited liability company that directly or indirectly owns 100% of the outstanding equity interests of the other Debtors.  Cascade is the ultimate parent of the Debtors.  Cascade is also a Pre-Petition Secured Party and a DIP Lender in these Chapter 11 Cases.  Cascade, and its wholly-owned subsidiary ECJV, are "insiders" of the Debtors as such term is defined in the Bankruptcy Code.

Debtors Optim Marketing and Optim Generation are both wholly-owned direct subsidiaries of Optim Energy.  Debtor OEM is the wholly-owned direct subsidiary of Optim Marketing.  All the remaining Debtors are subsidiaries of Optim Generation.  Twin Oaks GP owns the general partnership interest in Twin Oaks LP, and Optim Generation wholly owns the limited partnership interest in Twin Oaks LP.  Twin Oaks LP, a limited partnership organized under the laws of Texas, owned the Twin Oaks Plant before its sale as described herein.  Additionally, Optim Generation owns all of the Equity Interests in: (a) Altura Cogen, a Delaware limited liability company, which owns the Altura Cogen Plant; and (b) Cedar Bayou, a Delaware limited liability company, which owns an undivided 50% interest in the Cedar Bayou Plant.

An organizational chart showing the Debtors' legal structure as of the Petition Date is below:



### Section 3.04.  Debtors' Prepetition Indebtedness

Optim Energy, as borrower, and Wells Fargo, as lender, entered into a credit agreement dated June 1, 2007 (the "***Wells Fargo Credit Agreement***"), which provided for up to $1 billion of credit consisting of a revolving loan facility and a letter of credit facility.  The proceeds from borrowings under the revolving loan facility of the Wells Fargo Credit Agreement were used, together with PNMR's contribution of the Twin Oaks Plant and certain equity Cash contributions and ECJV's equity Cash contributions, to fund the acquisitions of the Altura Cogen Plant, the development and construction of the Cedar Bayou Plant and the general operations of the Debtors.  Optim Energy's obligations under the Wells Fargo Credit Agreement were guaranteed by each of Cascade and ECJV (together, the "***Guarantors***") under the Continuing Guaranty issued by Cascade and the Continuing Guaranty issued by ECJV, respectively, each dated as of June 1, 2007 (as amended, the "***Guarantees***"), for the benefit of Wells Fargo in respect of amounts owed by Optim Energy under the Wells Fargo Credit Agreement.  The Debtors were also obligated to reimburse the Guarantors for any payments made to Wells Fargo under the Guarantees pursuant to the Pre-Petition Reimbursement Agreement.  The Debtors' obligations under the Pre-Petition Reimbursement Agreement are secured by (a) a senior lien on, and first priority interest in, substantially all of the Debtors' assets and (b) pledges of all of the shares of equity interests in all of Optim Energy's subsidiaries pursuant to the Pre-Petition Reimbursement Agreement Security Documents.  Additionally, Cascade, ECJV, Wells Fargo and all the Debtors entered into a Subordination Agreement, dated June 1, 2007, under which Cascade and ECJV, in their capacities as Guarantors under the Guarantees, agreed to subordinate all of the Guarantors'

claims against the Debtors (including any amounts owed to any Guarantor under the Reimbursement Agreement) to all of the claims of Wells Fargo against the Debtors and the Guarantors (including any amounts owed to Wells Fargo under the Wells Fargo Credit Agreement and the Guarantees) until such claims of Wells Fargo are paid in full.

Pursuant to the Reimbursement Agreement, the Debtors were required to pay Cascade a guarantee fee of $1.934 million on December 31, 2013.  To preserve liquidity, the Debtors withheld this payment and, on December 30, 2013, entered into a Forbearance Agreement in which Cascade and ECJV agreed, subject to certain conditions, to forbear from exercising any remedies as a result of such nonpayment until February 14, 2014.  As a result of Cascade's payment in full of the outstanding indebtedness under the revolving loan facility (including delivery of Cash Collateral in respect of outstanding letters of credit) to Wells Fargo in accordance with the Guarantee on the Petition Date, the aggregate amount of the Debtors' outstanding obligations under the Reimbursement Agreement was approximately $715 million, which included all accrued and unpaid interest, the missed guarantee fee of $1.934 million, and reasonable out-of-pocket charges and other fees and expenses incurred in connection with the Guarantees as of the Petition Date, plus the face amount of issued and outstanding undrawn letters of credit[7] of approximately $41 million, plus accrued, but unpaid, interest, fees and other amounts.

Since the Petition Date, the Twin Oaks Plant has been sold.  Proceeds from the sale of the Twin Oaks Plant were used to pay the administrative costs associated with that sale, and to pay down the Debtors' obligations under the Reimbursement Agreement.  As of January 31, 2015, the aggregate principal amount of the secured amount outstanding under the Reimbursement Agreement was approximately $596.5 million [D.I. 773].  This amount does not include the missed guarantee fee of $1.934 million and certain other fees paid to Wells Fargo.

**Section 3.05.  Events Leading to the Chapter 11 Cases**

Optim Energy's acquisition of the Twin Oaks Plant and Altura Cogen Plant and its investment to develop and construct the Cedar Bayou Plant occurred in 2007, one year before the 2008 economic downturn that plagued the energy industry, power markets and economy as a whole.  Over the ensuing years, sustained lower electricity prices, primarily driven by plummeting natural gas prices, proved to be a substantial challenge to the Debtors' power generation assets.  The price of natural gas, which is closely tied to the price of electricity in much of the U.S. (including the ERCOT market where the Debtors' Power Plants are located), fell from about $8.50 per MMBtu in 2008 to under $3.90 per MMBtu as of December 2013 (a decline of approximately 54%).

In large part as a result of the drop in natural gas prices, ERCOT market power prices fell correspondingly from about $63.24 per MWh in 2008 to under $38.00 per MWh as of December 2013 (a decline of approximately 40%).  Consequently, the Debtors were left with a significant debt load that could not be serviced or repaid due to persistent operating losses, which were

---

[7] The pre-petition letter of credit obligations were replaced by new letters of credit issued by Wells Fargo as issuing bank under the DIP Credit Agreement.

magnified by seasonal fluctuations in the Debtors' revenue with decreased revenues generally recorded in the winter months.

The impact of depressed power prices was particularly acute with respect to the Twin Oaks Plant. Prior to the sale of the Twin Oaks Plant, Twin Oaks was obligated under the long term fuel supply agreement between Walnut Creek and Optim Energy Twin Oaks, LP, executed in 1987 (as amended, the "**Fuel Supply Agreement**") to purchase almost all of its coal requirements from Walnut Creek. The terms of the Fuel Supply Agreement provided for escalating prices for coal purchased from Walnut Creek over time without any adjustment for declining power prices. In the two (2) years prior to the Petition Date, this dynamic generated average annual operating losses of approximately $11.5 million attributable to the Twin Oaks Plant. The material cash flow drain required to sustain the Twin Oaks Plant, when combined with the systemic decrease in power prices, materially impaired the Debtors' ability to service their debts and perform their obligations.

As a result of these adverse market conditions, in September 2011, PNMR, ECJV and Cascade entered into agreements whereby Optim Energy was restructured such that PNMR's ownership in Optim Energy was reduced from 50% to 1% (with PNMR's remaining 1% ownership interest acquired by ECJV in January 2012). In preparation for, and in conjunction with, this restructuring, the Debtors implemented various cost reduction and stabilization strategies and ultimately laid off over 50 employees to enable the transition of the operations and management of the Debtors' plants to contractors NAES Corporation ("**NAES**") and Competitive Power Ventures, Inc. ("**CPV**"). This transition ultimately resulted in approximately $15 million in annual savings, in the aggregate, among the three original power plants. Unfortunately, the reduction in force and other cost-saving initiatives were insufficient to eliminate the recurring operating losses and required capital expenditures that strained liquidity. The depressed economic environment of the electric power industry—particularly with respect to coal-fired plants—and the Debtors' liquidity constraints resulted in continuing losses that left the Debtors without alternatives to a chapter 11 filing.

## Section 3.06.  Attempts to Reorganize Outside Bankruptcy

Recognizing that recurring operating losses were likely to impair liquidity and the ability to refinance the Wells Fargo Credit Agreement, in early 2013 the Debtors began to evaluate their strategic options, including the need for a potential restructuring. To assist with the process, the Debtors initially retained Bracewell & Giuliani LLP ("**Bracewell**") to advise on restructuring negotiations and strategies. The Debtors later engaged Protiviti Inc. ("**Protiviti**") as their restructuring advisor and Barclays as their financial advisor. Ultimately, the Debtors, in consultation with their advisors, concluded that an out-of-court solution was not attainable. With respect to the Debtors' balance sheet, without available financing, the Debtors' operating losses impaired their liquidity to the point that the Debtors could not continue to satisfy their obligations in the ordinary course of business. During the course of 2013 and 2014, the Debtors sought to address the operating losses at the Twin Oaks Plant through negotiations with Walnut Creek to amend the Fuel Supply Agreement. In furtherance of those discussions, on January 30, 2014, the Debtors and Walnut Creek entered into a Forbearance Agreement whereby Walnut Creek agreed to forego exercising remedies until February 14, 2014 (subject to the Debtors' non-default and the applicable cure period related thereto). But despite significant efforts, the parties

were unable to agree upon an ultimate amendment to the Debtors' long term coal purchase obligations under the Fuel Supply Agreement.

On February 11, 2014, Alan Heuberger, John Erickson, Quinn Cornelius and Randy Jack (all of whom are associated with or are consultants of Cascade) resigned their positions as directors of Optim Energy. The remaining two board positions were held by independent directors Richard Fleming and David Gibson. On April 7, 2014, Joseph Bondi was appointed as an additional independent director of Optim Energy.

## Section 3.07.  Commencement of the Chapter 11 Cases

After struggling against the downturn in the Texas power markets in recent years, aggressively managing costs, and engaging in a comprehensive effort to explore strategic alternatives to mitigate systemic operating losses, the Debtors filed these Chapter 11 Cases on February 12, 2014 with the goal of reorganizing, including the restructuring of the Debtors' obligations and pursuing strategic alternatives to maximize the value of their power producing assets.

## Section 3.08.  Debtors' Current Assets

The Reorganizing Debtors currently own and operate, in whole or in part, two power plants: the Altura Cogen Plant and the Cedar Bayou Plant. The Reorganizing Debtors sell the electricity generated by these two plants directly into ERCOT, on a wholesale basis. Debtor Altura Cogen also sells steam, and a portion of its electrical energy and capacity through an output contract. Additional detail regarding the two remaining power plants follows:

(a)    The Altura Cogen Plant

The Altura Cogen Plant is a natural-gas powered plant capable of producing 600 megawatts located in Harris County, Texas and sells the majority of its energy in the ERCOT market. The plant is owned by Debtor Altura Cogen, LLC. The Altura Cogen Plant has been commercially operating since 1985 and is located within a complex of petrochemical facilities owned by Lyondell. Altura Cogen leases the land under which the power plant is situated from Lyondell pursuant to a ground lease entitled the "Lease and Easement Agreement" dated September 6, 2005 (as amended and restated, the "*Altura Lease*"). Altura Cogen purchases the natural gas to fuel the plant from EDF Trading North America, LLC ("*EDF*") pursuant to fuel purchase agreements, which typically expire every few years, at which time the Debtors must enter into new agreements to supply the Altura Cogen Plant. The energy generated by the Altura Cogen Plant is sold on a short-term basis into the ERCOT market pursuant to an energy management agreement between Debtor Optim Marketing and EDF, dated as of November 1, 2011. EDF provides power management services, including scheduling, bidding, and dispatching—in coordination with NAES—the power produced by the Altura Cogen Plant. EDF also provides fuel management services, including procuring fuel for Altura Cogen, and EDF assists the Debtors with risk management, all of which is supervised by CPV. Lyondell purchases a portion of the power generated at the Altura Cogen Plant, as well as the steam produced from power production operations. The terms of the sale of steam and power to Lyondell are governed by the SEPSA. A letter of credit in the amount of $40 million has been

issued under the DIP Credit Agreement for the benefit of Lyondell in connection with the Debtors' obligations under the SEPSA.

      (b)      <u>The Cedar Bayou Plant</u>

The Cedar Bayou Plant is a natural-gas powered plant capable of producing 550 megawatts located in Chambers County, Texas and operates in ERCOT's Houston Zone. Debtor Cedar Bayou owns a 50% undivided interest in the Cedar Bayou Plant and NRG Cedar Bayou Development Company, LLC ("***NRG Cedar Bayou***") owns the remaining 50% undivided interest. The Cedar Bayou Plant began operating in 2009. The Cedar Bayou Plant is located within a complex of electric generation facilities owned by NRG Texas Power LLC ("***NRG Texas***"), which owns the real property upon which the Cedar Bayou Plant is situated. Cedar Bayou and NRG Cedar Bayou are co-lessees from NRG Texas of the real property upon which the Cedar Bayou Plant is located pursuant to that certain Premises Lease dated August 1, 2007 (as amended, the "***CB 4 Lease***"). The Cedar Bayou Plant is operated by NRG Cedar Bayou in accordance with a Joint Ownership Agreement (as amended and restated), dated August 1, 2007 between Cedar Bayou and NRG Cedar Bayou. The energy generated by the Cedar Bayou Plant is sold on behalf of Cedar Bayou and NRG Texas as joint owners on a short-term basis into ERCOT through a scheduling and dispatch agreement with NRG Texas. Cedar Bayou purchases its share of the natural gas to fuel the plant pursuant to short term (typically periods of three (3) months) fuel purchase agreements with NRG Power Marketing LLC ("***NRGPM***"). Prior to the Petition Date, a letter of credit in the amount of $1 million was issued under the Wells Fargo Credit Agreement for the benefit of NRGPM in connection with the Debtors' obligations under the fuel purchase agreements for the Cedar Bayou Plant. This letter of credit has been replaced by one issued under the DIP Credit Agreement.

**Section 3.09.  Debtors' Management**

The Debtors' day-to-day management and operations are outsourced to third-party contractors and, therefore, the Debtors have no employees. On September 22, 2011, the Debtors entered into the O&M Services Agreement with NAES for the Altura Cogen Plant (as amended and restated, "***Altura Cogen NAES Agreement***"). Under the terms of the Altura Cogen NAES Agreement, NAES employs plant personnel and is responsible for operating and maintaining the Altura Cogen Plant. The responsibilities of NAES include general operational and maintenance services such as permitting, providing and training personnel, procuring supplies and inventory, and coordinating operations and maintenance with CPV. On October 31, 2011, Optim Energy entered into the Asset Management Agreement with CPV (as amended, the "***CPV Management Agreement***"), pursuant to which CPV manages the Debtors' operations and finances. These responsibilities include executive management, contract administration, accounting, treasury, regulatory compliance and other services. CPV is headquartered in Maryland, where the Debtors' financial records are located, and is supervised by Optim Energy's independent board of directors.

**Section 3.10.  Federal and State Regulatory Matters**

The Public Utility Commission of Texas ("***PUCT***") has oversight over the competitive wholesale electricity market administered by ERCOT and regulates certain aspects regarding

entities owning electric generating facilities in Texas and transactions involving the transfer of ownership of such facilities. Each of the Debtors is registered as a power generation company under the Texas Public Utility Regulatory Act and, by virtue of such registration, qualifies to generate electric energy and power in Texas. The Debtors are also subject to standards and rules adopted by the PUCT relating to the operation of the competitive wholesale electric market administered by ERCOT. The PUCT requires market participants to observe all ERCOT scheduling, operating, reliability, and settlement policies, rules, guidelines, and procedures and prohibits activities by wholesale market participants which are unfair, misleading, or deceptive or constitute an abuse of market power. The PUCT monitors the activities of market participants in the wholesale ERCOT market, and to the extent the PUCT determines that any activity constitutes an abuse of market power or is otherwise unfair, misleading, or deceptive or violates a governing ERCOT practice or procedure, the PUCT may assess administrative penalties of up to $25,000 per violation per day and may also order the disgorgement of all excess revenue resulting from the violation.

The Debtors are also subject to oversight by the Federal Energy Regulatory Energy Commission ("***FERC***"), North American Electric Reliability Corporation ("***NERC***"), and Texas Reliability Entity, Inc. ("***TRE***") in connection with national electric reliability standards for the bulk power system promulgated by NERC and adopted by FERC. In ERCOT, TRE has been delegated the authority to administer, monitor and enforce compliance with the NERC electric reliability standards and conducts compliance and enforcement activities in accordance with the NERC rules of procedure. FERC has authority to assess penalties of up to $1,000,000 per day of violation for violations of the NERC electric reliability standards. In addition to FERC-assessed monetary penalties for violation of the NERC electric reliability standards, NERC or TRE may issue a remedial action directive, such as: (a) specifying operating or planning criteria or limits; (b) requiring specific system studies; (c) defining operating practices or guidelines; (d) requiring confirmation of data, practices, or procedures through inspection, testing, or other methods; (e) requiring specific training for personnel; (f) requiring development of specific operating plans; and/or (g) requiring an independent contractor for internal audit. TRE also has authority to apply a sanction, which is not limited to a monetary penalty, with the objective of promoting reliability and compliance with the reliability standards, such as limiting the entity's activities, functions, or operations, or placing the entity on a reliability watch list.

## Section 3.11.  Environmental Laws and Regulations

The Debtors are subject to numerous federal, state and local laws and regulations with regard to air and water quality, hazardous and solid waste management, environmental remediation and other environmental matters. Environmental laws and regulations affecting the Debtors include, but are not limited to:

- the Clean Air Act, as well as state laws and regulations impacting air emissions, including State Implementation Plans relating to existing and new National Ambient Air Quality Standards for ozone and particulate matter. Owners and/or operators of air emission sources are responsible for obtaining permits and for annual compliance and reporting;

- the Clean Water Act, as well as state laws and regulations regarding water quality, which require permits for facilities that discharge wastewater and storm water into the environment;

- the Comprehensive Environmental Response, Compensation and Liability Act, which can require any individual or entity that currently owns or in the past may have owned or operated a disposal site, as well as transporters or generators of hazardous substances sent to a disposal site, to share in remediation costs; and

- the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, as well as state laws and regulations regarding solid and hazardous waste, which require certain solid wastes, including hazardous wastes, to be managed pursuant to a comprehensive regulatory regime.

These laws and regulations can result in increased capital, operating and other costs. These laws and regulations generally require the Debtors to obtain and comply with a wide variety of environmental licenses, permits, inspections and other approvals. Compliance with these laws and regulations can require significant expenditures, including expenditures for the installation of pollution control equipment, environmental monitoring, emissions fees, permits and cleanup costs and damages arising from contaminated properties. Failure to comply with environmental regulations may result in the assessment of administrative, civil and criminal penalties, including the assessment of monetary penalties, the imposition of investigatory and remedial obligations, the suspension or revocation of necessary permits, licenses and authorizations, the requirement that additional pollution controls be installed and the issuance of orders enjoining future operations or imposing additional compliance requirements.

Additionally, other recently passed and potential future environmental laws and regulations could have a significant impact on the Debtors' results of operations, cash flows or financial position. The U.S. Environmental Protection Agency (EPA) has adopted and is in the process of implementing regulations governing the emission of nitrogen oxide (NOx), sulfur dioxide (SO2), particulate matter, mercury and other air pollutants under the Clean Air Act through the National Ambient Air Quality Standards, the Mercury and Air Toxics Standards rule and other air quality regulations. The EPA also adopted the Cross-State Air Pollution Rule, which provides for limits on the interstate transport of NOx and SO2 emissions, and recently finalized regulations governing the management of cooling water intake structures. In addition, the EPA has proposed revisions to the effluent guidelines for steam electric generating plants under the Clean Water Act and proposed new carbon dioxide (CO2) emissions requirements for existing fossil fuel electric generating units, called the Clean Power Plan. There have also been a number of other federal and state legislative and regulatory initiatives to reduce greenhouse gas (GHG) emissions. These recent and potential future environmental laws and regulations may require the Debtors to make additional capital expenditures and increase operating and maintenance costs.

## ARTICLE IV

## THE CHAPTER 11 CASES

### Section 4.01.   Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Chapter 11 authorizes a debtor to reorganize its business for the benefit of its creditors, interest holders, and other parties in interest.  Commencing a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the filing date.   The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The principal objective of a chapter 11 case is to consummate a plan of reorganization or liquidation.  A plan of reorganization or liquidation sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by a bankruptcy court binds a debtor, any issuer of securities thereunder, any person acquiring property under the plan, any creditor or interest holder of a debtor, and any other person or entity the bankruptcy court may find to be bound by such plan.   Chapter 11 contains certain requirements related to obtaining the approval of a plan of reorganization by the bankruptcy court.

Subject to certain limited exceptions, the bankruptcy court order confirming a plan of reorganization or liquidation discharges a debtor from any debt that arose prior to the effective date of a plan of reorganization or liquidation, and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization or liquidation.

Prior to soliciting acceptances of a proposed plan of reorganization or liquidation, Bankruptcy Code section 1125 requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor typical of the types of claims and interests in the case to make an informed judgment regarding acceptance of the plan of reorganization or liquidation.  This Disclosure Statement is submitted in accordance with Bankruptcy Code section 1125.

### Section 4.02.   First Day Motions

The Debtors devoted substantial efforts to stabilizing their operations and preserving and restoring their relationships with vendors, customers, landlords and utility providers that had been impacted by the commencement of these Chapter 11 Cases.  As a result of these initial efforts, the Debtors minimized the negative impact resulting from the commencement of these Chapter 11 Cases.

On the Petition Date, in addition to the voluntary petitions for relief filed by the Debtors under chapter 11 of the Bankruptcy Code, the Debtors also filed a number of "first day" motions and applications (collectively, the "***First Day Motions***") with the Bankruptcy Court.   The Bankruptcy Court entered several orders to, among other things: (i) prevent interruptions to the Debtors' businesses; (ii) ease the strain on the Debtors' relationships with certain essential constituents; (iii) allow the Debtors to retain certain advisors necessary to assist the Debtors with the administration of the Chapter 11 Cases; and (iv) obtain debtor in possession financing (each,

-18-

a "*First Day Order*").  The First Day Motions and First Day Orders are described in more detail below:

(a)      Administrative Motions

To facilitate a smooth and efficient administration of these Chapter 11 Cases, the Bankruptcy Court entered a procedural order authorizing the joint administration of the Debtors' Chapter 11 Cases [D.I. 27].

(b)      Cash Management Systems

As part of a smooth transition into these Chapter 11 Cases, the Debtors sought and the Bankruptcy Court entered certain orders authorizing the Debtors to (i) continue using the Debtors' existing cash management system, (ii) maintain existing bank accounts and business forms, (iii) continue intercompany transactions, and (iv) grant superpriority administrative expense status to postpetition intercompany payments [D.I. 30, 140].  Further, the Bankruptcy Court deemed the Debtors' bank accounts to be debtor in possession accounts and authorized the Debtors to maintain and continue using these accounts in the same manner as those employed before the Petition Date without reference to their status as debtors in possession.

(c)      Critical Vendors

The Debtors rely on their vendors to, among other things, (i) assist the Debtors in complying with applicable governmental laws and regulations, (ii) supply essential raw materials, specialized replacement parts and supplies, operations consumables, and certain other goods required to operate the Debtors' generating facilities and ensure continuous business operations, and (iii) ensure the wide range of specialized equipment the Debtors utilize for energy production and pollution control operate in an effective, safe, and efficient manner. While the Debtors rely on hundreds of vendors, payments for truly critical vendors represented less than 0.14 percent of the Debtors' approximately $720 million of total unsecured and project debt.  The disruption of their work would impede the Debtors' ability to continue operation. Therefore, the Bankruptcy Court entered a First Day Order authorizing the Debtors to pay prepetition claims of certain critical vendors in the interim amount of $450,000 [D.I. 34].  The Debtors obtained a Final Order authorizing them to pay their critical vendors in the aggregate amount of $750,000 on March 4, 2014 [D.I. 126].  As of March 3, 2015, Altura Cogen and Cedar Bayou had paid their critical vendors $191,223.79 and $0, respectively, pursuant to the Final Order.

(d)      Lien Claimants

Before the Petition Date, and in the ordinary course of business, the Debtors contracted with certain domestic third-party carriers and warehousemen (the "*Lien Claimants*") to ship, transport, and deliver raw materials, parts, and components to the Debtors.  The Debtors use certain raw materials without which the Debtors cannot generate electricity or maintain compliance with environmental regulations.  Additionally, the Debtors' generating facilities employ sophisticated generating equipment to monitor the facilities, move supplies within the facilities, and produce energy, which all require replacement parts, supplies, and other critical goods to continue operating.  An inability to acquire raw materials and parts from the Lien

Claimants could have resulted in a slow-down or shut-down of the Debtors' operations at various facilities. The Debtors were concerned that unless these Lien Claimants were paid outstanding prepetition amounts, many of these Lien Claimants would refuse to perform their ongoing obligations under their existing agreements with the Debtors or may refuse to release goods in their possession, which would have had a material adverse effect on the Debtors' businesses. The Bankruptcy Court entered a First Day Order [D.I. 34] and then, on March 4, 2014, a Final Order [D.I. 126] authorizing, among other things, the Debtors to pay certain prepetition claims of the Lien Claimants.

      (e)    <u>Energy Trading</u>

The Debtors were parties to prepetition contracts with respect to energy trading. First, the SEPSA became effective on January 1, 2007, for an initial term of fifteen (15) years, with an automatic two-year renewal option thereafter, until January 1, 2047. Under the SEPSA, Lyondell purchases a portion of the power generated at the Altura Cogen Plant, and the steam produced from the power production operations. The SEPSA requires Altura Cogen to deliver to Lyondell every 24-hour period up to (i) 80 megawatts of electric capacity and the associated energy and (ii) 1.33 million pounds of steam per hour from the Altura Cogen Plant. Second, on May 18, 2009 Optim Marketing entered into an ISDA 2002 Master Agreement (the "***EDF ISDA***") with EDF. Under the EDF ISDA, Optim Marketing and EDF enter into transactions for the purchase, sale or exchange of natural gas products and derivatives. Third, on October 31, 2008 Cedar Bayou (as successor in interest to Optim Marketing) entered into an ISDA 2002 Master Agreement (as amended, the "***NRG ISDA***" and, together with the SEPSA and the EDF ISDA and the transactions under each of the foregoing, the "***Energy Trading Contracts***") with NRG Power Marketing for the purchase of natural gas supply for Cedar Bayou's 50% share of the Cedar Bayou Plant's fuel requirements. Concerned that certain counterparties could take actions adverse to the Debtors as a result of the bankruptcy filings, out of an abundance of caution, the Debtors sought and the Bankruptcy Court entered a First Day Order [D.I. 35] and then, on March 6, 2014, a Final Order [D.I. 139] authorizing, among other things, the Debtors to continue performance under their Energy Trading Contracts, enter into new trading contracts, and pledge Collateral as necessary and appropriate under their trading contracts, provided that notice was provided to certain parties.

      (f)    <u>Taxes and Fees</u>

The Debtors believed that, in some cases, certain taxing, regulatory, and governmental authorities had the ability to exercise rights and remedies if the Debtors failed to remit certain taxes and fees. Accordingly, the Debtors sought entry of an order authorizing the Debtors to pay certain fees and taxes to avoid harm to the Debtors' business operations. On February 12, 2014, the Bankruptcy Court entered a First Day Order authorizing the Debtors to pay certain taxes and fees [D.I. 33], and on March 6, 2014, the Bankruptcy Court entered a Final Order authorizing the Debtors to pay such taxes and fees [D.I. 138].

      (g)    <u>Utilities</u>

Section 366 of the Bankruptcy Code protects debtors from utility service cutoffs upon a bankruptcy filing while providing utility companies with adequate assurance that the debtors will

pay for postpetition services.  To ensure uninterrupted utility service, the Debtors filed a First Day Motion seeking entry of an order approving procedures for, among other things, determining adequate assurance for utility providers and prohibiting utility providers from altering, refusing or discontinuing services without further order by the Bankruptcy Court [D.I. 9].  On February 12, 2014, the Bankruptcy Court entered a First Day Order approving the relief requested in this motion [D.I. 31] and, on March 4, 2014, the Bankruptcy Court entered a Final Order approving the relief requested in this motion [D.I. 127].

(h)      DIP Facility and Cash Collateral

On the Petition Date, the Debtors filed a motion [D.I. 16] to obtain approval of the DIP Facility and use of the Pre-Petition Secured Parties' Cash Collateral to fund operational and other expenses during the Chapter 11 Cases.  Following the First Day Hearing, on the Petition Date the Bankruptcy Court entered an interim order authorizing the Debtors' use of Cash Collateral and to borrow up to $75 million under the DIP Facility [D.I. 36].  On March 6, 2014, the Bankruptcy Court entered a Final Order authorizing the Debtors' use of Cash Collateral and granting approval to borrow up to $115 million under the DIP Facility [D.I. 144].  Following the closing on the sale of the Twin Oaks Plant, the commitment was reduced to $85 million (from $115 million) and the letter of credit sublimit was reduced to $47 million (from $56 million).  The letter of credit sublimit was reduced again, to $44 million, on April 20, 2015 upon the approval by the Bankruptcy Court of Amendment No. 15 to the DIP Credit Agreement [D.I. 851].  The hedging sublimit under the DIP has remained unchanged.  As of May 4, 2015, $45 million in letters of credit was outstanding under the DIP Facility, and no loan balance was outstanding.  Under the Debtors' cash management system, Cash generated from the operating Debtors is consolidated into accounts and investments held by Optim Energy.  The use of Cash is subject to the DIP Credit Agreement (as amended) and the Final DIP Order.  As of April 23, 2015, Cash balances at Altura Cogen and Cedar Bayou were $457,229.65 and $43,746.89, respectively.

**Section 4.03.  Employee Incentive Plans**

During the course of the Chapter 11 Cases, the Debtors implemented certain employee incentive plans.  The terms of these narrowly-tailored plans were calculated and developed by Optim Energy's independent board of directors with the assistance of Debtors' advisors.  A summary of these incentive plans is provided below:

(a)      2014 Bonus Plan

The Debtors outsourced operational management of the Twin Oaks Plant and the Altura Cogen Plant pursuant to the Operations and Maintenance Services Agreement between NAES and Twin Oaks LP (the "***Twin Oaks NAES Agreement***") and the Altura Cogen NAES Agreement (together with the Twin Oaks NAES Agreement, the "***O&M Agreements***").  Pursuant to the O&M Agreements, in connection with the sale of the Twin Oaks Plant and consistent with past practice, the Debtors and NAES agreed on terms for a Bonus Plan for 2014 that set parameters under which a plant worker or plant manager could earn his or her bonus.  The incentive program was based on the weighted average performance with respect to, among other things: (i) unit availability; (ii) EBITDA; (iii) cost efficiency; (iv) safety performance; (v) environmental compliance; and (vi) other factors deemed relevant by management in their

reasonable discretion and judgment. In total, there were approximately 100 NAES plant workers eligible to receive a bonus under the Bonus Plan. The maximum amount payable under the Bonus Plan was approximately $1.9 million in the aggregate. To date, $1,585,000 has been paid under the Bonus Plan in the aggregate.

(b)     The KEIP

As described above, the Debtors outsourced executive management responsibilities, which were performed by CPV pursuant to the CPV Management Agreement. The primary officer and director provided by CPV is Nick Rahn, who serves as Optim Energy's Chief Executive Officer and managing agent for Optim Energy's affiliated Debtors. In addition to the ordinary course incentive bonuses described above, on May 14, 2014 the Debtors implemented a Key Employee Incentive Plan (the "*KEIP*") approved by the Bankruptcy Court [D.I. 293]. In addition to Mr. Rahn, four members of the plant management personnel employed by NAES and two members of the plant management personnel employed by CPV were eligible to participate in the KEIP. The maximum amount that could be earned under the KEIP was $400,000, which has been paid.

(c)     The Original MIP

The Debtors implemented a Management Incentive Plan (the "*Original MIP*") for Mr. Rahn, the Chief Executive Officer of Optim Energy and the Debtors' key manager, in connection with the sale of the Twin Oaks Plant. On May 14, 2014, the Bankruptcy Court entered an order approving the Original MIP [D.I. 293]. The maximum sale bonus that Mr. Rahn could earn under the Original MIP was $250,000, which was comprised of two components. First, a $150,000 bonus was earned upon the approval of the Twin Oaks bidding procedures. Second, a sale bonus component capped at $100,000, which was based on a percentage of sale proceeds above a threshold, was earned upon the Bankruptcy Court's entry of the Order approving the sale of the Twin Oaks Plant. Under the Original MIP, $250,000 has been paid to Mr. Rahn.

(d)     The Gas Plant Portfolio MIP

The Debtors implemented a second Management Incentive Plan (the "*Gas Plant Portfolio MIP*") for Mr. Rahn, the Chief Executive Officer of Optim Energy and the Debtors' key manager, in connection with the Sale of the Gas Plant Portfolio. On October 27, 2014, the Bankruptcy Court entered an order approving the Gas Plant Portfolio MIP [D.I. 612]. The incentive award payable to Mr. Rahn under the Gas Plant Portfolio MIP is comprised of two components. There is a $200,000 bonus payable upon the entry of: (x) a final order approving a sale of the Gas Plant Portfolio; (y) a confirmation order approving the transactions set forth in a plan sponsor agreement that results in a disposition of the Gas Plant Portfolio; or (z) an order approving any other binding sale agreement or plan sponsor agreement relating to the disposition of the Gas Plant Portfolio to a buyer unaffiliated with the DIP Lenders or the Pre-Petition Secured Parties. There is also a sale bonus component, which is based on a percentage of sale proceeds above a threshold. Nothing has been paid to Mr. Rahn to date under the terms of the Gas Plant Portfolio MIP. However, amounts will be payable to Mr. Rahn under the Gas Plant Portfolio MIP if a sale of the Gas Plant Portfolio under a Membership Interest Purchase and Sale Agreement is completed.

# ARTICLE V

# OTHER SIGNIFICANT EVENTS OF THE CHAPTER 11 CASES

## Section 5.01.   DIP Facility Milestones and Amendments

Pursuant to section 12.1 of the DIP Credit Agreement, it shall constitute an event of default under the DIP Credit Agreement if, among other things, the Debtors fail to meet any of the milestones set forth on Schedule 12.1 of the DIP Credit Agreement, which are set forth below:

     (i)     As soon as practicable, but in any event within the ninety (90) days immediately following the Petition Date, either (a) executing a sale agreement with a stalking horse bidder relating to the sale of, at a minimum, Twin Oaks or substantially all of Twin Oaks' assets, and filing a sale motion and bidding procedures motion relating to such sale with the Bankruptcy Court, or (b) filing a bidding procedures motion and an auction sale motion with the Bankruptcy Court to implement bidding procedures for a sale of Twin Oaks or substantially all of Twin Oaks' assets without a stalking horse bidder; in each case acceptable to the Majority Lenders in their sole discretion;

     (ii)     Within one hundred twenty (120) days of the Petition Date, obtain entry of a bidding procedures order from the Bankruptcy Court approving bidding procedures for a sale of Twin Oaks or substantially all of Twin Oaks' assets;

     (iii)     Within one hundred fifty (150) days of the Petition Date, obtain Bankruptcy Court approval of a sale of Twin Oaks or substantially all of Twin Oaks' assets, to the extent a successful bidder has been selected;

     (iv)     By six (6) months from the Petition Date, deliver to the Lenders either (a) a draft Plan of Reorganization and Disclosure Statement, in each case acceptable to the Majority Lenders in their reasonable discretion or (b) a Sale Proposal acceptable to the Majority Lenders in their reasonable discretion;

     (v)     By eight (8) months from the Petition Date, file the Plan of Reorganization and the Disclosure Statement or file a sale and bidding procedures motion relating to the Sale Proposal with the Bankruptcy Court; and

     (vi)     By twelve (12) months from the Petition Date, obtain confirmation by the Bankruptcy Court of the Plan of Reorganization and attain the effective date thereof or consummate the sale contemplated by the Sale Proposal; provided, however, that if the Plan of Reorganization or the Sale Proposal has been filed, and the Extension has been elected by the Borrower and consented by the Majority Lenders in writing, this Milestone deadline shall be fifteen (15) months.

The DIP Facility has been amended several times, with the consent of the DIP Lenders (and in certain cases, as required, the consent of the L/C Issuer and the approval of the Bankruptcy Court), since entry of the Final Order approving it.  A summary of the amendments is set for the below:

(vii)    On April 15, 2014, the Debtors filed a notice of Consent dated April 7, 2014 pursuant to which the DIP Lenders agreed: (a) to amend Schedule 12.1 to the DIP Credit Agreement to extend the milestones regarding the sale of the Twin Oaks Plant by thirty (30) days, including the milestones for (x) execution of a sale agreement or filing of a bidding procedures motion, (y) obtaining entry of a bidding procedures order from the Bankruptcy Court, and (z) obtaining Bankruptcy Court approval of a sale; and (b) to appoint Joseph Bondi as an additional Independent Director of Optim Energy [D.I. 222].

(viii)    On May 29, 2014, the Debtors, the DIP Lenders, the Administrative Agent and L/C Issuer entered into a letter agreement waiving (a) the cash collateralization provision of Section 3.3(c) of the DIP Credit Agreement, and (b) the requirement to deposit excess cash in a segregated account so that the Debtors could use the excess cash as working capital (the "*Waiver Letter*").  The non-Debtor parties to the Waiver Letter reserved their rights to rescind the waiver upon written notice at any time.

(ix)    On June 17, 2014, the Debtors filed notices of Consent and Amendment dated June 12, 2014, and Consent and Amendment dated June 13, 2014, pursuant to which the DIP Lenders agreed to amend Schedule 12.1 to the DIP Credit Agreement to extend first to June 13, 2014, and subsequently to June 17, 2014, the milestone regarding (a) the execution of a sale agreement with a stalking horse bidder relating to the sale of, at a minimum, Twin Oaks LP or substantially all of Twin Oaks LP's assets, and the filing of a sale motion and bidding procedures motion relating to such sale with the Bankruptcy Court, or, in the alternative (b) the filing of a bidding procedures motion and an auction sale motion with the Bankruptcy Court to implement bidding procedures for a sale of Twin Oaks LP or substantially all of Twin Oaks LP's assets without a stalking horse bidder [D.I. 363].

(x)    On August 12, 2014, the Debtors filed a notice of Consent and Amendment dated August 11, 2014 pursuant to which the DIP Lenders agreed to amend Schedule 12.1 to the DIP Credit Agreement to extend to September 26, 2014 the milestone regarding the Debtors' delivery to the DIP Lenders (a) a draft Plan of Reorganization and Disclosure Statement (each as defined in the DIP Credit Agreement), in each case acceptable to the Majority Lenders (as defined in the DIP Credit Agreement) in their reasonable discretion, or (b) a Sale Proposal (as defined in the DIP Credit Agreement) acceptable to the Majority Lenders in their reasonable discretion [D.I. 484].

(xi)     On October 2, 2014, the Debtors filed a notice of Consent, Amendment and Waiver dated September 25, 2014 and an Amendment dated October 8, 2014 pursuant to which the DIP Lenders agreed: (a) to amend Schedule 12.1 to the DIP Credit Agreement to extend to October 10, 2014 the milestone regarding the Debtors' delivery to the Lenders of either (x) a draft Plan of Reorganization and Disclosure Statement, in each case acceptable to the Majority Lenders in their reasonable discretion, or (y) a Sale Proposal acceptable to the Majority Lenders in their reasonable discretion [D.I. 559]; and (b) to waive any default of the Gross Margin Covenant under Sections 10.1 and 12.1(c) of the DIP Credit Agreement that has arisen or may arise for August 2014 until the earlier of (x) October 31, 2014 and (y) the date of entry of a Bankruptcy Court order approving an amendment to the Gross Margin Covenant.

(xii)    On October 8, 2014, the Debtors filed a notice of Consent and Amendment dated October 8, 2014 pursuant to which the DIP Lenders agreed to amend Schedule 12.1 to the DIP Credit Agreement to extend to October 31, 2014 the milestones regarding: (a) the Debtors' delivery to the Lenders of either (x) a draft Plan of Reorganization and Disclosure Statement, in each case acceptable to the Majority Lenders in their reasonable discretion, or (y) a Sale Proposal acceptable to the Majority Lenders in their reasonable discretion; and (b) the Debtors' filing of a Plan of Reorganization and the Disclosure Statement or the filing of a sale and bidding procedures motion relating to the Sale Proposal with the Bankruptcy Court [D.I. 571].

(xiii)   On October 8, 2014 the Debtors entered into Amendment No. 6 to the DIP Credit Agreement pursuant to which the Debtors and the DIP Lenders agreed to amend the DIP Credit Agreement to provide $15 million of continuing DIP Financing commitments upon the closing of the Twin Oaks Plant sale, to be increased to $85 million upon the Bankruptcy Court's approval of Amendment No. 7 to the DIP Credit Agreement, which the Debtors also entered into on October 8, 2014.  On October 8, 2014, the Debtors filed a motion for an order approving Amendment No. 7 to the DIP Credit Agreement [D.I. 568].  On October 27, 2014, the Bankruptcy Court entered an order approving Amendment No. 7 as of October 8, 2014, and pursuant to which (x) Section 10.1 of the DIP Credit Agreement was amended to implement a revised Gross Margin Covenant following the sale of the Twin Oaks Plant (and to reflect operating revenues generated from only the remaining Gas Plant Portfolio), and (y) the requirement that $44 million in letters of credit be cash collateralized from the proceeds of the sale of the Twin Oaks Plant was removed [D.I. 614].

(xiv)    On November 3, 2014, the Debtors filed a notice of Consent and Amendment dated October 30, 2014 pursuant to which the DIP Lenders agreed to amend Schedule 12.1 to the DIP Credit Agreement to extend to November 14, 2014 the milestones regarding (a) the Debtors' delivery to the Lenders of either (x) a draft Plan of Reorganization and Disclosure

Statement, in each case acceptable to the Majority Lenders in their reasonable discretion, or (y) a Sale Proposal acceptable to the Majority Lenders in their reasonable discretion; and (b) the Debtors' filing of either such Plan of Reorganization and Disclosure Statement or a sale and bidding procedures motion relating to such Sale Proposal with the Bankruptcy Court [D.I. 623].

(xv)    On November 17, 2014, the Debtors filed a notice of Consent and Amendment dated November 13, 2014 pursuant to which the DIP Lenders agreed to amend Schedule 12.1 to the DIP Credit Agreement: (a) to extend to December 15, 2014 the milestone regarding the Debtors' delivery to the Lenders of either (x) a draft Plan of Reorganization and Disclosure Statement, in each case acceptable to the Majority Lenders in their reasonable discretion, or (y) a Sale Proposal acceptable to the Majority Lenders in their reasonable discretion; and (b) to extend to February 9, 2015 the milestone regarding the Debtors' filing of either (x) such Plan of Reorganization and Disclosure Statement or (y) a sale and bidding procedures motion relating to such Sale Proposal with the Bankruptcy Court [D.I. 637].

(xvi)   On December 16, 2014, Debtors filed a notice of Consent and Amendment dated December 12, 2014 pursuant to which the DIP Lenders agreed to amend Schedule 12.1 to the DIP Credit Agreement to extend to January 30, 2015 the milestone regarding the Debtors' delivery to the Lenders of either (a) a draft Plan of Reorganization and Disclosure Statement, in each case acceptable to the Majority Lenders in their reasonable discretion, or (b) a Sale Proposal acceptable to the Majority Lenders in their reasonable discretion [D.I. 662].

(xvii)  On January 14, 2015, the Debtors filed a notice of the *Request of Extended Outside Date* dated January 13, 2015 pursuant to which the DIP Lenders agreed to extend the Outside Date by a single three-month period to the Extended Outside Date, which is May 12, 2015, pursuant to Section 2.2(h) of the DIP Credit Agreement, to become effective on the date of and upon the Bankruptcy Court entering an order that extends the Debtors' Exclusive Filing Period (as defined below) for proposing a plan of reorganization to at least the Extended Outside Date, provided that on such date no Event of Default has occurred and is continuing [D.I. 691] (the "***Extension***").  On February 3, 2015, the Bankruptcy Court entered an order extending the Debtors' Exclusive Filing Period through and including June 9, 2015 [D.I. 722], and the Extension became effective.

(xviii) On January 28, 2015, the Debtors filed a notice of Consent and Amendment dated January 27, 2015 pursuant to which the DIP Lenders agreed to amend Schedule 12.1 to the DIP Credit Agreement:

a. to extend to February 9, 2015 the milestone regarding the Debtors' delivery to the Lenders (as defined in the DIP Credit Agreement) of either (a) a draft Plan of Reorganization and Disclosure Statement, in each case acceptable to the Majority Lenders in their reasonable discretion, or (b) a Sale Proposal acceptable to the Majority Lenders in their reasonable discretion; provided, however, that if, on or before February 9, 2015, the Extension becomes effective (which it has), then this milestone deadline shall be February 27, 2015;

b. to extend to February 9, 2015 the milestone regarding either (a) the Debtors' filing of the Plan of Reorganization and Disclosure Statement or (b) the Debtors' filing of a sale and bidding procedures motion relating to the Sale Proposal with the Bankruptcy Court; provided, however, that if, on or before February 9, 2015, the Extension becomes effective (which it did), then this Milestone deadline shall be March 6, 2015; and

c. to extend to February 12, 2015 the milestone regarding either (a) the confirmation by the Bankruptcy Court of the Plan of Reorganization and attainment of the effective date thereof or (b) the consummation of the sale contemplated by the Sale Proposal; provided, however, that if the Plan of Reorganization or the Sale Proposal has been filed and the Extension becomes effective (which it did), this milestone deadline shall be May 12, 2015 [D.I. 712].

(xix) On March 2, 2015, the Debtors filed a notice of Consent and Amendment dated February 25, 2015 pursuant to which the DIP Lenders agreed to amend Schedule 12.1 to the DIP Credit Agreement to: (a) extend to March 13, 2015 the milestone regarding the Debtors' delivery to the Lenders of either (x) a draft Plan of Reorganization and Disclosure Statement, in each case acceptable to the Majority Lenders in their reasonable discretion, or (y) a Sale Proposal acceptable to the Majority Lenders in their reasonable discretion; (b) extend to March 20, 2015 the milestone regarding the Debtors' filing of either (x) such Plan of Reorganization and Disclosure Statement or (y) a sale and bidding procedures motion relating to such Sale Proposal with the Bankruptcy Court; and (c), pursuant to their satisfaction of the aforementioned milestones, the Debtors shall, no later than May 12, 2015, obtain confirmation by the Bankruptcy Court of the Plan of Reorganization and attain the effective date thereof or consummate the sale contemplated by the Sale Proposal [D.I. 749].

(xx) On March 13, 2015, the Debtors filed a notice of Consent and Amendment dated March 10, 2015 pursuant to which the DIP Lenders agreed to amend Schedule 12.1 to the DIP Credit Agreement to extend to April 24, 2015 the milestone regarding the Debtors' delivery to the Lenders of either (i) a draft Plan of Reorganization and Disclosure Statement, in each case acceptable to the Majority Lenders in their reasonable discretion, or (ii) a Sale

Proposal acceptable to the Majority Lenders in their reasonable discretion [D.I. 767].

On April 20, 2015, the Bankruptcy Court entered an order approving Amendment No. 15 to the DIP Credit Agreement [D.I. 851], implementing the following changes to the DIP Credit Agreement:

(xxi)    <u>Extension of Outside Date and Related Fees</u>: The original DIP Credit Agreement established February 12, 2015 as the initial Outside Date. Pursuant to Section 2.2(h) of the DIP Credit Agreement, the Debtors elected to extend the initial Outside Date by a single three-month period to May 12, 2015 (the "***First Extension Date***").  Pursuant to Amendment No. 15, (a) the Outside Date is further extended to August 31, 2015, subject to certain conditions and approvals, and (b) Optim Energy may elect to further extend the Outside Date to September 30, 2015, subject to certain conditions and approvals.  Each such extension of the Outside Date shall be an "***Extension***" and the Outside Date as extended in each case shall be the "***Extended Outside Date***."  Upon the effectiveness of the Extension under clause (a) above, a fee equal to one percent (1.00%) times the Lenders' aggregate outstanding Commitments available at the time of such Extension, whether drawn or undrawn, determined on the first day of such Extension (an "***Extension Fee***" and together with the extension fee incurred on the First Extension Date, the "***Extension Fees***") shall accrue; <u>provided</u>, <u>however</u>, the Extension Fees shall be payable on the latest Extended Outside Date.  A conforming amendment to Section 14.2 of the DIP Credit Agreement was also made to include the additional Extension being contemplated by the Majority Lenders as defined under the DIP Credit Agreement.

(xxii)    <u>Use of Excess Cash Collateral</u>: Section 3.3(c) of the DIP Credit Agreement states that on the first business day of each month, operating cash in excess of the Liquidity Cushion shall be used <u>first</u>, to repay outstanding indebtedness under the DIP Credit Agreement, and <u>second</u>, to Cash Collateralize any outstanding Letters of Credit.  Pursuant to Amendment No. 15, the parties have agreed to terminate the Waiver Letter and re-implement a modified cash sweep provision under Section 3.3(c) of the DIP Credit Agreement, requiring operating cash in excess of the sum of the Liquidity Cushion plus $3.5 million, by at least $1 million, to be used <u>first</u>, to repay outstanding indebtedness under the DIP Credit Agreement, <u>second</u>, to make adequate protection payments to the Pre-Petition Secured Parties to reduce the Pre-Petition Indebtedness, and <u>third</u>, if all outstanding Pre-Petition Indebtedness has been repaid, to Cash Collateralize any outstanding Letters of Credit on a pro-rata basis, in all cases subject to the re-borrowing provisions of Section 2.2 of the DIP Credit Agreement.

(xxiii)    <u>Letters of Credit</u>: Pursuant to Amendment No. 15, the definition of "Letter of Credit Sublimit" in the DIP Credit Agreement is modified (a) to reduce

the sublimit from an amount equal to $47 million to an amount equal to $44 million, and (b) to eliminate the credit support made available for Walnut Creek because the Debtors rejected the Walnut Creek fuel supply agreement in 2014 so there is no longer any need for this credit support and the letter of credit previously issued from the benefit of Walnut Creek has been terminated, undrawn, in accordance with the *Stipulation Resolving Emergency Motion Filed by Walnut Creek Mining Company*, filed with the Bankruptcy Court on March 6, 2014 [D.I. 141].

(xxiv)  Gross Margin: Section 10.1 of the DIP Credit Agreement requires the Debtors to maintain aggregate monthly gross margin within a certain percentage of the forecasts provided by the Debtors and agreed to by the DIP Lenders (the "***Gross Margin Covenant***"). Pursuant to Amendment No. 15, Schedule 10.1 to the DIP Credit Agreement is also amended to include target numbers for the Gross Margin Covenant to reflect anticipated revenues generated from the Gas Plant Portfolio for the period from February 1, 2015 through the maximum extended period ending on September 30, 2015.

(xxv)  Milestones: Pursuant to Amendment No. 15, the milestones are further adjusted pursuant to a revised Schedule 12.1 to the DIP Credit Agreement, as follows:

The following Milestones have been met:

a.  As soon as practicable, but in any event no later than June 17, 2014, Optim Energy shall have either (x) executed a sale agreement with a stalking horse bidder relating to the sale of, at a minimum, Twin Oaks or substantially all of Twin Oaks' assets, and have filed a sale motion and bidding procedures motion relating to such sale with the Bankruptcy Court, or (y) have filed a bidding procedures motion and an auction sale motion with the Bankruptcy Court to implement bidding procedures for a sale of Twin Oaks or substantially all of Twin Oaks' assets without a stalking horse bidder; in each case having been acceptable to the Majority Lenders in their sole discretion;

b.  No later than July 11, 2014, Optim Energy shall have obtained entry of a bidding procedures order from the Bankruptcy Court approving bidding procedures for a sale of Twin Oaks or substantially all of Twin Oaks' assets;

c.  No later than August 12, 2014, Optim Energy shall have obtained Bankruptcy Court approval of a sale of Twin Oaks or substantially all of Twin Oaks' assets, to the extent a successful bidder has been selected; and

d.  No later than March 20, 2015, Optim Energy shall have filed the Plan of Reorganization and the Disclosure Statement or a sale and bidding procedures motion relating to the Sale Proposal with the Bankruptcy Court.

The following milestones have not been met and remain outstanding:

e.  On April 24, 2015, the Debtors filed a notice of Consent and Amendment dated April 23, 2015 pursuant to which the DIP Lenders agreed to amend Schedule 12.1 to the DIP Credit Agreement to extend this date from April 24, 2015 to May 18, 2015.  No later than May 18, 2015, Optim Energy shall deliver to the Lenders either (x) a draft Plan of Reorganization and Disclosure Statement, in each case acceptable to the Majority Lenders in their reasonable discretion or (y) a Sale Proposal acceptable to the Majority Lenders in their reasonable discretion; and

f.  No later than June 30, 2015, Optim Energy shall obtain confirmation by the Bankruptcy Court of the Plan of Reorganization and attain the effective date thereof or consummate the sale contemplated by the Sale Proposal.

As of the date of this Disclosure Statement, letters of credit of approximately $45 million are outstanding under the DIP Facility;[8] otherwise, there are no outstanding borrowings under the facility.  For more information about the specific terms of the DIP Facility, including the Debtors' stipulations and protective provisions regarding the DIP Lenders and Pre-Petition Secured Parties, refer to the Final DIP Order [D.I. 144], the DIP Motion [D.I. 16] and the exhibits thereto.

**Section 5.02.  Retention and Employment of Professionals**

The Debtors filed various applications, which were subsequently approved, for employment of Professionals in connection with the Chapter 11 Cases.  Such applications include: (a) Bracewell, as general bankruptcy and restructuring counsel [D.I. 172]; (b) Morris, Nichols, Arsht & Tunnell LLP, as Delaware bankruptcy co-counsel [D.I. 173]; (c) Barclays, as investment banker [D.I. 166]; (d) Protiviti, as restructuring advisor [D.I. 171]; (e) Prime Clerk as Claims and Solicitation Agent [D.I. 29, 164]; (e) KPMG LLP, as independent auditors [D.I. 279]; (f) Deloitte Tax LLP, as tax advisor [D.I. 271 and 738]; and (g) certain Professionals in the ordinary course of business [D.I. 165] (Professionals covered by this application consist of various outside Professionals whom the Debtors employed prior to filing the Chapter 11 Cases). These Professionals (and the services provided) are: (i) Nora Del Bosque (lobbying/consulting); (ii) David Carlile (coal market consultant); (iii) Element Markets (management and marketing of emissions credits); (iv) Jackson Walker LLP (legal representation in the Varner Litigation); (v) Bob Warburton (consultant/operational advice); (vi) WCM (environmental consulting, air permit

---

[8]  In addition to the letters of credit in favor of Lyondell and NRG, on May 4, 2015, a $4 million letter of credit was issued in favor of EDF Trading North America, LLC, under the hedging sublimit, in support of an energy hedging/swap contract.

for Twin Oaks repowering); (vii) Thorndike Landing (dispatch forecast for 2015 budget projections; (viii) Norton Rose Fulbright (tax advice – legal); (ix) Myers-Hill, Attorneys at Law, (tax advice (compliance) – legal), removed as an ordinary course Professional on April 20, 2015 [D.I. 853]; (x) Black & Veatch Corporation (consultant/operational advice); and (y) Property Tax Partners (property tax compliance, valuation and analysis), added as an ordinary course Professional on April 20, 2015 [D.I. 853].  Finally, the Debtors utilized Wise & Susong, LLC to obtain a mineral abstract for 2,769.762 acres in Robertson County, TX, in connection with the sale of the Twin Oaks Plant.

## Section 5.03.  Schedules and Statements of Financial Affairs

On April 14, 2014, the Debtors filed their Schedules [D.I. 206-21].

## Section 5.04.  Bar Dates

On May 9, 2014, the Bankruptcy Court entered the bar date order and established the following deadlines for filing Proofs of Claim in these Chapter 11 Cases: (a) August 11, 2014 at 4:00 p.m. (ET) as the governmental bar date by which Proofs of Claim against the Debtors by a Governmental Unit must be filed; and (b) June 18, 2014 at 4:00 p.m. (ET) as the general bar date by which Proofs of Claim against the Debtors must be filed for all other Claims (other than Administrative Claims and Rejection Damages Claims, if any) [D.I. 275].

On April 20, 2015, the Bankruptcy Court entered an order establishing May 27, 2015 at 5:00 p.m. (ET) as the deadline for filing proofs of Administrative Claim(s) (other than Excluded Claims) in these Chapter 11 Cases incurred on or before March 31, 2015 [D.I. 852].

## Section 5.05.  Walnut Creek Motion

On April 14, 2014, Walnut Creek filed a motion seeking the derivative standing of the Debtors to pursue purported claims on behalf of the Debtors against Cascade and ECJV as Pre-Petition Secured Parties.

In connection with its motion for standing, Walnut Creek submitted a proposed complaint asserting five claims against Cascade and ECJV: (a) recharacterization of prepetition debt owed to Cascade and ECJV as equity; (b) equitable subordination of the secured claims to the claims of unsecured creditors; (c) breach of fiduciary duty; (d) aiding and abetting breach of fiduciary duty; and (e) avoidance of Cascade and ECJV's liens.  Both the Debtors and Cascade/ECJV opposed Walnut Creek's motion, arguing that Walnut Creek failed to satisfy the standard for derivative standing as it had not demonstrated that the Debtors' refusal to pursue the claims at issue was unjustified or that the claims were colorable.

The Bankruptcy Court held a hearing on Walnut Creek's motion on May 5, 2014, where all interested parties were provided an opportunity to be heard.  By opinion [D.I. 288] and accompanying Order [D.I. 289], issued May 13, 2014, the Bankruptcy Court denied Walnut Creek's request for derivative standing and found that none of Walnut Creek's claims were colorable.  More specifically, the Bankruptcy Court held that Walnut Creek's breach of fiduciary duty claims could not lie because the Debtors' operating agreement provided that no fiduciary duties were owed, which provision was supported by Delaware law.  Second, the Bankruptcy

Court found that Walnut Creek's recharacterization claim was not colorable because Walnut Creek had failed to allege sufficient facts to support a claim that the prepetition transactions and financial arrangements were structured and intended as equity rather than debt, and thus were not susceptible to recharacterization. Third, the Bankruptcy Court held that Walnut Creek had not alleged any inequitable conduct to sustain a claim of equitable subordination. Finally, the Bankruptcy Court held that the lien avoidance claim failed because it was more in the nature of a proposed remedy than a separate claim, and Walnut Creek failed to state any basis for avoiding the liens.

On May 14, 2014, Walnut Creek filed a notice of appeal from the Bankruptcy Court's order [D.I. 296] to the United States District Court for the District of Delaware (the "***District Court***"). Oral argument took place on February 10, 2015. On March 13, 2015, the Delaware District Court entered an order affirming the Bankruptcy Court's decision denying Walnut Creek derivative standing to pursue purported claims on behalf of the Debtors against Cascade and ECJV as Pre-Petition Secured Parties. On April 13, 2015, the deadline to appeal the District Court's decision passed with no notice of appeal being filed by Walnut Creek. Therefore, the stipulations and other protections for the benefit of the DIP Lenders and Pre-Petition Secured Parties in the Final DIP Order are binding on all parties in interest.

## Section 5.06.  Exclusivity

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of one hundred twenty (120) days from the petition date (which may be extended by a bankruptcy court for a period of up to eighteen (18) months from the petition date) (the "***Exclusive Filing Period***"). If a debtor files a plan within this initial exclusive period, then the debtor has the exclusive right for one hundred eighty (180) days from the petition date to solicit acceptances to the plan (which may be extended by a bankruptcy court for a period of up to twenty (20) months from the petition date) (the "***Exclusive Solicitation Period***"). During these exclusive periods, no other party in interest may file a competing plan of reorganization. However, a court may extend these periods only up to the extensions mentioned above upon request of a party in interest and "for cause."

The Debtors' initial 120-day Exclusive Filing Period was scheduled to expire on June 12, 2014 with the initial 180-day Exclusive Solicitation Period set to expire on August 11, 2014. On June 10, 2014, the Bankruptcy Court extended the Exclusive Filing Period through and including October 10, 2014 and the Exclusive Solicitation Period through and including December 9, 2014 [D.I. 343]. On November 10, 2014, the Bankruptcy Court further extended the Exclusive Filing Period through and including February 9, 2015 and the Exclusive Solicitation Period through and including April 10, 2015 [D.I. 632]. On February 3, 2015, the Bankruptcy Court further extended the Exclusive Filing Period through and including June 9, 2015 and the Exclusive Solicitation Period through and including August 10, 2015 [D.I. 722]. The Reorganizing Debtors filed the Plan and Disclosure Statement within the Exclusive Filing Period.

## Section 5.07.  Twin Oaks Plant Sale

On June 17, 2014, the Debtors filed a motion [D.I. 359] to sell the Twin Oaks Plant free and clear of liens pursuant to section 363(f) of the Bankruptcy Code. On July 3, 2014, the

Bankruptcy Court entered an order [D.I. 423] approving the Debtors' selection of Twin Oaks Power, LLC, an affiliate of ArcLight Capital Partners, LLC, as the proposed purchaser of the Twin Oaks Plant. The Debtors conducted an auction on August 4, 2014 (the "**Twin Oaks Auction**"). At the Twin Oaks Auction, the Debtors stated on the record that Blackstone (as defined herein) had reached a nonexclusive agreement to purchase the Walnut Creek mine and that this agreement was contingent upon Major Oak Power, LLC, an affiliate of Blackstone Capital Partners VI L.P. and Blackstone Energy Partners L.P. (together with their respective affiliates, "**Blackstone**") being the successful bidder for the Twin Oaks Plant [D.I. 470]. As this agreement was nonexclusive, other parties, including potential and actual bidders, were free to submit offers to acquire the Walnut Creek mine. At the conclusion of the Twin Oaks Auction, the Debtors determined that: (a) Major Oak Power, LLC was the highest and best bidder for the Twin Oaks Plant with a bid of $126 million; and (b) Twin Oaks Power, LLC was the second highest and best qualifying back-up bidder for the Twin Oaks Plant with a bid of $121.5 million. On August 5, 2014, the Debtors filed a notice [D.I. 467] with the Bankruptcy Court in this regard. On October 14, 2014, the Debtors closed on the sale of the Twin Oaks Plant to Major Oak Power, LLC. Proceeds from the sale of the Twin Oaks Plant were used first to pay the administrative costs associated with the sale and then to pay down the Pre-Petition Secured Parties under the Pre-Petition Reimbursement Agreement. The parent of Walnut Creek (a Blackstone affiliate) also closed the nonexclusive agreement announced at the Twin Oaks Auction to purchase the membership interests of Walnut Creek, and thereby gain ownership of the Walnut Creek mine.

## Section 5.08.  Nonresidential Leases

Under the Bankruptcy Code, for unexpired leases of nonresidential real property with respect to which a debtor is the lessee, a debtor must make a decision to assume or reject the lease within an initial period of one-hundred twenty (120) days from the petition date (the "**Nonresidential Lease Deadline**"). A bankruptcy court may extend the 120-day period (prior to its expiration) for ninety (90) days on the motion of the debtor or lessor "for cause." Any subsequent extensions of time require the written consent of the lessor in each instance.

The Debtors' initial 120-day Nonresidential Lease Deadline was June 12, 2014. On June 10, 2014, the Bankruptcy Court extended the Nonresidential Lease Deadline through and including September 10, 2014 [D.I. 342]. On August 19, 2014, the Bankruptcy Court entered an order [D.I. 495] approving a stipulation and further extension of the Nonresidential Lease Deadline, through and including November 12, 2014, with respect to the CB 4 Lease. On August 22, 2014, the Bankruptcy Court entered an order [D.I. 506] approving a stipulation and further extension of the Nonresidential Lease Deadline, through and including November 12, 2014 at 4:00 p.m. (ET), with respect to the Altura Lease. On November 7, 2014, the Bankruptcy Court entered orders [D.I. 628-29] approving stipulations and further extension of the Nonresidential Lease Deadline, through and including February 9, 2015, with respect to the foregoing two leases. On January 14-15, 2015, the Bankruptcy Court entered orders [D.I. 688 and 697] approving stipulations and further extension of the Nonresidential Lease Deadline, through and including June 9, 2015, with respect to the foregoing two leases. Pursuant to the most recent Lyondell stipulation approved by the Bankruptcy Court [D.I. 694], the Debtors reserved their rights: (a) to seek to assume, reject, or assign the Altura Lease in isolation independently of the Debtors' other agreements with Lyondell; and (b) to object to or otherwise

contest Lyondell's assertions made throughout these Chapter 11 Cases that the Altura Lease and the Debtors' other agreements with Lyondell are one set of interrelated documents that must be assumed, rejected or assigned at the same time.  Lyondell also reserved its rights pursuant to the stipulation (a) to oppose any attempt by the Debtors or their Estates to seek to assume the Altura Lease in isolation independently of the Debtors' other agreements with Lyondell; and (b) to argue the Altura Lease and the Debtors' other agreements with Lyondell are not severable.

### Section 5.09.  Cedar Bayou IDA

On October 22, 2014, Cedar Bayou filed a motion authorizing it to enter into an Industrial District Agreement (the "*IDA*") with the NRG Cedar Bayou and the City of Baytown, Texas, a municipal corporation in Harris and Chambers County, Texas.  On November 10, 2014, the Bankruptcy Court entered an order approving the IDA [D.I. 633] establishing the parties' payment in lieu of tax obligations for calendar years 2014-2020.

### Section 5.10.  Sales and Use Tax Claims Against Cedar Bayou

As described in the First Day Declaration and in the Debtors' First Day Motion regarding taxes and fees, use taxes arise in the ordinary course of the Debtors' business when the Debtors purchase certain goods and services, including fuel, power generation-related equipment, and other spare equipment parts, from vendors who do not have business operations in the State of Texas.  Applicable law and regulations require the Debtors to self-assess the amount of such taxes, and subsequently pay use taxes to the Tax Authority monthly.  On July 30 and August 11, 2014, the Texas Comptroller of Public Accounts on behalf of the State of Texas, Texas Municipalities, Texas Counties, Special Purpose Districts and/or Texas Metropolitan or Regional Transportation Authorities (the "***Tax Authority***") filed Proofs of Claim in the Chapter 11 Cases, which are described below:

(a)    Priority Tax Claim

In Proof of Claim number 100, the Tax Authority asserts that it has a Priority Tax Claim against Cedar Bayou in the amount of $12,636,452.18, which represents purported unpaid sales and use taxes in the aggregate amount of $12,306,354.69 allegedly owed by Cedar Bayou for the period from July 2010 through the Petition Date, $183,657.78 in penalties and $146,439.71 in interest as a result of nonpayment, all of which the Tax Authority asserts is entitled to priority treatment under section 507(a)(8) of the Bankruptcy Code.  On March 16, 2015 the Tax Authority filed Proof of Claim number 121 to amend and supersede Proof of Claim number 100, in which the Tax Authority asserts that it has a Priority Tax Claim against Cedar Bayou in the amount of $1,793,773.57, which represents purported unpaid sales and use taxes in the aggregate amount of $1,513,792.74 allegedly owed by Cedar Bayou for the period from July 2010 through the Petition Date, $150,601.91 in penalties and $129,378.92 in interest as a result of nonpayment, all of which the Tax Authority continues to assert is entitled to priority treatment under section 507(a)(8) of the Bankruptcy Code.  The Reorganizing Debtors have reviewed their books and records and believe that Cedar Bayou had funded all of its sales and use tax payment obligations to the Tax Authority as of the Petition Date.  The Reorganizing Debtors are currently in discussions with the Tax Authority to resolve its Priority Tax Claim against Cedar Bayou; however, the Reorganizing Debtors reserve the right to object to such Claim if necessary.

(b)     Administrative Claim

In Proof of Claim number 101, the Tax Authority asserts that it has an Administrative Claim against Cedar Bayou in the amount of $4,646,085.03, which represents purported unpaid sale and use taxes in the aggregate amount of $4,207,007.73 allegedly owed by Cedar Bayou for the period from the Petition Date through June 2014, $420,775.12 in penalties and $28,302.18 in interest as a result of nonpayment, all of which the Tax Authority continues to assert is entitled as an administrative expense under section 503(b) of the Bankruptcy Code. The Reorganizing Debtors have reviewed their books and records and believe that Cedar Bayou has funded all of its sales and use tax payment obligations to the Tax Authority during these Chapter 11 Cases. On March 6, 2015, the Tax Authority withdrew Proof of Claim number 101 in its entirety based on evidence of Cedar Bayou's full payment of such Claim.

## Section 5.11.  Lyondell Claims and Objections

On June 16, 2014, Lyondell filed Proofs of Claim (Nos. 75 and 86) against Altura Cogen and Optim Energy asserting secured Claims of $503,359.00 based on Altura Cogen's obligations to Lyondell under the SEPSA, which are guaranteed by Optim Energy pursuant to that certain Guaranty, dated December 10, 2010, and which are further secured by the letter of credit issued under the DIP Credit Agreement for the benefit of Lyondell. The Debtors disputed the secured status and validity of the Claims and entered into negotiations with Lyondell. The Claims stemming from the Debtors' obligations under the SEPSA were agreed to be settled at an amount of $250,000, conditioned upon the SEPSA being assumed.

In general terms, the SEPSA provides that neither party may assign its rights or obligations under the SEPSA without the express written consent of the other party, which consent may not be unreasonably withheld. The Debtors and Lyondell have different views on the potential scope, applicability and enforceability of this provision of the SEPSA. However, there is still no definitive transaction, so any effort to interpret this provision would be done in a vacuum and be based on hypotheticals that may or may not ever materialize.

Additionally, throughout these Chapter 11 Cases, Lyondell has consistently taken the position that the series of contracts and the lease between Lyondell and certain of the Debtors (collectively, the "*Altura Cogen Agreements*") are executory contracts and are inextricably entwined such that they must all be assumed or rejected as a package. The Debtors disagree with Lyondell's position on the integrated nature of these five standalone agreements. To date, the issue has not been ripe for determination because the Debtors have not yet moved to assume or reject any of the Altura Cogen Agreements, either individually or collectively.

## ARTICLE VI

## TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(l) of the Bankruptcy Code, DIP Facility Claims, Administrative Claims (including Professional Claims) and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in ARTICLE III of the Plan. For either Subplan, the following designation and treatment of unclassified Claims applies:

**Section 6.01.  DIP Facility Claims**

Consistent with the Final DIP Order, all DIP Facility Claims are and shall be deemed Allowed Claims against each Reorganizing Debtor.  On the Effective Date the Subplan for each Reorganizing Debtor, the holders of the Allowed DIP Facility Claims shall receive, in full and final satisfaction of such Claims, an amount of Cash equal to the amount of such Claims (including, without limitation, all outstanding principal and accrued but unpaid interest, costs, fees and expenses owing as of the Effective Date, or any other amounts due and owing under the DIP Facility) to the extent not previously paid during the Chapter 11 Cases.  The Debtors estimate that DIP Facility Claims will be in the range of $4.5 million to $5.5 million of interest and fees as of the Effective Date, plus $45 million of outstanding letters of credit will require cash collateralization.  The Debtors do not have an estimate of what the Pre-Petition Secured Parties' adequate protection Claim may be as of the Effective Date.

**Section 6.02.  Administrative Claims**

To the extent not previously paid during the Chapter 11 Cases, except as otherwise provided herein or unless the holder agrees to a different treatment, each holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release and discharge of such Claim, an amount of Cash equal to the amount of such Allowed Administrative Claim on the later of: (a) the Effective Date; or (b) the date such Administrative Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by a Reorganizing Debtor in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto (x) on or prior to the Effective Date, by the Reorganizing Debtors from their operating accounts, and (y) after the Effective Date, by the Reorganized Debtors or a Distribution Agent, in the ordinary course of business solely from the Reorganizing Debtors Claims Reserve, subject to the provisions of the Plan.  The Debtors do not have an estimate of what the Allowed Administrative Claims may be as of the Effective Date.

(a)    Administrative Claims Bar Date

Holders of Administrative Claims (other than Professional Claims) shall file any request for allowance and payment of Administrative Claims by the Administrative Claims Bar Date or otherwise be forever barred, estopped, and enjoined from asserting such Claims against the Reorganizing Debtors or the Reorganized Debtors (as applicable), their respective Estates and property, a Distribution Agent, or otherwise, and such Administrative Claim shall be deemed discharged and released as of the Effective Date.

(b)    Professional Claims Bar Date

Holders of Professional Claims shall file any request for allowance and payment of such Professional Claims by the Professional Claims Bar Date or otherwise be forever barred, estopped, and enjoined from asserting such Claims against the Reorganizing Debtors or the Reorganized Debtors (as applicable), their respective Estates and property, a Distribution Agent, or otherwise, and such Professional Claims shall be deemed discharged as of the Effective Date.

For the avoidance of doubt, Allowed Professional Claims shall be paid from the Professional Claims Reserve after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and prior Bankruptcy Court orders.

       (c)     <u>Post-Effective Date Professional Fees</u>

From and after the Effective Date, the Reorganized Debtors shall pay in Cash the reasonable legal fees and expenses incurred by the Reorganized Debtors' professionals incurred in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court.  For the avoidance of doubt, following the Effective Date any requirement that a professional comply with sections 327 through 331 of the Bankruptcy Code in seeking compensation for services rendered after such date shall terminate.

       (d)     <u>U.S. Trustee Fees</u>

All fees payable pursuant to 28 U.S.C. § 1930(a) shall be paid by the applicable Reorganizing Debtor or Reorganized Debtor, as applicable, for each quarter (including any fraction therein) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

**Section 6.03.  Priority Tax Claims**

To the extent not previously paid during the Chapter 11 Cases, unless the holder agrees to a different treatment each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release and discharge of such Claim, an amount of Cash equal to the amount of such Allowed Priority Tax Claim on the later of: (a) the Effective Date; or (b) the date such Priority Tax Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.  For the avoidance of doubt, Allowed Priority Tax Claims shall be paid in Cash solely from the Reorganizing Debtors Claims Reserve, subject to the provisions of the Plan.

**ARTICLE VII**

**CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS**

For the avoidance of doubt, unless otherwise specified in ARTICLE III of the Plan, any holder of Claim(s) that is entitled to receive Cash on account of such Allowed Claim(s) under the Subplan(s) for the applicable Reorganizing Debtor(s) shall be paid in Cash solely from the Reorganizing Debtors Claims Reserve, subject to the provisions of the Plan, without recourse to the Reorganizing Debtors or the Reorganized Debtors, as applicable, their respective Estates and property, a Distribution Agent or any of their property or Assets.  Notwithstanding any other provision of the Plan, for obligations on which the Reorganizing Debtors and the Other Debtors are jointly and severally liable, a distribution on account of any Allowed Claim arising from such obligations under a Reorganizing Debtor's confirmed Subplan shall not operate as a discharge, release and/or satisfaction of such Allowed Claim asserted against any other Debtor(s) for which a Subplan or Subplans are not confirmed (or do not become effective) unless and until such time that such Allowed Claim is paid in full.  In the event no holder of a Claim with respect to a specific Class for a particular Reorganizing Debtor timely submits a Ballot that complies with

the Disclosure Statement Order indicating acceptance or rejection of the Plan, such Class will be deemed to have accepted the Plan (including for purposes of satisfying section 1129(a)(10) of the Bankruptcy Code). IF THE CLASS CB 4 GENERAL UNSECURED CLAIMS OR THE CLASS AC 4 GENERAL UNSECURED CLAIMS VOTES TO REJECT THE PLAN, THE HOLDERS OF THAT CLASS WILL NOT RECEIVE A DISTRIBUTION. FURTHER, IF THE CLASS CB 4 GENERAL UNSECURED CLAIMS OR THE CLASS AC 4 GENERAL UNSECURED CLAIMS VOTES TO ACCEPT THE PLAN, ANY HOLDER OF A GENERAL UNSECURED CLAIM OR CLAIMS WHO OPTS OUT OF THE RELEASES DESCRIBED IN SECTION 10.03 OF THE PLAN WILL NOT RECEIVE THE ADDITIONAL CONSIDERATION IN THE FORM OF CASH EQUAL TO 20% OF SUCH CLAIM UNDER THE SUBPLAN(S) FOR THE APPLICABLE REORGANIZING DEBTOR(S).

**Section 7.01. Classification**

The Plan constitutes a separate Subplan with respect to each Reorganizing Debtor. The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, confirmation and distribution pursuant to either Subplan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

Holders of Allowed Other Secured Claims shall receive Post-Petition Interest required to be paid under section 506(b) of the Bankruptcy Code (if any) on account of such Allowed Claims. Holders of Allowed Other Priority Claims shall receive Post-Petition Interest on account of such Allowed Claims.

Claims against (other than those listed in ARTICLE II of the Plan, which are not required to be classified pursuant to section 1123(a)(1) of the Bankruptcy Code) and Equity Interests are classified as follows:

(a)    Subplan CB: Claims Against and Equity Interests in Cedar Bayou

| Class | Claim or Equity Interest | Status | Voting Rights |
|-------|--------------------------|--------|---------------|
| CB 1 | Allowed Pre-Petition Secured Parties Secured Claims | Impaired | Entitled to Vote |
| CB 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| CB 3 | Other Priority Claims | Unimpaired | Deemed to Accept |
| CB 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| CB 5 | Equity Interests | Impaired | Deemed to Reject |

(b)    Subplan AC: Claims Against and Equity Interests in Altura Cogen

| Class | Claim or Equity Interest | Status | Voting Rights |
|-------|--------------------------|--------|---------------|
| AC 1 | Allowed Pre-Petition Secured Parties Secured Claims | Impaired | Entitled to Vote |

| Class | Claim or Equity Interest | Status | Voting Rights |
|---|---|---|---|
| AC 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| AC 3 | Other Priority Claims | Unimpaired | Deemed to Accept |
| AC 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| AC 5 | Equity Interests | Impaired | Deemed to Reject |

## Section 7.02.  Subplan CB: Treatment of Claims Against and Equity Interests in Cedar Bayou

(a)    Class CB 1—Allowed Pre-Petition Secured Parties Secured Claims

    (i)    *Allowance*: The Class CB 1 Allowed Pre-Petition Secured Parties Secured Claims against Cedar Bayou have been deemed Allowed against Cedar Bayou pursuant to the terms of the Final DIP Order.

    (ii)    *Treatment*: The holders of Class CB 1 Allowed Pre-Petition Secured Parties Secured Claims against Cedar Bayou shall receive, in exchange for their Class CB1 Allowed Pre-Petition Secured Parties Secured Claims against Cedar Bayou: (w) the Second Lien Note on the Effective Date; (x) the Newco Equity Interests on the Effective Date; (y) the residual Cash in the Reserves allocable to Cedar Bayou, if any, following payment of all amounts budgeted for Cedar Bayou thereunder; and (z) the unclaimed Undeliverable Distributions allocable to Cedar Bayou, if any, as set forth in Section 7.05(b) of the Plan.

    (iii)    *Voting*: Class CB 1 is Impaired.  The holders of the Class CB 1 Allowed Pre-Petition Secured Parties Secured Claims against Cedar Bayou are entitled to vote to accept or reject the Subplan for Cedar Bayou.

(b)    Class CB 2—Other Secured Claims

    (i)    *Treatment*: Unless the holder agrees to a different treatment, each holder of a Class CB 2 Allowed Other Secured Claim against Cedar Bayou shall receive, in Cedar Bayou's sole discretion and in full and final satisfaction, release, settlement and discharge of, and in exchange for, such holder's Allowed Other Secured Claim, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court:

        a.    Cash equal to the amount of such Allowed Other Secured Claim plus Post-Petition Interest required to be paid under section 506(b) of the Bankruptcy Code (if any), payable solely from the Reorganizing Debtors Claims Reserve subject to the provisions of the Plan;

        b.    Reinstatement of the legal, equitable and contractual rights of the holder of such Allowed Other Secured Claim, subject to the provisions of the Subplan for Cedar Bayou;

        c.    the Collateral securing such Allowed Other Secured Claim <u>plus</u> Post-Petition Interest required to be paid under section 506(b) of the Bankruptcy Code (if any); or

        d.    such other treatment as necessary to satisfy the requirements of section 1124(2) of the Bankruptcy Code for such Allowed Other Secured Claim to be rendered Unimpaired.

    (ii)    *Voting*: Class CB 2 is Unimpaired. The holders of Class CB 2 Allowed Other Secured Claims against Cedar Bayou are conclusively deemed to accept the Subplan for Cedar Bayou pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(c)    <u>Class CB 3—Other Priority Claims</u>

    (i)    *Treatment*: Unless the holder agrees to a different treatment, each holder of a Class CB 3 Allowed Other Priority Claim against Cedar Bayou shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, Cash equal to the amount of such Allowed Claim <u>plus</u> Post-Petition Interest, payable solely from the Reorganizing Debtors Claims Reserve subject to the provisions of the Plan, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.

    (ii)    *Voting*: Class CB 3 is Unimpaired. The holders of Class CB 3 Allowed Other Priority Claims against Cedar Bayou are conclusively deemed to accept the Subplan for Cedar Bayou pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(d)    <u>Class CB 4—General Unsecured Claims</u>

    (i)    *Treatment*:

        a.    <u>Claim Consideration</u>.  In the event that Class CB 4 votes to accept the Subplan for Cedar Bayou, each holder of a Class CB 4 Allowed General Unsecured Claim against Cedar Bayou (other than a holder of a Class CB 4 Allowed Pre-Petition Secured Parties Deficiency Claim against Cedar Bayou) shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, Cash equal to 75% of such Allowed Claim, payable solely from the Reorganizing Debtors Claims Reserve subject to the provisions of the Plan, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.

Release Consideration. In the event that Class CB 4 votes to accept the Subplan for Cedar Bayou, each holder of a Class CB 4 Allowed General Unsecured Claim against Cedar Bayou (other than a holder of a Class CB 4 Allowed Pre-Petition Secured Parties Deficiency Claim against Cedar Bayou) that does not opt out of the releases described in Section 10.03 of the Plan shall receive additional consideration in the form of Cash equal to 20% of such Allowed Claim, payable solely from the Reorganizing Debtors Claims Reserve subject to the provisions of the Plan, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.

b. In the event that Class CB 4 does not vote to accept the Subplan for Cedar Bayou, on the Effective Date each holder of a Class CB 4 Allowed General Unsecured Claim against Cedar Bayou: (x) shall be enjoined from pursuing any Class CB 4 Allowed General Unsecured Claim against Cedar Bayou; and (y) shall not receive or retain any distribution on account of its Class CB 4 Allowed General Unsecured Claim under the Subplan for Cedar Bayou.

(ii) *Amounts*: The Reorganizing Debtors estimate that there will be approximately two (2) holders of Class CB 4 Allowed General Unsecured Claims against Cedar Bayou (other than a holder of a Class CB 4 Allowed Pre-Petition Secured Parties Deficiency Claim) with $400,000-$500,000 in Claims.

(iii) *Voting*: Class CB 4 is Impaired. The holders of Class CB 4 Allowed General Unsecured Claims against Cedar Bayou are entitled to vote to accept or reject the Subplan for Cedar Bayou.

(e)     Class CB 5—Equity Interests

(i) *Treatment*: On the Effective Date, the Class CB 5 Equity Interests in Cedar Bayou shall be cancelled, extinguished and discharged, and Newco shall receive 100% of the Reorganized CB 4 Equity Interests.

(ii) *Voting*: Class CB 5 is Impaired. The holders of Class CB 5 Equity Interests in Cedar Bayou are conclusively deemed to reject the Subplan for Cedar Bayou pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

**Section 7.03.  Subplan AC: Treatment of Claims Against and Equity Interests in Altura Cogen**

(a)      Class AC 1—Allowed Pre-Petition Secured Parties Secured Claims

(i)      *Allowance*: The Class AC 1 Allowed Pre-Petition Secured Parties Secured Claims against Altura Cogen have been deemed Allowed against Altura Cogen pursuant to the terms of the Final DIP Order.

(ii)     *Treatment*: The holders of Class AC 1 Allowed Pre-Petition Secured Parties Secured Claims against Altura Cogen shall receive, in exchange for their Class AC1 Allowed Pre-Petition Secured Parties Secured Claims against Altura Cogen: (w) the Second Lien Note on the Effective Date; (x) the Newco Equity Interests on the Effective Date; (y) the residual Cash in the Reserves allocable to Altura Cogen, if any, following payment of all amounts budgeted for Altura Cogen thereunder; and (z) the unclaimed Undeliverable Distributions allocable to Altura Cogen, if any, as set forth in Section 7.05(b) of the Plan.

(iii)    *Voting*: Class AC 1 is Impaired.  The holders of the Class AC 1 Allowed Pre-Petition Secured Parties Secured Claims against Altura Cogen are entitled to vote to accept or reject the Subplan for Altura Cogen.

(b)      Class AC 2—Other Secured Claims

(i)      *Treatment*: Unless the holder agrees to a different treatment, each holder of a Class AC 2 Allowed Other Secured Claim against Altura Cogen shall receive, in Altura Cogen's sole discretion and in full and final satisfaction, release, settlement and discharge of, and in exchange for, such holder's Allowed Other Secured Claim, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court:

a.    Cash equal to the amount of such Allowed Other Secured Claim plus Post-Petition Interest required to be paid under section 506(b) of the Bankruptcy Code (if any), payable solely from the Reorganizing Debtors Claims Reserve subject to the provisions of the Plan;

b.    Reinstatement of the legal, equitable and contractual rights of the holder of such Allowed Other Secured Claim, subject to the provisions of the Subplan for Altura Cogen;

c.    the Collateral securing such Allowed Other Secured Claim plus Post-Petition Interest required to be paid under section 506(b) of the Bankruptcy Code (if any); or

    d.  such other treatment as necessary to satisfy the requirements of section 1124(2) of the Bankruptcy Code for such Allowed Other Secured Claim to be rendered Unimpaired.

(ii)    *Voting*: Class AC 2 is Unimpaired.  The holders of Class AC 2 Allowed Other Secured Claims against Altura Cogen are conclusively deemed to accept the Subplan for Altura Cogen pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(c)    Class AC 3—Other Priority Claims

(i)    *Treatment*: Unless the holder agrees to a different treatment, each holder of a Class AC 3 Allowed Other Priority Claim against Altura Cogen shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, Cash equal to the amount of such Allowed Claim plus Post-Petition Interest, payable solely from the Reorganizing Debtors Claims Reserve subject to the provisions of the Plan, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.

(ii)    *Voting*: Class AC 3 is Unimpaired.  The holders of Class AC 3 Allowed Other Priority Claims against Altura Cogen are conclusively deemed to accept the Subplan for Altura Cogen pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(d)    Class AC 4—General Unsecured Claims

(i)    *Treatment*:

    a.  <u>Claim Consideration</u>.  In the event that Class AC 4 votes to accept the Subplan for Altura Cogen, each holder of a Class AC 4 Allowed General Unsecured Claim against Altura Cogen (other than a holder of a Class AC 4 Allowed Pre-Petition Secured Parties Deficiency Claim against Altura Cogen) shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, Cash equal to 75% of such Allowed Claim, payable solely from the Reorganizing Debtors Claims Reserve subject to the provisions of the Plan, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.

    <u>Release Consideration</u>.  In the event that Class AC 4 votes to accept the Subplan for Altura Cogen, each holder of a Class AC 4 Allowed General Unsecured Claim against Altura Cogen (other than a holder of a Class AC 4 Allowed Pre-Petition Secured Parties Deficiency Claim against Altura Cogen) that does not opt out of the releases described in

Section 10.03 of the Plan shall receive additional consideration in the form of Cash equal to 20% of such Allowed Claim, payable solely from the Reorganizing Debtors Claims Reserve subject to the provisions of the Plan, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.

b. In the event that Class AC 4 does not vote to accept the Subplan for Altura Cogen, on the Effective Date each holder of a Class AC 4 Allowed General Unsecured Claim against Altura Cogen: (x) shall be enjoined from pursuing any Class AC 4 Allowed General Unsecured Claim against Altura Cogen; and (y) shall not receive or retain any distribution on account of its Class AC 4 Allowed General Unsecured Claim under the Subplan for Altura Cogen.

(ii) *Amounts*: The Debtors estimate that there will be approximately sixty (60) to seventy (70) holders of Class AC 4 Allowed General Unsecured Claims against Altura Cogen (other than a holder of a Class CB 4 Allowed Pre-Petition Secured Parties Deficiency Claim) with $800,000-$900,000 in Claims.

(iii) *Voting*: Class AC 4 is Impaired.  The holders of Class AC 4 Allowed General Unsecured Claims against Altura Cogen are entitled to vote to accept or reject the Subplan for Altura Cogen.

(e) Class AC 5—Equity Interests

(i) *Treatment*: On the Effective Date, the Class AC 5 Equity Interests in Altura Cogen shall be cancelled, extinguished and discharged, and Newco shall receive 100% of the Reorganized AC Equity Interests.

(ii) *Voting*: Class AC 5 is Impaired.  The holders of Class AC 5 Equity Interests in Altura Cogen are conclusively deemed to reject the Subplan for Altura Cogen pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

# ARTICLE VIII

## ACCEPTANCE OR REJECTION OF THE SUBPLANS

### Section 8.01.  Acceptance by an Impaired Class

In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, Impaired Classes entitled to vote under a Subplan shall have accepted the applicable Subplan if it is accepted by the holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims that have timely and properly voted to accept or reject the Subplan or if no holder of a Claim with respect to a

specific Class for a particular Reorganizing Debtor timely submits Ballot that complies with the Disclosure Statement Order indicating acceptance or rejection of the Plan.

## Section 8.02.  Nonconsensual Confirmation

The Reorganizing Debtors may request confirmation under section 1129(b) of the Bankruptcy Code with respect to (a) any Impaired Class of Claims and Equity Interests that have not accepted a Subplan in accordance with sections 1126 and 1129(a)(8) of the Bankruptcy Code and (b) any Class that is deemed to reject the applicable Subplan pursuant to section 1126(g) of the Bankruptcy Code or the terms of the Subplan or otherwise.  The Reorganizing Debtors reserve the right, subject to the written approval of the Consultation Parties to amend or modify either Subplan in accordance with Section 11.01 of the Plan to the extent, if any, that Confirmation of the Subplan pursuant to section 1129(b) of the Bankruptcy Code requires such amendment or modification.  If either Subplan is not confirmed, then the Reorganizing Debtors reserve the right, subject to the written approval of the Consultation Parties, to either (a) request that other Subplan be confirmed or (b) withdraw such Subplan.  The Reorganizing Debtors' inability to confirm or election to withdraw either Subplan shall not impair the Confirmation of the other Subplan.

## Section 8.03.  Limited Deficiency Waiver

For the avoidance of doubt, the holders of the Allowed Pre-Petition Secured Parties Deficiency Claims agree to waive and withdraw such Claims on the Effective Date only if the respective Class of General Unsecured Claims against a particular Reorganizing Debtor votes, as a Class, to accept the Subplan for the Reorganizing Debtor.

## ARTICLE IX

## IMPLEMENTATION OF THE PLAN

The transactions required to implement the Plan shall be implemented in accordance with ARTICLE V of the Plan.

## Section 9.01.  Organization of Newco

(a)    Formation

On or before the Effective Date, Newco will be formed pursuant to the Newco Governance Documents.  Except as otherwise provided in the Newco Governance Documents (including as they may be amended or modified from time to time in accordance with applicable law), Newco will be a "private" company that is not required to register any Securities pursuant to the Securities Exchange Act of 1934.

(b)    Governance

On and after the Effective Date, Newco will be managed by and under the direction of its board of directors or other governing body, as they may be constituted from time to time

pursuant to the Newco Governance Documents and applicable non-bankruptcy law.  The officers and directors of Newco will be those individuals listed in the Plan Supplement.

**Section 9.02.  Issuance of Equity Interests**

        (a)        <u>Issuance of Newco Equity Interests</u>

On the Effective Date, 100% of the Newco Equity Interests will be issued to the Pre-Petition Secured Parties (or their nominee).  The Equity Interests shall have the rights, privileges, limitations and restrictions set forth in the Newco Governance Documents.

        (b)        <u>Issuance of Reorganized AC Equity Interests</u>

On the Effective Date: (i) the existing Equity Interests in Altura Cogen will be cancelled, extinguished and discharged; and (ii) 100% of the Reorganized AC Equity Interests will be issued to Newco.  The Reorganized AC Equity Interests shall have the rights, privileges, limitations and restrictions set forth in the Reorganized AC Governance Documents.

        (c)        <u>Issuance of Reorganized CB 4 Equity Interests</u>

On the Effective Date: (i) the existing Equity Interests in Cedar Bayou will be cancelled, extinguished and discharged; and (ii) 100% of the Reorganized CB 4 Equity Interests will be issued to Newco.  The Reorganized CB 4 Equity Interests shall have the rights, privileges, limitations and restrictions set forth in the Reorganized CB 4 Governance Documents.

**Section 9.03.  Restructuring Transactions**

On or before the Effective Date or as soon as reasonably practicable thereafter, the Reorganizing Debtors or the Reorganized Debtors (as applicable), the Exit Facility Agent, the Exit Facility L/C Issuer and the Exit Facility Lenders, the Second Lien Agent and the Second Lien Noteholders are authorized, without further order of the Bankruptcy Court, to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Restructuring Transactions under and in connection with the Plan, the Exit Facility and/or the Second Lien Note, including, without limitation: (a) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) rejection or assumption, as applicable, of Executory Contracts and Unexpired Leases; (d) selection of the board of directors of Newco; (e) the filing and/or execution of appropriate limited liability company agreements, certificates or articles of incorporation or organization, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; (f) the consummation of the transactions contemplated by the Exit Facility Documentation and the execution thereof; (g) the consummation of the transactions contemplated by the Second Lien Note Documentation and the execution thereof; (h) the issuance of the Newco Equity Interests,

the Reorganized AC Equity Interests and the Reorganized CB 4 Equity Interests, and the execution of all documents related thereto; and (i) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

**Section 9.04.  Incurrence of Indebtedness**

(a)      Exit Facility

The Exit Facility shall become effective on the Effective Date.  Newco and the Reorganized Debtors may use the Exit Facility for any purpose permitted by the Exit Facility, including the funding of obligations under the Plan and satisfaction of ongoing working capital needs. In the event only one Subplan is confirmed, the Reorganizing Debtors, the Consultation Parties, the Exit Facility Agent and the Exit Facility Lenders may agree to modify the commitment amount (and related letter of credit and hedging sublimits) under the Exit Facility, as well as any covenants of Newco and/or the Reorganized Debtor under the Exit Facility to reflect the needs of the Reorganized Debtor and Newco in such a circumstance.

Confirmation of the Subplans shall be deemed to constitute approval of the Exit Facility (including all transactions contemplated thereby, such as any supplementation or additional syndication of the Exit Facility, and all actions to be taken, undertakings to be made and obligations to be incurred by Newco or the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities and expenses provided for therein) and the granting of security interests thereunder, and authorization for Newco and the Reorganized Debtors to enter into and perform under the Exit Facility Documentation and such other documents as may be required or appropriate.

The Exit Facility Documentation shall constitute legal, valid, binding, and authorized obligations of Newco and the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit Facility Documentation are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.  On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Documentation (a) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documentation, (b) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facility Documentation, and (c) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Persons or Entities granting such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect, or to evidence the perfection of, such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law

(whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties. To the extent that any holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, then as soon as practicable on or after the Effective Date such holder (or the agent for such holder) shall take any and all steps requested by the Reorganizing Debtors, the Reorganized Debtors or the Exit Facility Agent that are necessary to cancel and/or extinguish such Liens and/or security interests.

(b)      Second Lien Note

The Second Lien Note shall be issued and become effective on the Effective Date. In the event only one Subplan is confirmed, the Reorganizing Debtors, the Consultation Parties, the Second Lien Agent and the Second Lien Noteholders may agree to modify the Second Lien Note.

Confirmation of the Subplans shall be deemed to constitute approval of the Second Lien Note (including all transactions contemplated thereby, and all actions to be taken, undertakings to be made and obligations to be incurred by Newco or the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities and expenses provided for therein) and the granting of security interests thereunder, and authorization for Newco and the Reorganized Debtors to enter into and perform under the Second Lien Note Documentation and such other documents as may be required or appropriate.

The Second Lien Note Documentation shall constitute legal, valid, binding, and authorized obligations of Newco and the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Second Lien Note Documentation are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted in accordance with the Second Lien Note Documentation (a) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Second Lien Note Documentation, (b) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Second Lien Note Documentation, and (c) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the Persons or Entities granting such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect, or to evidence the perfection of, such Liens and security interests under the provisions of

the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties. To the extent that any holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, then as soon as practicable on or after the Effective Date such holder (or the agent for such holder) shall take any and all steps requested by the Reorganizing Debtors, the Reorganized Debtors or the Second Lien Agent that are necessary to cancel and/or extinguish such Liens and/or security interests.

(c)    Additional Post-Effective Date Indebtedness

From and after the Effective Date, Newco and the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date financing, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of directors of Newco and/or the applicable Reorganized Debtors deem appropriate.

**Section 9.05.  Assets and Liabilities**

On the Effective Date, all of the Assets of Altura Cogen and Cedar Bayou and their Estates, including but not limited to the respective operating assets they each owned before the Effective Date, shall vest in Reorganized Cedar Bayou and Reorganized Altura Cogen, respectively, free and clear of all Liens, Claims and encumbrances (except for Liens, if any, granted to secure the repayment of the Exit Facility and the Second Lien Note, and Claims or obligations provided for in the Subplans).

**Section 9.06.  Funding of Reserves**

On the Effective Date, the Reserves shall be funded with Cash on hand (which is Cash Collateral) and/or Cash from the Exit Facility.  The reserves funded pursuant to Section 5.06 of the Plan shall be deemed authorized and approved by the Bankruptcy Court pursuant to the Confirmation Order.

**Section 9.07.  Causes of Action**

(a)    Preservation of Causes of Action Other Than Avoidance Actions

In accordance with section 1123(b) of the Bankruptcy Code or any corresponding provision of federal or state laws, and except as expressly released by the Plan, Final DIP Order, Confirmation Order or other Final Order: (i) on the Effective Date, all Causes of Action of the Reorganizing Debtors shall be transferred to and vest in the Reorganized Debtors; and (ii) on and after the Effective Date of the Subplans, all such Causes of Action for the Reorganizing Debtors shall be retained by the Reorganized Debtors, which may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) any or all of such Causes of Action on behalf of the

Reorganizing Debtors; <u>provided</u>, <u>however</u>, that as of the Effective Date, all Avoidance Actions of the Reorganizing Debtors shall be waived and released.

      (b)      <u>No Waiver</u>

Except as otherwise provided in Section 10.02 of the Plan, or as released by the Final DIP Order, the Confirmation Order or other Final Order, nothing in the Plan shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, account receivable, right of setoff, or other legal or equitable right or defense that the Reorganized Debtors may have or choose to assert on behalf of the Reorganizing Debtors or their respective Estates under any provision of the Bankruptcy Code or any applicable non-bankruptcy law.  No Entity may rely on the absence of a specific reference in the Plan to any Cause of Action or account receivable against it as an indication that the Reorganized Debtors will not pursue any and all available Causes of Action or accounts receivable against it, and all such rights to prosecute or pursue any and all Causes of Action or accounts receivable against any Entity are expressly reserved for later adjudication and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action or accounts receivable upon or after the Confirmation or Consummation of the Subplans.

**ARTICLE X**

**TREATMENT OF EXECUTORY CONTRACTS AND LEASES**

**Section 10.01.** **Treatment of Executory Contracts and Unexpired Leases**

Except as otherwise expressly provided in (a) the Subplans, (b) the Plan Supplement, or (c) any other filing made before the Confirmation Hearing, all Executory Contracts and Unexpired Leases shall be cured and assumed by the applicable Reorganized Debtor(s) as of the Effective Date in accordance with, and subject to the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that Section 6.01 of the Plan shall not apply to any Executory Contract and Unexpired Lease of a Reorganizing Debtor that expired or terminated pursuant to its own terms prior to the Petition Date.

**Section 10.02.** **Effect of Confirmation Order on Assumption/Rejection**

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order of the Bankruptcy Court pursuant to sections 365 and 1123(b) of the Bankruptcy Code approving the assumption, assumption and assignment, or rejection, as applicable, of the Executory Contracts and Unexpired Leases as of the Effective Date and determining that: (a) with respect to such rejections, such rejected Executory Contracts and Unexpired Leases are burdensome and that the rejection therein is in the best interests of the Estates; (b) with respect to such assumptions, to the extent necessary, that the applicable Reorganizing Debtor has (i) cured any default, (ii) compensated the counterparty for any actual pecuniary loss resulting from any default, and (iii) provided adequate assurance of future performance under such Executory Contract or Unexpired Lease of the applicable Reorganizing Debtor, and (c) with respect to any assignment, to the extent necessary, that the applicable Reorganizing Debtor has (i) cured any default, (ii)

compensated the counterparty for any actual pecuniary loss resulting from any default, and (iii) that "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) by the assignee has been demonstrated and no further adequate assurance is required.  Assumption of any Executory Contract or Unexpired Lease of any Reorganizing Debtor, and satisfaction of the Cure Costs, shall result in the full discharge, release and satisfaction of any claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease of such Reorganizing Debtor at any time before the date such Executory Contract or Unexpired Lease is assumed.  Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or Bankruptcy Court order shall vest in and be fully enforceable by the applicable Reorganizing Debtor.  To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

**Section 10.03. Cure of Defaults and Objections to Assumption**

Except as may be otherwise agreed to by the parties, within five (5) Business Days after the Effective Date, the applicable Reorganized Debtor or a Distribution Agent, as the case may be, shall pay any undisputed Cure Costs to the counterparties to any assumed Executory Contracts and Unexpired Leases.  The Cure Costs for the contracts to be assumed will be included in the Schedule of Assumed Executory Contracts and Unexpired Leases.  If there are no Cure Costs listed for an Executory Contract or Unexpired Lease, then the proposed Cure Costs shall be $0.00.  Such amount shall be deemed full payment of such obligations under section 365(b) of the Bankruptcy Code, unless, on or before the Voting Deadline, the contract counter-party files an objection disputing: (a) the amount of any Cure Costs, (b) the ability of the Reorganizing Debtors or any assignee to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (c) any other matter pertaining to assumption.  The disputed Cure Costs required by section 365(b)(1) of the Bankruptcy Code shall be made only after entry of a Final Order resolving the dispute and approving the assumption.

**Section 10.04. Rejection Damages Claims and Objections to Rejection**

Claims arising out of the rejection of Executory Contract or Unexpired Leases pursuant to the Plan must be filed and served pursuant to the procedures specified in the Bar Date Order, or another order of the Bankruptcy Court, no later than thirty (30) days after the Effective Date.  Holders of any Claim not filed within such time will be forever barred from asserting such Claim against the Reorganizing Debtors, the Reorganized Debtors, their Estates, or their respective successors or their respective properties.  Unless otherwise ordered by the Bankruptcy Court or specified in the Plan, all Claims arising from the rejection of Executory Contracts and Unexpired Leases  shall be treated as General Unsecured Claims under the Plan.

**Section 10.05. Preexisting Obligations Under Executory Contracts and Unexpired Leases**

The Reorganizing Debtors or the Reorganized Debtors, as applicable, reserve the right to assert that rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of obligations owed to the Reorganizing Debtors or the Reorganized Debtors, as applicable, under such contracts or leases, prior to the rejection of such contracts or leases. Notwithstanding any nonbankruptcy law to the contrary, the Reorganizing Debtors or the Reorganized Debtors, as applicable, expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on good previously purchased, or services previously received, by the contracting Reorganizing Debtors or Reorganized Debtors, as applicable, from counterparties to rejected Executory Contracts and Unexpired Leases.

**Section 10.06. Modifications, Amendments, Supplements, Restatements or Other Agreements**

Unless otherwise provided in the Plan, each assumed or assumed and assigned Executory Contract and Unexpired Lease shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or is rejected under the Plan or otherwise.

Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

**Section 10.07. Reservation of Rights**

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Reorganizing Debtors or the Reorganized Debtors, as applicable, that any such contract or lease is in fact an Executory Contract or Unexpired Lease, or that the Reorganizing Debtors or the Reorganized Debtors, as applicable, have any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Reorganizing Debtors or the Reorganized Debtors, as applicable, shall have ninety (90) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided herein.

**Section 10.08. Non-Occurrence of the Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, notwithstanding anything to the contrary in the Plan or otherwise.

# ARTICLE XI

# PROVISIONS GOVERNING DISTRIBUTIONS

## Section 11.01. Amount of Distributions

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim to the extent payable in accordance with the Plan.

## Section 11.02. Method of Distributions

The Reorganizing Debtors and the Reorganized Debtors, as applicable, shall have the authority, in their sole discretion, to enter into agreements with a Distribution Agent to facilitate the distributions required hereunder. To the extent the Reorganizing Debtors and the Reorganized Debtors, as applicable, do determine to utilize a Distribution Agent to facilitate the distributions under the Plan to holders of Allowed Claims, any such Distribution Agent would first be required to: (a) affirm its obligation to facilitate the prompt distribution of any documents; (b) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under the Plan; (c) waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required under the Plan to be distributed by such Distribution Agent; and (d) post a bond, obtain or surety or provide some other form of security for the performance of its duties, the costs and expenses of procuring which shall be borne by the Reorganizing Debtors or the Reorganized Debtors, as applicable.

The Reorganizing Debtors or the Reorganized Debtors, as applicable, shall pay to the Distribution Agents all reasonable and documented fees and expenses of the Distribution Agent without the need for any approvals, authorizations, actions, or consents. The Distribution Agent shall submit detailed invoices to the Reorganizing Debtors or the Reorganized Debtors, as applicable, for all fees and expenses for which the Distribution Agent seeks reimbursement and the Reorganizing Debtors or the Reorganized Debtors, as applicable, shall pay those amounts that they, in their sole discretion, deem reasonable, and shall object in writing to those fees and expenses, if any, that the Reorganizing Debtors or the Reorganized Debtors, as applicable, deem to be unreasonable. In the event that the Reorganizing Debtors or the Reorganized Debtors, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Reorganizing Debtors or the Reorganized Debtors, as applicable, and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses. In the event that the Reorganizing Debtors or the Reorganized Debtors, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

## Section 11.03. Delivery of Distributions

Distributions to holders of Allowed Claims shall be made at the address of the holder of such Claim as indicated in the Claims Register as of the Distribution Record Date. A Distribution Agent shall have no obligation to recognize the transfer of or sale of any Claim that

occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those holders of Allowed Claims who are holders as of the close of business on the Distribution Record Date.

## Section 11.04. No Fractional or De Minimis Distributions

Notwithstanding anything contained herein to the contrary, payments of fractional dollars will not be made. Whenever any payment of a fraction of a dollar under the applicable Subplan would otherwise be called for, the actual payment made will reflect a rounding down of such fractions. A Reorganizing Debtor or a Reorganized Debtor, as applicable, or a Distribution Agent shall not be required to make any payment of less than $20.00 on any distribution.

## Section 11.05. Undeliverable Distributions

(a)    Holding of Undeliverable Distributions

If any distribution to a holder of an Allowed Claim is returned to a Reorganizing Debtor or a Reorganized Debtor, as applicable, or a Distribution Agent as undeliverable, no further distributions shall be made to such holder unless and until such Reorganizing Debtor or Reorganized Debtor, as applicable, or Distribution Agent is notified in writing of such holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such holder as soon as practicable. Undeliverable Distributions shall remain in the possession of a Reorganizing Debtor or a Reorganized Debtor, as applicable, or a Distribution Agent until such time as a distribution becomes deliverable, and shall not be supplemented with any interest, dividends or other accruals of any kind.

(b)    Failure to Claim Undeliverable Distributions

Any holder of an Allowed Claim that does not assert a Claim pursuant to the Plan for an Undeliverable Distribution within one hundred eighty (180) days after the distribution is distributed shall be deemed to have waived its Claim for such Undeliverable Distribution and shall be forever barred from asserting any such Claim, the Reorganized Debtors or their property. In such cases, notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary, any Cash held for distribution on account of such Undeliverable Distribution shall be property of the holders of Class CB 1 Allowed Pre-Petition Secured Parties Secured Claims against Cedar Bayou and/or the holders of Class AC 1 Allowed Pre-Petition Secured Parties Secured Claims against Altura Cogen, as applicable, free of any restrictions thereon. Nothing contained in the Plan shall require the Reorganizing Debtors, the Reorganized Debtors, the holders of Class CB 1 Allowed Pre-Petition Secured Parties Secured Claims, the holders of Class AC 1 Allowed Pre-Petition Secured Parties Secured Claims, or a Distribution Agent to attempt to locate any holder of an Allowed Claim.

## Section 11.06. Tax Withholding From Distributions

A Reorganizing Debtor or a Reorganized Debtor, as applicable, or a Distribution Agent shall withhold all amounts required by law to be withheld from payments made under the Plan. Any amounts so withheld from any payment made under the Plan shall be deemed paid to the holder of the Allowed Claim subject to withholding. Notwithstanding the above, each holder of

an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any Governmental Unit on account of such distribution, except for taxes withheld from payments made under the Plan. A Reorganizing Debtor or a Reorganized Debtor, as applicable, or a Distribution Agent has the right, but not the obligation, not to make a distribution until such holder has made arrangements satisfactory to a Reorganizing Debtor or a Reorganized Debtor, as applicable, or a Distribution Agent for payment of any withholding tax obligations. If a Reorganizing Debtor or a Reorganized Debtor, as applicable, or a Distribution Agent fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse a Reorganizing Debtor or a Reorganized Debtor, as applicable, or a Distribution Agent. Notwithstanding any provision in the Plan to the contrary, a Reorganizing Debtor or a Reorganized Debtor, as applicable, or a Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms it believes are reasonable and appropriate. A Reorganizing Debtor or a Reorganized Debtor, as applicable, or a Distribution Agent may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder. If the holder fails to comply with such a request within six (6) months, such distribution shall be deemed an Undeliverable Distribution. Finally, a Reorganizing Debtor or a Reorganized Debtor, as applicable, or a Distribution Agent reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

## Section 11.07. Allocations

Unless otherwise provided in the Plan, distributions in respect of Allowed Claims shall be allocated first to the principal amount (as determined for U.S. federal income tax purposes) of such Allowed Claims, and then, to the extent the consideration exceeds the principal amount of such Allowed Claims, to any portion of such Allowed Claims for accrued but unpaid interest.

## Section 11.08. Time Bar to Cash Payments

Checks issued on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance therein. Requests for reissuance of any check shall be made in writing directly to a Reorganizing Debtor or a Reorganized Debtor, as applicable, or a Distribution Agent by the holder of the Allowed Claim with respect to which such check originally was issued. Any Claim in respect of such a voided check shall be made in writing on or before the later of one hundred eighty (180) days after the Effective Date or ninety (90) days after the date of issuance of such check. After such date, all Claims in respect of void checks shall be discharged and forever barred and the distribution on account of such Claims shall be treated in accordance with Section 7.05 of the Plan.

**Section 11.09. Means of Cash Payments**

Any Cash payment to be made pursuant to the Plan will be made in U.S. dollars by checks drawn on or by wire transfer from a domestic bank selected by a Reorganizing Debtor or a Reorganized Debtor, as applicable, or a Distribution Agent.  No post-Effective Date interest shall be paid on Cash distributions hereunder.

**Section 11.10. Foreign Currency Exchange Rates**

As of the Effective Date, any Claim asserted in currency(ies) other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the mid-range spot rate of exchange for the applicable currency as published in *The Wall Street Journal*, National Edition, the day after the Petition Date.

**Section 11.11. Setoffs**

A Reorganizing Debtor or a Reorganized Debtor, as applicable, or a Distribution Agent may, pursuant to section 553 of the Bankruptcy Code and applicable non-bankruptcy law, set off against any Allowed Claim  or the Reorganized Debtors, as applicable, and the distributions to be made pursuant to the Plan on account of such Claim (before any distribution is made on account of such Claim), the claims, rights and Causes of Action of any nature that the Reorganizing Debtors or the Reorganized Debtors, as applicable, may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release of any such claims, rights and Causes of Action that the Reorganizing Debtors or the Reorganized Debtors may possess against such holder.

**Section 11.12. Claims Paid or Payable by Third Parties**

A Claim shall be reduced in full and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to, or action, order or approval of, the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Reorganizing Debtor or a Reorganized Debtor, as applicable, or a Distribution Agent.  To the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Reorganizing Debtor or a Reorganized Debtor, as applicable, or a Distribution Agent on account of such Claim, such holder shall repay, return or deliver any distribution held by or transferred to the holder to the applicable Reorganizing Debtor or Reorganized Debtor, as applicable, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the total amount of such Claim as of the date of any such distribution under the Plan.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Reorganizing Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Reorganizing Debtors' insurers agrees to satisfy in full a Claim, then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE XII

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

**Section 12.01. Prosecution of Objections to Claims**

After the Effective Date, the Reorganized Debtors shall have and shall retain any and all rights and defenses they may have with respect to any Claim, and shall have the exclusive authority to file objections and to settle, compromise, withdraw or litigate to judgment objections to Claims (except those Allowed by, or released by, the Plan, or by the Final DIP Order, the Confirmation Order or other Final Order). The Reorganized Debtors shall file objections to any Disputed Claims in accordance with the Bankruptcy Rules on or before the Claims Objection Deadline, as the same may be extended pursuant to the terms of the Plan or order of the Bankruptcy Court.

**Section 12.02. Estimation of Claims**

The Reorganizing Debtors or the Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any contingent or unliquidated Claim, pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Reorganizing Debtors or the Reorganized Debtors, as applicable, previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time, including during litigation concerning any objection to any Claim, and during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the applicable Reorganizing Debtor or Reorganized Debtor may elect to pursue any supplemental proceedings to object to the allowance and any ultimate payment on such Claim. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

**Section 12.03. No Distributions on Disputed Claims**

Notwithstanding any provision in the Plan to the contrary, no distributions, partial or otherwise, shall be made with respect to a Disputed Claim until all disputes with respect to such Claim are resolved by Final Order. Subject to the provisions of the Plan, after a Disputed Claim becomes an Allowed Claim, the holder of such an Allowed Claim will receive all distributions to which such holder is then entitled under the Plan. No post-Effective Date interest shall be paid on distributions hereunder. If a Creditor incorporates more than one Claim in a Proof of Claim then: (a) such Claims will be considered one Claim for purposes of the Plan, and (b) no such Claim will be bifurcated into an Allowed portion and a Disputed portion.

**Section 12.04. Reserve of Cash for Disputed Claims**

On the Effective Date, the Reorganizing Debtors Claims Reserve shall be held, in part, for the benefit of holders of Disputed Claims, if any. As Disputed Claims are resolved, a Reorganizing Debtor or a Reorganized Debtor, as applicable, or a Distribution Agent shall make

distributions under the Subplans to holders of Allowed Claims and the Reorganizing Debtors Claims Reserve shall be adjusted accordingly; provided, however, that the Reorganizing Debtors Claim Reserve shall be approved by the Bankruptcy Court in the Confirmation Order, and that such amount shall be binding on all holders of Disputed Claims.

## ARTICLE XIII

## CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### Section 13.01. Conditions Precedent to Confirmation

It shall be a condition to Confirmation of either Subplan that the Disclosure Statement Order shall have been entered by the Bankruptcy Court on the docket of the Chapter 11 Cases, in form and substance acceptable to the Reorganizing Debtors and the Consultation Parties, and such order shall not be subject to a stay.

### Section 13.02. Effect of Non-Occurrence of Conditions to Confirmation or Conditions Precedent to the Effective Date

If the conditions in Section 9.01 and Section 9.03 of the Plan are not satisfied for either Subplan, or if the Confirmation Order is vacated regarding either Subplan, the affected Subplan shall be null and void in all respects and nothing contained in the affected Subplan or the Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Reorganizing Debtors; (b) prejudice in any manner the rights of the Reorganizing Debtors, or any other Person or Entity (including, in each case and without limitation, the Other Debtors and Newco); or (c) constitute an admission, acknowledgment, offer or undertaking by the Reorganizing Debtors or any other Person or Entity (including, in each case and without limitation, the Other Debtors and Newco) in any respects.

### Section 13.03. Conditions Precedent to the Effective Date

It shall be a condition to occurrence of the Effective Date of either Subplan that the following conditions shall have been satisfied or waived pursuant to Section 9.04 of the Plan:

(i)     all conditions precedent to Confirmation have been satisfied;

(ii)    the Confirmation Order shall have been entered by the Bankruptcy Court on the docket of the Chapter 11 Cases, in form and substance acceptable to the Reorganizing Debtors and the Consultation Parties, and such order shall not be subject to a stay;

(iii)   the Assets, including contracts, identified in the Plan Supplement shall have been transferred or assigned to, or reissued in the name of (as applicable), one or more of the Reorganizing Debtors;

(iv)   all of the conditions precedent for effectiveness of the Exit Facility, if any, shall have been satisfied or waived in accordance with the terms thereof;

(v)    all of the conditions precedent for effectiveness of the Second Lien Note, if any, shall have been satisfied or waived in accordance with the terms thereof;

(vi)   all financing provided to the Reorganizing Debtors pursuant to section 364 of the Bankruptcy Code, including the DIP Facility Claims, shall have been paid or replaced, or other arrangements to the lenders providing such financing in their discretion regarding the repayment and termination of such financing shall have been made;

(vii)  all Reserves shall have been funded;

(viii) all other actions and documents necessary to implement the provisions of the Plan to be effectuated on or before the Effective Date (including but not limited to the Plan Supplement, the Exit Facility Documentation and the Second Lien Note Documentation) shall be reasonably satisfactory to the Reorganizing Debtors and the Consultation Parties; and

(ix)   the Reorganizing Debtors shall have received all authorizations, consents, approvals, regulatory approvals, rulings, letters, opinions or documents, if any, necessary to implement the Plan.

**Section 13.04. Waiver of Conditions Precedent**

The Reorganizing Debtors, with the written approval of the Consultation Parties, may waive any of the conditions precedent set forth in Section 9.01 and Section 9.03 of the Plan in whole or in part at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to confirm and/or consummate the Plan.

## ARTICLE XIV

## EFFECT OF CONFIRMATION OF THE PLAN

**Section 14.01. Discharge of Claims Against and Equity Interests in the Reorganizing Debtors**

**Except as otherwise provided for herein and effective as of the Effective Date: (a) the rights afforded in the Plan and the treatment of all Claims against and Equity Interests in the Reorganizing Debtors shall be in exchange for and in complete satisfaction, discharge, and release of all Claims against and Equity Interests in, their property and Estates of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date; (b) the Plan shall bind all holders of Claims against and Equity Interests in the Reorganizing Debtors, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) the Reorganizing Debtors**

**shall be deemed discharged and released under and to the fullest extent provided under the Bankruptcy Code from any and all Claims against and Equity Interests, of any kind or nature whatsoever, and all Claims against and Equity Interests in the Reorganizing Debtors, their property and Estates shall be satisfied, discharged, and released in full, and the Reorganizing Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Reorganizing Debtors or the Reorganized Debtors, as applicable, their Estates, their successors and assigns and their assets and properties any and all Claims, Equity Interests, damages, debts, and other liabilities based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date; provided, however, that Section 10.01 of the Plan shall not satisfy, discharge or release any Claim(s) against and Equity Interest(s) in the Other Debtor(s) (including, without limitation, any Allowed Prepetition Secured Parties Secured Claim(s) or DIP Facility Claim(s) against the Other Debtor(s)).**

## Section 14.02. Releases

Under Section 10.02 of the Plan, the Reorganizing Debtors, the Reorganized Debtors, the Estates and any Person or Entity seeking to exercise the rights of each of the foregoing have agreed to release the Released Parties (i.e., the Reorganizing Debtors and their Estates, each of the Reorganizing Debtors' current and former officers and directors, the Pre-Petition Secured Parties, the DIP Agent, the DIP Lenders, the L/C Issuer, the Exit Facility Agent, the Exit Facility L/C Issuer, the Exit Facility Lenders, the Second Lien Agent, the Second Lien Noteholders and the respective Related Persons of each of the foregoing) from any and all claims and Causes of Action taking place before the Effective Date; provided, however, that the foregoing releases shall not apply to claims or Causes of Action resulting from fraud, gross negligence or willful misconduct of a Released Party.  In addition, under Section 10.03 of the Plan, the Releasing Parties (i.e., each holder of a Claim against or Equity Interest that (a) affirmatively votes to accept or reject the applicable Subplan, (b) is Unimpaired pursuant to the applicable Subplan, or (c) rejects the Plan or abstains from voting on the applicable Subplan and who does not mark its Ballot indicating its desire to opt out of the releases provided in Section 10.03 of the Plan) have also agreed to release the Released Parties from any and all claims and Causes of Action taking place before the Effective Date; provided, however, that the foregoing releases shall not apply to claims or Causes of Action resulting from fraud, gross negligence or willful misconduct of a Released Party.

**It is important to note that a holder of a General Unsecured Claim or Claims against either of the Reorganizing Debtors who opts out of the releases described in Section 10.03 of the Plan will not receive the "Release Consideration" under the Subplan for the applicable Reorganizing Debtor, as further described in ARTICLE III of the Plan.**  In addition, the Reorganizing Debtors believe the Pre-Petition Secured Parties are entitled to these releases in consideration for, among other reasons, their agreement to (i) waive their Allowed Pre-Petition Secured Parties Deficiency Claims, if any, and (ii) consent to the Reorganizing Debtors' Estates funding the distributions to holders of Allowed Claims under each Subplan.

The specific release provisions in the Plan are set forth below:

(a)     <u>Certain Releases by the Reorganizing Debtors</u>

**Notwithstanding anything contained herein to the contrary, as of the Effective Date, and to the fullest extent authorized by applicable law, for good and valuable consideration, the adequacy of which is hereby confirmed, the Released Parties are deemed released and discharged by the Reorganizing Debtors, the Reorganized Debtors, their Estates and any Person or Entity seeking to exercise the rights of the Reorganizing Debtors, the Reorganized Debtors or their Estates from any and all claims, obligations, suits, judgments, damages, demands, debts, remedies, Causes of Action, rights of setoff, other rights, and liabilities whatsoever, whether for tort, contract, violations of federal or state securities laws, Avoidance Actions, including any derivative claims, asserted or that could possibly have been asserted directly or indirectly on behalf of the Reorganizing Debtors, the Reorganized Debtors, their Estates or their Affiliates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, and any and all Causes of Action asserted or that could possibly have been asserted on behalf of the Reorganizing Debtors, the Reorganized Debtors, the Estates or their Affiliates (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Entity, based on or in any way relating to, or in any manner arising from, in whole or in part, the Reorganizing Debtors, the Reorganized Debtors, their Estates or their Affiliates, the conduct of the Reorganizing Debtors' businesses, the in-court or out-of-court efforts to implement the Exit Facility and/or the Second Lien Note, the formulation, preparation, solicitation, dissemination, negotiation, or filing of the Disclosure Statement or Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with or pursuant to the Disclosure Statement, or the Plan, the filing and prosecution of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the purchase, sale, or rescission of the purchase or sale of any Security of the Reorganizing Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between the Reorganizing Debtors, their Estates or their Affiliates, on the one hand, and any Released Party, on the other hand, prepetition contracts and agreements with one or both Reorganizing Debtors, or any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date; <u>provided</u> that to the extent that a claim or Cause of Action is determined by a Final Order to have resulted from fraud, gross negligence or willful misconduct of a Released Party, such claim or Cause of Action shall not be so released against such Released Party.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any obligations arising on or after the Effective Date of any party under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in this Section 10.02, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by this Section 10.02; (c) in the**

best interests of the Reorganizing Debtors, their Estates and all holders of Claims and Equity Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity asserting any claim or Cause of Action released by this Section 10.02.

        (b)      <u>Certain Releases by Holders of Claims and Equity Interests</u>

       Notwithstanding anything contained herein to the contrary, as of the Effective Date, and to the fullest extent authorized by applicable law, the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, remedies, Causes of Action, rights of setoff, other rights, and liabilities whatsoever, whether for tort, contract, violations of federal or state securities laws, Avoidance Actions, including any derivative claims, asserted or that could possibly have been asserted directly or indirectly on behalf of the Releasing Parties or their Affiliates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, and any and all Causes of Action asserted or that could possibly have been asserted on behalf of the Releasing Parties or their Affiliates (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Entity, based on or in any way relating to, or in any manner arising from, in whole or in part, the Reorganizing Debtors, their Estates or their Affiliates, the conduct of the Reorganizing Debtors' businesses, the in-court or out-of-court efforts to implement Exit Facility and/or the Second Lien Note, the formulation, preparation, solicitation, dissemination, negotiation, or filing of the Disclosure Statement or Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with or pursuant to the Disclosure Statement, or the Plan; the filing and prosecution of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the purchase, sale, or rescission of the purchase or sale of any Security of the Reorganizing Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between either of the Reorganizing Debtors, their Estates or their Affiliates, on the one hand, and any Released Party, on the other hand, prepetition contracts and agreements with one or both Reorganizing Debtors, or any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date; <u>provided</u> that to the extent that a claim or Cause of Action is determined by a Final Order to have resulted from fraud, gross negligence or willful misconduct of a Released Party, such claim or Cause of Action shall not be so released against such Released Party.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any obligations arising on or after the Effective Date of any party under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

       Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in this Section 10.03, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a

**good faith settlement and compromise of the claims released by this Section 10.03; (c) in the best interests of the Reorganizing Debtors, their Estates and all holders of Claims and Equity Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity granting a release under this Section 10.03 from asserting any claim or Cause of Action released by this Section 10.03.**

## Section 14.03. Exculpation

**Effective as of the Effective Date and to the fullest extent authorized by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim or any obligation, Cause of Action, or liability for any Exculpated Claim except to the extent determined in a Final Order to have resulted from actual fraud, gross negligence or willful misconduct of such Exculpated Party. The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of acceptances and rejections of the Plan and the making of distributions pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable, law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

The U.S. Trustee has indicated that one of the grounds upon which it intends to object to Confirmation of the Plan is that the exculpation provisions are improper. The Reorganizing Debtors disagree with the U.S. Trustee's position.

## Section 14.04. Injunction

**Except as otherwise provided herein or in the Confirmation Order, from and after the Effective Date and to the fullest extent authorized by applicable law, all Entities are, to the fullest extent provided under section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined and forever barred from taking any of the following actions against, as applicable, the Released Parties, the Reorganizing Debtors, the Reorganized Debtors, and/or the Exculpated Parties and their respective properties and Assets: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Claims or Equity Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order on account of or in connection with or with respect to any such Claims or Equity Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind on account of or in connection with or with respect to any such Claims or Equity Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind on account of or in connection with or with respect to any such Claims or Equity Interests unless such holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Equity Interests released, exculpated or settled pursuant to the Plan.**

**Section 14.05. Protection Against Discriminatory Treatment**

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganizing Debtor or Reorganized Debtor, as applicable, or any Entity (including, without limitation, Newco) with which a Reorganizing Debtor or Reorganized Debtor has been or is associated, solely because such Reorganizing Debtor or Reorganized Debtor was a debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Reorganizing Debtor or Reorganized Debtor was granted a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**Section 14.06. Release of Liens**

Except as otherwise provided herein, in the Confirmation Order, or in any contract, instrument, release or other agreement or document created pursuant to or as contemplated under the Plan (including, for the avoidance of doubt, the Exit Facility, Exit Facility Documentation, Second Lien Note and Second Lien Note Documentation), on the Effective Date all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Reorganizing Debtors' Estates shall be fully released, settled and discharged, and all of the rights, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganizing Debtors or the Reorganized Debtors, as applicable.

**Section 14.07. Cancellation of Securities and Notes Against the Reorganizing Debtors**

So long as the treatments provided for in, and the distributions contemplated by, ARTICLE II and ARTICLE III of the Plan are effectuated or made, on the Effective Date, but subject to Section 10.08 of the Plan and the introductory paragraph to ARTICLE III of the Plan, each of (a) the Pre-Petition Reimbursement Agreement; (b) the DIP Credit Agreement; (c) the Equity Interests in the Reorganizing Debtors; and (d) any other notes, bonds, indentures, certificates or other instruments or documents evidencing or creating any Claims or Equity Interests that are Impaired by the Plan, shall be cancelled and deemed terminated and satisfied and discharged solely with respect to the Reorganizing Debtors, and the holders thereof shall have no further rights or entitlements in respect thereof against the Reorganizing Debtors or the Reorganized Debtors, except the rights to receive the distributions, if any, to which the holders thereof are entitled under the Plan.

## ARTICLE XV

## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

**Section 15.01. Modification of a Subplan**

The Reorganizing Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, and subject to the written approval of the Consultation Parties, to amend or modify the Plan or either Subplan before the entry of the Confirmation Order, subject to the limitations set forth herein. After entry of the Confirmation Order for either Subplan, the applicable Reorganizing Debtor(s) may amend or modify such Subplan, subject to the written

approval of the Consultation Parties and in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission or reconcile any inconsistency in such Subplan in such manner as may be necessary to carry out the purpose and intent of the Subplan.

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan or either Subplan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

## Section 15.02. Revocation or Withdrawal of a Subplan

The Reorganizing Debtors reserve the right, subject to the written approval of the Consultation Parties, to revoke or withdraw the Plan or either Subplan before the Confirmation Date and to file subsequent chapter 11 Subplans.  If the Reorganizing Debtors revoke or withdraw a Subplan, or if Confirmation or Consummation does not occur with respect to either Subplan, then: (a) the affected Subplan will be null and void in all respects; (b) any settlement or compromise embodied in the Subplan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Subplan, and any document or agreement executed pursuant hereto shall be null and void in all respects; and (c) nothing contained in the affected Subplan or this Disclosure Statement shall: (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Reorganizing Debtors; (ii) prejudice in any manner the rights of the Reorganizing Debtors or any other Entity (including, without limitation, the Other Debtors); or (iii) constitute an admission, acknowledgment, offer or undertaking by the Reorganizing Debtors or any other Entity (including, without limitation, the Other Debtors) in any respects.

## ARTICLE XVI

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date for either Subplan, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases after the Effective Date as legally permissible, including jurisdiction to:

(i)     allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim , including the resolution of any request for payment of any Administrative Claim  and the resolution of any and all objections to the allowance or priority of Claims;

(ii)    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(iii)   resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease (including Cure Costs);

(iv)     ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(v)     decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Reorganizing Debtors that may be pending on the Effective Date;

(vi)     enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, this Disclosure Statement, the Exit Facility and/or the Second Lien Note;

(vii)     enter and enforce any order related to or otherwise in connection with any sale of property by the Reorganizing Debtors pursuant to sections 363 or 1123 of the Bankruptcy Code;

(viii)     decide or resolve any Causes of Action arising under the Bankruptcy Code, including, without limitation, Avoidance Actions and Claims under sections 362, 510, 542 and 543 of the Bankruptcy Code;

(ix)     resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Plan or either Subplan, or any Person's or Entity's (including, without limitation, Newco's) obligations incurred in connection with the Plan or either Subplan;

(x)     issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity (including, in each case and without limitation, the Other Debtors) with Consummation or enforcement of the Plan or either Subplan, except as otherwise provided herein;

(xi)     resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in ARTICLE X of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunction and other provisions;

(xii)     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(xiii)     determine any other matters that may arise in connection with or relate to the Plan, this Disclosure Statement, the Confirmation Order, the Exit Facility and/or the Second Lien Note, or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or this Disclosure Statement;

(xiv)  enter order(s) and/or Final Decree(s) concluding the Chapter 11 Cases;

(xv)  hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(xvi)  consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order; and

(xvii)  hear any other matter not inconsistent with the Bankruptcy Code.

# ARTICLE XVII

## MISCELLANEOUS PROVISIONS

**Section 17.01. Corporate Action**

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Equity Interests, directors, managers or officers of the Reorganizing Debtors or any other Entity or Person (including, without limitation, Newco), as applicable, including: (a) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) rejection or assumption, as applicable, of Executory Contracts and Unexpired Leases; (d) selection of the board of directors of Newco or any employees or trustee; (e) the filing of appropriate limited liability company agreements, certificates or articles of incorporation or organization, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; (f) the consummation of the transactions contemplated by the Exit Facility Documentation and the execution thereof; (g) the consummation of the transactions contemplated by the Second Lien Note Documentation and the execution thereof; (h) the issuance of the Newco Equity Interests and the execution of all documents related thereto; (i) the issuance of the Reorganized AC Equity Interests and the execution of all documents related thereto; (j) the issuance of the Reorganized CB 4 Equity Interests and the execution of all documents related thereto; and (k) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.  All matters provided for in the Plan involving the company structure of the Reorganizing Debtors, and any company action required by the Reorganizing Debtors in connection therewith, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, authorized persons or officers of the Reorganizing Debtors.  The authorizations and approvals contemplated by Section 13.01 of the Plan shall be effective notwithstanding any requirements under nonbankruptcy law.

**Section 17.02. Securities Issued Under the Plan**

The Newco Equity Interests, the Reorganized AC Equity Interests and the Reorganized CB 4 Equity Interests will be issued under the Plan. They will be exempt from registration under Section 4(a)(2) of the Securities Act of 1933 or section 1145(a) of the Bankruptcy Code, as applicable.

**Section 17.03. General Settlement of Claims**

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan constitute a good-faith compromise and settlement of all Claims against and Equity Interests in the Reorganizing Debtors.

**Section 17.04. Preservation of Causes of Action Not Expressly Released**

The Reorganizing Debtors or the Reorganized Debtors, as applicable, retain all rights to commence and pursue, as appropriate, any and all claims or Causes of Action of the Reorganizing Debtors or the Reorganized Debtors, as applicable, whether arising before or after the Petition Date, in any court or other tribunal including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases, other than Avoidance Actions or any Causes of Action released under the Plan. The failure to list any potential or existing claims or Causes of Action is not intended to limit the rights of the Reorganizing Debtors or the Reorganized Debtors, as applicable, to pursue any claims or Causes of Action not listed or identified.

Unless a claim or Cause of Action against a Creditor or other Person or Entity (including, in each case and without limitation, the Other Debtors) is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, the Reorganizing Debtors or the Reorganized Debtors, as applicable, expressly reserve such claim or Cause of Action for later adjudication for and on behalf of the Reorganizing Debtors or the Reorganized Debtors, as applicable (including, without limitation, claims and Causes of Action not specifically identified or which Reorganizing Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Reorganizing Debtors at this time or facts or circumstances which may change or be different from those which the Reorganizing Debtors now believe to exist). No preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such claims or Causes of Action upon or after the Confirmation or Consummation of the Plan based on this Disclosure Statement, the Plan or the Confirmation Order, except where such claims or Causes of Action have been released in the Plan or other Final Order. In addition, the Reorganizing Debtors or the Reorganized Debtors, as applicable, and their successor entities under the Plan expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which the Reorganizing Debtors or the Reorganized Debtors, as applicable, are a defendant or an interested party, against any Person or Entity (including, in each case and without limitation, the Other Debtors), including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Except as otherwise provided in the Plan or in any contract, instrument, release, indenture or other agreement entered into in connection with the Plan, in accordance with section 1123(b)(3) of the Bankruptcy Code, any claims, rights, and Causes of Action that the Reorganizing Debtors or the Reorganized Debtors, as applicable, may hold against any Person, shall vest in the Reorganizing Debtors or the Reorganized Debtors, as applicable, and the Reorganizing Debtors or the Reorganized Debtors, as applicable, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such claims, rights or Causes of Action. The Reorganizing Debtors or the Reorganized Debtors, as applicable, shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such claims, rights, and Causes of Action without the consent or approval of any third party and without any further order of court.

Delivery (by any means) of the Plan or Disclosure Statement to any Person to whom the Reorganizing Debtors or the Reorganized Debtors, as applicable, have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Reorganizing Debtors or the Reorganized Debtors, as applicable, or a transfer of money or property of the Reorganizing Debtors or the Reorganized Debtors, as applicable, or who has transacted business with the Reorganizing Debtors or the Reorganized Debtors, as applicable, or leased equipment or property from the Reorganizing Debtors or the Reorganized Debtors, as applicable, shall constitute actual notice that such obligation, transfer, or transaction may be reviewed by the Reorganizing Debtors or the Reorganized Debtors, as applicable subsequent to the Effective Date and may, if appropriate, be the subject of an action after the Effective Date, whether or not: (a) such Person has filed a Proof of Claim or Reorganized Debtors, as applicable, in their Chapter 11 Cases; (b) such Person's Proof of Claim has been objected to by the Reorganizing Debtors or the Reorganized Debtors, as applicable; (c) such Person's Claim was included in Reorganizing Debtors' Schedules; (d) such Person's scheduled Claim has been objected to by the Reorganizing Debtors or the Reorganized Debtors, as applicable, or has been identified by the Reorganizing Debtors or the Reorganized Debtors, as applicable, as a Disputed Claim; or (e) such action falls within the list of affirmative Causes of Action in the Plan Supplement.

## Section 17.05. Section 1146(a) Exemption

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording tax, or other similar tax or governmental assessment. Upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax, fee, or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

## Section 17.06. Elimination of Vacant Classes

Any Class of Claims or Equity Interests that is not populated as of the commencement of the Confirmation Hearing by an Allowed Claim or Equity Interest, or a Claim or Equity Interest that is temporarily allowed under Bankruptcy Rule 3018, shall be deemed eliminated from the

applicable Subplan for purposes of: (a) voting to accept or reject the Subplan; and (b) determining the acceptance or rejection of the Subplan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## Section 17.07. Intercompany Claims

Pursuant to Section 13.07 of the Plan and Bankruptcy Rule 9019 (and consistent with the provisions of **Error! Reference source not found.** of the Plan), the Reorganizing Debtors propose a good faith compromise and settlement of the Intercompany Claims pursuant to the provisions the Plan.  On the Effective Date, the Intercompany Claims shall be cancelled, extinguished and discharged and the holders of Intercompany Claims shall not receive or retain any property under the Plan on account of such Intercompany Claims.  Intercompany Claims are subject to the Liens of the DIP Lenders and Pre-Petition Secured Parties.  Moreover, because all the Debtors are jointly and severally liable for the obligations arising under the Pre-Petition Reimbursement Agreement and the DIP Facility, the settlement of Intercompany Claims would not have any impact on the recoveries of the holders of Claims against any Debtor (including either Reorganizing Debtor).

## Section 17.08. Additional Documents

On or before the Effective Date, the Reorganizing Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Subplans.  The Reorganizing Debtors or the Reorganized Debtors, as applicable, and all holders of Claims and Equity Interests receiving distributions pursuant to a Subplan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

## Section 17.09. Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

## Section 17.10. Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court has entered the Confirmation Order.  Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Reorganizing Debtor or Reorganized Debtors, as applicable, with respect to the Plan, this Disclosure Statement, the Confirmation Order or the Plan Supplement, shall be or shall be deemed to be an admission or waiver of any rights of the Reorganizing Debtors or the Reorganized Debtors, as applicable, with respect to the holders of Claims or Equity Interests prior to the Effective Date.

## Section 17.11. Notices

Except as otherwise set forth in the Plan, all notices or requests in connection with the Plan shall be in writing and will be deemed to have been given when received by personal delivery, facsimile, e-mail, overnight courier or first class mail and addressed to:

| | |
|---|---|
| **If to the Reorganizing Debtors:** | Bracewell & Giuliani LLP<br>CityPlace I, 34th Floor<br>185 Asylum Street<br>Hartford, Connecticut 06103<br>Attn: Kurt Mayr<br><br>with a copy to:<br><br>Bracewell & Giuliani LLP<br>1251 Avenue of Americas, 49th Floor<br>New York, New York 10020<br>Attn: Robert G. Burns |
| **If to the Consultation Parties:** | Cleary Gottlieb Steen & Hamilton LLP<br>One Liberty Plaza<br>New York, New York 10006<br>Attn: Lindsee P. Granfield<br>     Luke A. Barefoot |

## Section 17.12. Term of Injunctions or Stay

**Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

## Section 17.13. Entire Agreement

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan. To the extent the Confirmation Order is inconsistent with the Plan, the Confirmation Order shall control for all purposes.

**Section 17.14. Plan Supplement Exhibits**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Reorganizing Debtors' counsel at the address above or by downloading such exhibits and documents from the Claims and Solicitation Agent's website at https://cases.primeclerk.com/optim/Home-DocketInfo or the Bankruptcy Court's website at www.deb.uscourts.gov.

**Section 17.15. Severability**

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Reorganizing Debtors, and subject to the written approval of the Consultation Parties, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms; (b) integral to the Plan; and (c) non-severable and mutually dependent.

**Section 17.16. Substantial Consummation**

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

**ARTICLE XVIII**

**RISK FACTORS**

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

**THESE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE REORGANIZING DEBTORS' BUSINESSES OR THE PLAN AND ITS IMPLEMENTATION.**

**Section 18.01. Risks Related to the Plan and Other Bankruptcy Law Considerations**

(a)    A Claim or Equity Interest Holder May Object to, and the Bankruptcy Court May Disagree with, the Reorganizing Debtors' Classification of Claims and Equity Interests

Section 1122(a) of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.   The Reorganizing Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Reorganizing Debtors created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, which are substantially similar to the other Claims and Equity Interests in each such Class.   However, a Claim or Equity Interest holder could challenge the Reorganizing Debtors' classification.   In such an event, the cost of the Chapter 11 Cases and the time needed to confirm the Plan (including the Subplans therein) may increase, and there can be no assurance that the Bankruptcy Court will agree with the Reorganizing Debtors' classification.   If the Bankruptcy Court concludes that either or both of the classifications of Claims and Equity Interests under any of the Subplan(s) does not comply with the requirements of the Bankruptcy Code, the Reorganizing Debtors may need to modify the Subplan(s).   Such modification could require re-solicitation of votes on the applicable Subplan(s).    The Subplan(s) may not be confirmed   if the Bankruptcy Court determines that the Reorganizing Debtors' classification of Claims and Equity Interests is not appropriate.

(b)    The Reorganizing Debtors May Not Be Able to Satisfy the Voting Requirements for Confirmation of the Subplan(s)

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Subplan(s), the Reorganizing Debtors may seek, as promptly as practicable thereafter, Confirmation.   If the Subplan(s) is not accepted or deemed to be accepted by at least one Class of Claims that is Impaired under the applicable Subplan(s), the applicable Subplan(s) may not be confirmed.   Although styled as a "joint" plan, the Plan consists of two (2) separate Subplans (one for each Reorganizing Debtor), and each Reorganizing Debtor is a proponent herein within the meaning of section 1129 of the Bankruptcy Code in its respective Chapter 11 Case.   If a Subplan is not confirmed, then the Reorganizing Debtors reserve the right to either (a) request that the other Subplan be confirmed or (b) withdraw one or both of the Subplan(s).   The Reorganizing Debtors' inability to confirm or election to withdraw any Subplan(s) shall not impair the confirmation of any other Subplan(s).

(c)    The Bankruptcy Court May Not Confirm the Subplan(s)

The Reorganizing Debtors cannot assure you that any or all the Subplan(s) will be confirmed by the Bankruptcy Court.   Section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a plan of reorganization, requires, among other things, a finding by a bankruptcy court that the plan of reorganization is "feasible," that all claims and interests have been classified in compliance with the provisions of section 1122 of the Bankruptcy Code, and that, under the plan of reorganization, each holder of a claim or interest within each impaired class either accepts the plan of reorganization or receives or retains cash or property of a value,

as of the date the plan of reorganization becomes effective, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. There can be no assurance that the Bankruptcy Court will conclude that the feasibility test and other requirements of section 1129 of the Bankruptcy Code have been met with respect to the Subplan(s).

If the Subplan(s) are not confirmed, the Reorganizing Debtors may elect to amend the Subplan(s), seek to sell their assets pursuant to section 363 of the Bankruptcy Code, or permit the Pre-Petition Secured Parties to seek relief from the automatic stay to exercise their rights in the Collateral under the Pre-Petition Reimbursement Agreement and the Pre-Petition Reimbursement Agreement Security Documents. The Reorganizing Debtors believe that the Plan provides a greater recovery for holders of Allowed Claims than would be achieved under any alternative structure. This belief is based on a number of considerations, perhaps most importantly, the Consultation Parties' consent to fund Cash distributions to junior Classes of Claims and Equity Interests despite not being paid in full under the Plan on account of their Pre-Petition Secured Parties Secured Claims. The Reorganizing Debtors believe there may be insufficient value to fund these Cash distributions to creditors under an alternative structure.

(d)    Nonconsensual Confirmation

In the event that any impaired class of claims against or interests in a debtor does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class has or deemed to have accepted the plan (with such acceptance being determined without including the vote of any insider in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Reorganizing Debtors believe that the Plan satisfies these requirements, and the Reorganizing Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased Administrative Claims.

(e)    The Reorganizing Debtors May Object to the Amount or Classification of a Claim or Equity Interest

Except as otherwise provided in the Plan, the Reorganizing Debtors reserve the right to object to the amount or classification of any Claim or Equity Interest under the Subplans. The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim or Equity Interest where such Claim or Equity Interest is subject to an objection. Any holder of a Claim or Equity Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

(f)    Even if the Reorganizing Debtors Receive All Necessary Acceptances for the Subplans to Become Effective, the Reorganizing Debtors May Fail to Meet All Conditions Precedent to Effectiveness of the Subplans

The Confirmation and effectiveness of the Subplans are subject to certain conditions that may or may not be satisfied.  The Reorganizing Debtors cannot assure you that all requirements for Confirmation and effectiveness required under the Subplans will be satisfied.

(g)    Contingencies May Affect Distributions to Holders of Allowed Claims and Equity Interests

The distributions available to holders of Allowed Claims and Equity Interests under the Subplans can be affected by a variety of contingencies, including, whether the Bankruptcy Court orders certain Allowed Claims to be disallowed or subordinated to other Allowed Claims.  For example, the Reorganizing Debtors cannot determine whether certain Classes of Claims against the Reorganizing Debtors will vote to accept the applicable Subplan(s).  Without such Class acceptance, holders of Claims in these Classes will not receive a distribution on account of their Allowed Claims under the Subplan(s).  The occurrence of such contingencies could affect distributions under the Subplans.

(h)    Allowed Claims May Exceed Amount in the Reserves

Unless explicitly provided otherwise in the Plan with respect to a particular Claim, the Reorganizing Debtors Claims Reserve shall be the only source of recovery for Claims not Allowed as of the Effective Date (including Disputed and contingent Claims).  There is a risk that if such Claims are allowed in higher amounts than the aggregate available in the Reorganizing Debtors Claims Reserve, and accounting for other Claims that were Allowed in higher or lower amounts, certain Claims not Allowed as of the Effective Date may receive lower recoveries.

(i)    The Reorganizing Debtors May Seek to Amend, Waive, Modify or Withdraw a Subplan(s) at Any Time Prior to Confirmation

The Reorganizing Debtors reserve the right, subject to the written approval of the Consultation Parties, to revoke or withdraw the Plan or any Subplan before the Confirmation Date and to file subsequent chapter 11 Subplans prior to the Confirmation of the Subplan(s) or substantial Consummation thereof, subject to the provisions of section 1127 of the Bankruptcy Code and applicable law, to amend the terms of the Subplan(s) or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to Consummate the Subplan(s).  The potential impact of any such amendment or waiver on the holders of Claims and Equity Interests cannot presently be foreseen but may include a change in the economic impact of the applicable Subplan(s) on some or all of the proposed classes or a change in the relative rights of such classes.  All holders of Claims and Equity Interests will receive notice of such amendments or waivers to the extent required by applicable law or the Bankruptcy Court.  If, after receiving sufficient acceptances, but prior to Confirmation of the Subplan(s), the Reorganizing Debtors seek to modify the Subplan(s), the previously solicited acceptances will be valid only if (i) all Classes of adversely affected creditors and interest holders accept the

modification in writing, or (ii) the Bankruptcy Court determines, after notice to designated parties, that such modification did not adversely change the treatment of holders of accepting Claims and Equity Interests or is otherwise permitted by the Bankruptcy Code.

(j)    Releases, Injunctions, and Exculpations Provisions May Not Be Approved

ARTICLE X of the Plan provides for certain releases, injunctions, and exculpations. However, all of the releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.

(k)    No Substantive Consolidation

The Reorganizing Debtors are not seeking substantive consolidation.  The Claims held against either of the Reorganizing Debtors will be satisfied solely from the assets of such Reorganizing Debtor.  Nothing in the Plan shall constitute or be deemed to constitute an admission that one of the Reorganizing Debtors is subject to or liable for any Claim against any other Reorganizing Debtor.  The Claims of Creditors that hold Claims against both Reorganizing Debtors will be treated as separate Claims with respect to each Reorganizing Debtor's Estate for all purposes (including, but not limited to, distributions and voting), and such Claims will be administered as provided in the Plan and each Subplan.

(l)    The Reorganizing Debtors Cannot Predict the Amount of Time Spent in Bankruptcy for the Purpose of Implementing the Plan (Including the Subplans Therein).

The Reorganizing Debtors estimate that the process of obtaining Confirmation of the Plan by the Bankruptcy Court will last approximately forty-five (45) to sixty (60) days from filing the Plan, but it could last considerably longer if, for example, Confirmation is contested or the conditions to Confirmation or Consummation are not satisfied or waived.  If the Reorganizing Debtors are unable to obtain Confirmation of the Subplans on a timely basis, because of a challenge to the Plan or otherwise, the Reorganizing Debtors may be forced to operate in bankruptcy for a longer period of time while they try to develop a different reorganization plan that can be confirmed.  A protracted bankruptcy case could increase both the probability and the magnitude of the adverse effects described above.

(m)    Other Parties in Interest Might Be Permitted to Propose Alternative Plans of Reorganization that May Be Less Favorable to Certain of the Reorganizing Debtors' Constituencies than the Plan

Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization to the Plan.  Under the Bankruptcy Code, a debtor in possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization for a period of one hundred twenty (120) days from filing.  However, such exclusivity period can be reduced or terminated upon order of a bankruptcy court.  The Reorganizing Debtors' exclusive period to file a plan of reorganization currently extends through June 9, 2015.  If Confirmation does not occur, and the Reorganizing Debtors do not file a revised chapter 11 plan of reorganization on or before June 9, 2015 or the Bankruptcy Court does not enter an order further extending this period, other parties in interest may then have the opportunity to propose alternative plans of reorganization.

If other parties in interest were to propose an alternative plan of reorganization following expiration or termination of the Reorganizing Debtors' exclusivity period, such a plan may be less favorable to existing holders of Claims and Equity Interests and may seek to exclude these holders from receiving the distributions completed by the Plan.  Alternative plans of reorganization also may treat less favorably the Claims of a number of other constituencies, including the Reorganizing Debtors' trading partners and customers.  The Reorganizing Debtors consider maintaining relationships with their Creditors, trading partners, and customers as critical to maintaining the value of the Reorganized Debtors following the Effective Date, and have sought to treat those constituencies accordingly.  However, proponents of alternative plans of reorganization may not share the Reorganizing Debtors' assessments and may seek to impair the Claims of such constituencies to a greater degree.  If there were competing plans of reorganization, the Chapter 11 Cases likely would become longer, more complicated, and much more expensive.  If this were to occur, or if the Reorganizing Debtors' other constituencies important to the Reorganized Debtors' business reacted adversely to an alternative plan of reorganization, there could be adverse consequences to holders of Claim against and Equity Interests in the Reorganizing Debtors.

The Reorganizing Debtors note that an alternative plan of reorganization could not include a sale or transfer of the Gas Plant Portfolio to a third party.  All of the assets of the Debtors are subject to (i) the Final DIP Order and (ii) the security interests of the DIP Lenders and the Pre-Petition Secured Parties.  The DIP Credit Agreement (section 9.7(b)) requires the consent of the DIP Lenders to consummate any Major Asset Sale (as defined in the DIP Credit Agreement).  The period to challenge the extent and validity of the Liens of the Pre-Petition Secured Parties has expired and no challenge was brought and standing to bring Claims was denied.

(n)     The Reorganizing Debtors May Be Unable to Assume Executory Contracts and Unexpired Leases

The Reorganizing Debtors may need to obtain the consent of the counterparty to maintain the benefit of the contract or lease.  There is no guarantee that such consent either would be forthcoming or that conditions would not be attached to any such consent that makes assuming the contracts unattractive.  The Reorganizing Debtors then would be required to either forego the benefits offered by such contracts or to find alternative arrangements to replace them.  There can be no assurance that alternative arrangements can be found.

(o)     The Reorganizing Debtors May Not Be Able to Secure Confirmation and Consummation of the Plan Within the Milestones Currently Required by the DIP Facility

The Reorganizing Debtors may not be able to secure Confirmation and Consummation of the Plan within the milestones currently contemplated by the DIP Credit Agreement.  On April 20, 2015, the Bankruptcy Court entered an order approving Amendment No. 15 to the DIP Credit Agreement [D.I. 851], which establishes, among other things, June 30, 2015 as the deadline for the Reorganizing Debtors to obtain Confirmation and Consummation of the Plan.  If the Reorganizing Debtors cannot meet the June 30, 2015 deadline, the Reorganizing Debtors cannot guarantee that the DIP Lenders will agree to amend the DIP Credit Agreement to extend these milestones any further.  To the extent that the terms or conditions of the DIP Credit Agreement

are not satisfied, or to the extent events giving rise to termination of the DIP Facility under the DIP Credit Agreement occur, the DIP Facility may terminate prior to the Confirmation and Consummation of the Plan, which could result in the loss of financing and/or support for the Plan by important creditor constituents.  Any such loss of financing and/or support could adversely affect the Reorganizing Debtors' ability to reorganize confirm and Consummate the Plan.

(p)    Non-Occurrence of the Effective Date

Operating in bankruptcy imposes significant risks on the Reorganizing Debtors' operations.  The Reorganizing Debtors believe that the Effective Date will occur very shortly after the Confirmation Date; however, there can be no assurance as to such timing.  In fact, there can be no assurance as that the conditions to the Effective Date will ever be satisfied, including without limitation: (i) entry of the Confirmation Order by the Bankruptcy Court in form and substance reasonably acceptable to the Reorganizing Debtors and the Consultation Parties; (ii) the satisfaction (or waiver in accordance with the terms therein) of the conditions precedent for the closing of the Exit Facility and the Second Lien Note; and (iii) the Reorganizing Debtors' receipt of all authorizations, consents, approvals, or documents, if any, necessary to implement the Plan.

(q)    The Reorganizing Debtors' Ability to Confirm and Consummate the Plan May Be Jeopardized Due to a Potential Liquidity Shortfall

The Debtors agreed with the DIP Lenders regarding the initial three-month extension (to May 12, 2015) contemplated by the DIP Facility.  On April 20, 2015, the Bankruptcy Court entered an order approving Amendment No. 15 to the DIP Credit Agreement [D.I. 851], which establishes, among other things, August 31, 2015 (which can be further extended to September 30, 2015) as the maturity date of the DIP Facility.  There can be no guarantee of any further extension of the DIP Facility, nor can there be any assurance that a replacement facility can be found.  If Consummation does not occur prior the DIP maturity, the Reorganizing Debtors may not have sufficient Cash to safely and effectively operate their businesses during the pendency of these Chapter 11 Cases, absent further financing, which may in turn impact the Reorganizing Debtors' ability to confirm and Consummate the Plan.

(r)    Certain Claims May Not Be Discharged

The Reorganizing Debtors are subject to complex and stringent energy, environmental, and other governmental laws and regulations at the federal, state, and local levels in connection with the development, ownership, and operation of the power plants, and in connection with the purchase and sale of electricity.  There may be future claims not discharged in the Chapter 11 Cases related to the Reorganizing Debtors' business operations and this regulatory environment.

In particular, the Reorganizing Debtors' activities in the ERCOT wholesale market are subject to electric reliability standards, market governance rules, and prohibitions on certain activities promulgated under federal and state law.  An occurrence of a violation of such standards, rules, and prohibitions could result in substantial penalties and disgorgement of excess revenues resulting from the violation.  If any such violation were to be found to have occurred,

such matter might not be discharged in the Chapter 11 Cases related to the Reorganizing Debtors' business operations.

(s)     Certain Material U.S. Federal Income Tax Consequences

Certain material U.S. federal income tax consequences of the Plan are summarized in ARTICLE XXII of this Disclosure Statement.   Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described therein.   No ruling from the U.S. Internal Revenue Service ("**IRS**") has been sought by the Reorganizing Debtors regarding the tax consequences described in this Disclosure Statement.   No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position disclosed in this Disclosure Statement.   For a more detailed discussion please review ARTICLE XXII of this Disclosure Statement.

## Section 18.02. Certain Business Specific Risk Factors

Pursuant to the Plan, if confirmed, a portion of the Allowed Pre-Petition Secured Parties Secured Claims will be exchanged for the Newco Equity Interests.   The Reorganizing Debtors will (subject to Confirmation and Consummation) emerge as Reorganized Debtors subject to ongoing business and financial risks after bankruptcy, which could affect the Pre-Petition Secured Parties on account of their ownership of the Newco Equity Interests, as well as counterparties to any assumed Executory Contracts and Unexpired Leases.   Such business risk factors include:

(a)     General Economic Conditions

In their financial projections, the Reorganizing Debtors have assumed that the general economic conditions of the U.S. economy will improve over the next several years.   The stability of economic conditions is subject to many factors outside the Reorganizing Debtors' control, including interest rates, inflation, unemployment rates, the housing market, consumer spending, war, terrorism, natural disasters, and other such factors.   Any one of these or other economic factors could have a significant effect on the operating performance of the Reorganized Debtors.

(b)     Implementation of Business Plan

The Reorganizing Debtors believe that the Reorganized Debtors will succeed in implementing and executing its business plan and financial restructuring.   There are risks, however, that the goals of the Reorganized Debtors' going-forward business plan and financial restructuring strategy will not be achieved.   In such event, the Reorganized Debtors may be unable to restructure their funded debt or be forced to sell all or parts of their business, develop and implement further restructuring plans not contemplated in this Disclosure Statement, or become subject to further insolvency proceedings.

(c)     Repairs to Gas Plant Portfolio

There may be repairs necessary in the future to allow the Gas Plant Portfolio to operate at or near full capacity.   There are risks, however, that such repairs may be unsuccessful and that

the Reorganized Debtors may suffer loss of cash flow due to operational issues at the Gas Plant Portfolio. In such event, the Reorganized Debtors may be unable to restructure their funded debt or be forced to sell all or parts of their business, develop and implement further restructuring plans not contemplated in this Disclosure Statement, or become subject to further insolvency proceedings.

(d)    Contracts

As described in the First Day Declaration, the Reorganizing Debtors' contracts are instrumental to their ongoing business operations. Some of these contracts are summarized in Section 3.08, Section 3.09, Section 4.02(e) and Section 5.09 of this Disclosure Statement. If the Reorganized Debtors are unable to maintain these contracts, the Reorganized Debtors may be unable to find alternative contract counterparties at economically feasible prices, which could increase operational costs and cause a material adverse effect on the Reorganized Debtors' business, financial condition, and results of operations.

(e)    Seasonality

The Reorganizing Debtors' principal sources of revenue are revenues generated by power generation. The Reorganizing Debtors experience seasonal revenue patterns similar to those of the merchant power generation industry in general. This seasonality can be expected to also cause fluctuations in the Reorganized Debtors' revenues, cash flows, profit margins, and net income.

(f)    Competition

The power generation industry is highly competitive, which may affect the Reorganized Debtors' ability to compete successfully for customers with their industry competitors. The Reorganizing Debtors generally operate in markets that contain numerous competitors. The Reorganized Debtors' ability to remain competitive requires the Reorganized Debtors to offer their electricity at competitive prices vis-à-vis the national and regional markets. If the Reorganized Debtors are unable to compete successfully in these areas, this may limit their respective operating margins, diminish their market share, and reduce their earnings.

(g)    Operational Costs

Many of the expenses associated with owning and operating the Gas Plant Portfolio, such as debt-service payments, property taxes, insurance, and utilities, are relatively inflexible and do not necessarily decrease in tandem with a reduction in the Reorganized Debtors' revenue. The Reorganized Debtors' expenses also will be affected by inflationary increases and certain costs may exceed the rate of inflation in any given period. In the event of a significant decrease in demand for electricity, the Reorganized Debtors may be unable to reduce the size of their operating expenses or to offset any such increased expenses with higher electricity or coal prices. As a result, any of the Reorganized Debtors' efforts to reduce operating costs or failure to make scheduled capital expenditures also could adversely affect the future growth of their business and the value of the Reorganized Debtors' assets and it is possible that increased operational costs may decrease the Reorganized Debtors' net revenues.

(h)    Terrorist Attacks, Future War, or Risk of War may Adversely Impact the Reorganized Debtors' Results of Operations, their Ability to Raise Capital, or their Future Growth

As power generators, the Reorganized Debtors may face an above-average risk of an act of terrorism, which could include either a direct act against the Gas Plant Portfolio or an inability to operate as a result of systemic damage resulting from an act against the transmission and distribution infrastructure that they use to transport their power. If such an attack were to occur, the Reorganized Debtors' business, financial condition, and results of operations could be materially adversely impacted. In addition, such an attack could impact their ability to service their indebtedness, their ability to raise capital, and their future growth opportunities.

(i)    Potential Costs to Comply with Environmental Laws

The Reorganizing Debtors' activities are subject to complex and stringent energy, environmental, and other governmental laws and regulations as described in Section 3.10 and Section 3.11 of this Disclosure Statement, which could adversely affect their operations. Although the Reorganizing Debtors believe that they have obtained the requisite approvals and permits for their existing operations and that their business is operated in accordance with applicable laws, the Reorganized Debtors remain subject to a varied and complex body of laws and regulations that both public officials and private individuals may seek to enforce. Existing laws and regulations may be revised or reinterpreted, or new laws and regulations may become applicable to the Reorganized Debtors that may have a negative effect on their business and results of operations.

(j)    Key Personnel

The success of the business of the Reorganized Debtors will be materially dependent upon the skills, experience, and efforts of its executive officer and senior management. The loss of one or more of these people could have a material adverse effect on its business, operating results, or financial condition.

(k)    Labor Relations Issues

The Reorganized Debtors may be subject to many of the costs and risks generally associated with the power plant labor forces. Although currently the Reorganizing Debtors have no direct employees (plant personnel are employed by third parties and dispatched to the plants), there can be no guarantee this will continue. If the Reorganized Debtors employ plant personnel, the Reorganized Debtors' operations may be disrupted as a result of strikes, lockouts, public demonstrations, or other negative actions. The Reorganized Debtors may also incur increased legal costs and indirect labor costs as a result of contract disputes or other events. The resolution of labor disputes could lead to increased labor costs, either by increases in wages or benefits or by changes in work rules that raise operating costs. The Reorganized Debtors may not have the ability to affect the outcome of these negotiations.

(l)    Capital Expenditures

The Reorganized Debtors will have an ongoing need to make potentially significant capital expenditures to remain competitive in the power generation marketplace or to comply with applicable laws or regulations.  The timing and costs of such capital expenditures may result in reduced operating performance during construction and may not improve the return on these investments.  These capital expenditures may also reduce the availability of cash for other purposes and are subject to cost overruns and delays.

(m)    Liquidity Risk Factors

(i)    Exit Facility

Disruptions in the capital and credit markets could adversely affect the ability of the Reorganized Debtors to close on the Exit Facility.  Even if the Reorganized Debtors close, these factors may continue to impact their ability to draw on the Exit Facility.  The Reorganized Debtors' access to funds under their Exit Facility Documentation will be dependent on the ability of the Exit Facility Lender(s) that will be parties to the facility to meet their funding commitments.  Those lender(s) may not be able to meet their funding commitments to the Reorganized Debtors if they experience shortages of capital and liquidity or if they experience excessive volumes of borrowing requests from the Reorganized Debtors and other borrowers within a short period of time.  Longer-term disruptions in the capital and credit markets as a result of uncertainty, changing or increased regulation, reduced alternatives or failures of significant financial institutions could adversely affect the Reorganized Debtors' access to liquidity needed for its business.  Any disruption could require the Reorganized Debtors to take measures to conserve cash until the markets stabilize or until alternative credit arrangements or other funding for its business needs can be arranged.  Such disruptions may also impact the capital needs of the Reorganized Debtors' vendors and third party manufacturers, which, in turn, could adversely affect the Reorganized Debtors' results of operations, cash flows and financial condition.

(ii)    Adverse Effect of Indebtedness on Financial Health and Operating Flexibility

The Reorganized Debtors' Exit Facility and/or Second Lien Note may affect their value, by, among other things: (w) limiting their ability to borrow additional amounts for working capital, capital expenditures, debt service requirements, execution of business strategy, to support surety bonds required for constructions, and development or other purposes; (x) limiting the Reorganized Debtors' ability to use operating cash flows in other areas of the business or to pay dividends; (y) increasing the vulnerability of the Reorganized Debtors to general adverse economic and industry conditions, including increases in interest rates; (z) limiting the Reorganized Debtors' ability to capitalize on business opportunities, reinvest in and develop the Reorganized Debtors' assets, and to react to competitive pressures and adverse changes in government regulation; (ww) limiting the Reorganized Debtors' ability, or increasing the costs, to restructure funded indebtedness; (xx) limiting the Reorganized Debtors' ability to enter into marketing and hedging transactions by reducing the number of potential counterparties to such

transactions as well as the volume of those transactions; and (yy) giving secured lenders the ability to foreclose on assets.

(iii)    Debt Restrictions and Covenants

The terms of the Reorganized Debtors' Exit Facility and/or Second Lien Note may require the Reorganized Debtors to satisfy certain customary affirmative and negative covenants and to meet financial ratios and tests including ratios and tests based on leverage, interest coverage, and net worth.  In addition, the covenants and other restrictions under the Exit Facility Documentation and/or Second Lien Note Documentation may limit the ability of the Reorganized Debtors to, among other things, incur indebtedness, create liens on assets, sell assets, manage cash flows, transfer assets to other subsidiaries, make capital expenditures, engage in mergers and acquisitions, and make distributions to equity holders.

Due to the current lending environment, the Chapter 11 Cases, the Reorganizing Debtors' financial condition, and general economic factors, the Reorganized Debtors' Exit Facility Documentation and/or Second Lien Note Documentation may contain restrictive operational and financial covenants, restrictions on the distribution of cash flows from properties serving as Collateral for the debt, and, in certain limited instances, higher interest rates.  These fees and cash flow restrictions may affect the ability of the Reorganized Debtors to fund their respective ongoing operations from operating cash flows and may significantly limit the operating and financial flexibility of the Reorganized Debtors as well as their ability to respond to business changes or competitive activities.

(iv)    Despite current anticipated indebtedness levels and restrictive covenants, the Reorganized Debtors may incur additional indebtedness in the future

Despite their current anticipated level of indebtedness, the Reorganized Debtors may be able to incur substantial additional indebtedness in the future, including additional secured indebtedness.  Although the terms of the Exit Facility and/or Second Lien Note may restrict the Reorganized Debtors from incurring additional indebtedness, these restrictions are subject to important exceptions and qualifications.   If the Reorganized Debtors incur additional indebtedness, the risks that it will face as a result of its leverage could intensify.

**Section 18.03. Avoidance Actions**

A bankruptcy trustee (or a debtor as a debtor in possession) may avoid as a preference a transfer of property made by a debtor to a creditor on account of an antecedent debt while a debtor was insolvent, where that creditor receives more than it would have received in a liquidation of the entity under chapter 7 had the payment not been made, if (i) the payment was made within ninety (90) days before the date the bankruptcy case was commenced or (ii) the creditor is found to have been an "insider," as defined in the Bankruptcy Code, within one year before the commencement of the bankruptcy case.  A debtor is presumed to have been insolvent during the ninety (90) days preceding the commencement of the case.

A bankruptcy trustee (or a debtor as a debtor in possession) may avoid as a fraudulent transfer a transfer of property made by a debtor within two (2) years (and under applicable state laws, longer) before the date the bankruptcy case was commenced if a debtor (a) received less

than reasonably equivalent value in exchange for such transfer and (b) was insolvent on the date of such transfer or became insolvent as a result of such transfer, such transfer left a debtor with an unreasonably small capital, or a debtor intended to incur debts that would be beyond a Debtors' ability to pay as such debts matured.

Except as expressly released by the Plan, Final DIP Order, Confirmation Order or other Final Order, all Causes of Action (other than Avoidance Actions, which are being released) for the Reorganizing Debtors are being retained by the Reorganized Debtors, and the Reorganized Debtors may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) any or all of such Causes of Action.  To date, the Reorganizing Debtors may not have conclusively identified all potential Avoidance Actions prior to their decision to release such Avoidance Actions under the Plan.

## Section 18.04. Intercompany Claims

Pursuant to Section 13.07 of the Plan and Bankruptcy Rule 9019 (and consistent with the provisions of **Error! Reference source not found.** of the Plan), the Reorganizing Debtors propose a good faith compromise and settlement of the Intercompany Claims pursuant to the provisions the Plan.  On the Effective Date, the Intercompany Claims shall be cancelled, extinguished and discharged and the holders of Intercompany Claims shall not receive or retain any property under the Plan on account of such Intercompany Claims.  If Confirmation and Consummation do not occur, the Intercompany Claims will not be settled and compromised under the Plan.

## Section 18.05. Disclosure Statement Disclaimer

(a)    Information Contained Herein is for Soliciting Votes

The information contained in this Disclosure Statement is for the purpose of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

(b)    Disclosure Statement Was Not Approved by the SEC

This Disclosure Statement was not filed with the SEC nor is it required to be.  Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the Exhibits or the statements contained herein, and any representation to the contrary is unlawful.

(c)    Disclosure Statement May Contain Forward Looking Statements

This Disclosure Statement may contain "forward looking statements."  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," the negative thereof, or other variations thereon or comparable terminology.

The Reorganizing Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the pendency of the Chapter 11 Cases;

- results of litigation;

- business strategy;

- contractual obligations; and

- projected and estimated liability costs, including tort, and environmental costs and costs of environmental remediation.

Statements concerning these and other matters are not guarantees of the Reorganized Debtors' future performance. The reader is cautioned that all forward-looking statements are necessarily speculative. The Liquidation Analysis and the other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to holders of Allowed Claims and Equity Interests may be affected by many factors that cannot be predicted. Forward-looking statements represent the Reorganizing Debtors' estimates and assumptions only as of the date such statements were made. There are risks, uncertainties, and other important factors that could cause the Reorganized Debtors' actual performance or achievements to be materially different from those they may project, and the Reorganized Debtors undertake no obligation to update any such statement.

(d)     No Legal or Tax Advice Is Provided to You by This Disclosure Statement

**THIS DISCLOSURE STATEMENT IS NOT LEGAL ADVICE TO YOU**. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan (including the Subplans therein) or object to Confirmation.

(e)     No Admissions Made

The information and statements contained in this Disclosure Statement shall neither (1) constitute an admission of any fact or liability by any entity (including the Reorganizing Debtors) nor (2) be deemed evidence of the tax or other legal effects of the Plan on the Reorganizing Debtors or the Reorganized Debtors, as applicable, holders of Allowed Claims or Equity Interests, or any other parties-in-interest.

(f)     Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Reorganizing Debtors reserve the right to continue to investigate Claims and Equity Interests and file and prosecute objections to Claims and Equity Interests.

(g)      No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a holder of an Allowed Claim or Equity Interest for or against the Plan does not constitute a waiver or release of any Claims or rights of the Reorganizing Debtors or the Reorganized Debtors, as applicable, to object to that holder's Allowed Claim or Equity Interest, or to bring Causes of Action or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of Action of the Reorganizing Debtors, the Reorganized Debtors or their respective Estates are specifically or generally identified herein, except as expressly released by the Plan, Final DIP Order, Confirmation Order or other Final Order.

(h)      Information Was Provided by the Reorganizing Debtors and Was Relied Upon by the Reorganizing Debtors' Advisors

Counsel to, and other advisors retained by, the Reorganizing Debtors have relied upon information provided by the Reorganizing Debtors in connection with the preparation of this Disclosure Statement.  Although counsel to, and other advisors retained by the Reorganizing Debtors, have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

(i)      Potential Exists for Inaccuracies and the Reorganizing Debtors Have No Duty to Update

The Reorganizing Debtors make the statements contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since such date.  Although the Reorganizing Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Reorganizing Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Reorganizing Debtors may subsequently update the information in this Disclosure Statement, the Reorganizing Debtors have no affirmative duty to do so unless ordered by the Bankruptcy Court.

(j)      No Representations Outside of this Disclosure Statement Are Authorized

No representations concerning or relating to the Reorganizing Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  In deciding whether to vote to accept or reject the Plan, you should not rely upon any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, unless otherwise indicated herein.

# ARTICLE XIX

# CONFIRMATION AND CONSUMMATION PROCEDURE

## Section 19.01. Plan Objection Deadline

The Bankruptcy Court has established 4:00 p.m. prevailing Eastern Time on June [15], 2015, as the deadline to object to confirmation of the Plan (the "***Plan Objection Deadline***").  All such objections must be filed with the Bankruptcy Court and served on the Reorganizing Debtors, counsel to the DIP Lenders and the Pre-Petition Secured Parties, and certain other parties in interest in accordance with the Disclosure Statement Order and Solicitation Procedures so that they are actually received on or before the Plan Objection Deadline.  The Reorganizing Debtors believe the Plan Objection Deadline, as established by the Bankruptcy Court, affords the Bankruptcy Court, the Reorganizing Debtors, and other parties in interest reasonable time to consider the objections to the Plan before a Confirmation Hearing.

## Section 19.02. Confirmation Hearing

Assuming the requisite acceptances are obtained for the Plan (including the Subplans contained therein), the Reorganizing Debtors intend to seek Confirmation of the Plan at the Confirmation Hearing to be held on June [24], 2015, 10:00 a.m. prevailing Eastern Time, before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, in Courtroom No. 1 of the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Wilmington, Delaware 19801.  The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the entities who have filed objections to the Plan, without further notice to other parties in interest.  The Bankruptcy Court, in its discretion and before a Confirmation Hearing, may put in place additional procedures governing such hearing.  The Plan may be modified, if necessary, before, during, or as a result of the hearing to confirm the Plan without further notice to parties in interest.

## Section 19.03. Plan Confirmation Requirements Under the Bankruptcy Code

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of chapter 11 of the Bankruptcy Code that must be satisfied in order for a plan to be confirmed.  Specifically, in addition to other applicable requirements, the Reorganizing Debtors believe that the Plan complies with the applicable provisions of the Bankruptcy Code and satisfies or will satisfy the following requirements of section 1129 of the Bankruptcy Code:

> (i)     the Reorganizing Debtors, as the proponents of the Plan, have complied with the applicable provisions of the Bankruptcy Code;

> (ii)    the Plan has been proposed in good faith and not by any means forbidden by law;

> (iii)   any payment made or promised by the Reorganizing Debtors or by a person acquiring property under the Plan for services or for costs and

expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment: (a) made before the Confirmation of the Plan is reasonable; or (b) is subject to the approval of the Bankruptcy Court as reasonable, if such payment is to be fixed after Confirmation of the Plan.

(iv)    the Reorganizing Debtors, as proponents of the Plan, will disclose the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as a director, officer, or voting trustee of the Reorganized Debtors, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and with public policy;

(v)     the Reorganizing Debtors will disclose the identity of any insider that will be employed or retained as or by the Reorganized Debtors and the nature of any compensation for such insider;

(vi)    each holder of an Impaired Claim or Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Equity Interest, property of a value as of the Effective Date that is not less than the amount such holder would receive or retain if the Reorganizing Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code (the "best interests" test);

a.    the starting point in determining whether the Plan meets the "best interests" test is a determination of the amount of proceeds that would be generated from the hypothetical liquidation of the Reorganizing Debtors' assets in the context of a chapter 7 liquidation (such amount, the "*Liquidation Proceeds*").  The Liquidation Proceeds must then be reduced by the costs of such liquidation, including costs incurred during the Chapter 11 Cases and allowed under chapter 7 of the Bankruptcy Code (such as Professionals' fees and expenses, a chapter 7 trustee's fees and the fees and expenses of professionals retained by the chapter 7 trustee).  The potential chapter 7 liquidation distribution in respect of each class must be reduced further by costs imposed by the delay caused by conversion to chapter 7.  In addition, inefficiencies in the claims resolution process in a chapter 7 liquidation would negatively impact the recoveries of creditors.  The net present value of a hypothetical chapter 7 liquidation distribution in respect of an Impaired Claim or Equity Interest is then compared to the recovery provided by the Plan for such Impaired Claim or Equity Interest;

b.    to support their opinion that the Plan meets the best interests test for the Reorganizing Debtors, the Reorganizing Debtors have prepared the Liquidation Analysis attached as **Exhibit D** hereto.  Based on this, the

Reorganizing Debtors are of the opinion that the Plan meets the best interests test for the Reorganizing Debtors;

(vii)     except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code, each Class of Claims or Equity Interests either has accepted the Plan or is not an Impaired Class under the Plan;

(viii)    except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims, Priority Tax Claims and Other Priority Claims will be paid in full or otherwise treated in accordance with section 1129(a)(9) of the Bankruptcy Code;

(ix)      at least one Impaired Class of Claims has accepted or has been deemed to accept the Plan or there is no Impaired non-consenting Class of Claims in accordance with section 1129(a)(10) of the Bankruptcy Code;

(x)       Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of any successor to the Reorganizing Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.  To support their opinion that the Plan is not likely to be followed by liquidation or the need for further financial reorganization, except as contemplated by the Plan, the Reorganizing Debtors have prepared the Financial Projections attached as **Exhibit C** hereto.  Based on this, the Reorganizing Debtors believe that the Reorganizing Debtors or Reorganized Debtors, as applicable, will be able to make all payments required under the Plan, and that Confirmation is not likely to be followed by liquidation or the need for further reorganization; and

(xi)      All fees payable under 28 U.S.C. § 1930, including the fees of the U.S. Trustee, have been paid or will be paid as of the Effective Date.

## Section 19.04. "Cramdown" Under Section 1129(b) of the Bankruptcy Code

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a chapter 11 plan of reorganization even if not all impaired classes have accepted the plan, provided that such plan has been accepted or deemed to accept by at least one impaired class.  The Reorganizing Debtors will seek to confirm the Subplan(s) notwithstanding their rejection by any of the Impaired Classes.

In order to obtain such nonconsensual confirmation (or "cramdown") of the Subplan(s), the Reorganizing Debtors must demonstrate to the Bankruptcy Court that the applicable Subplan(s) "does not discriminate unfairly" and is "fair and equitable" with respect to each Impaired Class that voted to reject the Subplan(s) (each such Impaired Class, a "***Non-Accepting Class***").

(a)    <u>Fair and Equitable Test</u>

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable" and sets different standards for secured creditors, unsecured creditors, and equity holders, as follows:

(i)    Secured Creditors

With respect to Non-Accepting Classes of secured claims, the "fair and equitable" test requires that either: (x) each impaired secured creditor retains the liens securing its allowed secured claim and receives on account of that claim deferred cash payments having a present value equal to the amount of its allowed secured claim; (y) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (x) or (y) of this paragraph; or (z) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim.

(ii)    Unsecured Creditors

With respect to Non-Accepting Classes of unsecured claims, the "fair and equitable" test requires that: (x) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim; or (y) the holders of any claims (or equity interests) that are junior to the Non-Accepting Class will not receive any property under the Plan. (This provision is often referred to as the "absolute priority" rule.)

(iii)    Equity Interests

With respect to the classes of equity interests, the "fair and equitable" test requires that: (x) the Plan provides that each holders of an allowed equity interest receives or retains on account of such allowed equity interest property of a value, as of the Effective Date of the Plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such allowed equity interest; or (y) the holder of any allowed equity interest that is junior to the allowed equity interest of such class will not receive or retain any property under the Plan on account of such junior interest.

(b)    <u>No Unfair Discrimination</u>

A plan does not "discriminate unfairly" with respect to a Non-Accepting Class if the value of the cash and/or securities to be distributed to the class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the Non-Accepting Class.  Exact parity is not required.  The Reorganizing Debtors believe that any discrepancy in treatment or potential distributions to holders of Claims is justified based on certain inherent differences in the nature of their Claims, the time that will be required to liquidate their Claims, and the relative levels of risk that are being taken by different creditors simply based upon the time it will take to liquidate their Claims.

To the extent necessary, the Reorganizing Debtors will establish at the Confirmation Hearing that each of these requirements has been satisfied under the Plan.

**Section 19.05.** **Liquidation Analysis; Financial Projections; Valuation**

(a)        Liquidation Analysis

The Bankruptcy Code permits a plan to be confirmed only if the plan provides recoveries that are not less than any recoveries that could be obtained in a chapter 7 liquidation. For purposes of determining whether the Plan meets this requirement, the Reorganizing Debtors, in consultation with their financial advisors, have prepared an unaudited Liquidation Analysis for the Reorganizing Debtors, which is attached hereto as **Exhibit D**, to assist holders of Claims in evaluating the Subplans for the Reorganizing Debtors. The Liquidation Analysis compares the projected creditor recoveries that would result from the liquidation of the Reorganizing Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to holders of Allowed Claims and Equity Interests under the Subplans for the Reorganizing Debtors. The Liquidation Analysis is based on the value of the Reorganizing Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date. Further, the analysis is subject to potentially material changes, including with respect to economic and business conditions and legal rulings. Therefore, the actual liquidation value of the Reorganizing Debtors could vary materially from the estimate provided in the Liquidation Analysis.

Underlying the Liquidation Analysis is a number of estimates and assumptions that, although developed and considered reasonable by the Reorganizing Debtors, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Reorganizing Debtors and their management. The Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are subject to change and significant economic and competitive uncertainties and contingencies beyond the control of the Reorganizing Debtors and their management. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the results of a liquidation of the Reorganizing Debtors. Accordingly, the values reflected might not be realized if the Reorganizing Debtors were, in fact, to be liquidated. The chapter 7 liquidation period for the Reorganizing Debtors is assumed to average three (3) months, following the appointment of a chapter 7 trustee, allowing for, among other things, the discontinuation and wind-down of operations, the sale of the operations, the sale of assets and the collection of receivables. All holders of Claims that are entitled to vote to accept or reject the Subplan(s) for the Reorganizing Debtor(s) are urged to examine carefully all of the assumptions on which the Liquidation Analysis is based in connection with their evaluation of the Plan.

The Reorganizing Debtors believe that the Plan provides a greater recovery for holders of Allowed Claims and Equity Interests than would be achieved in liquidation under chapter 7 of the Bankruptcy Code. This belief is based on a number of considerations, including: (a) the Reorganizing Debtors' assets would have a substantially reduced value in a chapter 7 liquidation; (b) the Administrative Claims would significantly increase as a result of conversion to a chapter 7 case; (c) the delays caused by a chapter 7 liquidation; and, perhaps most importantly, (d) the Consultation Parties' consent to fund Cash distributions to junior Classes of Claims despite not being paid in full under the Plan on account of their Pre-Petition Secured Parties Secured Claims. The Reorganizing Debtors believe there is insufficient value to fund these Cash distributions to creditors in a chapter 7 liquidation.

(b)    Financial Projections

The Bankruptcy Code permits a plan to be confirmed only if confirmation is not likely to be followed by liquidation or the need for further financial reorganization except to the extent provided for in a plan. For purposes of determining whether the Plan meets this requirement, the Reorganizing Debtors, in consultation with their financial advisors, have analyzed their ability to meet their obligations under the Plan.

The Reorganizing Debtors, in consultation with their financial advisors, have prepared Financial Projections for the Reorganizing Debtors, which are attached hereto as **Exhibit C**, to assist holders of Claims in evaluating the Subplans for the Reorganizing Debtors for each of the five (5) fiscal years from 2015 through 2019. The Reorganizing Debtors believe the Financial Projections demonstrate that the Reorganized Debtors will be able to make all payments required pursuant to the Plan while conducting ongoing business operations and, therefore, that Confirmation of the Plan would not likely be followed by liquidation or the need for further reorganization. The Financial Projections are based on the assumption that the Plan will be confirmed by the Bankruptcy Court and, for projection purposes, the Effective Date would be July 31, 2015.

THE FINANCIAL PROJECTIONS INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, WOULD BE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WOULD BE REALIZED. THE REORGANIZING DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS.

The Reorganizing Debtors have prepared the Financial Projections based upon certain assumptions that they believe are reasonable under the circumstances. The Financial Projections have been prepared by the Reorganizing Debtors' management, in conjunction with their advisors, and will not be examined or compiled by independent accountants. The Reorganizing Debtors make no representation as to the accuracy of the Financial Projections, or the Reorganizing Debtors' ability to achieve the projected results. Many of the assumptions on which the Financial Projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Reorganizing Debtors and their management. Inevitably, some assumptions may not materialize and unanticipated events and circumstances could affect the actual financial results. Therefore, the actual results achieved throughout the five-year period of the Financial Projections could vary from the projected results and the variations could be material. All holders of Claims that are entitled to vote to accept or reject the Subplans are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of the Plan.

(c)    Valuation of the Reorganizing Debtors

The Reorganizing Debtors' efforts to market the Gas Plant Portfolio evidence that the Reorganizing Debtors' Assets are worth substantially less than the Allowed Pre-Petition Secured

Parties Secured Claims.  The Plan, if confirmed, will provide the Pre-Petition Secured Parties with the Second Lien Note and ownership of the Gas Plant Portfolio (via the Newco Equity Interests) in exchange for the Allowed Pre-Petition Secured Parties Secured Claims against the Reorganizing Debtors.  The Reorganizing Debtors believe the Pre-Petition Secured Parties will receive substantially less than a full recovery on account of their Claims under the Plan.

**Section 19.06. Notice to Holders of Claims and Equity Interests**

Approval by the Bankruptcy Court of this Disclosure Statement means that the Bankruptcy Court has found that this Disclosure Statement contains information of a kind and in sufficient and adequate detail to enable holders of Claims entitled to vote on the Subplan(s) to make an informed judgment about whether to accept or reject the applicable Subplan(s).  **THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR THEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.**

**IF THE PLAN IS APPROVED BY THE REQUISITE VOTE OF HOLDERS OF CLAIMS OR EQUITY INTERESTS ENTITLED TO VOTE AND IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE REORGANIZING DEBTORS, WHETHER OR NOT THEY WERE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN.  THUS ALL HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE REORGANIZING DEBTORS ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES, SUPPLEMENTS AND/OR EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.**

**THIS DISCLOSURE STATEMENT AND THE PLAN ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN.**  No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Reorganizing Debtors other than the information contained herein or therein.  No such information should be relied upon in making a determination to vote to accept or reject the Plan.

**ARTICLE XX**

**ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

If any Subplan(s) cannot be confirmed, the Reorganizing Debtors may seek to: (1) prepare and present to the Bankruptcy Court an alternative chapter 11 plan for confirmation; and/or (2) effect an alternative transaction, including, potentially, not opposing an attempt by the Pre-Petition Secured Parties to seek relief from the automatic stay to exercise their rights in their Collateral.  Any attempt to formulate an alternative chapter 11 plan, or alternative relief, would

necessarily delay creditors' receipt of distributions and, due to the incurrence of additional administrative expenses during such period of delay, may provide for smaller distributions to holders of Allowed Claims than are currently provided for under the Plan. Accordingly, the Reorganizing Debtors believe that the Plan will enable all creditors to realize the greatest possible recovery on their respective Claims or Equity Interests with the least delay.

## ARTICLE XXI

## CERTAIN SECURITIES LAWS MATTERS

Under the Plan, the Pre-Petition Secured Parties will receive the Newco Equity Interests, and Newco will receive the Reorganized AC Equity Interests and the Reorganized CB 4 Equity Interests. These Equity Interests shall be considered duly authorized, validly issued, fully paid, and non-assessable when issued pursuant to the Plan.

The offering, sale and issuance of the Newco Equity Interests, the Reorganized AC Equity Interests and the Reorganized CB 4 Equity Interests shall be exempt from securities laws registration requirements pursuant to Section 4(2) of the Securities Act and, to the extent applicable, Regulation D promulgated thereunder, and Section 18 of the Securities Act with respect to similar state securities or "blue sky" laws. Section 4(2) of the Securities Act exempts from registration transactions by an issuer not involving a public offering. Regulation D similarly exempts from the registration requirements of the Securities Act private offerings by an issuer of securities to "accredited investors," as such term is defined under Regulation D, and to certain other qualified investors. Equity Interests issued pursuant to an exemption from registration pursuant to section 4(2) or Regulation D will be deemed "restricted securities" and may not be resold without registration under the Securities Act or pursuant to an exemption therefrom.

The offering, issuance and distribution of the Newco Equity Interests, the Reorganized AC Equity Interests and the Reorganized CB 4 Equity Interests shall also be exempt from the registration requirements of section 5 of the Securities Act, to the extent applicable, pursuant to section 1145 of the Bankruptcy Code. In general, offers and issuances of securities made in reliance on the exemption afforded under section 1145(a) of the Bankruptcy Code are deemed to be made in a public offering. Accordingly, the Newco Equity Interests, the Reorganized AC Equity Interests and the Reorganized CB 4 Equity Interests can be resold without registration under the Securities Act or other federal securities laws, unless the holder of the Equity Interests is an "underwriter" with respect to Equity Interests, within the meaning of section 1145(b)(1) of the Bankruptcy Code or similar federal, state, local, or foreign laws.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who: (a) purchases a claim against, an interest in, or a claim for an administrative expense in the case concerning, the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest; (b) offers to sell securities offered under a plan of reorganization for the holders of those securities; (c) offers to buy those securities from the holders of the securities, if the offer to buy is (i) with a view to distributing those securities and (ii) under an agreement made in connection with the plan of reorganization, or with the offer or

sale of securities under the plan of reorganization; or (d) is an "issuer" with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

To the extent that holders of the Newco Equity Interests, the Reorganized AC Equity Interests and the Reorganized CB 4 Equity Interests are deemed to be "underwriters," resales by such holders may not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code.  Those holders may, however, be permitted to sell such Newco Equity Interests, Reorganized AC Equity Interests and Reorganized CB 4 Equity Interests, without registration, subject to the provisions of Rule 144 under the Securities Act, which permit the public sale of securities received pursuant to a plan of reorganization by "underwriters," subject to the availability to the public of current information regarding the issuer, volume limitations and certain other conditions.  Whether or not any holder would be deemed to be an "underwriter" with respect to the Newco Equity Interests, Reorganized AC Equity Interests and Reorganized CB 4 Equity Interests being offered, sold, distributed or issued under the Plan would depend upon various facts and circumstances applicable to that holder.  Accordingly, the Reorganizing Debtors express no view as to whether any holder would be an "underwriter" with respect to the Newco Equity Interests, Reorganized AC Equity Interests and Reorganized CB 4 Equity Interests being offered, sold, distributed or issued under the Plan, and the Reorganizing Debtors make no representation concerning the ability of any particular person to resell such Equity Interests.  **YOU SHOULD CONFER WITH YOUR OWN LEGAL ADVISORS TO HELP DETERMINE WHETHER OR NOT YOU ARE AN "UNDERWRITER" OR MAY FREELY TRADE SUCH SECURITIES.**

## ARTICLE XXII

## CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion is a summary of certain material U.S. federal income tax consequences of the Consummation of the Plan to the Reorganizing Debtors and to certain holders of Allowed Claims.  This summary is based on the Internal Revenue Code of 1986, as amended (the "*IRC*"), the Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the IRS and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Reorganizing Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed in this Disclosure Statement.

This discussion does not address the U.S. federal income tax consequences to holders of Allowed Claims that are (a) Unimpaired or otherwise entitled to payment in full in Cash on the Effective Date under the Plan, or (b) deemed to reject the Plan.  For the avoidance of doubt, Allowed Claims include any Disputed Claim when such Claim becomes Allowed under the Plan.

The following discussion does not address the U.S. federal income tax consequences to holders of Allowed Claims that are not U.S. Holders.  For purposes of this discussion, a "**U.S. Holder**" is a holder that is: (a) an individual citizen or resident of the United States for U.S. federal income tax purposes; (b) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof, or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (i) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more U.S. persons have authority to control all substantial decisions of the trust or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person. This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Reorganizing Debtors or to certain holders of Allowed Claims in light of their individual circumstances, nor does it address tax issues with respect to such holders that are subject to special treatment under the U.S. federal income tax laws (including, without limitation, banks, governmental authorities or agencies, pass-through entities (such as partnerships or disregarded entities), brokers, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, mutual funds, small business investment companies, and regulated investment companies and those holding, or who will hold, Allowed Claims as part of a hedge, straddle, conversion, or constructive sale transaction).  Furthermore, the following discussion does not purport to address any aspect of state, local, estate, gift, foreign, or other tax law.  Lastly, the following discussion assumes (a) each holder of an Allowed Claim holds its Claim as a "capital asset" (generally, property held for investment) within the meaning of Section 1221 of the IRC, and (b) the debt obligations(s) underlying each Allowed Claim is properly treated as debt (rather than equity) of the related Reorganizing Debtor(s) for U.S. federal income tax purposes.

If a holder is a partnership or a disregarded entity for U.S. federal income tax purposes, the tax treatment of a partner in or owner of such entity generally will depend upon the status of the partner or owner, and the activities of the entity.  Partners or owners of other pass-through entities that are holders of Allowed Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF A HOLDER OF AN ALLOWED CLAIM.  ALL HOLDERS OF ALLOWED CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, NON-U.S., AND OTHER TAX CONSEQUENCES OF THE PLAN.**

## Section 22.01. Certain Material U.S. Federal Income Tax Consequences to the Reorganizing Debtors

Each Reorganizing Debtor is an entity disregarded as separate from its beneficial owner as determined for U.S. federal income tax purposes.  Accordingly, all assets and liabilities of each Reorganizing Debtor are treated as assets and liabilities of its beneficial owner as

determined for U.S. federal income tax purposes.  As such, the Reorganizing Debtors themselves are not subject to U.S. federal income tax, but rather operate as unincorporated divisions of their beneficial owners as determined for U.S. federal income tax purposes.  Each Reorganizing Debtor's taxable income (or loss) is included in the U.S. federal income tax return filed by its beneficial owner as determined for U.S. federal income tax purposes.  Consequently, the transactions contemplated by the Plan should be treated for U.S. federal income tax purposes as though they were effected directly by the beneficial owners of the Reorganizing Debtors and should not have any U.S. federal income tax consequences to the Reorganizing Debtors.

### Section 22.02. Certain Material U.S. Federal Income Tax Consequences to U.S. Holders of Certain Allowed Claims and Disputed Claims

(a)     Consequences to the U.S. Holders of Allowed Claims

The discussion of certain material U.S. federal income tax consequences to the U.S. Holders of Allowed Claims in this Section 22.02(a) does not address the tax consequences of the Plan to holders of Allowed Claims who also own Equity Interests in the Reorganizing Debtors, including holders of Allowed Claims in Class AC 1 and Class CB 1.

With respect to each U.S. Holder of an Allowed Claim, such U.S. Holder should recognize gain or loss equal to the difference between (i) Cash received in exchange for its Allowed Claims (other than any claim for accrued but unpaid interest and imputed interest) and (ii) such U.S. Holder's adjusted tax basis in the Allowed Claims surrendered by such U.S. Holder (other than basis attributable to accrued but unpaid interest previously included in the U.S. Holder's taxable income).

The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Allowed Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to its Allowed Claim.  See the discussions of "accrued interest" and "market discount" below.  Such gain may be long-term capital gain or loss if the Allowed Claim has been held for more than one year.  Each U.S. Holder of an Allowed Claim should consult its own tax advisor to determine the character of the gain or loss recognized.

(b)     Consequences to the U.S. Holders of Disputed Claims

The Reorganizing Debtors Claims Reserve will hold Cash sufficient to fund, among other things, the anticipated Allowed amount of Disputed Claims against the Reorganizing Debtors (the "***Reorganizing Debtors Disputed Claims Reserve***").  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Reorganizing Debtors Disputed Claims Reserves is intended to be treated, for U.S. federal income tax purposes, as a disputed ownership fund within the meaning of Treasury Regulations Section 1.468B-9(b)(1).  If so treated, the Reorganizing Debtors Disputed Claims Reserve will be subject to tax on its income as provided by the regulations governing disputed ownership funds.  A U.S. Holder of a Disputed Claim should not be deemed to receive any payment of Cash from the Reorganizing Debtors Disputed Claims Reserve until, and then only to the extent that, Cash is transferred to

such U.S. Holder in satisfaction of its Claim Allowed under the Plan.  At such time, such U.S. Holder should recognize gain or loss equal to the difference between (i) Cash received in exchange for its Claims allowed under the Plan (other than any claim for accrued but unpaid interest and imputed interest) and (ii) such U.S. Holder's adjusted tax basis in such Claims (other than basis attributable to accrued but unpaid interest previously included in the U.S. Holder's taxable income).  Recipients of amounts from the Reorganizing Debtors Disputed Claims Reserve should report these amounts consistently with the foregoing and should consult their tax advisors concerning the federal, state, local, and other tax consequences of the receipt of amounts from the Reorganizing Debtors Disputed Claims Reserve.

(c)    Accrued Interest

A portion of the consideration received by the U.S. Holders of Allowed Claims may be attributable to accrued interest on such Allowed Claims.  Such amount may be taxable to that holder as interest income if such accrued interest has not been previously included in such U.S. Holder's gross income for U.S. federal income tax purposes.  Conversely, U.S. Holders of Allowed Claims may be able to recognize a deductible loss to the extent any accrued interest on the Allowed Claims was previously included in such U.S. Holder's gross income but was not paid in full by the Reorganizing Debtors.

If the fair market value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued interest is unclear.  Under Section 7.07 of the Plan, the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to accrued but unpaid interest on such Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for U.S. federal income tax purposes, however, the applicable Treasury Regulations generally treat payments as allocated first to any accrued but unpaid interest and then as a payment of principal.  The IRS could take the position that the consideration received by the U.S. Holder should be allocated other than as provided in the Plan.  U.S. Holders of Allowed Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

**Section 22.03. Market Discount**

Under the "market discount" provisions of the IRC, some or all of any gain realized by a U.S. Holder of an Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" constituting the Allowed Claim.  In general, a debt instrument is considered to have been acquired by a U.S. Holder with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

**Section 22.04. Withholding**

All distributions to U.S. Holders of Allowed Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable backup withholding rate (currently 28%). Backup withholding generally applies if the U.S. Holder (a) fails to furnish its social security number or other taxpayer identification number ("*TIN*"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is correct and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF AN ALLOWED CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES. ALL HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-US, OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## ARTICLE XXIII

## CONCLUSION AND RECOMMENDATION

The Reorganizing Debtors believe that Confirmation and implementation of the Plan is preferable to any of the alternatives described herein because it will provide the greatest recovery to holders of Claims and Equity Interests. Other alternatives would involve significant delay, erosion of value, uncertainty and substantial administrative costs and are likely to reduce any return to holders of Impaired Claims and Equity Interests. The Reorganizing Debtors urge the holders of Claims entitled to vote on the Subplans to vote to accept the Subplans and to evidence such acceptance by casting their Ballots as set forth in the instructions enclosed with the Ballots so that they will be received by the Voting Deadline.

Dated: May 6, 2015
Wilmington, Delaware

Respectfully submitted,

Optim Energy Cedar Bayou 4, LLC

By: _____

     Name:  Nicholas R. Rahn
     Title:   Manager

Optim Energy Altura Cogen, LLC

By: _____

     Name:  Nicholas R. Rahn
     Title:   Manager