## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Optim Energy, LLC, *et al.*, | Case No. 14-10262 (BLS) |
| Debtors.[1] | (Jointly Administered) |

## DISCLOSURE STATEMENT FOR FIRST AMENDED JOINT PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**BRACEWELL & GIULIANI LLP**

Kurt Mayr (admitted *pro hac vice*)
Mark E. Dendinger (admitted *pro hac vice*)
CityPlace I, 34th Floor
185 Asylum Street
Hartford, Connecticut 06103
Telephone: (860) 947-9000
Facsimile: (800) 404-3970

-and-

Robert G. Burns (admitted *pro hac vice*)
1251 Avenue of Americas, 49th Floor
New York, New York 10020-1104
Telephone: (212) 508-6100
Facsimile: (800) 404-3970

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

Robert J. Dehney (No. 3578)
Eric D. Schwartz (No. 3134)
Erin R. Fay (No. 5268)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Counsel to Optim Energy, LLC, OEM 1, LLC, Optim Energy Marketing, LLC, Optim Energy Generation, LLC, Optim Energy Twin Oaks GP, LLC and Optim Energy Twin Oaks, LP*

Dated: August 21, 2015

---

[1] The Debtors in these chapter 11 cases are: Optim Energy, LLC; OEM 1, LLC; Optim Energy Cedar Bayou 4, LLC; Optim Energy Altura Cogen, LLC; Optim Energy Marketing, LLC; Optim Energy Generation, LLC; Optim Energy Twin Oaks GP, LLC; and Optim Energy Twin Oaks, LP. The Debtors' main corporate and mailing address for purposes of these chapter 11 cases is: c/o Competitive Power Ventures, Inc., 8403 Colesville Road, Suite 915, Silver Spring, MD 20910.

**DISCLAIMER**

THIS DISCLOSURE STATEMENT[2] IS BEING DISTRIBUTED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN FROM THE PARTIES ENTITLED TO VOTE ON THE PLAN.  A COPY OF THE PLAN IS ATTACHED HERETO AS **EXHIBIT A**. ALTHOUGH STYLED AS A "JOINT" PLAN, THE PLAN CONSISTS OF TWO SEPARATE SUBPLANS (ONE FOR OPTIM ENERGY AND, BY VIRTUE OF THE MERGER, FOR THE MERGING DEBTORS, AND ONE FOR TWIN OAKS LP), AND EACH LIQUIDATING DEBTOR AND MERGING DEBTOR IS A PROPONENT OF THE PLAN WITHIN THE MEANING OF SECTION 1129 OF THE BANKRUPTCY CODE IN ITS RESPECTIVE CHAPTER 11 CASE.  EACH SUBPLAN IS INDEPENDENTLY SUBJECT TO THE REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE.

PURSUANT TO SECTION 1128 OF THE BANKRUPTCY CODE, A CONFIRMATION HEARING WILL BE HELD WITH RESPECT TO THE PLAN (INCLUDING THE SUBPLANS CONTAINED THEREIN) ON **[__], 2015 AT [__]:[__] [__].M. PREVAILING EASTERN TIME** BEFORE THE HONORABLE BRENDAN L. SHANNON, CHIEF UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 NORTH MARKET STREET, 6TH FLOOR, WILMINGTON, DELAWARE 19801.  OBJECTIONS TO CONFIRMATION OF THE PLAN (INCLUDING THE SUBPLANS CONTAINED THEREIN) MUST BE FILED AND SERVED NO LATER THAN **[__], 2015 AT [__]:[__] [__].M. PREVAILING EASTERN TIME** IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER, OR ELSE THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.  THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME WITHOUT FURTHER NOTICE.

ALL HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE ON A SUBPLAN(S) ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE SUBPLAN(S).  TO BE COUNTED, THE BALLOT INDICATING ACCEPTANCE OR REJECTION OF A SUBPLAN(S) MUST BE RECEIVED BY PRIME CLERK, LLC, THE CLAIMS AND SOLICITATION AGENT, NO LATER THAN **[__], 2015 AT [__]:[__] [__].M. PREVAILING EASTERN TIME**.

THERE CAN BE NO ASSURANCE AS TO WHETHER OR WHEN CONFIRMATION OF THE SUBPLAN(S) ACTUALLY WILL OCCUR.  IF EITHER SUBPLAN IS NOT CONFIRMED, THEN THE LIQUIDATING DEBTORS RESERVE THE RIGHT TO EITHER (A) REQUEST THAT THE OTHER SUBPLAN BE CONFIRMED OR (B) WITHDRAW ANY OF THE SUBPLAN(S).  THE LIQUIDATING DEBTORS' INABILITY TO CONFIRM OR ELECTION TO WITHDRAW ANY SUBPLAN(S) SHALL NOT IMPAIR THE CONFIRMATION OF ANY OTHER SUBPLAN(S).

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *First Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code*, attached hereto as **Exhibit A**.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NONBANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT HAS BEEN NEITHER REVIEWED NOR APPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "*SEC*"), OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY OTHER SUCH STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE SUBPLAN(S).  NO SOLICITATION OF VOTES TO ACCEPT THE SUBPLAN(S) MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO OR HAVE BEEN, OR WILL BE, SEPARATELY FILED WITH THE BANKRUPTCY COURT.  ALTHOUGH THE LIQUIDATING DEBTORS AND THE MERGING DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER SUCH DOCUMENTS, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN AND CONTROL FOR ALL PURPOSES. EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BASED UPON INFORMATION THAT IS PUBLICLY AVAILABLE OR PROVIDED BY THE LIQUIDATING DEBTORS' AND THE MERGING DEBTORS' MANAGEMENT.  THE LIQUIDATING DEBTORS AND/OR THE MERGING DEBTORS MAY HAVE NOT INDEPENDENTLY VERIFIED ALL OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, AND, AS SUCH, MAKE NO REPRESENTATION OR WARRANTY THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE LIQUIDATION ANALYSIS ATTACHED HERETO AS **EXHIBIT B** (THE "*LIQUIDATION ANALYSIS*") HAS BEEN OR WILL BE PREPARED BY THE LIQUIDATING DEBTORS' AND THE MERGING DEBTORS' MANAGEMENT IN CONSULTATION WITH THEIR ADVISORS.  THE ESTIMATES AND ANALYSES, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, NECESSARILY ARE BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY UNCERTAIN AND MAY BE BEYOND THE CONTROL OF THE LIQUIDATING DEBTORS' AND THE MERGING DEBTORS' MANAGEMENT.  THE LIQUIDATING DEBTORS AND THE MERGING DEBTORS CAUTION THAT NO REPRESENTATIONS

CAN BE MADE AS TO THE ACCURACY OF THESE ESTIMATES OR ANALYSES. THEREFORE, THE ESTIMATES AND ANALYSES MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE THAT THE ACTUAL RESULTS WILL OCCUR.

HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE SUBPLAN(S) MUST RELY ON THEIR OWN EVALUATION AND ANALYSES OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE SUBPLAN(S).  IMPORTANTLY, PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE SUBPLAN(S), EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD REVIEW THE PLAN IN ITS ENTIRETY AND CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN, AND THE PLAN SUPPLEMENT.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER CAUSES OF ACTION, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, OR AS A STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY BANKRUPTCY OR NONBANKRUPTCY PROCEEDING INVOLVING THE LIQUIDATING DEBTORS, THE MERGING DEBTORS OR ANY OTHER PARTY (OTHER THAN IN CONNECTION WITH APPROVAL OF THIS DISCLOSURE STATEMENT OR CONFIRMATION OF ANY SUBPLAN(S)), NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS.  YOU ARE ADVISED TO OBTAIN INDEPENDENT EXPERT ADVICE ON SUCH SUBJECTS.

**SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995**: ALL FORWARD-LOOKING STATEMENTS CONTAINED HEREIN OR OTHERWISE MADE BY THE LIQUIDATING DEBTORS AND THE MERGING DEBTORS INVOLVE MATERIAL RISKS AND UNCERTAINTIES AND ARE SUBJECT TO CHANGE BASED ON NUMEROUS FACTORS, INCLUDING FACTORS THAT ARE BEYOND THE LIQUIDATING DEBTORS' AND/OR THE MERGING DEBTORS' CONTROL.  ACCORDINGLY, THE LIQUIDATING DEBTORS' AND THE MERGING DEBTORS' FUTURE PERFORMANCE AND FINANCIAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED IN ANY SUCH FORWARD-LOOKING STATEMENTS.  SUCH FACTORS INCLUDE, BUT ARE NOT LIMITED TO, THOSE DESCRIBED IN THIS DISCLOSURE STATEMENT.  THE LIQUIDATING DEBTORS AND THE MERGING DEBTORS  DO NOT UNDERTAKE TO PUBLICLY UPDATE OR REVISE FORWARD-LOOKING STATEMENTS EVEN IF EXPERIENCE OR FUTURE CHANGES MAKE IT CLEAR THAT ANY PROJECTED RESULTS EXPRESSED OR IMPLIED THEREIN WILL NOT BE REALIZED.

# TABLE OF CONTENTS

**Page**

**ARTICLE I INTRODUCTION** ....................................................................................1
    Section 1.01. Summary of the Plan ...........................................................................3
    Section 1.02. Purpose of this Disclosure Statement .................................................5

**ARTICLE II SOLICITATION AND VOTING PROCEDURES** ................................6
    Section 2.01. Classification Under the Plan ..............................................................6
    Section 2.02. Parties Entitled to Vote.......................................................................6
    Section 2.03. Votes Required for Acceptance by Class ............................................7
    Section 2.04. Certain Factors to be Considered Prior to Voting...............................7
    Section 2.05. Solicitation Procedures.......................................................................8

**ARTICLE III GENERAL INFORMATION ABOUT THE DEBTORS**............................10
    Section 3.01. Debtors' Business and Industry.........................................................10
    Section 3.02. Debtors' Formation...........................................................................10
    Section 3.03. Debtors' Corporate Structure ...........................................................11
    Section 3.04. Debtors' Prepetition Indebtedness.....................................................12
    Section 3.05. Events Leading to the Chapter 11 Cases ...........................................13
    Section 3.06. Attempts to Reorganize Outside Bankruptcy ....................................14
    Section 3.07. Commencement of the Chapter 11 Cases..........................................14
    Section 3.08. Liquidating Debtors' and Merging Debtors' Current Assets.............................15
    Section 3.09. Debtors' Management........................................................................15
    Section 3.10. Federal and State Regulatory Matters ...............................................15
    Section 3.11. Environmental Laws and Regulations...............................................16

**ARTICLE IV THE CHAPTER 11 CASES**................................................................17
    Section 4.01. Overview of Chapter 11 ....................................................................17
    Section 4.02. First Day Motions .............................................................................18
    Section 4.03. Employee Incentive Plans .................................................................21

**ARTICLE V OTHER SIGNIFICANT EVENTS OF THE CHAPTER 11 CASES** ............22
    Section 5.01. DIP Facility Milestones and Amendments........................................22
    Section 5.02. Retention and Employment of Professionals.....................................25
    Section 5.03. Schedules and Statements of Financial Affairs .................................26
    Section 5.04. Bar Dates ..........................................................................................26
    Section 5.05. Walnut Creek Motion........................................................................26
    Section 5.06. Exclusivity ........................................................................................27
    Section 5.07. Twin Oaks Plant Sale ........................................................................27
    Section 5.08. Gas Plant Portfolio Disposition ........................................................28
    Section 5.09. Nonresidential Leases .......................................................................29
    Section 5.10. Sales and Use Tax Claims Against Twin Oaks GP ...........................30
    Section 5.11. Lyondell Claims and Objections.......................................................31
    Section 5.12. Third Amended Plan .........................................................................32
    Section 5.13. Plan Support Agreement....................................................................32

**ARTICLE VI TREATMENT OF UNCLASSIFIED CLAIMS**..................................33
    Section 6.01. DIP Facility Claims...........................................................................33

## TABLE OF CONTENTS (CONT'D)

Section 6.02. Administrative Claims ........................................................34
Section 6.03. Priority Tax Claims ...........................................................35

**ARTICLE VII CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS ........................................................35**
Section 7.01. Classification .....................................................................36
Section 7.02. Subplan OE: Treatment of Claims Against and Equity Interests in Optim Energy .......................................................................37
Section 7.03. Subplan TOLP: Treatment of Claims Against and Equity Interests in Twin Oaks LP ....................................................................41

**ARTICLE VIII ACCEPTANCE OR REJECTION OF THE SUBPLANS .........................46**
Section 8.01. Acceptance by an Impaired Class ......................................46
Section 8.02. Nonconsensual Confirmation ............................................46
Section 8.03. Limited Deficiency Waiver ...............................................46

**ARTICLE IX IMPLEMENTATION OF THE PLAN ...........................................46**
Section 9.01. Compromise and Settlement ..............................................47
Section 9.02. Corporate Action ..............................................................47
Section 9.03. Corporate Governance .......................................................47
Section 9.04. Funding of Reserves .........................................................48
Section 9.05. Liquidation Trust ..............................................................48
Section 9.06. Causes of Action ...............................................................52

**ARTICLE X TREATMENT OF EXECUTORY CONTRACTS AND LEASES .................53**
Section 10.01. Treatment of Executory Contracts and Unexpired Leases ...........53
Section 10.02. Effect of Confirmation Order on Rejection ......................53
Section 10.03. Rejection Damages Claims and Objections to Rejection ..............53
Section 10.04. Preexisting Obligations Under Executory Contracts and Unexpired Leases .....................................................................53
Section 10.05. Reservation of Rights ......................................................54

**ARTICLE XI PROVISIONS GOVERNING DISTRIBUTIONS ...........................54**
Section 11.01. Amount of Distributions ..................................................54
Section 11.02. Method of Distributions ..................................................54
Section 11.03. Delivery of Distributions .................................................55
Section 11.04. No Fractional or De Minimis Distributions ......................55
Section 11.05. Undeliverable Distributions .............................................55
Section 11.06. Tax Withholding From Distributions ...............................56
Section 11.07. Allocations ......................................................................56
Section 11.08. Time Bar to Cash Payments .............................................57
Section 11.09. Means of Cash Payments .................................................57
Section 11.10. Foreign Currency Exchange Rates ...................................57
Section 11.11. Setoffs .............................................................................57
Section 11.12. Claims Paid or Payable by Third Parties .........................57

## TABLE OF CONTENTS (CONT'D)

**ARTICLE XII PROCEDURES FOR RESOLVING DISPUTED CLAIMS** ........................ **58**
Section 12.01. Prosecution of Objections to Claims ........................................... 58
Section 12.02. Estimation of Claims ................................................................... 58
Section 12.03. No Distributions on Disputed Claims .......................................... 59
Section 12.04. Reserve of Cash for Disputed Claims .......................................... 59

**ARTICLE XIII CONDITIONS PRECEDENT TO CONFIRMATION AND
CONSUMMATION OF THE PLAN** ..................................................... **59**
Section 13.01. Conditions Precedent to Confirmation ........................................ 59
Section 13.02. Effect of Non-Occurrence of Conditions to Confirmation or
Conditions Precedent to the Effective Date ............................... 60
Section 13.03. Conditions Precedent to the Effective Date ................................. 60
Section 13.04. Waiver of Conditions Precedent ................................................. 61

**ARTICLE XIV EFFECT OF CONFIRMATION OF THE PLAN** ....................................... **61**
Section 14.01. Effect of Plan on Claims Against and Equity Interests in the
Liquidating Debtors and the Merging Debtors ........................... 61
Section 14.02. Releases ..................................................................................... 61
Section 14.03. Exculpation ................................................................................ 64
Section 14.04. Injunction ................................................................................... 65
Section 14.05. Protection Against Discriminatory Treatment ............................. 65
Section 14.06. Release of Liens ......................................................................... 65
Section 14.07. Cancellation of Securities and Notes Against the Liquidating Debtors
and the Merging Debtors ............................................................ 66

**ARTICLE XV MODIFICATION, REVOCATION OR WITHDRAWAL OF THE
PLAN** ................................................................................................ **66**
Section 15.01. Modification of a Subplan ........................................................... 66
Section 15.02. Revocation or Withdrawal of Plan .............................................. 66

**ARTICLE XVI RETENTION OF JURISDICTION** .......................................................... **67**

**ARTICLE XVII MISCELLANEOUS PROVISIONS** ......................................................... **69**
Section 17.01. Corporate Action ........................................................................ 69
Section 17.02. General Settlement of Claims ...................................................... 69
Section 17.03. Preservation of Causes of Action Not Expressly Released ........... 69
Section 17.04. Sales and Use Tax Obligations .................................................... 71
Section 17.05. Environmental and Other Liabilities to Governmental Units ........ 71
Section 17.06. Section 1146(a) Exemption ......................................................... 71
Section 17.07. Elimination of Vacant Classes ..................................................... 71
Section 17.08. Intercompany Claims .................................................................. 72
Section 17.09. Additional Documents ................................................................. 72
Section 17.10. Successors and Assigns ............................................................... 72
Section 17.11. Reservation of Rights .................................................................. 72
Section 17.12. Notices ....................................................................................... 73
Section 17.13. Term of Injunctions or Stay ........................................................ 73

**TABLE OF CONTENTS (CONT'D)**

Section 17.14. Entire Agreement ..........................................................74
Section 17.15. Plan Supplement Exhibits................................................74
Section 17.16. Severability .................................................................74
Section 17.17. Substantial Consummation ............................................74

**ARTICLE XVIII RISK FACTORS ....................................................74**
Section 18.01. Risks Related to the Plan and Other Bankruptcy Law Considerations ...........75
Section 18.02. Avoidance Actions ......................................................80
Section 18.03. Disclosure Statement Disclaimer ..................................81

**ARTICLE XIX CONFIRMATION AND CONSUMMATION PROCEDURE....................83**
Section 19.01. Plan Objection Deadline................................................83
Section 19.02. Confirmation Hearing...................................................83
Section 19.03. Plan Confirmation Requirements Under the Bankruptcy Code....................83
Section 19.04. "Cramdown" Under Section 1129(b) of the Bankruptcy Code ....................85
Section 19.05. Liquidation Analysis ....................................................87
Section 19.06. Notice to Holders of Claims and Equity Interests........................88

**ARTICLE XX ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ....................................................89**

**ARTICLE XXI CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES ........................................................89**
Section 21.01. Certain Material U.S. Federal Income Tax Consequences to the Liquidating Debtors and the Merging Debtors ........................................90
Section 21.02. Certain Material U.S. Federal Income Tax Consequences to U.S. Holders of Certain Allowed Claims and Disputed Claims ......................91
Section 21.03. Market Discount............................................................92
Section 21.04. Withholding ................................................................92

**ARTICLE XXII CONCLUSION AND RECOMMENDATION ..........................................93**

**EXHIBITS**

**Exhibit**

Plan.................................................................................................................................... A

Liquidation Analysis ........................................................................................................ B

# ARTICLE I

## INTRODUCTION

Optim Energy, LLC ("***Optim Energy***") and Optim Energy Twin Oaks, LP ("***Twin Oaks LP***" and, together with Optim Energy, the "***Liquidating Debtors***") and OEM 1, LLC ("***OEM***"), Optim Energy Marketing, LLC ("***Optim Marketing***"), Optim Energy Generation, LLC ("***Optim Generation***"), and Optim Energy Twin Oaks GP, LLC ("***Twin Oaks GP***" and, collectively with OEM, Optim Marketing, Optim Generation and Twin Oaks GP, the "***Merging Debtors***") hereby submit this Disclosure Statement pursuant to section 1125(b) of the Bankruptcy Code to holders of Claims against and Equity Interests for use in the solicitation of acceptances of the Plan (including the Subplans contained therein).

As described in more detail below, on the Petition Date the Debtors owned interests in and operated, in whole or in part, three power plants in eastern Texas—one coal-fired power plant (the Twin Oaks Plant) and two gas-fired power plants (the Altura Cogen Plant and the Cedar Bayou Plant and, together, the "***Gas Plant Portfolio***"). Shortly after the Petition Date, the Debtors initiated a broad-based marketing process for the Twin Oaks Plant led by Barclays Capital, Inc. ("***Barclays***"), the Debtors' investment banker retained in these Chapter 11 Cases. After a successful marketing and auction process, the Debtors sold the Twin Oaks Plant in August 2014 pursuant to section 363 of the Bankruptcy Code [D.I. 481], and the sale closed in October 2014.

In light of the successful Twin Oaks Plant sale, the Debtors carefully considered whether a similar process should be explored with respect to the Gas Plant Portfolio. As was done with the Twin Oaks Plant, in November 2014 the Debtors initiated a broad-based marketing process led by Barclays. The Debtors determined that the best path forward for a potential sale of the Gas Plant Portfolio was through a court-approved process in accordance with bidding procedures approved by the Bankruptcy Court (the "***Bidding Procedures***") [D.I. 861]. The Bidding Procedures were approved on April 22, 2015, with the deadline to submit bids (the "***Bid Deadline***") set on May 1, 2015. The Bidding Procedures provided, among other things, that in order for a bid to be a Qualifying Bid (as defined therein), such bid must be in Cash in the amount of not less than $355 million (the "***Reserve Price***"). The Debtors sought an auction and sale of the Gas Plant Portfolio provided certain transaction conditions were met, and the Debtors built this sale process into their plan of reorganization [D.I. 774, 818, 856].

The Debtors received no satisfactory bids above the $355 million Reserve Price by the Bid Deadline. With the option of an auction and sale thereby eliminated, the Debtors proceeded to formulate the *Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (the "***Third Amended Plan***"), which provided for, among other things: (i) the delivery of the equity interests in the Gas Plant Portfolio to the Pre-Petition Secured Parties in exchange for the Pre-Petition Secured Parties Secured Claims against the Reorganizing Debtors (rather than a sale of the Gas Plant Portfolio); (ii) the reorganization of the Reorganizing Debtors while leaving the remaining Debtors for another day; and (iii) the execution of a $110 million Exit Facility and a $50 million Second Lien Note. Walnut Creek Mining Company (collectively with Black Walnut Mining, LLC, Lonestar Generation, LLC, Major Oak Power, LLC, The Blackstone Group L.P. and the respective Related Persons of each of the foregoing,

1

"**Blackstone**") contested the Third Amended Plan. However, on July 24, 2015, the Bankruptcy Court announced an oral ruling confirming the Third Amended Plan over Blackstone's objection. The Bankruptcy Court entered an order confirming the Third Amended Plan on July 30, 2015 [D.I. 1159]. Blackstone has appealed the confirmation order and other related orders [D.I. 1149, 1170, 1171] (the "**Appeals**"). On August 10, 2015, the United States District Court for the District of Delaware (the "**District Court**") entered orders staying the Appeals pending further orders of the District Court.

Since confirmation of the Third Amended Plan, the Debtors continued to engage in meaningful settlement discussions with Blackstone regarding a plan of reorganization for the remaining Debtors and a resolution of Blackstone's claims against certain of the Debtors. On August 12, 2015, the Debtors reached an agreement with Blackstone, the Pre-Petition Secured Parties and the DIP Lender regarding a plan support agreement (the "**PSA**") which, in the Debtors' business judgment, represents the best alternative now available to the Debtors' remaining stakeholders, and which the Bankruptcy Court approved on August 18, 2015 [D.I. 1217]. Pursuant to the PSA, Blackstone has agreed to support the Plan, and hold the Appeals in abeyance pending confirmation of the Plan, in exchange for a total Cash payment of $4.6 million under a confirmed Plan in full satisfaction of the WC 503(b)(9) Claim and the Blackstone General Unsecured Claims (so long as Blackstone votes to accept the Plan and does not opt out of the release contained in Section 10.03 of the Plan with respect to the Blackstone General Unsecured Claims). Blackstone will also work with Optim Energy Altura Cogen, LLC ("**Altura Cogen**") in good faith to reconcile its claims against Altura Cogen. Blackstone will take no further action in the chapter 11 cases that is not related to performance under, approval and enforcement of the PSA. If the Plan is confirmed, Blackstone will withdraw the Appeals with prejudice.

The fact that the Debtors did not receive a single satisfactory bid at or above the Reserve Price indicates that the Gas Plant Portfolio is worth less than $355 million in the current energy market, and—when compared to the Pre-Petition Secured Parties Secured Claim in the amount of $572.6 million—leaves the Pre-Petition Secured Parties undersecured. Nonetheless, if the Bankruptcy Court approves the PSA, in addition to the Blackstone settlement payment, the Pre-Petition Secured Parties are consenting to the Liquidating Debtors' and Merging Debtors' Estates funding distributions under the Plan to holders of Allowed Claims under each Subplan. The Plan provides full recoveries to holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims and Allowed Other Priority Claims. The Plan also provides meaningful recoveries for holders of Allowed Convenience Class Claims and Allowed General Unsecured Claims so long as these Class(es) vote to accept the Plan, and holders of Claims in these Class(es) do not opt out of the releases contained in Section 10.03 of the Plan, and the Plan is confirmed. It is therefore very important that you read this Disclosure Statement, the attached Plan and all of the referenced supporting documentation in their entirety and, if you support the Plan, that you submit a Ballot voting in favor of the Subplan and the recoveries it will provide, and consent to the release provisions contained therein.

**THE LIQUIDATING DEBTORS AND THE MERGING DEBTORS BELIEVE THAT THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF THE LIQUIDATING DEBTORS' AND THE MERGING DEBTORS' ESTATES AND PROVIDES THE BEST RECOVERY AND CERTAINTY OF OUTCOME TO CLAIM**

**HOLDERS.  AT THIS TIME, THE LIQUIDATING DEBTORS AND THE MERGING DEBTORS BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE LIQUIDATING DEBTORS' AND THE MERGING DEBTORS' CHAPTER 11 CASES.   THE LIQUIDATING DEBTORS AND THE MERGING DEBTORS' STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

**Section 1.01.  Summary of the Plan**

As described more fully in the Plan and this Disclosure Statement, on or about the Effective Date each of the Merging Debtors—OEM, Optim Generation, Optim Marketing and Twin Oaks GP—shall be merged or consolidated with Optim Energy.  The Equity Interests of each of the Merging Debtors shall be deemed cancelled and of no further force and effect, and deemed extinguished without any further limited liability company action.  The Debtors estimate there are no outstanding Claims against the Merging Debtors (other than the Allowed Pre-Petition Secured Parties Secured Claims) subject to classification or Plan solicitation.  Following the merger and dissolution described above, any unclassified Claims against the Merging Debtors that are outstanding will be Claims against Optim Energy.  In addition, a Liquidation Trust shall be established on or about the Effective Date.  Each of the Liquidating Debtors will transfer their Assets and liabilities to the Liquidation Trust.  Upon the transfer of the Liquidation Trust Assets, the Equity Interests of each of the Liquidating Debtors shall be deemed cancelled and of no further force and effect, and deemed extinguished without any further limited liability company or partnership action.

The Liquidation Trust shall be funded with, among other things, Cash on hand (which is Cash Collateral) with the consent of the Pre-Petition Secured Parties.  The Plan provides for Cash distributions from the Liquidation Trust to holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims and Allowed Other Priority Claims against the Liquidating Debtors and the Merging Debtors (if any).  The Plan also provides for distributions to holders of classified Claims against the Liquidating Debtors.  The following table summarizes the classification and treatment of Allowed Claims and Allowed Equity Interests under the Subplans, if confirmed, compared to what such holders could receive in a hypothetical chapter 7 liquidation.   To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.  *For a more detailed description of the classification and treatment of Claims and Equity Interests under the Subplans, please see ARTICLE III of the Plan.*

(a)     Subplan OE: Claims Against and Equity Interests in Optim Energy

| Class | Claim or Equity Interest | Estimated Amount of Claims | Estimated % Recovery Under the Plan[3] | Estimated % Recovery Under Chapter 7 |
|---|---|---|---|---|
| OE 1 | Allowed Pre-Petition Secured Parties Secured Claims | At least $217.6 million[4] | Less than 100% | Less than 100% |
| OE 2 | Other Secured Claims | $0 | N/A[5] | 0% |
| OE 3 | Other Priority Claims | $0 | N/A[6] | 0% |
| OE 4 | General Unsecured Claims | $0 | N/A[7] | 0% |
| OE 5 | Convenience Class Claims | Less than $20,000 | 75-90% | 0% |
| OE 6 | Blackstone General Unsecured Claims | $3.9 million[8] | 0%[9] | 0% |
| OE 7 | Subordinated Claims | $0 | 0% | 0% |
| OE 8 | Equity Interests | N/A | 0% | 0% |

(b)     Subplan TOLP: Claims Against and Equity Interests in Twin Oaks LP

| Class | Claim or Equity Interest | Estimated Amount of Claims | Estimated Recovery (as % of Claim Amount)[10] | Estimated % Recovery Under Chapter 7 |
|---|---|---|---|---|
| TOLP 1 | Allowed Pre-Petition Secured Parties | At least | Less than | Less than |

---

[3] Class OE 4, OE 5 and OE 6 Claim recoveries are contingent on each Class voting to accept the Plan. If each such Class does not vote to accept the Plan, holders of a Claim or Claims in each Class will not receive a distribution. In addition, holders of Allowed Claims in Classes OE 4, OE 5 and OE 6 who opt out of the release in Section 10.03 of the Plan will not receive a distribution under the Plan.

[4] *See Declaration Of George Mack In Support Of Confirmation Of The Third Amended Joint Plan Of Reorganization Under Chapter 11 of the Bankruptcy Code* [D.I. 1106] (the "***Mack Declaration***"), at ¶ 16.

[5] The Liquidating Debtors estimate there will not be any Allowed Class OE 2 Claims, so the Liquidating Debtors have not provided an Estimated % Recovery Under the Plan for Claims in this Class.

[6] The Liquidating Debtors estimate there will not be any Allowed Class OE 3 Claims, so the Liquidating Debtors have not provided an Estimated % Recovery Under the Plan for Claims in this Class.

[7] The Liquidating Debtors estimate there will not be any Allowed Class OE 4 Claims, so the Liquidating Debtors have not provided an Estimated % Recovery Under the Plan for Claims in this Class.

[8] This reflects the Allowed Blackstone General Unsecured Claims pursuant to the PSA, if the Bankruptcy Court enters the PSA Approval Order.

[9] This reflects that Blackstone will receive its recovery on the Allowed Blackstone General Unsecured Claims through Class TOLP 6.

[10] Class TOLP 4, TOLP 5 and TOLP 6 Claim recoveries are contingent on each Class voting to accept the Plan. If each such Class does not vote to accept the Plan, holders of a Claim or Claims in each Class will not receive a distribution. In addition, holders of Allowed Claims in Classes TOLP 4, TOLP 5 and TOLP 6 who opt out of the release in Section 10.03 of the Plan will not receive a distribution under the Plan.

| Class | Claim or Equity Interest | Estimated Amount of Claims | Estimated Recovery (as % of Claim Amount)[10] | Estimated % Recovery Under Chapter 7 |
|---|---|---|---|---|
| | Secured Claims | $217.6 million[11] | 100% | 100% |
| TOLP 2 | Other Secured Claims | $0 | N/A[12] | 0% |
| TOLP 3 | Other Priority Claims | $0 | N/A[13] | 0% |
| TOLP 4 | General Unsecured Claims | $120,000 to $150,000 | 65%-75% | 0% |
| TOLP 5 | Convenience Class Claims | $90,000 to $120,000 | 85%-90% | 0% |
| TOLP 6 | Blackstone General Unsecured Claims | $3.9 million[14] | 37.6%[15] | 0% |
| TOLP 7 | Subordinated Claims | $0 | 0% | 0% |
| TOLP 8 | Equity Interests | N/A | 0% | 0% |

## Section 1.02.  Purpose of this Disclosure Statement

After a chapter 11 plan has been filed, holders of certain claims against and equity interests in a debtor are permitted to vote to accept or reject such plan.  Before soliciting acceptances of the proposed plan, however, a debtor is required under section 1125 of the Bankruptcy Code to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.

The Liquidating Debtors and the Merging Debtors are submitting this Disclosure Statement to holders of Claims and Equity Interests to satisfy the requirements of section 1125 of the Bankruptcy Code.  This Disclosure Statement sets forth specific information regarding the pre-bankruptcy history of the Debtors, the nature and progress of these Chapter 11 Cases and the anticipated organizational and capital structure after confirmation of the Plan and emergence from chapter 11.  This Disclosure Statement also describes the Plan, alternatives to the Plan, effects of Confirmation of the Plan, certain risk factors and the manner in which distributions will be made under the Plan.  In addition, this Disclosure Statement discusses the Confirmation

---

[11] *See* Mack Declaration, at ¶ 16.

[12] The Liquidating Debtors estimate there will not be any Allowed Class TOLP 2 Claims, so the Liquidating Debtors have not provided an Estimated % Recovery Under the Plan for Claims in this Class.

[13] The Liquidating Debtors estimate there will not be any Allowed Class TOLP 3 Claims, so the Liquidating Debtors have not provided an Estimated % Recovery Under the Plan for Claims in this Class.

[14] This reflects the Allowed Blackstone General Unsecured Claims pursuant to the PSA, if the Bankruptcy Court enters the PSA Approval Order.

[15] If the Court approves the PSA, and if Class TOLP 6 votes to accept the Plan and Blackstone does not opt out of the release in Section 10.03 of the Plan, Blackstone will receive a Cash payment of approximately $1.4 million in full satisfaction of the Allowed Blackstone General Unsecured Claims.

process and the voting procedures that holders of Claims entitled to vote must follow in order for their votes to be counted.

The purpose of this Disclosure Statement is to provide those holders of Claims entitled to vote on the Plan with adequate information to make an informed decision as to whether to accept or reject the Plan.  On [__], 2015, after notice and a hearing, the Bankruptcy Court approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical, reasonable investor being solicited to make an informed judgment whether to accept or reject the Plan.  **APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT CONSTITUTES A DETERMINATION THAT THIS DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION REGARDING THE PLAN, BUT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

## ARTICLE II

## SOLICITATION AND VOTING PROCEDURES

### Section 2.01.  Classification Under the Plan

Under section 1122(a) of the Bankruptcy Code, a chapter 11 plan may place a claim or equity interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  To determine whether claims are substantially similar, the proper focus is on the legal character of the claim as it relates to the assets of the debtor.  Thus, the question is whether the claims in a class have the same or similar legal status in relation to the assets of the debtor.

Under section 1122(b) of the Bankruptcy Code, a chapter 11 plan may designate a separate class of claims for all unsecured claims that are less than or reduced to an amount approved by the Bankruptcy Court.  This class of claims is often referred to as a "convenience class" and is utilized by debtors when a separate class of unsecured claims is reasonable and necessary for administrative convenience.

### Section 2.02.  Parties Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest, and the claim or interest is impaired by the plan.  If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the

plan, and, accordingly, holders of such claims and interests do not actually vote on the plan.  If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the plan.

Additional detail regarding impairment (and the entitlement of holders of Claims to vote on the Plan) is included below and in ARTICLE III of the Plan.

## Section 2.03.   Votes Required for Acceptance by Class

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number of claims voting to accept, as a percentage of the allowed claims or interests, as applicable, that has voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted.  Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

## Section 2.04.   Certain Factors to be Considered Prior to Voting

There are a variety of factors that all holders of Claims entitled to vote on the Plan should consider prior to  voting to accept or reject the applicable Subplan(s).  These factors may impact recoveries under the Plan and include:

(i) unless otherwise specifically indicated, the financial information contained in this Disclosure Statement has  not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

(ii) although the Liquidating Debtors and the Merging Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code,  the Liquidating Debtors and the Merging Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

(iii) the Liquidating Debtors and the Merging Debtors may request Confirmation without the acceptance of all Impaired Classes in accordance with  section 1129(b) of the Bankruptcy Code; and

(iv) any delays of either Confirmation or Consummation could result in, among other things, increased  Administrative Claims and Professional Claims.

While these factors could affect distributions available to holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Impaired Classes entitled to vote to accept or reject the Plan (the "**Voting Classes**") or necessarily require a re-solicitation of the votes of holders of Claims in such Voting Classes.

For a further discussion of risk factors, please refer to the Risk Factors included in ARTICLE XVIII herein.

## Section 2.05.  Solicitation Procedures

(a)    <u>Claims and Solicitation Agent</u>

The Debtors retained the Prime Clerk LLC ("***Prime Clerk***") to act, among other things, as the Claims and Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

(b)    <u>Solicitation Package</u>

The following materials will constitute the solicitation package (the "***Solicitation Package***") distributed to holders of Claims entitled to vote to accept or reject the Plan:

(i)    this Disclosure Statement, as approved by the Bankruptcy Court (with the Plan as an exhibit thereto);

(ii)    the Disclosure Statement Order;

(iii)    the Solicitation Procedures, substantially in the form attached to the Disclosure Statement Order;

(iv)    the *Notice of Order (A) Approving the Disclosure Statement, (B) Approving the Solicitation Procedures, (C) Approving the Form of Ballots and Notices in Connection Therewith, (D) Establishing the Plan Confirmation Schedule and (E) Granting Related Relief*, substantially in the form attached to the Disclosure Statement Order (the "***Confirmation Hearing Notice***");

(v)    a cover letter from the Liquidating Debtors and the Merging Debtors, substantially in the form attached to the Disclosure Statement Order, describing the contents of the Solicitation Package and urging the holders of Claims in each of the Voting Classes to vote to accept the Plan;

(vi)    appropriate forms of Ballots for holders of Claims in the Voting Classes, substantially in the forms of the Ballots attached to the Disclosure Statement Order;

(vii)    any supplemental documents the Liquidating Debtors and/or the Merging Debtors file with the Bankruptcy Court and any documents that the Bankruptcy Court orders to be included in the Solicitation Package; and

(viii)    a pre-addressed, postage paid return envelope.

(c)    Plan Supplement

The Bankruptcy Court has approved [__], 2015 as the deadline by which the Liquidating Debtors and the Merging Debtors shall file the Plan Supplement, which will include, among other things, documents and forms of documents, agreements, schedules, and exhibits to the Plan (all of which shall be in form and substance satisfactory to the Liquidating Debtors and the Merging Debtors, and the Consultation Parties).

(d)    Distribution of the Solicitation Package and Plan Supplement

The Liquidating Debtors and the Merging Debtors shall cause the Solicitation Package (other than the Ballots) to be provided in paper or CD-ROM format and the Ballots shall be provided in paper format.

The Liquidating Debtors and the Merging Debtors shall serve, or cause to be served, all of the materials in the Solicitation Package (including the Ballots) and the Plan Supplement on holders of Claims entitled to vote on the Plan. In addition, the Liquidating Debtors and the Merging Debtors shall serve, or cause to be served, all of the materials in the Solicitation Package (other than the Ballots) and the Plan Supplement on: (i) the Office of the United States Trustee for the District of Delaware; (ii) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (iii) counsel to Cascade Investment, L.L.C. and ECJV Holdings, LLC; (iv) counsel to Blackstone; and (v) any party who has requested notice pursuant to Bankruptcy Rule 2002. The Solicitation Package (other than the Ballots) and the Plan Supplement' may also be obtained from Prime Clerk, by: (i) accessing the Debtors' restructuring website at https://cases.primeclerk.com/optim/Home-DocketInfo; (ii) writing to Prime Clerk at Optim Energy, LLC Ballot Processing Center, c/o Prime Clerk LLC, 830 Third Avenue, Ninth Floor, New York, NY 10022; or (iii) contacting Prime Clerk via telephone at (855) 410-7358 or via email at solicitation@primeclerk.com.

(e)    Voting Record Date

The Bankruptcy Court has approved [__], 2015 as the record date for purposes of determining which holders of Claims are entitled to vote on the Plan (the "***Voting Record Date***").

(f)    Voting Deadline

The Bankruptcy Court has approved [__], 2015 at 4:00 p.m. ET as the voting deadline (the "***Voting Deadline***") for the Plan. The Liquidating Debtors and the Merging Debtors may extend the Voting Deadline, in their discretion, even if lapsed without further order of the Bankruptcy Court. To be counted as votes to accept or reject the Plan, all Ballots sent to holders of Claims must be properly executed, completed and delivered in accordance with the instructions set forth in the Ballots, by (i) first class mail, (ii) overnight courier or (iii) personal delivery so that they are **actually received**, in any case, no later than the Voting Deadline by Prime Clerk. Delivery of a Ballot to Prime Clerk by facsimile, email or any other electronic means will not be valid.

**IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE LIQUIDATING DEBTORS AND THE MERGING DEBTORS DETERMINE OTHERWISE IN THEIR SOLE DISCRETION.**

**IT IS IMPORTANT THAT HOLDERS OF CLAIMS ENTITLED TO VOTE FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON OR ACCOMPANYING SUCH HOLDER'S BALLOT. HOLDERS OF CLAIMS THAT DO NOT VOTE TO REJECT THE PLAN AND OPT OUT OF GRANTING THE RELEASES DESCRIBED IN SECTION 10.03 OF THE PLAN BY CHECKING THE APPROPRIATE BOX ON THEIR RESPECTIVE BALLOT(S) WILL BE DEEMED TO CONSENT TO SUCH RELEASES. <u>IF A CLASS(ES) OF GENERAL UNSECURED CLAIMS, CONVENIENCE CLASS CLAIMS OR BLACKSTONE GENERAL UNSECURED CLAIMS VOTES TO REJECT THE PLAN, THE HOLDERS OF CLAIMS IN SUCH CLASS(ES) WILL NOT RECEIVE A DISTRIBUTION. FURTHER, ANY HOLDER OF A CLAIM(S) WHO REJECTS THE PLAN AND OPTS OUT OF THE RELEASES DESCRIBED IN SECTION 10.03 OF THE PLAN WILL NOT RECEIVE ANY DISTRIBUTION(S) UNDER THE SUBPLAN(S) FOR THE APPLICABLE LIQUIDATING DEBTOR(S).</u>**

## ARTICLE III

## GENERAL INFORMATION ABOUT THE DEBTORS[16]

### Section 3.01.  Debtors' Business and Industry

The Debtors are power plant owners principally engaged in the production of energy in Texas's deregulated energy market. The Debtors owned and operated, in whole or in part, three power plants on the Petition Date: the Twin Oaks Plant, the Altura Cogen Plant and the Cedar Bayou Plant. The Debtors sold the Twin Oaks Plant in 2014. In July 2015, the Bankruptcy Court confirmed the Third Amended Plan providing for the return of the Gas Plant Portfolio to the Pre-Petition Secured Parties.

### Section 3.02.  Debtors' Formation

On January 8, 2007, PNM Resources, Inc. ("***PNMR***"), and Cascade Investment, L.L.C. ("***Cascade***") through its wholly-owned subsidiary, ECJV Holdings, LLC ("***ECJV***") formed Optim Energy as a limited liability company organized under the laws of Delaware. The focus of ECJV and PNMR (an energy holding company that provides electricity through its subsidiaries to areas in New Mexico and Texas) was to enter the deregulated Texas electricity markets by acquiring or constructing merchant power plants to sell electricity to the public through the Electric Reliability Council of Texas, Inc. ("***ERCOT***"). To form Optim Energy,

---

[16] The following is a summary of the Debtors' businesses and operations. For additional details concerning the Debtors and the background to these Chapter 11 Cases, readers are referred to the *Declaration of Nick Rahn, Chief Executive Officer of Optim Energy, LLC, In Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 4] (the "***First Day Declaration***").

PNMR originally contributed the "Twin Oaks Plant" located in Robertson County, Texas, and ECJV contributed Cash.

## Section 3.03.  Debtors' Corporate Structure

On the Petition Date, Debtor Optim Energy was the wholly-owned direct subsidiary of non-Debtor ECJV (which is a wholly-owned subsidiary of Cascade) and is a holding company and Delaware limited liability company that directly or indirectly owns 100% of the outstanding equity interests of the other Debtors.  Cascade is the ultimate parent of the Debtors.  Cascade is also a Pre-Petition Secured Party and a DIP Lender in the Debtors' chapter 11 cases.  Cascade, and its wholly-owned subsidiary ECJV, are "insiders" of the Debtors as such term is defined in the Bankruptcy Code.

On the Petition Date, Debtors Optim Marketing and Optim Generation were both wholly-owned direct subsidiaries of Optim Energy.   Debtor OEM was the wholly-owned direct subsidiary of Optim Marketing.   All the remaining Debtors were subsidiaries of Optim Generation.  Twin Oaks GP owned the general partnership interest in Twin Oaks LP, and Optim Generation wholly owned the limited partnership interest in Twin Oaks LP.  Twin Oaks LP, a limited partnership organized under the laws of Texas, owned the Twin Oaks Plant before its sale as described herein.   Additionally, Optim Generation owned all of the Equity Interests in: (a) Altura Cogen, a Delaware limited liability company, which owned the Altura Cogen Plant; and (b) Cedar Bayou, a Delaware limited liability company, which owned an undivided 50% interest in the Cedar Bayou Plant, prior to the distribution of the Gas Plant Portfolio to the Pre-Petition Secured Parties following Confirmation of the Third Amended Plan.

An organizational chart showing the legal structure as of the Petition Date is below:



If the Third Amended Plan becomes effective, the only remaining Debtors will be the Liquidating Debtors and the Merging Debtors, each of which is a proponent of the Plan.

## Section 3.04.  Debtors' Prepetition Indebtedness

Optim Energy, as borrower, and Wells Fargo, as lender, entered into a credit agreement dated June 1, 2007 (the "**Wells Fargo Credit Agreement**"), which provided for up to $1 billion of credit consisting of a revolving loan facility and a letter of credit facility.  The proceeds from borrowings under the revolving loan facility of the Wells Fargo Credit Agreement were used, together with PNMR's contribution of the Twin Oaks Plant and certain equity Cash contributions and ECJV's equity Cash contributions, to fund the acquisitions of the Altura Cogen Plant, the development and construction of the Cedar Bayou Plant and the general operations of the Debtors.  Optim Energy's obligations under the Wells Fargo Credit Agreement were guaranteed by each of Cascade and ECJV (together, the "**Guarantors**") under the Continuing Guaranty issued by Cascade and the Continuing Guaranty issued by ECJV, respectively, each dated as of June 1, 2007 (as amended, the "**Guarantees**"), for the benefit of Wells Fargo in respect of amounts owed by Optim Energy under the Wells Fargo Credit Agreement.  The Debtors were also obligated to reimburse the Guarantors for any payments made to Wells Fargo under the Guarantees pursuant to the Pre-Petition Reimbursement Agreement.  The Debtors' obligations under the Pre-Petition Reimbursement Agreement are secured by (a) a senior lien on, and first priority interest in, substantially all of the Debtors' assets and (b) pledges of all of the shares of equity interests in all of Optim Energy's subsidiaries pursuant to the Pre-Petition Reimbursement Agreement Security Documents.  Additionally, Cascade, ECJV, Wells Fargo and all the Debtors entered into a Subordination Agreement, dated June 1, 2007, under which Cascade and ECJV, in their capacities as Guarantors under the Guarantees, agreed to subordinate all of the Guarantors' claims against the Debtors (including any amounts owed to any Guarantor under the Reimbursement Agreement) to all of the claims of Wells Fargo against the Debtors and the Guarantors (including any amounts owed to Wells Fargo under the Wells Fargo Credit Agreement and the Guarantees) until such claims of Wells Fargo are paid in full.

Pursuant to the Reimbursement Agreement, the Debtors were required to pay Cascade a guarantee fee of $1.934 million on December 31, 2013.  To preserve liquidity, the Debtors withheld this payment and, on December 30, 2013, entered into a Forbearance Agreement in which Cascade and ECJV agreed, subject to certain conditions, to forbear from exercising any remedies as a result of such nonpayment until February 14, 2014.  As a result of Cascade's payment in full of the outstanding indebtedness under the revolving loan facility (including delivery of Cash Collateral in respect of outstanding letters of credit) to Wells Fargo in accordance with the Guarantee on the Petition Date, the aggregate amount of the Debtors' outstanding obligations under the Reimbursement Agreement was approximately $715 million, which included all accrued and unpaid interest, the missed guarantee fee of $1.934 million, and reasonable out-of-pocket charges and other fees and expenses incurred in connection with the Guarantees as of the Petition Date, plus the face amount of issued and outstanding undrawn

letters of credit[17] of approximately $41 million, plus accrued, but unpaid, interest, fees and other amounts.

Since the Petition Date, the Twin Oaks Plant has been sold and the Reorganizing Debtors are in the process of distributing ownership of the Gas Plant Portfolio to the Pre-Petition Secured Parties. Proceeds from the sale of the Twin Oaks Plant were used to pay the administrative costs associated with that sale, and to pay down the Debtors' obligations under the Reimbursement Agreement. As of May 31, 2015, the aggregate principal amount of the secured amount outstanding under the Reimbursement Agreement was approximately $572.6 million net of paydowns. If the Third Amended Plan becomes effective, it is estimated the aggregate principal amount of the secured amount outstanding under the Reimbursement Agreement will be at least $217.6 million net of paydowns and distributions under the Third Amended Plan.[18]

## Section 3.05. Events Leading to the Chapter 11 Cases

Optim Energy's acquisition of the Twin Oaks Plant and Altura Cogen Plant and its investment to develop and construct the Cedar Bayou Plant occurred in 2007, one year before the 2008 economic downturn that plagued the energy industry, power markets and economy as a whole. Over the ensuing years, sustained lower electricity prices, primarily driven by plummeting natural gas prices, proved to be a substantial challenge to the Debtors' power generation assets. The price of natural gas, which is closely tied to the price of electricity in much of the U.S. (including the ERCOT market where the Debtors' Power Plants are located), fell from about $8.50 per MMBtu in 2008 to under $3.90 per MMBtu as of December 2013 (a decline of approximately 54%).

In large part as a result of the drop in natural gas prices, ERCOT market power prices fell correspondingly from about $63.24 per MWh in 2008 to under $38.00 per MWh as of December 2013 (a decline of approximately 40%). Consequently, the Debtors were left with a significant debt load that could not be serviced or repaid due to persistent operating losses, which were magnified by seasonal fluctuations in the Debtors' revenue with decreased revenues generally recorded in the winter months.

The impact of depressed power prices was particularly acute with respect to the Twin Oaks Plant. Prior to the sale of the Twin Oaks Plant, Twin Oaks was obligated under the long term fuel supply agreement between Walnut Creek and Optim Energy Twin Oaks, LP, executed in 1987 (as amended, the "*Fuel Supply Agreement*") to purchase almost all of its coal requirements from Walnut Creek. The terms of the Fuel Supply Agreement provided for escalating prices for coal purchased from Walnut Creek over time without any adjustment for declining power prices. In the two (2) years prior to the Petition Date, this dynamic generated average annual operating losses of approximately $11.5 million attributable to the Twin Oaks Plant. The material cash flow drain required to sustain the Twin Oaks Plant, when combined with the systemic decrease in power prices, materially impaired the Debtors' ability to service their debts and perform their obligations.

---

[17] The pre-petition letter of credit obligations were replaced by new letters of credit issued by Wells Fargo as issuing bank under the DIP Credit Agreement.

[18] *See* Mack Declaration, ¶ 16.

As a result of these adverse market conditions, in September 2011, PNMR, ECJV and Cascade entered into agreements whereby Optim Energy was restructured such that PNMR's ownership in Optim Energy was reduced from 50% to 1% (with PNMR's remaining 1% ownership interest acquired by ECJV in January 2012). In preparation for, and in conjunction with, this restructuring, the Debtors implemented various cost reduction and stabilization strategies and ultimately laid off over 50 employees to enable the transition of the operations and management of the Debtors' plants to contractors NAES Corporation ("**NAES**") and Competitive Power Ventures, Inc. ("**CPV**"). This transition ultimately resulted in approximately $15 million in annual savings, in the aggregate, among the three original power plants. Unfortunately, the reduction in force and other cost-saving initiatives were insufficient to eliminate the recurring operating losses and required capital expenditures that strained liquidity. The depressed economic environment of the electric power industry—particularly with respect to coal-fired plants—and the Debtors' liquidity constraints resulted in continuing losses that left the Debtors without alternatives to a chapter 11 filing.

**Section 3.06.  Attempts to Reorganize Outside Bankruptcy**

Recognizing that recurring operating losses were likely to impair liquidity and the ability to refinance the Wells Fargo Credit Agreement, in early 2013 the Debtors began to evaluate their strategic options, including the need for a potential restructuring. To assist with the process, the Debtors initially retained Bracewell & Giuliani LLP ("**Bracewell**") to advise on restructuring negotiations and strategies. The Debtors later engaged Protiviti Inc. ("**Protiviti**") as their restructuring advisor and Barclays as their financial advisor. Ultimately, the Debtors, in consultation with their advisors, concluded that an out-of-court solution was not attainable. With respect to the Debtors' balance sheet, without available financing, the Debtors' operating losses impaired their liquidity to the point that the Debtors could not continue to satisfy their obligations in the ordinary course of business. During the course of 2013 and 2014, the Debtors sought to address the operating losses at the Twin Oaks Plant through negotiations with Walnut Creek to amend the Fuel Supply Agreement. In furtherance of those discussions, on January 30, 2014, the Debtors and Walnut Creek entered into a Forbearance Agreement whereby Walnut Creek agreed to forego exercising remedies until February 14, 2014 (subject to the Debtors' non-default and the applicable cure period related thereto). But despite significant efforts, the parties were unable to agree upon an ultimate amendment to the Debtors' long term coal purchase obligations under the Fuel Supply Agreement.

**Section 3.07.  Commencement of the Chapter 11 Cases**

After struggling against the downturn in the Texas power markets in recent years, aggressively managing costs, and engaging in a comprehensive effort to explore strategic alternatives to mitigate systemic operating losses, the Debtors filed these Chapter 11 Cases on February 12, 2014 with the goal of reorganizing, including the restructuring of the Debtors' obligations and pursuing strategic alternatives to maximize the value of their power producing assets.

**Section 3.08.  Liquidating Debtors' and Merging Debtors' Current Assets**

As of August 14, 2015, Optim Energy and Twin Oaks LP held approximately $14.2 million and $54,391, respectively, in Cash and Cash equivalents (which is Cash Collateral).  As of August 14, 2015, the only other material balance sheet assets held by the Liquidating Debtors and the Merging Debtors were investments in other Debtors and intercompany receivables, which will be settled and compromised as part of the Intercompany Claims settlement proposed in the Plan.

**Section 3.09.  Debtors' Management**

On October 31, 2011, Optim Energy entered into the Asset Management Agreement with CPV (as amended, the "***CPV Management Agreement***"), pursuant to which CPV manages the Debtors' operations and finances.  These responsibilities include executive management, contract administration, accounting, treasury, regulatory compliance and other services.  CPV is headquartered in Maryland, where the Debtors' financial records are located, and is supervised by Optim Energy's independent board of directors.  Nick Rahn, an employee of CPV, serves as the Chief Executive Officer of Optim Energy and manager of the Debtors.

On February 11, 2014, Alan Heuberger, John Erickson, Quinn Cornelius and Randy Jack (all of whom are associated with or are consultants of Cascade) resigned their positions as directors of Optim Energy.  The remaining two board positions at Optim Energy were held by independent directors Richard Fleming and David Gibson.  On April 7, 2014, Joseph Bondi was appointed as an additional independent director of Optim Energy.

The only Debtor that has a board of directors is Optim Energy.  Each of the other Debtors are member managed limited liability companies, with Mr. Rahn serving as the manager of each entity and Mr. Bondi, Mr. Fleming, and Mr. Gibson serving as directors of Optim Energy.  This allows the board of directors of Optim Energy to review and approve actions for each individual Debtor.

If the Third Amended Plan becomes effective, it is anticipated Mr. Rahn will be appointed the chief executive officer of OE Holdings, LLC, a limited liability company wholly-owned by Cascade, which will own 100% of each of the Reorganized Debtors.  In addition, Mr. Fleming has been appointed an independent director of OE Holdings, LLC.

**Section 3.10.  Federal and State Regulatory Matters**

The Public Utility Commission of Texas ("***PUCT***") has oversight over the competitive wholesale electricity market administered by ERCOT and regulates certain aspects regarding entities owning electric generating facilities in Texas and transactions involving the transfer of ownership of such facilities.  Each of the Debtors is registered as a power generation company under the Texas Public Utility Regulatory Act and, by virtue of such registration, qualifies to generate electric energy and power in Texas.  The Debtors are also subject to standards and rules adopted by the PUCT relating to the operation of the competitive wholesale electric market administered by ERCOT.  The PUCT requires market participants to observe all ERCOT scheduling, operating, reliability, and settlement policies, rules, guidelines, and procedures and prohibits activities by wholesale market participants which are unfair, misleading, or deceptive

or constitute an abuse of market power.  The PUCT monitors the activities of market participants in the wholesale ERCOT market, and to the extent the PUCT determines that any activity constitutes an abuse of market power or is otherwise unfair, misleading, or deceptive or violates a governing ERCOT practice or procedure, the PUCT may assess administrative penalties of up to $25,000 per violation per day and may also order the disgorgement of all excess revenue resulting from the violation.

The Debtors are also subject to oversight by the Federal Energy Regulatory Energy Commission ("**FERC**"), North American Electric Reliability Corporation ("**NERC**"), and Texas Reliability Entity, Inc. ("**TRE**") in connection with national electric reliability standards for the bulk power system promulgated by NERC and adopted by FERC.  In ERCOT, TRE has been delegated the authority to administer, monitor and enforce compliance with the NERC electric reliability standards and conducts compliance and enforcement activities in accordance with the NERC rules of procedure.  FERC has authority to assess penalties of up to $1,000,000 per day of violation for violations of the NERC electric reliability standards.  In addition to FERC-assessed monetary penalties for violation of the NERC electric reliability standards, NERC or TRE may issue a remedial action directive, such as: (a) specifying operating or planning criteria or limits; (b) requiring specific system studies; (c) defining operating practices or guidelines; (d) requiring confirmation of data, practices, or procedures through inspection, testing, or other methods; (e) requiring specific training for personnel; (f) requiring development of specific operating plans; and/or (g) requiring an independent contractor for internal audit.  TRE also has authority to apply a sanction, which is not limited to a monetary penalty, with the objective of promoting reliability and compliance with the reliability standards, such as limiting the entity's activities, functions, or operations, or placing the entity on a reliability watch list.

## Section 3.11.  Environmental Laws and Regulations

The Debtors are subject to numerous federal, state and local laws and regulations with regard to air and water quality, hazardous and solid waste management, environmental remediation and other environmental matters.  Environmental laws and regulations affecting the Debtors include, but are not limited to:

- the Clean Air Act, as well as state laws and regulations impacting air emissions, including State Implementation Plans relating to existing and new National Ambient Air Quality Standards for ozone and particulate matter. Owners and/or operators of air emission sources are responsible for obtaining permits and for annual compliance and reporting;

- the Clean Water Act, as well as state laws and regulations regarding water quality, which require permits for facilities that discharge wastewater and storm water into the environment;

- the Comprehensive Environmental Response, Compensation and Liability Act, which can require any individual or entity that currently owns or in the past may have owned or operated a disposal site, as well as transporters or generators of hazardous substances sent to a disposal site, to share in remediation costs; and

- the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, as well as state laws and regulations regarding solid and hazardous waste, which require certain solid wastes, including hazardous wastes, to be managed pursuant to a comprehensive regulatory regime.

These laws and regulations can result in increased capital, operating and other costs. These laws and regulations generally require the Debtors to obtain and comply with a wide variety of environmental licenses, permits, inspections and other approvals.  Compliance with these laws and regulations can require significant expenditures, including expenditures for the installation of pollution control equipment, environmental monitoring, emissions fees, permits and cleanup costs and damages arising from contaminated properties.  Failure to comply with environmental regulations may result in the assessment of administrative, civil and criminal penalties, including the assessment of monetary penalties, the imposition of investigatory and remedial obligations, the suspension or revocation of necessary permits, licenses and authorizations, the requirement that additional pollution controls be installed and the issuance of orders enjoining future operations or imposing additional compliance requirements.

Additionally, other recently passed and potential future environmental laws and regulations could have a significant impact on the Debtors' results of operations, cash flows or financial position.  The U.S. Environmental Protection Agency (EPA) has adopted and is in the process of implementing regulations governing the emission of nitrogen oxide (NOx), sulfur dioxide (SO2), particulate matter, mercury and other air pollutants under the Clean Air Act through the National Ambient Air Quality Standards, the Mercury and Air Toxics Standards rule and other air quality regulations.  The EPA also adopted the Cross-State Air Pollution Rule, which provides for limits on the interstate transport of NOx and SO2 emissions, and recently finalized regulations governing the management of cooling water intake structures.  In addition, the EPA has proposed revisions to the effluent guidelines for steam electric generating plants under the Clean Water Act and proposed new carbon dioxide (CO2) emissions requirements for existing fossil fuel electric generating units, called the Clean Power Plan.  There have also been a number of other federal and state legislative and regulatory initiatives to reduce greenhouse gas (GHG) emissions.  These recent and potential future environmental laws and regulations may require the Debtors to make additional capital expenditures and increase operating and maintenance costs.

## ARTICLE IV

## THE CHAPTER 11 CASES

### Section 4.01.  Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Chapter 11 authorizes a debtor to reorganize its business for the benefit of its creditors, interest holders, and other parties in interest.  Commencing a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The principal objective of a chapter 11 case is to consummate a plan of reorganization or liquidation. A plan of reorganization or liquidation sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by a bankruptcy court binds a debtor, any issuer of securities thereunder, any person acquiring property under the plan, any creditor or interest holder of a debtor, and any other person or entity the bankruptcy court may find to be bound by such plan. Chapter 11 contains certain requirements related to obtaining the approval of a plan of reorganization by the bankruptcy court.

Subject to certain limited exceptions, the bankruptcy court order confirming a plan of reorganization or liquidation discharges a debtor from any debt that arose prior to the effective date of a plan of reorganization or liquidation, and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization or liquidation.

Prior to soliciting acceptances of a proposed plan of reorganization or liquidation, Bankruptcy Code section 1125 requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor typical of the types of claims and interests in the case to make an informed judgment regarding acceptance of the plan of reorganization or liquidation. This Disclosure Statement is submitted in accordance with Bankruptcy Code section 1125.

## Section 4.02.  First Day Motions

The Debtors devoted substantial efforts to stabilizing their operations and preserving and restoring their relationships with vendors, customers, landlords and utility providers that had been impacted by the commencement of these Chapter 11 Cases. As a result of these initial efforts, the Debtors minimized the negative impact resulting from the commencement of these Chapter 11 Cases.

On the Petition Date, in addition to the voluntary petitions for relief filed by the Debtors under chapter 11 of the Bankruptcy Code, the Debtors also filed a number of "first day" motions and applications (collectively, the "*First Day Motions*") with the Bankruptcy Court. The Bankruptcy Court entered several orders to, among other things: (i) prevent interruptions to the Debtors' businesses; (ii) ease the strain on the Debtors' relationships with certain essential constituents; (iii) allow the Debtors to retain certain advisors necessary to assist the Debtors with the administration of the Chapter 11 Cases; and (iv) obtain debtor in possession financing (each, a "*First Day Order*"). The First Day Motions and First Day Orders are described in more detail below:

(a)    Administrative Motions

To facilitate a smooth and efficient administration of these Chapter 11 Cases, the Bankruptcy Court entered a procedural order authorizing the joint administration of the Debtors' Chapter 11 Cases [D.I. 27].

(b)    Cash Management Systems

As part of a smooth transition into these Chapter 11 Cases, the Debtors sought and the Bankruptcy Court entered certain orders authorizing the Debtors to (i) continue using the

Debtors' existing cash management system, (ii) maintain existing bank accounts and business forms, (iii) continue intercompany transactions, and (iv) grant superpriority administrative expense status to postpetition intercompany payments [D.I. 30, 140]. Further, the Bankruptcy Court deemed the Debtors' bank accounts to be debtor in possession accounts and authorized the Debtors to maintain and continue using these accounts in the same manner as those employed before the Petition Date without reference to their status as debtors in possession.

(c)     Critical Vendors

The Debtors rely on their vendors to, among other things, (i) assist the Debtors in complying with applicable governmental laws and regulations, (ii) supply essential raw materials, specialized replacement parts and supplies, operations consumables, and certain other goods required to operate the Debtors' generating facilities and ensure continuous business operations, and (iii) ensure the wide range of specialized equipment the Debtors utilize for energy production and pollution control operate in an effective, safe, and efficient manner. While the Debtors rely on hundreds of vendors, payments for truly critical vendors represented less than 0.14 percent of the Debtors' approximately $720 million of total unsecured and project debt. The disruption of their work would impede the Debtors' ability to continue operation. Therefore, the Bankruptcy Court entered a First Day Order authorizing the Debtors to pay prepetition claims of certain critical vendors in the interim amount of $450,000 [D.I. 34]. The Debtors obtained a Final Order authorizing them to pay their critical vendors in the aggregate amount of $750,000 on March 4, 2014 [D.I. 126]. As of March 3, 2015, Altura Cogen and Cedar Bayou had paid their critical vendors $191,223.79 and $0, respectively, pursuant to the Final Order.

(d)     Lien Claimants

Before the Petition Date, and in the ordinary course of business, the Debtors contracted with certain domestic third-party carriers and warehousemen (the "*Lien Claimants*") to ship, transport, and deliver raw materials, parts, and components to the Debtors. The Debtors use certain raw materials without which the Debtors cannot generate electricity or maintain compliance with environmental regulations. Additionally, the Debtors' generating facilities employ sophisticated generating equipment to monitor the facilities, move supplies within the facilities, and produce energy, which all require replacement parts, supplies, and other critical goods to continue operating. An inability to acquire raw materials and parts from the Lien Claimants could have resulted in a slow-down or shut-down of the Debtors' operations at various facilities. The Debtors were concerned that unless these Lien Claimants were paid outstanding prepetition amounts, many of these Lien Claimants would refuse to perform their ongoing obligations under their existing agreements with the Debtors or may refuse to release goods in their possession, which would have had a material adverse effect on the Debtors' businesses. The Bankruptcy Court entered a First Day Order [D.I. 34] and then, on March 4, 2014, a Final Order [D.I. 126] authorizing, among other things, the Debtors to pay certain prepetition claims of the Lien Claimants.

(e)   Energy Trading

The Debtors were parties to prepetition contracts with respect to energy trading. First, the SEPSA became effective on January 1, 2007, for an initial term of fifteen (15) years, with an automatic two-year renewal option thereafter, until January 1, 2047. Under the SEPSA, Lyondell purchases a portion of the power generated at the Altura Cogen Plant, and the steam produced from the power production operations. The SEPSA requires Altura Cogen to deliver to Lyondell every 24-hour period up to (i) 80 megawatts of electric capacity and the associated energy and (ii) 1.33 million pounds of steam per hour from the Altura Cogen Plant. Second, on May 18, 2009 Optim Marketing entered into an ISDA 2002 Master Agreement (the "*EDF ISDA*") with EDF. Under the EDF ISDA, Optim Marketing and EDF enter into transactions for the purchase, sale or exchange of natural gas products and derivatives. Third, on October 31, 2008 Cedar Bayou (as successor in interest to Optim Marketing) entered into an ISDA 2002 Master Agreement (as amended, the "*NRG ISDA*" and, together with the SEPSA and the EDF ISDA and the transactions under each of the foregoing, the "*Energy Trading Contracts*") with NRG Power Marketing for the purchase of natural gas supply for Cedar Bayou's 50% share of the Cedar Bayou Plant's fuel requirements. Concerned that certain counterparties could take actions adverse to the Debtors as a result of the bankruptcy filings, out of an abundance of caution, the Debtors sought and the Bankruptcy Court entered a First Day Order [D.I. 35] and then, on March 6, 2014, a Final Order [D.I. 139] authorizing, among other things, the Debtors to continue performance under their Energy Trading Contracts, enter into new trading contracts, and pledge Collateral as necessary and appropriate under their trading contracts, provided that notice was provided to certain parties.

(f)   Taxes and Fees

The Debtors believed that, in some cases, certain taxing, regulatory, and governmental authorities had the ability to exercise rights and remedies if the Debtors failed to remit certain taxes and fees. Accordingly, the Debtors sought entry of an order authorizing the Debtors to pay certain fees and taxes to avoid harm to the Debtors' business operations. On February 12, 2014, the Bankruptcy Court entered a First Day Order authorizing the Debtors to pay certain taxes and fees [D.I. 33], and on March 6, 2014, the Bankruptcy Court entered a Final Order authorizing the Debtors to pay such taxes and fees [D.I. 138].

(g)   Utilities

Section 366 of the Bankruptcy Code protects debtors from utility service cutoffs upon a bankruptcy filing while providing utility companies with adequate assurance that the debtors will pay for postpetition services. To ensure uninterrupted utility service, the Debtors filed a First Day Motion seeking entry of an order approving procedures for, among other things, determining adequate assurance for utility providers and prohibiting utility providers from altering, refusing or discontinuing services without further order by the Bankruptcy Court [D.I. 9]. On February 12, 2014, the Bankruptcy Court entered a First Day Order approving the relief requested in this motion [D.I. 31] and, on March 4, 2014, the Bankruptcy Court entered a Final Order approving the relief requested in this motion [D.I. 127].

(h)     DIP Facility and Cash Collateral

On the Petition Date, the Debtors filed a motion [D.I. 16] to obtain approval of the DIP Facility and use of the Pre-Petition Secured Parties' Cash Collateral to fund operational and other expenses during the Chapter 11 Cases.  Following the First Day Hearing, on the Petition Date the Bankruptcy Court entered an interim order authorizing the Debtors' use of Cash Collateral and to borrow up to $75 million under the DIP Facility [D.I. 36].  On March 6, 2014, the Bankruptcy Court entered a Final Order authorizing the Debtors' use of Cash Collateral and granting approval to borrow up to $115 million under the DIP Facility [D.I. 144].  Following the closing on the sale of the Twin Oaks Plant, the commitment was reduced to $85 million (from $115 million) and the letter of credit sublimit was reduced to $47 million (from $56 million).  The letter of credit sublimit was reduced again, to $44 million, on April 20, 2015 upon the approval by the Bankruptcy Court of Amendment No. 15 to the DIP Credit Agreement [D.I. 851].  The hedging sublimit under the DIP has remained unchanged.  As of August 14, 2015, $45 million in letters of credit was outstanding under the DIP Facility, and no loan balance was outstanding.  Under the Debtors' cash management system, Cash generated from the operating Debtors is consolidated into accounts and investments held by Optim Energy.  The use of Cash is subject to the DIP Credit Agreement (as amended) and the Final DIP Order.

**Section 4.03.  Employee Incentive Plans**

During the course of the Chapter 11 Cases, the Debtors implemented certain employee incentive plans.  The terms of these narrowly-tailored plans were calculated and developed by Optim Energy's independent board of directors with the assistance of Debtors' advisors.  A summary of these incentive plans is provided below:

(a)     2014 Bonus Plan

The Debtors outsourced operational management of the Twin Oaks Plant and the Altura Cogen Plant pursuant to the Operations and Maintenance Services Agreement between NAES and Twin Oaks LP (the "***Twin Oaks NAES Agreement***") and the Altura Cogen NAES Agreement (together with the Twin Oaks NAES Agreement, the "***O&M Agreements***").  Pursuant to the O&M Agreements, in connection with the sale of the Twin Oaks Plant and consistent with past practice, the Debtors and NAES agreed on terms for a Bonus Plan for 2014 that set parameters under which a plant worker or plant manager could earn his or her bonus.  The incentive program was based on the weighted average performance with respect to, among other things: (i) unit availability; (ii) EBITDA; (iii) cost efficiency; (iv) safety performance; (v) environmental compliance; and (vi) other factors deemed relevant by management in their reasonable discretion and judgment.  In total, there were approximately 100 NAES plant workers eligible to receive a bonus under the Bonus Plan.  The maximum amount payable under the Bonus Plan was approximately $1.9 million in the aggregate.  To date, $1,585,000 has been paid under the Bonus Plan in the aggregate.

(b)     The KEIP

As described above, the Debtors outsourced executive management responsibilities, which were performed by CPV pursuant to the CPV Management Agreement.  The primary

officer and director provided by CPV is Mr. Rahn.  In addition to the ordinary course incentive bonuses described above, on May 14, 2014 the Debtors implemented a Key Employee Incentive Plan (the "**KEIP**") approved by the Bankruptcy Court [D.I. 293].  In addition to Mr. Rahn, four members of the plant management personnel employed by NAES and two members of the plant management personnel employed by CPV were eligible to participate in the KEIP.  The maximum amount that could be earned under the KEIP was $400,000, which has been paid.

      (c)      The Original MIP

The Debtors implemented a Management Incentive Plan (the "**Original MIP**") for Mr. Rahn in connection with the sale of the Twin Oaks Plant.  On May 14, 2014, the Bankruptcy Court entered an order approving the Original MIP [D.I. 293].  The maximum sale bonus that Mr. Rahn could earn under the Original MIP was $250,000, which was comprised of two components.  First, a $150,000 bonus was earned upon the approval of the Twin Oaks bidding procedures.  Second, a sale bonus component capped at $100,000, which was based on a percentage of sale proceeds above a threshold, was earned upon the Bankruptcy Court's entry of the Order approving the sale of the Twin Oaks Plant.  Under the Original MIP, $250,000 has been paid to Mr. Rahn.

      (d)      The Gas Plant Portfolio MIP

The Debtors implemented a second Management Incentive Plan (the "**Gas Plant Portfolio MIP**") for Mr. Rahn, the Chief Executive Officer of Optim Energy and the Debtors' key manager, in connection with the Sale of the Gas Plant Portfolio.  On October 27, 2014, the Bankruptcy Court entered an order approving the Gas Plant Portfolio MIP [D.I. 612].  The incentive award payable to Mr. Rahn under the Gas Plant Portfolio MIP is comprised of two components.  There is a $200,000 bonus payable upon the entry of: (x) a final order approving a sale of the Gas Plant Portfolio; (y) a confirmation order approving the transactions set forth in a plan sponsor agreement that results in a disposition of the Gas Plant Portfolio; or (z) an order approving any other binding sale agreement or plan sponsor agreement relating to the disposition of the Gas Plant Portfolio to a buyer unaffiliated with the DIP Lenders or the Pre-Petition Secured Parties.  There is also a sale bonus component, which is based on a percentage of sale proceeds above a threshold.  If the Third Amended Plan becomes effective, Mr. Rahn will not receive any compensation under the terms of the Gas Plant Portfolio MIP.

## ARTICLE V

## OTHER SIGNIFICANT EVENTS OF THE CHAPTER 11 CASES

### Section 5.01.  DIP Facility Milestones[19] and Amendments

The DIP Facility has been amended several times, with the consent of the DIP Lenders (and in certain cases, as required, the consent of the L/C Issuer and the approval of the

---

[19] Capitalized terms used in this Section 5.01 shall have the meanings ascribed to such terms under the Final DIP Order.

Bankruptcy Court), since entry of the Final Order approving it.  The following milestones have been met:

(i)      As soon as practicable, but in any event no later than June 17, 2014, either (a) execute a sale agreement with a stalking horse bidder relating to the sale of, at a minimum, Twin Oaks or substantially all of Twin Oaks' assets, and file a sale motion and bidding procedures motion relating to such sale with the Bankruptcy Court, or (b) file a bidding procedures motion and an auction sale motion with the Bankruptcy Court to implement bidding procedures for a sale of Twin Oaks or substantially all of Twin Oaks' assets without a stalking horse bidder; in each case acceptable to the Majority Lenders in their sole discretion;

(ii)     No later than July 11, 2014, obtain entry of a bidding procedures order from the Bankruptcy Court approving bidding procedures for a sale of Twin Oaks or substantially all of Twin Oaks' assets;

(iii)    No later than August 12, 2014, obtain Bankruptcy Court approval of a sale of Twin Oaks or substantially all of Twin Oaks' assets, to the extent a successful bidder has been selected;

(iv)     No later than May 18, 2015, deliver to the Lenders either (a) a draft Plan of Reorganization and Disclosure Statement, in each case acceptable to the Majority Lenders in their reasonable discretion or (b) a Sale Proposal acceptable to the Majority Lenders in their reasonable discretion; and

(v)      No later than March 20, 2015, file the Plan of Reorganization and the Disclosure Statement or file a sale and bidding procedures motion relating to the Sale Proposal with the Bankruptcy Court.

The following milestone has not been met and remains outstanding:

(vi)     No later than August 3, 2015, obtain confirmation by the Bankruptcy Court of the Plan of Reorganization, and with respect to attaining the effective date of the Plan of Reorganization or consummating the sale contemplated by the Sale Proposal, no later than August 21, 2015.

In addition, on April 20, 2015, the Bankruptcy Court entered an order approving Amendment No. 15 to the DIP Credit Agreement [D.I. 851], implementing the following changes to the DIP Credit Agreement:

(i)      <u>Extension of Outside Date and Related Fees</u>: The original DIP Credit Agreement established February 12, 2015 as the initial Outside Date. Pursuant to Section 2.2(h) of the DIP Credit Agreement, the Debtors elected to extend the initial Outside Date by a single three-month period to May 12, 2015 (the "***First Extension Date***").  Pursuant to Amendment No. 15, (a) the Outside Date is further extended to August 31, 2015, subject to certain conditions and approvals, and (b) Optim Energy may elect to

further extend the Outside Date to September 30, 2015, subject to certain conditions and approvals. Each such extension of the Outside Date shall be an "***Extension***" and the Outside Date as extended in each case shall be the "***Extended Outside Date***." Upon the effectiveness of the Extension under clause (a) above, a fee equal to one percent (1.00%) times the Lenders' aggregate outstanding Commitments available at the time of such Extension, whether drawn or undrawn, determined on the first day of such Extension (an "***Extension Fee***" and together with the extension fee incurred on the First Extension Date, the "***Extension Fees***") shall accrue; provided, however, the Extension Fees shall be payable on the latest Extended Outside Date. A conforming amendment to Section 14.2 of the DIP Credit Agreement was also made to include the additional Extension being contemplated by the Majority Lenders as defined under the DIP Credit Agreement.

(ii)    <u>Use of Excess Cash Collateral</u>: Section 3.3(c) of the DIP Credit Agreement states that on the first business day of each month, operating cash in excess of the Liquidity Cushion shall be used <u>first</u>, to repay outstanding indebtedness under the DIP Credit Agreement, and <u>second</u>, to Cash Collateralize any outstanding Letters of Credit. Pursuant to Amendment No. 15, the parties have agreed to terminate the Waiver Letter and re-implement a modified cash sweep provision under Section 3.3(c) of the DIP Credit Agreement, requiring operating cash in excess of the sum of the Liquidity Cushion plus $3.5 million, by at least $1 million, to be used <u>first</u>, to repay outstanding indebtedness under the DIP Credit Agreement, <u>second</u>, to make adequate protection payments to the Pre-Petition Secured Parties to reduce the Pre-Petition Indebtedness, and <u>third</u>, if all outstanding Pre-Petition Indebtedness has been repaid, to Cash Collateralize any outstanding Letters of Credit on a pro-rata basis, in all cases subject to the re-borrowing provisions of Section 2.2 of the DIP Credit Agreement.

(iii)    <u>Letters of Credit</u>: Pursuant to Amendment No. 15, the definition of "Letter of Credit Sublimit" in the DIP Credit Agreement is modified (a) to reduce the sublimit from an amount equal to $47 million to an amount equal to $44 million, and (b) to eliminate the credit support made available for Walnut Creek because the Debtors rejected the Walnut Creek fuel supply agreement in 2014 so there is no longer any need for this credit support and the letter of credit previously issued from the benefit of Walnut Creek has been terminated, undrawn, in accordance with the *Stipulation Resolving Emergency Motion Filed by Walnut Creek Mining Company*, filed with the Bankruptcy Court on March 6, 2014 [D.I. 141].

(iv)    <u>Gross Margin</u>: Section 10.1 of the DIP Credit Agreement requires the Debtors to maintain aggregate monthly gross margin within a certain percentage of the forecasts provided by the Debtors and agreed to by the DIP Lenders (the "***Gross Margin Covenant***"). Pursuant to Amendment No. 15, Schedule 10.1 to the DIP Credit Agreement is also amended to

include target numbers for the Gross Margin Covenant to reflect anticipated revenues generated from the Gas Plant Portfolio for the period from February 1, 2015 through the maximum extended period ending on September 30, 2015.

Finally, on August 10, 2015, the Debtors and the DIP Lenders agreed to amend Section 12.1(q) of the DIP Credit Agreement to delete the section in its entirety (the consequence of which is that it is no longer an Event of Default under the DIP Credit Agreement if the Debtors' exclusivity period for proposing a Plan of Reorganization is terminated) [D.I. 1191].

As of August 14, 2015, letters of credit of approximately $45 million are outstanding under the DIP Facility;[20] otherwise, there are no outstanding borrowings under the facility. If the Third Amended Plan becomes effective, the DIP Facility Claims will be paid in full pursuant to the Third Amended Plan and the DIP Facility will be terminated. For more information about the specific terms of the DIP Facility, including the Debtors' stipulations and protective provisions regarding the DIP Lenders and Pre-Petition Secured Parties, refer to the Final DIP Order [D.I. 144], the DIP Motion [D.I. 16] and the exhibits thereto.

## Section 5.02.  Retention and Employment of Professionals

The Debtors filed various applications, which were subsequently approved, for employment of Professionals in connection with the Chapter 11 Cases. Such applications include: (a) Bracewell, as general bankruptcy and restructuring counsel [D.I. 172]; (b) Morris, Nichols, Arsht & Tunnell LLP, as Delaware bankruptcy co-counsel [D.I. 173]; (c) Barclays, as investment banker [D.I. 166]; (d) Protiviti, as restructuring advisor [D.I. 171]; (e) Prime Clerk as Claims and Solicitation Agent [D.I. 29, 164]; (e) KPMG LLP, as independent auditors [D.I. 279]; (f) Deloitte Tax LLP, as tax advisor [D.I. 271 and 738]; and (g) certain Professionals in the ordinary course of business [D.I. 165] (Professionals covered by this application consist of various outside Professionals whom the Debtors employed prior to filing the Chapter 11 Cases). These Professionals (and the services provided) are: (i) Nora Del Bosque (lobbying/consulting); (ii) David Carlile (coal market consultant); (iii) Element Markets (management and marketing of emissions credits); (iv) Jackson Walker LLP (legal representation in the Varner Litigation); (v) Bob Warburton (consultant/operational advice); (vi) WCM (environmental consulting, air permit for Twin Oaks repowering); (vii) Thorndike Landing (dispatch forecast for 2015 budget projections; (viii) Norton Rose Fulbright (tax advice – legal); (ix) Myers-Hill, Attorneys at Law, (tax advice (compliance) – legal), removed as an ordinary course Professional on April 20, 2015 [D.I. 853]; (x) Black & Veatch Corporation (consultant/operational advice); and (y) Property Tax Partners (property tax compliance, valuation and analysis), added as an ordinary course Professional on April 20, 2015 [D.I. 853]. Finally, the Debtors utilized Wise & Susong, LLC to obtain a mineral abstract for 2,769.762 acres in Robertson County, TX, in connection with the sale of the Twin Oaks Plant.

---

[20] In addition to the letters of credit in favor of Lyondell and NRG, on May 4, 2015, a $4 million letter of credit was issued in favor of EDF Trading North America, LLC, under the hedging sublimit, in support of an energy hedging/swap contract.

**Section 5.03.    Schedules and Statements of Financial Affairs**

On April 14, 2014, the Debtors filed their Schedules [D.I. 206-21].

**Section 5.04.    Bar Dates**

On May 9, 2014, the Bankruptcy Court entered the bar date order and established the following deadlines for filing Proofs of Claim in these Chapter 11 Cases: (a) August 11, 2014 at 4:00 p.m. (ET) as the governmental bar date by which Proofs of Claim against the Debtors by a Governmental Unit must be filed; and (b) June 18, 2014 at 4:00 p.m. (ET) as the general bar date by which Proofs of Claim against the Debtors must be filed for all other Claims (other than Administrative Claims and Rejection Damages Claims, if any) [D.I. 275].

On April 20, 2015, the Bankruptcy Court entered an order establishing May 27, 2015 at 5:00 p.m. (ET) as the deadline for filing proofs of Administrative Claim(s) (other than Excluded Claims) in these Chapter 11 Cases incurred on or before March 31, 2015 [D.I. 852].

**Section 5.05.    Walnut Creek Motion**

On April 14, 2014, Walnut Creek filed a motion seeking the derivative standing of the Debtors to pursue purported claims on behalf of the Debtors against Cascade and ECJV as Pre-Petition Secured Parties.

In connection with its motion for standing, Walnut Creek submitted a proposed complaint asserting five claims against Cascade and ECJV: (a) recharacterization of prepetition debt owed to Cascade and ECJV as equity; (b) equitable subordination of the secured claims to the claims of unsecured creditors; (c) breach of fiduciary duty; (d) aiding and abetting breach of fiduciary duty; and (e) avoidance of Cascade and ECJV's liens.  Both the Debtors and Cascade/ECJV opposed Walnut Creek's motion, arguing that Walnut Creek failed to satisfy the standard for derivative standing as it had not demonstrated that the Debtors' refusal to pursue the claims at issue was unjustified or that the claims were colorable.

The Bankruptcy Court held a hearing on Walnut Creek's motion on May 5, 2014, where all interested parties were provided an opportunity to be heard.  By opinion [D.I. 288] and accompanying Order [D.I. 289], issued May 13, 2014, the Bankruptcy Court denied Walnut Creek's request for derivative standing and found that none of Walnut Creek's claims were colorable.  More specifically, the Bankruptcy Court held that Walnut Creek's breach of fiduciary duty claims could not lie because the Debtors' operating agreement provided that no fiduciary duties were owed, which provision was supported by Delaware law.  Second, the Bankruptcy Court found that Walnut Creek's recharacterization claim was not colorable because Walnut Creek had failed to allege sufficient facts to support a claim that the prepetition transactions and financial arrangements were structured and intended as equity rather than debt, and thus were not susceptible to recharacterization.  Third, the Bankruptcy Court held that Walnut Creek had not alleged any inequitable conduct to sustain a claim of equitable subordination.  Finally, the Bankruptcy Court held that the lien avoidance claim failed because it was more in the nature of a proposed remedy than a separate claim, and Walnut Creek failed to state any basis for avoiding the liens.

On May 14, 2014, Walnut Creek filed a notice of appeal from the Bankruptcy Court's order [D.I. 296] to the United States District Court for the District of Delaware (the "***District Court***"). Oral argument took place on February 10, 2015. On March 13, 2015, the Delaware District Court entered an order affirming the Bankruptcy Court's decision denying Walnut Creek derivative standing to pursue purported claims on behalf of the Debtors against Cascade and ECJV as Pre-Petition Secured Parties. On April 13, 2015, the deadline to appeal the District Court's decision passed with no notice of appeal being filed by Walnut Creek. Therefore, the stipulations and other protections for the benefit of the DIP Lenders and Pre-Petition Secured Parties in the Final DIP Order are binding on all parties in interest.

## Section 5.06.  Exclusivity

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of one hundred twenty (120) days from the petition date (which may be extended by a bankruptcy court for a period of up to eighteen (18) months from the petition date) (the "***Exclusive Filing Period***"). If a debtor files a plan within this initial exclusive period, then the debtor has the exclusive right for one hundred eighty (180) days from the petition date to solicit acceptances to the plan (which may be extended by a bankruptcy court for a period of up to twenty (20) months from the petition date) (the "***Exclusive Solicitation Period***"). During these exclusive periods, no other party in interest may file a competing plan of reorganization. However, a court may extend these periods only up to the extensions mentioned above upon request of a party in interest and "for cause."

The Debtors' initial 120-day Exclusive Filing Period was scheduled to expire on June 12, 2014 with the initial 180-day Exclusive Solicitation Period set to expire on August 11, 2014. On June 10, 2014, the Bankruptcy Court extended the Exclusive Filing Period through and including October 10, 2014 and the Exclusive Solicitation Period through and including December 9, 2014 [D.I. 343]. On November 10, 2014, the Bankruptcy Court further extended the Exclusive Filing Period through and including February 9, 2015 and the Exclusive Solicitation Period through and including April 10, 2015 [D.I. 632]. On February 3, 2015, the Bankruptcy Court further extended the Exclusive Filing Period through and including June 9, 2015 and the Exclusive Solicitation Period through and including August 10, 2015 [D.I. 722]. On June 8, 2015, the Debtors filed a motion to extend the Exclusive Filing Period through and including August 12, 2015 and the Exclusive Solicitation Period through and including October 12, 2015 [D.I. 1000]. The Debtors operated under a bridge order provided under the Bankruptcy Rules until the Bankruptcy Court entered an order, on August 14, 2015, approving the motion and extending the Exclusive Filing Period through and including August 12, 2015 and the Exclusive Solicitation Period through and including October 12, 2015 [D.I. 1205]. The Liquidating Debtors and the Merging Debtors filed the Plan within the Exclusive Filing Period.

## Section 5.07.  Twin Oaks Plant Sale

On June 17, 2014, the Debtors filed a motion [D.I. 359] to sell the Twin Oaks Plant free and clear of liens pursuant to section 363(f) of the Bankruptcy Code. On July 3, 2014, the Bankruptcy Court entered an order [D.I. 423] approving the Debtors' selection of Twin Oaks Power, LLC, an affiliate of ArcLight Capital Partners, LLC, as the proposed purchaser of the Twin Oaks Plant. The Debtors conducted an auction on August 4, 2014 (the "***Twin Oaks***

-27-

*Auction*").  At the Twin Oaks Auction, the Debtors stated on the record that Blackstone had reached a nonexclusive agreement to purchase the Walnut Creek mine and that this agreement was contingent upon Major Oak Power, LLC, an affiliate of Blackstone, being the successful bidder for the Twin Oaks Plant [D.I. 470].  As this agreement was nonexclusive, other parties, including potential and actual bidders, were free to submit offers to acquire the Walnut Creek mine.  At the conclusion of the Twin Oaks Auction, the Debtors determined that: (a) Major Oak Power, LLC was the highest and best bidder for the Twin Oaks Plant with a bid of $126 million; and (b) Twin Oaks Power, LLC was the second highest and best qualifying back-up bidder for the Twin Oaks Plant with a bid of $121.5 million.  On August 5, 2014, the Debtors filed a notice [D.I. 467] with the Bankruptcy Court in this regard.  On October 14, 2014, the Debtors closed on the sale of the Twin Oaks Plant to Major Oak Power, LLC.  Proceeds from the sale of the Twin Oaks Plant were used first to pay the administrative costs associated with the sale and then to pay down the Pre-Petition Secured Parties under the Pre-Petition Reimbursement Agreement.  The parent of Walnut Creek (a Blackstone affiliate) also closed the nonexclusive agreement announced at the Twin Oaks Auction to purchase the membership interests of Walnut Creek, and thereby gain ownership of the Walnut Creek mine.

**Section 5.08.  Gas Plant Portfolio Disposition**

In light of the successful Twin Oaks Plant sale, the Debtors carefully considered whether a similar process should be explored with respect to the Gas Plant Portfolio.  In consultation with the Debtors' advisors, their independent directors and with the Consultation Parties, the Debtors ultimately determined that, in light of existing market conditions and the nature of the Debtors' operations and assets after the Twin Oaks Plant sale, marketing the Gas Plant Portfolio may be the best alternative to maximize value for the Debtors' estates and to reorganize their affairs.

As was done with the Twin Oaks Plant, in November 2014 the Debtors initiated a broad-based marketing process led by Barclays.  Barclays prepared a high level "teaser" that provided basic information regarding the opportunity to purchase the Gas Plant Portfolio.  The teaser was sent to more than seventy (70) parties that Barclays believed, based on its experience with the Twin Oaks Plant and in conducting sales of assets in distressed situations and sales of power plant facilities, might have an interest in acquiring the Gas Plant Portfolio. The recipients of the teaser included private equity investors and strategic industry participants.

Barclays received a high level of initial interest in the Gas Plant Portfolio. Nearly thirty (30) parties executed confidentiality agreements (collectively, the "***Potential Purchasers***"). Potential Purchasers received a Confidential Information Memorandum setting forth detailed information about the Gas Plant Portfolio, including technical descriptions of the facilities, a summary of existing commercial arrangements and key contracts, historical operating data, and market and environmental overviews.  The Debtors also provided Potential Purchasers with access to Barclays and the facilities' management for their preliminary due diligence.  The Debtors requested that Potential Purchasers submit non-binding preliminary proposals to purchase the Gas Plant Portfolio (the "***Preliminary Proposals***") by November 21, 2014.  Several Potential Purchasers submitted Preliminary Proposals.

The Debtors, in consultation with their advisors and independent directors, reviewed the Preliminary Proposals with the Consultation Parties.  After a thorough review process, the

Debtors invited several Potential Purchasers to participate in a second round of the marketing process (the "***Round Two Participants***").  The Debtors and their advisors provided Round Two Participants with access to an electronic data room containing extensive information about the Gas Plant Portfolio.  The data room included copies of the applicable Debtors' significant contracts, detailed financial reports, and comprehensive operational data.  The Debtors and their advisors designed the second round of the marketing process to elicit detailed binding proposals from the Round Two Participants.

The Debtors provided each of the Round Two Participants an opportunity to tour the facilities, attend a management presentation and participate in detailed question and answer sessions.  Several of the Round Two Participants retained independent consultants and advisors to assist with their due diligence and bid preparation. The Debtors distributed a proposed form of purchase agreement to Round Two Participants and established a deadline for Round Two Participants to submit definitive documented bids.  The Debtors, in consultation with their advisors and independent directors, reviewed the bids received from Round Two Participants with the Consultation Parties.  The Debtors determined that the best path forward for a potential sale of the Gas Plant Portfolio was through a court-approved process in accordance with the Bidding Procedures.  The Bidding Procedures provided, among other things, that in order for a bid to be a Qualifying Bid (as defined therein), such bid must be in the amount of not less than the $355 million Reserve Price.

The Debtors built this marketing process into their Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, filed on March 18, 2015 (the "***Initial Plan***").  Under the Initial Plan, the Debtors sought an auction and sale of the Gas Plant Portfolio provided certain transaction conditions were met.  If these transaction conditions were not met then the Initial Plan provided for the Gas Plant Portfolio to be handed over to the Pre-Petition Secured Parties in exchange for the Allowed Pre-Petition Secured Parties Secured Claims.

The Bidding Procedures were approved on April 22, 2015, with the Bid Deadline set on May 1, 2015.  After the adjournment of the April 22, 2015 hearing, the Debtors awaited any bids above the $355 million Reserve Price.  However, the Debtors receive no satisfactory bids by the Bid Deadline.  With the option of an auction and sale thereby eliminated, the Debtors proceeded to formulate the Third Amended Plan, which provided for, among other things: (i) the delivery of the equity interests in the Gas Plant Portfolio to the Pre-Petition Secured Parties in exchange for the Pre-Petition Secured Parties Secured Claims against the Reorganizing Debtors (rather than a sale of the Gas Plant Portfolio); (ii) the reorganization of the Reorganizing Debtors while leaving the remaining Debtors for another day; and (iii) the execution of a $110 million Exit Facility and a $50 million Second Lien Note.  The Third Amended Plan is discussed in more detail in Section 5.12 of this Disclosure Statement.

**Section 5.09.  Nonresidential Leases**

Under the Bankruptcy Code, for unexpired leases of nonresidential real property with respect to which a debtor is the lessee, a debtor must make a decision to assume or reject the lease within an initial period of one-hundred twenty (120) days from the petition date (the "***Nonresidential Lease Deadline***").  A bankruptcy court may extend the 120-day period (prior to

its expiration) for ninety (90) days on the motion of the debtor or lessor "for cause."  Any subsequent extensions of time require the written consent of the lessor in each instance.

The Debtors' initial 120-day Nonresidential Lease Deadline was June 12, 2014.  On June 10, 2014, the Bankruptcy Court extended the Nonresidential Lease Deadline through and including September 10, 2014 [D.I. 342].  On August 19, 2014, the Bankruptcy Court entered an order [D.I. 495] approving a stipulation and further extension of the Nonresidential Lease Deadline, through and including November 12, 2014, with respect to the CB 4 Lease.   On August 22, 2014, the Bankruptcy Court entered an order [D.I. 506] approving a stipulation and further extension of the Nonresidential Lease Deadline, through and including November 12, 2014 at 4:00 p.m. (ET), with respect to the Altura Lease.  On November 7, 2014, the Bankruptcy Court entered orders [D.I. 628-29] approving stipulations and further extension of the Nonresidential Lease Deadline, through and including February 9, 2015, with respect to the foregoing two leases.  On January 14-15, 2015, the Bankruptcy Court entered orders [D.I. 688 and 697] approving stipulations and further extension of the Nonresidential Lease Deadline, through and including June 9, 2015, with respect to the foregoing two leases.  On May 13-14, 2015, the Bankruptcy Court entered orders [D.I. 907 and 915] approving stipulations and further extension of the Nonresidential Lease Deadline, through and including August 12, 2015, with respect to the foregoing two leases.  On July 22, 2015, the Bankruptcy Court entered an order [D.I. 1119] approving a stipulation and further extension of the Nonresidential Lease Deadline, through and including September 16, 2015, with respect to the CB 4 Lease.  On August 10, 2015, the Bankruptcy Court entered an order [D.I. 1188] approving a stipulation and further extension of the Nonresidential Lease Deadline, through and including August 31, 2015, with respect to the Altura Lease.

## Section 5.10.  Sales and Use Tax Claims Against Twin Oaks GP

As described in the First Day Declaration and in the Debtors' First Day Motion regarding taxes and fees, use taxes arise in the ordinary course of the Debtors' business when the Debtors purchase certain goods and services, including fuel, power generation-related equipment, and other spare equipment parts, from vendors who do not have business operations in the State of Texas.  Applicable law and regulations require the Debtors to self-assess the amount of such taxes, and subsequently pay use taxes monthly.  The Texas Comptroller of Public Accounts on behalf of the State of Texas, Texas Municipalities, Texas Counties, Special Purpose Districts and/or Texas Metropolitan or Regional Transportation Authorities (the "***Tax Authority***") filed Proofs of Claim in the Chapter 11 Cases, which are described below:

(a)    <u>Priority Tax Claim</u>

In Proof of Claim number 107, the Tax Authority asserted a Priority Tax Claim against Twin Oaks GP in the amount of $1,192,048.01, including penalties and interest.  On March 16, 2015, the Tax Authority filed Proof of Claim number 122 to amend and supersede Proof of Claim number 107, in which the Tax Authority asserted a Priority Tax Claim against Twin Oaks GP in the amount of $642,519.59, including penalties and interest, which represents purported unpaid sales and use taxes allegedly owed by Twin Oaks GP for the period from February 2011 through the Petition Date.  Twin Oaks GP is currently in discussions with the Tax Authority to

resolve its Priority Tax Claim against Twin Oaks GP; however, Twin Oaks GP reserves the right to object to such Claim if necessary.

(b)        Administrative Claim

In Proof of Claim number 106, the Tax Authority asserted an Administrative Claim against Twin Oaks GP in the amount of $142,197.44, including penalties and interest. On March 16, 2015, the Tax Authority filed Proof of Claim number 120 to amend and supersede Proof of Claim number 106, in which the Tax Authority asserted an Administrative Claim against Twin Oaks GP in the amount of $73,839.32, including penalties and interest, which represents purported unpaid sales and use taxes allegedly owed by Twin Oaks GP since the Petition Date. Twin Oaks GP has reviewed its books and records and believes that Twin Oaks GP has funded all of its sales and use tax payment obligations to the Tax Authority during these Chapter 11 Cases.  Twin Oaks GP is currently in discussions with the Tax Authority to resolve its Administrative Claim against Twin Oaks GP; however, Twin Oaks GP reserves the right to object to such Claim if necessary.

**Section 5.11.  Lyondell Claims and Objections**

On June 16, 2014, Lyondell filed Proofs of Claim (Nos. 75 and 86) against Altura Cogen and Optim Energy asserting secured Claims of $503,359.00 based on Altura Cogen's obligations to Lyondell under the SEPSA, which are guaranteed by Optim Energy pursuant to that certain Guaranty, dated December 10, 2010, and which are further secured by the letter of credit issued under the DIP Credit Agreement for the benefit of Lyondell.  The Debtors disputed the secured status and validity of the Claims and entered into negotiations with Lyondell.  The Claims stemming from the Debtors' obligations under the SEPSA were agreed to be settled at an amount of $250,000, conditioned upon the SEPSA being assumed.

In general terms, the SEPSA provides that neither party may assign its rights or obligations under the SEPSA without the express written consent of the other party, which consent may not be unreasonably withheld.  The Debtors and Lyondell have different views on the potential scope, applicability and enforceability of this provision of the SEPSA.  However, there is still no definitive transaction, so any effort to interpret this provision would be done in a vacuum and be based on hypotheticals that may or may not ever materialize.

Additionally, throughout these Chapter 11 Cases, Lyondell has consistently taken the position that the series of contracts and the lease between Lyondell and certain of the Debtors (collectively, the "*Altura Cogen Agreements*") are executory contracts and are inextricably entwined such that they must all be assumed or rejected as a package.  The Debtors disagree with Lyondell's position on the integrated nature of these five standalone agreements.

If the Third Amended Plan becomes effective, the claims asserted by Lyondell against Optim Energy will be satisfied.  In addition, the Guaranty, dated December 10, 2010, will be replaced by a guaranty from OE Holdings, LLC, and the letter of credit originally issued under the DIP Credit Agreement will be issued under the Exit Facility (as defined in the Third Amended Plan) for the benefit of Lyondell.

**Section 5.12.  Third Amended Plan**

On May 19, 2015, the Reorganizing Debtors filed the Third Amended Plan.  The Third Amended Plan provides for, among other things: (i) the delivery of the equity interests in the Gas Plant Portfolio to the Pre-Petition Secured Parties in exchange for the Pre-Petition Secured Parties Secured Claims against the Reorganizing Debtors (rather than a sale of the Gas Plant Portfolio); (ii) the reorganization of the Reorganizing Debtors while leaving the remaining Debtors for another day; and (iii) the execution of a $110 million Exit Facility and a $50 million Second Lien Note.

On July 13, 2015, Blackstone filed an objection to the Third Amended Plan [D.I. 1081, 1082].  On July 23-24, 2015, the Bankruptcy Court held a hearing on, among other things, confirmation of the Third Amended Plan.  At such hearing, the Bankruptcy Court announced that it would overrule Blackstone's objection, approve the Third Amended Plan, and enter an order regarding the same upon submission of such order.  On July 29, 2015, Blackstone filed a notice of appeal of the confirmation order [D.I. 1149] (the "*Confirmation Appeal*") to the District Court.[21]  On the same day, Blackstone filed a *Motion for Stay Pending Appeal* with the Bankruptcy Court [D.I. 1150, 1151] (the "*Stay Motion*") and a related motion to shorten notice [D.I. 1152].  On July 30, 2015, the Bankruptcy Court entered an order confirming the Third Amended Plan [D.I. 1159].  On August 3, 2015, the Bankruptcy Court entered the *Order Denying Motion for Stay Pending Appeal, and Providing Related Relief* [D.I. 1164] (the "*Stay Order*") implementing, among other relief, a stay of the confirmation order through August 20, 2015 (the "*Confirmation Stay*").  On August 10, 2015, the District Court entered orders staying the Appeals pending further orders of the District Court.

Following the entry of the Stay Order, the Debtors, Blackstone and the Pre-Petition Secured Parties and DIP Lender negotiated the PSA, which provides a resolution of issues between the parties, including the Appeals and issues related to the Confirmation Stay.  As a part of such resolution, the parties have agreed that the Confirmation Stay should be lifted.  In addition, the parties jointly requested that the District Court stay the Appeals, subject to further order of the District Court and revival if the settlement is not consummated, so that the parties may document and consummate the settlement described in the PSA.  Additional information on the terms of the PSA are included in Section 5.13 of this Disclosure Statement.

On August 14, 2015, the Bankruptcy Court entered an order lifting the Confirmation Stay [D.I. 1203].  The Reorganizing Debtors are working to close on the Third Amended Plan and declare the effective date.

**Section 5.13.  Plan Support Agreement**

Following the Bankruptcy Court's confirmation of the Plan on July 24, 2015, the Debtors and Blackstone continued to engage in meaningful settlement discussions designed to implement an unopposed plan of reorganization for the Liquidating and Merging Debtors, dispense with the need for appeals of the confirmation order and other related orders relating to confirmation of the Third Amended Plan, and resolve Blackstone's claims.  After these discussions, and careful

---

[21]On August 5, 2015, Blackstone filed two additional appeals [D.I. 1170, 1171] related to the Confirmation Appeal.

analysis and deliberation, on August 12, 2015 the Debtors were able to broker a settlement among the Debtors, Blackstone and the Pre-Petition Secured Parties and DIP Lender, the specific terms of which are embodied in the PSA.  The PSA provides a global resolution of all issues between Blackstone, the Debtors, the Pre-Petition Secured Parties and DIP Lender.  In general terms, the PSA contemplates as follows:[22]

- On the Effective Date, Blackstone will receive (i) Cash payment of $3,121,899.00 in full satisfaction of the WC 503(b)(9) Claim; and (ii) an Allowed General Unsecured Claim in the amount of $3,932,376.61 for which it will receive a total cash payment of $1,478,101.00 in full satisfaction of the Blackstone General Unsecured Claims.

- Blackstone's $190 million Rejection Damages Claim will receive no recovery, and will be discharged under the terms of the Plan.

- Blackstone will not contest the Plan and will agree to vote in favor of the Plan.

- The parties have agreed, subject to Bankruptcy Court approval, to hold the Appeals in abeyance pending confirmation and consummation of the Plan. Once the Plan is effective, the Appeals will be dismissed with prejudice.

On August 12, 2015, the Debtors filed a motion to approve the PSA [D.I. 1197] and a motion to have it heard on shortened notice on August 19, 2015 at 10:00 a.m. ET [D.I. 1198], which the Bankruptcy Court approved [D.I. 1204].  On August 18, 2015, the Bankruptcy Court approved the PSA [D.I. 1217].  The PSA provides a full and final settlement of all of Blackstone's claims and an ending to ongoing litigation with Blackstone in these Chapter 11 Cases on all fronts.  Ultimately, the Debtors believe the PSA marks the beginning of a smooth and swift path toward confirmation and consummation of the Plan for the Liquidating Debtors and the Merging Debtors, and will provide much-needed closure in these Chapter 11 Cases for the benefit of the Debtors' estates, creditors, and other parties in interest.

## ARTICLE VI

## TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(l) of the Bankruptcy Code, DIP Facility Claims, Administrative Claims (including Professional Claims) and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in ARTICLE III of the Plan. For either Subplan, the following designation and treatment of unclassified Claims applies:

### Section 6.01.  DIP Facility Claims

Consistent with the Final DIP Order, all DIP Facility Claims are and shall be deemed Allowed Claims against each Liquidating Debtor.  On the Effective Date the Subplan for each

---

[22] The description of these material terms of the PSA are qualified in their entirety by the PSA.

Liquidating Debtor, the holders of the Allowed DIP Facility Claims shall receive, in full and final satisfaction of such Claims, an amount of Cash equal to the amount of such Claims (including, without limitation, all outstanding principal and accrued but unpaid interest, costs, fees and expenses owing as of the Effective Date, or any other amounts due and owing under the DIP Facility) to the extent not previously paid during the Chapter 11 Cases. The Liquidating Debtors estimate the DIP Facility Claims will be paid in full under the Third Amended Plan.

## Section 6.02. Administrative Claims

To the extent not previously paid during the Chapter 11 Cases, except as otherwise provided herein or unless the holder agrees to a different treatment, each holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release and discharge of such Claim, an amount of Cash equal to the amount of such Allowed Administrative Claim on the later of: (a) the Effective Date; or (b) the date such Administrative Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by a Liquidating Debtor in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto (x) on or prior to the Effective Date, by the Liquidating Debtors from their operating accounts, and (y) after the Effective Date, by the Liquidation Trustee or the Distribution Agent, as applicable, in the ordinary course of business solely from the Liquidating Debtors Claims Reserve, subject to the provisions of the Plan. The Liquidating Debtors have no estimate of the exact amount of the Allowed Administrative Claims that will not have been previously paid as of the Effective Date.

(a)     Administrative Claims Bar Date

Holders of Administrative Claims (other than Professional Claims) shall file any request for allowance and payment of Administrative Claims by the Administrative Claims Bar Date or otherwise be forever barred, estopped, and enjoined from asserting such Claims against the Liquidating Debtors, their respective Estates and property, the Liquidation Trust, the Liquidation Trustee or the Distribution Agent, or otherwise, and such Administrative Claim shall be deemed discharged and released as of the Effective Date.

(b)     Professional Claims Bar Date

Holders of Professional Claims shall file any request for allowance and payment of such Professional Claims by the Professional Claims Bar Date or otherwise be forever barred, estopped, and enjoined from asserting such Claims against the Liquidating Debtors, their respective Estates and property, the Liquidation Trust, the Liquidation Trustee or the Distribution Agent, or otherwise, and such Professional Claims shall be deemed discharged as of the Effective Date. For the avoidance of doubt, Allowed Professional Claims shall be paid from the Professional Claims Reserve after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and other Bankruptcy Court orders.

(c)     Post-Effective Date Professional Fees

From and after the Effective Date, the Liquidation Trustee shall pay in Cash from the Liquidating Debtors Wind-Down Costs Reserve the reasonable legal fees and expenses incurred

-34-

by the Liquidating Debtors', the Merging Debtors' or the Liquidation Trustee's professionals, as applicable, incurred in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court.  For the avoidance of doubt, following the Effective Date any requirement that a professional comply with sections 327 through 331 of the Bankruptcy Code in seeking compensation for services rendered after such date shall terminate.

(d)      U.S. Trustee Fees

All fees payable pursuant to 28 U.S.C. § 1930(a) shall be paid by the applicable Liquidating Debtor, Merging Debtor or the Liquidation Trust, as applicable, for each quarter (including any fraction therein) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

**Section 6.03.  Priority Tax Claims**

To the extent not previously paid during the Chapter 11 Cases, unless the holder agrees to a different treatment each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release and discharge of such Claim, an amount of Cash equal to the amount of such Allowed Priority Tax Claim on the later of: (a) the Effective Date; or (b) the date such Priority Tax Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.  For the avoidance of doubt, Allowed Priority Tax Claims shall be paid in Cash solely from the Liquidating Debtors Claims Reserve, subject to the provisions of the Plan.  The amount of Allowed Priority Tax Claims is currently being negotiated.  Therefore, the Debtors do not know the exact amount that will be unpaid as of the Effective Date.

**ARTICLE VII**

**CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS**

For the avoidance of doubt, unless otherwise specified in ARTICLE III of the Plan, any holder of Claim(s) that is entitled to receive Cash on account of such Allowed Claim(s) under the Subplan(s) for the applicable Liquidating Debtor(s) shall be paid in Cash solely from the Liquidating Debtors Claims Reserve, subject to the provisions of the Plan, without recourse to the Liquidating Debtors, their respective Estates and property, the Liquidation Trust, the Liquidation Trustee or the Distribution Agent, or any of their property or Assets. Notwithstanding any other provision of the Plan, for obligations on which the Liquidating Debtors, the Reorganizing Debtors or the Reorganized Debtors, as applicable, are jointly and severally liable, a distribution on account of any Allowed Claim arising from such obligations under a Liquidating Debtor's confirmed Subplan shall not operate as a discharge, release and/or satisfaction of such Allowed Claim asserted against any other Liquidating Debtor for which a Subplan or Subplans are not confirmed (or do not become effective) unless and until such time that such Allowed Claim is paid in full.  In the event no holder of a Claim with respect to a specific Class for a particular Liquidating Debtor timely submits a Ballot that complies with the Disclosure Statement Order indicating acceptance or rejection of the Plan, such Class will be deemed to have accepted the Plan (including for purposes of satisfying section 1129(a)(10) of the Bankruptcy Code).      IF A CLASS(ES) OF GENERAL UNSECURED CLAIMS, CONVENIENCE CLASS CLAIMS OR BLACKSTONE GENERAL UNSECURED CLAIMS

VOTES TO REJECT THE PLAN, THE HOLDERS OF CLAIMS IN SUCH CLASS(ES) WILL NOT RECEIVE A DISTRIBUTION.  FURTHER, ANY HOLDER OF A CLAIM(S) AGAINST A LIQUIDATING DEBTOR(S) WHO REJECTS THE PLAN AND OPTS OUT OF THE RELEASES DESCRIBED IN SECTION 10.03 OF THE PLAN WILL NOT RECEIVE ANY DISTRIBUTION(S) UNDER THE SUBPLAN(S) FOR THE APPLICABLE LIQUIDATING DEBTOR(S).

**Section 7.01.  Classification**

The Plan constitutes a separate Subplan with respect to each Liquidating Debtor.  The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, confirmation and distribution pursuant to either Subplan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

Holders of Allowed Other Secured Claims shall receive Post-Petition Interest required to be paid under section 506(b) of the Bankruptcy Code (if any) on account of such Allowed Claims.  Holders of Allowed Other Priority Claims shall receive Post-Petition Interest on account of such Allowed Claims.

Claims against (other than those listed in ARTICLE II of the Plan, which are not required to be classified pursuant to section 1123(a)(1) of the Bankruptcy Code) and Equity Interests are classified as follows:

(a)    Subplan OE: Claims Against and Equity Interests in Optim Energy

| Class | Claim or Equity Interest | Status | Voting Rights |
|-------|--------------------------|--------|---------------|
| OE 1 | Allowed Pre-Petition Secured Parties Secured Claim | Impaired | Entitled to Vote |
| OE 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| OE 3 | Other Priority Claims | Unimpaired | Deemed to Accept |
| OE 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| OE 5 | Convenience Class Claims | Impaired | Entitled to Vote |
| OE 6 | Blackstone General Unsecured Claims | Impaired | Entitled to Vote |
| OE 7 | Subordinated Claims | Impaired | Deemed to Reject |
| OE 8 | Equity Interests | Impaired | Deemed to Reject |

(b)    Subplan TOLP: Claims Against and Equity Interests in Twin Oaks LP

| Class | Claim or Equity Interest | Status | Voting Rights |
|-------|--------------------------|--------|---------------|
| TOLP 1 | Allowed Pre-Petition Secured Parties Secured Claim | Impaired | Entitled to Vote |
| TOLP 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| TOLP 3 | Other Priority Claims | Unimpaired | Deemed to Accept |

| Class | Claim or Equity Interest | Status | Voting Rights |
|---|---|---|---|
| TOLP 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| TOLP 5 | Convenience Class Claims | Impaired | Entitled to Vote |
| TOLP 6 | Blackstone General Unsecured Claims | Impaired | Entitled to Vote |
| TOLP 7 | Subordinated Claims | Impaired | Deemed to Reject |
| TOLP 8 | Equity Interests | Impaired | Deemed to Reject |

**Section 7.02. Subplan OE: Treatment of Claims Against and Equity Interests in Optim Energy**

(a)    Class OE 1—Allowed Pre-Petition Secured Parties Secured Claim

(i)    *Allowance*: The Class OE 1 Allowed Pre-Petition Secured Parties Secured Claim against Optim Energy have been deemed Allowed against Optim Energy pursuant to the terms of the Final DIP Order.

(ii)    *Treatment*: The holders of Class OE 1 Allowed Pre-Petition Secured Parties Secured Claim against Optim Energy shall receive, in exchange for their Class OE 1 Allowed Pre-Petition Secured Parties Secured Claim against Optim Energy: (v) the Effective Date Class OE 1 Distributable Cash, on the Effective Date; (w) the assignment of the Intellectual Property at the direction of Cascade; (x) the residual Cash in the Liquidating Debtors Wind-Down Costs Reserve, if any, following payment of all amounts budgeted for thereunder; (y) the residual Cash in the Professional Claims Reserve, if any, following payment of all amounts budgeted for thereunder; and (z) the residual Liquidation Trust Assets, if any, following dissolution of the Liquidation Trust in accordance with Section 5.05(j) of the Plan.

(iii)    *Voting*: Class OE 1 is Impaired.  The holders of the Class OE 1 Allowed Pre-Petition Secured Parties Secured Claim against Optim Energy are entitled to vote to accept or reject the Subplan for Optim Energy.

(b)    Class OE 2—Other Secured Claims

(i)    *Treatment*: Unless the holder agrees to a different treatment, each holder of a Class OE 2 Allowed Other Secured Claim against Optim Energy shall receive, in Optim Energy's sole discretion and in full and final satisfaction, release, settlement and discharge of, and in exchange for, such holder's Allowed Other Secured Claim, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court:

a.    Cash equal to the amount of such Allowed Other Secured Claim plus Post-Petition Interest required to be paid under section 506(b) of the Bankruptcy Code (if any), payable solely from the Liquidating Debtors Claims Reserve subject to the provisions of the Plan and the Liquidation Trust Agreement;

     b.  Reinstatement of the legal, equitable and contractual rights of the holder of such Allowed Other Secured Claim, subject to the provisions of the Subplan for Optim Energy;

     c.  the Collateral securing such Allowed Other Secured Claim <u>plus</u> Post-Petition Interest required to be paid under section 506(b) of the Bankruptcy Code (if any); or

     d.  such other treatment as necessary to satisfy the requirements of section 1124(2) of the Bankruptcy Code for such Allowed Other Secured Claim to be rendered Unimpaired.

    (ii)   *Voting*: Class OE 2 is Unimpaired.  The holders of Class OE 2 Allowed Other Secured Claims against Optim Energy are conclusively deemed to accept the Subplan for Optim Energy pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(c)    <u>Class OE 3—Other Priority Claims</u>

    (i)   *Treatment*: Unless the holder agrees to a different treatment, each holder of a Class OE 3 Allowed Other Priority Claim against Optim Energy shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, Cash equal to the amount of such Allowed Claim, payable solely from the Liquidating Debtors Claims Reserve subject to the provisions of the Plan and the Liquidation Trust Agreement, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.

    (ii)   *Voting*: Class OE 3 is Unimpaired.  The holders of Class OE 3 Allowed Other Priority Claims against Optim Energy are conclusively deemed to accept the Subplan for Optim Energy pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(d)    <u>Class OE 4—General Unsecured Claims</u>

    (i)   *Treatment*: In the event that Class OE 4 votes to accept the Subplan for Optim Energy, unless the holder agrees to a different treatment each holder of a Class OE 4 Allowed General Unsecured Claim against Optim Energy (other than a holder of a Class OE 4 Allowed Pre-Petition Secured Parties Deficiency Claim against Optim Energy) shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, Cash equal to its Pro Rata share of $10,000.00 (not to exceed such holder's possible percentage recovery under Class OE 5), payable solely from the Liquidating Debtors Claims Reserve subject to the provisions of the Plan and the Liquidation Trust Agreement, on the later of:

(x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.  For the avoidance of doubt, in consideration for the Class OE 1—Allowed Pre-Petition Secured Parties Secured Claim treatment in Section 3.02(a)(ii) of the Plan, and in the event that Class OE 4 votes to accept the Subplan for Optim Energy, the holders of Class OE 4 Allowed Pre-Petition Secured Parties Deficiency Claim against Optim Energy have agreed to waive and withdraw such Claims on the Effective Date.

In the event that Class OE 4 does not vote to accept the Subplan for Optim Energy, on the Effective Date each holder of a Class OE 4 Allowed General Unsecured Claim against Optim Energy: (x) shall be enjoined from pursuing any Class OE 4 Allowed General Unsecured Claim against Optim Energy; and (y) shall not receive or retain any distribution on account of its Class OE 4 Allowed General Unsecured Claim under the Subplan for Optim Energy.

(ii)  *Amounts:* The Liquidating Debtors believe there are no holders of Class OE 4 Allowed General Unsecured Claims against Optim Energy (other than the holders of the Class OE 4 Allowed Pre-Petition Secured Parties Deficiency Claim).

(iii)  *Voting*: Class OE 4 is Impaired.  The holders of Class OE 4 Allowed General Unsecured Claims against Optim Energy are entitled to vote to accept or reject the Subplan for Optim Energy.

(e)  Class OE 5—Convenience Class Claims

(i)  *Treatment*: In the event that Class OE 5 votes to accept the Subplan for Optim Energy, unless the holder agrees to a different treatment each holder of a Class OE 5 Allowed Convenience Class Claim against Optim Energy shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, Cash equal to its Pro Rata share of $10,000.00, payable solely from the Liquidating Debtors Claims Reserve subject to the provisions of the Plan and the Liquidation Trust Agreement, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.  For the avoidance of doubt, in consideration for the Class OE 1—Allowed Pre-Petition Secured Parties Secured Claim treatment in Section 3.02(a)(ii) of the Plan, and in the event that Class OE 5 votes to accept the Subplan for Optim Energy, the holders of Class OE 4 Allowed Pre-Petition Secured Parties Deficiency Claim against Optim Energy have agreed to waive and withdraw such Claims on the Effective Date.

In the event that Class OE 5 does not vote to accept the Subplan for Optim Energy, on the Effective Date each holder of a Class OE 5 Allowed

Convenience Class Claim against Optim Energy: (x) shall be enjoined from pursuing any Class OE 5 Allowed Convenience Class Claim against Optim Energy; and (y) shall not receive or retain any distribution on account of its Class OE 5 Allowed Convenience Class Claim under the Subplan for Optim Energy.

(ii) *Amounts*: The Liquidating Debtors believe there are approximately five (5) to ten (10) holders of Class OE 5 Allowed Convenience Class Claims against Optim Energy (before taking into account any holders that elect to have their Class OE 4 Claims treated as Class OE 5 Claims) in the aggregate amount of approximately $20,000.

(iii) *Voting*: Class OE 5 is Impaired.  The holders of Class OE 5 Allowed Convenience Class Claims against Optim Energy are entitled to vote to accept or reject the Subplan for Optim Energy.

(f)     <u>Class OE 6—Blackstone General Unsecured Claims</u>

(i) *Allowance*: The Blackstone General Unsecured Claims have been deemed Allowed Class OE 6 Claims in the amount of $3,932,376.61 pursuant to the PSA (as approved by the PSA Order) and Section 3.03(f) of the Plan.

(ii) *Treatment*: In the event that Class OE 6 votes to accept the Subplan for Optim Energy, unless the holder agrees to a different treatment each holder of a Class OE 6 Allowed Blackstone General Unsecured Claim against Optim Energy shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, the Class TOLP 6—Allowed Blackstone General Unsecured Claims treatment in Section 3.03(f)(ii) of the Plan.  For the avoidance of doubt, (a) Blackstone will receive only one Cash distribution under Section 3.03(f)(ii) of the Plan in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Blackstone General Unsecured Claims against the Liquidating Debtors; and (b) in consideration for the Allowed Claim Class OE 1—Allowed Pre-Petition Secured Parties Secured Claim treatment in Section 3.02(a)(ii) of the Plan, and in the event that Class OE 6 votes to accept the Subplan for Optim Energy, the holders of Class OE 4 Allowed Pre-Petition Secured Parties Deficiency Claim against Optim Energy have agreed to waive and withdraw such Claims on the Effective Date.

In the event that Class OE 6 does not vote to accept the Subplan for Optim Energy, on the Effective Date each holder of a Class OE 6 Allowed Blackstone General Unsecured Claim against Optim Energy: (x) shall be enjoined from pursuing any Class OE 6 Allowed Blackstone General Unsecured Claim against Optim Energy; and (y) shall not receive or retain any distribution on account of its Class OE 6 Allowed Blackstone General Unsecured Claim under the Subplan for Optim Energy.

-40-

(iii)  *Voting*: Class OE 6 is Impaired.  The holders of Class OE 6 Allowed Blackstone General Unsecured Claims against Optim Energy are entitled to vote to accept or reject the Subplan for Optim Energy.

(g)  <u>Class OE 7—Subordinated Claims</u>

(i)  *Allowance*: A Subordinated Claim (if any) against Optim Energy may only become Allowed by Final Order of the Bankruptcy Court.

(ii)  *Treatment*: On the Effective Date, each holder of a Class OE 7 Allowed Subordinated Claim against Optim Energy: (x) shall be enjoined from pursuing any Class OE 7 Subordinated Claim against Optim Energy; and (y) shall not receive or retain any distribution on account of its Class OE 7 Subordinated Claim under the Subplan for Optim Energy.

(iii)  *Voting*: Class OE 7 is Impaired.  The holders of Class OE 7 Allowed Subordinated Claims against Optim Energy are conclusively deemed to reject the Subplan for Optim Energy pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(h)  <u>Class OE 8—Equity Interests</u>

(i)  *Treatment*: On the Effective Date, the Class OE 8 Equity Interests in Optim Energy shall be cancelled, extinguished and discharged and each holder thereof shall not receive or retain any distribution on account of its Class OE 8 Equity Interests under the Subplan for Optim Energy.

(ii)  *Voting*: Class OE 8 is Impaired.  The holders of the Equity Interests in Optim Energy are conclusively deemed to reject the Subplan for Optim Energy pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

**Section 7.03.  Subplan TOLP: Treatment of Claims Against and Equity Interests in Twin Oaks LP**

(a)  <u>Class TOLP 1—Allowed Pre-Petition Secured Parties Secured Claim</u>

(i)  *Allowance*: The Class TOLP 1 Allowed Pre-Petition Secured Parties Secured Claim against Twin Oaks LP have been deemed Allowed against Twin Oaks LP pursuant to the terms of the Final DIP Order.

(ii)  *Treatment*: On the Effective Date, the holders of Class TOLP 1 Allowed Pre-Petition Secured Parties Secured Claim against Twin Oaks LP shall release, settle and discharge their Class TOLP 1—Allowed Pre-Petition Secured Parties Secured Claim against Twin Oaks LP in consideration for the Class OE 1—Allowed Pre-Petition Secured Parties Secured Claim treatment in Section 3.02(a)(ii) of the Plan.

(iii)    *Voting*: Class TOLP 1 is Impaired.  The holders of the Class TOLP 1 Allowed Pre-Petition Secured Parties Secured Claim against Twin Oaks LP are entitled to vote to accept or reject the Subplan for Twin Oaks LP.

(b)    <u>Class TOLP 2—Other Secured Claims</u>

(i)    *Treatment*: Unless the holder agrees to a different treatment, each holder of a Class TOLP 2 Allowed Other Secured Claim against Twin Oaks LP shall receive, in Twin Oaks LP's sole discretion and in full and final satisfaction, release, settlement and discharge of, and in exchange for, such holder's Allowed Other Secured Claim, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court:

a.    Cash equal to the amount of such Allowed Other Secured Claim <u>plus</u> Post-Petition Interest required to be paid under section 506(b) of the Bankruptcy Code (if any), payable solely from the Liquidating Debtors Claims Reserve subject to the provisions of the Plan and the Liquidation Trust Agreement;

b.    Reinstatement of the legal, equitable and contractual rights of the holder of such Allowed Other Secured Claim, subject to the provisions of the Subplan for Twin Oaks LP;

c.    the Collateral securing such Allowed Other Secured Claim <u>plus</u> Post-Petition Interest required to be paid under section 506(b) of the Bankruptcy Code (if any); or

d.    such other treatment as necessary to satisfy the requirements of section 1124(2) of the Bankruptcy Code for such Allowed Other Secured Claim to be rendered Unimpaired.

(ii)    *Voting*: Class TOLP 2 is Unimpaired.  The holders of Class TOLP 2 Allowed Other Secured Claims against Twin Oaks LP are conclusively deemed to accept the Subplan for Twin Oaks LP pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(c)    <u>Class TOLP 3—Other Priority Claims</u>

(i)    *Treatment*: Unless the holder agrees to a different treatment, each holder of a Class TOLP 3 Allowed Other Priority Claim against Twin Oaks LP shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, Cash equal to the amount of such Allowed Claim, payable solely from the Liquidating Debtors Claims Reserve subject to the provisions of the Plan and the Liquidation Trust Agreement, on the later of: (x) the Effective Date; or (y) the date such

Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.

(ii)     *Voting*: Class TOLP 3 is Unimpaired.  The holders of Class TOLP 3 Allowed Other Priority Claims against Twin Oaks LP are conclusively deemed to accept the Subplan for Twin Oaks LP pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(d)     Class TOLP 4—General Unsecured Claims

(i)     *Treatment*: In the event that Class TOLP 4 votes to accept the Subplan for Twin Oaks LP, unless the holder agrees to a different treatment each holder of a Class TOLP 4 Allowed General Unsecured Claim against Twin Oaks LP (other than a holder of a Class TOLP 4 Allowed Pre-Petition Secured Parties Deficiency Claim against Twin Oaks LP) shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, Cash equal to its Pro Rata share of $80,000.00 (not to exceed such holder's possible percentage recovery under Class TOLP 5), payable solely from the Liquidating Debtors Claims Reserve subject to the provisions of the Plan and the Liquidation Trust Agreement, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.  For the avoidance of doubt, in consideration for the Class OE 1—Allowed Pre-Petition Secured Parties Secured Claim treatment in Section 3.02(a)(ii) of the Plan, and in the event that Class TOLP 4 votes to accept the Subplan for Twin Oaks LP, the holders of Class TOLP 4 Allowed Pre-Petition Secured Parties Deficiency Claim against Twin Oaks LP have agreed to waive and withdraw such Claims on the Effective Date.

In the event that Class TOLP 4 does not vote to accept the Subplan for Twin Oaks LP, on the Effective Date each holder of a Class TOLP 4 Allowed General Unsecured Claim against Twin Oaks LP: (x) shall be enjoined from pursuing any Class TOLP 4 Allowed General Unsecured Claim against Twin Oaks LP; and (y) shall not receive or retain any distribution on account of its Class TOLP 4 Allowed General Unsecured Claim under the Subplan for Twin Oaks LP.

(ii)     *Amounts*: The Liquidating Debtors estimate that there will be approximately five (5) to ten (10) holders of Class TOLP 4 Allowed General Unsecured Claims against TOLP (other than a holder of a Class TOLP 4 Allowed Pre-Petition Secured Parties Deficiency Claim) with $120,000-$150,000 in Claims.

(iii)     *Voting*: Class TOLP 4 is Impaired.  The holders of Class TOLP 4 Allowed General Unsecured Claims against Twin Oaks LP are entitled to vote to accept or reject the Subplan for Twin Oaks LP.

(e)     Class TOLP 5—Convenience Class Claims

(i)     *Treatment*: In the event that Class TOLP 5 votes to accept the Subplan for Twin Oaks LP, unless the holder agrees to a different treatment each holder of a Class TOLP 5 Allowed Convenience Class Claim against Twin Oaks LP shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for, its Allowed Claim, Cash equal to its Pro Rata share of $80,000.00, payable solely from the Liquidating Debtors Claims Reserve subject to the provisions of the Plan and the Liquidation Trust Agreement, on the later of: (x) the Effective Date; or (y) the date such Claim becomes due and Allowed or as otherwise ordered by the Bankruptcy Court.  For the avoidance of doubt, in consideration for the Class OE 1—Allowed Pre-Petition Secured Parties Secured Claim treatment in Section 3.02(a)(ii) of the Plan, and in the event that Class TOLP 5 votes to accept the Subplan for Twin Oaks LP, the holders of Class TOLP 4 Allowed Pre-Petition Secured Parties Deficiency Claim against Twin Oaks LP have agreed to waive and withdraw such Claims on the Effective Date.

In the event that Class TOLP 5 does not vote to accept the Subplan for Twin Oaks LP, on the Effective Date each holder of a Class TOLP 5 Allowed Convenience Class Claim against Twin Oaks LP: (x) shall be enjoined from pursuing any Class TOLP 5 Allowed Convenience Class Claim against Twin Oaks LP; and (y) shall not receive or retain any distribution on account of its Class TOLP 5 Allowed Convenience Class Claim under the Subplan for Twin Oaks LP.

(ii)    *Amounts*: The Liquidating Debtors believe there are approximately forty (40) to fifty (50) holders of Class TOLP 5 Allowed Convenience Class Claims against TOLP (before taking into account any holders that elect to have their Class TOLP 4 Claims treated as Class TOLP 5 Claims) in the aggregate amount of $90,000-$120,000.

(iii)   *Voting*: Class TOLP 5 is Impaired.  The holders of Class TOLP 5 Allowed Convenience Class Claims against Twin Oaks LP are entitled to vote to accept or reject the Subplan for Twin Oaks LP.

(f)     Class TOLP 6—Blackstone General Unsecured Claims

(i)     *Allowance*: The Blackstone General Unsecured Claims have been deemed Allowed Class TOLP 6 Claims in the amount of $3,932,376.61 pursuant to the PSA (as approved by the PSA Order) and Section 7.03(f) of the Plan.

(ii)    *Treatment*: In the event that Class TOLP 6 votes to accept the Subplan for Twin Oaks LP, each holder of a Class TOLP 6 Allowed Blackstone General Unsecured Claim against Twin Oaks LP shall receive, in full and final satisfaction, release, settlement and discharge of, and in exchange for,

its Allowed Claim, $1,478,101.00, payable solely from the Liquidating Debtors Claims Reserve subject to the provisions of the Plan and the Liquidation Trust Agreement, on the Effective Date. For the avoidance of doubt, in consideration for the Class OE 1—Allowed Pre-Petition Secured Parties Secured Claim treatment in Section 3.02(a)(ii) of the Plan, and in the event that Class TOLP 6 votes to accept the Subplan for Twin Oaks LP, the holders of Class TOLP 4 Allowed Pre-Petition Secured Parties Deficiency Claim against Twin Oaks LP have agreed to waive and withdraw such Claims on the Effective Date.

In the event that Class TOLP 6 does not vote to accept the Subplan for Twin Oaks LP, on the Effective Date each holder of a Class TOLP 6 Allowed Blackstone General Unsecured Claim against Twin Oaks LP: (x) shall be enjoined from pursuing any Class TOLP 6 Allowed Blackstone General Unsecured Claim against Twin Oaks LP; and (y) shall not receive or retain any distribution on account of its Class TOLP 6 Allowed Blackstone General Unsecured Claim under the Subplan for Twin Oaks LP.

(iii)  *Voting*: Class TOLP 6 is Impaired. The holders of Class TOLP 6 Allowed Blackstone General Unsecured Claims against Twin Oaks LP are entitled to vote to accept or reject the Subplan for Twin Oaks LP.

(g)  Class TOLP 7—Subordinated Claims

(i)  *Allowance*: A Subordinated Claim (if any) against Twin Oaks LP may only become Allowed by Final Order of the Bankruptcy Court.

(ii)  *Treatment*: On the Effective Date, each holder of a Class TOLP 7 Allowed Subordinated Claim against Twin Oaks LP: (x) shall be enjoined from pursuing any Class TOLP 7 Subordinated Claim against Twin Oaks LP; and (y) shall not receive or retain any distribution on account of its Class TOLP 7 Subordinated Claim under the Subplan for Twin Oaks LP.

(iii)  *Voting*: Class TOLP 7 is Impaired. The holders of Class TOLP 7 Allowed Subordinated Claims against Twin Oaks LP are conclusively deemed to reject the Subplan for Twin Oaks LP pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

(h)  Class TOLP 8—Equity Interests

(i)  *Treatment*: On the Effective Date, the Class TOLP 8 Equity Interests in Twin Oaks LP shall be cancelled, extinguished and discharged and each holder thereof shall not receive or retain any distribution on account of its Class TOLP 8 Equity Interests under the Subplan for Twin Oaks LP.

(ii)  *Voting*: Class TOLP 8 is Impaired. The holders of the Equity Interests in Twin Oaks LP are conclusively deemed to reject the Subplan for Twin

Oaks LP pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject such Subplan.

## ARTICLE VIII

## ACCEPTANCE OR REJECTION OF THE SUBPLANS

### Section 8.01.  Acceptance by an Impaired Class

In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, Impaired Classes entitled to vote under a Subplan shall have accepted the applicable Subplan if it is accepted by the holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims that have timely and properly voted to accept or reject the Subplan or if no holder of a Claim with respect to a specific Class for a particular Liquidating Debtor timely submits Ballot that complies with the Disclosure Statement Order indicating acceptance or rejection of the Plan.

### Section 8.02.  Nonconsensual Confirmation

The Liquidating Debtors may request confirmation under section 1129(b) of the Bankruptcy Code with respect to (a) any Impaired Class of Claims and Equity Interests that have not accepted a Subplan in accordance with sections 1126 and 1129(a)(8) of the Bankruptcy Code and (b) any Class that is deemed to reject the applicable Subplan pursuant to section 1126(g) of the Bankruptcy Code or the terms of the Subplan or otherwise.  The Liquidating Debtors reserve the right, subject to the written approval of the Consultation Parties to amend or modify either Subplan in accordance with Section 11.01 of the Plan to the extent, if any, that Confirmation of the Subplan pursuant to section 1129(b) of the Bankruptcy Code requires such amendment or modification.  If either Subplan is not confirmed, then the Liquidating Debtors reserve the right, subject to the written approval of the Consultation Parties, to either (a) request that other Subplan be confirmed or (b) withdraw such Subplan.  The Liquidating Debtors' inability to confirm or election to withdraw either Subplan shall not impair the Confirmation of the other Subplan.

### Section 8.03.  Limited Deficiency Waiver

For the avoidance of doubt, the holders of the Allowed Pre-Petition Secured Parties Deficiency Claim agree to waive and withdraw such Claims on the Effective Date only if the respective Class of General Unsecured Claims against a particular Liquidating Debtor votes, as a Class, to accept the Subplan for the relevant Liquidating Debtor.

## ARTICLE IX

## IMPLEMENTATION OF THE PLAN

The transactions required to implement the Plan shall be implemented in accordance with ARTICLE V of the Plan.

### Section 9.01.    Compromise and Settlement

Pursuant to Bankruptcy Rule 9019 and Section 13.02 of the Plan, the Plan incorporates the PSA (as approved by the PSA Approval Order) among the Debtors, the Pre-Petition Secured Parties and the DIP Lender, and Blackstone of all issues relating to the validity, priority, amount, and extent of the claims (as defined in section 101(5) of the Bankruptcy Code) or Claims that Blackstone may have against the Debtors and their estates.  For the avoidance of doubt, to the extent that a provision of the PSA is not expressly incorporated herein, such provision is deemed to be included in the Plan by reference.

### Section 9.02.    Corporate Action

(a)    Liquidation, Merger and Dissolution of the Merging Debtors

On the Effective Date, each of the Merging Debtors shall be deemed merged with Optim Energy without further limited liability company action.  Claims against the Merging Debtors, if any, shall become Claims against Optim Energy.  The Equity Interests of each of the Merging Debtors shall be deemed cancelled and of no further force and effect, and deemed extinguished without any further limited liability company action.  The manager of each of the Merging Debtors shall be deemed to have been removed, and each of the Merging Debtors shall be deemed dissolved for all purposes without any further limited liability company action.

(b)    Transfer of Liquidation Trust Assets

Upon the transfer of the Assets and liabilities in accordance with Section 5.02(a) of the Plan, the Liquidating Debtors shall cause the Liquidation Trust Assets to be transferred to, and vest in, the Liquidation Trust in accordance with Section 5.05(b) of the Plan, on the Effective Date free and clear of Liens, Claims and encumbrances (except for Claims and obligations provided for in the Subplans for the Liquidating Debtors), without any further corporate action.

(c)    Liquidation and Dissolution of the Liquidating Debtors

Upon the transfer of the Liquidation Trust Assets in accordance with Section 5.05(b) of the Plan, on the Effective Date the Equity Interests of each of the Liquidating Debtors shall be deemed cancelled and of no further force and effect, and deemed extinguished without any further limited liability company or partnership action.  The officer and the members of the board of directors of Optim Energy, and the manager of Twin Oaks LP, shall all be deemed to have been removed, and each of the Liquidating Debtors shall be deemed dissolved for all purposes without any further limited liability company or partnership action.

### Section 9.03.    Corporate Governance

On and after the Effective Date, the Liquidating Debtors' affairs will be managed by and under the direction of the Liquidation Trustee pursuant to the Liquidation Trust Agreement. Within the time determined by the Liquidation Trustee as necessary or appropriate under the circumstances, each Liquidating Debtor shall be dissolved without any further action by its former stockholders, officers, members, or directors.  The Liquidation Trustee may, in his or her discretion, file all necessary certificates of dissolution and take any other actions necessary or

appropriate to effect such dissolution under applicable non-bankruptcy law. All applicable regulatory or governmental agencies shall accept any certificates of dissolution or other papers filed by the Liquidation Trustee on behalf of each Liquidating Debtor and shall take all steps necessary to allow and effect the prompt dissolution as provided herein, without the payment of any fee, tax, or charge and without need for the filing of reports or certificates, except as the Liquidation Trustee may determine in its sole discretion. Upon entry of a Final Decree in each Chapter 11 Case of each Liquidating Debtor, if not previously dissolved, the applicable Liquidating Debtor shall be deemed automatically dissolved and wound up without any further action or formality which might otherwise be required under applicable non-bankruptcy laws.

## Section 9.04.  Funding of Reserves

On the Effective Date, the Reserves shall be funded with Cash on hand (which is Cash Collateral) and shall be deemed authorized and approved by the Bankruptcy Court pursuant to the Confirmation Order.

## Section 9.05.  Liquidation Trust[23]

(a)      Creation of the Liquidation Trust

On the Effective Date, the Liquidation Trust shall be created and established by the execution and delivery of the Liquidation Trust Agreement.

(b)      Transfer of the Liquidation Trust Assets

On the Effective Date, the Liquidation Trust Assets shall be deemed irrevocably transferred to the Liquidation Trust free and clear of all Liens, Claims, and encumbrances (except for Liens Claims or obligations provided for in the Plan), for and on behalf of the holders of Allowed Claims), with no reversionary interest in the Liquidating Debtors.

(c)      Purpose of the Liquidation Trust

The Liquidation Trust shall be established for the sole purpose of making distributions to holders of Allowed Claims under the Subplans for the Liquidating Debtors (to the extent such Allowed Claims were not previously paid under the Subplans), and winding up the remaining affairs of the Liquidating Debtors' Estates in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Liquidation Trust.

(d)      Administration of the Liquidation Trust

The Liquidation Trust shall be administered by the Liquidation Trustee pursuant to the Liquidation Trust Agreement and the Subplans for the Liquidating Debtors.

---

[23] Section 5.05 of the Plan and this Section 9.05 are general descriptions of the Liquidation Trust and its provisions. The Liquidation Trust Agreement shall be included in the Plan Supplement.  To the extent that Section 5.05 of the Plan and this Section 9.05 are inconsistent with the Liquidation Trust Agreement, the Liquidation Trust Agreement shall control for all purposes.

(e)    <u>Powers and Duties of the Liquidation Trustee</u>

The Liquidation Trustee shall be a representative of the Estates of the Liquidating Debtors pursuant to section 1123 of the Bankruptcy Code, shall have the rights and powers set forth in the Liquidation Trust Agreement, and shall be governed in all respects by the terms of the Liquidation Trust Agreement and the Subplans for the Liquidating Debtors.  The Liquidation Trustee shall have reasonable access to the Liquidating Debtors' books and records to the extent necessary to carry out its duties under the Liquidation Trust Agreement.  Subject to the terms of the Liquidation Trust Agreement, the Liquidation Trustee shall be authorized, empowered, and directed to take all actions necessary to comply with the Subplans for the Liquidating Debtors and exercise and fulfill the duties and obligations arising thereunder, including, without limitation, to: (i) act as the trustee for the Liquidation Trust and administer the Liquidation Trust; (ii) take any action necessary to transfer the Liquidation Trust Assets to the Liquidation Trust, establish the Liquidation Trust, and dissolve the Liquidating Debtors in accordance with the Subplans for the Liquidating Debtors and applicable law, including, without limitation, in respect of the establishment of the Liquidation Trust for the allocation of assets, the making of related reserves and the attribution of rights of holders of beneficial interests based on the classification schemes of the applicable Subplans for the Liquidating Debtors; (iii) retain attorneys, advisors, and other professionals as may be necessary and appropriate to perform the duties required of, and the obligations assumed by, the Liquidation Trustee under the applicable Subplans for the Liquidating Debtors and the Liquidation Trust Agreement, and pursuant to Section 5.05(g) of the Plan; (iv) execute any documents, instruments, contracts, and agreements necessary and appropriate to carry out the powers and duties of the Liquidation Trust; (v) open, maintain, and administer bank accounts as necessary to discharge the duties of the Liquidation Trustee under the applicable Subplans for the Liquidating Debtors and the Liquidation Trust Agreement; (vi) administer, sell, liquidate, or otherwise dispose of the Liquidation Trust Assets in accordance with the applicable Subplans for the Liquidating Debtors; (vii) make, on behalf of the Liquidating Debtors and their Estates, all transfers and distributions required to be made pursuant to the Subplans for the Liquidating Debtors on and after the Effective Date, including, without limitation, distributions from the proceeds of the Liquidation Trust Assets; (viii) file and prosecute objections to, and negotiate, settle, or otherwise resolve without Bankruptcy Court approval, any and all Disputed Claims against the Liquidating Debtors and their Estates; (ix) review all Proofs of Claim filed against the Liquidating Debtors and, if warranted, object thereto; (x) represent the Liquidation Trust before the Bankruptcy Court and other courts of competent jurisdiction with respect to matters concerning the Liquidation Trust; (xi) investigate, commence, and prosecute all Causes of Action transferred to the Liquidation Trust under the Subplans for the Liquidating Debtors to judgment or settlement, and take all other necessary and appropriate steps to collect, recover, liquidate, or otherwise reduce such Causes of Action and accounts receivable to Cash; (xii) prepare and file quarterly financial reports with the Bankruptcy Court; and (xiii) comply with applicable orders of the Bankruptcy Court and any other court of competent jurisdiction over the matters set forth herein, and all applicable laws and regulations concerning the matters set forth herein.  The Liquidation Trustee may purchase any insurance the Liquidation Trustee reasonably deems necessary or appropriate for the benefit of the Liquidating Debtors pursuant to the Liquidation Trust Agreement.  The Liquidation Trustee shall have the authority, but not the obligation, to destroy the Liquidating Debtors' books and records following termination of the Liquidation Trust pursuant to Section 5.05(j) of the Plan.

In no event shall the Liquidation Trustee or any agent, employee, attorney, advisor or other professional retained by the Liquidation Trustee have any recourse against the Debtors, the Liquidating Debtors, the Consultation Parties, or any of their respective Related Persons, with respect to compensation for services rendered, and reimbursement for expenses incurred by, the Liquidation Trustee or any agent, employee, attorney, advisor or other professional retained by the Liquidation Trustee, with respect to the administration of the Subplans for the Liquidating Debtors, regardless of whether sufficient Cash or other property remains for payment of such compensation or reimbursement in the Wind-Down Budget at the time such request for compensation or reimbursement is made.

(f)    Cash Investments

All Cash held by the Liquidation Trust shall be held in a non-interest-bearing account at domestic bank selected by the Liquidation Trustee and shall not be invested or reinvested.

(g)    Retention of Professionals

The Liquidation Trustee is authorized to retain, employ, and compensate any attorneys, advisors, or other professionals necessary to assist the Liquidation Trustee in carrying out its duties under the Plan and the Liquidation Trust Agreement, without further order of the Bankruptcy Court.  The past or current retention of any Professional in the Chapter 11 Cases shall not be asserted by any party in interest as a basis to disqualify such Professional from being retained by the Liquidation Trust.  From and after the Effective Date, the Liquidation Trustee, for and on behalf of the Liquidation Trust, shall pay in Cash the reasonable legal fees and expenses incurred by the professionals retained by the Liquidation Trustee pursuant to the Wind-Down Budget, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court.  For the avoidance of doubt, any requirement that a professional retained by the Liquidation Trustee comply with sections 327 through 331 and/or 1103 of the Bankruptcy Code in seeking compensation for services rendered, for and on behalf of the Liquidation Trust, shall terminate.

In no event shall the Liquidation Trustee or any agent, employee, attorney, advisor or other professional retained by the Liquidation Trustee have any recourse against the Debtors, the Liquidating Debtors, the Consultation Parties, or any of their respective Related Persons, with respect to compensation for services rendered, and reimbursement for expenses incurred by, the Liquidation Trustee or any agent, employee, attorney, advisor or other professional retained by the Liquidation Trustee, with respect to the administration of the Subplans for the Liquidating Debtors, regardless of whether sufficient Cash or other property remains for payment of such compensation or reimbursement in the Wind-Down Budget at the time such request for compensation or reimbursement is made.

(h)    Accounting and Reporting

The Liquidation Trustee shall maintain an accounting of receipts and disbursements with respect to the Liquidation Trust, which shall be open to inspection and review by the Bankruptcy Court and any holder of an Allowed Claim against the Liquidating Debtors, upon reasonable notice to the Liquidation Trustee.  After the Effective Date, the Liquidation Trustee shall

continue the reporting obligations for the Estate of each Liquidating Debtor pursuant to U.S. Trustee guidelines until the Bankruptcy Court enters a Final Decree closing each of the Chapter 11 Cases of the Liquidating Debtors.

(i)      Resignation/Removal of Liquidation Trustee

The Liquidation Trustee for the Liquidation Trust may resign or be removed in accordance with the Liquidation Trust Agreement.  Any successor Liquidation Trustee for the Liquidation Trust shall be appointed in accordance with the Liquidation Trust Agreement and subject to the written approval of the Consultation Parties.

(j)      Termination of the Liquidation Trust; Final Distribution

The Liquidation Trust shall terminate upon the earlier of: (x) satisfaction of all Allowed Claims; (y) the three (3) year anniversary of the Effective Date; or (z) the entry by the Bankruptcy Court of a Final Decree(s) closing each of the Chapter 11 Cases of the Liquidating Debtors, and submission by the Liquidation Trustee of the final financial report to the Bankruptcy Court pursuant to the applicable Subplan for each Liquidating Debtor.  On or prior to the date of termination of the Liquidation Trust, the Bankruptcy Court, upon motion by the Liquidation Trustee, may extend the term of the Liquidation Trust for cause shown.  Upon termination of the Liquidation Trust and as soon as practicable thereafter, the balance of any Cash and other assets of the Liquidation Trust shall be transferred to the Pre-Petition Secured Parties pursuant to Section 3.02(a)(ii) of the Plan.

(k)      Governing Law

The establishment of the Liquidation Trust and all transfers to the Liquidation Trust shall be governed by the laws of the State of Delaware.

(l)      Limitation on Liability

No recourse shall ever be had, directly or indirectly, against the Liquidation Trustee or its officers, directors, agents, employees, attorneys, advisors or other professionals by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge, or note, or upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Liquidation Trustee under the Subplans for the Liquidating Debtors or the Liquidation Trust Agreement, or by reason of the creation of any indebtedness by the Liquidation Trustee under the Subplans for the Liquidating Debtors for any purpose authorized by such Subplans.  Every undertaking, contract, covenant or agreement entered into in writing by the Liquidation Trustee shall provide expressly against the personal liability of the Liquidation Trustee under the Liquidation Trust Agreement.  The Liquidation Trustee and its officers, directors, agents, employees, attorneys, advisors and other professionals shall not be liable for any act they may do, or omit to do under the Liquidation Trust Agreement in good faith and in the exercise of their respective best judgment, and the fact that such act or omission was advised, directed or approved by an attorney acting as counsel for the Liquidation Trustee shall be conclusive evidence of such good faith and best judgment; provided, however, that Section 5.05(l) of the Plan shall not apply to any bad faith, fraud, gross negligence or willful

misconduct by the Liquidation Trustee under the Liquidation Trust Agreement or its officers, directors, agents, employees, attorneys, advisors or other professionals.

      (m)     <u>Reliance on Documents</u>

The Liquidation Trustee may rely, and shall be protected in acting or refraining from acting, upon any certificates, opinions, statements, instruments or reports believed by it to be genuine and to have been signed or presented by the proper Entity.

**Section 9.06.  Causes of Action**

      (a)     <u>Preservation of Causes of Action Other Than Avoidance Actions</u>

In accordance with section 1123(b) of the Bankruptcy Code or any corresponding provision of federal or state laws, and except as expressly released by the Plan, the Final DIP Order, the Confirmation Order, the PSA, the PSA Approval Order or other Final Order: (i) on the Effective Date, all Causes of Action shall be transferred to and vest in the Liquidation Trust as part of the Liquidation Trust Assets; and (ii) on and after the Effective Date, all such Causes of Action shall be retained by the Liquidation Trust, and the Liquidation Trustee, for and on behalf of the Liquidation Trust, may, in accordance with the Liquidation Trust Agreement, enforce, sue on, settle, or compromise (or decline to do any of the foregoing) any or all of such Causes of Action; <u>provided</u>, <u>however</u>, that as of the Effective Date, all Avoidance Actions of the Liquidating Debtors and/or the Merging Debtors shall be waived and released.

      (b)     <u>No Waiver</u>

Except as otherwise provided in Section 10.02 of the Plan, or as released by the Final DIP Order, the Confirmation Order, the PSA, the PSA Approval Order or other Final Order, nothing in the Plan shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, account receivable, right of setoff, or other legal or equitable right or defense that the Liquidating Debtors, the Merging Debtors or the Liquidation Trustee for and on behalf of the Liquidation Trust, may have or choose to assert on behalf of the Liquidating Debtors, the Merging Debtors or their respective Estates, or the Liquidation Trust, as applicable, under any provision of the Bankruptcy Code or any applicable non-bankruptcy law.  No Person or Entity may rely on the absence of a specific reference in the Plan to any Cause of Action or account receivable against it as an indication that the Liquidating Debtors, the Merging Debtors or the Liquidation Trustee for and on behalf of the Liquidation Trust, will not pursue any and all available Causes of Action or accounts receivable against it, and all such rights to prosecute or pursue any and all Causes of Action or accounts receivable against any such Person or Entity are expressly reserved for later adjudication and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action or accounts receivable upon or after the Confirmation or Consummation of the Subplans for the Liquidating Debtors.

# ARTICLE X

## TREATMENT OF EXECUTORY CONTRACTS AND LEASES

**Section 10.01. Treatment of Executory Contracts and Unexpired Leases**

Except as otherwise expressly provided in (a) the Subplans, (b) the Plan Supplement, or (c) any other filing made before the Confirmation Hearing, all Executory Contracts and Unexpired Leases shall be rejected as of the Effective Date in accordance with, and subject to the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code; provided, however, that Section 6.01 of the Plan shall not apply to any Executory Contract and Unexpired Lease that expired or terminated pursuant to its own terms prior to the Petition Date.

**Section 10.02. Effect of Confirmation Order on Rejection**

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order of the Bankruptcy Court pursuant to sections 365 and 1123(b) of the Bankruptcy Code approving the rejection of the Executory Contracts and Unexpired Leases as of the Effective Date and determining that with respect to such rejections, such rejected Executory Contracts and Unexpired Leases no longer benefit the Estates  and that the rejection is in the best interests of the Estates.

**Section 10.03. Rejection Damages Claims and Objections to Rejection**

Claims arising out of the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan must be filed and served pursuant to the procedures specified in the Bar Date Order, or another order of the Bankruptcy Court, no later than thirty (30) days after the Effective Date. Holders of any Claim not filed within such time will be forever barred from asserting such Claim.  Unless otherwise ordered by the Bankruptcy Court or specified in the Plan, all Claims arising from the rejection of Executory Contracts and Unexpired Leases shall be treated as General Unsecured Claims under the Plan.

**Section 10.04. Preexisting Obligations Under Executory Contracts and Unexpired Leases**

The Liquidating Debtors and/or the Merging Debtors reserve the right to assert that rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of obligations owed to the Liquidating Debtors and/or the Merging Debtors under such contracts or leases prior to the rejection of such contracts or leases. Notwithstanding any nonbankruptcy law to the contrary, the Liquidating Debtors and/or the Merging Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Liquidating Debtors and/or the Merging Debtors from counterparties to rejected Executory Contracts and Unexpired Leases.

**Section 10.05. Reservation of Rights**

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Liquidating Debtors and/or the Merging Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors have any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of rejection, the Liquidating Debtors and/or the Merging Debtors or the Liquidation Trustee, for and on behalf of the Liquidation Trust, as applicable, shall have ninety (90) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided herein.

## ARTICLE XI

## PROVISIONS GOVERNING DISTRIBUTIONS

**Section 11.01. Amount of Distributions**

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim to the extent payable in accordance with the Plan.

**Section 11.02. Method of Distributions**

The Liquidation Trustee, for and on behalf of the Liquidation Trust, shall have the authority to enter into agreements with the Distribution Agent to facilitate the distributions required hereunder. To the extent the Liquidation Trustee determines to utilize the Distribution Agent to facilitate the distributions under the Plan to holders of Allowed Claims, any such Distribution Agent would first be required to: (a) affirm its obligation to facilitate the prompt distribution of any documents; (b) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under the Plan; (c) waive any right or ability to setoff, deduct from or assert any Lien or encumbrance against the distributions required under the Plan to be distributed by such Distribution Agent; and (d) post a bond, obtain or surety or provide some other form of security for the performance of its duties, the costs and expenses of procuring which shall be borne by the Liquidation Trust.

The Liquidation Trustee, for and on behalf of the Liquidation Trust, shall pay to any Distribution Agent that is engaged all reasonable and documented fees and expenses of the Distribution Agent without the need for any approvals, authorizations, actions, or consents. The Distribution Agent shall submit detailed invoices to the Liquidation Trustee for all fees and expenses for which the Distribution Agent seeks reimbursement and the Liquidation Trustee, for and on behalf of the Liquidation Trust shall pay those amounts that it deems reasonable, and shall object in writing to those fees and expenses, if any, that it deems to be unreasonable. These payments will be made on terms agreed to with the Liquidation Trustee, and will not be deducted from distributions to be made pursuant to the Subplans for the Liquidating Debtors to holders of Allowed Claims receiving distributions from the Distribution Agent.

In the event that the Liquidation Trustee objects to all or any portion of the amounts requested to be reimbursed in the Distribution Agent's invoice, the Liquidation Trustee and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses.  In the event that the Liquidation Trustee and the Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

## Section 11.03. Delivery of Distributions

Distributions to holders of Allowed Claims shall be made at the address of the holder of such Claim as indicated in the Claims Register as of the Distribution Record Date.  The Liquidation Trustee or the Distribution Agent, as applicable, shall have no obligation to recognize the transfer of or sale of any Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those holders of Allowed Claims who are holders as of the close of business on the Distribution Record Date.

## Section 11.04. No Fractional or De Minimis Distributions

Notwithstanding anything contained herein to the contrary, payments of fractional dollars will not be made.  Whenever any payment of a fraction of a dollar under the applicable Subplan would otherwise be called for, the actual payment made will reflect a rounding down of such fractions.  The Liquidation Trustee or the Distribution Agent, as applicable, shall not be required to make any payment of less than $20.00 on any distribution.

## Section 11.05. Undeliverable Distributions

(a)     Holding of Undeliverable Distributions

If any distribution to a holder of an Allowed Claim is returned to the Liquidation Trustee or the Distribution Agent, as applicable, as undeliverable, no further distributions shall be made to such holder unless and until such Liquidation Trustee or Distribution Agent is notified in writing of such holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such holder as soon as practicable.  Undeliverable Distributions shall remain vested in the Liquidation Trust until such time as a distribution becomes deliverable, and shall not be supplemented with any interest, dividends or other accruals of any kind.

(b)     Failure to Claim Undeliverable Distributions

Any holder of an Allowed Claim that does not assert a Claim pursuant to the Plan for an Undeliverable Distribution within one hundred eighty (180) days after the distribution is distributed shall be deemed to have waived its Claim for such Undeliverable Distribution and shall be forever barred from asserting any such Claim against the Liquidating Debtors, the Merging Debtor, the Liquidation Trust or their property.  In such cases, notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary, any Cash held for distribution on account of such Undeliverable Distribution shall be property of the

Liquidation Trust, free of any restrictions thereon. Nothing contained in the Plan shall require the Liquidating Debtors, the Merging Debtors or the Liquidation Trustee, for and on behalf of the Liquidation Trust, or any Distribution Agent to attempt to locate any holder of an Allowed Claim following one hundred eighty (180) days after the distribution is distributed. Notwithstanding any provision herein to the contrary, Undeliverable Distributions that become property of the Liquidation Trust shall be distributed to the holders of the Allowed Pre-Petition Secured Parties Secured Claim following dissolution of the Liquidation Trust in accordance with Section 5.05(j) of the Plan.

**Section 11.06. Tax Withholding From Distributions**

The Liquidation Trustee, for and on behalf of the Liquidation Trust, or the Distribution Agent shall withhold all amounts required by law to be withheld from payments made under the Plan. Any amounts so withheld from any payment made under the Plan shall be deemed paid to the holder of the Allowed Claim subject to withholding. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any Governmental Unit on account of such distribution, except for taxes withheld from payments made under the Plan. The Liquidation Trustee or the Distribution Agent has the right, but not the obligation, not to make a distribution until such holder has made arrangements satisfactory to a the Liquidation Trustee or the Distribution Agent for payment of any withholding tax obligations. If the Liquidation Trustee or the Distribution Agent fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse the Liquidation Trustee or the Distribution Agent. Notwithstanding any provision in the Plan to the contrary, the Liquidation Trustee or the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms it believes are reasonable and appropriate. The Liquidation Trustee or the Distribution Agent may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder. If the holder fails to comply with such a request within six (6) months, such distribution shall be deemed an Undeliverable Distribution. Finally, the Liquidation Trustee or the Distribution Agent reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

**Section 11.07. Allocations**

Unless otherwise provided in the Plan, distributions in respect of Allowed Claims shall be allocated first to the principal amount (as determined for U.S. federal income tax purposes) of such Allowed Claims, and then, to the extent the consideration exceeds the principal amount of such Allowed Claims, to any portion of such Allowed Claims for accrued but unpaid interest.

**Section 11.08. Time Bar to Cash Payments**

Checks issued on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance therein. Requests for reissuance of any check shall be made in writing directly to the Liquidation Trustee, for and on behalf of the Liquidation Trust, as applicable, or the Distribution Agent by the holder of the Allowed Claim with respect to which such check originally was issued. Any Claim in respect of such a voided check shall be made in writing on or before the later of one hundred eighty (180) days after the Effective Date or ninety (90) days after the date of issuance of such check. After such date, all Claims in respect of void checks shall be discharged and forever barred and the distribution on account of such Claims shall be treated in accordance with Section 7.05 of the Plan.

**Section 11.09. Means of Cash Payments**

Any Cash payment to be made pursuant to the Plan will be made in U.S. dollars by checks drawn on or by wire transfer from a domestic bank selected by the Liquidation Trustee, for and on behalf of the Liquidation Trust, or the Distribution Agent. No post-Effective Date interest shall be paid on Cash distributions hereunder.

**Section 11.10. Foreign Currency Exchange Rates**

As of the Effective Date, any Claim asserted in currency(ies) other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the mid-range spot rate of exchange for the applicable currency as published in *The Wall Street Journal*, National Edition, the day after the Petition Date.

**Section 11.11. Setoffs**

The Liquidation Trustee, for and on behalf of the Liquidation Trust, or the Distribution Agent may, pursuant to section 553 of the Bankruptcy Code and applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Claim (before any distribution is made on account of such Claim), the claims, rights and Causes of Action the Liquidation Trustee, for and on behalf of the Liquidation Trust, may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release of any such claims, rights and Causes of Action that the Liquidation Trustee, for and on behalf of the Liquidation Trust, may possess against such holder.

**Section 11.12. Claims Paid or Payable by Third Parties**

A Claim shall be reduced in full and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to, or action, order or approval of, the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not the Liquidation Trustee, for and on behalf of the Liquidation Trust, or the Distribution Agent. To the extent a holder of a Claim receives a distribution on account of such Claim and receives payment on account of such Claim from a party that is not a the Liquidation Trustee, for and on behalf of the Liquidation Trust, or the Distribution Agent, such holder shall repay, return or deliver any distribution held by or

transferred to the holder to the Liquidation Trustee, for and on behalf of the Liquidation Trust, or the Distribution Agent, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Liquidating Debtors' or the Merging Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.   To the extent that one or more of the Liquidating Debtors' or the Merging Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE XII

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

### Section 12.01. Prosecution of Objections to Claims

After the Effective Date, subject to the terms of the Liquidation Trust Agreement, the Liquidation Trustee shall have and shall retain any and all rights and defenses that the Liquidating Debtors and/or the Merging Debtors had with respect to any Claim and shall have the exclusive authority to file objections and to settle, compromise, withdraw or litigate to judgment objections to Claims against the Liquidating Debtors and/or the Merging Debtors (except those Allowed by, or released by, the Plan, or by the Final DIP Order, the Confirmation Order or other Final Order).   The Liquidation Trustee shall file objections to any Disputed Claims in accordance with the Bankruptcy Rules on or before the Claims Objection Deadline, as the same may be extended pursuant to the terms of the Plan or order of the Bankruptcy Court.

### Section 12.02. Estimation of Claims

The Liquidating Debtors, the Merging Debtors and/or the Liquidation Trustee, for and on behalf of the Liquidation Trust, as applicable, may at any time request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Liquidating Debtors, the Merging Debtors or the Liquidation Trustee, for and on behalf of the Liquidation Trust, as applicable, previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time, including during litigation concerning any objection to any Claim, and during the pendency of any appeal relating to any such objection.   If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.   If the estimated amount constitutes a maximum limitation on such Claim, the Liquidating Debtors, the Merging Debtors or the Liquidation Trustee, for and on behalf of the Liquidation Trust, as applicable, may elect to pursue any supplemental proceedings to object to the allowance and any ultimate payment on

such Claim.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### Section 12.03. No Distributions on Disputed Claims

Notwithstanding any provision in the Plan to the contrary, no distributions, partial or otherwise, shall be made with respect to a Disputed Claim until all disputes with respect to such Claim are resolved by Final Order.  Subject to the provisions of the Plan, after a Disputed Claim becomes an Allowed Claim, the holder of such an Allowed Claim will receive all distributions to which such holder is then entitled under the Plan.  No post-Effective Date interest shall be paid on distributions hereunder.  If a Creditor incorporates more than one Claim in a Proof of Claim, then: (a) the Claims will be considered one Claim for purposes of the Plan, and (b) unless the Liquidation Trustee, for and on behalf of the Liquidation Trust, otherwise agrees no Claim will be bifurcated into an Allowed portion and a Disputed portion.

### Section 12.04. Reserve of Cash for Disputed Claims

On the Effective Date, the Liquidating Debtors Claims Reserve shall be held, in part, for the benefit of holders of Disputed Claims, if any.   As Disputed Claims are resolved, the Liquidation Trustee, for and on behalf of the Liquidation Trust, or the Distribution Agent, as applicable, shall make distributions under the Subplans to holders of Allowed Claims and the Liquidating Debtors Claims Reserve shall be adjusted accordingly; provided, however, that the Liquidating Debtors Claim Reserve shall be approved by the Bankruptcy Court in the Confirmation Order, and that such amount shall be binding on all holders of Disputed Claims.

## ARTICLE XIII

## CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### Section 13.01. Conditions Precedent to Confirmation

It shall be a condition to Confirmation of either Subplan that the following conditions shall have been satisfied or waived pursuant to Section 9.04 of the Plan:

(i)     the PSA Approval Order shall have been entered by the Bankruptcy Court on the docket of the Chapter 11 Cases, in form and substance acceptable to the Liquidating Debtors and/or the Merging Debtors, and the Consultation Parties, and such order shall not be subject to a stay;

(ii)    the Disclosure Statement Order shall have been entered by the Bankruptcy Court on the docket of the Chapter 11 Cases, in form and substance acceptable to the Liquidating Debtors and/or the Merging Debtors, and the Consultation Parties, and such order shall not be subject to a stay; and

(iii) the PSA shall not have been breached and the reconciliation of the AC General Unsecured Claims (as defined in the PSA) shall have been completed.

**Section 13.02. Effect of Non-Occurrence of Conditions to Confirmation or Conditions Precedent to the Effective Date**

If the conditions in Section 9.01 and Section 9.03 of the Plan are not satisfied for either Subplan, or if the Confirmation Order is vacated regarding either Subplan, the affected Subplan shall be null and void in all respects and nothing contained in the affected Subplan or this Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Liquidating Debtors and/or the Merging Debtors; (b) prejudice in any manner the rights of the Liquidating Debtors and/or the Merging Debtors, or any other Person or Entity; or (c) constitute an admission, acknowledgment, offer or undertaking by the Liquidating Debtors and/or the Merging Debtors or any other Person or Entity in any respects.

**Section 13.03. Conditions Precedent to the Effective Date**

It shall be a condition to occurrence of the Effective Date of either Subplan that the following conditions shall have been satisfied or waived pursuant to Section 9.04 of the Plan:

(i) all conditions precedent to Confirmation have been satisfied;

(ii) the Confirmation Order shall have been entered by the Bankruptcy Court on the docket of the Chapter 11 Cases, in form and substance acceptable to the Liquidating Debtors and/or the Merging Debtors, and the Consultation Parties, and such order shall not be subject to a stay;

(iii) all financing provided to the Liquidating Debtors and/or the Merging Debtors, pursuant to section 364 of the Bankruptcy Code, including the DIP Facility Claims, shall have been paid or replaced, or other arrangements to the lenders providing such financing in their discretion regarding the repayment and termination of such financing shall have been made;

(iv) the Liquidation Trust shall have been formed and the Liquidation Trust Agreement, in form and substance acceptable to the Liquidating Debtors and/or the Merging Debtors, and the Consultation Parties, shall have been executed and become enforceable;

(v) the appointment of the Liquidation Trustee shall have been confirmed pursuant to an order of the Bankruptcy Court, which may be the Confirmation Order and which shall not be subject to a stay;

(vi) the Reserves shall have been funded; and

(vii) all other actions and documents necessary to implement the provisions of Plan to be effectuated on or before the Effective Date shall be reasonably

satisfactory to the Liquidating Debtors and/or the Merging Debtors, and the Consultation Parties.

## Section 13.04. Waiver of Conditions Precedent

The Liquidating Debtors and/or the Merging Debtors, with the written approval of the Consultation Parties, may waive any of the conditions precedent set forth in Section 9.01 and Section 9.03 of the Plan in whole or in part at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to confirm and/or consummate the Plan.

## ARTICLE XIV

## EFFECT OF CONFIRMATION OF THE PLAN

## Section 14.01. Effect of Plan on Claims Against and Equity Interests in the Liquidating Debtors and the Merging Debtors

**Except as otherwise provided for herein and effective as of the Effective Date: (a) the rights afforded in the Plan and the treatment of all Claims against and Equity Interests in the Liquidating Debtors and the Merging Debtors shall be in exchange for and in complete satisfaction, and release of all Claims against and Equity Interests in, their property and Estates of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date; (b) the Plan shall bind all holders of Claims against and Equity Interests in the Liquidating Debtors and the Merging Debtors, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) the Liquidating Debtors and the Merging Debtors shall be deemed released under and to the fullest extent provided under the Bankruptcy Code from any and all Claims against and Equity Interests, of any kind or nature whatsoever, and all Claims against and Equity Interests in the Liquidating Debtors and the Merging Debtors, their property and Estates shall be satisfied and released in full, and the Liquidating Debtors' and the Merging Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Liquidating Debtors and the Merging Debtors, their Estates, their successors and assigns including the Liquidation Trust, and their assets and properties any and all Claims, Equity Interests, damages, debts, and other liabilities based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date; provided, however, that Section 10.01 of the Plan shall not satisfy or release any claim(s) against and equity interest(s) in the Reorganizing Debtors or the Reorganized Debtors, as applicable.**

## Section 14.02. Releases

Under Section 10.02 of the Plan, (a) the Liquidating Debtors and their Estates, (b) each of the Liquidating Debtors' current and former officers, managers and directors, (c) the Liquidation Trustee for and on behalf of the Liquidation Trust, (d) the Liquidation Trust, (e) the Merging

Debtors and their Estates, (f) each of the Merging Debtors' current and former officers, managers and directors, (g) the Pre-Petition Secured Parties, (h) the DIP Agent, (i) the DIP Lender, (j) the L/C Issuer, (k) solely with respect to the release provided by Section 10.02 of the Plan, Blackstone, and (l) the respective Related Persons of each of the foregoing, shall be released from any and all claims and Causes of Action taking place before the Effective Date; provided, however, that the foregoing releases shall not apply to claims or Causes of Action resulting from fraud, gross negligence or willful misconduct of a Released Party.  In addition, under Section 10.03 of the Plan, the Releasing Parties (i.e., each holder of a Claim against or Equity Interest that (a) affirmatively votes to accept or reject the applicable Subplan, (b) is Unimpaired pursuant to the applicable Subplan, or (c) rejects the Plan or abstains from voting on the applicable Subplan and who does not mark its Ballot indicating its desire to opt out of the releases provided in Section 10.03 of the Plan) have also agreed to release the Released Parties from any and all claims and Causes of Action taking place before the Effective Date; provided, however, that the foregoing releases shall not apply to claims or Causes of Action resulting from fraud, gross negligence or willful misconduct of a Released Party.

**It is important to note that a holder of a General Unsecured Claim, Convenience Class Claim or Blackstone General Unsecured Claim who opts out of the releases described in Section 10.03 of the Plan will not receive distribution under the Plan, as further described in ARTICLE III of the Plan.**  In addition, the Liquidating Debtors and the Merging Debtors believe the Pre-Petition Secured Parties are entitled to these releases in consideration for, among other reasons, their agreement to (i) waive their Allowed Pre-Petition Secured Parties Deficiency Claims, if any, and (ii) consent to the Liquidating Debtors' and the Merging Debtors' Estates funding the distributions to holders of Allowed Claims under each Subplan.

The specific release provisions in the Plan are set forth below:

(a)     Certain Releases by the Liquidating Debtors and the Merging Debtors

**Notwithstanding anything contained herein to the contrary, as of the Effective Date, and to the fullest extent authorized by applicable law, for good and valuable consideration, the adequacy of which is hereby confirmed, the Released Parties are deemed released and discharged by the Liquidating Debtors and the Merging Debtors, their Estates and any Person or Entity seeking to exercise the rights of the Liquidating Debtors, the Merging Debtors or their Estates (including the Liquidation Trustee or any Distribution Agent) from any and all claims, obligations, suits, judgments, damages, demands, debts, remedies, Causes of Action, rights of setoff, other rights, and liabilities whatsoever, whether for tort, contract, violations of federal or state securities laws, Avoidance Actions, including any derivative claims, asserted or that could possibly have been asserted directly or indirectly on behalf of the Liquidating Debtors, the Merging Debtors or their Estates or their Affiliates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, and any and all Causes of Action asserted or that could possibly have been asserted on behalf of the Liquidating Debtors, the Merging Debtors or their Estates or their Affiliates (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Entity, based on or in any way relating to, or in any manner arising from, in whole or in part, the Liquidating Debtors, the Merging Debtors or their**

Estates or their Affiliates, the conduct of the Liquidating Debtors' and the Merging Debtors' businesses, the formulation, preparation, solicitation, dissemination, negotiation, or filing of the PSA, this Disclosure Statement or the Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with or pursuant to the PSA, this Disclosure Statement or the Plan, the filing and prosecution of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the purchase, sale, or rescission of the purchase or sale of any Security of the Liquidating Debtors or the Merging Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between the Liquidating Debtors, the Merging Debtors their Estates or their Affiliates, on the one hand, and any Released Party, on the other hand, prepetition contracts and agreements with one or both Liquidating Debtors, the Merging Debtors or any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date; provided that to the extent that a claim or Cause of Action is determined by a Final Order to have resulted from fraud, gross negligence or willful misconduct of a Released Party, such claim or Cause of Action shall not be so released against such Released Party.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any obligations arising on or after the Effective Date of any party under the PSA Approval Order, Plan, the Liquidation Trust Agreement or the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in this Section 10.02, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by this Section 10.02; (c) in the best interests of the Liquidating Debtors, the Merging Debtors their Estates and all holders of Claims and Equity Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity asserting any claim or Cause of Action released by this Section 10.02.

(b)    Certain Releases by Holders of Claims and Equity Interests

Notwithstanding anything contained herein to the contrary, as of the Effective Date, and to the fullest extent authorized by applicable law, the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, remedies, Causes of Action, rights of setoff, other rights, and liabilities whatsoever, whether for tort, contract, violations of federal or state securities laws, Avoidance Actions, including any derivative claims, asserted or that could possibly have been asserted directly or indirectly on behalf of the Releasing Parties or their Affiliates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, and any and all Causes of Action asserted or that could possibly have been asserted on behalf of the Releasing Parties or their Affiliates (whether individually or

collectively) or on behalf of the holder of any Claim or Equity Interest or other Entity, based on or in any way relating to, or in any manner arising from, in whole or in part, the Liquidating Debtors, the Merging Debtors their Estates or their Affiliates, the conduct of the Liquidating Debtors' or the Merging Debtors' businesses, the formulation, preparation, solicitation, dissemination, negotiation, or filing of the PSA, this Disclosure Statement or the Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with or pursuant to the PSA, this Disclosure Statement or the Plan, the filing and prosecution of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the purchase, sale, or rescission of the purchase or sale of any Security of the Liquidating Debtors or the Merging Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any of the Liquidating Debtors or the Merging Debtors, their Estates or their Affiliates, on the one hand, and any Released Party, on the other hand, prepetition contracts and agreements with one or both Liquidating Debtors or the Merging Debtors, or any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date; <u>provided</u> that to the extent that a claim or Cause of Action is determined by a Final Order to have resulted from fraud, gross negligence or willful misconduct of a Released Party, such claim or Cause of Action shall not be so released against such Released Party.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any obligations arising on or after the Effective Date of any party under the PSA Approval Order, Plan, the Liquidation Trust Agreement or the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in this Section 10.03, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by this Section 10.03; (c) in the best interests of the Liquidating Debtors, the Merging Debtors or their Estates and all holders of Claims and Equity Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity granting a release under this Section 10.03 from asserting any claim or Cause of Action released by this Section 10.03.

## Section 14.03. Exculpation

Effective as of the Effective Date and to the fullest extent authorized by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim or any obligation, Cause of Action, or liability for any Exculpated Claim except to the extent determined in a Final Order to have resulted from actual fraud, gross negligence or willful misconduct of such Exculpated Party.  The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of acceptances and rejections of the Plan and the making of

**distributions pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable, law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

**Section 14.04. Injunction**

**Except as otherwise provided herein or in the Confirmation Order, from and after the Effective Date and to the fullest extent authorized by applicable law, all Persons are, to the fullest extent provided under section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined and forever barred from taking any of the following actions against, as applicable, the Released Parties and/or the Exculpated Parties and their respective properties and Assets: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any claims (as defined in section 101(5) of the Bankruptcy Code), Claims or Equity Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order on account of or in connection with or with respect to any such claims, Claims or Equity Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind on account of or in connection with or with respect to any such claims, Claims or Equity Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind on account of or in connection with or with respect to any such claims, Claims or Equity Interests unless such holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims, Claims or Equity Interests released, exculpated or settled pursuant to the PSA, the PSA Approval Order, the Plan or the Confirmation Order.**

**Section 14.05. Protection Against Discriminatory Treatment**

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Liquidating Debtor or Merging Debtor, or any Person or Entity (including, without limitation, the Liquidation Trustee for and on behalf of the Liquidation Trust, and the Distribution Agent, as applicable) with which a Liquidating Debtor or Merging Debtor has been or is associated, solely because such Liquidating Debtor or Merging Debtor was a debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Liquidating Debtor or Merging Debtor was granted a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**Section 14.06. Release of Liens**

Except as otherwise provided herein, in the Confirmation Order, or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates  shall be fully released, settled and discharged, and all of the rights, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Liquidation Trust.

**Section 14.07. Cancellation of Securities and Notes Against the Liquidating Debtors and the Merging Debtors**

So long as the treatments provided for in, and the distributions contemplated by, ARTICLE II and ARTICLE III of the Plan are effectuated or made, on the Effective Date, but subject to Section 10.08 of the Plan and the introductory paragraph to ARTICLE III of the Plan, each of (a) the Pre-Petition Reimbursement Agreement; (b) the DIP Credit Agreement; (c) the Equity Interests in the Liquidating Debtors and the Merging Debtors; and (d) any other notes, bonds, indentures, certificates or other instruments or documents evidencing or creating any Claims or Equity Interests that are Impaired by the Plan, shall be cancelled and deemed terminated and satisfied and discharged solely with respect to the Liquidating Debtors and/or the Merging Debtors, and the holders thereof shall have no further rights or entitlements in respect thereof against the Liquidating Debtors and/or the Merging Debtors, except the rights to receive the distributions, if any, to which the holders thereof are entitled under the Plan.

## ARTICLE XV

## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

**Section 15.01. Modification of a Subplan**

The Liquidating Debtors and/or the Merging Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, and subject to the written approval of the Consultation Parties, to amend or modify the Plan before the entry of the Confirmation Order, subject to the limitations set forth herein.  After entry of the Confirmation Order, the applicable Liquidating Debtor(s) and/or Merging Debtor(s) may amend or modify the Plan, subject to the written approval of the Consultation Parties and in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission or reconcile any inconsistency in such Subplan in such manner as may be necessary to carry out the purpose and intent of the Subplan.

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and does not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**Section 15.02. Revocation or Withdrawal of Plan**

The Liquidating Debtors and/or the Merging Debtors, as applicable, reserve the right, subject to the written approval of the Consultation Parties, to revoke or withdraw the Plan or either Subplan before the Confirmation Date and to file subsequent chapter 11 Subplans.  If a Liquidating Debtor revokes or withdraws a Subplan, or if Confirmation or Consummation does not occur with respect to either Subplan, then: (a) the affected Subplan will be null and void in all respects; (b) any settlement or compromise embodied in the Subplan, or rejection of Executory Contracts or Unexpired Leases effected by the Subplan, and any document or agreement executed pursuant hereto shall be null and void in all respects; and (c) nothing contained in the affected Subplan or this Disclosure Statement shall: (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the affected Liquidating Debtor;

(ii) prejudice in any manner the rights of the affected Liquidating Debtor or any other Person or Entity; or (iii) constitute an admission, acknowledgment, offer or undertaking by the affected Liquidating Debtor or any other Person or Entity in any respects.

## ARTICLE XVI

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date for either Subplan, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases after the Effective Date as legally permissible, including jurisdiction to:

(i)  enforce the terms of, and to hear and determine any motions, adversary proceedings, applications, contested matters, or other litigated matters relating to, the PSA and the PSA Approval Order;

(ii)  allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims;

(iii)  grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(iv)  resolve any matters related to the rejection of any Executory Contract or Unexpired Lease;

(v)  ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(vi)  decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Liquidating Debtors and/or the Merging Debtors that may be pending on the Effective Date;

(vii)  enter such orders as may be necessary or appropriate to implement or consummate the provisions of the PSA, the Plan and/or this Disclosure Statement, and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the foregoing;

(viii)  enter and enforce any order related to or otherwise in connection with any sale of property by the Liquidating Debtors and/or the Merging Debtors pursuant to sections 363 or 1123 of the Bankruptcy Code;

(ix)    decide or resolve any Causes of Action arising under the Bankruptcy Code, including, without limitation, Avoidance Actions and Claims under sections 362, 510, 542 and 543 of the Bankruptcy Code;

(x)    resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Plan or either Subplan, or any Person's or Entity's obligations incurred in connection with the Plan or either Subplan;

(xi)    issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the Consummation or enforcement of the Plan or either Subplan, or with the consummation or enforcement of the PSA Approval Order, the Confirmation Order or any other order of the Bankruptcy Court except as otherwise provided herein;

(xii)    resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in ARTICLE X of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunction and other provisions;

(xiii)    enter and implement such orders as are necessary or appropriate if the PSA Approval Order or the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(xiv)    determine any other matters that may arise in connection with or relate to the PSA, the PSA Approval Order, the Plan, this Disclosure Statement, the Disclosure Statement Order and/or the Confirmation Order, or any contract, instrument, release, indenture or other agreement or document created in connection with the foregoing;

(xv)    enter order(s) and/or Final Decree(s) concluding the Chapter 11 Cases;

(xvi)    hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(xvii)    consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order; and

(xviii)    hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XVII

## MISCELLANEOUS PROVISIONS

**Section 17.01. Corporate Action**

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Equity Interests, directors, managers or the officer of the Liquidating Debtors and/or the Merging Debtors or any other Person or Entity (including, without limitation, the Liquidation Trustee for and on behalf of the Liquidation Trust), as applicable, including: (a) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) rejection of Executory Contracts and Unexpired Leases; (d) formation of the Liquidation Trust pursuant to the Liquidation Trust Agreement; (e) the filing of appropriate limited liability company agreements, certificates or articles of incorporation or organization, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (f) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.  All matters provided for in the Plan involving the company structure of the Liquidating Debtors and/or the Merging Debtors, and any limited liability company or partnership action required by the Liquidating Debtors and/or the Merging Debtors in connection therewith, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, authorized persons or officers of the Liquidating Debtors and/or the Merging Debtors.  The authorizations and approvals contemplated by Section 13.01 of the Plan shall be effective notwithstanding any requirements under nonbankruptcy law.

**Section 17.02. General Settlement of Claims**

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the PSA (as approved by the PSA Approval Order) and the Plan shall constitute a good-faith compromise and settlement of all (a) Claims against and Equity Interests in the Liquidating Debtors and the Merging Debtors; and (b) all claims (as defined in section 101(5) of the Bankruptcy Code) set forth in the PSA.

**Section 17.03. Preservation of Causes of Action Not Expressly Released**

On and after the Effective Date, the Liquidation Trustee, for and on behalf of the Liquidation Trust, retains all rights to commence and pursue, as appropriate, any and all claims

or Causes of Action, whether arising before or after the Petition Date, in any court or other tribunal including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases, other than Avoidance Actions or any Causes of Action released under the Plan.  The failure to list any potential or existing claims or Causes of Action is not intended to limit the rights of the Liquidation Trustee, for and on behalf of the Liquidation Trust, to pursue any claims or Causes of Action not listed or identified.

Unless a claim or Cause of Action against a Creditor or other Person or Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, the Liquidating Debtors and/or the Merging Debtors expressly reserve such claim or Cause of Action for later adjudication by the Liquidation Trustee, for and on behalf of the Liquidation Trust (including, without limitation, claims and Causes of Action not specifically identified or which Liquidating Debtors and/or the Merging Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Liquidating Debtors and/or the Merging Debtors at this time or facts or circumstances which may change or be different from those which the Liquidating Debtors and/or the Merging Debtors now believe to exist).  No preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such claims or Causes of Action upon or after the Confirmation or Consummation of the Plan based on this Disclosure Statement, the Plan or the Confirmation Order, except where such claims or Causes of Action have been released in the Plan or other Final Order.  In addition, the Liquidating Debtors and/or the Merging Debtors expressly reserve for later adjudication by the Liquidation Trustee, for and on behalf of the Liquidation Trust, the right to pursue or adopt any claims alleged in any lawsuit in which the Liquidating Debtors and/or the Merging Debtors are a defendant or an interested party, against any Person or Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Except as otherwise provided in the Plan or in any contract, instrument, release, indenture or other agreement entered into in connection with the Plan (including the PSA and the PSA Approval Order), in accordance with section 1123(b)(3) of the Bankruptcy Code, any claims, rights, and Causes of Action that the Liquidating Debtors and/or the Merging Debtors may hold against any Person, shall vest in the Liquidation Trust, and the Liquidation Trustee, for and on behalf of the Liquidation Trust, shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such claims, rights, and Causes of Action without the consent or approval of any third party and without any further order of court.

Delivery (by any means) of the Plan or Disclosure Statement to any Person or Entity to whom the Liquidating Debtors and/or the Merging Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Liquidating Debtors and/or the Merging Debtors, or a transfer of money or property of the Liquidating Debtors and/or the Merging Debtors, or who has transacted business with the Liquidating Debtors and/or the Merging Debtors, or leased equipment or property from the Liquidating Debtors and/or the Merging Debtors, shall constitute actual notice that such obligation, transfer, or transaction may be reviewed by the Liquidation Trustee, for and on behalf of the Liquidation Trust, subsequent to the Effective Date and may, if appropriate, be the subject

of an action after the Effective Date, whether or not: (a) such Person or Entity has filed a Proof of Claim against the Liquidating Debtors and/or the Merging Debtors in their Chapter 11 Cases; (b) such Person's or Entity's Proof of Claim has been objected to by the Liquidating Debtors and/or the Merging Debtors or the Liquidation Trustee, for and on behalf of the Liquidation Trust; (c) such Person's or Entity's Claim was included in the Schedules; (d) such Person's or Entity's scheduled Claim has been amended by the Liquidating Debtors and/or the Merging Debtors or the Liquidation Trustee, for and on behalf of the Liquidation Trust, or has been identified by the Liquidating Debtors and/or the Merging Debtors or the Liquidation Trustee as a Disputed Claim; or (e) such action falls within the list of affirmative Causes of Action in the Plan Supplement.

## Section 17.04. Sales and Use Tax Obligations

Notwithstanding any provision to the contrary in the Plan, nothing shall: (i) affect the ability of the Texas Comptroller of Public Accounts to pursue any non-Debtors to the extent allowed by non-bankruptcy law for any liabilities that may be related to any federal or state tax liabilities owed by the Liquidating Debtors and/or the Merging Debtors or their Estates; or (ii) from and after the Effective Date, permit or allow the Liquidation Trustee, for and on behalf of the Liquidation Trust, or the Liquidation Trust to violate any state or federal law relating to federal or state tax liabilities or duties.

## Section 17.05. Environmental and Other Liabilities to Governmental Units

Nothing in the Plan or entry of the Confirmation Order discharges, releases, resolves, exculpates, precludes, or enjoins: (a) any environmental liability to any Governmental Unit that is not a Claim as defined in section 101(5) of the Bankruptcy Code; (b) any environmental Claim of any Governmental Unit arising on or after the Effective Date; (c) any environmental liability to any Governmental Unit on the part of any entity as the owner or operator of property after the Effective Date; (d) any liability to the United States on the part of any person or entity other than the Debtors or the Liquidation Trust; or (e) any valid right of setoff or recoupment of any Governmental Unit.

## Section 17.06. Section 1146(a) Exemption

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording tax, or other similar tax or governmental assessment. Upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax, fee, or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

## Section 17.07. Elimination of Vacant Classes

Any Class of Claims or Equity Interests that is not populated as of the commencement of the Confirmation Hearing by an Allowed Claim or Equity Interest, or a Claim or Equity Interest that is temporarily allowed under Bankruptcy Rule 3018, shall be deemed eliminated from the

applicable Subplan for purposes of: (a) voting to accept or reject the Subplan; and (b) determining the acceptance or rejection of the Subplan by such Class pursuant to sections 1129(a)(8) and 1129(a)(10) of the Bankruptcy Code.

## Section 17.08. Intercompany Claims

Pursuant to Bankruptcy Rule 9019 (and consistent with the provisions of Section 13.02 of the Plan), the Liquidating Debtors and the Merging Debtors propose a good faith compromise and settlement of the Intercompany Claims pursuant to the provisions the Plan.  On the Effective Date, the Intercompany Claims shall be cancelled, extinguished and discharged and the holders of Intercompany Claims shall not receive or retain any property under the Plan on account of such Intercompany Claims.  Intercompany Claims are subject to the Liens of the DIP Lender and Pre-Petition Secured Parties.  Moreover, because all the Debtors are jointly and severally liable for the obligations arising under the Pre-Petition Reimbursement Agreement and the DIP Facility, the settlement of Intercompany Claims would not have any impact on the recoveries of the holders of Claims against any Debtor.

## Section 17.09. Additional Documents

On or before the Effective Date, the Liquidating Debtors and/or the Merging Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Subplans.  The Liquidating Debtors and/or the Merging Debtors, and all holders of Claims and Equity Interests receiving distributions pursuant the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

## Section 17.10. Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

## Section 17.11. Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court has entered the Confirmation Order.  Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Liquidating Debtor or Merging Debtor with respect to the PSA, the Plan, this Disclosure Statement, the Confirmation Order or the Plan Supplement, shall be or shall be deemed to be an admission or waiver of any rights of the Liquidating Debtors and/or the Merging Debtors with respect to the holders of Claims or Equity Interests prior to the Effective Date.

**Section 17.12. Notices**

Except as otherwise set forth in the Plan, all notices or requests in connection with the Plan shall be in writing and will be deemed to have been given when received by personal delivery, e-mail, overnight courier or first class mail and addressed to:

| **If to the Liquidating Debtors and/or the Merging Debtors:** | Bracewell & Giuliani LLP CityPlace I, 34th Floor 185 Asylum Street Hartford, Connecticut 06103 Attn: Kurt Mayr Email: kurt.mayr@bgllp.com<br><br>with a copy to:<br><br>Bracewell & Giuliani LLP 1251 Avenue of Americas, 49th Floor New York, New York 10020 Attn: Robert G. Burns Email: robert.burns@bgllp.com |
|---|---|
| **If to the Liquidation Trustee, for and on behalf of the Liquidation Trust:** | [_____] |
| **If to the Consultation Parties:** | Cleary Gottlieb Steen & Hamilton LLP One Liberty Plaza New York, New York 10006 Attn: Lindsee P. Granfield Email: lgranfield@cgsh.com<br>        Luke A. Barefoot Email: lbarefoot@cgsh.com |

**Section 17.13. Term of Injunctions or Stay**

**Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

**Section 17.14. Entire Agreement**

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.  To the extent the Confirmation Order is inconsistent with the Plan, the Confirmation Order shall control for all purposes.

**Section 17.15. Plan Supplement Exhibits**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Liquidating Debtors' and/or the Merging Debtors' counsel at the address above or by downloading such exhibits and documents from the Claims and Solicitation Agent's website at https://cases.primeclerk.com/optim/Home-DocketInfo or the Bankruptcy Court's website at www.deb.uscourts.gov.

**Section 17.16. Severability**

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Liquidating Debtors and/or the Merging Debtors, and subject to the written approval of the Consultation Parties, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms; (b) integral to the Plan; and (c) non-severable and mutually dependent.

**Section 17.17. Substantial Consummation**

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

**ARTICLE XVIII**

**RISK FACTORS**

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

**THESE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

**Section 18.01. Risks Related to the Plan and Other Bankruptcy Law Considerations**

 (a) <u>A Claim or Equity Interest Holder May Object to, and the Bankruptcy Court May Disagree with, the Classification of Claims and Equity Interests</u>

 Section 1122(a) of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Liquidating Debtors and the Merging Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Liquidating Debtors and the Merging Debtors created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, which are substantially similar to the other Claims and Equity Interests in each such Class. However, a Claim or Equity Interest holder could challenge the Liquidating Debtors' and the Merging Debtors' classification. In such an event, the cost of the Chapter 11 Cases and the time needed to confirm the Plan may increase, and there can be no assurance that the Bankruptcy Court will agree with the Liquidating Debtors' and the Merging Debtors' classification. If the Bankruptcy Court concludes that either or both of the classifications of Claims and Equity Interests under any of the Subplan(s) does not comply with the requirements of the Bankruptcy Code, the Liquidating Debtors and the Merging Debtors may need to modify the Plan. Such modification could require re-solicitation of votes on the applicable Subplan(s). The Subplan(s) may not be confirmed if the Bankruptcy Court determines that the Liquidating Debtors' and the Merging Debtors' classification of Claims and Equity Interests is not appropriate.

 (b) <u>The Liquidating Debtors and the Merging Debtors May Not Be Able to Satisfy the Voting Requirements for Confirmation of the Subplan(s)</u>

 If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Subplan(s), the Liquidating Debtors and the Merging Debtors may seek, as promptly as practicable thereafter, Confirmation. If the Subplan(s) is not accepted or deemed to be accepted by at least one Class of Claims that is Impaired under the applicable Subplan(s), the applicable Subplan(s) may not be confirmed. Although styled as a "joint" plan, this Plan consists of separate Subplans (one Optim Energy and, by virtue of the merger, for the Merging Debtors, and one for Twin Oaks LP), and each Liquidating Debtor and Merging Debtor is a proponent herein within the meaning of section 1129 of the Bankruptcy Code in its respective Chapter 11 Case. If a Subplan is not confirmed, then the Liquidating Debtors and the Merging Debtors reserve the right, subject to the written approval of the Consultation Parties, to either (a) request that the other Subplans be confirmed or (b) withdraw any of the Subplans. The Liquidating Debtors' and the Merging Debtors' inability to confirm, or election to withdraw, any of the Subplan(s) shall not impair the Confirmation of the other Subplan(s).

(c)     The Bankruptcy Court May Not Confirm the Subplan(s)

The Liquidating Debtors and the Merging Debtors cannot assure you that any or all the Subplan(s) will be confirmed by the Bankruptcy Court.  Section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a plan of reorganization, requires, among other things, a finding by a bankruptcy court that the plan of reorganization is "feasible," that all claims and interests have been classified in compliance with the provisions of section 1122 of the Bankruptcy Code, and that, under the plan of reorganization, each holder of a claim or interest within each impaired class either accepts the plan of reorganization or receives or retains cash or property of a value, as of the date the plan of reorganization becomes effective, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  There can be no assurance that the Bankruptcy Court will conclude that the feasibility test and other requirements of section 1129 of the Bankruptcy Code have been met with respect to the Subplan(s).

If the Subplan(s) are not confirmed, the Liquidating Debtors and/or the Merging Debtors may elect to amend the Subplan(s), or permit the Pre-Petition Secured Parties to seek relief from the automatic stay to exercise their rights in the Collateral under the Pre-Petition Reimbursement Agreement and the Pre-Petition Reimbursement Agreement Security Documents or file a motion to convert the remaining Chapter 11 Cases to a chapter 7 liquidation.  The Liquidating Debtors and the Merging Debtors believe that the Plan provides a greater recovery for holders of Allowed Claims than would be achieved under any alternative structure.  This belief is based on a number of considerations, perhaps most importantly, the Consultation Parties' consent to fund Cash distributions to junior Classes of Claims and Equity Interests despite not being paid in full under the Plan on account of their Pre-Petition Secured Parties Secured Claims.  The Liquidating Debtors and the Merging Debtors believe there may be insufficient value to fund these Cash distributions to creditors under an alternative structure.

(d)     Nonconsensual Confirmation

In the event that any impaired class of claims against or interests in a debtor does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class has or deemed to have accepted the plan (with such acceptance being determined without including the vote of any insider in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  The Liquidating Debtors and the Merging Debtors believe that the Plan satisfies these requirements, and the Liquidating Debtors and the Merging Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased Administrative Claims.

(e)     The Liquidating Debtors, the Merging Debtors and/or the Liquidation Trustee May Object to the Amount or Classification of a Claim or Equity Interest

Except as otherwise provided in the Plan, the Liquidating Debtors, the Merging Debtors and/or the Liquidation Trustee reserve the right to object to the amount or classification of any Claim or Equity Interest under the Subplans.  The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim or Equity Interest where such Claim or Equity Interest is subject to an objection.  Any holder of a Claim or Equity Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

(f)     Even if the Liquidating Debtors and the Merging Debtors Receive All Necessary Acceptances for the Subplans to Become Effective, the Liquidating Debtors and the Merging Debtors May Fail to Meet All Conditions Precedent to Effectiveness of the Subplans

The Confirmation and effectiveness of the Subplans are subject to certain conditions that may or may not be satisfied.  The Liquidating Debtors and the Merging Debtors cannot assure you that all requirements for Confirmation and effectiveness required under the Subplans will be satisfied.

(g)     Contingencies May Affect Distributions to Holders of Allowed Claims and Equity Interests

The distributions available to holders of Allowed Claims and Equity Interests under the Subplans can be affected by a variety of contingencies, including, whether the Bankruptcy Court orders certain Allowed Claims to be disallowed or subordinated to other Allowed Claims.  For example, the Liquidating Debtors and the Merging Debtors cannot determine whether certain Classes of Claims against the Liquidating Debtors will vote to accept the applicable Subplan(s).  Without such Class acceptance, holders of Claims in these Classes will not receive a distribution on account of their Allowed Claims under the Subplan(s).  The occurrence of such contingencies could affect distributions under the Subplans.

(h)     Allowed Claims May Exceed Amount in the Reserves

Unless explicitly provided otherwise in the Plan with respect to a particular Claim, the Liquidating Debtors Claims Reserve shall be the only source of recovery for Claims not Allowed as of the Effective Date (including Disputed and contingent Claims).  There is a risk that if such Claims are allowed in higher amounts than the aggregate available in the Liquidating Debtors Claims Reserve, and accounting for other Claims that were Allowed in higher or lower amounts, certain Claims not Allowed as of the Effective Date may receive lower recoveries.

(i)     The Liquidating Debtors and/or the Merging Debtors May Seek to Amend, Waive, Modify or Withdraw a Subplan(s) at Any Time Prior to Confirmation

The Liquidating Debtors and/or the Merging Debtors reserve the right, subject to the written approval of the Consultation Parties, to revoke or withdraw the Plan or any Subplan before the Confirmation Date and to file subsequent chapter 11 Subplans prior to the Confirmation of the Subplan(s) or substantial Consummation thereof, subject to the provisions of

section 1127 of the Bankruptcy Code and applicable law, to amend the terms of the Subplan(s) or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to Consummate the Subplan(s). The potential impact of any such amendment or waiver on the holders of Claims and Equity Interests cannot presently be foreseen but may include a change in the economic impact of the applicable Subplan(s) on some or all of the proposed classes or a change in the relative rights of such classes. All holders of Claims and Equity Interests will receive notice of such amendments or waivers to the extent required by applicable law or the Bankruptcy Court. If, after receiving sufficient acceptances, but prior to Confirmation of the Subplan(s), the Liquidating Debtors and/or the Merging Debtors seek to modify the Subplan(s), the previously solicited acceptances will be valid only if (i) all Classes of adversely affected creditors and interest holders accept the modification in writing, or (ii) the Bankruptcy Court determines, after notice to designated parties, that such modification did not adversely change the treatment of holders of accepting Claims and Equity Interests or is otherwise permitted by the Bankruptcy Code.

      (j)      <u>Releases, Injunctions, and Exculpations Provisions May Not Be Approved</u>

ARTICLE X of the Plan provides for certain releases, injunctions, and exculpations. However, all of the releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.

      (k)      <u>No Substantive Consolidation</u>

The Liquidating Debtors and the Merging Debtors are not seeking substantive consolidation. Nothing in the Plan shall constitute or be deemed to constitute an admission that one of the Liquidating Debtors and/or Merging Debtors is subject to or liable for any Claim against any other Liquidating Debtor or Merging Debtor.

      (l)      <u>The Liquidating Debtors and/or the Merging Debtors Cannot Predict the Amount of Time Spent in Bankruptcy for the Purpose of Implementing the Plan (Including the Subplans Therein).</u>

The Liquidating Debtors and the Merging Debtors estimate that the process of obtaining Confirmation of the Plan by the Bankruptcy Court will last approximately forty-five (45) to sixty (60) days from filing the Plan, but it could last considerably longer if, for example, Confirmation is contested or the conditions to Confirmation or Consummation are not satisfied or waived. If the Liquidating Debtors and the Merging Debtors are unable to obtain Confirmation of the Subplans on a timely basis, because of a challenge to the Plan or otherwise, the Liquidating Debtors and the Merging Debtors may be forced to operate in bankruptcy for a longer period of time while they try to develop a different reorganization plan that can be confirmed. A protracted bankruptcy case could increase both the probability and the magnitude of the adverse effects described above.

      (m)      <u>Other Parties in Interest Might Be Permitted to Propose Alternative Plans of Reorganization that May Be Less Favorable to Certain Constituencies than the Plan</u>

Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization to the Plan. Under the Bankruptcy Code, a debtor in

possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization for a period of one hundred twenty (120) days from filing. However, such exclusivity period can be reduced or terminated upon order of a bankruptcy court. The Liquidating Debtors' and the Merging Debtors' exclusive period to file a plan of reorganization currently extends through June 9, 2015. On June 8, 2015, the Debtors filed a motion to extend the Exclusive Filing Period through and including August 12, 2015 and the Exclusive Solicitation Period through and including October 12, 2015 [D.I. 1000]. The Debtors operated under a bridge order provided under the Bankruptcy Rules until the Bankruptcy Court entered an order, on August 14, 2015, approving the motion and extending the Exclusive Filing Period through and including August 12, 2015 and the Exclusive Solicitation Period through and including October 12, 2015 [D.I. 1205].

If Confirmation does not occur within the Exclusive Solicitation Period, other parties in interest may then have the opportunity to propose alternative plans on terms less favorable to existing holders of Claims and Equity Interests and may seek to exclude these holders from receiving the distributions completed by the Plan. Alternative plans also may treat less favorably the Claims of a number of other constituencies. If there were competing plans, the Chapter 11 Cases likely would become longer, more complicated, and much more expensive. If this were to occur, there could be adverse consequences to holders of Claims and Equity Interests.

        (n)      The Liquidating Debtors and/or the Merging Debtors May Not Be Able to Secure Confirmation and Consummation of the Plan Prior to Termination of the DIP Facility

If the Third Amended Plan does not become effective, and if the DIP Credit Agreement is not terminated, the Liquidating Debtors and/or the Merging Debtors cannot guarantee that the DIP Lenders will agree to amend the DIP Credit Agreement to extend these milestones any further. To the extent that the terms or conditions of the DIP Credit Agreement are not satisfied, or to the extent events giving rise to termination of the DIP Facility under the DIP Credit Agreement occur, the DIP Facility may terminate prior to the Confirmation and Consummation of the Plan, which could result in the loss of financing and/or support for the Plan by important creditor constituents. Any such loss of financing and/or support could adversely affect the Liquidating Debtors' and the Merging Debtors' ability to reorganize confirm and Consummate the Plan.

        (o)      Non-Occurrence of the Effective Date

Operating in bankruptcy imposes significant risks. The Liquidating Debtors and the Merging Debtors believe that the Effective Date will occur very shortly after the Confirmation Date; however, there can be no assurance as to such timing. In fact, there can be no assurance as that the conditions to the Effective Date will ever be satisfied.

        (p)      Certain Claims May Not Be Discharged

The Liquidating Debtors and the Merging Debtors are subject to complex and stringent energy, environmental, and other governmental laws and regulations at the federal, state, and local levels in connection with the development, ownership, and operation of the power plants, and in connection with the purchase and sale of electricity. There may be future claims not

discharged in the Chapter 11 Cases related to the Debtors' business operations and this regulatory environment.

In particular, the Debtors' activities in the ERCOT wholesale market are subject to electric reliability standards, market governance rules, and prohibitions on certain activities promulgated under federal and state law. An occurrence of a violation of such standards, rules, and prohibitions could result in substantial penalties and disgorgement of excess revenues resulting from the violation. If any such violation were to be found to have occurred, such matter might not be discharged in the Chapter 11 Cases related to the Debtors' business operations.

(q)     Certain Material U.S. Federal Income Tax Consequences

Certain material U.S. federal income tax consequences of the Plan are summarized in ARTICLE XXI of this Disclosure Statement. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described therein. No ruling from the U.S. Internal Revenue Service ("**IRS**") has been sought by the Liquidating Debtors and/or the Merging Debtors regarding the tax consequences described in this Disclosure Statement. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position disclosed in this Disclosure Statement. For a more detailed discussion please review ARTICLE XXI of this Disclosure Statement.

## Section 18.02. Avoidance Actions

A bankruptcy trustee (or a debtor as a debtor in possession) may avoid as a preference a transfer of property made by a debtor to a creditor on account of an antecedent debt while a debtor was insolvent, where that creditor receives more than it would have received in a liquidation of the entity under chapter 7 had the payment not been made, if (i) the payment was made within ninety (90) days before the date the bankruptcy case was commenced or (ii) the creditor is found to have been an "insider," as defined in the Bankruptcy Code, within one year before the commencement of the bankruptcy case. A debtor is presumed to have been insolvent during the ninety (90) days preceding the commencement of the case.

A bankruptcy trustee (or a debtor as a debtor in possession) may avoid as a fraudulent transfer a transfer of property made by a debtor within two (2) years (and under applicable state laws, longer) before the date the bankruptcy case was commenced if a debtor (a) received less than reasonably equivalent value in exchange for such transfer and (b) was insolvent on the date of such transfer or became insolvent as a result of such transfer, such transfer left a debtor with an unreasonably small capital, or a debtor intended to incur debts that would be beyond a Debtors' ability to pay as such debts matured.

Except as expressly released by the Plan, Final DIP Order, Confirmation Order or other Final Order, all Causes of Action (other than Avoidance Actions, which are being released) for the Liquidating Debtors and the Merging Debtors are being retained by the Liquidation Trustee, for and on behalf of the Liquidation Trust, and the Liquidation Trustee may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) any or all of such Causes of Action.

To date, the Liquidating Debtors and/or the Merging Debtors may not have conclusively identified all potential Avoidance Actions prior to their decision to release such Avoidance Actions under the Plan.

**Section 18.03. Disclosure Statement Disclaimer**

(a)    <u>Information Contained Herein is for Soliciting Votes</u>

The information contained in this Disclosure Statement is for the purpose of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

(b)    <u>Disclosure Statement Was Not Approved by the SEC</u>

This Disclosure Statement was not filed with the SEC nor is it required to be. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the Exhibits or the statements contained herein, and any representation to the contrary is unlawful.

(c)    <u>Disclosure Statement May Contain Forward Looking Statements</u>

This Disclosure Statement may contain "forward looking statements." Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," the negative thereof, or other variations thereon or comparable terminology. The reader is cautioned that all forward-looking statements are necessarily speculative. The Liquidation Analysis and the other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to holders of Allowed Claims and Equity Interests may be affected by many factors that cannot be predicted. Forward-looking statements represent the Liquidating Debtors' and the Merging Debtors' estimates and assumptions only as of the date such statements were made.

(d)    <u>No Legal or Tax Advice Is Provided to You by This Disclosure Statement</u>

**THIS DISCLOSURE STATEMENT IS NOT LEGAL ADVICE TO YOU.** The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan (including the Subplans therein) or object to Confirmation.

(e)    <u>No Admissions Made</u>

The information and statements contained in this Disclosure Statement shall neither (1) constitute an admission of any fact or liability by any entity nor (2) be deemed evidence of the tax or other legal effects of the Plan on the Liquidating Debtors and/or the Merging Debtors, or holders of Allowed Claims or Equity Interests, or any other parties-in-interest.

(f)     Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Liquidating Debtors and/or the Merging Debtors, and the Liquidation Trustee reserve the right to continue to investigate Claims and Equity Interests and file and prosecute objections to Claims and Equity Interests.

(g)     No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a holder of an Allowed Claim or Equity Interest for or against the Plan does not constitute a waiver or release of any Claims or rights of the Liquidating Debtors or the Merging Debtors, or the Liquidation Trustee, as applicable, to object to that holder's Allowed Claim or Equity Interest, or to bring Causes of Action or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of Action of the Liquidating Debtors, the Merging Debtors or their respective Estates are specifically or generally identified herein, except as expressly released by the Plan, Final DIP Order, Confirmation Order or other Final Order.

(h)     Information Was Provided by the Liquidating Debtors and/or the Merging Debtors and Was Relied Upon by the Liquidating Debtors' and/or the Merging Debtors' Advisors

Counsel to, and other advisors retained by, the Liquidating Debtors and/or the Merging Debtors have relied upon information provided by the Liquidating Debtors and/or the Merging Debtors in connection with the preparation of this Disclosure Statement. Although counsel to, and other advisors retained by the Liquidating Debtors and/or the Merging Debtors, have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

(i)     Potential Exists for Inaccuracies and the Liquidating Debtors and/or the Merging Debtors Have No Duty to Update

The Liquidating Debtors and/or the Merging Debtors make the statements contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since such date. Although the Liquidating Debtors and/or the Merging Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Liquidating Debtors and/or the Merging Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Liquidating Debtors and/or the Merging Debtors may subsequently update the information in this Disclosure Statement, the Liquidating Debtors and/or the Merging Debtors have no affirmative duty to do so unless ordered by the Bankruptcy Court.

(j)     No Representations Outside of this Disclosure Statement Are Authorized

No representations concerning or relating to the Liquidating and/or the Merging Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy

Code, other than as set forth in this Disclosure Statement. In deciding whether to vote to accept or reject the Plan, you should not rely upon any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, unless otherwise indicated herein.

## ARTICLE XIX

## CONFIRMATION AND CONSUMMATION PROCEDURE

### Section 19.01. Plan Objection Deadline

The Bankruptcy Court has established 4:00 p.m. prevailing Eastern Time on [__], 2015, as the deadline to object to confirmation of the Plan (the "*Plan Objection Deadline*"). All such objections must be filed with the Bankruptcy Court and served on the Liquidating Debtors and/or the Merging Debtors, counsel to the DIP Lenders and the Pre-Petition Secured Parties, and certain other parties in interest in accordance with the Disclosure Statement Order and Solicitation Procedures so that they are actually received on or before the Plan Objection Deadline. The Liquidating Debtors and the Merging Debtors believe the Plan Objection Deadline, as established by the Bankruptcy Court, affords the Bankruptcy Court, the Liquidating Debtors and the Merging Debtors, and other parties in interest reasonable time to consider the objections to the Plan before a Confirmation Hearing.

### Section 19.02. Confirmation Hearing

Assuming the requisite acceptances are obtained for the Plan (including the Subplans contained therein), the Liquidating Debtors and the Merging Debtors intend to seek Confirmation of the Plan at the Confirmation Hearing to be held on [__], 2015, [__]:[__][__] a.m. prevailing Eastern Time, before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, in Courtroom No. 1 of the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Wilmington, Delaware 19801. The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the entities who have filed objections to the Plan, without further notice to other parties in interest. The Bankruptcy Court, in its discretion and before a Confirmation Hearing, may put in place additional procedures governing such hearing. The Plan may be modified, if necessary, before, during, or as a result of the hearing to confirm the Plan without further notice to parties in interest.

### Section 19.03. Plan Confirmation Requirements Under the Bankruptcy Code

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of chapter 11 of the Bankruptcy Code that must be satisfied in order for a plan to be confirmed. Specifically, in addition to other applicable requirements, the Liquidating Debtors and the Merging Debtors believe that the Plan complies with the applicable provisions of the Bankruptcy Code and satisfies or will satisfy the following requirements of section 1129 of the Bankruptcy Code:

(i)      the Liquidating Debtors and the Merging Debtors, as the proponents of the Plan, have complied with the applicable provisions of the Bankruptcy Code;

(ii)     the Plan has been proposed in good faith and not by any means forbidden by law;

(iii)    any payment made or promised by the Liquidating Debtors and the Merging Debtors or by a person acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment: (a) made before the Confirmation of the Plan is reasonable; or (b) is subject to the approval of the Bankruptcy Court as reasonable, if such payment is to be fixed after Confirmation of the Plan.

(iv)     the Liquidating Debtors and the Merging Debtors, as proponents of the Plan, will disclose the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as a director, officer, or voting trustee of the Liquidating Debtors and the Merging Debtors (via the Liquidation Trust), and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and with public policy;

(v)      the Liquidating Debtors and the Merging Debtors will disclose the identity of any insider that will be employed or retained as or by the Reorganized Debtors and the nature of any compensation for such insider;

(vi)     each holder of an Impaired Claim or Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Equity Interest, property of a value as of the Effective Date that is not less than the amount such holder would receive or retain if the Liquidating Debtors and the Merging Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code (the "best interests" test);

   a.   the starting point in determining whether the Plan meets the "best interests" test is a determination of the amount of proceeds that would be generated from the hypothetical liquidation of the Liquidating Debtors' and the Merging Debtors' assets in the context of a chapter 7 liquidation (such amount, the "***Liquidation Proceeds***").    The Liquidation Proceeds must then be reduced by the costs of such liquidation, including costs incurred during the Chapter 11 Cases and allowed under chapter 7 of the Bankruptcy Code (such as Professionals' fees and expenses, a chapter 7 trustee's fees and the fees and expenses of professionals retained by the chapter 7 trustee).    The potential chapter 7 liquidation distribution in respect of each class

must be reduced further by costs imposed by the delay caused by conversion to chapter 7. In addition, inefficiencies in the claims resolution process in a chapter 7 liquidation would negatively impact the recoveries of creditors. The net present value of a hypothetical chapter 7 liquidation distribution in respect of an Impaired Claim or Equity Interest is then compared to the recovery provided by the Plan for such Impaired Claim or Equity Interest;

b.  to support their opinion that the Plan meets the best interests test for the Liquidating Debtors and the Merging Debtors, the Liquidating Debtors and the Merging Debtors have prepared the Liquidation Analysis attached as **Exhibit B** hereto. Based on this, the Liquidating Debtors and the Merging Debtors are of the opinion that the Plan meets the best interests test for the Liquidating Debtors and the Merging Debtors;

(vii)  except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code, each Class of Claims or Equity Interests either has accepted the Plan or is not an Impaired Class under the Plan;

(viii)  except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims, Priority Tax Claims and Other Priority Claims will be paid in full or otherwise treated in accordance with section 1129(a)(9) of the Bankruptcy Code;

(ix)  at least one Impaired Class of Claims has accepted or has been deemed to accept the Plan or there is no Impaired non-consenting Class of Claims in accordance with section 1129(a)(10) of the Bankruptcy Code;

(x)  Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of any successor to the Liquidating Debtors and Merging Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan; and

(xi)  All fees payable under 28 U.S.C. § 1930, including the fees of the U.S. Trustee, have been paid or will be paid as of the Effective Date.

## Section 19.04. "Cramdown" Under Section 1129(b) of the Bankruptcy Code

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a chapter 11 plan of reorganization even if not all impaired classes have accepted the plan, provided that such plan has been accepted or deemed to accept by at least one impaired class. The Liquidating Debtors and the Merging Debtors will seek to confirm the Subplan(s) notwithstanding their rejection by any of the Impaired Classes.

In order to obtain such nonconsensual confirmation (or "cramdown") of the Subplan(s), the Liquidating Debtors and the Merging Debtors must demonstrate to the Bankruptcy Court that

the applicable Subplan(s) "does not discriminate unfairly" and is "fair and equitable" with respect to each Impaired Class that voted to reject the Subplan(s) (each such Impaired Class, a "***Non-Accepting Class***").

      (a)    <u>Fair and Equitable Test</u>

      The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable" and sets different standards for secured creditors, unsecured creditors, and equity holders, as follows:

      (i)    Secured Creditors

      With respect to Non-Accepting Classes of secured claims, the "fair and equitable" test requires that either: (x) each impaired secured creditor retains the liens securing its allowed secured claim and receives on account of that claim deferred cash payments having a present value equal to the amount of its allowed secured claim; (y) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (x) or (y) of this paragraph; or (z) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim.

      (ii)    Unsecured Creditors

      With respect to Non-Accepting Classes of unsecured claims, the "fair and equitable" test requires that: (x) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim; or (y) the holders of any claims (or equity interests) that are junior to the Non-Accepting Class will not receive any property under the Plan. (This provision is often referred to as the "absolute priority" rule.)

      (iii)    Equity Interests

      With respect to the classes of equity interests, the "fair and equitable" test requires that: (x) the Plan provides that each holders of an allowed equity interest receives or retains on account of such allowed equity interest property of a value, as of the Effective Date of the Plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such allowed equity interest; or (y) the holder of any allowed equity interest that is junior to the allowed equity interest of such class will not receive or retain any property under the Plan on account of such junior interest.

      (b)    <u>No Unfair Discrimination</u>

      A plan does not "discriminate unfairly" with respect to a Non-Accepting Class if the value of the cash and/or securities to be distributed to the class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the Non-Accepting Class. Exact parity is not required. The Liquidating Debtors and the Merging Debtors believe that any discrepancy in treatment or potential distributions to holders of Claims is justified based on certain inherent differences in the nature of their Claims, the time

that will be required to liquidate their Claims, and the relative levels of risk that are being taken by different creditors simply based upon the time it will take to liquidate their Claims.

To the extent necessary, the Liquidating Debtors and the Merging Debtors will establish at the Confirmation Hearing that each of these requirements has been satisfied under the Plan.

### Section 19.05. Liquidation Analysis

The Bankruptcy Code permits a plan to be confirmed only if the plan provides recoveries that are not less than any recoveries that could be obtained in a chapter 7 liquidation. For purposes of determining whether the Plan meets this requirement, the Liquidating Debtors and the Merging Debtors, in consultation with their financial advisors, have prepared an unaudited Liquidation Analysis for the Liquidating Debtors and the Merging Debtors, which is attached hereto as **Exhibit B**, to assist holders of Claims in evaluating the Plan. The Liquidation Analysis compares the projected creditor recoveries that would result from the liquidation of the Liquidating Debtors and the Merging Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to holders of Allowed Claims and Equity Interests under the Subplans for the Liquidating Debtors and the Merging Debtors. The Liquidation Analysis is based on the value of the Liquidating Debtors' and the Merging Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date. Further, the analysis is subject to potentially material changes, including with respect to economic and business conditions and legal rulings. Therefore, the actual liquidation value of Liquidating Debtors and the Merging Debtors could vary materially from the estimate provided in the Liquidation Analysis.

Underlying the Liquidation Analysis is a number of estimates and assumptions that, although developed and considered reasonable by the Liquidating Debtors and the Merging Debtors, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Liquidating Debtors and the Merging Debtors and their management. The Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are subject to change and significant economic and competitive uncertainties and contingencies beyond the control of the Liquidating Debtors and the Merging Debtors and their management. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the results of a liquidation of the Liquidating Debtors and the Merging Debtors. Accordingly, the values reflected might not be realized if the Liquidating Debtors and the Merging Debtors were, in fact, to be liquidated. The chapter 7 liquidation period for the Liquidating Debtors and the Merging Debtors is assumed to average three (3) months, following the appointment of a chapter 7 trustee, allowing for, among other things, the discontinuation and wind-down of operations, the sale of the operations, the sale of assets and the collection of receivables. All holders of Claims that are entitled to vote to accept or reject the Subplan(s) for the Liquidating Debtors and the Merging Debtors are urged to examine carefully all of the assumptions on which the Liquidation Analysis is based in connection with their evaluation of the Plan.

The Liquidating Debtors and the Merging Debtors believe that the Plan provides a greater recovery for holders of Allowed Claims and Equity Interests than would be achieved in

liquidation under chapter 7 of the Bankruptcy Code. This belief is based on a number of considerations, including: (a) the Liquidating Debtor's and the Merging Debtors' assets would have a substantially reduced value in a chapter 7 liquidation; (b) the Administrative Claims would significantly increase as a result of conversion to a chapter 7 case; (c) the delays caused by a chapter 7 liquidation; and, perhaps most importantly, (d) the Consultation Parties' consent to fund Cash distributions to junior Classes of Claims despite not being paid in full under the Plan on account of their Pre-Petition Secured Parties Secured Claims. The Liquidating Debtors and the Merging Debtors believe there is insufficient value to fund these Cash distributions to creditors in a chapter 7 liquidation.

**Section 19.06. Notice to Holders of Claims and Equity Interests**

Approval by the Bankruptcy Court of this Disclosure Statement means that the Bankruptcy Court has found that this Disclosure Statement contains information of a kind and in sufficient and adequate detail to enable holders of Claims entitled to vote on the Subplan(s) to make an informed judgment about whether to accept or reject the applicable Subplan(s). **THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR THEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.**

**IF THE PLAN IS APPROVED BY THE REQUISITE VOTE OF HOLDERS OF CLAIMS ENTITLED TO VOTE AND IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE LIQUIDATING DEBTORS AND THE MERGING DEBTORS, WHETHER OR NOT THEY WERE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN. THUS ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES, SUPPLEMENTS AND/OR EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.**

**THIS DISCLOSURE STATEMENT AND THE PLAN ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN.** No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Liquidating Debtors and the Merging Debtors other than the information contained herein or therein. No such information should be relied upon in making a determination to vote to accept or reject the Plan.

**ARTICLE XX**

**ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

If any Subplan(s) cannot be confirmed, the Liquidating Debtors and the Merging Debtors may seek to: (1) prepare and present to the Bankruptcy Court an alternative chapter 11 plan for confirmation; (2) pursue a chapter 7 liquidation; and/or (e) effect an alternative transaction, including, potentially, not opposing an attempt by the Pre-Petition Secured Parties to seek relief from the automatic stay to exercise their rights in their Collateral. Any attempt to formulate an alternative chapter 11 plan, or alternative relief, would necessarily delay creditors' receipt of distributions and, due to the incurrence of additional administrative expenses during such period of delay, may provide for smaller distributions to holders of Allowed Claims than are currently provided for under the Plan. Accordingly, the Liquidating Debtors and the Merging Debtors believe that the Plan will enable all creditors to realize the greatest possible recovery on their respective Claims or Equity Interests with the least delay.

**ARTICLE XXI**

**CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES**

The following discussion is a summary of certain material U.S. federal income tax consequences of the Consummation of the Plan to the Liquidating Debtors and the Merging Debtors and to certain holders of Allowed Claims. This summary is based on the Internal Revenue Code of 1986, as amended (the "***IRC***"), the Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the IRS and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Liquidating Debtors and the Merging Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed in this Disclosure Statement.

This discussion does not address the U.S. federal income tax consequences to holders of Allowed Claims that are (a) Unimpaired or otherwise entitled to payment in full in Cash on the Effective Date under the Plan, or (b) deemed to reject the Plan. For the avoidance of doubt, Allowed Claims include any Disputed Claim when such Claim becomes Allowed under the Plan.

The following discussion does not address the U.S. federal income tax consequences to holders of Allowed Claims that are not U.S. Holders. For purposes of this discussion, a "***U.S. Holder***" is a holder that is: (a) an individual citizen or resident of the United States for U.S. federal income tax purposes; (b) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof, or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (i) if a court within the

United States is able to exercise primary jurisdiction over the trust's administration and one or more U.S. persons have authority to control all substantial decisions of the trust or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person. This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Liquidating Debtors and the Merging Debtors or to certain holders of Allowed Claims in light of their individual circumstances, nor does it address tax issues with respect to such holders that are subject to special treatment under the U.S. federal income tax laws (including, without limitation, banks, governmental authorities or agencies, pass-through entities (such as partnerships or disregarded entities), brokers, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, mutual funds, small business investment companies, and regulated investment companies and those holding, or who will hold, Allowed Claims as part of a hedge, straddle, conversion, or constructive sale transaction).  Furthermore, the following discussion does not purport to address any aspect of state, local, estate, gift, foreign, or other tax law.  Lastly, the following discussion assumes (a) each holder of an Allowed Claim holds its Claim as a "capital asset" (generally, property held for investment) within the meaning of Section 1221 of the IRC, and (b) the debt obligations(s) underlying each Allowed Claim is properly treated as debt (rather than equity) of the related Liquidating Debtors and the Merging Debtors for U.S. federal income tax purposes.

If a holder is a partnership or a disregarded entity for U.S. federal income tax purposes, the tax treatment of a partner in or owner of such entity generally will depend upon the status of the partner or owner, and the activities of the entity.  Partners or owners of other pass-through entities that are holders of Allowed Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF A HOLDER OF AN ALLOWED CLAIM.  ALL HOLDERS OF ALLOWED CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, NON-U.S., AND OTHER TAX CONSEQUENCES OF THE PLAN.**

### Section 21.01. Certain Material U.S. Federal Income Tax Consequences to the Liquidating Debtors and the Merging Debtors

Each Liquidating Debtor and Merging Debtor is an entity disregarded as separate from its beneficial owner as determined for U.S. federal income tax purposes.  Accordingly, all assets and liabilities of each Liquidating Debtor and Merging Debtor are treated as assets and liabilities of its beneficial owner as determined for U.S. federal income tax purposes.  As such, the Liquidating Debtors and the Merging Debtors themselves are not subject to U.S. federal income tax, but rather operate as unincorporated divisions of their beneficial owners as determined for U.S. federal income tax purposes.  Each Liquidating Debtor's and Merging's Debtor taxable income (or loss) is included in the U.S. federal income tax return filed by its beneficial owner as determined for U.S. federal income tax purposes.  Consequently, the transactions contemplated by the Plan should be treated for U.S. federal income tax purposes as though they were effected

directly by the beneficial owners of the Liquidating Debtors and the Merging Debtors and should not have any U.S. federal income tax consequences to the Liquidating Debtors and the Merging Debtors.

**Section 21.02. Certain Material U.S. Federal Income Tax Consequences to U.S. Holders of Certain Allowed Claims and Disputed Claims**

    (a)    <u>Consequences to the U.S. Holders of Allowed Claims</u>

The discussion of certain material U.S. federal income tax consequences to the U.S. Holders of Allowed Claims in this Section 21.02(a) does not address the tax consequences of the Plan to holders of Allowed Claims who also own Equity Interests in the Liquidating Debtors and the Merging Debtors.

With respect to each U.S. Holder of an Allowed Claim, such U.S. Holder should recognize gain or loss equal to the difference between (i) Cash received in exchange for its Allowed Claims (other than any claim for accrued but unpaid interest and imputed interest) and (ii) such U.S. Holder's adjusted tax basis in the Allowed Claims surrendered by such U.S. Holder (other than basis attributable to accrued but unpaid interest previously included in the U.S. Holder's taxable income).

The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Allowed Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to its Allowed Claim.  See the discussions of "accrued interest" and "market discount" below.  Such gain may be long-term capital gain or loss if the Allowed Claim has been held for more than one year.  Each U.S. Holder of an Allowed Claim should consult its own tax advisor to determine the character of the gain or loss recognized.

    (b)    <u>Consequences to the U.S. Holders of Disputed Claims</u>

The Liquidating Debtors Claims Reserve will hold Cash sufficient to fund, among other things, the anticipated Allowed amount of Disputed Claims against the Liquidating Debtors and the Merging Debtors (the "***Liquidating Debtors Disputed Claims Reserve***").   Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Liquidating Debtors Disputed Claims Reserves is intended to be treated, for U.S. federal income tax purposes, as a disputed ownership fund within the meaning of Treasury Regulations Section 1.468B-9(b)(1).  If so treated, the Liquidating Debtors Disputed Claims Reserve will be subject to tax on its income as provided by the regulations governing disputed ownership funds.  A U.S. Holder of a Disputed Claim should not be deemed to receive any payment of Cash from the Liquidating Debtors Disputed Claims Reserve until, and then only to the extent that, Cash is transferred to such U.S. Holder in satisfaction of its Claim Allowed under the Plan.  At such time, such U.S. Holder should recognize gain or loss equal to the difference between (i) Cash received in exchange for its Claims allowed under the Plan (other than any claim for accrued but unpaid interest and imputed interest) and (ii) such U.S. Holder's adjusted tax basis in such Claims (other than basis attributable to accrued but unpaid interest previously included in the

U.S. Holder's taxable income).  Recipients of amounts from the Liquidating Debtors Disputed Claims Reserve should report these amounts consistently with the foregoing and should consult their tax advisors concerning the federal, state, local, and other tax consequences of the receipt of amounts from the Liquidating Debtors Disputed Claims Reserve.

(c)     Accrued Interest

A portion of the consideration received by the U.S. Holders of Allowed Claims may be attributable to accrued interest on such Allowed Claims.  Such amount may be taxable to that holder as interest income if such accrued interest has not been previously included in such U.S. Holder's gross income for U.S. federal income tax purposes.  Conversely, U.S. Holders of Allowed Claims may be able to recognize a deductible loss to the extent any accrued interest on the Allowed Claims was previously included in such U.S. Holder's gross income but was not paid in full by the Liquidating Debtors and the Merging Debtors.

If the fair market value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued interest is unclear.  Under Section 7.07 of the Plan, the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to accrued but unpaid interest on such Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for U.S. federal income tax purposes, however, the applicable Treasury Regulations generally treat payments as allocated first to any accrued but unpaid interest and then as a payment of principal.  The IRS could take the position that the consideration received by the U.S. Holder should be allocated other than as provided in the Plan.  U.S. Holders of Allowed Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

## Section 21.03. Market Discount

Under the "market discount" provisions of the IRC, some or all of any gain realized by a U.S. Holder of an Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" constituting the Allowed Claim.  In general, a debt instrument is considered to have been acquired by a U.S. Holder with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

## Section 21.04. Withholding

All distributions to U.S. Holders of Allowed Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding.  Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable backup withholding rate (currently 28%).

Backup withholding generally applies if the U.S. Holder (a) fails to furnish its social security number or other taxpayer identification number ("**TIN**"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is correct and that it is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF AN ALLOWED CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES.  ALL HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-US, OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## ARTICLE XXII

## CONCLUSION AND RECOMMENDATION

The Liquidating Debtors and the Merging Debtors believe that Confirmation and implementation of the Plan is preferable to any of the alternatives described herein because it will provide the greatest recovery to holders of Claims and Equity Interests.  Other alternatives would involve significant delay, erosion of value, uncertainty and substantial administrative costs and are likely to reduce any return to holders of Impaired Claims and Equity Interests.  The Liquidating Debtors and the Merging Debtors urge the holders of Claims entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by casting their Ballots as set forth in the instructions enclosed with the Ballots so that they will be received by the Voting Deadline.

Dated: August 21 , 2015
Wilmington, Delaware

Optim Energy, LLC

By: _____

Name: Nicholas R. Rahn

Title:  Chief Executive Officer


Optim Energy Marketing, LLC

By: _____

Name: Nicholas R. Rahn

Title:  Manager


OEM 1, LLC

By: _____

Name: Nicholas R. Rahn

Title:  Manager


Optim Energy Generation, LLC

By: _____

Name: Nicholas R. Rahn

Title:  Manager


Optim Energy Twin Oaks GP, LLC

By: _____

Name: Nicholas R. Rahn

Title:  Manager


Optim Energy Twin Oaks, LP

By Optim Energy Twin Oaks GP, LLC its General
Partner

By: _____

Name: Nicholas R. Rahn

Title:  Manager


*[Signature Page to Disclosure Statement for First Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code]*